United States District Court

For the Northern District of California

1

2

3 UNITED STATES DISTRICT COURT

4 NORTHERN DISTRICT OF CALIFORNIA

5

6

7 In re DYNAMIC RANDOM ACCESS
MEMORY (DRAM) ANTITRUST                    No. M 02-1486 PJH
LITIGATION

8 _____/         **ORDER GRANTING MOTION FOR**
                                           **CLASS CERTIFICATION**
9 This Document Relates to:

10 All Direct Purchaser Actions

11 _____/

12          Plaintiffs' motion for class certification came on for hearing before this court on May

13 17, 2006.  Plaintiffs appeared through their respective counsel, Anthony D. Shapiro,

14 George W. Sampson, Cadio Zirpoli, Fred T. Isquith, Clinton P. Walker, Bruce L. Simon,

15 Joseph J. Tabacco, Jr., and Terry Gross.  Defendants appeared through their counsel,

16 Ronald C. Redclay, Joel S. Sanders, Michael F. Tubach, Paul G. Griffin, Gary L. Halling,

17 Howard Ullman, Andrea P. DeShazo, Jonathan E. Schwartz, and Robert E. Freitas.

18 Having read the parties' papers and carefully considered their arguments and the relevant

19 legal authority, and good cause appearing, the court hereby GRANTS plaintiffs' motion for

20 class certification, for the reasons stated at the hearing and as follows.

21                              **BACKGROUND**

22          The instant multidistrict litigation stems from allegations of a price-fixing conspiracy

23 in the market for dynamic random access memory (DRAM).

24          A.      The DRAM Market

25          DRAM is an electronic microchip that is used to store digital information and provide

26 high-speed storage and retrieval of data.  It is commonly used in a wide assortment of

27 electronic devices, including personal computers, printers, digital cameras, and wireless

28 telephones.  DRAM is primarily sold in two forms, component and module, both of which

**United States District Court**
For the Northern District of California

1   come in different densities, speeds, and frequencies (e.g., 16, 64, 128, or 256 Mb).

2          The DRAM manufacturing market is primarily occupied by a handful of leading

3   manufacturers – namely, the defendants in the instant actions.[1]  For the years 2000-2002 –

4   during the relevant class period at issue – defendants' market share, for example,

5   exceeded 70%.

6          Defendants sell the DRAM they manufacture directly to various types of customers,

7   including both large scale and small scale customers, through a variety of sales channels.

8   The price they charge for DRAM depends on the particular sales channel through which

9   DRAM is sold and/or the type of customer to whom DRAM is sold.  Generally, defendants

10   have identified four major sales channels and/or customer groups through which and to

11   whom DRAM is sold:  (1) equipment manufacturer customers – including the major PC and

12   server manufacturers ("PC and Server OEMs") – who purchase DRAM from defendants

13   under long-term contracts, pursuant to which the pricing for DRAM is negotiated; (2)

14   franchise distributors that sell various electronic components to their customers, who

15   purchase DRAM from defendants under long-term distribution contracts, pursuant to which

16   pricing is initially based on established "book prices"; (3) smaller-volume customers who

17   purchase DRAM from defendants via negotiated one-time transactions known as "spot"

18   sales, in which price is negotiated individually through email or telephone contacts; and (4)

19   customers who purchase DRAM through defendant Micron's Crucial Technology, Inc.

20   ("Crucial") division, which offers online DRAM sales at prices set via price lists that

21   differentiate between customers according to customer classification - e.g., consumer,

22   business, reseller, or government/educational.

23   _____

24          [1]     Defendants are Micron Technology, Inc.; Micron Semiconductor Products, Inc.;
     Crucial Technology, Inc.; Infineon Technologies AG; Infineon Technologies North America
25   Corp.; Samsung Electronics Co., Ltd.; Samsung Semiconductor, Inc.; Mosel Vitelic
     Corporation; Mosel Vitelic Corporation (USA); Nanya Technology Corporation; Nanya
26   Technology Corporation USA; Winbond Electronics Corporation; Winbond Electronics
     Corporation America; Elpida Memory, Inc.; Elpida Memory (USA), Inc.; and NEC Electronics
27   America, Inc. (collectively "defendants").  Of these, all except for the Infineon, Samsung, and
     Hynix entity defendants, who have entered into settlements with plaintiffs, jointly oppose the
28   instant motion.

2

United States District Court

For the Northern District of California

1   All defendants therefore use two general pricing methods in making direct DRAM

2   sales to customers, contract pricing and spot pricing, while defendant Micron additionally

3   engages in direct sales to customers through its Crucial division.

