REDACTED

1   ROBERT E. FREITAS (State Bar No. 80948)
    CYNTHIA WICKSTROM (State Bar No. 209320)
2   NA'IL BENJAMIN (State Bar No. 240354)
    ORRICK, HERRINGTON & SUTCLIFFE LLP
3   1000 Marsh Road
    Menlo Park, California 94025
4   Telephone:    650-614-7400
    Facsimile:    650-614-7401
5   E-Mail:       rfreitas@orrick.com
    E-Mail:       cwickstrom@orrick.com
6   E-Mail:       nbenjamin@orrick.com

7   HOWARD M. ULLMAN (State Bar No. 206760)
    E. ANNE HAWKINS (State Bar No. 209135)
8   ALEJANDRO T. VALLEJO (State Bar No. 224792)
    ORRICK, HERRINGTON & SUTCLIFFE LLP
9   405 Howard Street
    San Francisco, California 94105
10  Telephone:    415-773-5700
    Facsimile:    415-773-5759
11  E-Mail:       hullman@orrick.com
    E-Mail:       ahawkins@orrick.com
12  E-Mail:       avallejo@orrick.com

13  Attorneys for Defendants
    Nanya Technology Corporation and
14  Nanya Technology Corporation USA

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17                  SAN JOSE DIVISION

18  In re DYNAMIC RANDOM ACCESS          Case No.  M 02-1486 PJH
    MEMORY (DRAM) ANTITRUST
19  LITIGATION                           MDL No. 1486

20  This Document Relates to:            **NANYA TECHNOLOGY
                                         CORPORATION USA'S NOTICE OF
21       ALL ACTIONS                     MOTION AND MOTION FOR
                                         SUMMARY JUDGMENT;
22                                       MEMORANDUM IN SUPPORT
                                         THEREOF**
23
24                                       Date:       January 10, 2007
                                         Time:       9:00 a.m.
25                                       Ctrm.:      3
                                         Judge:      Hon. Phyllis J. Hamilton
26

27        **CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

28        **LODGED WITH THE COURT FOR FILING UNDER SEAL**

**HIGHLY CONFIDENTIAL, SUBJECT TO PROTECTIVE ORDER**

# TABLE OF CONTENTS

**Page**

I. BACKGROUND ................................................................................................ 1

II. THE PLAINTIFFS CANNOT PROVE THAT NTC USA ENGAGED IN PRICE FIXING ........................................................................................................ 5

III. NTC USA DID NOT ENGAGE IN ANY UNLAWFUL EXCHANGE OF PRICE INFORMATION ............................................................................................ 7

    A. The Plaintiffs Do Not Attempt To Establish That Any Communication Or Group Of Communications By NTC Resulted In A Forbidden Impact On Price ............................................................................................................ 9

    B. Price Impact Is Implausible Given NTC USA's Limited Market Share .............. 10

IV. NTC USA DID NOT PARTICIPATE IN A CONSPIRACY WITH OTHER DEFENDANTS .............................................................................................. 12

    A. The Claimed Conspiracy .................................................................................. 13

    B. Proof Of The Existence, Nature, And Scope Of The Alleged Conspiracy Is A Prerequisite To Liability ................................................................................ 13

    C. NTC USA Did Not Participate In The Conspiracy For Which The Plaintiffs Seek Damages ................................................................................................ 14

    D. The Theory That NTC USA Participated In A Conspiracy Is Highly Implausible ...................................................................................................... 15

    E. NTC USA Was Not Aware Of A "Global" Conspiracy ...................................... 15

    F. NTC USA Did Not Join A Conspiracy .............................................................. 16

V. THE PLAINTIFFS CANNOT FILL THE HOLES IN THEIR CASE ON THE BASIS OF THE INVOCATION OF THE FIFTH AMENDMENT BY THREE NTC USA EMPLOYEES ................................................................................ 17

VI. CONCLUSION ............................................................................................... 22

# TABLE OF AUTHORITIES

**FEDERAL CASES**

| | Page |
|---|---|
| *49er Chevrolet, Inc.* v. *General Motors Corp.*, 803 F.2d 1463 | 14 |
| *In re Baby Food Antitrust Litigation*, 166 F.3d 112 | 8, 9, 10, 20 |
| *Baxter* v. *Palmigiano*, 425 U.S. 308 | 17, 18, 20, 22 |
| *In re Citric Acid Litigation*, 191 F.3d 1090 | 17 |
| *Doe ex rel. Rudy-Glanzer* v. *Glanzer*, 232 F.3d 1258 | 18, 19, 20, 22 |
| *In re Flat Glass Antitrust Litigation*, 385 F.3d 350 | 10 |
| *Lefkowitz* v. *Cunningham*, 431 U.S. 801 | 17, 20, 21, 22 |
| *Lefkowitz* v. *Turley*, 414 U.S. 70 | 17 |
| *Maple Flooring Mfrs. Ass'n* v. *United States*, 268 U.S. 563 | 17 |
| *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574 | 15 |
| *Ralph C. Wilson Industries* v. *Chronicle Broadcasting Co.*, 794 F.2d 1359 (9th Cir. 1986) | 14 |
| *Supermarket of Homes, Inc.* v. *San Fernando Valley Bd. of Realtors*, 786 F.2d 1400 | 8 |
| *T.W. Electrical Service, Inc.* v. *Pacific Electrical Contractors Ass'n*, 809 F.2d 626 | 13 |
| *United States* v. *Citizens & Southern Nat'l Bank*, 422 U.S. 86 | 8 |
| *United States* v. *Container Corp. of America*, 393 U.S. 333 | 8, 12 |
| *Wilcox* v. *First Interstate Bank, N.A.*, 815 F.2d 522 | 8 |
| *United States* v. *United States Gypsum Corp* 438 U.S. 422 | 8 |

PLEASE TAKE NOTICE that on January 10, 2007, at 9:00 a.m., or as soon thereafter as this matter may be heard, in Courtroom 3 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, Nanya Technology Corporation USA ("NTC USA") will and hereby does, move this Court pursuant to Rule 56(b) of the Federal Rules of Civil Procedure for an Order for summary judgment in its favor.

