UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re DYNAMIC RANDOM ACCESS
MEMORY (DRAM) ANTITRUST
LITIGATION
_____/

This Document Relates to:

All Direct Purchaser Actions
_____/

No. M 02-1486 PJH

**ORDER GRANTING SUMMARY
JUDGMENT IN PART AND
DENYING SUMMARY JUDGMENT
IN PART**

Defendants' motions for summary judgment came on for hearing on January 10, 2007 before this court. Plaintiffs, the direct purchaser class ("plaintiffs"), appeared through their class counsel, Guido Saveri, Anthony Shapiro, Fred T. Isquith, R. Alexander Saveri, Frank A. Bottini, Bruce L. Simon, George W. Sampson, Geoffrey C. Rushing, and Clinton P. Walker. Defendants appeared through their counsel, Paul R. Griffin, Robert B. Pringle, Robert E. Freitas, Na'il Benjamin, Howard Ullman, Joel S. Sanders, Ronald C. Redcay, William M. Goodman, Stephen V. Bomse, Harrison J. Frahn, William S. Farmer, and Steven H. Morrissett. Having read all the papers submitted and carefully considered the relevant legal authority, the court hereby GRANTS the motions for summary judgment in part and DENIES the motions for summary judgment in part, for the reasons stated at the hearing, and as follows.

## BACKGROUND

The instant action is part of a larger multidistrict litigation proceeding, and arises under section 1 of the Sherman Act.

A.    Background Facts

Dynamic random access memory ("DRAM") is an electronic memory microchip that

**United States District Court**
For the Northern District of California

1   is used to store digital information and provide high-speed storage and retrieval of data.

2   DRAM is commonly used in a wide assortment of electronic devices, including personal

3   computers, printers, digital cameras, and wireless telephones.  It is also the most common

4   kind of random access memory chip sold in both new computers and computer upgrades in

5   the United States.  DRAM is primarily sold in two forms, component and module, both of

6   which come in different densities, speeds, and frequencies.  The defendants[1] in the instant

7   action are all engaged in the manufacture and/or sale of DRAM on the worldwide market.

8   Collectively, they are the leading manufacturers of DRAM, and control the majority of the

9   DRAM market.

10       Beginning in May 2002, the Antitrust Division of the Department of Justice ("DOJ")

11  began investigating the existence of price-fixing in the DRAM industry – specifically, the

12  existence of a conspiracy to restrict supply and raise prices for DRAM among the largest

13  makers and sellers of DRAM globally.  Several defendants were targeted by the DOJ as

14  part of this larger investigation.  As a result of the investigation, four defendants – Infineon,

15  Hynix, Samsung, and Elpida – have pled guilty to participation in a price-fixing conspiracy

16  in violation of federal antitrust law.  In addition, several of their employees and agents have

17  also pled guilty to criminal antitrust violations, and have been sentenced accordingly.

18       B.      The Instant Action

19       On June 21, 2002, on the heels of the DOJ's antitrust investigation, plaintiffs filed a

20

21       [1]      Defendants are: Micron Technology, Inc., and Micron Semiconductor Products,
Inc. (collectively "Micron"); Infineon Technologies AG, and Infineon Technologies North
22  America Corp. (collectively "Infineon"); Hynix Semiconductor, Inc., and Hynix Semiconductor
America, Inc. (collectively "Hynix"); Samsung Electronics Co., Ltd., and Samsung
23  Semiconductor, Inc. (collectively "Samsung"); Mosel-Vitelic Corporation, and Mosel-Vitelic
Corporation (USA)(collectively "Mosel-Vitelic"); Nanya Technology Corporation, and Nanya
24  Technology Corporation USA ("NTC" and "NTC USA," respectively); Winbond Electronics
Corporation, and Winbond Electronics Corporation America (collectively "Winbond"); Elpida
25  Memory, Inc., and Elpida Memory (USA) Inc. (collectively "Elpida"); and NEC Electronics
America, Inc. ("NEC").  To date, however, seven of these nine defendant groupings have
26  entered into settlement agreements with plaintiffs.  Accordingly, only two defendant entities
remain, and proceed before the court here on the instant motions for summary judgment –
27  Nanya, and Mosel-Vitelic.

28

**United States District Court**
For the Northern District of California

class action lawsuit in the Southern District of New York, alleging federal antitrust violations

by defendants.  Plaintiffs are a class comprised of all persons and/or entities who

purchased DRAM in the United States market directly from defendants during the period

April 1, 1999 through June 30, 2002 (the "class period").  The original action, along with

numerous subsequently-filed actions, was later transferred to this court for consolidated

pre-trial proceedings, pursuant to the multidistrict litigation ("MDL") procedures set forth in

28 U.S.C. § 1407.  After the cases were transferred and consolidated, plaintiffs filed a

consolidated class action complaint on October 1, 2003.  The most recent and operative

complaint – the Third Consolidated Amended Class Action Complaint – was filed on June

30, 2005.

        In their complaint, plaintiffs generally allege that defendants engaged in a global

conspiracy to "fix, raise, maintain and stabilize the prices of, and/or allocate the market for,

DRAM they sold in the United States" during the class period, and that plaintiffs were

injured by this activity when they were forced to pay artificially inflated prices for DRAM.

See, e.g.,Third Consolidated Amended Class Action Complaint ("Complaint"), ¶¶ 2, 55, 61-

65, 73-74.  As part of that conspiracy, plaintiffs allege that the defendants participated in

meetings and conversations to discuss the price of DRAM; agreed to manipulate prices and

supply so as to boost sagging DRAM sales; issued price announcements and price

quotations in accordance with the agreements reached by defendants; and sold DRAM to

customers in the United States at non-competitive prices.  See id. at ¶ 64.

        Now post-discovery, plaintiffs present these allegations in more concrete form.  In

sum, they assert that defendants effectuated the alleged price-fixing conspiracy in two

ways: first, plaintiffs allege that defendants coordinated an industry-wide reduction in

DRAM production, or else created the appearance of such a reduction, in order create an

artificial DRAM shortage that would ultimately drive up the price of DRAM on the US

market.  See, e.g., Pl. Opp. Br. re Nanya MSJ at 2:23-3:8.  Second, plaintiffs contend that,

in connection with creating a supply shortage that would have the effect of increasing the

United States District Court

For the Northern District of California

1   market price for DRAM, the defendants coordinated with each other – through frequent

2   high-level communications and meetings – to raise and keep the DRAM prices artificially

3   high to all DRAM purchasers.  See id. at 3:9-16.  All these actions, assert plaintiffs, resulted

4   in harm to DRAM purchasers, and render defendants liable to those purchasers under the

5   Sherman Act.

6           C.      The Instant Motions

7           The remaining defendants in this action now move for summary judgment.  There

8   are four motions in total, as follows:  (1) Nanya Technology Corporation's ("NTC") motion to

9   determine liability under the Sherman Act; (2) Nanya Technology Corporation USA's ("NTC

10  USA") companion motion to determine liability under the Sherman Act; (3) defendants'

11  motion for partial summary judgment based on pre-existing cost-plus contract purchases;

12  and (4) defendants' motion for partial summary judgment based on DRAM purchases from

13  April 1, 2001 to November 30, 2001.  In addition, the parties have both filed motions to seal

14  certain documents.

15                                      **DISCUSSION**

16          A.      Summary Judgment Standard

17          Generally speaking, normal summary judgment standards apply.  That is to say,

18  summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

19  interrogatories, and admissions on file, together with the affidavits, if any, show that there is

20  no genuine issue as to any material fact and that the moving party is entitled to a judgment

21  as a matter of law."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The court

22  must view the facts in the light most favorable to the non-moving party and give it the

23  benefit of all reasonable inferences to be drawn from those facts.  Matsushita Elec. Indus.

24  Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

25          Where, as here, concerted price-fixing is alleged, the plaintiffs bear the ultimate

26  burden of presenting sufficient evidence to prove that an agreement to fix prices existed.

27  See, e.g., In re Citric Acid Litig., 191 F.3d 1090, 1093 (9th Cir. 1999)(noting that price-fixing

28

                                            4

**United States District Court**
For the Northern District of California

1  is a per se violation of section 1 of the Sherman Act).  In order for them to survive

2  defendants' motion for summary judgment, therefore, plaintiffs must establish that there is

3  a genuine issue of material fact as to whether defendants entered into an illegal conspiracy

4  that caused respondents to suffer a cognizable injury.  See Matsushita, 475 U.S. at 585-86.

5  Plaintiffs can establish a genuine issue of material fact by producing either direct evidence

6  that defendants participated in an agreement to fix prices, or circumstantial evidence from

7  which a reasonable fact finder could conclude the same.  See, e.g.,Movie 1 & 2 v. United

8  Artists Commc'ns, 909 F.2d 1245, 1251-52 (9th Cir. 1990); United States v. Gen. Motors

9  Corp., 384 U.S. 127, 142-43 (1966).

10      With respect to proof by way of circumstantial evidence in section 1 cases, special

11  rules apply.  In Matsushita Elec. Indus. Co., the Supreme Court noted that "antitrust law

12  limits the range of permissible inferences from ambiguous evidence in a [section 1] case...".

13  See 475 U.S. at 588.  In addressing plaintiff's burden in proving that an issue of material

14  fact exists on the conspiracy question, the court stated, "conduct as consistent with

15  permissible competition as with illegal conspiracy does not, standing alone, support an

16  inference of antitrust conspiracy...".  See id.  In sum, to survive a motion for summary

17  judgment, "a plaintiff seeking damages for a violation of [section] 1 must present evidence

18  'that tends to exclude the possibility' that the alleged conspirators acted independently ...."

19  Id.

20      The Ninth Circuit has embraced Matsushita and has outlined a two-part test to be

21  applied whenever a plaintiff rests its case entirely on circumstantial evidence.  First, the

22  defendant can rebut an allegation of conspiracy by showing a plausible and justifiable

23  reason for its conduct that is consistent with proper business practice.  Second, the burden

24  then "shifts back to the plaintiff to provide specific evidence tending to show that the

25  defendant was not engaging in permissible competitive behavior."  See, e.g., In re Citric

26  Acid Litig., 191 F.3d at 1094.

27      These standards apply here, to the extent that plaintiffs seek to defeat summary

28

5

**United States District Court**
For the Northern District of California

1  judgment as to section 1 liability on the basis of circumstantial evidence, whether in whole

2  or in part.

3      The court now turns to the four summary judgment motions before it, and addresses

4  each in turn.

5      B.     NTC's Motion for Summary Judgment

6      NTC attacks plaintiffs' ability to prove that NTC – as distinguished from its

7  subsidiary, NTC USA – is liable for participation in any agreement to fix prices, reduce

8  output, or engage in any other prohibited activity under section 1 of the Sherman Act.

9  Focusing on its own conduct, NTC argues that plaintiffs cannot prove either (1) that NTC

10  itself is guilty of any unlawful activity, or (2) that NTC is guilty as a co-conspirator, by virtue

11  of its' participation in *other* defendants' unlawful activities.  In response, plaintiffs marshal

12  what they claim is both direct and circumstantial evidence of NTC's participation in the

13  alleged section 1 conspiracy.

14      Regardless of the parties' differing characterizations of their arguments – i.e.,

15  conduct v. nature of evidentiary proof – the fundamental issue raised by the parties is the

16  same:  whether there is sufficient direct and/or circumstantial evidence to create a triable

17  issue of fact as to whether NTC participated in the alleged conspiracy to "fix", via output

18  reduction and/or price manipulation, the market for DRAM.  In analyzing this issue, the

19  court must consider: (1) the preliminary issue whether plaintiffs may attempt to create a

20  triable issue as to NTC's participation in the overarching conspiracy vis-a-vis NTC's

21  relationship with its wholly owned subsidiary, NTC USA; (2) the direct evidence of NTC's

22  participation in the alleged conspiracy; and (3) the circumstantial evidence of NTC's

23  participation in the same.

24      1.     NTC's Vicarious Liability Based on Relationship with NTC USA

25      NTC claims that it has a separate legal existence from its wholly owned subsidiary,

26  NTC USA, and that NTC has not engaged in any direct sales of DRAM within the United

27  States since 1998, the year after NTC USA was incorporated.  See Declaration of Kenneth

28

**United States District Court**
For the Northern District of California

1   M. Hurley ("Hurley Decl."), ¶ 2.  In view of this distinction, NTC asserts that plaintiffs cannot

2   offer evidence of NTC USA's conduct in attempting to create a material dispute with

3   respect to NTC's participation in any unlawful activity.  See NTC MSJ Op. Br. at 4:18-7:14.

4   Specifically, NTC argues:  (1) that under principles of basic corporate law, a parent

5   corporation is not liable for the acts of its subsidiary; (2) that plaintiffs have not and cannot

6   establish liability through an alter ego theory; (3) that vicarious liability also may not be

7   established through the "single entity" doctrine applicable to antitrust cases; and (4) that,

8   even assuming that NTC USA participated in any unlawful acts, there is no evidence that

9   NTC knowingly participated in those unlawful acts.  Plaintiffs challenge these contentions,

10  asserting that the evidence of NTC's individual participation in the alleged conspiracy is

11  plentiful, but even if it weren't, NTC could still be found vicariously liable based on NTC

12  USA's conduct, since NTC is the alter ego and marketing conduit for NTC USA.

13      First, NTC is generally correct that corporate law prohibits a parent corporation from

14  being held liable on the basis of its subsidiary's actions.  See, e.g., U.S. v. Bestfoods, 524

15  U.S. 51 (1998)("It is a general principle of corporate law deeply 'ingrained in our economic

16  and legal systems' that a parent corporation (so-called because of control through

17  ownership of another corporation's stock) is not liable for the acts of its subsidiaries.").

