1   ANDREW M. CUOMO
    Attorney General of the State of New York
2   JAY L.  HIMES
    Bureau Chief, Antitrust Bureau
3   RICHARD L. SCHWARTZ
    JEREMY R. KASHA
4   Assistant Attorneys General
            Office of the New York Attorney General
5           120 Broadway, 26th Floor
            New York, New York 10271-0332
6           Tel: (212) 416-8262/Fax: (212) 416-6015
        Email:  Jay.Himes@oag.state.ny.us
7                Richard.Schwartz@oag.state.ny.us
                 Jeremy.Kasha@oag.state.ny.us
8   Attorneys for Plaintiff State of New York

9               **UNITED STATES DISTRICT COURT**

10              **NORTHERN DISTRICT OF CALIFORNIA**

11                **SAN FRANCISCO DIVISION**

12  ------------------------------------------------------------ :
                                                                 :   Case No. M-02-01486 PJH (JCS)
13  In re DYNAMIC RANDOM ACCESS MEMORY                           :
    (DRAM) ANTITRUST LITIGATION                                  :
14                                                               :
    ------------------------------------------------------------ :
15                                                               :
    STATE OF NEW YORK,                                           :
16                                                               :
            Plaintiff,                                           :
17                                                               :
            v.                                                   :
18                                                               :
    MICRON TECHNOLOGY, INC.; MICRON                              :   Case Nos.:
19  SEMICONDUCTOR PRODUCTS, INC.;                                :   C-06-06436 PJH (JCS) (N.D. Ca.)
    INFINEON TECHNOLOGIES AG; INFINEON                           :   06-CV-5309 (S.D.N.Y.)
20  TECHNOLOGIES NORTH AMERICA CORP.;                            :
    HYNIX SEMICONDUCTOR, INC.; HYNIX                             :
21  SEMICONDUCTOR AMERICA, INC.;                                 :   **AMENDED COMPLAINT**
    SAMSUNG ELECTRONICS CO., LTD.;                               :
22  SAMSUNG SEMICONDUCTOR, INC.;                                 :
    MOSEL VITELIC CORP.; MOSEL VITELIC                           :
23  INC.; NANYA TECHNOLOGY                                       :
    CORPORATION; NANYA TECHNOLOGY                                :
24  CORPORATION USA, INC.; ELPIDA                                :
    MEMORY, INC.; ELPIDA MEMORY (USA)                            :
25  INC.; and NEC ELECTRONICS AMERICA,                           :   **Trial by Jury Demanded**
    INC.                                                         :
26                                                               :
            Defendants.                                          :
27  ------------------------------------------------------------ :

28

The State of New York, by its Attorney General Andrew M. Cuomo, brings this action to recover treble damages and attorney fees, and seeking civil penalties and injunctive and other equitable relief. The defendants, manufacturers of computer memory chips, participated in one of the largest price-fixing cartels of our time.

More specifically, the State of New York alleges, as and for its Amended Complaint, upon information and belief (except as otherwise indicated), as follows:[1]

**INTRODUCTION**

1.       This action arises from a conspiracy to artificially control and inflate prices of semiconductors known as dynamic random access memory chips ("DRAM"). DRAM are memory chips that hold data and temporary instructions for quick access while the device is in use. One of the most important components of modern digital electronics, DRAM is used in virtually every kind of personal computer, as well as in many servers and other digital electronic devices ("DRAM containing products").

2.       In approximately 1998, the defendant DRAM manufacturers entered into a secret, worldwide conspiracy designed to eliminate competition. Instead of competing, they began coordinating the prices they charged to the large computer manufacturers – commonly known as OEMs ("Original Equipment Manufacturers") – and to their other customers. This pricing coordination was not an isolated or occasional occurrence. Over a period of more than three years, there were hundreds, if not thousands, of pricing communications among the conspirators, intensifying in the days immediately preceding the dates on which the cartel members submitted pricing bids to the OEMs, their largest and most important customers. The conspirators succeeded in their principal objective: controlling DRAM prices and raising them far above competitive levels. As a result, consumers of PCs and other digital devices paid more for DRAM memory – or purchased less of it or purchased DRAM of lesser quality – than they would have

---

[1] New York's Amended Complaint is pleaded pursuant to leave granted in this Court's Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, dated and filed August 31, 2007 (the "Dismissal Order"). With respect to those claims or branches of claims dismissed by the Dismissal Order, New York respectfully reserves its rights.

in a competitive market.  In sum, during the period 1998 through June of 2002, when federal criminal inquiries into the price-fixing scheme began, pervasive exchanges of pricing information, coordination of pricing, and manipulation of the DRAM market became a routine way of doing business among the conspirators.

3.     The scheme continued so long because the conspirators took deliberate steps to maintain its secrecy.  Individuals participating in the price exchanges were instructed to refrain from communicating via emails or cell phone calls, which might reveal their illegal activity.

4.     In June, 2002,  the U.S. Department of Justice launched a criminal investigation. One of the conspirators, Micron, initially denied any culpability, but later agreed to cooperate with federal investigators, revealing the details of the conspiracy in exchange for immunity from criminal charges.  To date, four other companies  – Samsung, Hynix, Infineon and Elpida – have been charged with, and have pleaded guilty to, federal criminal price-fixing.  These four companies have agreed to pay fines in excess of $730 million.  [DOJ Release March 22, 2006.] Moreover, at least 12 employees or officers of these DRAM manufacturers have also pleaded guilty and, in many cases, agreed to serve prison terms in the United States. Justice Department officials have called the conspiracy "one of the largest cartels ever discovered."  [DOJ Release January 30, 2006.]

5.     The DRAM conspiracy caused enormous damage to users of DRAM-containing products and DRAM memory chips.  In particular, New York residents, businesses, schools and government entities purchased significant quantities of products containing price-fixed DRAM chips.  Accordingly, the State of New York brings this action to recover monetary and equitable relief, as set forth below.

## JURISDICTION AND VENUE

6.     This complaint alleges violations of the Sherman Act, 15 U.S.C. §1.  It is filed under, and jurisdiction is conferred upon this Court by, sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26.   The State of New York also alleges violations of state antitrust and consumer protection laws, and seeks damages and civil penalties, as well as injunctive and other equitable relief under those state laws.  All claims under federal and state law are based upon a

common nucleus of operative facts, and the entire action commenced by this Complaint

constitutes a single case that would ordinarily be tried in one judicial proceeding.

7.    The Court further has jurisdiction over the federal claims under 28 U.S.C.

§§ 1331 and 1337.  The Court has jurisdiction over the state law claims under 28 U.S.C. § 1367

because those claims are so related to the federal claims that they form part of the same case or

controversy.

8.    Jurisdiction over Defendants is proper pursuant to 15 U.S.C. § 22 and N.Y.

C.P.L.R. §§ 301 and 302(a)(1), (2) and (3).

9.    Venue is proper in this District and in the Southern District of New York under

15 U.S.C. § 22 and 28 U.S.C. § 1391 because each Defendant resides, transacts business,

committed an illegal or tortious act, or is found in this District, and a substantial part of the

events giving rise to the claims arose in this District.

## THE PARTIES

### Plaintiff

10.    Plaintiff, the State of New York, brings this action as a sovereign state, in its

proprietary capacity and as otherwise authorized by law, including 15 U.S.C. § 15, N.Y. Gen.

Bus. L. § 340 *et seq.*, N.Y. Exec. L. §§ 63(1), 63(12) and the common law. Plaintiff State of New

York sues on behalf of: (a) the State itself, including all of its branches, departments, agencies or

other parts thereof (the "State" or "New York") (all Claims); (b) the non-State entities listed on

the attached Schedule A ("Requesting non-State Public Entities") (Third Claim and the First and

Second Claims in the alternative); and (c) natural persons in New York who purchased DRAM

or DRAM-containing products indirectly from Defendants or their co-conspirators (Fourth

Claim).  In addition, for ease of exposition, the term "non-State Public Entities" shall refer to all

New York subdivisions, counties, cities, towns, villages, local governmental units, school

districts, and other public entities created under New York law – not simply to Requesting non-

State Public Entities.

//

//

**Defendants**

11.     Defendant Micron Technology, Inc. is a Delaware corporation with its principal place of business at 8000 South Federal Way, Boise, Idaho.  During the time period covered by this Complaint, Defendant Micron Technology, Inc. manufactured, sold and distributed DRAM throughout the United States, including New York, as well as worldwide.

12.     Defendant Micron Semiconductor Products, Inc. is a wholly owned and controlled subsidiary of Defendant Micron Technology, Inc., with its principal place of business at 8000 South Federal Way, Boise, Idaho.  During the time period covered by this Complaint, Defendant Micron Semiconductor Products, Inc., by itself and through its Crucial Technology division, sold and distributed DRAM to customers throughout the United States, including New York and worldwide.  Micron Technology, Inc. and Micron Semiconductor Products, Inc. (including the Crucial Technology division) are referred to collectively as "Micron."