4         B.      The DOJ Investigation

5         In or around 2002, the Antitrust Division of the Department of Justice ("DOJ") began

6   investigating several defendants' alleged participation in a global price-fixing conspiracy to

7   fix prices for the sale of DRAM.  As a result of the DOJ investigation, certain defendants

8   have pled guilty to criminal conspiracy violations of federal antitrust law.  Since 2003, for

9   example, at least three defendants and/or their agents have pled guilty to antitrust

10  conspiracy charges, and agreed to pay hefty criminal fines.

11        C.      The Instant Litigation

12        Plaintiffs, direct purchasers of DRAM who purchased DRAM from Micron's Crucial

13  division, filed their original class action lawsuit in the Southern District of New York on June

14  21, 2002, alleging federal antitrust violations by defendants.  That action, along with

15  numerous subsequently-filed actions, were later transferred to this court for consolidated

16  pre-trial proceedings, pursuant to the multidistrict litigation ("MDL") procedures set forth in

17  28 U.S.C. § 1407.  After the cases were transferred and consolidated, plaintiffs filed a

18  consolidated class action complaint on October 1, 2003.  The most recent iteration of

19  plaintiffs' complaint – the Third Consolidated Amended Class Action Complaint – was filed

20  on June 30, 2005.

21        Plaintiffs allege that defendants engaged in a global conspiracy to fix, raise, and

22  maintain prices for DRAM, in violation of section 1 of the Sherman Act, during the period

23  July 1, 1999 through June 30, 2002.  See, e.g.,Third Consolidated Amended Class Action

24  Complaint ("Complaint"), ¶¶ 2, 55, 61-65, 74.  As a result of the conspiracy, plaintiffs allege

25  that they were injured because they were forced to pay artificially inflated prices for DRAM.

26  See Complaint at ¶¶ 2, 65, 73-74.

27        Plaintiffs now move the court for class certification pursuant to Federal Rule of Civil

28

3

United States District Court
For the Northern District of California

1  Procedure 23, and seek certification of the following class:

2      All individuals and entities, who, during the period from April 1, 1999 to June
3      30, 2002, purchased DRAM in the United States directly from the
4      defendants or their subsidiaries.  Excluded from the class are defendants
       and their parents, subsidiaries, affiliates, all governmental entities, and co-
5      conspirators.

6      In the event the court grants class certification, plaintiffs also seek an order

7  appointing current co-lead counsel, as lead counsel for the class.

8                                  **DISCUSSION**

9      A.      Class Certification Standards

10     In order for a class action to be certified, plaintiffs must prove that they meet the

11  requirements of Federal Rule of Civil Procedure ("FRCP") 23(a) and (b).  Under FRCP

12  23(a), plaintiffs must satisfy four prerequisites.  First, the class must be so numerous that

13  joinder of all members individually is "impracticable."  See Fed. R. Civ. P. 23(a)(1).

14  Second, there must be questions of law or fact common to the class.  Fed. R. Civ. P.

15  23(a)(2).  Third, the claims or defenses of the class representative must be typical of the

16  claims or defenses of the class.  Fed. R. Civ. P. 23(a)(3).  And fourth, the person

17  representing the class must be able fairly and adequately to protect the interests of all

18  members of the class.  Fed. R. Civ. P. 23(a)(4).  In addition to demonstrating these

19  requirements, plaintiffs must also satisfy one of the requirements of FRCP 23(b).  In this

20  case, this requires proof that questions of law or fact common to the class predominate

21  over questions affecting the individual members, and on balance, that a class action is

22  superior to other methods available for adjudicating the controversy at issue.  See Fed. R.

23  Civ. P. 23(b)(3).

24     The court does not make a preliminary inquiry into the merits of plaintiffs' claims in

25  determining whether to certify a class.  See Eisen v. Carlisle & Jacquelin, 417 U.S. 156

26  (1974).  It will, however, scrutinize plaintiffs' legal causes of action to determine whether

27  they are suitable for resolution on a class wide basis.  See, e.g., Moore v. Hughes

28

                                        4

United States District Court

For the Northern District of California

1    Helicopters, Inc. 708 F.2d 475, 478 (9th Cir. 1983).  In doing so, the court must accept the

2    substantive allegations contained in plaintiffs' complaints as true, but will consider matters

3    beyond the pleadings in order to ascertain whether the asserted claims or defenses are

4    susceptible of resolution on a class wide basis.  See McCarthy v. Kleindienst, 741 F.2d

5    1406, 1419 n.8 (D.C. Cir. 1984).