This motion is made on the grounds that NTC USA is not liable to the Direct Purchaser Plaintiffs for price fixing or for any other unlawful activity alleged in the Third Consolidated Amended Class Action Complaint, there are no genuine issues of any material fact, and NTC USA is entitled to judgment as a matter of law. This motion is based upon this Notice, the accompanying memorandum of points and authorities, the declarations of Alan J. Cox, Ph.D., Vincent E. O'Brien, D.B.A., Kenneth M. Hurley, Na'il Benjamin, and Erin Blasquez, including all exhibits thereto, all pleadings and papers on file with the Court in this action, and any other or further evidence and arguments as may be presented at the hearing on this motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

NTC USA submits this memorandum in support of its motion for summary judgment against the direct purchaser class ("Direct Purchasers" or "Plaintiffs"). NTC USA is not liable to the Plaintiffs for price fixing or for any other unlawful activity alleged in the Third Consolidated Amended Class Action Complaint ("Complaint"), and NTC USA is therefore entitled to summary judgment.

## I.  BACKGROUND.

NTC USA is a California corporation based in Santa Clara and incorporated in 1997. NTC USA's business is the sale of DRAM manufactured by and purchased from its Taiwan-based parent corporation, Nanya Technology Corporation ("NTC"). NTC USA does not itself manufacture DRAM.

When NTC USA began selling DRAM in the late 1990s, it had no "contract" customers, such as Dell, Inc. ("Dell") Compaq Computer Corporation ("Compaq"), and the other large computer makers. NTC USA made spot market sales to brokers and other buyers. NTC USA planned, however, to enter the contract business and it became qualified with and made its

REDACTED

first sale to a major contract buyer, in 2001. Late in 2001, NTC USA made its first sales to Dell, its only significant contract customer during the Class Period. See Declaration of Kenneth M. Hurley ("Hurley Decl.") ¶ 7.

In April 1999, at the beginning of the Class Period, NTC and its affiliates were Declaration of Alan J. Cox, Ph.D. ("Cox Decl.") Ex. A (Cox Expert Report) 10. Through aggressive pricing and the investment of more than                in new production capacity, NTC and its affiliates substantially expanded their sales during the Class Period, but still had only a by the end of the Class Period. Id.

As a new entrant intent on substantially increasing its sales, NTC USA priced its products aggressively. Early in 2002, NTC USA orally committed that it would match the lowest price provided by any of Dell's major DRAM suppliers. As a result, NTC USA made no real pricing decisions in connection with its Dell business. At some point during the typically semi-monthly contract negotiations, Dell would advise NTC USA of the best price it received from a major supplier, and NTC USA would supply a portion of the Dell requirements at that price.

As of May 1, 2002, the relationship with Dell was formalized in a Strategic Alliance Agreement ("Alliance Agreement"), Hurley Decl. ¶ 7. A few weeks before the Alliance Agreement was signed, Dell founder and Chairman Michael Dell gave a speech in which he stated that his company had decided to establish a more substantial relationship with NTC to counter what Dell perceived as "cartel like" behavior by other suppliers.

Neither NTC USA nor any of its employees has been indicted or agreed to plead guilty to price fixing in connection with the ongoing investigation of alleged price fixing in the DRAM industry.

Like NTC, its parent company, NTC USA has served contention interrogatories and other written discovery requests designed to enable it to determine why, despite its late arrival in the contract market, small market share, and aggressive pricing that led to a very substantial increase in its market share, it has been accused of price fixing. The Direct Purchasers

REDACTED

1    declined to offer an explanation, relying instead on a group of documents labeled "Attachment

2    A," which supposedly reveal NTC USA's participation in a conspiracy, and "Attachment B,"

3    claimed to demonstrate the participation of the other defendants in conspiratorial conduct.[1]

4    Declaration of Erin Blasquez ("Blasquez Decl.") Exs. A-D.

5         The Plaintiff's expert disclosures were no more helpful.  Contrary to the

6    allegations of the Complaint, Professor Roger Noll, the Plaintiffs' liability expert, has

7    acknowledged that he has found no evidence of price fixing by the defendants.  Declaration of

8    Na'il Benjamin ("Benjamin Decl.") Ex. W (Noll Depo.) 164:3-17.  Moreover, although he claims

9    to have observed evidence of communications among the defendants on the prices they expected

10   to charge certain customers, Professor Noll has formed no opinions about the possible impact of

11   the communications on market prices.  Id.

12        Professor Noll's report did not include a mention of any documents suggesting

13   pricing communications by NTC USA until early 2001, almost two years into the Class Period.

14   He noted only one document evidencing any such discussions before Summer 2001, but the

15   document cited by Professor Noll does not actually reveal a communication, or suggest any

16   impact on the prices charged by NTC or anyone else.

17

18        In response, Professor Noll notes in his report,

19

20

21

22

23        Professor Noll does not mention any other pricing communications in which NTC

24   USA is said to have engaged, although, as noted below, he mentions a claim that Micron sought

25

26   [1] NTC USA's efforts to obtain additional information about the basis for the Plaintiffs' allegations continues.  The
     parties have met and conferred and further discussions are pending.

27

28   not become qualified at Compaq until the second half of 2001.  The quote that elicited the unfavorable comment was
     made in February 2001.                                                                         Jurley Decl. ¶ 4.  NTC USA did

REDACTED

1

2

3

4

5

6                                                         In various ways, the evidence

7    shows that the isolated price related communications in which NTC USA engaged had no effect

8    on the market price of DRAM and did not alter the pricing behavior of NTC USA or the

9    competing sellers with which it spoke.