18  However, a parent corporation *may* be held liable for the acts of its subsidiary "where stock

19  ownership has been resorted to, not for the purpose of participating in the affairs of a

20  corporation in the normal and usual manner, but for the purpose of controlling a subsidiary

21  company so that it may be used as a mere agency or instrumentality of the owning

22  company."  See id. at 62-63.  Accordingly, NTC may be held vicariously liable for NTC

23  USA's actions, but only if plaintiffs can establish that NTC USA is a mere 'agency or

24  instrumentality' of NTC's.

25      This brings the court to NTC's second argument, for plaintiffs have chosen to rely on

26  the alter-ego doctrine as an independent theory that would justify the imposition of vicarious

27  liability here.  In order to prove that the alter-ego theory applies, plaintiffs must show that

28

United States District Court
For the Northern District of California

1   there is "such unity of interest and ownership that the separate personalities [of the two

2   entities] no longer exist." See Doe v. Unocal Corp., 248 F.3d 915 (9th Cir. 2001).  An alter

3   ego or agency relationship is specifically proven up by facts that demonstrate "parental

4   control of the subsidiary's internal affairs or daily operations." See Doe, 248 F.3d at 927

5   (alter ego test also satisfied where the record indicates that the parent dictates "[e]very

6   facet [of the subsidiary's] business - from broad policy decisions to routine matters of day-

7   to-day operation [.]").

8        Here, plaintiffs attempt to satisfy the alter-ego test by showing that NTC had full

9   operational control over NTC USA and owned 100% of its stock; that NTC manufactured all

10  the DRAM sold by NTC USA; that certain of NTC USA's officers reported directly to NTC;

11  that two of the three directors on NTC USA's board of directors were from NTC; that NTC

12  had ultimate authority over, and made, all of NTC USA's pricing decisions; and that NTC

13  was merely NTC USA's "marketing conduit" during the alleged time period.  See Opp. Br. at

14  32:23-33:7.

15       The undisputed evidence that plaintiffs rely on, however, discloses only that NTC

16  USA's president, Kenneth Hurley, reported directly to NTC officers; that NTC USA's

17  executives had orders not to deviate from pricing policies set by NTC; and that NTC in fact

18  set the pricing policies that drove NTC USA's DRAM prices.  See Declaration of George

19  Sampson in Support of Oppositions ("Sampson Decl."), Exs. 104 at 22:13-16, 23:17-19,

20  24:18-27:24; 105 at 14; see also Plaintiffs' Slide Presentation in Opp. to NTC MSJ at 36.

21  Even combining this evidence with NTC's undisputed evidence that NTC USA is, in fact,

22  wholly owned by NTC, this evidence is insufficient to prove that NTC USA is NTC's alter

23  ego.  See, e.g., Hurley Decl., ¶ 1.  This is because the evidence as a whole does not

24  sufficiently speak to whether NTC actually controls the day to day operations and internal

25  affairs of NTC USA, even if NTC does control decisions regarding pricing, nor does it

26  demonstrate that NTC dictates "every facet of NTC USA's business."  In the absence of

27  evidence establishing these factors, the alter ego theory is unavailable to plaintiffs as a

28

United States District Court

For the Northern District of California

1  means of holding NTC vicariously liable for NTC USA's actions.[2]

2      Nor can plaintiffs demonstrate NTC's liability on the basis of NTC USA's conduct

3  through application of the single entity doctrine.  That doctrine, announced in <u>Copperweld</u>

4  <u>Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 771 (1984), holds that parent and

5  subsidiary corporations are to be considered a single collective entity for purposes of

6  conspiracy liability under section 1 of the Sherman Act, and as such, they are incapable of

7  conspiring together under the Act.  The doctrine, however, is inapplicable here.  Although it

8  deals with the question whether a parent and subsidiary corporation may be charged with

9  conspiring with each other, it says nothing about whether a parent and subsidiary may,

10  collectively or individually, be charged with conspiring with *other* unaffiliated members of an

11  alleged conspiracy.  That is the issue before this court.  As such, the doctrine cannot be

12  used to invoke NTC's liability with respect to the global conspiracy alleged by plaintiffs.

13      Finally, NTC argues that no liability can possibly exist via NTC USA, because there

14  are no ties connecting NTC to any unlawful activity by NTC USA, to the extent NTC USA

15  engaged in such activity.  NTC USA acted independently, posits NTC, and without NTC's

16  participation.  In making this argument, NTC preemptively targets the deposition testimony

17  of Steven Hsu, an NTC USA employee, arguing that his testimony  – which confirms NTC's

18  influence over NTC USA's pricing policies – cannot be used to demonstrate NTC's

19  participation in NTC USA's allegedly unlawful activity.  Plaintiffs, for their part, fail to rebut

20  NTC's argument in this regard, and they rely on Hsu's testimony for proof of alter ego

21  liability only.  In the absence of argument by plaintiffs, the court finds, as NTC urges, that

22  Mr. Hsu's testimony standing alone does not form the basis for vicarious liability.

23

24      [2]    Plaintiffs also drop a footnote in their opposition brief, and further argued at the
hearing on this matter, that NTC "could also be held vicariously liable for the acts of [NTC USA]

25  under an agency theory," as distinguished from an alter ego theory.  <u>See</u> Opp. Br. at 33 fn. 27.
Plaintiffs cited no evidence in support of this assertion, however, relying only on the bald

26  assumption that "without [NTC USA], the parent company [NTC] would have to perform" the
marketing and sales functions that Nanya USA engages in.  Such conclusory argument, with

27  no supporting evidence, is unpersuasive, and the court declines plaintiffs' invitation to find an
agency theory of liability applicable to NTC on the record before it.

28

United States District Court

For the Northern District of California

In conclusion, the court finds that plaintiffs have not created a triable issue of material fact with respect to NTC's vicarious liability for the overarching conspiracy alleged by plaintiffs, on the basis of its relationship with NTC USA. NTC's participation in the alleged overarching conspiracy must be independently proven, either through direct or circumstantial evidence.

## 2.   Direct Evidence of Conspiracy

NTC asserts that there is a general absence of any evidence proving that it (a) participated in a price-fixing agreement with other defendants; (b) reduced its DRAM output in order to drive up prices for DRAM; or (c) engaged in any exchange of price information with any competitor that resulted in an increase or stabilization of market prices.[3] See NTC Op. Br. at 8-13. Plaintiffs, however, assert that there is sufficient direct evidence of NTC's participation in the alleged conspiracy to raise a genuine issue of material fact on the issue. See In re Citric Acid Litig., 191 F.3d at 1093 (where a plaintiff produces direct evidence that a defendant entered into an illegal price-fixing agreement, summary judgment will be denied).

Direct evidence in a section 1 conspiracy case "must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." See id. at 1094, citing In re Baby Food Antitrust Litig., 166 F.3d 112, 118 (3d Cir. 1999). Here, plaintiffs contend that they have direct evidence that NTC participated in secret price-fixing meetings with its competitors to discuss DRAM pricing and to coordinate output reduction, and furthermore, that NTC did in fact reduce its DRAM production.

### a.   emails

---

[3] NTC also makes the somewhat baffling argument that it does not stand accused of price fixing. Plaintiffs' complaint explicitly charges that defendant – among others – entered into a contract, combination or conspiracy to unreasonably restrain trade, the substantial terms of which were to fix and maintain the price for DRAM. See Third Consolidated Amended Complaint, ¶¶ 61, 63. It is difficult to conclude from this that NTC does not stand "accused" of price fixing, for it is clear from the complaint that this is precisely what plaintiffs accuse. To the extent, however, that NTC really means simply that plaintiffs have not successfully *proven* the actual existence of any agreement to actually fix prices, this argument is dealt with in the body of this section.

United States District Court
For the Northern District of California

1    Plaintiffs claim that secret meetings among the defendants, including NTC, took

2   place in June and July 2001.  For the June meeting(s), plaintiffs first rely on email

3   communications sent in June 2001 by defendant Micron's Managing Director of

4   International Sales, Linda Turner, in which Ms. Turner reports that "the Taiwanese DRAM

5   dudes are pow-wowing next week on how to set a floor" regarding DRAM price, and notes

6   that "Sammy/Infineon/Hynix have had pricing discussions recently."  See Sampson Decl.,

7   Ex. 14, 15.  With respect to the alleged July 2001 meeting(s), plaintiffs point to a July 2001

8   bulletin to which all DRAM manufacturers subscribe (forwarded via email), which reported

9   that there was "a secret meeting hosted by Taiwanese DRAM companies in Taipei in early

10   July to coordinate a cut in output or at least try to hold the line on prices."  See id. at Ex. 86.

11   Although neither source specifically refers to either NTC or NTC USA, plaintiffs contend by

12   way of a separate article identifying NTC as a "local DRAM die manufacturer" that NTC

13   qualifies as one of the "Taiwanese" entities referred to in the above exhibits.  See id. at Ex.

14   85.

15    This evidence is neither direct nor persuasive.  Preliminarily, the court notes that

16   NTC has objected to each of the above exhibits submitted by plaintiffs, on grounds that

17   each constitutes impermissible hearsay.  NTC is correct.  Plaintiffs are seeking to introduce

18   out of court statements contained in individual emails and industry news bulletins, noting

19   the existence of so-called secret meetings between Taiwanese DRAM manufacturers, as

20   proof that the meetings actually took place.  This constitutes hearsay under Federal Rule of

21   Evidence 801(c).  Plaintiffs attempt to overcome the objections by invoking the co-

22   conspirator provision to Rule 801, which refuses to qualify as hearsay the statements made

23   by co-conspirators of a party during the course and in furtherance of the conspiracy.  See

24   Fed. R. Evid. 801(d)(2)(E); see also Bourjaily v. United States, 483 U.S. 171, 175-81

25   (1987).  However, as Bourjaily and the Ninth Circuit's subsequent interpretation of that case

26   in United States v. Silverman make clear, in order for such statements to be admissible,

27   there must be evidence beyond the statements in question, that demonstrate by a

28

United States District Court

For the Northern District of California

1   preponderance of the evidence the underlying conspiracy and NTC's connection to it.

2   Silverman, 861 F.2d 571, 576 (9th Cir. 1988); see also United States v. Tamez, 941 F.2d

3   770 (9th Cir. 1991).  Here, plaintiffs do not attempt to argue, and the court does not attempt

4   to scour the record for, the existence of any such independent evidence that would satisfy

5   the Silverman and Tamez standards.  As such, the hearsay objections lodged by NTC to

6   the above exhibits are sustained.  Furthermore, to the extent that plaintiffs would attempt to

7   meet their burden in establishing the co-conspirator definition under FRE 801(d)(2)(E) by

8   pointing to other sources of evidence that may itself be subject to hearsay objections, the

9   court would find such attempts similarly unpersuasive.

10         Moreover, even if the court did not sustain NTC's objections herein, the evidence

11   would still not prove persuasive as direct evidence of NTC's participation in secret meetings

12   to fix DRAM prices.  Ms. Turner, for example, was a *Micron* employee, not an NTC

13   employee, thereby diminishing the directness of the evidence as far as NTC is concerned.

14   But even if her emails were considered as direct evidence of NTC's own actions, the emails

15   are simply not dispositive of NTC's participation in any agreement or conspiracy.  Ms.

16   Turner states in one of her emails only that "the Taiwanese DRAM dudes" will be meeting.

17   Sampson Decl., Ex. 15.  She never references NTC specifically, but only defendants

18   Samsung, Infineon and Hynix.  And in her second email, while Ms. Turner states that she

19   has "heard rumors from one of the Taiwan DRAM makers that there is a meeting

20   scheduled with all of the Taiwan DRAM makers over the next week to discuss raising their

21   pricing," there is again no mention of NTC specifically, just an allegation of a "rumor" told to

22   Ms. Turner by an unnamed "Taiwan DRAM maker."  See Sampson Decl., Ex. 14.

23         In short, this evidence is not explicit, and would require that the court make certain

24   inferences unsupported by the record to conclude that NTC participated in any of the

25   alleged secret meetings, or for that matter in the conspiracy.  Accordingly, the court

26   concludes that the emails are not direct evidence sufficient to defeat NTC's motion for

27   summary judgment.

28

United States District Court

For the Northern District of California

b.      Mr. Kau's testimony

Plaintiffs also rely on the deposition testimony of NTC Vice President Charles Kau, as direct evidence that NTC participated in meetings and discussions with its Taiwanese rivals regarding a DRAM production cut. According to plaintiffs, Mr. Kau testified that there was a local conference that took place around 2001, at which he recalls discussing a DRAM production cut with NTC's competitors. See Sampson Decl., Ex. 88 at 107:14-24.

Here, too, however, plaintiffs' reliance on this testimony as direct evidence of NTC's participation in secret meetings to raise DRAM prices or cut production, is misplaced. For as NTC points out, plaintiffs have completely – and disingenuously – omitted Mr. Kau's follow-up explanation with respect to the very statement upon which plaintiffs rely. To wit, when asked during follow-up deposition questioning about the 2001 conference at which the production cut was discussed, Mr. Kau clarified that, while a discussion was in fact raised about reducing DRAM output, the discussion was also immediately halted when someone present during the discussion noted that cutting production would be illegal. See Benjamin Reply Decl., Ex. A at 160-161. Mr. Kau then went on to testify that, at any rate, NTC did not reduce production following that discussion. Id.