13.     Defendant Infineon Technologies AG is a German corporation with its principal place of business at St. Martin-Str. 53, 81669, Munich, Germany.  During the time period covered by this Complaint, Defendant Infineon Technologies AG manufactured, sold and distributed DRAM throughout the United States, including New York, as well as worldwide.

14.     Defendant Infineon Technologies North America Corp. is a wholly owned and controlled subsidiary of Infineon Technologies AG, with its principal place of business at 1730 North First Street, San Jose, California.  During the time period covered by this Complaint, Defendant Infineon Technologies North America Corp. sold and distributed DRAM to customers throughout the United States. Infineon Technologies AG and Infineon Technologies North America Corp. are referred to collectively as "Infineon."

15.     Defendant Hynix Semiconductor, Inc. is a business entity organized under the laws of South Korea, with its principal place of business at SAN 136-1, Ami-Ri Bubal-eub, Ichon-si, Kyongki-do, Korea.  During the time period covered by this Complaint, Defendant Hynix Semiconductor, Inc. manufactured, sold and distributed DRAM to customers throughout the United States, including New York, as well as worldwide.

16.     Defendant Hynix Semiconductor America, Inc. is a wholly owned and controlled

1   subsidiary of Defendant Hynix Semiconductor, Inc., with its principal place of business at 3101

2   North First Street, San Jose, California.  During the time period covered by this Complaint,

3   Defendant Hynix Semiconductor America, Inc. sold and distributed DRAM to customers

4   throughout the United States, including New York, as well as worldwide.  Hynix Semiconductor,

5   Inc. and Hynix Semiconductor America, Inc. are referred to collectively as "Hynix."

6          17.    Defendant Samsung Electronics Co. Ltd. is a business entity organized under the

7   laws of South Korea, with its principal place of business at Samsung Main Building 250-2 ga,

8   Taepyung-ro Chung-gu, Seoul, Korea.  During the time period covered by this Complaint,

9   Defendant Samsung Electronics Co. Ltd. manufactured, sold and distributed DRAM to

10  customers throughout the United States, including New York, as well as worldwide.

11         18.    Defendant Samsung Semiconductor, Inc. is a wholly owned and controlled

12  subsidiary of Defendant Samsung Electronics Co. Ltd., with its principal place of business at

13  3655 North First Street, San Jose, California.  During the time period covered by this Complaint,

14  Defendant Samsung Semiconductor, Inc. sold and distributed DRAM to customers throughout

15  the United States, including New York, as well as worldwide.  Samsung Electronics Co. Ltd.,

16  and Samsung Semiconductor, Inc. are referred to collectively as "Samsung."

17         19.    Defendant Mosel Vitelic, Inc. ("MVI") is a business entity organized under the

18  laws of Taiwan, with its principal place of business at No. 19 Li Hsin Road, Hsinchu Science

19  Based Industrial Park, Hsinchu, Taiwan, R.O.C.   During the time period covered by this

20  Complaint, Defendant Mosel Vitelic, Corp. manufactured, sold and distributed DRAM to

21  customers throughout the United States, including New York, as well as worldwide.

22         20.    Defendant Mosel Vitelic Corporation ("MVC") is a wholly owned and controlled

23  subsidiary of MVI with its principal place of business at 3910 North First Street, San Jose,

24  California.  During the time period covered by this Complaint, Defendant  MVC sold and

25  distributed DRAM to customers throughout the United States, including New York, as well as

26  worldwide.  MVC and MVI are referred to collectively as "Mosel Vitelic."

27         21.    Defendant Nanya Technology Corporation is a business entity organized under

28  the laws of Taiwan, with its principal place of business at HWA YA Technology Park, 669, Fu

1   Hsing 3rd Rd., Kueishan, Taoyuan, Taiwan, R.O.C.   During the time period covered by this

2   Complaint, Defendant Nanya Technology Corporation manufactured, sold and distributed

3   DRAM to customers throughout the United States, including New York, as well as worldwide.

4         22.     Defendant Nanya Technology Corporation USA, Inc. is a wholly owned and

5   controlled subsidiary of Nanya Technology Corporation, with its principal place of business at

6   675 E. Brokaw Road, San Jose, California.  During the time period covered by this Complaint,

7   Defendant Nanya Technology USA, Inc. sold and distributed DRAM to customers throughout

8   the United States, including New York, as well as worldwide.   Nanya Technology Corporation

9   and Nanya Technology Corporation USA, Inc. are referred to collectively as "Nanya."

10        23.     Defendant Elpida Memory, Inc. is a business entity organized under the laws of

11  Japan, with its principal place of business at Sumitomo Seimei Yaesu Bldg., 3F, 2-1 Yaseu

12  2-chome, Chuo-ku, Tokyo, Japan.   During the time period covered by this Complaint,

13  Defendant Elpida Memory, Inc. manufactured, sold and distributed DRAM to customers

14  throughout the United States, including New York, as well as worldwide.

15        24.     Defendant Elpida Memory (USA), Inc. is a wholly owned and controlled

16  subsidiary of Elpida Memory, Inc., with its principal place of business at 2001 Walsh Avenue,

17  Santa Clara, California.  During the time period covered by this Complaint, Defendant Elpida

18  Memory (USA) Inc. sold and distributed DRAM to customers throughout the United States,

19  including New York, as well as worldwide. Elpida Memory, Inc. and Elpida Memory (USA),

20  Inc. are referred to collectively as "Elpida."

21        25.     Defendant NEC Electronics America, Inc. ("NEC") is a wholly owned and

22  controlled subsidiary of NEC Electronics Corporation, with its principal place of business at

23  2880 Scott Boulevard, Santa Clara, California, and its manufacturing plant in Roseville,

24  California.   During the time period covered by this Complaint, Defendant NEC sold and

25  distributed DRAM to customers throughout the United States, including New York, as well as

26  worldwide.

27  //

28  //

AMENDED COMPLAINT

-7-

CASE NO. M-02-01486 PJH (JCS)
C-06-06436 PJH (JCS)

**The Conspiracy and Co-Conspirators**

26.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered, done, or ratified by their respective officers, agents, employees or representatives while actively engaged in the business or affairs of each Defendant.

27.     Each named Defendant acted as the agent of, or otherwise for or on behalf of, each other Defendant with respect to the matters alleged in this Complaint.  Each Defendant that is a subsidiary of a foreign parent acts and acted – in the United States, including the State of New York – as the agent of, or otherwise for or on behalf of, its parent company.

28.     Various others participated as co-conspirators with Defendants in the violations of law alleged in this Complaint and have engaged in conduct and made statements in furtherance of the conspiracy.

**INTERSTATE COMMERCE**

29.     At all times relevant to this action, Defendants participated in the market for DRAM.  Their activities in that market (and those of their co-conspirators) were in the regular, continuous, and substantial flow of interstate and foreign commerce, and had a substantial effect on interstate and foreign commerce of the United States, including the State of New York.  Those activities included the manufacture, sale and distribution of DRAM, the submission of prices to OEMs and other DRAM customers, and the illegal fixing and coordination of those prices.

**DRAM:  THE PRICE FIXED PRODUCT**

**The Product And Its Functions**

30.     DRAM  are high-speed memory chips, used to store data in a wide variety of computing and other electronic devices while the device is in operation.  The chips consist chiefly of  silicon "wafers" onto which millions of transistors – circuits for the flow of electrons – have been traced.  Through these transistor switches, electrons are shunted back and forth, and stored in the memory cells created on the surface of the chips.  These intricate arrangements of electrons must be recharged or "refreshed" by fresh flows of electrons – something that happens automatically thousands of times per second.  This constant refreshing, which ensures

1   continuous availability,  is why these memory chips are called "dynamic."

2       31.   **"**Random Access Memory" means that the data on the chip, stored in the form of

3   0s and 1s, can be accessed directly from any part of the memory, rather than having to proceed

4   sequentially from a starting place.  A DRAM chip is thus the opposite of, for example, a cassette

5   tape from which data can be retrieved only in a fixed sequence.

6       32.   DRAM chips perform a crucial function in PCs and many other electronic

7   devices:  to hold data and instructions available for quick and random access while the device is

8   in use.  For purposes of this Complaint, DRAM includes not only Dynamic Random Access

9   Memory chips, but also Synchronous Dynamic Random Access Memory ("SDRAM") and

10  Double-Data Synchronous Dynamic Random Access Memory ("DDR") chips.  SDRAM and

11  DDR are high-speed, high-performance types of DRAM chips.

12      33.   A key attribute of a DRAM chip is its "density" – the amount of information it

13  can store in the tiny circuits etched into its silicon surface.  The basic unit of information is the

14  "bit", designated by an "on/off" flow of electrons.  Eight bits are packaged together as a "byte."