6         Moreover, in antitrust actions such as this one, it has long been recognized that

7    class actions play an important role in the private enforcement of antitrust laws.  See

8    Hawaii v. Standard Oil Co., 405 U.S. 251, 262 (1972).  Accordingly, when courts are in

9    doubt as to whether certification is warranted, courts tend to favor class certification.  See,

10   e.g., In re Vitamins Antitrust Litig., 209 F.R.D. 251, 258 (D.C. Cir. 2002); In re Playmobil

11   Antitrust Litig., 35 F. Supp. 2d 231, 238 (E.D. N.Y. 1998).

12        B.      Federal Rule of Civil Procedure 23(a) Requirements

13             1.      Numerosity

14        FRCP 23(a)(1) requires that a class be so numerous that joinder of all members is

15   impracticable.  In order to satisfy this requirement, plaintiffs need not state the "exact"

16   number of potential class members, nor is there any specific magic number that is required.

17   See In re Rubber Chem. Antitrust Litig., 232 F.R.D. 346, 350-51 (N.D. Cal. 2005); In re

18   Bulk [Extruded] Graphite Prod. Antitrust Litig., 2006 WL 891362, *5  (D. N.J. 2006).  The

19   fact that a class is geographically dispersed, or class members difficult to identify, supports

20   class certification.  See In re Rubber Chem. Antitrust Litig., 232 F.R.D. at 350-51.

21        Here, plaintiffs estimate that the proposed class contains thousands of members

22   dispersed across the country.  In support of this estimation, plaintiffs point to one

23   defendant's customer list that names 173 customers, and another defendant's transaction

24   list that includes more than 7,000 sales transactions in 1999 alone.  See Declaration of

25   Guido Saveri in Support of Motion for Class Certification, Exs. J-K.  Defendants have not

26   disputed either this evidence, or that the class satisfies the numerosity requirement.

27        In view of the above, the court finds that plaintiffs have satisfied the numerosity

28

United States District Court

For the Northern District of California

1    requirement.

2              2.      Commonality

3         FRCP 23(a)(2) requires that there exist "questions of law or fact common to the

4    class."  Where an antitrust conspiracy has been alleged, courts have consistently held that

5    "the very nature of a conspiracy antitrust action compels a finding that common questions

6    of law and fact exist."  See In re Rubber Chem. Antitrust Litig., 232 F.R.D. at 351; In re Bulk

7    [Extruded] Graphite Prod. Antitrust Litig., 2006 WL 891362 at *5.

8         So here.  The existence, scope, and efficacy of the conspiracy to fix or stabilize

9    prices of DRAM sold in the United States are common questions that all plaintiffs must

10   address.  Defendants, for their part, do not dispute this.

11        Accordingly, the court finds that plaintiffs have satisfied the commonality requirement

12   of FRCP 23(a)(2).

13             3.      Typicality

14        FRCP 23(a)(3) also requires that the claims of the named plaintiffs be typical of

15   those of the class.  This does not require that the claims of the representative party be

16   identical to the claims of class members.  See, e.g., In re Playmobil Antitrust Litig., 35 F.

17   Supp. 2d at 242.  Rather, typicality results if the representative plaintiffs' claims "arise[]

18   from the same event, practice or course of conduct that gives rise to the claims of the

19   absent class members and if their claims are based on the same legal or remedial theory."

20   See In re Auction Houses Antitrust Litig., 193 F.R.D. 162, 164 (S.D. N.Y. 2000).  In

21   evaluating typicality, the court should consider whether the named plaintiffs' "individual

22   circumstances are markedly different or ... the legal theory upon which the claims are

23   based differs from that upon which the claims of other class members will perforce be

24   based."  See In re Bulk [Extruded] Graphite Prod. Antitrust Litig., 2006 WL 891362 at *5.  In

25   cases involving an alleged price-fixing conspiracy, the representative plaintiff's claim is

26   usually considered typical even though the plaintiff followed different purchasing

27   procedures, purchased in different quantities or at different prices, or purchased a different

28

United States District Court

For the Northern District of California

1  mix of products than did the members of the class.  See, e.g., In re Flat Glass Antitrust

2  Litig., 191 F.R.D. 472, 479 (W.D. Pa. 1999); In re Indus. Diamonds Antitrust Litig., 167

3  F.R.D. 374 (S.D. N.Y. 1996).

4      Plaintiffs argue that all members of the putative class purchased DRAM directly from

5  defendants, and that the claims of the proposed class are typical because they arise from

6  the same events or course of conduct (i.e., the conspiracy to fix and raise DRAM prices)

7  and are based on the same legal theory as the antitrust claims of other class members

8  (i.e., price-fixing conspiracy liability under Sherman Act section 1).  See Motion for Class

9  Certification at 13:13-16.  Specifically, plaintiffs argue that as a result of defendants'

10  participation in an overarching price-fixing conspiracy to fix the price for DRAM, all class

11  members paid artificially inflated prices for DRAM, regardless whether the DRAM was

12  bought through a negotiated contract, through a one time transaction on the spot market, or

13  through the Crucial website.