10               Throughout the Class Period, NTC USA's market share was insubstantial, ranging

11   from                              the Class Period.  Cox Decl. Ex. A (Cox Expert Report)

12   10.  With this limited market penetration, NTC USA expert Alan Cox has explained, NTC USA

13   was simply not in a position to impact market prices.  Cox Decl. ¶ 10.  Dr. Cox's work

14                                                                                          le

15

16

17   USA in any collusive activity.  *Id.* ¶¶ 7-11.

18               The Plaintiffs' sole attempt to satisfy the crucial impact requirement essential both

19   to prove that an exchange of pricing information was unlawful, and to the recovery of damages by

20   the Plaintiffs, is based on the expert report of Dr. Paul Liu.  It is undisputed that Dr. Liu made no

21   examination of any NTC USA specific conduct, and there is therefore no possibility that the

22   Plaintiffs can avoid summary judgment by proving that NTC USA directly violated the law.

23   Rather than examine the facts specific to NTC USA or other defendants,

24

25                                                                          NTC USA

26   expert Vincent O'Brien has evaluated the damage model prepared by Dr. Liu and determined that

27   it is not reliable for various reasons.  See Declaration of Vincent E. O'Brien ("O'Brien Decl.").

28   This motion is not, however, based on the flaws in Dr. Liu's model.



Dr. Liu's model is relevant only if there is proof of an industry wide conspiracy of such a magnitude and nature that it might reasonably be thought to have caused a increase in the price paid for DRAM during the three sub-periods described by Dr. Liu. Dr. Liu assumes the existence of such a conspiracy on the basis of Professor Noll's liability report. Nothing from Dr. Liu or Professor Noll is sufficient, however, to raise an issue as to whether NTC USA was a party to such a massive conspiracy. Because the Plaintiffs' experts say nothing sufficient to suggest participation by NTC USA in the multi-year global conspiracy on which the Plaintiffs' damage case is based, and because there is no other evidence sufficient to necessitate a trial on any such proposition, NTC USA is entitled to summary judgment.

## II.   THE PLAINTIFFS CANNOT PROVE THAT NTC USA ENGAGED IN PRICE FIXING.

NTC USA believes that the Plaintiffs seek to impose liability on it based on allegations that NTC USA participated in the multi-year "global" conspiracy on which the damage case set forth in Dr. Liu's report depends. As discussed in Section IV below, NTC USA did not participate in a "global" conspiracy, and there is therefore no basis on which it can be held liable for the damages asserted in the Liu report. To the extent a narrower theory, based on specific actions allegedly undertaken by NTC USA, is alleged, there are two reasons why summary judgment is in order. NTC USA is entitled to summary judgment because (a) the Plaintiffs cannot prove that any damages are attributable to any actions of NTC USA and (b) NTC USA did not engage in any unlawful conduct.

The Complaint contains a series of conclusory allegations to the effect that the defendants have engaged in "price fixing," but the Plaintiffs have never offered any evidence to substantiate the suggestion that the defendants entered into agreements by which they collusively set the price of DRAM. Indeed, it is fair to say that the Plaintiffs have never explained the basis for the boilerplate accusation of price fixing, as noted by Micron expert Carl Shapiro.

Benjamin Decl. Ex. Z (Shapiro Expert Report) 19. Dr. Shapiro found ·



" *id.*, and Professor Noll, the Plaintiffs' liability expert, appears to concur. Professor Noll's expert report contains no mention of price agreements between or among the defendants, and Professor Noll admitted in his deposition that, like Dr. Shapiro, he found no evidence of price fixing. Benjamin Decl. Ex. W (Noll Depo.) 15:19-16:14.

Putting aside the Plaintiffs' failure to explain the basis for the claim of an industry wide agreement on price, and their apparent abandonment of the allegation of price fixing, it makes no sense to expect that a seller with the limited market share held by NTC USA during the Class Period would be a participant in a price fixing conspiracy. Professor Noll explains in his report that

Benjamin Decl. Ex. Y (Noll Expert Report) 7. In his deposition, Professor Noll suggested that at

Benjamin Decl. Ex. W (Noll Depo.) 183:16-22.

Given NTC USA's small market share, sellers participating in a pricing cartel would have no incentive to include NTC USA. As NTC USA expert Alan Cox has explained,

Decl. ¶ 11. *See also* Benjamin Decl. Ex. Z (Shapiro Expert Report ) 24. (

Dr. Cox has also explained why NTC USA would have no incentive to participate in a price fixing conspiracy.

REDACTED

Regardless of what economic theory might predict, the fact is that the plaintiffs have marshaled no evidence of price fixing by NTC USA. Indeed, to the extent there is evidence addressing the possibility of price fixing, the evidence shows that NTC USA did not agree with other DRAM sellers on the prices to be charged their customers. Professor Noll acknowledges the comment by Micron in its "Statement of Conduct" that Mr. Sadler

Benjamin Decl. Ex. Y (Noll Expert Report) 26-27, and he offers no suggestion that NTC USA agreed at any time with a competitor on the prices it would charge. NTC USA did not fix prices, and NTC USA is entitled to summary judgment if the Plaintiffs intend to try to prove the price fixing allegations of the Complaint.[3]

## III.   NTC USA DID NOT ENGAGE IN ANY UNLAWFUL EXCHANGE OF PRICE INFORMATION

Professor Noll's report and his deposition testimony suggest that the Plaintiffs have repudiated the broadly worded allegations of the Complaint about "agreements" among the defendants to fix prices or to reduce their production of DRAM. The Direct Purchasers appear instead to base their case on the contention that the defendants violated section 1 of the Sherman Act by engaging in the exchange of price information on an industry wide basis over a period of several years. This theory presents significant problems that the Plaintiffs cannot overcome.

---

[3] The Complaint also refers to alleged agreements by the defendants to restrict their output. NTC USA is not a manufacturer, so it could not have restricted production of DRAM, and NTC USA did not otherwise collusively reduce supply. NTC explains in its motion for summary judgment that NTC also did not engage in any collusive restriction of DRAM supply at any time.