In view of the complete testimony offered by Mr. Kau on the subject, Mr. Kau's statements cannot be considered direct evidence of NTC's involvement in meetings to fix DRAM prices or to cut production of DRAM in order to raise DRAM prices.

c.      industry news and articles

Finally, plaintiffs rely on a series of three news articles written in 2001, in which Mr. Kau was quoted, and that refer to discussions about joint efforts by defendants to cut DRAM production. See Opp. Br. at 10:20-21. First, on August 14, 2001, an EBN article entitled "Taiwan DRAM makers may cut output" was published, in which Mr. Kau is quoted as stating that NTC is "willing to cooperate" in a production cut. See Sampson Decl., Ex. 22. Second, on October 1, 2001, a Financial Times article entitled "Nanya raises the prospect of cuts in DRAM output," quoted Mr. Kau as saying that NTC was "willing to cut

13

United States District Court

For the Northern District of California

1   production voluntarily, once we have got the right signal." See id. at Ex. 23. Finally, in a

2   separate Financial Times article also dated October 1, 2001, Mr. Kau purportedly stated

3   that "Taiwanese strategies include ... exploring the possibility of joint production cuts...",

4   and he furthermore joked that the DRAM industry might one day be called "D-Pec," like the

5   "Global oil cartel OPEC." See id. at Ex. 24; see also Ex. 88 at 125:6-127:23.

6        Preliminarily, as with the emails discussed above, NTC has raised hearsay

7   objections to the three articles in question. Plaintiffs seek to use statements in each article

8   attributed to Mr. Kau, to the effect that NTC was willing to participate in joint efforts to cut

9   DRAM production. In the court's view, plaintiffs offer Mr. Kau's statements for the truth of

10  the matter asserted therein, and as such, the statements uttered by Mr. Kau are

11  inadmissible hearsay. Furthermore, none of the hearsay exceptions relied on by plaintiffs –

12  i.e., co-conspirator or party admission exceptions – apply. The co-conspirator exception

13  fails for the same reasons already enunciated above. As for the party admission exception,

14  while it is true that the statements at issue were made by Mr. Kau in his representative

15  capacity for NTC, the statements as relayed in the newspaper articles simply do not bear

16  sufficient indicia of reliability such that the party admission exception is warranted. The

17  court finds newspaper articles, even the direct quotes contained within them, to be

18  inherently unreliable. Moreover, there is proof of such unreliability here. As Mr. Kau

19  testified, his comments were translated into English from the Chinese language, and the

20  content of the statements as written does not accurately reflect the content of Mr. Kau's

21  statements to the articles' authors. See Benjamin Reply Decl., Ex. A at 112-15.

22  Accordingly, NTC's objections to the articles on hearsay grounds, are sustained.

23       Even if Mr. Kau's statements in the newspaper articles in question were to be

24  considered substantively, the court would nonetheless find that they do not constitute direct

25  evidence of NTC's participation in a conspiracy to cut DRAM production or fix DRAM

26  prices. It is true enough that the statements attributed to Mr. Kau in the articles deal with

27  the concept of cutting DRAM production. See Sampson Decl., Exs. 22-24. However, Mr.

28

United States District Court

For the Northern District of California

1    Kau's statements are not statements that explicitly concede the existence of any actual

2    agreement to limit production of DRAM, nor are they statements that would lead to such a

3    conclusion without need of any inferences.  For example, in the first EBN article, Mr. Kau

4    said only that everyone was feeling the need to cut production, but that "as of how to

5    engage in the cut is an issue that needs to be discussed."  See id. at Ex. 22.  This

6    statement expressly leaves open the question of whether NTC would choose to limit

7    production, and if so, how it would do so.  Similarly, in the first Financial Times article, Mr.

8    Kau is referenced as stating that DRAM rivals had approached NTC about coordinating

9    output cuts, but he is also referenced as stating that any moves would have to be led by

10   other producers, that "leading by example was more important than attempts to coordinate,

11   and that [NTC] would be 'willing to cut production voluntarily, once we have got the right

12   signal.'"  See id. at Ex. 23.  This, too, expressly leaves open the possibility of a voluntary

13   production cut *independent of* any joint attempt to coordinate production cuts.[4]  Finally, with

14   respect to the last article Financial Times article cited by plaintiffs, while Mr. Kau may have

15   engaged in the unwise strategy of joking about the future existence of a "D-Pec", there is

16   simply nothing in the article that indicates NTC's participation in an actual agreement or

17   conspiracy to limit production or raise prices.

18         In sum, as with the emails and the evidence of Mr. Kau's deposition testimony, none

19   of the news articles or Mr. Kau's statements therein constitute direct evidence of NTC's

20   participation in the conspiracy alleged by plaintiffs.  Accordingly, the court finds that

21   plaintiffs have not presented any direct evidence that successfully defeats NTC's motion for

22   summary judgment.

23                3.    Circumstantial Evidence of Conspiracy

24         The above conclusion brings the court to the central issue raised by the parties –

25

26         [4]    As defendants note, even conscious parallelism – i.e., a company's independent
27   and voluntary decision to track prices and production of competitors – is not unlawful standing
     alone.  See, e.g., Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, 203 F.3d 1028,
28   1032 (8th Cir.).

United States District Court

For the Northern District of California

1   whether there is sufficient circumstantial evidence of NTC's participation in an agreement to

2   fix the ultimate price of DRAM, whether via participation in a coordinated output reduction

3   or discussions regarding pricing.  Keeping in mind the Matsushita standards enunciated

4   above, the critical question in evaluating this issue is "whether all the evidence considered

5   as a whole can reasonably support the inference that [NTC] conspired with the admitted

6   conspirators to fix prices."  See In re Citric Acid, 191 F.3d at 1097.

7        Plaintiffs generally point to three categories of evidence that they claim supports an

8   "inference" of collusive conduct sufficient to preclude summary judgment: (a) economic

9   evidence; (b) evidence of NTC's "frequent, high-level communications" correlated to

10  specific collusive behavior; and (c) evidence of several co-defendants' guilty pleas in the

11  DOJ's related criminal antitrust proceedings.

12                         a.      economic evidence

13       Plaintiffs contend that two types of economic evidence in this case demonstrate that

14  a conspiracy makes economic sense and is plausible.  First, plaintiffs point to evidence

15  regarding the structure of the DRAM market as a whole, and specifically to their expert, Dr.

16  Roger Noll, whose report and testimony plaintiffs assert establishes that the conditions of

17  the DRAM market made NTC's participation in the alleged conspiracy economically viable

18  and productive.[5]  Second, plaintiffs point to evidence that they claim proves that NTC's

19  behavior was consistently anticompetitive and against its own economic self interest –

20  thereby further supporting the inference of NTC's participation in the conspiracy.  See, e.g.,

21  Zoslaw v. MCA Distrib. Corp., 693 F.2d 870, 884 (9th Cir. 1982)("plaintiff must demonstrate

22  that [allegedly parallel acts] were against each conspirator's self-interest").

23

24       [5]      Originally, Dr. Noll's report was submitted in connection with the Winbond entity
     defendants' accompanying motion for summary judgment, and plaintiffs relied on that
25   submission in citing to the report.  Winbond withdrew its motion, however, following its
     settlement with plaintiffs, thereby withdrawing the Noll report from consideration as well.  In
26   order to cure this problem, and at the court's request, plaintiffs re-submitted Dr. Noll's report
     by way of a separate declaration.  The Nanya entity defendants have now filed objections to
27   the re-submission of Dr. Noll's expert report, in part based on timeliness issues.  The court
     hereby OVERRULES defendants' objections.
28

                                                    16

United States District Court

For the Northern District of California

i.      structure of the DRAM market

Dr. Noll, plaintiffs' expert, analyzed five key characteristics of the DRAM industry –

concentration in the industry, defendants' market share, DRAM's commodity status, the

size of DRAM buyers/transactions, and the effect of US anti-dumping restrictions on DRAM

pricing – and concluded that the DRAM industry was favorable to successful collusion

during the relevant class period.  See Saveri Decl., Ex. A at 31-46.  Although this testimony

standing alone does not necessarily implicate NTC's individual participation in any such

collusion, plaintiffs also point to the testimony of NTC's expert, Dr. Alan Cox, on which

plaintiffs rely for support of their claim that NTC's increasing technological advantages at

the time of the conspiracy provided an economic reason for the top DRAM manufacturers

to include NTC in their conspiracy, even if NTC was a smaller player in the market for

DRAM.  See, e.g., Declaration of Alan Cox in Support of Nanya's Motion for Summary

Judgment ("Cox Decl.,"), Ex. A at ¶ 78 (noting that "Nanya/Nanya USA gained a significant

advantage" due to "product innovation" in 2001).  Given both the DRAM market's

receptiveness to collusion and the significance of NTC's position in the market, plaintiffs

contend that the economic evidence regarding the structure of the market supports NTC's

participation in the alleged conspiracy.

As plaintiffs note, persuasive authority suggests that evidence bearing on the

economic structure of the market, and evidence specifically suggesting that particular

characteristics of the market are conducive to the creation of, and participation in, an

overarching price-fixing conspiracy, can be relevant in supporting an inference that a

defendant participated in such a conspiracy.  See, e.g., In re Flat Glass Antitrust Litig., 385

F.3d 350, 360 (3d Cir. 2004)("[e]vidence that the defendant had a motive to enter into a

price-fixing conspiracy means evidence ... that the structure of the market was such as to

make secret price-fixing feasible"); In re High Fructose Corn Syrup Antitrust Litigation, 295

F.3d 651, 655-56 (7th Cir. 2002).  Nonetheless, while relevant, the economic evidence

surrounding the DRAM market is not, in and of itself, a sufficient basis upon which to infer a

United States District Court

For the Northern District of California

1   conspiracy here.  See, e.g., In re Flat Glass, 385 F.3d at 360 n. 12 ("this type of economic

2   evidence is neither necessary nor sufficient to conclude that sufficient proof of an

3   agreement exists to preclude summary judgment, but it is relevant and courts should as a

4   general matter consider it").  This conclusion is strengthened by the observation that,

5   despite plaintiffs' reliance on Dr. Cox's testimony regarding NTC's technological capacities,

6   Dr. Cox's actual conclusion was that it was *unlikely* that other defendants would have

7   wanted to include NTC in the conspiracy, since NTC's capacity for DRAM production was

8   never greater than 6% of industry capacity during the class period, and less than 1.5%

9   when the conspiracy purportedly began.  See Cox Decl., Ex. A at ¶ 14.  Plaintiffs present

10  no other testimony that supports the conclusion that the structure of the market would have

11  been receptive to *NTC itself* engaging in a conspiracy.

12          In sum, plaintiffs' evidence regarding the structure of the DRAM market, even if

13  relevant to the larger question whether an inference of conspiracy may be made on the

14  whole cannot, standing alone, conclusively establish an inference of conspiracy.

15                          ii.        anticompetitive behavior

16          Plaintiffs also claim that the economic evidence discloses that NTC behaved in an

17  anticompetitive manner during the conspiracy period, such that an inference of conspiracy

18  is reasonable.  Specifically, plaintiffs assert that during the conspiracy period, NTC reduced

19  its DRAM output in coordination with the top 5 DRAM producers in the industry; that NTC

20  failed to price aggressively and consistently passed up opportunities to undercut its

21  competitors and grow its market share; and that NTC refused to bid in an auction held by

22  Compaq in November 2001.  See Opp. Br. at 19:13-22:17.

23          Output reduction.  Plaintiffs assert that NTC reduced its DRAM output during the

24  fourth quarter of 2001 ("2001Q4") and the first quarter of 2002 ("2002Q1"), in step with the

25  top DRAM producers and other co-conspirators.  They rely specifically on Exhibit 10 of Dr.

26  Cox's expert report, which consists of a chart comparing NTC's DRAM output growth

27  during the conspiracy period with that of the top 5 DRAM manufacturers (defined as Elpida,

28

United States District Court

For the Northern District of California

1   Hynix, Infineon, Micron and Samsung).  <u>See</u> Cox Decl., Ex. A at Ex. 10.  The chart

2   demonstrates that, during 2001Q4 and 2002Q1, NTC's DRAM output growth dropped, at

3   the same time that the top 5 DRAM producers' output growth also collectively dropped.  <u>Id</u>.

4   Plaintiffs argue that this supports an inference of conspiracy, since the timing of NTC's

5   output reduction coincided with the conspiracy period.

6       Naturally, NTC disputes the significance of the evidence.  NTC points out that NTC's

7   own actual output data – which was not used in compiling Dr. Cox's exhibit 10 – indicates

8   that between October 2001 and March 2002 (e.g., during 2001Q4 and 2002Q1), NTC's

9   output of finished DRAM wafers ("wafer outs") actually increased, with the exception of only

10  November 2001 and February 2002.  <u>See</u> Reply Declaration of Vincent O'Brien in Support

11  of Nanya's Motions for Summary Judgment ("O'Brien Reply Decl."), Ex. A, E.  Similarly,

12  NTC's sales grew, instead of fell, from the fourth quarter of 2001 to the first quarter of 2002.

13  <u>See id</u>. at Ex. B.  To the extent that November 2001 and February 2002 saw any decline in

14  "wafer outs," NTC submits that the declines were due in part to "yield" issues (i.e., a decline

15  in the amount of viable DRAM chips that NTC was able to produce from raw wafers), as

16  NTC shifted production from 128 Mb of DRAM to 256 Mb of DRAM.  <u>See</u> O'Brien Reply

17  Decl., Ex. A.; Ex. C at NTC 65-00006200; Ex. E at NTC 73-00022899-22922; Ex. F at NTC

18  73-00037436.