15  Technological progress in the DRAM industry has been rapid, and is reflected in increasing chip

16  capacity, measured in bytes.  Approximately every three years, a new, higher density chip has

17  reached the market, permitting PCs and other electronic devices to process greater amounts of

18  information more quickly in a shrinking space.

19      34.   Typically, sales of DRAM show rising trendlines for each new key product,

20  which then shift downward as a new DRAM product is brought to market.  Thus, in 1998, sales

21  of the 16 megabyte ("MB") chip, which had been introduced several years before, far exceeded

22  those of any other chip.  Thereafter, sales of the 16MB chip fell, as the product was successively

23  superseded, within a few years, by the 64MB chip, the 128MB chip, and the 256MB chip, which

24  is still the current leader.

25      35.   Until approximately 1998, when the conspiracy began,  density-adjusted prices

26  for DRAM  generally declined over time. An important reason for this was that, while DRAM

27  are complex and costly to manufacture, the chips do not differ significantly, regardless of who

28  manufactures them.  As a consequence, DRAM chips tend to be substitutable, one for another –

1   what economists call a "commodity" product. DRAM purchasers were thus able to buy chips

2   from multiple sources, preventing any single manufacturer from amassing significant pricing

3   power.  As DRAM technology improved, manufacturers of computers and other electronic

4   devices were able to cut the cost and improve the quality of their own products, effectively

5   passing these improvements in DRAM price and performance along to consumers.

6        36.    DRAM are produced in highly automated facilities, called "fabs."   Even for an

7   established firm – let alone a newcomer to the market – constructing a fab is a risky undertaking,

8   often requiring years of work and a significant investment that can exceed a billion dollars.   In

9   the period 1998 through 2002 the industry trend was strongly toward consolidation.  Smaller

10  players dropped out of the market, or were acquired by the major players:  Samsung, Micron,

11  Hynix and Infineon.

12       37.    Because DRAM manufacture is a difficult and costly business to enter, DRAM

13  production capacity tends to be relatively fixed for years into the future.  Thus, existing DRAM

14  firms need not fear that new competitors will emerge quickly or easily, and – absent a

15  competitive environment – they can price DRAM accordingly.

16                 **Major DRAM Purchasers:  Computer OEMs**

17       38.    The principal use of DRAM chips is in personal computers.  PC OEMs are,

18  therefore, the DRAM manufacturers' largest and most important customers.  During the period

19  of the DRAM conspiracy, these OEMs included Dell, Inc., Hewlett-Packard Company, Compaq

20  Computer Corporation, IBM Corporation, Apple Computer, Inc., and Gateway, Inc., among

21  others.

22       39.    Each of these OEMs purchased from several of the DRAM manufacturers.  Some

23  terms of purchase, and business targets, were set in agreements generally entered into by each of

24  the OEMs with each of its DRAM suppliers.  OEMs generally subjected the particular products

25  to testing and qualification processes.  Many of the DRAM products that the OEMS purchased

26  were not single chips, but rather, modules, *i.e.,* sets of chips soldered onto a modular printed

27  circuit board, which was then assembled as part of a PC.

28       40.    The key terms of DRAM sales – price and quantity – arose from negotiations

1   between the DRAM manufacturers and the OEMs.  Negotiations were structured around

2   bi-weekly or one month intervals.  At the end of that period, agreements on price were reached,

3   which were effective for the next two weeks or one month.  For the OEMs, DRAM procurement

4   teams operated in a competitive downstream market, in which consumers had come to expect

5   declining price points and increased performance.

6       41.    OEMs often solicited initial or "first pass" pricing proposals from their DRAM

7   suppliers. These price quotes were a starting point for further negotiations, conducted by

8   meetings, teleconferences, and exchanges of emails between an OEM and its DRAM suppliers.

9   In the negotiations, each side tried to buttress its position by appealing to current market

10  conditions and trends.  An important market variable was the relationship of the "spot" price –

11  the price at which DRAM chips could be obtained on the open market – to the "contract" price

12  that the OEM paid its DRAM suppliers.  If the spot price rose above the contract price, the

13  DRAM manufacturer argued that the contract price should rise to reflect market conditions.

14  Correspondingly, if the spot price dropped, OEMs generally sought a downward price

15  adjustment.

16      42.    Because the OEMs purchased from several DRAM suppliers, a particular OEM

17  could, and did, threaten to shift business away from a particular DRAM manufacturer that it

18  believed was pricing too aggressively.  Each DRAM manufacturer, on the other hand, while

19  often striving to establish itself as a favored supplier with these "core" or "strategic" accounts,

20  knew that the OEMs had long-term incentives not to concentrate their purchases excessively

21  among too small a group of DRAM suppliers.  To do so would render an OEM more vulnerable

22  to supply shortages or price increases in the future.  As described below, the conspirators used

23  illegal means to upset this balance of market forces in their favor.

24          **The Conspiracy Forms And Increases Prices**

25      43.    Because PCs accounted for so substantial a share of total DRAM production,

26  negotiations between DRAM manufacturers and PC OEMs were a focal point of price

27  competition among DRAM manufacturers.  In approximately 1998, the DRAM manufacturers

28  began to put an end to that competition and to raise prices to the OEMs.  To achieve this goal,

AMENDED COMPLAINT

-11-

CASE NO. M-02-01486 PJH (JCS)
C-06-06436 PJH (JCS)

1   one of the DRAM manufacturers' principal means was the systematic and continuous exchange

2   among themselves of confidential pricing information relating to the bids that each submitted to

3   the OEMs at two or four week intervals.

4        44.    The sheer number of DRAM executives who participated in the exchanges of

5   price information is extraordinary. Although the total number remains unclear, in sworn

6   evidence Samsung has acknowledged that 48 of its executives and employees may have obtained

7   or received competitive information, and it has provided a list of 30 additional Samsung

8   executives and employees who may also have been involved.  Hynix has acknowledged that at

9   least 15 of its executives had contacts with competitors related to pricing or the DRAM market

10  in general. Infineon has identified at least 16 of its executives who had pricing-related contacts

11  with their DRAM competitors. Micron has identified 20 of its executives and employees who

12  had pricing-related communications with competitors

13       45.    These exchanges occurred at several levels. At one level, there was a continuous

14  exchange of pricing information among the DRAM manufacturer account executives, who were

15  primarily involved, on a day-to-day basis, in price negotiations with a particular OEM.  For

16  example, at Hynix Semiconductor America, a subsidiary of Hynix Semiconductor Inc., an

17  account executive for IBM during the period of the conspiracy was Paul Palonsky.  As Hynix

18  has acknowledged in sworn evidence, Palonsky gathered competitive pricing information

19  "directly from competitors, including Samsung, Micron, Infineon, Hitachi, Toshiba, Elpida, LG,

20  and NEC."

21       46.    Palonsky exchanged pricing information, among others, with Tom Treventi of

22  Infineon, primarily by telephone, as frequently as once per month during the period between

23  mid-1999 and the end of 2001.  They exchanged information on such topics as:  (a) current

24  prices charged to IBM; (b) possible prices to be quoted to IBM during upcoming negotiations;

25  (c) actual prices quoted to IBM during negotiations; and (d) actual prices agreed upon with IBM

26  during negotiations.

27       47.    During this same period, Palonsky's counterpart at Micron was Keith Weinstock,

28  worldwide account executive for IBM.  Between summer 1998 and spring 2002, Weinstock and

1  Palonsky spoke regularly, in general over the telephone.  They also lunched together during the

2  same period.   According to Micron itself:  "Weinstock and Palonsky discussed various topics

3  including  . . . price or price quotes, in terms of ranges. Weinstock and Palonsky exchanged

4  information about what they believed their respective employers planned to initially quote to

5  IBM in upcoming negotiations . . . . Palonsky would provide Weinstock with specific bid figures

6  that he said were the initial bids offered to IBM by DRAM suppliers other than Hynix."

7       48.     These account executives worked under the direction of higher-level corporate

8  officials, who, in turn, exchanged pricing information with their counterparts at competing firms,

9  and then relayed directions to the account executives they supervised.  For example, between

10  April 1999 and June 2002, Palonsky worked for CK Chung, Hynix's Director of Worldwide

11  Strategic Account Sales.  Hynix has acknowledged that Chung not only collected pricing

12  information, which his subordinates had obtained from Hynix's competitors; Chung also had his

13  own direct pricing discussions with competitors.  Chung's contacts with executives at Samsung

14  are illustrative.  At times, he spoke with a Samsung contact about pricing and other issues as

15  frequently as once every two weeks.