14      Defendants, for their part, make much of the fact that there are different types of

15  DRAM, different categories of customers that purchase DRAM, and different sales

16  channels through which those customers buy DRAM.  Yet, they argue, the representative

17  plaintiffs all belong only to that particular category of customers who purchased DRAM

18  directly through defendant Micron's online Crucial division.  This, defendants assert, makes

19  these named plaintiffs' claims atypical from the claims of other class members, who may

20  have purchased different types of DRAM through the other sales channels available to the

21  other categories of customers.

22      For support, defendants rely on Deiter v. Microsoft Corp., 436 F.3d 461, 466 (4th cir.

23  2006).  The Fourth Circuit affirmed the district court's decision to exclude from a certified

24  class those absent plaintiffs whose purchases of products were deemed to be sufficiently

25  different.  Specifically, the Fourth Circuit held that the claims of absent class members who

26  had negotiated individual application and operating software agreements with Microsoft

27  through a different online distribution division of Microsoft, were not typical of the claims

28

7

United States District Court

For the Northern District of California

1   asserted by the class members, who bought only operating software directly from Microsoft

2   online.  See id. at 465-66.  At first blush, this reasoning would seem to support defendants'

3   argument that no typicality should be found where, as here, there are different customer

4   classes and distribution systems for DRAM, as well as different types of DRAM.  However,

5   on closer look, Deiter is distinguishable.  It dealt with a section 2 monopolization claim.  As

6   such, proof of plaintiffs' claims did not depend on whether all defendants participated in the

7   same conspiracy, but rather on whether defendant possessed sufficient market power *in

8   the relevant market*.  See Deiter, 436 F.3d at 467.  Issues related to proof of the relevant

9   market depend on the particular categories of products and distribution channels at issue in

10   a way that proof of participation in a section 1 conspiracy does not.

11         Moreover, there is substantial legal authority holding in favor of a finding of typicality

12   in price fixing conspiracy cases, even where differences exist between plaintiffs and absent

13   class members with respect to pricing, products, and/or methods of purchasing products.

14   See, e.g., In re Vitamins Antitrust Litig., 209 F.R.D. at 260-61; In re Rubber Chem. Antitrust

15   Litig., 232 F.R.D. at 351; In re Bulk [Extruded] Graphite Prod. Antitrust Litig., 2006 WL

16   891362 at *6.  These cases recognize that, in conspiracy cases, plaintiffs' claims are typical

17   of the class because proof of their section 1 claim will depend on proof of violation *by*

18   *defendants*, and not on the individual positioning of the plaintiff.  See In re Vitamins

19   Antitrust Litig., 209 F.R.D. at 260.

20         Indeed, In re Bulk [Extruded] Graphite Products is particularly persuasive in this

21   regard.  In that case, as here, the court considered whether to certify a plaintiff class in an

22   antitrust price-fixing conspiracy case where the named plaintiffs represented only one

23   particular customer category (from among three) that had purchased bulk extruded

24   graphite from defendants.  Significantly, defendants there argued that the customer

25   category to which the named plaintiffs belonged – the "machine shop" customers – placed

26   them into a different "purchasing position" from the absent class members, which fact was

27   "evidenced by the differences in prices paid by machine shops, on one hand," and the

28

8

United States District Court

For the Northern District of California

1  remaining customer categories, on the other.  See 2006 WL 891362 at *6.  The court,

2  however, was unmoved by these arguments, stating that defendants had failed to

3  "demonstrate how the class representatives' *claims* are atypical....  That the proposed class

4  representatives had different purchasing positions from [other] class members does not

5  mean that the class representatives' claims are atypical, considering that all members of

6  the proposed plaintiffs' class have alleged that they purchased bulk extruded graphite from

7  the defendants at a price that was inflated as a result of the horizontal price-fixing

8  conspiracy."  See id.

9       So here.  The named plaintiffs' claims and the claims of absent class members *both*

10 depend on allegations that they purchased DRAM from defendants at a price that was

11 artificially inflated as a result of the alleged price-fixing conspiracy.  As such, the claims are

12 typical of each other, despite the differences in types of DRAM, customer categories (i.e.,

13 Crucial v. non-Crucial customer), and sales channels.

14      In short, and in view of the applicable legal authority, defendants have not

15 demonstrated that the named plaintiffs' claims here are atypical of the claims of the entire

16 proposed plaintiff class.  Accordingly, the court finds the typicality requirement satisfied.

17             4.    Adequacy

18      FRCP 23(a)(4) requires that the representative parties fairly and adequately protect

19 the interests of the class.  First, the adequacy requirement mandates that no conflicts of

20 interest exist between the named plaintiffs and the absent class members.  See, e.g., In re

21 Rubber Chem. Antitrust Litig., 232 F.R.D. at 351, citing Local Joint Exec. Bd. of

22 Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1162 (9th Cir.