1   Exchanges of price information, unlike actual agreements to fix prices, are not *per*

2   *se* illegal. *See* ABA Section of Antitrust Law, Antitrust Law Developments 93 (5th ed. 2002)

3   ("Information exchanges, or agreements to share information, are not in themselves illegal per se,

4   but are judged under the rule of reason.")  As the Supreme Court explained in *United States v.*

5   *United States Gypsum Corp.*:

6   The exchange of price data and other information among
    competitors does not invariably have anticompetitive effects;
7   indeed such practices can in certain circumstances increase
    economic efficiency and render markets more, rather than less,
8   competitive.  For this reason, we have held that such exchanges of
    information do not constitute a per se violation of the Sherman Act.
9

10  438 U.S. 422, 443 n.16 (1978); *see also United States v. Citizens & Southern Nat'l Bank*, 422

11  U.S. 86, 113 (1975) ("the dissemination of price information is not itself a per se violation of the

12  Sherman Act"); *United States v. Container Corp. of America*, 393 U.S. 333, 346 (1969) (Fortas,

13  J., concurring)); *id.* at 337 ("Price information exchanged in some markets may have no effect on

14  a truly competitive price.") (Fortas, J., concurring); *id.* at 340 ("This Court has refused to apply a

15  per se rule to exchanges of price and market information in the past.") (Marshall, J., dissenting);

16  *In re Baby Food Antitrust Litigation*, 166 F.3d 112, 118 (3d Cir. 1999) ("Exchanges of

17  information are not considered a per se violation . . . .") (quoting *Gypsum*); *Wilcox v. First*

18  *Interstate Bank, N.A.*, 815 F.2d 522, 526-27 (9th Cir. 1987); *Supermarket of Homes, Inc. v. San*

19  *Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1407 (9th Cir. 1986) ("Price information

20  published without 'plus factors,' which indicate an agreement, is judged under the rule of

21  reason.").  *See also* Benjamin Decl. Ex. Z (Shapiro Expert Report) 25 (

22

23

24

25  "Absent per se violation, proof is essential that the practice resulted in an

26  unreasonable restraint of trade." *Container Corp.*, 393 U.S. at 338-39 (Fortas, J., concurring).  In

27  the information exchange context, there can be no proof of an unreasonable restraint of trade

28  without proof that the exchange has resulted in an increase or stabilization of price that would not

1  have been present but for the exchange. *Baby Food*, 166 F.3d at 125 ("there must be evidence

2  that the exchange of information had an impact on pricing decisions").  The Plaintiffs cannot

3  prove that any communication in which NTC USA participated had an impact on the market price

4  of DRAM, or that the limited number of communications of which NTC USA has been accused

5  collectively had such an impact.  There is therefore no basis on which NTC USA can be held to

6  have violated section 1 by exchanging pricing information.

7     **A.   The Plaintiffs Do Not Attempt To Establish That Any Communication Or
          Group Of Communications By NTC Resulted In A Forbidden Impact On
8          Price.**

9        The pricing communications of which NTC USA is accused are limited in number

10  and sporadic.  Most of the sales employees of the other defendants have testified that they had no

11  pricing contact with NTC USA.  Messrs. Abbruzzese (Winbond), Addie (Micron), Bugee

12  (Infineon), Byrd (Hynix), Censullo (Micron), Chung (Hynix), Corwin (Infineon), Despotes

13  (Elpida), Florian (Infineon), Kim (Hynix), Ladd (NEC), Nam (Hynix), Ostberg (Micron),

14  Palonsky (Hynix), Panacci (Elpida), Peterson (Hynix), Suh (Hynix), Waddel (Micron), and Wahl

15  (Infineon), testified that they had no pricing communications with NTC USA.  Benjamin Decl.

16  Exs. A-S.  The Plaintiffs did not even bother to ask another nineteen deponents if they had

17  participated in pricing related communications with NTC USA.

18        Given the limited number of communications potentially in issue, it is difficult to

19  see how the Plaintiffs might try to construct an impact case, and there is no indication that they

20  have attempted to do so.  There is no hint in any of the submissions by the Plaintiffs or their

21  experts that they have made any attempt to prove that a given NTC USA communication or the

22  communications as a group resulted in an impact on market pricing.  Dr. Liu specifically

23  acknowledged that his damages work did not include any firm specific analysis, and his is the

24  only work that could conceivably support an impact case.  Benjamin Decl. Ex. X (Liu Depo.)

25  174:4-21.  Professor Noll did not engage in any general or specific causation analysis, and he also

26  confirmed that his only defendant specific work was to review documents and testimony for the

27  purpose of determining whether each defendant participated in pricing communications.

28  Benjamin Decl. Ex. W (Noll Depo.) 15:19-16:14; 162:23-163:15; 182:5-10.



1    Because they are thus unable to present evidence of price impact, the Plaintiffs

2  cannot prove that NTC USA violated section 1 by exchanging price information with

3  competitors.

4    **B.    Price Impact Is Implausible Given NTC USA's Limited Market Share.**

5    Summary judgment on any direct claims against NTC USA is proper not only

6  because the plaintiffs have no evidence of impact, but also because the economic evidence

7  provides no support for the idea that NTC USA could have influenced the price at which DRAM

8  was sold. As Dr. Cox explains,

9

10    . . .                                    Cox Decl. ¶ 9. Until 2001, NTC USA did not even have any

11  contract business. Even after NTC began to sell to OEMs, primarily Dell, it never achieved a

12  market share sufficient to enable it to affect the prices prevailing in the market.

13    Nor is there evidence of pervasive price communications, or evidence that NTC

14  USA senior management made a practice of instructing subordinate employees to gather pricing

15  information from, or to provide pricing information to, competitors. The parade of witnesses who

16  testified to the absence of communications with NTC USA shows that NTC USA did not

17  habitually discuss pricing with competitors, and there is no theory that would explain how a

18  modest number of communications by a minor player would impact market prices. Like the

19  plaintiffs in *Baby Food*, the Direct Purchasers cannot hope to be able to "correlate information

20  exchanges [in which NTC USA participated] with specific collusive behavior." *See In re Flat*

21  *Glass Antitrust Litigation*, 385 F.3d 350, 369 (3d Cir. 2004). There is nothing in the Exhibit A

22  documents or any other information the Plaintiffs have disclosed in discovery suggesting

23  anything close to such a possibility, and the direct evidence is to the contrary.