19      Generally speaking, evidence that a defendant reduced production at the same time

20  as other admitted members of an alleged conspiracy may be relevant on the question of

21  conspiratorial conduct.  <u>See In re Petroleum Prod. Antitrust Litig.</u>, 906 F.2d 432, 460-62 (9th

22  Cir. 1990) (considering conspiracy allegations based in part on supply reduction); <u>see also,</u>

23  <u>e.g., In re Citric Acid</u>, 191 F.3d at 1102 (evidence of parallel pricing decisions undertaken

24  by defendant also relevant to conspiracy question, in conjunction with other "plus" factors).

25  Here, however, the evidence ultimately does not support the inference of a conspiracy.

26  This is because defendants have articulated a plausible competitive justification for any

27  production cut.  As they point out, although there were wafer out production declines in

28

United States District Court

For the Northern District of California

1  November 2001 and February 2002 – periods that fall within 2001Q4 and 2002Q1 as

2  indicated in exhibit 10 to the Cox report – those production declines appear to be

3  attributable to root causes.  The November 2001 decline, for example, corresponded with

4  NTC's decreased production of 128 Mb DRAM chips, as its second fabrication plant

5  switched over to 256 Mb DRAM chips, and its first fabrication plant, which was focusing on

6  the 128 Mb DRAM chips, experienced yield problems.  See O'Brien Reply Decl., A; Ex. C

7  at NTC 64-00006200; Ex. E at NTC 73-00022899-22922; Ex. F at NTC 73-00037436.  The

8  February 2002 decline also occurred in tandem with reported yield problems.  See id. at Ex.

9  D at NTC 64-00012021; Ex. G at NTC 73-00008704-8709.

10         Not only does this evidence demonstrate a plausible justification for NTC's 2001Q4

11  and 2002Q1 decreased wafer out DRAM production, but the justification is made more

12  plausible by Mr. Kau's testimony, noted elsewhere herein, that NTC did not cut its DRAM

13  production pursuant to any agreement to do so.  See  Benjamin Reply Decl., Ex. A at 160-

14  161.

15         In the face of this evidence, plaintiffs must "provide specific evidence tending to

16  show that the defendant was *not* engaging in permissible competitive behavior." See, e.g.,

17  In re Citric Acid Litig., 191 F.3d at 1094.  In other words, as explained in the legal standard

18  section above, plaintiffs' evidence must tend to *exclude* the possibility of independent

19  behavior. Id. at 1096.  Here, plaintiffs' evidence of output reduction – the sum total of

20  which appears to be evidenced by Exhibit 10 to the Cox report – does not, in the face of the

21  evidence demonstrating a production shift to 256 Mb chips at one of NTC's fabrication

22  plants, and yield problems, tend to exclude the possibility that NTC, acting independently,

23  suffered declines as a result of internal decision-making, rather than a coordinated effort at

24  output reduction.

25         NTC's failure to price aggressively and grow market share.  Plaintiffs also contend

26  that NTC failed to price aggressively during the conspiracy period and consistently passed

27  up opportunities to undercut competitors and grow its market share, something NTC would

28

**United States District Court**
For the Northern District of California

1   have done if it had been behaving competitively.  See Opp. Br. at 20:23-24.  Plaintiffs rely

2   for support on three exhibits produced from non-NTC sources, relaying through emails and

3   spreadsheet notes, NTC's supposed price quotes for DRAM at different points in November

4   and December 2001.  Plaintiffs point out that the prices quoted therein show that NTC's

5   DRAM price was among the highest among competitors, and that NTC would not come

6   down from the price of DRAM it was quoting to Dell Computers, despite Dell's desire to

7   negotiate a lower price.  See Sampson Decl., Exs. 63, 116, 118.

8          Preliminarily, the court once again confronts NTC's hearsay objections, which NTC

9   has submitted in response to all three exhibits.  The court is of the opinion that all three

10  constitute inadmissible hearsay.  For the reasons already described in connection with

11  plaintiffs' direct evidence of conspiracy, plaintiffs' invocation of the co-conspirator exception

12  does not save the evidence.  See Fed. R. Evid. 801(d)(2)(E).  Nor does plaintiffs' invocation

13  of other hearsay exceptions, as the court finds that the statements contained in the exhibits

14  do not bear on the declarants' state of mind, and there is insufficient foundational testimony

15  upon which to base application of the business records exception.  See, e.g., Plaintiffs'

16  Summary Responses to Winbond and Nanya Defendants' Objections to Exhibits, Ex. C.

17  Furthermore, none of the documents exhibit any indicia of reliability that would incline the

18  court toward admitting the documents.  Accordingly, the court hereby sustains NTC's

19  objections to the documents.

20         Even if the court were to consider the documents substantively, it would still decline

21  to find that the evidence supports an inference of collusive behavior.  To begin with, none

22  of the documents compel the conclusion that plaintiffs urge upon the court – i.e., that NTC

23  consistently passed up opportunities to grow market share by lowering prices.  The

24  statements contained in the documents show only that: (1) on December 19, 2001, David

25  Lin, an Elpida employee, had been told by one of his "buddies" that NTC was quoting a

26  "$21/$42" DRAM price that NTC wanted to raise in January; (2) that Mr. Lin was also aware

27  that back on November 23, 2001, NTC had tried to "increase pricing" but failed; and (3) that

28

United States District Court
For the Northern District of California

1  earlier still, on November 8, 2001, Mr. Lin had "polled the market" and discovered that NTC

2  would not be moving on price.  See Sampson Decl., Exs. 63, 116, 118.  These statements

3  indicate, at most, that someone at NTC told Mr. Lin that NTC had a desire to raise prices.

4  But they do not establish or even suggest whether NTC actually did, in fact, raise prices, or,

5  to the contrary, whether NTC refused to raise prices, or refused to compete for Dell's

6  business by lowering price.  Nor does the evidence indicate whether NTC had a habit of

7  passing up opportunities to increase market share, as plaintiffs contend.  Indeed, NTC

8  points to evidence that demonstrates the opposite – that, during the same time period, NTC

9  *increased* both overall DRAM production and total sales of DRAM (accomplished through

10  NTC USA).  See O'Brien Decl., Ex. B; O'Brien Reply Decl., Ex. E.

11       Moreover, plaintiffs do not rely on any legal authority that requires a defendant to

12  have affirmatively engaged in undercutting competitors in order for the court to consider

13  that defendant as having acted competitively.  Although plaintiffs cite most persuasively to

14  In re Citric Acid, the Ninth Circuit there did not hold that undercutting competitors is

15  generally evidence of competitive behavior, let alone did it hold that lack of evidence as to a

16  defendant affirmatively undercutting its competitors supports an inference of uncompetitive

17  behavior.  It simply held that, in the case before it, evidence that defendant priced

18  aggressively in its actual contracts and had gained market share by consistently

19  underpricing its competitors in the price-fixed market, was sufficient to demonstrate the

20  possibility that defendant acted legally in its pricing decisions.  See 191 F.3d at 1103.

21       Here, by contrast, plaintiffs' evidence – which does not conclusively indicate whether

22  NTC priced aggressively with respect to Dell, or whether it had a policy of pricing

23  aggressively – fails to exclude the possibility that NTC was acting competitively as a whole,

24  particularly in view of the fact that the evidence does indicate that NTC's sales and

25  production were increasing.  As such, it simply cannot be said that, based on the three

26  exhibits relied on by plaintiffs, they have sufficiently excluded the possibility that NTC was

27  acting competitively and in its own self-interest.

28

22

United States District Court

For the Northern District of California

1    <u>Compaq auction</u>.  Finally, plaintiffs point to NTC's purported refusal to bid in a

2  DRAM auction held by Compaq, as proof that NTC was engaged in behavior against its

3  own self-interest, and therefore that an inference of conspiratorial activity may be made.

4  <u>See</u> Sampson, Ex. 93 at 173:4-177:2 (deposition testimony of Ken Hurley, Nanya USA's

5  President).  On its face, however, this evidence cannot support an inference of collusive

6  activity by NTC.  The evidence – which is the sole basis for plaintiffs' claim – refers to *NTC*

7  *USA*'s refusal to participate in the Compaq auction, not NTC's.  And since, as discussed

8  previously, NTC USA's actions here may not be imputed to NTC for liability purposes, the

9  evidence fails to raise a material dispute of fact with respect to NTC's participation in the

10  alleged conspiracy.

11    In sum, the court concludes that none of the 'economic' evidence relied on by

12  plaintiffs supports an inference of collusive activity on NTC's part.  This is true whether the

13  evidence is viewed independently, or in the aggregate, as the evidence simply does not

14  tend to exclude the possibility that NTC acted in a competitive manner.

15                    b.    NTC's "frequent, high-level communications"

16    Besides the economic evidence, plaintiffs also rely on evidence of NTC's allegedly

17  frequent communications with the other co-defendants as circumstantial evidence that

18  supports an inference of collusive activity.  Specifically, plaintiffs point to communications

19  that took place throughout five different periods:  summer 2001; fall 2001; November 2001;

20  December 2001/January 2002; and early 2002 through June 2002.  All of these

21  communications, argue plaintiffs, corresponded with collusive activity taking place in the

22  DRAM market.

23    The communications themselves are extensive.  For each of the periods mentioned,

24  plaintiffs cite to numerous emails or correspondence between the Nanya defendants and

25  various other defendants, detailing alleged exchanges of information and meetings

26  between the parties, all of which purportedly track the defendants' alleged production cuts

27  and price increases.  <u>See, e.g.</u>, Sampson Decl., Exs. 15, 22, 46, 55, 57, 86, 94, 103

28

                                        23

United States District Court

For the Northern District of California

1  Appendix A, 105-112, 114-125, 127-129, 132-34.

2      Despite its volume, however, there exist fundamental problems with the evidence.

3  Namely, the communications relied on by plaintiffs are largely irrelevant as far as NTC is

4  concerned.  For the vast majority of the "high-level" communications relied upon by

5  plaintiffs concern NTC USA, not NTC.  See, e.g., id. at Exs. 94, 103 Appendix A, 105, 106,

6  111-12.  Once again, for the reasons already outlined, NTC USA's contacts cannot be

7  imputed to NTC.  As such, to the extent this is true, the court disregards those

8  communications dealing with NTC USA.

9      This leaves the court with exhibits such as 46, 57, and 120 to the Sampson

10  Declaration.  These exhibits are communications made within Mosel Vitelic, discussing or

11  reiterating the prices applicable to "Nanya's" DRAM.  Preliminarily, it is not clear whether

12  the communications even refer to NTC as opposed to NTC USA, as they by refer only to

13  "Nanya" generally.  More importantly, however, these exhibits do not constitute probative

14  information that tends to exclude the possibility of permissible competitive conduct.  At

15  best, they merely repeat pricing information that has presumably been relayed to the

16  sender by a marketing director at NTC.  See id. at Ex. 46.  But there is nothing inherently

17  wrong with a company's marketing director sharing pricing information with another

18  company. See In re Citric Acid,191 F.3d at 1103, citing In re Baby Food, 166 F.3d 112, 126

19  (3d Cir. 1999)("[C]ommunications between competitors do not permit an inference of an

20  agreement to fix prices unless 'those communications rise to the level of an agreement,

21  tacit or otherwise.'"); Rutledge v. Elec. Hose & Rubber Co., 327 F. Supp. 1267, 1271 (C.D.

22  Cal. 1971)("Absent an agreement to fix prices, there is nothing unlawful about competitors

23  meeting and exchanging price information or discussing problems common in their

24  industry, or even exchanging information as to the cost of their product.").

25      This same analysis applies to other exhibits relied on by plaintiffs, which constitute

26  communications and correspondence that do not expressly implicate NTC – or even come

27  from NTC – but at most refer to "Nanya" generally.  See, e.g., Sampson Decl., Exs. 116-

28

United States District Court
For the Northern District of California

1   119.

2        Accordingly, even crediting the three exhibits as referring to NTC rather than NTC

3   USA as evidence, they still do not provide a basis from which the court may infer

4   conspiratorial activity.  Thus the court rejects the evidence of "high-level" communications

5   as circumstantial proof that NTC engaged in collusive activity.

6                        c.      guilty pleas

7        Finally, plaintiffs urge the court take notice of certain guilty pleas that other co-

8   defendants have entered into, as well as the fact that NTC USA's employees invoked the

9   Fifth Amendment during their depositions.

10       First, as NTC points out, it is improper for the court accept evidence of the co-

11  defendants' guilty pleas as evidence tending to support an inference of NTC's collusive

12  activity when none of those guilty pleas implicated NTC in their criminal activity.  Given that

13  NTC was not implicated, the court declines to consider these pleas as evidence bearing on

14  NTC's participation in the alleged unlawful activity.

15       Second, and with respect to any adverse inferences to be drawn from the testimony

16  of NTC USA's employees, the fact remains, as noted above, that there is simply no basis

17  here upon which to impute NTC USA's actions or testimony to NTC.  Accordingly, the court

18  similarly declines to draw an adverse inference as to NTC's participation in the alleged

19  conspiracy, based on testimony or lack of testimony of NTC USA employees.

20       Accordingly, the court does not find that the evidence of other co-defendants' guilty

21  pleas, or the invocation of 5th Amendment protection by NTC USA employees, supports an

22  inference of collusive activity with respect to NTC.

23                                    * * *

24       In conclusion, and having considered plaintiffs' circumstantial evidence, individually

25  and in the aggregate, the court simply cannot find that the evidence relied on by plaintiffs

26  supports an inference of collusive activity on NTC's part, under the standard contemplated

27  by Matsushita.  Accordingly, the court hereby GRANTS summary judgment in NTC's favor.