16       49.     As Hynix has also admitted, Chung transmitted this "pricing information from

17  competitors to his superiors with the knowledge that the information would be used to set Hynix

18  pricing to OEMs in the United States."  Emails reflect that Chung relayed the competitive

19  pricing information that he obtained from his competitor-contacts to his superior, DS Kim, and

20  widely throughout the Hynix sales and marketing organization.

21       50.     A March 2001 email exchange between Palonsky and Chung regarding

22  Palonsky's negotiations with IBM illustrates how the price exchange and coordination process

23  drove DRAM prices upward. At the time, IBM was resisting Hynix's pressure to raise a DRAM

24  module price from $36 to $38.  Palonsky reported to Chung:

25       I talked to IBM about the potential that we might want to raise
         prices now to the $38.00 level. This was received very poorly.
26       IBM told me we would be alone and they would be forced to cut
         our share. IBM does not expect their biggest and favorite supplier
27       to lead the price up.

28       51.     IBM assured Palonsky that other suppliers were charging no more than $36, and

1  had even committed not to increase prices until April 15.  Based on IBM's feedback, Palonsky

2  recommended that Hynix's pricing stay "flat," but sought Chung's authorization to proceed.  On

3  the same day, however, Chung emailed back the information he had obtained from Samsung, the

4  largest DRAM manufacturer:

> Before you submit our final price as you suggested for the first part
> of April, please have a last minute coordination with SS
> [Samsung]. They are saying they will go with $38. . . .  If you can
> have SS lead the charge, you will follow Samsung's leadership.

52.    The same pattern was repeated at other OEMs, as the conspirators continuously
and systematically relied on pricing information from their competitors to guide their own
pricing decisions.  A January 2002 email exchange between Infineon's Dennis Lee, the Gateway
account manager, and Joachin Soucheiron, another Infineon executive, provides another
example.  Soucheiron solicited input from Lee on Infineon's intended price quote to Gateway:

> [P]lease check with your usual channels and let's discuss. I do
> NOT want to be any higher than our competitors, but I believe they
> will be aiming high as well given the current market situation.
> (emphasis in original)

Later that day, Lee transmitted specific competitor prices back to Sourcheiron and to T. Rudd
Corwin, Infineon's Vice President for Sales of Memory Products:

> Here are some price proint [sic] for you from our friends at Micron
> and Hynix - Micron dropped the bomb last Friday and Hynix is
> increasing the pricing today. . . .  Let me know what you think . . . .
> it will be better if we don't have the exact same price as Hynix and
> Micron. . . .

53.    The pricing information that the DRAM manufacturers illegally shared was used
to set prices across the entire range of key accounts. At Micron, for example, during the relevant
period, there were weekly "core account" conference calls.  High-level Micron sales executives
presided over exchanges of information among the Micron account executives responsible for
each of the major OEMs. This included pricing information obtained directly from Micron's
competitors.

54.    The sensitive competitive information that the DRAM manufacturers
continuously exchanged was not always narrowly targeted to boost the prices they charged to the
OEMs. Broader exchanges of information also took place. In July 2001, for example, Infineon's

1   Christine Lee forwarded to her superior, Rudd Corwin, Micron's then-current price book, which

2   listed DRAM prices by alphanumeric part numbers.

3       55.    The conspirators also exchanged price-related information regarding the DRAM

4   "spot" market. In contrast to the OEM sales described above, which generally were made

5   pursuant to contracts, DRAM also were sold on the spot market on a single transaction basis, for

6   immediate or short-term delivery.  The spot market price was important to DRAM market

7   participants, even if they themselves did not make "spot" purchases, because it provided a

8   "real-time" measure of changing market demand.  Some spot price data was available to market

9   participants publicly; commercial services also provided data.  As noted above, where "spot"

10  prices dropped below "contract" prices, contract customers, such as the OEMs, could use that

11  market indicator to pressure the DRAM manufacturers to adjust contract prices downward.

12      56.    The conspirators therefore took steps to control spot, as well as contract, prices.

13  Micron has acknowledged, for example, that an executive with responsibility for spot sales

14  communicated with executives from both Samsung and Infineon regarding spot market prices.

15  Specifically, Micron has admitted that James Alt, its Channel Sales Account Manager during

16  part of the relevant period, spoke to Samsung's Jim Elliott by telephone between January 2002

17  and June 2002, and that Elliott and Alt exchanged information regarding the price ranges that

18  their respective employers were quoting to spot customers.  Alt also exchanged spot market price

19  quote ranges with Jim Champion, an Infineon employee with responsibility for spot sales.

20      57.    As noted above, the prices paid by OEMs and the spot prices were pricing

21  benchmarks.  In consequence, the effects of the price manipulation engaged in by the DRAM

22  manufacturers extended throughout the DRAM market, affecting prices to DRAM customers

23  beyond merely the OEMs.

24      58.    Sensitive information was also communicated in face-to-face meetings of

25  competitors.  During an August 1999 meeting of executives from Infineon and Hyundai (later

26  Hynix), Hyundai provided Infineon with specific figures for Hyundai's "SAM" ("share of

27  market") at major OEMs such as Dell, HP and IBM.  The information detailed the share of total

28  DRAM purchases made by each of those OEMs that Hyundai's own sales represented.  In

1   addition, Hyundai provided DRAM market forecasts to its competitor, Infineon.

2       59.   An internal email, written by Samsung Vice-President Mike Bocian to other top

3   Samsung executives, is revealing.  Bocian, an active member of the conspiracy, exchanged

4   pricing information with a top Micron marketing executive, Bill Lauer, among others,

5   concerning Dell, the world's largest OEM.  Bocian and Lauer exchanged their respective

6   companies' current intentions to lower, hold, or raise their price quotes, and they described their

7   expectations about their companies' likely price quotes by using phrases such as "sub $20" or

8   "plus $30."

9       60.   In March of 2002, Bocian was asked for a report on "current pricing issues."  In a

10  responding email, he highlighted that it was:

11              key to our advantage. . . the successful dramatic rate of pricing
               increases. . . . They [DRAM customers] clearly never expected the
12              supply base [DRAM manufacturers] would stick together to bring
               the price up so quickly. . . .
13

14      61.   Incredibly, an official of defendant Mosel Vitelic Inc. was even quoted in the

    press bragging about the cartel's manipulation of prices:

15
                We're trying to encourage a price of $3. . . . That's the
16              consensus. . . . [Y]ou just need to have a phone call. . . Everybody
                knows each other.  We just said "try not to sell below $3."
17

18      62.   An official of Defendant Nanya has also been quoted openly discussing

    anticompetitive measures:
19
                "Everyone is feeling the need of cutting production," said Charles
20              Kau, an executive vice president with Linko-based Nanya
                Technology.  "As of [sic] how to engage in the cut is an issue that
21              needs to be discussed."  Nanya is wiling to cooperate in such a cut,
                he added.
22

23      63.   In sum, during the period 1998 through June of 2002, when federal criminal

24  inquiries into the price-fixing scheme began, pervasive exchanges of pricing information,

25  coordination of pricing, and manipulation of the DRAM market became a routine way of doing

26  business among the conspirators.  Although the conspirators took steps to conceal their unlawful

27  activity, by the spring of 2002, the conspiracy's effects – significant price increases – were clear

    to at least some major DRAM purchasers.
28

AMENDED COMPLAINT                                              CASE NO. M-02-01486 PJH (JCS)
                                                              C-06-06436 PJH (JCS)

64.     To reiterate, four of the DRAM manufacturers – Samsung, Infineon, Hynix, and Elpida, all of which are named defendants – have pleaded guilty to participating in this unlawful conspiracy.  Each has acknowledged entering into illegal price-fixing agreements and making substantial sales that were affected by the conspiracy.

65.     Samsung, for example, has admitted that "[d]uring the relevant period [on or about April 1, 1999 to on or about June 15, 2002] [Samsung's] sales directly affected by the conspiracy to OEMs in the United States totaled approximately $1.3 billion." *United States v. Samsung Electronics Co., Ltd., et al.,* N. D. Ca., No. CR-05-0634 PJH,  Sentencing Hearing Tr., at 19 (Nov. 30, 2005).

66.     Similarly, Hynix has admitted that: "[d]uring at least certain periods of time during that relevant period [on or about April 1, 1999 to on or about June 15, 2002] [Hynix], through certain officers and employees participated in a conspiracy in the United States and elsewhere . . .  the primary purpose of which was to fix the price of DRAM sold to certain OEMs . . . .  During the relevant period Hynix DRAM sales, directly affected by the conspiracy, to OEMs in the United States totalled 839 million U.S. dollars." *United States v. Hynix Semiconductor, Inc.,* N. D. Ca., No. CR 05-249 (PJH), Sentencing Hearing Tr., at 22-23 (May 11, 2005).