23 2001).  Second, the adequacy requirement seeks to ensure that plaintiffs are represented

24 by "counsel of sufficient diligence and competence to fully litigate the claims."  See id.; see

25 also In re Linerboard Antitrust Litig., 203 F.R.D. 197, 207 (E.D. Pa. 2001).

26      Here, both requirements are met.  First, there are no discernible conflicts of interest

27 between the named plaintiffs and the absent class members: the named plaintiffs allege

28

9

United States District Court

For the Northern District of California

that all members of the proposed class paid artificially inflated prices as a result of

defendants' participation in a global price-fixing conspiracy during the relevant class period,

that all suffered similar injury as a consequence of the conspiracy, and that all seek the

same relief.  Second, all the evidence and the history of the instant litigation demonstrate

that plaintiffs have retained highly skilled and experienced counsel to represent them in

their proceedings against defendants.

Accordingly, and in view of the fact that defendants do not dispute this element of

certification, the court finds that the adequacy requirement has been satisfied.

C.      Federal Rule of Civil Procedure 23(b) Requirements

In addition to the requirements for class certification set forth in FRCP 23(a), the

court must determine whether the requirements of FRCP 23(b) have been satisfied – here,

whether (1) "questions of law or fact common to the members of the class predominate"

and (2) whether "a class action is superior to other available methods for the fair and

efficient adjudication of the controversy."  See Fed. R. Civ. P. 23(b)(3).  The parties dispute

both issues.

1.      Predominance

Predominance requires "that the common issues be both numerically and

qualitatively substantial in relation to the issues peculiar to individual class members."  See,

e.g., In re Bulk [Extruded] Graphite Prod. Antitrust Litig., 2006 WL 891362 at *9.  Generally

speaking, the test for predominance is met "when there exists generalized evidence which

proves or disproves an [issue or element] on a simultaneous, class-wide basis, since such

proof obviates the need to examine each class members' individual position."  See In re

Vitamins Antitrust Litig., 209 F.R.D. at 262.   In undertaking the predominance analysis,

courts must identify the issues involved in the case and determine which are subject to

"generalized proof," and which must be the subject of individualized proof.

There are three key elements of plaintiffs' section 1 claim for which plaintiffs must

establish the predominance of common issues:  (1) whether there was a conspiracy to fix

10

United States District Court

For the Northern District of California

1   prices in violation of the antitrust laws; (2) the fact of plaintiff's antitrust injury, or "impact" of

2   defendants' unlawful activity; and (3) the amount of damages sustained as a result of the

3   antitrust violations.  See In re Vitamins Antitrust Litig., 209 F.R.D. at 257.  As discussed

4   below, plaintiffs can establish predominance for all three.

5                                a.      antitrust violation

6          Common issues predominate in proving an antitrust violation "when the focus is on

7   the defendants' conduct and not on the conduct of the individual class members."  See,

8   e.g., In re Bulk [Extruded] Graphite Prod. Antitrust Litig., 2006 WL 891362 at *9; In re Flat

9   Glass Antitrust Litig., 191 F.R.D. at 484.  Courts have frequently found this standard

10  satisfied, however, in cases alleging price-fixing conspiracies.  See In re Bulk [Extruded]

11  Graphite Prod. Antitrust Litig., 2006 WL 891362 at *9 (whether a conspiracy exists is a

12  common question that predominates over other issues in the case and "has the effect of

13  satisfying the first prerequisite of FRCP 23(b)(3)").  This is because proof of an alleged

14  conspiracy and defendants' acts in furtherance of such conspiracy require common proof of

15  defendants' conduct.

16         So here.  Plaintiffs allege that defendants fixed, raised, stabilized, and maintained at

17  artificially high levels the prices they charged for DRAM sold in the United States.  See

18  Complaint at ¶¶ 2, 55, 61-65, 74.  To prove these violations, all class members must

19  establish that the defendants engaged in the conspiracy to fix prices in violation of section 1

20  of the Sherman Act.  This requires proof common to all plaintiffs.

21         Accordingly, the court finds that common issues predominate as to the element of

22  antitrust violation.

23                               b.      impact

24         Antitrust "impact" – also referred to as antitrust injury – is the "fact of damage" that

25  results from a violation of the antitrust laws.  See, e.g., In re Bulk [Extruded] Graphite Prod.

26  Antitrust Litig., 2006 WL 891362 at *10.  Proof of impact may be made on a common basis

27  "so long as the common proof adequately demonstrates some damage to each individual"

28

United States District Court
For the Northern District of California

1   member of the class.  See id.; see also Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454 (3d

2   Cir. 1977).  In other words, plaintiffs must establish, with generalized proof, that all

3   members of the class suffered damage as a result of defendants' alleged price-fixing

4   conspiracy.  Whether plaintiffs can do so here is disputed by the parties.