24    NTC USA President Ken Hurley was asked in his deposition whether

25  communications he had with two Micron employees caused NTC USA to raise its prices. Mr.

26  Hurley explained

27

28    . . .

REDACTED

Ex. T (Hurley Depo.) 74:1-13. Plaintiffs' counsel simply confirmed, but did not challenge, Mr. Hurley's testimony.

Other evidence shows the absence of a reason to believe that the limited contacts between NTC USA and its competitors caused an increase in NTC USA's prices, much less market prices as a whole. Dr. Liu's damages analysis for the Plaintiffs purports to demonstrate at the industry wide level that collusion among the defendants resulted in an increase in the price of DRAM over the price expected to prevail under competitive conditions. Dr. Liu prepared a "baseline" price and compared it to the actual average prices during the Class Period.

NTC USA expert Vincent O'Brien applied the Liu pricing model to NTC USA's prices, and determined that .

O'Brien Decl. ¶ 11. There is simply no evidence that NTC USA raised its prices as a result of a pricing contact with a competitor, and no basis on which the implausible hypothesis that information provided by or to NTC USA caused an increase in market prices could be sustained.

The Plaintiffs had ample opportunity to attempt to develop an impact case, but they did not make a serious effort in this regard. When they deposed Micron executive Steve Thorsen –

4

1   Decl. Ex. Y (Noll Expert Report) 26-27. When he was questioned about his conversations with

2   Mr. Thorsen, Mr. Hurley was not challenged with any documentary evidence suggesting that his

3   testimony regarding the absence of impact was inaccurate in any respect.

4           The *Gypsum* Court noted that in *Container* and other cases, section 1 violations

5   have been found on the basis of exchanges of current price information, and the exchange of

6   information of this type can result in higher prices in some circumstances. Mere proof of an

7   exchange is not sufficient, however. There is no evidence that any of the communications in

8   which NTC USA is alleged to have participated resulted in any impact.

9           Receiving and acting upon price information provided by a customer is not only

10  not *per se* illegal, it is not illegal at all. *Container*, 393 U.S. 333, 346 n.4 ("It should be noted

11  that, in most cases, this information was obtained from a customer rather than a competitor, a

12  practice the Government does not condemn.") In virtually any commercial transaction, a seller

13  must interact with its customer about price, and it is common that price negotiations include

14  discussion by the customer about pricing it has been offered by the seller's competitors. When a

15  seller acts on such information, the concerted action required for a violation of section 1 is absent.

16  Rather than a "contract, combination, or conspiracy" between or among competing sellers, there

17  is nothing more than ordinary give and take between buyer and seller. Thus, NTC USA's

18  agreement to match the lowest price offered by Dell's major suppliers was entirely lawful and the

19  receipt of the pricing information provided by Dell that was necessary to NTC USA's

20  performance under the agreement was similarly unassailable. The added step involved in the

21  occasional efforts to verify the information provided by Dell had no effect on the prices Dell paid

22  to any seller, and there is no therefore no possibility that the Plaintiffs could prove that NTC USA

23  violated section 1 on the occasions on which it discussed pricing with Micron.

24  **IV.    NTC USA DID NOT PARTICIPATE IN A CONSPIRACY WITH OTHER**
25  **        DEFENDANTS.**

26          Because they are unable to prove that NTC USA directly violated section 1, or that

27  any damages were caused by any actions taken by NTC USA, the Plaintiffs can avoid summary

28  judgment only if they can prove that NTC USA is vicariously liable for the acts of other

REDACTED

1  defendants as a co-conspirator. Here, also, the Plaintiffs fail.

2  **A.     The Claimed Conspiracy.**

3           As NTC has pointed out in support of its motion for summary judgment, there is a

4  conflict between the broad allegations of the Complaint and the conspiracy theory that appears to

5  be set forth in Professor Noll's report. NTC USA believes, based on Professor Noll's deposition

6  testimony, that the conspiracy alleged is an industry wide (or at ............................

7

8  involving the exchange of price information, as opposed to actual agreement on price. NTC USA

9  notes that the Plaintiffs have not, however, formally withdrawn the allegations of price fixing.

10  **B.     Proof Of The Existence, Nature, And Scope Of The Alleged Conspiracy Is A**
11  **Prerequisite To Liability.**

12           Whatever they have in mind, the Plaintiffs will not be able to avoid summary

13  judgment unless they can offer evidence sufficient to prove the existence of the specific

14  conspiracy they allege and further to prove that NTC USA both knew of and manifested a

15  conscious commitment to join the conspiracy. "The first step in a §1 analysis is to determine the

16  identity of the alleged conspirators and the content of the alleged conspiracy." *T.W. Electrical*

17  *Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 632 (9th Cir. 1987). *See* 6

18  Areeda & Hovenkamp, Antitrust Law ¶ 1401 at 6 ("As an obvious initial step, the court must pin

19  down the subject matter and parties of the alleged agreement and then focus on the proof of that

20  agreement rather than on some other meeting of the minds."); *id.* ¶ 1405 at 21 ("Perhaps the most

21  frequent operational question encountered by an antitrust court is whether a conspiracy claim is

22  sufficiently supported to require a trial and, if so, to be submitted to the jury. Obviously, neither

23  question can be answered without first defining the nature of the conspiracy and the permissible

24  grounds for inferring its existence.") To avoid confusion, it is essential to "ask precisely (1) who

25  was in agreement with whom and (2) about what?" *Id.* ¶ 1409 at 54.

26           It bears repeating that Dr. Liu's damage study necessitates proof of an industry

27  wide, or at least substantially industry wide, conspiracy. As Plaintiffs' expert Professor Noll

28  explains in his report,

1                                                                          1. *See* Benjamin Decl. Ex. Y

2  (Noll Expert Report) 7,

3

4                                     Benjamin Decl. Ex AA (Liu Expert Report) 22.

5          NTC USA assumes for purposes of this motion that it is accused of participating in

6  a conspiracy including all or substantially all of its competitors.  Based on the Noll report and

7  Noll deposition testimony, NTC USA understands the purpose of the conspiracy to have been the

8  exchange of information about current pricing, rather than actual agreement on price.  Whether

9  the alleged purpose was price fixing (as alleged in the Complaint) or information exchange (as

10  suggested by Professor Noll), the Plaintiffs cannot prove that NTC USA joined or participated in

11  a conspiracy.