28

25

United States District Court

For the Northern District of California

C.     NTC USA's Motion for Summary Judgment

NTC USA makes the same general argument that NTC made – i.e., that there is no evidence of NTC USA's involvement in the alleged conspiracy to fix the market prices for DRAM.  NTC USA's focus, however, is slightly different than NTC.  Since NTC USA does not actually manufacture DRAM, but only buys and sells the DRAM manufactured by its parent corporation, NTC USA does not address proof of conspiracy via concerted output reduction.  Rather, it focuses on plaintiffs' ability to prove a section 1 violation via an actual agreement to fix prices, or an exchange of price information among defendants.  NTC USA argues that plaintiffs cannot demonstrate NTC USA's participation in either activity.  It contends that, not only is the evidence insufficient to prove an agreement or an exchange of information, but the evidence does not even support the conclusion that DRAM pricing was affected by any of NTC USA's actions.

Before weighing the evidence of NTC USA's participation in conspiratorial activity, the court preliminarily addresses two of the arguments raised by NTC USA.  First, whether the court should employ a rule of reason analysis.  NTC USA relies on Dr. Noll's report and testimony, and argues that the analysis therein demonstrates that plaintiffs have rejected a price-fixing claim in favor of alleging an unlawful exchange of price information.  This type of activity, asserts NTC USA, is not subject to per se treatment, but rather to a rule of reason analysis.

The court declines this invitation, however.  Plaintiffs have alleged that all defendants participated in an agreement to fix, raise, and maintain the price of DRAM, and that, in order to effectuate that agreement, defendants engaged in numerous actions, including a coordinated reduction in DRAM output, as well as engaging in meetings and discussions with each other regarding price.  See Third Consolidated Amended Class Action Complaint, ¶ 61-64.  Dr. Noll's expert report is but one of the types of evidence on which plaintiffs rely to support the allegation of collusive activity.  See, e.g., Saveri Decl., Ex. A at 2-6.  And while NTC USA is correct, as stated in Dr. Noll's report and testimony,

United States District Court

For the Northern District of California

1   that plaintiffs assert that NTC USA unlawfully exchanged price information, such testimony

2   and evidence is consistent with plaintiffs' allegation that NTC USA did so *in a manner*

3   *consistent with an overriding agreement* to fix price and reduce supply.[6]   And such

4   allegations, if proven, support per se treatment.   See United States v. Socony-Vacuum Oil

5   Co., 310 U.S. 150 (1940); see also In re Petroleum Prods. Antitrust Litig., 906 F.2d 432,

6   445-50 (9th Cir. 1990)(proof that competitors shared price information treated as evidence

7   of per se illegal conspiracy to fix prices).   In sum, while plaintiffs' ability to prove NTC USA's

8   involvement in the alleged conspiracy remains to be seen, there is simply no basis upon

9   which to deviate from the well-accepted principle that a conspiracy to fix prices – even if

10   effectuated in part by an exchange of information regarding price – is worthy of per se

11   treatment.

12          Second, the court addresses NTC USA's intimation that it cannot be held liable for

13   an unlawful conspiracy to reduce output, as alleged by plaintiffs in their complaint, because

14   it does not actually manufacture any DRAM, but rather buys and sells DRAM obtained from

15   its parent company NTC.   While this may be true, it is not exculpatory.   It is well-settled, as

16   a principle of co-conspirator liability, that even if NTC USA did not itself engage in a

17   reduction in DRAM output, it may nonetheless be held liable for the actions of other co-

18   defendants in reducing their DRAM output, if it is proven that NTC USA otherwise

19   participated in an unlawful conspiracy with those defendants.   See, e.g., BBD Transp. Co.,

20   Inc. v. Southern Pac. Transp. Co., 627 F.2d 170, 173 (9th Cir. 1980)("To be liable as a co-

21   conspirator for the anticompetitive acts of [other co-conspirators], the railroads need not

22   have known of or participated in those acts themselves.").

23

24          [6]          Moreover, contrary to NTC USA's characterization of Dr. Noll's testimony, what
     Dr. Noll actually said was that plaintiffs' collusion allegations can include the exchange of
25   information regarding price, *in addition to* "a naked price fixing agreement."   See Benjamin
     Decl., Ex. W at 164:3-17.   This supports, rather than undercuts, the application of per se
26   analysis here.   To the extent, therefore, that NTC USA's arguments address the need for
     plaintiffs to establish harm or impact on the market, as part of a rule of reason analysis, NTC
27   USA's arguments are irrelevant. See, e.g., National Soc'y of Prof'l Eng'rs v. United States, 435
     U.S. 679, 690 (1978)(rule of reason requires analysis of alleged conduct's effect on market).

28

Having dispensed with these preliminary issues, the salient issue as to NTC USA remains:  whether there is any direct or circumstantial evidence that NTC USA participated in any unlawful conspiracy to fix, maintain, or stabilize, the price of DRAM.

NTC USA asserts, not only that the evidence does not support plaintiffs' allegations against it, but that the evidence affirmatively answers this question in the negative.  NTC USA points, for example, to the various testimony of other co-defendants' employees, in which every single one states that they had no pricing communications with NTC USA. See Benjamin Decl., Exs. A-S.  It also points to the testimony of its expert, Dr. Cox, noting NTC USA's small market share, stating that NTC USA was expanding its business during the relevant time period, rather than restricting it – as would be consistent with anticompetitive behavior – and further opining that NTC USA was committed to aggressive and competitive pricing.  See Hurley Decl., ¶ 7.  NTC USA even relies on Dr. Hall's testimony, in which he acknowledges that Micron, an admitted co-conspirator, testified that it was *unsuccessful* in getting Nanya USA President Ken Hurley to go along with it in its bid to raise prices.  See Benjamin Decl., Ex. Y.  All of which, according to NTC USA, points to an utter lack of evidence tying it to the conspiracy alleged by plaintiffs.

This evidence is sufficient to switch the burden to plaintiffs to come forward with either direct or circumstantial evidence that creates a material issue of fact regarding NTC USA's involvement in the alleged section 1 conspiracy.  Plaintiffs attempt to meet this burden with the same argument and evidence that was submitted in response to NTC's motion.  As it did in connection with NTC's motion, the court has attempted to distinguish the evidence where it is clear that it relates to NTC USA specifically.

### 1.   Direct Evidence of Conspiracy

Plaintiffs' "direct" evidence of NTC USA's participation in the overarching DRAM conspiracy is largely the same as that which was discussed in connection with NTC's motion.  Namely, that NTC USA participated in "secret" meetings with its fellow Taiwanese manufacturers to discuss cutbacks and price increases.

**United States District Court**
For the Northern District of California

1    For support, plaintiffs rely for the most part on the same evidence already discussed

2    – i.e., Micron emails, and news articles in which NTC's president, Mr. Kau, is quoted.  See

3    Sampson Decl., Exs. 13-15, 22-24, 86.  Substantively, this evidence fails for the same

4    reasons discussed in connection with NTC's motion.  In addition, however, the evidence

5    fails because it relates to the actions of NTC and NTC's President, *not* directly to NTC

6    USA, or NTC USA's president, Kenneth Hurley.  And, as stated above, NTC USA cannot

7    be liable for NTC's acts and events without proving some theory of liability that would allow

8    such a conclusion, which plaintiffs have not done.

9    This is not to say that plaintiffs have submitted *no* evidence specific to NTC USA.

10   For plaintiffs also rely on an email that indicates that a meeting was scheduled for

11   November 2001 between Mr. Kau, Mr. Hurley, and Mike Sadler, among others.  See

12   Sampson Decl., Ex. 87.  Mr. Sadler was a Micron executive, alleged by plaintiffs to be the

13   "ringleader" of the conspiracy.

14   The court does not find this email, however, to be direct evidence of NTC USA's

15   participation in the alleged conspiracy.  To begin with, it requires the court to draw the

16   inference that the alleged meeting actually took place, for the email itself only indicates that

17   such a meeting was scheduled.  See In re Citric Acid Litig., 191 F.3d at 1093 (direct

18   evidence of conspiracy requires no inferences).  Although this deficiency is not critical,

19   given that NTC USA has conceded the meeting's existence, see NTC USA Reply Br. at

20   3:1-9, the fact that NTC USA points to evidence establishing a legitimate business reason

21   for the meeting *is* critical.  Specifically, NTC USA points to the deposition testimony of Mr.

22   Kau, Mr. Hurley, and Mr. Appleton – Micron's president who was also at the meeting.  All

23   testify that the purpose of the meeting was to discuss the possibility of technological

24   collaboration between the two entities, since NTC USA's original licensor was exiting the

25   DRAM business.  See Benjamin Reply Decl., Ex. A at 76-80; Ex. I at 72-75; Ex. K at 187-

26   88.  Moreover, none of the deponents recall that any discussions regarding DRAM pricing

27   took place at the meeting.  See id.  Plaintiffs submit no evidence that actually refutes these

28

United States District Court
For the Northern District of California

1    facts.  In view of this, the court does not find that the email relied on by plaintiffs constitutes

2    direct evidence of NTC USA's participation in the overarching conspiracy.

3           Accordingly, with no other evidence to rely on, the court concludes that plaintiffs

4    have not submitted sufficient direct evidence of NTC USA's participation.

5                        2.       Circumstantial Evidence of Conspiracy

6           The court next turns to plaintiffs' circumstantial evidence connecting NTC USA to the

7    alleged conspiracy.  In turning to this evidence, the court is mindful once again that the

8    principles espoused in Matsushita, as reaffirmed by the Ninth Circuit in In re Citric Acid,

9    apply.

10          Preliminarily, NTC USA has come forward with evidence that its participation in the

11   alleged conspiracy would be economically implausible.  It points to its small market share,

12   which ranged from 1.4% in 1999 to 5.5% in 2002 at the end of the class period; the fact

13   that with such a small market share NTC USA could not be expected to have had an

14   impact on the market for DRAM by its participation in any conspiracy; Dr. Noll's supporting

15   explanation that price collusion is not possible unless a seller involved in the collusion

16   represents a significant portion of the market share (e.g., 40 to 60 percent); and the fact

17   that NTC USA was pricing aggressively during the time period in question.  See, e.g., Cox

18   Decl., Ex. A at 10, ¶¶ 7-11; Benjamin Decl., Ex. Y at 7, Ex. W at 183:16-22; Hurley Decl., ¶

19   7.  The court finds this evidence sufficient to shift the burden to plaintiffs, who must, in

20   order to defeat summary judgment, come forward with evidence tending to exclude the

21   possibility that NTC USA was engaging in permissible competitive behavior.  See In re

22   Citric Acid, 191 F.3d at 1094.  In other words, plaintiffs must introduce evidence sufficient

23   to exclude the possibility of independent conduct by NTC USA, such that an inference of

24   collusion is reasonable.  See id. at 1096.

25          Here, too, plaintiffs' circumstantial evidence largely overlaps with that already

26   discussed in connection with NTC's motion for summary judgment.  This includes plaintiffs'

27   (a) economic evidence; (b) evidence of NTC USA's "frequent, high-level communications"

28

correlated to specific collusive behavior; and (c) evidence of co-defendants' guilty pleas in the DOJ's related criminal antitrust proceedings.  Each category, as it relates to NTC USA, is discussed in turn.

a.      economic evidence

Generally speaking, plaintiffs rely on the same economic evidence here as they did with NTC – i.e., evidence relating to the structure of the DRAM market, and evidence relating to NTC USA's anticompetitive behavior.

With respect to its evidence relating to the structure of the DRAM market, plaintiffs again rely on Dr. Noll's report and testimony, as well as Dr. Cox's testimony regarding increasing technological advances exhibited by NTC and NTC USA.  The merits of the parties' competing arguments on this point – and whether NTC USA's collusion in the market would make economic sense – need not be repeated here.  It is sufficient for the court to reiterate only that this evidence, while relevant, is not in and of itself a sufficient basis upon which to infer a conspiracy.  See In re Flat Glass, 385 F.3d at 360 n. 12.

With respect to plaintiffs' evidence regarding NTC USA's anticompetitive behavior, however, the arguments and evidence related to NTC USA are slightly different.  Contrary to their arguments with respect to NTC, plaintiffs here do not submit evidence that NTC USA reduced its output of DRAM.  As already noted, they cannot, since NTC USA did not actually manufacture DRAM, but rather purchased it from NTC.

Plaintiffs do argue that, as with NTC, NTC USA (1) failed to grow its market share by pricing aggressively, and (2) failed to compete by refusing to bid in an auction held by computer manufacturer Compaq.  However, the analysis of these two claims is slightly different with respect to NTC USA.

Failure to grow market share/price aggressively.  For proof of NTC USA's failure to price aggressively and grow market share during the relevant time period, plaintiffs rely on the same documents as they did with respect to NTC's motion – i.e., the three exhibits produced from non-NTC sources, relaying through emails and spreadsheet notes NTC's

31

United States District Court
For the Northern District of California

1   supposed price quotes for DRAM at different points in November and December 2001.

2   Plaintiffs, once again, are seeking to prove that the prices quoted therein show that NTC

3   USA's DRAM price was the highest among competitors, and that NTC USA would not

4   come down from the price of DRAM it was quoting to Dell Computers.  See Sampson Decl.,

5   Exs. 63, 116, 118.

6        As the court has already found, these documents constitute inadmissible hearsay,

7   and are therefore inadmissible.  Moreover, even if substantively admitted, they would not

8   support an inference of conspiracy, as they do not actually demonstrate NTC USA's failure

9   to price aggressively and grow market share.