67.     Infineon has acknowledged:  "At certain times during the relevant period [on or about July 1, 1999 to on or about June 15, 2002) DRAM prices decreased significantly; nevertheless the defendant and its co-conspirators reached agreements to limit the rate of price declines which were achieved with varying levels of effectiveness. At other relevant periods the defendant and its conspirators reached agreements on price increases and were able to institute price increases on certain sales to certain OEMs."  *United States v. Infineon Technologies AG,* N. D. Ca.., No. CR-04-0299 PJH, Sentencing Hearing Tr. at 32 (October 20, 2004).

68.     Micron received immunity from the U.S. Department of Justice and, therefore, did not plead to criminal charges.  But its Chairman, CEO and President, Steve Appleton, has publicly admitted that "[t]he DOJ's investigation revealed evidence of price fixing by Micron employees and its competitors on DRAM sold to certain computer and server manufacturers."

1  Indeed, in sworn evidence provided to the State, Micron has admitted that it no longer "agrees"

2  with an earlier public statement that it did not violate "the U.S. antitrust laws."

3                          **FRAUDULENT CONCEALMENT AND TOLLING**

4          69.     The conspirators were careful to conceal the means by which they achieved their

5  illegal control over DRAM pricing. At Micron, for example, executives were instructed not to

6  report on pricing-related contacts with competitors via email or cell phone. Also, as illustrated

7  above, in some instances the conspirators discussed means of concealing the conspiracy, and

8  were concerned that quoting identical prices might reveal their collusion.  Moreover, like

9  price-fixing schemes generally, the conspiracy was inherently self-concealing.  Although the

10  OEMs felt the direct effects of the illegal activity, they did not suspect that it was occurring.

11         70.     The State of New York did not discover, and could not have discovered through

12  the exercise of reasonable diligence, the existence of the claims alleged until after the first of the

13  DRAM manufacturers' guilty pleas to federal antitrust charges.

14         71.     As a result of the DRAM manufacturers' active, intentional, and fraudulent

15  concealment, the statutes of limitations governing the claims asserted in this action have been

16  tolled.

17                  **THE ASSIGNMENT OF DIRECT CLAIMS TO THE STATE**

18         72.     During the relevant period, both the New York State and  non-State Public

19  Entities made substantial purchases of DRAM-containing products, including PCs.  Both the

20  State and non-State Public Entities  generally dealt directly with the OEMs and other producers

21  of DRAM-containing products, rather than with the Defendants, which manufactured the DRAM

22  chips.

23         73.     The State and many non-State Public Entities made their purchases from OEMs

24  pursuant to contracts entered into by New York State's procurement agency, the Office of

25  General Services ("OGS"), with the OEMs (the "Centralized Contract"). As set out below, all

26  purchases of DRAM-containing products made pursuant to the Centralized Contract give rise to

27  direct claims for damages that the OEMs assigned to the State, whether those purchases were

28  made by the State or non-State Public Entities.

AMENDED COMPLAINT                                              CASE NO. M-02-01486 PJH (JCS)
                                                                      C-06-06436 PJH (JCS)
                                    -18-

1    74.    The Centralized Contract contained generally applicable terms and conditions,

2    which were incorporated by reference into individual contract awards that OGS made with the

3    PC OEMs.  The Centralized Contract remained in effect for the entire period relevant to this

4    action.

5    75.    Part of the Centralized Contract (the "Assignment Clause") provides as follows:

6        ASSIGNMENT OF CLAIM. Contractor hereby assigns to the
         State any and all of its claims for overcharges associated with this
7        contract which may arise under the antitrust laws of the United
         States, 15 U.S.C. Section 1, et seq. and the antitrust laws of the
8        State of New York, G.B.L. Section 340, et seq.

9    76.    Following issuance of the Centralized Contract, individual contracts subject to its

10   terms were made between OGS and numerous PC OEMs.  Generally, these contracts remained in

11   effect during the entire period relevant to this action. Dell, IBM, Hewlett-Packard, Gateway, and

12   Apple are among those OEMs who entered into the Centralized Contract with OGS.

13   77.    The Centralized Contract terms were available not only to the State but also to

14   non-State Public Entities, which were authorized to make purchases pursuant to the Centralized

15   Contract in their dealings with OEMs, and which did so.  These non-State Public Entities include

16   political subdivisions, such as counties, cities, towns, and villages, and public school districts, as

17   well as public authorities and public benefit corporations.

18   78.    With the Centralized Contract as a framework, procurement procedures during the

19   relevant period allowed the purchasing entity to deal directly with the PC OEM contractors.

20   Generally, the PC OEM "hosted" its individual contract on a website accessible to the State and

21   to non-State Public Entities, and there quoted the contractually agreed-upon prices for its

22   products.  The State or non-State Public Entity, as the case might be, desiring a particular

23   product, transmitted purchase orders to the OEM, or its authorized resellers.

24   79.    The State and various non-State Public Entities made substantial purchases under

25   the Centralized Contract, including purchases of DRAM-containing products.  For example, in

26   the period of January 1999 through December 2002, the following purchases were made,

27   including purchases of DRAM-containing products, under the Centralized Contract in the

28   following amounts:

| Purchaser | OEM | Purchases |
|---|---|---|
| N.Y. Dept. of Environmental Conservation | Dell | $3,135,731.00 |
| N.Y. Dept. of Health | Dell | $4,026,460.47 |
| | Micron | $587,555.80 |
| N.Y. Insurance Dept. | IBM | $1,498,811.35 |
| | HP | $2,543,088.99 |
| N.Y. Dept. of Labor | Dell | $7,493,097.93 |
| SUNY at Stony Brook | Dell | $7,205,463.20 |
| | Gateway | $480,141.15 |
| | IBM | $422,382.99 |
| | Apple | $1,838,202.05 |
| | HP | $316,849.31 |

These are illustrative only.  The total purchases by the State and non-State Public Entities under the Centralized Contract during the relevant time period are in the hundreds of millions of dollars, a significant portion of which represents DRAM-containing products.

80.     By virtue of the Assignment Clause, the State stands in the shoes of the OEMs and other direct purchasers of price-fixed DRAM for purposes of alleging federal and New York state antitrust claims against Defendants. As the language of the Assignment Clause provides, it is the "Contractor" (generally an OEM that has purchased DRAM and made it a component of a PC or other DRAM-containing product) that assigns to "the State" the Contractor's antitrust claims against the DRAM manufacturer "for overcharges associated with" the contract (the "Assigned Claims"). The State, accordingly, owns the Assigned Claims and is entitled to assert them. The scope of the claims that the OEM assigned is determined by the extent of the

purchases of DRAM-containing products made under the Centralized Contract by both the State and the non-State Public Entities.

**CLAIMS FOR RELIEF**

***First Claim (Violation of Section 1 of the Sherman Act)***

81.     From approximately 1998 through approximately mid-2002, Defendants engaged in a continuing contract, combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

82.     The combination, contract and conspiracy consisted of, among other things, an agreement by the Defendants secretly to fix, coordinate and raise their DRAM prices, including without limitation through exchange of DRAM prices offered to OEMs and in the spot market.

83.     This unlawful cartel had the following effects, among others:

a.     price competition in the sale of DRAM was suppressed and/or eliminated;

b.     prices for DRAM sold by defendants and their co-conspirators were fixed, raised, maintained and stabilized at artificially high, non-competitive levels;

c.     purchasers of DRAM and DRAM-containing products were deprived of the benefits of free and open competition, and paid artificially high, supra-competitive prices for DRAM and DRAM-containing products, or purchased products that contained less memory, or were otherwise of lower quality, than they would have been absent the conspirators' illegal acts, or were unable to purchase products that they would otherwise have purchased absent the illegal conduct.

84.     The conduct set forth above is a per se violation of Section 1 of the Sherman Act.

85.     As a result of the conspiracy, the Defendants' customers, OEMs and other direct purchasers of DRAM, were injured in their business and property.  They paid higher prices for DRAM than they otherwise would have paid in a competitive market.

86.     Under 15 U.S.C. §15, the State, as owner of the Assigned Claims, is entitled to recover treble damages, based on the injury suffered directly by OEMs and other direct

1    purchasers as a result of Defendants' illegal conduct.  To the extent that the Court is of the view

2    that non-State Public Entities must request the Attorney General to act on their behalf

3    nonetheless, then the Requesting non- State Public Entities, identified on Schedule A, have

4    expressly so requested.  The State is also entitled to attorneys' fees and to enjoin Defendants

5    from engaging in similar illegal conduct in the future, as well as to such other equitable relief as

6    may be appropriate.

7                    ***Second Claim (Violation of the Donnelly Act, N.Y. Gen. Bus. L. § 340 et seq.)***

8           87.    From approximately 1998 through approximately mid-2002, Defendants engaged

9    in a contract, agreement, arrangement and combination in unreasonable restraint of business,

10   trade and commerce in violation of the Donnelly Act, N.Y. Gen. Bus. L. § 340 *et seq.*

11          88.    The contract, combination, agreement and arrangement consisted of, among other

12   things, an agreement by the Defendants secretly to fix, coordinate and raise their DRAM prices,

13   including without limitation through exchange of DRAM prices offered to OEMs and in the spot

14   market.