5          Preliminarily, plaintiffs contend that, since this is a case alleging a price-fixing

6   conspiracy, they are entitled to a presumption of impact.  They rely on the fact that many

7   courts have held, under similar factual scenarios, that common questions predominate

8   because "as a general rule, an illegal price-fixing scheme presumptively impacts upon all

9   purchasers of a price-fixed product in a conspiratorially affected market."  See, e.g., In re

10  Rubber Chem. Antitrust Litig., 232 F.R.D. at 352; In re Vitamins Antitrust Litig., 209 F.R.D.

11  251 at 262-63; In re Indus. Diamonds Antitrust Litig., 167 F.R.D. at 382; In re Linerboard

12  Antitrust Litig., 203 F.R.D. 197 at 217.  Defendants, for their part, challenge plaintiffs'

13  reliance on a presumption of impact, pointing out that other courts have "carefully

14  examine[d] the facts of each case in order to determine whether common proof of impact is

15  possible."  See, e.g., In re Rubber Chem. Antitrust Litig., 232 F.R.D. at 353; In re Citric

16  Acid Antitrust Litig., 1996 WL 655791, *7 (N.D. Cal. 1996); Windham v. Am. Brands, Inc.,

17  565 F.2d 59 (4th Cir. 1977).

18         As a practical matter, it makes little difference whether the court presumes impact or

19  not.  This is because the cases advanced by defendants requiring examination of the

20  underlying facts only require that plaintiffs "come forward with seemingly realistic

21  methodologies."  See id.; In re Indus. Diamonds Antitrust Litig., 167 F.R.D. at 382-84.  As

22  explained below, plaintiffs have done so here.

23         Plaintiffs have submitted the declaration of their expert, Dr. Roger G. Noll, a

24  professor of economics at Stanford University, who has examined the DRAM industry and

25  market to determine if plaintiffs would have suffered impact as a result of the alleged price-

26  fixing conspiracy.  See Expert Report of Roger G. Noll ("Noll Report").  Dr. Noll's report

27  assumes the truth of the conspiracy allegations and asserts the following:  that DRAM is a

28

commodity; that defendants possessed sufficient market power to raise prices (70%); that

the conditions in the market for DRAM are such that effective price-fixing with respect to

the sale of DRAM to some customers will raise the price of DRAM to other customers; and

that all prices for DRAM products were linked and closely correlated during the class period

in question, regardless of the type of DRAM purchased, customer category to whom DRAM

was sold, or manner in which DRAM was purchased.  See, e.g., Noll Report, ¶¶ 12, 16, 17,

19, 26, 53-54, 57.  Dr. Noll also provides three general methodologies for estimating the

actual difference between the collusive price and the "but for" price that class members

would have paid for DRAM absent the alleged conspiracy, and for measuring class-wide

impact (e.g., "before/after" comparison, "competitive yardstick" approach, and "competitive

operating margin" method).  Id. at ¶¶ 21.  Dr. Noll bases his analysis and conclusions on

actual market share estimates, review of contracts entered into between defendants and

various DRAM purchasers, industry and trade publications reflecting DRAM pricing

information, and actual sales and price data thus far produced in discovery.  Dr. Noll's

opinion is supported by charts, graphs, and data.  See Noll Report, Exs. 1-18.

Defendants, of course, dispute Dr. Noll's testimony.  They contend that the

complexity of the DRAM market, and the diversity of DRAM products and prices present

therein, makes common proof of impact impossible.  Specifically, defendants point to the

variations among the different types of DRAM (component v. module), the various

customer categories that utilize different types of DRAM for different purposes, and the

varying methods of purchasing DRAM (negotiated contract prices v. spot market

transactions).  See, e.g., Declaration of Michael Bokan; Declaration of Jeong Gyun Nam in

Opposition to Plaintiffs' Motion for Class Certification.  Defendants also utilize the testimony

of their own expert, Margaret E. Guerin-Calvert, to assert that these differences, when

properly taken into account, present a far more differentiated picture of the DRAM market –

one in which price is *not* correlated across product and customer class.  See, e.g., Expert

Report of Margaret E. Guerin-Calvert ("Guerin-Calvert Report"), ¶¶ 41-50.  Defendants

United States District Court

For the Northern District of California

1   claim that this differentiated picture of the market makes it impossible for the named

2   plaintiffs – who are Crucial purchasers – to prove that Crucial prices were impacted by the

3   alleged price-fixing conspiracy, let alone prove through generalized evidence that the prices

4   paid by the absent class members were so impacted.  See, e.g., id. at ¶¶ 35-36.