12  **C.**      **NTC USA Did Not Participate In The Conspiracy For Which The Plaintiffs**

13           **Seek Damages.**

14          NTC USA can be held liable as a co-conspirator only if the Plaintiffs prove that it

15  had "a conscious commitment to a common scheme designed to achieve an unlawful objective."

16  *49er Chevrolet, Inc. v. General Motors Corp.*, 803 F.2d 1463, 1467 (9th Cir. 1986) (citing *Ralph*

17  *C. Wilson Industries v. Chronicle* Broadcasting *Co.*, 794 F.2d 1359, 1365 (9th Cir. 1986)) (citing

18  *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3rd Cir. 1980)).  To do so,

19  the Plaintiffs must not only prove the existence, nature, and membership of the alleged

20  conspiracy, they must establish that NTC USA knew of the conspiracy and gave its "conscious

21  commitment" thereto.  The Plaintiffs cannot meet this burden, and they do not have any evidence

22  sufficient to require a trial on this issue.

23          There is no direct evidence that NTC USA joined a conspiracy.  There are no

24  "smoking guns" in which NTC USA acknowledges an unlawful scheme or offers to engage in

25  illegal behavior or help others who are doing so.  Evidence of conspiratorial behavior is so

26  lacking that Professor Noll refers to a

27                                                               As discussed above, there is no

28  evidence that NTC USA violated the law in any of its dealings with competitors, and the

1   Plaintiffs have cited no documents or testimony sufficient to allow the leap to a conclusion that

2   NTC USA manifested a "conscious commitment" to an industry wide scheme to violate the law.

3   See Hurley Decl. ¶ 9.

### D.   The Theory That NTC USA Participated In A Conspiracy Is Highly Implausible.

6          NTC explains in its motion for summary judgment that the economic theory

7   behind any claim that NTC or NTC USA participated in a price fixing, information exchange, or

8   output reduction conspiracy is so implausible as to fall outside of the range of inferences that are

9   permissible in antitrust cases.  Professor Noll expresses no substantial disagreement with the

10  opinion of NTC USA expert Alan Cox that the circumstances are such that the members of a

11  conspiracy of the type claimed by the Plaintiffs and NTC and NTC USA would not have any

12  reason to believe that the participation of NTC or NTC USA would be necessary to successful

13  collusion.  See Cox Decl. ¶¶ 10-11.

14          The theory that NTC USA participated in a price fixing or information exchange

15  conspiracy "simply makes no economic sense," *Matsushita Elec. Indus. Co. v. Zenith Radio*

16  *Corp.*, 475 U.S. 574, 587 (1986), and cannot provide a basis for the denial of summary judgment

17  in the absence of "more persuasive evidence . . . than would otherwise be necessary." *Id.*

18  Because there is no such evidence, NTC USA is entitled to summary judgment.

### E.   NTC USA Was Not Aware Of A "Global" Conspiracy.

20          The simple fact is that NTC USA was never aware of the existence of an industry

21  wide conspiracy.  Hurley Decl. ¶ 9.  NTC USA was not told that the other DRAM

22  manufacturers/sellers were engaged in price fixing or group wide information exchange, and it

23  did not itself engage in those practices.  The Plaintiffs have not cited any evidence that NTC USA

24  was informed of the existence of the industry wide conspiracy they allege.  As already noted,

25  NTC USA never made a price fixing agreement with any of its competitors, and it never engaged

26  in any unlawful exchange of pricing information. *Id.*  Any claim of knowledge of or knowing

27  participation in a conspiracy has no basis.

28          Plaintiffs cannot establish that NTC USA joined a conspiracy without first

showing that NTC USA was aware of the existence of the conspiracy and of its nature and purpose. Without proof that NTC USA knew of the existence of a global conspiracy, the Plaintiffs cannot hope to prove that NTC USA knowingly participated in a conspiracy.

**F.      NTC USA Did Not Join A Conspiracy.**

There is no direct evidence that NTC USA joined a conspiracy, and the circumstantial evidence points strongly in the other direction. *See* Hurley Decl. ¶ 6, 7. Throughout the Class Period, NTC made major investments in capacity and increased its output of DRAM. Cox Decl. ¶¶ 6, 14. NTC USA expanded its market share and priced its products aggressively. NTC USA's prices were *lower* during the damage period than predicted by the pricing model on which the Plaintiffs' damage case is based. O'Brien Decl. ¶ 11. NTC USA and its parent company consistently acted in a manner consistent with their unilateral self interest as they increased production and gained additional market share at the expense of their competitors.

Evidence that NTC USA engaged in occasional discussions with competitors that cannot be proved to have been illegal is not sufficient to support a finding that NTC USA joined a conspiracy. First, the evidence of pricing communications is not sufficient to prove price fixing, to the extent that remains relevant.

> [T]he existence of meetings or phone conversations among the defendants does not warrant the inference that they agreed about prices, terms of dealing with the plaintiff, or any other subject matter even if such subjects were discussed. Most courts correctly hold that such meetings or conversations merely amount to the opportunity to conspire about the subject matter alleged by the plaintiff and that such opportunities do not warrant the inference of a conspiracy about the alleged subject matter.

6 Areeda & Hovenkamp ¶ 1406a at 24. Evidence of sporadic information gathering or exchange is not itself illegal, and the case law recognizes that activity of this nature is not sufficient to support a conspiracy finding.

> We have little trouble concluding that the first three pieces of evidence do not tend to exclude the possibility of legitimate behavior. Gathering information about pricing and competition in the industry is standard fare for trade associations. If we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action. As the Supreme Court has recognized, however, trade associations often

serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services.