10       Most significantly, however, plaintiffs' argument on this point fails because they have

11   not disputed the most fundamental point argued by NTC USA – that, during the class

12   period, NTC USA actually succeeded in *increasing* sales and market share.  See, e.g., Cox

13   Decl., ¶¶ 13-14.  Without disputing this point, plaintiffs cannot demonstrate NTC USA's

14   failure to grow market share, or otherwise support any inference of conspiracy whatsoever.

15   See In re Citric Acid, 191 F.3d at 1102 (lack of evidence in record establishing that

16   defendant's market share stayed the same required conclusion that inference of conspiracy

17   was "necessarily unreasonable").

18       Accordingly, plaintiffs' lack of evidence on this point does not enable the court to

19   infer that NTC USA conspired with any co-defendants in unlawful section 1 activity.

20       Compaq auction.  Plaintiffs assert that NTC USA's anticompetitive behavior with

21   respect to the Compaq auction supports an inference of conspiracy.  Specifically, plaintiffs

22   contend that NTC USA refused to bid in the Compaq auction –  which was held in order to

23   attempt to procure DRAM at lower prices – pursuant to the DRAM cartel's goal of ensuring

24   that no competitor bid in the auction, thereby keeping the prices for DRAM high.  See Opp.

25   Br. at 21:13-14.

26       This evidence, too, fails.  NTC USA's president, Mr. Hurley, specifically states that

27   NTC USA had a policy in place that forbid it from bidding in auctions, including the Compaq

28

1   auction.  See Hurley Decl.,¶¶ 8-9.  Mr. Hurley testified that the no-bid policy was prompted

2   by the potential for market forces to intervene between auction and delivery of DRAM to

3   create a loss for the manufacturer.  See id.  This is a plausible explanation for NTC USA's

4   refusal to bid in the auction.

5        In response, plaintiffs contend that the no-bid policy was inherently anticompetitive,

6   but present no authority for this conclusion.  Nor do they submit contrary evidence

7   establishing that Mr. Hurley's explanation is purely pretextual.  Indeed, plaintiffs offer only

8   speculation, and a series of rhetorical questions (i.e., why wouldn't Nanya USA make an

9   "exception" in the case of the Compaq auction?), in their attempt to create an issue of

10  material fact on the issue.  See Opp. Br. at 21:19-21.

11       Based on the record before it, the court cannot conclude that plaintiffs' evidence

12  regarding the Compaq auction sufficiently overcomes NTC USA's plausible explanation for

13  its no-bid policy, such that an inference of collusive activity is reasonable.

14              b.     NTC USA's "frequent, high-level communications"

15       Plaintiffs again rely on proof of numerous communications between and among NTC

16  USA employees and competitors, in their effort to establish an inference of conspiracy.

17  The communications purportedly took place throughout five different periods in 2001 and

18  2002, and plaintiffs assert that all can be tied to NTC USA's pricing decisions.

19       As a preliminary matter, the court notes that the evidence of communications relied

20  on by plaintiffs with respect to NTC USA is of a different character than that relied on in

21  connection with NTC.  Whereas plaintiffs' submission of actual evidence with respect to

22  NTC's contacts was slim, this is not the case with respect to NTC USA.  Plaintiffs have

23  submitted evidence with respect to the latter that indicates a much higher volume of

24  communication and contact with other defendants.

25       Having reviewed all evidence submitted by plaintiffs in connection with this issue, the

26  court finds that the evidence can generally be classified into two general categories:  (i)

27  communications from or to NTC USA regarding NTC USA's contacts with defendants; and

28

United States District Court
For the Northern District of California

33

United States District Court

For the Northern District of California

1   (ii) communications from or to non-NTC USA sources regarding NTC USA's contacts with

2   defendants.

3          The correspondence from or to NTC USA sources demonstrates that numerous

4   contacts and communications took place during the relevant period between NTC USA

5   executives – namely, Mr. Hurley and North American Sales Director Mike Walsh – and

6   other defendants. See Sampson Decl., Ex. 103 Appendix A, Ex. 105, Exs. 106,109-112,

7   114, 124; see also Benjamin Reply Decl., Ex. R.  While it seems apparent that some of the

8   evidence, when viewed for its substance, conveys only innocent information, it is equally

9   apparent that some of the evidence conveys actions taken by NTC USA executives that

10  may, in fact, be suggestive of collusive behavior.  See, e.g., id. at Ex. 105 at 39 (describing

11  Mr. Hurley's "chance encounter" with alleged co-conspirators), cf. Ex. 130 at 103-05 (Steve

12  Thorsen deposition testimony re discussions with Mr. Hurley re DRAM pricing); see also In

13  re Citric Acid, 191 F.3d at 1103 (suggesting that specific discussions between competitors

14  regarding price may give rise to inference of conspiracy).

15         This also holds true with respect to the communications relied from or to non-NTC

16  USA sources regarding NTC USA's communications with defendants.  See Sampson Decl.,

17  Exs. 15, 22, 46, 55, 57, 86, 107-08, 115-123, 125, 127-129, 132-34.  Some of these

18  communications indicate innocent conduct.  See id. at Ex. 133 (email from Elpida employee

19  merely noting he had "polled the market place and found that most suppliers have moved

20  to $38 for 128MB SDR").  Some are more suggestive.  Id. at Ex. 134 (Hynix notes

21  conveying detailed product information purportedly learned from "Nanya", including price

22  info).[7]

23  _____

24         [7]      Defendants have lodged numerous objections to the documents discussed
    herein.  The court notes that some of the documents relied on by plaintiffs and objected to by
25  defendants – particularly those belonging to the first category of communications from or to
    NTC USA – are admissible.  See, e.g., Sampson Decl., Exs. 106, 111-12.  By contrast, it is
26  unlikely that many of the documents belonging to the category of communications from or to
    non-NTC USA sources are admissible.  See, e.g., Sampson Decl., Exs. 46, 57.  The court
27  need not rule on the admissibility of all documents submitted and at issue, however; it is
    enough that it finds some documents admissible and sufficient to raise a triable issue of
28  material fact, as described above.  The parties are, of course, entitled to raise objections to

United States District Court

For the Northern District of California

1    As such, and given the volume of communications present, and the varying degrees

2   to which the communications may suggest collusive activity by NTC USA, the court finds

3   that plaintiffs have, in fact, successfully met their burden in arguing that the evidence,

4   considered as a whole, might reasonably support the inference that NTC USA conspired

5   with the admitted conspirators in this action, to fix the actual prices for DRAM in the

6   marketplace.  The volume of contact and communications, and the presence of at least

7   some discussion regarding pricing, when viewed in the aggregate, and considering the fact

8   that some of the defendants and individuals with whom NTC USA was communicating are

9   admitted conspirators in this action, support this inference.

10    Accordingly, the court concludes that plaintiffs have presented a disputed issue of

11   fact as to proof of NTC USA's involvement in the overarching conspiracy alleged by

12   plaintiffs.

13                    c.    guilty pleas

14    Finally, plaintiffs once again argue that the guilty pleas entered into by other co-

15   defendants, and the fact that three of NTC USA's employees invoked the Fifth Amendment

16   at their depositions, further supports an inference of conspiracy.  For the reasons already

17   discussed in connection with NTC's motion, the court declines to accept the former – i.e.,

18   other co-defendants' guilty pleas – as evidence of conspiracy.

19    The court also comes to the same conclusion with respect to the latter.  However,

20   the court's analysis in doing so, is different than before.  This is because, whereas it would

21   *not* have been proper to draw adverse inferences against NTC based on *NTC USA*

22   employees' invocation of the 5th Amendment, it *may* be proper draw those inferences

23   against NTC USA.

24    The seminal case on the issue, Baxter v. Palmigiano, 425 U.S. 308 (1976), holds

25   that adverse inferences are permissible in certain situations.  However, lower courts

26   interpreting Baxter have been uniform in suggesting that the key to the Baxter holding is

27   _____

28   evidence not ruled on herein at trial.

United States District Court

For the Northern District of California

1    that such adverse inference can only be drawn when independent evidence exists of the

2    fact to which the party refuses to answer.  See, e.g., LaSalle Bank Lake View v. Seguban,

3    54 F.3d 387, 391 (7th Cir.1995); Peiffer v. Lebanon Sch. Dist., 848 F.2d 44, 46 (3d

4    Cir.1988).  Thus, an adverse inference can be drawn when silence is countered by

5    independent evidence of the fact being questioned, but that same inference cannot be

6    drawn when, for example, silence is the answer to an allegation contained in a complaint.

7    See Nat'l Acceptance Co. v. Bathalter, 705 F.2d 924, 930 (7th Cir.1983).  This

8    interpretation is, however, premised on the basic notion that, prior to drawing any adverse

9    inference, there must be, at a minimum, a foundation laid by the party seeking the adverse

10   inference, as to the fact upon which such an inference should be taken.

11        Here, plaintiffs have not made a sufficient foundational showing regarding the

12   specific questions and facts upon which they would like adverse inferences to be drawn.

13   Accordingly, the court will not grant them a sort of generic adverse inference based on the

14   mere fact that three of NTC USA's employees asserted the 5th Amendment.

15                                              * * *

16        In conclusion, and based on all the above, the court DENIES NTC USA's motion for

17   summary judgment regarding its liability pursuant to section 1 of the Sherman Act.

18   Plaintiffs have successfully demonstrated that disputed issues of fact are present with

19   respect to NTC USA's participation in the alleged conspiracy, based on circumstantial

20   evidence of NTC USA's contacts and communications with competitors.

21        D.    Motion for Summary Judgment re DRAM Purchases from April 1, 2001 to
               November 30, 2001
22

23        Defendants seek an order declaring that plaintiffs' claims based on DRAM

24   purchases made during the period April 1, 2001 through November 30, 2001, fail as a

25   matter of law.  Defendants contend that plaintiffs have admitted they cannot prove impact

26   for this eight month period, and that as a result, all claims based on purchases made during

27   this period are doomed.

28

                                              36

United States District Court

For the Northern District of California

1    Plaintiffs who bring suit for antitrust violations pursuant to section 4 of the Clayton

2  Act must satisfy antitrust standing requirements.  This standing requirement means that a

3  plaintiff must prove that he or she has been (1) "injured in his business or property; and (2)

4  "by reason of anything forbidden in the antitrust laws...".  See 15 U.S.C. § 15(a).  The first

5  of these two elements, which is at issue here, refers to 'impact,' whereby plaintiffs must

6  demonstrate the 'fact of damage', or the existence of injury to themselves.

7    The parties here do not actually dispute the fundamental legal standards applicable

8  for analyzing antitrust 'impact'.  Defendants, for instance, note the well-established maxim

9  that impact, or injury itself, is the "sine qua non" for stating a cause of action based on

10  antitrust conspiracy.  See, e.g., McClure v. Undersea Indus., Inc., 671 F.2d 1287, 1289

11  (11th Cir. 1982).  Plaintiffs, for their part, cite to legal authority indicating that antitrust

12  impact is satisfied by proof that the antitrust violation alleged is a material and substantial

13  cause of plaintiffs' injury.  See, e.g., Rossi v. Standard Roofing, Inc., 156 F.3d 452, 483 (3d

14  Cir. 1998); see also Supermarkets of Marlinton, Inc. v. Valley Rich Dairy, 1998 WL 610648,

15  **2 fn. 18 (4th Cir. Va. 1998)(unpublished opinion)(citing with approval notion that "in order

16  to establish the fact of injury, an antitrust plaintiff must demonstrate that it suffered 'some

17  damage' as a causal result of the defendant's violation").  Both are accurate statements of

18  the law.  For it is true here that, in order to show impact, plaintiffs must demonstrate both

19  that they have been injured, and that their injuries were caused by the alleged antitrust

20  violation in question.  See also In re Tamoxifen Citrate Antitrust Litigation, 2006 WL

21  2401244, *26 (2d Cir. 2006)(injury in fact must "flow[] from that which makes defendants'

22  acts unlawful").

23    Having noted the applicable legal standards, the court must decide whether, in light

24  of certain statements made by plaintiffs' experts, Dr. Noll and Dr. Liu, plaintiffs' claims

25  based on DRAM purchases made from April 1, 2001 to November 30, 2001, fail for

26  plaintiffs' inability to establish impact.

27    First, the court considers the evidence upon which defendants base their motion.

28

United States District Court
For the Northern District of California

1    Defendants rely almost entirely on statements made by two of plaintiffs' experts, Dr. Noll

2    and Dr. Liu.  To begin with, defendants point to:  Dr. Noll's expert report in which he states

3    that "during most of 2001," the defendants were engaged in activity with "a different

4    character" than that which resulted in higher prices for other periods of the alleged

5    conspiracy; Dr. Noll's statement that this activity consisted of defendants' concerted

6    attempt to lower DRAM prices in order to drive co-defendant Hynix out of the market; and

7    Dr. Noll's statement that during this period, "DRAM buyers did not suffer harm from the

8    price war" because although "[c]oordinated action to set prices below cost in order to drive

9    a firm from the market is a form of collusion, ... an industry's customers are not harmed

10   during the period while the concerted attempt to drive prices down takes place."  See

11   Declaration of Ross S. Goldstein in Support of MSJ re DRAM Purchases ("Goldstein

12   Decl."), Ex. A.  Second, defendants rely on Dr. Liu's expert report stating that the April 2001

13   to October 2001 period of the alleged conspiracy was a "predatory" period in which Dr. Liu

14   failed to find "price elevation" and failed to find "damages."  See id. at Ex. B.