15          89.    This unlawful cartel had the following effects, among others:

16                 a.     price competition in the sale of DRAM was suppressed and/or eliminated;

17                 b.     prices for DRAM sold by defendants and their co-conspirators were fixed,

18                        raised, maintained and stabilized at artificially high, non-competitive

19                        levels;

20                 c.     purchasers of DRAM and DRAM-containing products were deprived of

21                        the benefits of free and open competition, and paid artificially high,

22                        supra-competitive prices for DRAM and DRAM-containing products, or

23                        purchased products that contained less memory, or were otherwise of

24                        lower quality, than they would have been absent the conspirators' illegal

25                        acts, or were unable to purchase products that they would otherwise have

26                        purchased absent the illegal conduct.

27          90.    The conduct set forth above is a per se violation of the Donnelly Act.

28          91.    As a result of the conspiracy, the Defendants' customers, OEMs and other direct

1  purchasers of DRAM, were injured in their business and property.  They paid higher prices for

2  DRAM than they otherwise would have paid in a competitive market.

3          92.     Under § 340(1) and (5) of the New York General Business Law,  the State, as

4  owner of the Assigned Claims, is entitled to recover treble damages, based on the injury suffered

5  directly by OEMs and other direct purchasers as a result of Defendants' illegal conduct.  To the

6  extent that the Court is of the view that non-State Public Entities must request the Attorney

7  General to act on their behalf nonetheless, then the Requesting non-State Public Entities,

8  identified on Schedule A, have expressly so requested.  The State is also entitled to attorneys'

9  fees and to enjoin Defendants from engaging in similar illegal conduct in the future, as well as

10  such other equitable relief as may be appropriate.

11         93.     Further, the State, in its sovereign capacity, is entitled to recover civil penalties

12  under N.Y. Gen. Bus. L § 342-a.

13             *Third Claim (Violation of the Donnelly Act, N.Y. Gen. Bus. L. § 340 et seq.)*

14         94.     From approximately 1998 through approximately mid-2002, Defendants engaged

15  in a contract, agreement, arrangement and combination in unreasonable restraint of business,

16  trade and commerce in violation of the Donnelly Act, N.Y. Gen. Bus. L. § 340 *et seq.*

17         95.     The contract, combination, agreement and arrangement consisted of, among other

18  things, an agreement by the Defendants secretly to fix, coordinate and raise their DRAM prices,

19  including without limitation through exchange of DRAM prices offered to OEMs and in the spot

20  market.

21         96.     This unlawful cartel had the following effects, among others:

22              a.     price competition in the sale of DRAM was suppressed and/or eliminated;

23              b.     prices for DRAM sold by defendants and their co-conspirators were fixed,

24                     raised, maintained and stabilized at artificially high, non-competitive

25                     levels;

26              c.     purchasers of DRAM and DRAM-containing products were deprived of

27                     the benefits of free and open competition, and paid artificially high,

28                     supra-competitive prices for DRAM and DRAM-containing products, or

1          purchased products that contained less memory, or were otherwise of

2          lower quality, than they would have been absent the conspirators' illegal

3          acts, or were unable to purchase products that they would otherwise have

4          purchased absent the illegal conduct.

5     97.    The conduct set forth above is a per se violation of the Donnelly Act.

6     98.    As a result of the conspiracy, the State and the Requesting non-State Public

7 Entities which purchased DRAM indirectly from Defendants and their co-conspirators, were

8 injured in their business and property. They paid higher prices, as indirect purchasers, for

9 DRAM and DRAM-containing products than they otherwise would have paid in a competitive

10 market.[2]

11     99.    Under  § 340(1) and (6) of the New York General Business Law,  the State, on its

12 own behalf and on behalf of the Requesting non-State Public Entities, is entitled to recover treble

13 damages as a result of Defendants' illegal conduct. The State is also entitled to attorneys' fees

14 and to enjoin Defendants from engaging in similar illegal conduct in the future, as well as such

15 other equitable relief as may be appropriate.

16     100.    Further, the State, in its sovereign capacity, is entitled to recover civil penalties

17 under N.Y. Gen. Bus. L § 342-a.

18             ***Fourth Claim (N.Y. Exec. L. § 63 (12))***

19     101.    From approximately 1998 through approximately mid-2002, the Defendants

20 engaged in repeated and persistent fraudulent and illegal acts, in the conduct of their business, by

21 illegally conspiring to fix, coordinate, and raise their DRAM prices, including through

22 coordinating their prices to OEMs and in the spot market.

23     102.    Defendants' conduct violated the Sherman Act, 15 U.S.C. § 1, the Donnelly Act,

24 N.Y. Gen. Bus. L. § 340 *et seq.,* as well as state antitrust laws throughout the United States, and

25

26     [2] New York respectfully disagrees with and reserves its rights with respect to the Court's

27 ruling as to the need for requests by non-State Public Entities.  However, those entities that have notified the State of their requests to date are listed in the annexed Schedule A ("Requesting non-

28 State Entities.")  The State reserves its right to apply to supplement Schedule A to add later requests.

1   N.Y. Exec. L. § 63(12).

2       103.    On behalf of all natural persons in New York who purchased DRAM-containing

3   products or otherwise purchased DRAM indirectly, the State is entitled to recover damages

4   sustained as a result of injury caused by Defendants' violations of N.Y. Exec. L. § 63(12).  The

5   State further is entitled to enjoin Defendants from engaging in similar illegal conduct in the

6   future, as well as to such other equitable relief as may be appropriate.

7                                **RELIEF SOUGHT**

8       Accordingly, Plaintiff State of New York requests judgment as follows:

9       a.      Adjudging and decreeing that Defendants have engaged in conduct in violation of

10   Section 1 of the Sherman Act, 15 U.S.C. §1, the Donnelly Act, N.Y. Gen. Bus. L. § 340 *et seq,*

11   and N.Y. Exec L. § 63(1),

12      b.      Awarding damages in an amount proven at trial to have been sustained by the

13   State and those on whose behalf it sues, trebled as provided by law, against Defendants, jointly

14   and severally.

15      c.      Awarding disgorgement, restitution or such other equitable relief as may be

16   appropriate, in an amount to be proven at trial, by the State and those on whose behalf it sues,

17   against Defendants, jointly and severally.

18      d.      Awarding the State of New York civil penalties against each Defendant, pursuant

19   to New York Gen. Bus. Law § 342-a;

20      e.      Enjoining and restraining Defendants, their affiliates, assignees, subsidiaries,

21   successors and transferees, and their officers, directors, partners, agents and employees, and all

22   other persons acting or claiming to act on their behalf or in concert with them, from engaging in

23   any conduct, contract, combination or conspiracy, and from adopting or following any practice,

24   plan, program or device having a purpose or effect similar to the anti-competitive actions set

25   forth above;

26      f.      Awarding the State of New York the costs of this action, including reasonable

27   attorneys' fees, and expert fees; and

28      g.      Directing such other and further relief as may be just and proper.

1   Dated: New York, New York
          October 1, 2007
2
3                                       ANDREW M. CUOMO
                                        Attorney General of the State of New York
                                        Antitrust Bureau
4                                       120 Broadway, 26th Floor
                                        New York, New York 10271
5                                       (212) 416-8282
6                                       By:  /s/ Jay L. Himes
                                        JAY L. HIMES
7                                       Bureau Chief
                                        Antitrust Bureau
8
                                        RICHARD L. SCHWARTZ
9                                       JEREMY R. KASHA
                                        Assistant Attorneys General
10                                      Antitrust Bureau
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

**JURY DEMAND**

3

Pursuant to the provisions of Rule 38, Federal Rules of Civil Procedure, State of New

4

York hereby respectfully demands trial by jury.