5        It must be remembered, however, that during the class certification stage, the court

6   must simply determine whether plaintiffs have made "a sufficient showing that the evidence

7   they intend to present concerning antitrust impact will be made using generalized proof

8   common to the class and that these common issues will predominate...".  See In re Bulk

9   [Extruded] Graphite Prod. Antitrust Litig., 2006 WL 891362 at *14.  The court cannot weigh

10  in on the merits of plaintiffs' substantive arguments, and must avoid engaging in a battle of

11  expert testimony.  See id.; see also In re Diamonds Antitrust Litig., 167 F.R.D. at 384 ("we

12  need not consider [defendants' expert affidavit] in detail, as it is for the jury to evaluate

13  conflicting evidence and determine the weight to give the experts' conclusions").  Plaintiffs

14  need only advance a plausible methodology to demonstrate that antitrust injury can be

15  proven on a class-wide basis.

16       Plaintiffs have done so here.  Dr. Noll's report, supported by actual publication,

17  market, and sales data produced thus far, provides an adequate basis from which to

18  conclude that the proof plaintiffs will adduce to establish defendants' conspiracy to fix

19  prices, and the resulting effect of the conspiracy on all prices paid for DRAM, would be

20  common to all class members.  Moreover, the analysis and methodologies highlighted

21  therein – the correlation analysis used to compare pricing data across products and

22  customers, and the three damage methodologies identified by Dr. Noll – have been upheld

23  by numerous courts.  See, e.g., In re Rubber Chem. Antitrust Litig., 232 F.R.D. at 353

24  (upholding correlation analysis); In re Citric Acid Antitrust Litig., 1996 WL 655791 at *7

25  (upholding before/after approach); In re Linerboard Antitrust Litig., 203 F.R.D. 197 at 220

26  (upholding "yardstick" approach").  Dr. Noll's report is further buttressed by affirmative

27  evidence supporting plaintiffs' position that the ultimate DRAM pricing paid by all members

28

14

United States District Court

For the Northern District of California

of the class was determined with reference to a "benchmark" spot price – namely, defendants' own documents declaring that all pricing is dependent on the spot price, and suggesting that contract prices were also dependent on the spot price.  See, e.g., Exs. 24 at ITNA00057445, 35 at HSA: KLAUSNER, R. 012104-05.  In view of these facts, the court finds that plaintiffs have made a "threshold showing" that common issues of impact predominate.  Even if not ultimately persuasive to a trier of fact, the evidence passes muster at the class certification stage.  Defendants' challenge to plaintiffs' evidence – while admittedly highlighting significant differences as to the methods of analyses used by the competing experts, and differing conclusions that might be reached as a result – goes to the merits of plaintiffs' case, and must therefore be left to the trier of fact.

Other courts have come to a similar conclusion.  In a number of price-fixing cases, courts have certified classes where plaintiffs have alleged that defendants conspired to set an artificially inflated base – or "benchmark" price – from which all other prices are triggered.  See, e.g., In re Vitamins Antitrust Litig., 209 F.R.D. at 266; In re Flat Glass Antitrust Litig., 191 F.R.D. at 486; In re Potash Antitrust Litig., 159 F.R.D. 682, 696 n. 19 (D. Minn. 1995); In re Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677, 696 (N.D. Ga. 1991).  Notably, classes were certified in these cases regardless whether some members of the class negotiated price individually, or whether – as here – differences among product type, customer class, and method of purchase existed.  See, e.g., In re Indus. Diamonds Antitrust Litig., 167 F.R.D. at 383; Arden Architectural Specialties v. Washington Mills Electro Minerals, 2002 WL 31421915, *9 (W.D. N.Y. 2002).

In sum, having found that plaintiffs have identified a valid methodology for determining impact on a class-wide basis, the court finds that the predominance requirement has been satisfied with regard to the second element of plaintiffs' claim.

c.     damages

Defendants also contend that individual issues predominate on the issue of damages.  They attack all three methodologies set forth by Dr. Noll as a means for proving

United States District Court

For the Northern District of California

1   damages on a class-wide level – the before/after method, the yardstick approach, and the

2   operating margin approach.  See, e.g., Noll Report, ¶ 58.  In order to attack Dr. Noll's

3   damages approach, defendants again rely on the Guerin-Calvert report.

4          Courts have held that, at the certification stage of an antitrust class action, plaintiffs

5   have "a limited burden with respect to showing that individual damages issues" do not

6   predominate.  See In re Rubber Chem. Antitrust Litig., 232 F.R.D. at 354; In re Potash

7   Antitrust Litig., 159 F.R.D. at 697.  Plaintiffs need not supply a "precise damage formula,"

8   but must simply offer a proposed method for determining damages that is not "so

9   insubstantial as to amount to no method at all."  See id.