*In re Citric Acid Litigation*, 191 F.3d 1090, 1098 (9th Cir. 1999) (citing *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 567 (1925)). To prove that NTC USA joined a conspiracy, the Plaintiffs must prove more than that NTC USA participated in pricing communications that are not themselves illegal.

**V.      THE PLAINTIFFS CANNOT FILL THE HOLES IN THEIR CASE ON THE BASIS OF THE INVOCATION OF THE FIFTH AMENDMENT BY THREE NTC USA EMPLOYEES.**

Unable to prove that NTC USA engaged in illegal conduct or knowingly joined a conspiracy pursuant to which others did so, the Direct Purchasers will attempt to keep their case alive by advocating the adoption of "adverse inferences" as a substitute for evidence because two employees (Brian Donahue and David Dwyer) and one former employee (Michael Walsh) of NTC USA who are represented by independent counsel invoked their Fifth Amendment rights against self incrimination in their depositions in this case. Although the Fifth Amendment is not a complete bar to an adverse inference in a civil case in all circumstances, no relevant adverse inference is proper in this case, and no permissible inference is sufficient to raise an issue of fact requiring a trial.

*Baxter v. Palmigiano*, 425 U.S. 308 (1976), stands for the proposition that in a civil or administrative proceeding, an adverse inference based on a witness's invocation of his of her Fifth Amendment privilege against self incrimination is permissible in some circumstances. The Supreme Court has made it clear, however, that the Fifth Amendment is violated when a "refusal to waive the Fifth Amendment privilege leads automatically and without more to imposition of sanctions." *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977) (loss of political party office); *see also Lefkowitz v. Turley*, 414 U.S. 70, 83-85 (1973) (threat of termination of employment). Accordingly, a careful consideration of the relevant facts and circumstances is required, and a court is required to take steps to ensure that any inference that is allowed is limited in a manner appropriate to the specific matters at issue. As the Ninth Circuit

1  explained in *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1265 (9th Cir. 2000), the

2  "tension" between an invoking witness's Fifth Amendment rights and an adversary's right to a

3  fair proceeding "is resolved by analyzing each instance where the adverse inference was drawn,

4  or not drawn, on a case-by-case basis under the microscope of the circumstances of that particular

5  civil litigation." "In each particular circumstance, the competing interests of the party asserting

6  the privilege, and the party against whom the privilege is invoked must be carefully balanced."

7  *Id.*

8           The Ninth Circuit also explained the central focus of the inquiry in *Doe*.

9           The *Baxter* holding is not a blanket rule that allows adverse
           inferences to be drawn from invocations of the privilege against
10          self-incrimination under all circumstances in the civil context.
           Rather, lower courts interpreting *Baxter* have been uniform in
11          suggesting that the key to the *Baxter* holding is that such adverse
           inference can only be drawn when independent evidence exists of
12          the fact to which the party refuses to answer. Thus, an adverse
           inference can be drawn when silence is countered by *independent*
13          *evidence* of the fact being questioned, but that same inference
           cannot be drawn when, for example, silence is the answer to an
14          allegation contained in a complaint. In such instances, when there
           is no corroborating evidence to support the fact under inquiry, the
15          proponent of the fact must come forward with evidence to support
           the allegation, otherwise no negative inference will be permitted.

16

17  232 F.3d 1258, 1264 (9th Cir. 2000) (citations omitted). The corroboration requirement is

18  meaningful. When an inference is sought, the proponent of the inference must "offer some other

19  proof that such an event occurred." *Id.* at 1266.

20           Two other points are especially important in the balance required by *Doe*.

21           Because the privilege is constitutionally based, the detriment to the
           party asserting [the privilege] should be no more than is necessary
22          to prevent unfair prejudice to the other side.

23  *Id.* at 1265 (quoting *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 192 (3d Cir. 1994)). Thus, no

24  generic inferences of wrongdoing are permissible. Any inference that might be drawn must be

25  narrowly tailored to the information denied the opposing party as a result of a witness's

26  invocation of the Fifth Amendment. Because "in a civil case, the Fifth Amendment's protections

27  against self-incrimination are invoked on a question-by-question basis, and therefore the assertion

28  of the privilege necessarily attaches only to the question being asked and the information being

1  sought by that particular question," *id.* (citing *United States v. Rendahl*, 746 F.2d 553, at 555 (9th

2  Cir. 1984)), a court must measure the specifics of the adverse inference requested against the

3  precise details of each question not answered on the basis of the Fifth Amendment.  In this case,

4  for example, the law would not allow a generic inference that NTC USA engaged in price fixing

5  simply because an employee or former employee invoked the Fifth Amendment in response to a

6  general question about NTC USA's pricing practices.

7  　　　　The Ninth Circuit illustrated this point in *Doe*.  If a defendant was asked, the Court

8  explained, "did you ever pick up the gun," and corroborating evidence demonstrated that the

9  defendant's fingerprints were found on the gun, the jury would be permitted to infer from the

10  defendant's silence that he or she had picked up the gun.  *Id.* at 1266 n.2.  The jury could not be

11  instructed, however, "that the defendant fired the gun, or that he disposed of the gun at the crime

12  scene."  *Id.*  Allowing the additional conclusions "would be constructing an inference on another

13  inference," and would not be proper in the absence of additional specific questions and the

14  existence of additional corroborating evidence.  *Id.*

15  　　　　Also to avoid unnecessary infringement of the Fifth Amendment privilege, no

16  adverse inference is permissible unless the proponent of the inference can prove that it has truly

17  been deprived of significant information as a result of the invocation of the privilege against self-

18  incrimination.