15        The question for the court to address is what effect, if any, these statements have on

16   plaintiffs' ability to demonstrate antitrust impact.  Defendants argue that the above

17   statements amount to judicial admissions that, for the eight month period in question, not a

18   single member of the class suffered any injury in fact, since there was no artificially raised

19   price at issue that could have harmed plaintiffs.  Plaintiffs respond that defendants confuse

20   proof of impact, which requires only that plaintiffs prove that the conspiracy as a whole

21   caused some damage to plaintiffs, with proof of damages, which requires plaintiffs to

22   demonstrate overpayments for DRAM at artificially high prices in order to recover damages.

23   According to plaintiffs, the above statements are only relevant to the damages issue.

24        Neither party presents legal authority that is directly on point.  Nonetheless, the court

25   finds plaintiffs' arguments more persuasive.  To begin with, defendants' request that the

26   court carve out an eight month period from the broader three-year conspiracy period that

27   has always been alleged by plaintiffs is counter-intuitive.  See, e.g., Third Consolidated

28

United States District Court

For the Northern District of California

1    Amended Class Action Complaint, ¶¶ 1, 37, 72.  As the US Supreme Court has said in the

2    past with respect to Sherman Act antitrust cases, and as plaintiffs point out, "[i]n cases

3    such as [these], plaintiffs should be given the full benefit of their proof without tightly

4    compartmentalizing the various factual components and wiping the slate clean after

5    scrutiny of each.... [T]he character and effect of a conspiracy are not to be judged by

6    dismembering it and viewing its separate parts, but only by looking at it as a whole."  See

7    Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962).

8    Accordingly, the court must view the conspiracy alleged by plaintiffs in its entirety.

9         Second, viewing the conspiracy in question as a whole, plaintiffs are correct that the

10   question is simply whether plaintiffs can prove 'some damage' as a result of the alleged

11   antitrust violation by defendants – i.e., whether plaintiffs can prove some damage as a

12   result of the alleged three-year conspiracy engaged in by defendants.  See, e.g.,

13   Supermarkets of Marlinton, Inc. v. Valley Rich Dairy, 1998 WL 610648, **2 fn. 18; In re

14   Tamoxifen Citrate Antitrust Litigation, 2006 WL 2401244, *26 (injury in fact must "flow[]

15   from that which makes defendants' acts unlawful").  Here, defendants do not dispute that

16   plaintiffs have done so with respect to the three year conspiracy as a whole.  See Def.

17   Reply Br. ISO MSJ re DRAM Purchases at 3 n.1.  For purposes of this motion, this satisfies

18   plaintiffs' burden of proving that antitrust impact is present.

19        Moreover, plaintiffs' expert Dr. Noll also testified that the eight month period in

20   question formed an integral part of the overall 3 year conspiracy alleged by plaintiffs, as it

21   represents the period of time during which defendants conspired in an ultimately

22   unsuccessful attempt to drive Hynix out of the market, in order to decrease total DRAM

23   supply, thereby raising prices for DRAM.  As such, the period in question, even though

24   marked by lower prices on the surface that may not give rise to damages, nonetheless

25   forms a critical part of the conspiracy that led to plaintiffs' actual injury.  See, e.g.,

26   Declaration of Guido Saveri in Support of the Re-Submission of the Expert Report of Roger

27   G. Noll ("Saveri Decl."), Ex. A at 5, 50-51 (Noll Report).

28

United States District Court

For the Northern District of California

1    Indeed, as plaintiffs point out, In re NASDAQ Market -Makers Antitrust Litig. is

2    instructive.  There, the court specifically found that even where some class members

3    escape injury altogether, impact may still be found on the basis of the class members'

4    injury as a whole.  See 169 F.R.D. 493, 523 (S.D. N.Y. 1996).  The district court in that

5    case said that "unless it is clear that no ultimate consumers were damaged, the exact

6    amount each may have sustained is an issue to be treated at the damages phase of the

7    litigation," not at the preliminary stage in deciding whether plaintiffs had adequately made

8    out a prima facie case of impact.  See id.   This reasoning is relevant here.  For when

9    considering the conspiracy as alleged in its entirety, all indications are that there were at

10   least some "ultimate consumers" who were harmed at the end of the conspiracy period by

11   paying artificially high prices.  And since plaintiffs assert that those high prices stem from all

12   conspiratorial acts detailed by their experts – including the strategy to drive Hynix out of the

13   market, even if it involved lower prices for awhile – there is simply no justification for

14   finding, as defendants urge, that no liability can be premised on claims that are based on

15   that "kill Hynix" period.

16       Moreover, to the extent that – as defendants point out – there are some plaintiffs

17   who made purchases limited only to the eight month period in question and therefore truly

18   did not suffer any impact or injury, the above reasoning is also helpful.  In short, this is a

19   factor to be taken into account at the damages phase.  In other words, the lack of harm to

20   those individual plaintiffs whose claims are limited to the eight month period at issue does

21   not cause plaintiffs' class claims as a whole to fail where impact is undisputedly present for

22   other class members for the whole conspiracy period.  That lack of harm would, however,

23   prevent those plaintiffs whose claims are limited to the eight months in question from

24   recovering any damages on their individual claims, as none are present.  Furthermore, as

25   plaintiffs point out, this is an issue that is specifically contemplated – and dealt with – by Dr.

26   Liu.  Accordingly, the issue poses no barrier to allowing plaintiffs' class claims to proceed

27   as alleged.

28

40

United States District Court

For the Northern District of California

1    In conclusion, defendants present no reason for overlooking the more apt principles

2   relied on by plaintiffs, which dictate that defendants' motion for summary judgment as to all

3   claims based on purchases from April 1, 2001 to November 30, 2001 be, and hereby is,

4   DENIED.

5        E.    Motion for Summary Judgment re Purchases Based on Pre-Existing Cost
            Plus Contracts
6

7    Defendants seek summary judgment on all claims brought by direct purchasers who

8   bought DRAM pursuant to pre-existing cost-plus contracts.  The gist of defendants'

9   argument is that these purchasers, who buy and then resell DRAM to indirect purchasers at

10   a fixed mark-up over the price paid for the DRAM, have not suffered actual injury for

11   purposes of recovery under section 1.  While they acknowledge such argument would

12   normally be ineffective under the Supreme Court's well-established prohibition on the use

13   of "pass-on" defenses in antitrust cases, defendants rely on the narrow exception that the

14   court has specifically carved out for qualifying cost-plus contracts.

15    Resolution of defendants' motion requires determination of three issues: (1) the

16   applicable legal standards involved; (2) whether plaintiffs or defendants bear the burden of

17   proof on this issue; and (3) whether there is, in fact, any evidence of claims brought

18   pursuant to pre-existing cost-plus contracts.

19        1.    Legal Standards

20    The general argument that a direct purchaser plaintiff does not suffer injury where

21   that plaintiff passes on all or part of an illegal overcharge to subsequent purchasers is not

22   new.  This is frequently referred to as the "pass-on defense," and was first considered by

23   the Supreme Court in Hanover Shoe, Inc., v. United Machinery Corp., 392 U.S. 481, 491-

24   493 (1968).  There, the court held that a pass-on defense cannot be relied on by

25   defendants seeking to prove that a direct purchaser plaintiff was not actually injured by a

26   violation of the antitrust laws.  See 392 U.S. at 491-493.  The court adhered to the "general

27   principle" that the victim of an overcharge "is damaged within the meaning of [the antitrust

28

**United States District Court**
For the Northern District of California

standing statute] to the extent of the overcharge." Id. at 491.  It ruled against the pass-on defense, in part based on concerns that use of the defense could complicate antitrust litigation (due to problems of proof) and reduce incentives for private plaintiffs to sue.

The Supreme Court followed this holding with Illinois Brick Co. v. Illinois, in which it considered the pass-on defense, but this time from a plaintiff's perspective.  See 431 U.S. 720 (1977).  In Illinois Brick, plaintiffs were indirect purchasers who argued that they had antitrust standing to sue because the illegal overcharge that resulted from defendants' antitrust conspiracy had been passed on to them by direct purchasers of defendants'. Consistent with its holding in Hanover Shoe, the Supreme Court held that the principles of that earlier case also bar indirect purchasers' claims, in addition to pass-on defenses employed by defendants.  The court again expressed concerns with the complexity of proof involved in any contrary rule, as well as the risk of multiple liability for defendants.  See id. at 731-35.

Despite having twice rejected the use of pass-on theories – whether to demonstrate lack of injury or to allow indirect purchaser standing – the Supreme Court noted, in both cases, that an exception to the general rule is possible.  That exception, at issue here, is contemplated "when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged."  See Hanover Shoe, 392 U.S. at 494; see also Illinois Brick, 431 U.S. at 736 (reiterating Hanover Shoe exception for fixed quantity, pre-existing, cost-plus contracts).  The theory is that, pursuant to a pre-existing cost-plus contract, it may be possible to easily prove that 100% of an overcharge is directly passed through to an indirect purchaser, pursuant to pre-negotiated terms by which a price-fixed product is charged at cost to the indirect purchaser, the end result of which eliminates any injury borne by the direct purchaser.

The cost-plus contract exception was expressly considered in Kansas v. UtiliCorp United, Inc., 497 U.S. 199 (1990).  There, the Supreme Court held that the direct purchaser is the appropriate plaintiff in virtually every case, and that the opening for the cost-plus

United States District Court

For the Northern District of California

1    exception is extremely narrow.  The court was dealing with a parens patriae action brought

2    by state attorneys general ("AG"s), who sued defendant utility corporation on behalf of

3    natural gas consumers.  The AG plaintiffs argued that state regulations ensured that the

4    utility corporation passed on 100% of the overcharge directly to the state consumers in the

5    form of increased rates – thereby invoking the cost-plus contract exception.  The court,

6    however, declined to place the case within the cost-plus contract exception, holding that in

7    the absence of any such physical contract, the case only "resembled" the cost-plus contract

8    exception, which contemplates that a 100% overcharge may be proven with certainty.  See

9    497 U.S. at 218.

10         The Kansas court expressly reaffirmed its adherence to the prohibition on pass-on

11   theories, as well as the court's prior precedent regarding availability of the cost-plus

12   contract exception.  The court specifically noted and implied that the cost-plus contract

13   exception applies where the contract in question commits the buyer to purchasing "a fixed

14   quantity regardless of price," with the end result that "the effect of the overcharge is

15   essentially determined in advance, without reference to the interaction of supply and

16   demand that complicates the determination" of pass-on cost in the usual situation.  Id. at

17   217.  In other words, the court noted that it "might allow indirect purchasers to sue only

18   when, by hypothesis, the direct purchaser will bear no portion of the overcharge and

19   otherwise suffer no injury."  Id. at 218.

20         Since Kansas, some circuit courts have expressed the opinion that it is doubtful

21   whether the cost-plus exception can ever truly be used to get around the prohibition on

22   pass-on theories.  See, e.g., McCarthy v. Recordex Servs., 80 F.3d 842, 855 (3d Cir.

23   1996)(the "vitality of the pre-existing cost-plus contract exception is doubtful, however, in

24   view of Utilicorp); Illinois ex rel. Burris v. Panhandle E. Pipe Line Co., 935 F.2d 1469, 1478

25   (7th Cir. 1991)("The Court's interpretation of the cost-plus exception appears so narrow

26   (setting up as it does a demand for rigorous proof of a 100% pass through and then

27   suggesting an unwillingness to consider such detailed evidence) as to preclude its

28

43

United States District Court

For the Northern District of California

1    application in any case.").

2        There is no Ninth Circuit decision directly on point.  However, prior Ninth Circuit

3    precedent would appear to indicate that the Ninth Circuit continues to recognize the validity

4    of the pre-existing cost-plus exception to the prohibition on pass-on theories, although this

5    conclusion is to be inferred from dicta, as the court never actually discussed the

6    applicability of the exception.  See Lucas Automotive Engineering v. Bridgestone/Firestone,

7    Inc., 140 F.3d 1228, 1234 (9th Cir. 1998)(noting existence of exception for pre-existing,

8    "*fixed quantity*, cost-plus contract[s]", but refusing to discuss it as appellant failed to offer

9    any evidence that any purchases were made pursuant to such a contract)(emphasis

10   added).

11       Accordingly, based on review of controlling precedent, the court concludes that,

12   while there *is* a pre-existing cost-plus contract exception that may theoretically be stated,

13   the exception is to be applied extremely narrowly.  It requires proof of a pre-existing cost-

14   plus contract, pursuant to which a subsequent purchaser purchased a fixed quantity of

15   goods.  And it should only be applied where it is absolutely clear that the direct purchaser in

16   question will bear no portion of the overcharge and will otherwise suffer no injury as a result

17   of defendants' alleged antitrust violations.

18              2.    Burden of Proof

19       Having determined that the exception for pre-existing cost-plus contracts is still

20   legally viable, and having established the contours of the exception, the question remains

21   whether plaintiffs or defendants have the burden of burden of proof with respect to the

22   issue.  Defendants argue that plaintiffs bear the burden of proof, since the cost-plus

23   contract exception goes to the issue of injury in fact, an essential element for section 1

24   recovery, upon which plaintiffs undisputably bear the burden.  Plaintiffs, by contrast, argue

25   that defendants have it backwards:  Hanover Shoe established that plaintiffs make out a

26   prima facie case of injury merely by showing that they have been illegally overcharged, and

27   by demonstrating the amount of the overcharge.  Thereafter, it is *defendants* who bear both

28

United States District Court
For the Northern District of California

1   the burden of production and proof as to the exception, and who must come forward here

2   with evidence of any qualifying cost-plus contracts.