5

Dated: New York, New York
       October 1, 2007

6

7                                       ANDREW M. CUOMO
                                        Attorney General of the State of New York
8                                       Antitrust Bureau
                                        120 Broadway, 26th Floor
9                                       New York, New York 10271
                                        (212) 416-8282

10                                      By:   /s/ Jay L. Himes
                                        JAY L. HIMES
11                                      Bureau Chief
                                        Antitrust Bureau

12                                      RICHARD L. SCHWARTZ
13                                      JEREMY R. KASHA
                                        Assistant Attorneys General
14                                      Antitrust Bureau

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Schedule A**

Adirondack Central School, Boonville, New York 13309

Alexandria Central School District, Alexandria Bay, New York 13607

Alfred-Almond Central School District, Almond, New York, Fayetteville, New York 13066-1262

Amagansett UFSD, Amagansett, New York 11930

Andes Central School, Andes, New York 12455

Ardsley Public Schools, Ardsley, New York 10502

Auburn Enlarged City School District, Auburn, New York 13021

Babylon Union Free School District, Babylon, New York 11702

Baldwinsville Central School District, Baldwinsville, New York 13027

Bath Central Schools, Bath, New York 14810

Beaver River Central School District, Beaver Falls, New York 13305

Belleville Henderson Central School District, Belleville, New York 13611

Bellmore School District, Bellmore, New York 11710

Bemus Point Central School District, Bemus Point, New York 14712

Berlin Central School District, Berlin, New York 12022

Bethpage Union Free School District, Bethpage, New York 11714

Binghamton City School District, Binghamton, New York 13901-2126

Board of Cooperative Educational Services of Nassau County (Nassau BOCES), Garden City, New York 11530

Board of Cooperative Educational Services, Second Supervisory District of Suffolk County, Wheatley Heights, New York 11798

BOCES, First Supervisory District of Monroe County, Fairport, New York 14450

Bradford Central School, Bradford, New York 14815

Brasher Falls Central School, Brasher Falls, New York 13613

Briarcliff Manor U.F.S.D., Briarcliff Manor, New York 10510

Briarcliff Manor Union Free School District, Bedford Village, New York 10506

Brighton Central School District, Rochester, New York 14618

Broadalbin-Perth Central School, Broadalbin, New York 12025

Brockport Central School District, Brockport, New York 14420

Brookhaven-Comsewogue School District, Port Jefferson Station, New York 11776

Brunswick Central School District, Troy, New York 12180

Brushton-Moira Central School District, Brushton, New York 12916

Byram Hills Central School District, Armonk, New York 10504

Caledonia-Mumford Central School District, Caledonia, New York 14423

Camden Central School, Camden, New York 13316

Canastota Central School District, Canastota, New York 13032

Candor Central School District, Candor, New York 13743

Carle Place Union Free School District, Carle Place, New York  11514
Carthage Central School District, Carthage, New York 13619
Central Islip UFSD, Stony Brook, New York 11790
Central New York Regional Transportation Authority (CNYRTA), Syracuse, New York 13204
Central Square School District, Central Square, New York 13036
Charlotte Valley Central School, Davenport, New York 13750
Chautauqua Lake Central School, Mayville, New York 14757
Cheektowaga-Sloan Union Free School District, Cheektowaga, New York 14227
Chenango Valley Central Schools, Binghamton, New York 13901
Chittenango Central Schools of Chittenango, Chittenango, New York 13037
Cincinnatus Central School District, Cincinnatus, New York 13040
City of Canandaigua, Canandaigua, New York 14424
City of Cohoes, Cohoes, New York 12047
City of Elmira, Elmira, New York 14901
City of Ithaca, Ithaca, New York 14850
City of New York, New York, New York 10007
City of North Tonawanda, North Tonawanda, New York 14120
City of Ogdensburg, Ogdensburg, New York 13669
City of Rochester, Rochester, New York 14614-1224
City of Syracuse, Syracuse, New York 13202
City of Yonkers, Yonkers, New York 10701
City School District of the City of New Rochelle, 515 North Avenue, New Rochelle, New York 10501
Clifton-Fine Central School District, Star Lake, New York 13690
Clyde-Savannah Central School District, Clyde, New York 14433
Cobleskill-Richmondville Central School District, Cobleskill, New York 12043
Cold Spring Harbor Central School District, Cold Spring Harbor, New York 11724
Commack Union Free School District, Commack, NY
Copenhagen Central School District, Copenhagen, New York, Fayetteville, New York 13066-1262
Copiague Public Schools, Copiague, New York 11726
Corinth Central School District, Corinth, New York  12822
Cortland City School District, Cortland, New York 13045
County of Chautauqua, Mayville, New York 14757
County of Chenango, Norwich, New York 13815
County of Clinton, Plattsburgh New York 12901
County of Erie, Buffalo, New York 14202
County of Franklin, Malone, New York 12953

County of Monroe, Rochester, New York 14614
County of Nassau, Mineola, New York 11501
County of Onondaga, Syracuse, New York 13202
County of Ontario, Canandaigua, New York 14424
County of Rensselaer, Troy, New York 12180
County of Rockland
County of Seneca, Waterloo, New York 13165
County of Warren, Lake George, New York 12845
County of Wyoming, Warsaw, New York 14569
Coxsackie – Athens Central School District, Coxsackie, New York 12051
Deer Park Union Free School District, Deer Park, New York 11729
DeRuyter Central School, DeRuyter, New York 13052
Dolgeville Central School District, Dolgeville, New York 13329
Dundee Central School, Dundee, New York 14837
East Irondequoit Central School District, Rochester, New York 14622
East Ramapo Central School District, Nanuet, New York 10954
East Rochester Union Free School District, East Rochester, New York 14445
East Syracuse-Minoa Central School District, East Syracuse, New York 13057
Eden Central School District, Eden, New York 14057
Edgemont Union Free School District, 300 White Oak Lane, Scarsdale, New York 10583
Edmeston Central School District, Edmeston, New York 13335
Eldred Central School District, Eldred, New York 12732
Erie 1 BOCES, West Seneca, New York 14224
Essex County, Elizabethtown, New York 12932
Fillmore Central School, Fillmore, New York 14735
Fire Island Union Free School District, Ocean Beach, New York 11770-0428
Fishers Island School District, Fishers Island, New York 06390
Floral Park-Bellerose Union Free School District, Floral Park, New York 11001
Florida Union Free School District, Florida, New York 10921
Fort Plain Central School District, Fort Plain, New York 13339
Frankfort-Schuyler Central School, Frankfort, New York 13340
Frewsburg Central School District, Frewsburg, New York 14738
Fulton City School District, Fulton, New York 13069
Gananda Central School District, Macedon, New York 14502
Garden City Union Free School District, Garden City, New York 11530
General Brown Central School District, Dexter, New York 13634
Genesee County, Batavia, New York 14020
Genesee Valley Central School District, Belmont, New York 14813

Geneseo Central School District, Geneseo, New York 14454
Geneva City School District, Geneva, New York 14456
Germantown Central School District, Germantown, New York 12526
Glen Cove City School District, Glen Cove, New York 11542
Gowanda Central School District, Gowanda, New York 14070
Greater Johnstown School District, Johnstown, New York 12095
Greece Central School District, N. Greece, New York 14515-0300
Greenport Union Free School District, Greenport, New York 11944
Hamilton Central School District, Hamilton, New York 13346
Hannibal Central School District, Hannibal, New York 13074
Herkimer Central School District, Herkimer, New York 13350
Herkimer-Fulton-Hamilton-Otsego BOCES, East Syracuse, New York
       13057
Hermon-DeKalb Central School District, DeKalb Junction, New York
       13630
Herricks Union Free School District, New Hyde Park, New York 11040
Hewlett-Woodmere Union Free School District (Hewlett-Woodmere Public
       Schools), Woodmere, New York      11598
Hilton Central School District, Hilton, New York 14468
Holland Patent Central School District, Holland Patent, New York 13354
Huntington UFSD, Huntington, New York 11743
Ilion Central School District, Ilion, New York 13357
Indian River Central School District, Philadelphia, New York 13673
Islip Union Free School District, Islip, New York 11751
Jamestown Community College Region, Jamestown, New York 14702-
       0020
Jamesville-DeWitt Central Schools, DeWitt, New York 13214
Jefferson Central School District, Jefferson, New York 12093
Jefferson-Lewis-Hamilton-Herkimer-Oneida Board of Cooperative
       Educational Services, Watertown, New    York, Fayetteville, New York
       13066-1262
Lackawanna City School District, Lackawanna, New York 14218
LaFargeville Central School District, LaFargeville, New York 13656
LaFayette Central School District, LaFayette, New York 13084
Lansing Central School District, Lansing, New York 14882
Lawrence Union Free School District, Lawrence, New York 11559
Little Falls City School District, Little Falls, New York 13365
Liverpool Central School District, Liverpool, New York, Fayetteville, New
       York 13066-1262
Lowville Academy and Central School District, Lowville, New York,
       Fayetteville, New York 13066-1262
Lyncourt Union Free School District, Syracuse, New York 13208
Madison Central School, Madison, New York 13402

Madison-Oneida BOCES, Verona, New York 13478

Malone Central School District, Malone, New York 12953

Manhasset Union Free School District, Manhasset, New York 11030

Marathon Central School District, Marathon, New York 13803

Massapequa Union Free School District, Massapequa, New York 11758

Mayfield Central School District, Mayfield New York 12117

Mexico Academy and Central School District, Mexico, New York 13114

Minerva Central School District , Olmstedville, New York 12857

Mohawk Central School District, Mohawk, New York 13407

Morrisville-Eaton Central School District, Morrisville, New York 13408

Mount Sinai Union Free School District, Mount Sinai, New York 11766

New Hartford Central Schools, New Hartford, New York 13413

New Hyde Park - Garden City Park Union Free School DistrictNew Hyde Park, New York 11040