10         As noted above in connection with the discussion on antitrust impact, plaintiffs have

11  met this burden here.  This is because, with respect to plaintiffs' methodologies and the

12  before/after and yardstick methodologies in particular, other courts have already upheld

13  them as valid means for proving damages on a class-wide basis, and this court has found

14  no reason to reject them at this stage of the proceedings.  See, e.g., In re Rubber Chem.

15  Antitrust Litig., 232 F.R.D. at 353; In re Citric Acid Antitrust Litig., 1996 WL 655791 at *7; In

16  re Linerboard Antitrust Litig., 203 F.R.D. 197, 220 (E.D. Pa. 2001).  Defendants, moreover,

17  do not actually dispute that these methodologies in and of themselves are improper as a

18  matter of law, although they take issue with Dr. Noll's application of the methodologies,

19  again arguing that the "variability" present in the DRAM market prevent the methodologies

20  from being workable on a generalized basis.

21         Again, however, the issues raised by defendants need not be decided at this stage

22  of the litigation.  While they may be properly used to attack the merits of Dr. Noll's damages

23  methodologies and computations at trial, they are insufficient to demand a finding that

24  individual issues predominate at the certification stage.  Furthermore, defendants ignore

25  that, even if some individual issues may arise in calculating damages, this fact alone does

26  not defeat class certification.  See In re Bulk [Extruded] Graphite Prod. Antitrust Litig., 2006

27  WL 891362 at *15.

28

16

United States District Court

For the Northern District of California

1    For these reasons, the court finds that individual issues do not predominate with

2    respect to plaintiffs' proof of the third and final element of their antitrust conspiracy claim.

3            2.        Superiority

4    FRCP 23(b)(3) permits class certification where "a class action is superior to other

5    available methods for the fair and efficient adjudication of the controversy."  Traditionally,

6    there have been four factors that the court looks at in evaluating the superiority

7    requirement: the individual interests of members of the class; the extent and nature of any

8    litigation concerning the controversy already commenced by or against members of the

9    class; the desirability of concentrating the litigation of the claims in the particular forum; and

10   the difficulties likely to be encountered in the management of a class action.  See FRCP

11   23(b).

12   Each of these elements is satisfied here.  As plaintiffs point out, and as already

13   discussed, common questions of law and fact unite all plaintiffs with respect to the nature,

14   scope, and impact of the alleged price-fixing conspiracy in question.  As such, it would be

15   unnecessarily duplicative, and judicially inefficient, for the court to mandate individual trials

16   as to each class member.[2]  Second, the instant actions have already been consolidated for

17   MDL purposes before this court, and the consolidated actions have been proceeding along

18   in smooth fashion for several years.  Indeed, given the purpose and function of MDL

19   proceedings, which is to streamline the prosecution of cases involving multiple actions and

20   parties, it is inconceivable that allowing a class action to proceed in such circumstances

21   would *not* promote manageability.  Third, and for these same reasons, concentrating the

22   litigation of all claims in the instant forum – which has already heard all pretrial proceedings

23   thus far – would further promote manageability and efficiency.  Finally, few difficulties are

24   _____

25       [2]       Defendants in part argue that a class action is not superior to other available
     methods because the larger sophisticated purchasers of DRAM – such as the major PC and
26   Server OEMs – could easily maintain their own independent actions against defendants. This
     argument, however, fails to take into account the fact that smaller purchasers, who might form
27   a large part of the proposed plaintiff class, could *not* easily defend their interests in separate
     actions, and would accordingly suffer prejudice.  For this reason, the argument is rejected as
28   a basis for denying the motion for class certification.

17

United States District Court

For the Northern District of California

1   likely to result from a decision to certify the instant class.  Indeed, the only difficulties likely

2   to be encountered in this case would result from not certifying the class, given the

3   incredible expenditure of time and resources that would result – from both the court's and

4   the parties' perspectives – in requiring each class member's action to proceed

5   independently.

6        For all these reasons, the court finds that a class action, under the circumstances

7   present here, is the most efficient and superior means of litigating the instant MDL

8   proceedings.

9        **C.    CONCLUSION**

10        In view of the court's resolution of each of the above issues, the court finds that

11  plaintiffs have met their burden of establishing all required elements for class certification.

12  Accordingly, plaintiffs' motion for class certification is GRANTED.

13        The court further GRANTS plaintiffs' request to appoint Saveri & Saveri, Inc.,

14  Hagens Berman Sobol Shapiro LLP, and Wolf, Haldenstein, Adler, Freeman & Herze as

15  class counsel.

16

17  **IT IS SO ORDERED.**

18  Dated: June 5, 2006

19                                        _____
                                          PHYLLIS J. HAMILTON
20                                        United States District Judge

21

22

23

24

25

26

27

28