19  　　　　[N]o negative inference can be drawn against a civil litigant's
　　　　assertion of his privilege against self-incrimination unless there is a
20  　　　　substantial need for the information and there is not another less
　　　　burdensome way of obtaining that information.
21

22  *Id.*  Here, for example, NTC USA President Ken Hurley gave a deposition and did not invoke the

23  Fifth Amendment in response to a single question.  Similarly, Charles Kau, a member of the NTC

24  USA Board of Directors during the Class Period who was also involved in pricing decisions,

25  testified and did not invoke the Fifth Amendment. [5]  If they were genuinely interested in learning

26  about NTC USA's pricing practices, the Plaintiffs had the opportunity to obtain the important

27

28  　[5] Jih Lien and Dr. Y.S. Chuang also served on the NTC USA board during the Class Period.  Hurley Decl. ¶ 10.  The
plaintiffs never asked for a deposition of Dr. Lien or Mr. Chuang.

1   information from Mr. Hurley or Mr. Kau. It is therefore difficult to understand why the refusal of

2   the sales people who worked under Mr. Hurley to answer questions would give rise to a need

3   sufficient to justify a relevant adverse inference.

4           The Plaintiffs had other means available as well. For the most part, if the Plaintiffs

5   wanted to know whether there was a communication between NTC USA and a competitor, they

6   could ask the employees of the competitor. They could, and did, take the depositions of dozens

7   of employees of co-defendants. As noted above, the testimony of most of those witnesses

8   established that there were no pricing communications between NTC USA and them. Even in the

9   case of the few employees of other companies who also invoked the Fifth Amendment, the

10  Plaintiffs have other means to gather any information of significance.

11          This is true, in part, because of the limits of the substantive law. First, as the Third

12  Circuit noted in *Baby Food*, "[e]vidence of sporadic exchanges of shop talk among field sales

13  representatives who lack pricing authority is insufficient to survive summary judgment." 166

14  F.3d at 125 (citation omitted). The Plaintiffs cannot demonstrate a need for information about the

15  details of communications that might have taken place between Mr. Donahue, Mr. Dwyer, and

16  Mr. Walsh and competitors because the evidence of what these employees "who lack pricing

17  authority" might have said or heard cannot establish a violation of the law. Moreover, what they

18  said or heard, but did not report to Mr. Hurley, could not have any significance in proving a

19  violation of section 1. The Plaintiffs had a full and fair opportunity to ask Mr. Hurley what he

20  was told by the invoking witnesses and to inspect documents they sent or received. The Plaintiffs

21  took advantage of this opportunity in Mr. Hurley's deposition. Benjamin Decl. Ex. T (Hurley

22  Depo.) 166:23-167:11; 174:22-175:3; 176:16-25; 219:6-12.

23          In addition, no inference based on the invocation of the Fifth Amendment by the

24  employees working under Mr. Hurley can be sufficient to survive summary judgment because no

25  inference of the impact on market prices necessary to establish an information exchange violation

26  of section 1 is possible under *Doe* and the other cases applying *Baxter* and *Cunningham*.

27          None of the invoking witnesses is competent to answer a question inquiring about

28  the effect of conversations in which he possibly engaged on pricing in the DRAM market.

Whether such an impact occurred is beyond the personal knowledge of these employees. Because the Plaintiffs were not deprived of evidence that would establish market wide impact, they are not entitled to an inference of such impact as a matter of law.

The Plaintiffs cannot even justify an inference that the price offered by NTC USA or a competitor was raised as a result of a conversation with a competitor. The Plaintiffs have access to the transactional records of NTC USA and its competitors, and they have access to many other documents showing how the transactions were negotiated. In addition, if they had a genuine suspicion that a pricing communication took place and a good faith reason to believe that the conversation had meaningful impact, they could have taken the deposition of the customer. The Indirect Purchaser plaintiffs have served document subpoenas on numerous direct purchasers of DRAM, and this week they noticed the depositions of 14 direct purchasers. The Direct Purchasers could have done the same.

The limitations of the law are important to avoid the "automatic" forfeiture of legal rights condemned in *Lefkowitz v. Cunningham*, and to avoid the type of gamesmanship practiced by the Plaintiffs in this case. Rather than target their inquiries to the invoking witnesses to questions for which there was a good faith basis and as to which a legitimate claim of need might be made, the Plaintiffs attempted indiscriminately to "make a record" that would provide a basis for an attempt to garner an inference that might provide a substitute for the evidence the Plaintiffs know they cannot produce. In the deposition of Michael Walsh, for example, having been extended the courtesy of pre-deposition notice that Mr. Walsh would invoke the Fifth Amendment, the Plaintiffs posed a series of questions in which they suggested to Mr. Walsh that he had discussed pricing with numerous people. Mr. Walsh was read a laundry list of 24 names and asked leading questions asserting that he talked with each of these people about pricing. No matter how prolific a schmoozer Mr. Walsh might have been, it is simply not possible that he talked with all of the people identified in the Plaintiffs' questions, or that he had price related discussions with them. Had he done so, Mr. Hurley or Mr. Kau would have known about it, and the paper trail at NTC USA would have been very different than it was.

1    *Baxter*, *Cunningham*, *Doe* and the other cases do not allow a litigant to turn the

2    careful balance required by the law into a game whereby suggestions for which there is no basis

3    become the foundation for inferences that are used to defeat a motion for summary judgment.

4    The evidence will not allow the Plaintiffs to raise an issue requiring a trial on the question of

5    whether NTC USA is liable for price fixing, collusive output reduction, or the unlawful exchange

6    of pricing information, and the law will not allow them to overcome the failure of their proof with

7    inferences unsupported by corroborating evidence and unjustified by genuine need.

8    **VI.       CONCLUSION.**

9                For the foregoing reasons, NTC USA respectfully requests that its motion for

10   summary judgment be granted.

11

12   Dated: October 13, 2006              ROBERT E. FREITAS
                                          HOWARD M. ULLMAN
13                                        CYNTHIA WICKSTROM
                                          E. ANNE HAWKINS
14                                        NA'IL BENJAMIN
                                          ALEJANDRO T. VALLEJO
15                                        ORRICK, HERRINGTON & SUTCLIFFE LLP

16

17                                                    /s/ Robert E. Freitas /s/
                                          _____
18                                                   Robert E. Freitas
                                                  Attorneys for Defendants
19                                            Nanya Technology Corporation and
                                             Nanya Technology Corporation USA

20

21

22

23

24

25

26

27

28