3        The court has found no cases that squarely address the question of who bears the

4   burden of proof in establishing the cost-plus contracts exception.  However, the language of

5   the controlling cases themselves suggest that it is defendants, and not plaintiffs, who have

6   the burden here of proving that this exception to the Hanover Shoe/Illinois Brick doctrine

7   applies.  A review of Hanover Shoe – the case that considered the *defensive* use of the

8   pass-on theory – makes clear, even obvious, that the court considered that it would be

9   defendants' burden to meet the "normally ... insurmountable" task of proving that the pass

10  on defense applies.  See, e.g., 392 U.S. at 493 (in rejecting use of pass-on defense, noting

11  that, "if the existence of the defense [were to be] generally confirmed, antitrust *defendants*

12  [would] frequently seek to *establish its applicability*") (emphasis added).  Similarly, since

13  defendants here seek to establish an exception that would allow a narrow form of the pass-

14  on defense, defendants should also bear the burden of establishing its applicability.[8]

15       Moreover, as plaintiffs correctly point out, the Hanover Shoe court also expressly

16  held that a plaintiff's "prima facie case of injury and damage" is satisfied "when a buyer

17  shows that the price paid by him for materials purchased for use in his business is illegally

18  high and also shows the amount of the overcharge."  See id. at 489.  As such, plaintiffs

19  satisfy their prima facie case of injury here by demonstrating simply that plaintiffs paid an

20  illegally inflated amount for DRAM, and by showing the amount of that overcharge.  It would

21  step beyond the boundaries of the Hanover Shoe ruling to require plaintiffs to do more than

---

23  [8]    The court's conclusion is also guided in part by the fact that the Supreme Court
24  has specifically recognized two types of "pass-on" theories that may be used – defensive, and
    offensive.  The defensive pass-on theory was first discussed in Hanover Shoe, where
25  *defendants* attempted to use it to demonstrate that the direct purchaser plaintiffs had not
    established true antitrust injury. See 392 U.S. 481.  In Illinois Brick, by contrast, the offensive
26  use of the pass-on theory was utilized by indirect purchaser *plaintiffs* trying to establish
    antitrust injury for standing purposes under the Sherman Act.  See 431 U.S. 720. As a practical
27  matter, it makes intuitive sense that where – as here – defendants utilize the defensive pass-
    on theory, they should bear the burden of proof (and where plaintiffs employ offensive use of
28  the pass-on theory, it is plaintiffs who bear the burden).

45

United States District Court
For the Northern District of California

1    what the court there required – i.e., by forcing plaintiffs to establish the *absence* of any

2    exception to the prohibition on use of the pass-on defense, in addition to demonstrating the

3    amount of any illegal overcharge that was paid due to defendants' unlawful activities.

4         Furthermore, defendants' reliance on <u>Burkhalter Travel Agency v. MacFarms Int'l,</u>

5    <u>Inc.</u> for the contrary proposition is unpersuasive.  <u>See</u> 141 F.R.D. 144 (N.D. Cal. 1991).  It

6    is true that in that case, the court considered the cost-plus contract exception post-<u>Kansas</u>,

7    and held that the exception applied.  However, the court did not engage in any discussion

8    related to the burden of proof with respect to its application.  Accordingly, it does not aid the

9    analysis here.

10         In conclusion, the court holds that it is defendants who must prove that the cost-plus

11   contract exception applies.  In seeking summary judgment as to this issue, therefore,

12   defendants must produce admissible evidence demonstrating that there are no triable

13   issues of fact regarding application of the exception.  It then falls to plaintiffs to overcome

14   defendants' evidence, with proof of materially disputed facts.

15              3.    Evidence of Pre-existing Cost-plus Contracts

16         This brings the court to the final issue presented by the instant motion:  whether

17   defendants have presented sufficient evidence of qualifying cost-plus contracts to warrant

18   application of the exception.  In accordance with the standards enunciated above, to be

19   successful, defendants must specifically point to evidence of *pre-existing* cost-plus

20   contracts, pursuant to which subsequent purchasers purchased a *fixed quantity* of goods.

21   <u>See Lucas Automotive Eng'g</u>, 140 F.3d at 1234.

22         Defendants rely on three sources of evidence in their attempt to meet this burden.

23   First, they point to deposition testimony purportedly demonstrating that "several plaintiffs

24   package DRAM as one item among a bundle of goods and services that they provide to

25   their customers...".  <u>See</u> Declaration of Christopher Flack ("Flack Decl."), Exs. A-E.

26   Second, they point to "one example uncovered through discovery," of a purported qualifying

27   cost-plus contract between Apple computer and Solectron Corporation – Solectron directly

28

United States District Court
For the Northern District of California

1   buys DRAM from entities like defendants and uses it to manufacture products for Apple

2   under a cost-plus pricing formula.  See Flack Decl., Ex. H.  According to defendants, this

3   single contract demonstrates that Apple, as the final OEM to whom Solectron sells its

4   products, is charged the full cost that Solectron pays for the DRAM it purchases, plus a

5   one-percent margin over that cost.  See id. at SOL000196, 163.  Finally, defendants also

6   cite to the Declaration of Michael Bokan – a director of sales for Micron – in which Mr.

7   Bokan claims that he knows of numerous customers who purchase DRAM for resale in

8   accordance with "cost-plus" contracts.  See Bokan Decl., ¶¶ 3-4.

9        This evidence, however, is deficient.  First, the deposition testimony relied on by

10  defendants do not say what defendants say it does.  Presumably, defendants hope to

11  prove with the testimony that the DRAM packaged as an item can be separately tracked

12  through to the ultimate purchaser of the item – thereby providing a foundation for

13  application of the cost-plus contract rule.  But actual review of the deposition testimony

14  demonstrates that the deponents are nearly all testifying as to general job duties and

15  descriptions for what their companies do.  See Flack Decl., Exs. A-E.  They are in no way

16  affirmatively stating that DRAM is sold, or can be characterized, as a separate item within a

17  bundle of goods and services.  Furthermore, even if the testimony did support this

18  interpretation, it would still fall short of establishing the existence of any physical, pre-

19  existing, fixed quantity cost-plus contracts that qualify for application of the exception.

20  Indeed, to the contrary, the testimony of one of the deponents, Steven Coraluzzi, expressly

21  states that Mr. Coraluzzi had no contracts whatsoever with Crucial Technologies, a division

22  of defendant Micron.  See id. at Ex. A.

23       Second, with respect to the Apple/Solectron contract, neither Apple nor Solectron

24  are named plaintiffs in the instant action.  Assuming, therefore, that defendants attempt to

25  use the Apple/Solectron contract as evidence of unnamed class members' cost-plus

26  contracts, defendants provide no legal or other authority that would justify imputing the

27  existence of this single agreement to other unnamed class members, or to the class as a

28

47

United States District Court

For the Northern District of California

1  whole.  Nor is there any reason to assume, based on this one agreement, that other

2  unnamed class members had similar agreements.  Moreover, plaintiffs raise valid

3  arguments regarding the agreement itself.  Notably, they point out that the contract does

4  not appear to require the purchase of a fixed quantity of DRAM.  See Flack Decl., Ex. H.

5  Defendants, for their part, fail to overcome this with any evidence to the contrary.  As such,

6  it simply cannot be said that the Apple/Solectron contract qualifies as a valid pre-existing

7  cost-plus contract.

8       Finally, to the extent that defendants rely on the Bokan Declaration for added

9  support of its argument that cost-plus contracts exist, the Bokan Declaration is wholly

10  unpersuasive.  Mr. Bokan does not affirmatively point to any cost-plus contracts

11  whatsoever.  He merely states that he "believe[s] that contract manufacturers frequently

12  agree to take no profit, or to take a fixed, cost-plus profit, on DRAM purchased for use in an

13  OEM's products."  See Bokan Decl., ¶ 3.  Not only is this insufficient proof of the existence

14  of any cost-plus contracts, but as plaintiffs point out, most of this testimony is objectionable

15  as inadmissible hearsay.  To that end, the court disregards the testimony contained therein.

16

17       In sum, it simply cannot be said that defendants have met their burden in pointing to

18  evidence establishing that there are valid pre-existing, fixed quantity, cost-plus contracts

19  that warrant imposition of the exception in this case.

20       Nor does Burkhalter Travel Agency, discussed above, require a contrary conclusion.

21  In Burkhalter, the court considered a situation in which the plaintiff directly purchased

22  macadamia nuts from defendants, and subsequently passed the entire cost of the

23  macadamia nuts on to a subsequent purchaser pursuant to an existing agreement between

24  them.  Defendants argued that the cost-plus contract exception applied, and the court

25  agreed.  The court, however, assumed the existence of a qualifying cost-plus agreement.

26  Here, by contrast, as analysis of the above evidence demonstrates, defendants have not

27  proven the existence of any qualifying agreement, either between a named plaintiff and a

28

1   subsequent purchaser, or even between an unnamed plaintiff and a subsequent purchaser.

2   As such, there is simply no proof that the exception applies.

3          Defendants attempt to avoid this inevitable conclusion by arguing that, if they lack

4   sufficient evidence, it is only because plaintiffs thwarted their prior discovery efforts to

5   obtain relevant evidence going to this issue.  They note that, despite their seeking

6   information relating to cost-plus contracts during discovery, plaintiffs refused to produce

7   any, and after a motion to compel, the magistrate judge refused to order its production.

8   See Flack Decl., Exs. F, G.  To that end, defendants also seek an order from the court

9   "soliciting the information needed to determine whether the cost-plus contract rule applies."

10  Plaintiffs strenuously oppose this request, asserting that discovery has closed, that only

11  one defendant – Micron – ever sought discovery on the cost-plus contracts issue in the first

12  place, and that defendants failed to timely object to the magistrate judge's discovery ruling.

13         As the court stated at the hearing on this motion, these facts do present cause for

14  concern.  The court is particularly troubled by the fact that plaintiffs' counsel appears to

15  have engaged in the practice of regularly instructing clients and deponents not to answer

16  deposition questions regarding the existence of qualifying cost-plus contracts.  See, e.g.,

17  Sampson Decl., Ex. 138 at 184.  As counsel for plaintiffs is undoubtedly aware, instructions

18  not to answer are not proper in practice before this court, unless made in response to

19  inquiries that would require the disclosure of privileged information.  The impropriety of

20  such instructions here is made all the more striking because evidence with respect to the

21  existence of cost-plus contracts is, as demonstrated above, unquestionably relevant to this

22  case.  As such, had the issue been properly raised before the court – and there is no

23  indication that the issue as presently framed before the court was even raised with the

24  magistrate judge – the court would have provided defendants with timely relief.   As it

25  stands, however, the court is left only with the present discovery record.  For having made

26  a strategic decision not to challenge the magistrate judge's earlier decision, or to raise the

27  issue prior to the close of discovery, defendants are bound by their actions, unfortunate

28

49

United States District Court

For the Northern District of California

1    though the result may be.

2           As such, the court is left with no choice but to conclude, based on the evidence

3    submitted before it, that defendants have failed to present, as is their burden, evidence that

4    there are qualifying cost-plus contracts that warrant application of the exception here.

5    Having failed to so demonstrate, it is irrelevant whether plaintiffs present any facts that

6    materially dispute the exception's application, as the exception itself is not before the court.

7    Accordingly, summary judgment on the issue is DENIED.

8           F.      Motions to Seal

9           The parties have also filed numerous administrative requests to seal certain

10   documents and portions of briefs filed in connection with the present motions for summary

11   judgment.  The court has made a good faith effort to review these requests, alongside the

12   actual exhibits to which the requests purportedly refer.  However, after trying

13   unsuccessfully to match each document sought to be filed under seal with a corresponding

14   administrative request referring to the specific document and setting forth good cause, the

15   court concludes that the parties' motions to seal are simply too piecemeal to lend

16   themselves to a satisfactory determination by the court.  Moreover, as the supporting

17   declarations themselves indicate, it is not wholly clear that many of the documents justify a

18   sealing order, under the standard enunciated in Kamakana v. City of Honolulu, 447 F.3d

19   1172 (9th Cir. 2006).

20          As such, if the parties wish the court to grant sealing requests covering certain

21   documents or portions thereof in connection with the instant motions, the parties must (1)

22   withdraw all pending administrative requests to seal that have been filed in connection with

23   the instant motions; and (2) each re-file one comprehensive administrative request to seal,

24   which specifically sets forth each individual exhibit, document, or portion thereof that the

25   parties wish to have sealed, and which sets forth, by way of accompanying declaration, a

26   "compelling reason" for the sealing of each individual document.  See id. at 1136.  Any

27   revised request to seal filed pursuant to these instructions must be filed no later than

28

1    February 28, 2007.

2        If the parties' re-filed administrative requests to seal do not comply with the above,

3    the court will deny the parties' sealing request.  Alternatively, if the parties do not withdraw

4    their pending motions or file any revised administrative requests to seal by February 28,

5    2007, it will treat the pending motions to seal as either denied or moot.

6        G.    Conclusion

7        For the reasons stated above, the court hereby GRANTS summary judgment in part

8    and DENIES summary judgment in part, as follows: (1) NTC's motion for summary

9    judgment on liability under the Sherman Act is GRANTED; (2) NTC USA's motion for

10   summary judgment on liability under the Sherman Act is DENIED; (3) defendants' motion

11   for partial summary judgment based on DRAM purchases from April 1, 2001 to November

12   30, 2001 is DENIED; and (4) defendants' motion for partial summary judgment based on

13   pre-existing cost-plus contract purchases is DENIED.

14

15   **IT IS SO ORDERED.**

16   Dated: February 20, 2007

17   _____
     PHYLLIS J. HAMILTON
18   United States District Judge

19

20

21

22

23

24

25

26

27

28