New York Mills Union Free School District, New York Mills, New York 13417

New York Convention Center Operating Authority

New York State Energy Research and Development Authority, Albany, New York 12203

New York State Environmental Facilities Corporation, Albany, New York 12207

New York State Theatre Institute Corporation, Troy, New York 12180

Newark Valley Central School District, Newark Valley, New York 13811

Newburgh Enlarged City School District, Newburgh, New York 12550

North Bellmore Union Free School District, North Bellmore, New York 11710

North Shore Central School District, Sea Cliff,  New York 11579

North Syracuse Central School District, North Syracuse, New York 13212

Odessa-Montour Central School District, Odessa, New York 14869

Ogdensburg City School District, Ogdensburg, New York 13669

Oneida City School District, Oneida, New York 13421

Onondaga-Cortland-Madison BOCES, Syracuse, New York 13221

Oppenheim-Ephratah Central School District, St. Johnsville, New York 13452

Oriskany Central School District, Oriskany, New York 13424

Oswego BOCES, Mexico, New York 13114

Oswego County Board of Cooperative Educational Services, Mexico, New York 13114

Owen D. Young Central School District, Van Hornesville, New York 13475

Oysterponds U.F.S.D., Orient,  New York 11957

Patchogue-Medford UFSD, Patchogue, New York 11772

Pavilion Central School, Pavilion, New York 14525

Pearl River Union Free School District, Pearl River, New York 10965

Penfield Central School District, Rochester, New York 14625

Phelps-Clifton Springs Central School District, Clifton Springs,  New York 14432

Pittsford Central School District, Pittsford, New York 14534

Poland Central School District, Poland, New York 13431

Remsen Central School District, Remsen, New York 13438

Richfield Springs Central School, Richfield Springs, New York 13439

Rochester Genesee Regional Transportation Authority, Rochester, New York 14609

Romulus Central School, Romulus, New York 14541

Roscoe Central School District, Roscoe, New York 12776

Royalton-Hartland Central School District, Middleport New York 14105

Sachem Central School District, Ronkonkoma, New York 11779

Salem Central School District, 230 June Road, North Salem, New York 10560

Salmon River Central School District, Fort Covington, New York 12937

Sauquoit Valley Central School District, Sauquoit, New York 13456

Schalmont Central School District, Schenectady, New York 12306

Schenevus Central School District, Schenevus, New York 12155

Schoharie Central School District, Schoharie, New York 12157

Scio Central School District, Scio, New York 14880

Seaford Union Free School District, Seaford, New York 11783

Sidney Central School District, Sidney, New York 13838

Skaneateles Central School District, Skaneateles, New York, Fayetteville, New York 13066-1262

Smithtown Central School District, Smithtown, New York 11787

Solvay Union Free School District, Solvay, New York 13209

South Colonie Central School District, Albany, New York 12205

South Country Central School District, Farmingdale, New York 11735

South Jefferson Central School District, Adams, New York 13605

South Kortright Central School District, South Kortright, New York 13842

South Lewis Central School District, Turin, New York, Fayetteville, New York 13066-1262

South Seneca Central School District, Ovid, New York 14521

Southern Cayuga Central School, Aurora, New York 13026

Southern Westchester Board Of Cooperative Educational Services Sole Supervisory District of Westchester     County, Rye Brook, New York 10537

Spencerport Central Schools, Spencerport, New York 14559

Spencer-VanEtten Central School District, Spencer, New York 14883

Springville-Griffith Institute Central School District, Springville, New York 14141

Stockbridge Valley School District, Munnsville, New York 13409
Sullivan Board of Cooperative Educational Services - Sole Supervisory
    District of Sullivan County, Liberty,    New York 12754
Sullivan West Central School District, Jeffersonville, New York 12748
Sweet Home Central School District, Amherst, New York 14228
Syracuse City School District, East Syracuse, New York 13057
The City of Newburgh, Newburgh, New York 12550
The County Of Hamilton, Lake Pleasant, New York 12108
The Stamford Central School District, Stamford, New York 12167
The Town of Essex, Essex, New York 12936
The Town of Hyde Park, Dutchess County, Poughkeepsie, New York
    12601
The Village of Ardsley, Ardsley, New York 10502
Thousand Islands Central School District, Clayton, New York, Fayetteville,
    New York 13066-1262
Tompkins County Attorney, Ithaca, New York 14850
Town of Augusta, Oriskany Falls, New York 13425
Town of Blooming Grove, Blooming Grove, New York 10914
Town of Brookhaven, Farmingville, New York 11738
Town of Brutus, Weedsport, New York 13166
Town of Clinton (Dutchess County), Rhinebeck, New York 12572
Town of Conesus, Conesus, New York 14435
Town of Granby, Fulton, New York 13069
Town of Grand Island, Grand Island, New York 14072
Town of Hamlin, Rochester, New York 14625
Town of Hartland, Lockport, New York 14094
Town of Huntington, Huntington, New York 11743
Town of Jay, Au Sable Forks, New York 12912
Town of Lexington, Lexington, New York 12452
Town Of Lloyd, Highland, New York 12528
Town of Lockport, Lockport, New York 14094
Town of Minerva, Minerva, New York 12857
Town of Mount Pleasant, Valhalla, New York 10595
Town of Newburgh, Newburgh, New York 12550
Town of North Salem, North Salem, New York 10560
Town of Paris, Sauquoit, New York 13456
Town of Perinton, Fairport, New York 14450
Town of Poughkeepsie, Poughkeepsie, New York 12603
Town of Red Hook, Dutchess County, Poughkeepsie, NY, 12601
Town of Richland, Pulaski, New York 13142
Town of Rye, Port Chester, New York 10673
Town of Saranac, Plattsburgh, New York 12901
Town of Trenton, Barneveld New York 13304

Town of Troupsburg, Troupsburg, New York 14885
Town of Walton, Walton, New York 13856
Town of Walworth, Walworth, New York 14568
Town of Warwick, Warwick, New York 10990
Town of Westport, Westport, New York 12993
Tri-Valley Central School District, Grahamsville, New York 12740
Tully Central School District, Tully, New York 13159
Union Endicott Central School District, Endicott, New York 13760
Union Springs Central School District, Union Springs, New York 13152
Utica City School District, Utica, New York 13502
Valley Central School District, Hopewell Junction, New York 12533
Valley Stream USFD School District #24, Valley Stream, New York 11581
Vestal Central School District, Vestal, New York 13851-0426
Victor Central School District, Victor, New York 14564
Village of  Lima, Lima, New York 14485
Village of Alden, 13336 Broadway, Alden, New York 14004
Village of Antwerp, Antwerp, New York 13608
Village of Barker, Lockport, New York 14094
Village of Cayuga Heights, Tompkins County, Ithaca, New York 14850
Village of Chester, Goshen, New York 10924
Village of Clyde, Clyde, New York 14433
Village of Dobbs Ferry, Dobbs Ferry, New York  10522
Village of Franklin, Franklin, New York 13775
Village of Freeport, Freeport, New York 11520
Village of Ilion, Ilion, New York 13357
Village of Mayville, Mayville, New York 14757-0188
Village of Middleport, Lockport, New York 14094
Village of Oyster Bay Cove, Oyster Bay, New York 11771
Village of Pittsford, Pittsford, New York 14534
Village of Richfield Springs, Richfield Springs, New York 13439
Village of Russell Gardens, Great Neck, New York 11021
Village of Saddle Rock, Great Neck, New York 11023
Village of Savona, Savona, New York 14879
Village of Tivoli, Dutchess County, Poughkeepsie, NY, 12601
Village of Westhampton Beach, Westhampton Beach, New York 11978
Village of Whitney Point, Whitney Point, New York 13862
Washington County, Fort Edward, New York 12828
Watervliet City School District, Watervliet, New York
Watkins Glen Central School District, Watkins Glen, New York 14891
Wayne-Finger Lakes BOCES, Newark, New York 14513
Webster Central School District, Webster, New York 14580
Weedsport Central School District, Weedsport, New York 13166
West Canada Valley Central School District, Newport, New York 13416

West Genesee Central School District, Camillus, New York 13031
Westbury Union Free School District, Old Westbury, New York 11568
Westchester County, White Plains, N.Y.
Westhill Central School District, Syracuse, New York 13219
Whitesboro Central School District, Yorkville, New York 13495
Whitney Point Central School District, Whitney Point, New York 13862
Wilson Central School District, Wilson, New York 14172
Yorkshire-Pioneer Central School District, Yorkshire, New York 14173