1

2

3        UNITED STATES DISTRICT COURT

4        NORTHERN DISTRICT OF CALIFORNIA

5

6

In re DYNAMIC RANDOM ACCESS
7    MEMORY (DRAM) ANTITRUST
LITIGATION                                    No. M 02-1486 PJH
8    _____/

9    This Document Relates To:                 **ORDER GRANTING MOTION
                                               TO DISMISS IN PART AND DENYING
10   All INDIRECT PURCHASER ACTIONS            MOTION TO DISMISS IN PART**

11   _____/

12            Defendants' motion to dismiss portions of plaintiffs' second amended complaint

13   came on for hearing on December 12, 2007 before this court.  Plaintiffs, the indirect

14   purchaser class ("plaintiffs"), appeared through their counsel, Josef Cooper, Daniel J.

15   Mogin, David Boies, Francis O. Scarpulla, and Daniel E. Gustafson.  Defendants[1] appeared

16   through their counsel, Joshua Hess, Aton Arbisser, David Brownstein, Howard M. Ullman,

17   Robert Pringle, Tim M. Martin, and Kenneth R. O'Rourke.  Having read all the papers

18   submitted and carefully considered the relevant legal authority, the court hereby GRANTS

19   defendants' motion in part and DENIES the motion in part, for the reasons stated at the

20   hearing, and as follows.

21                                    **BACKGROUND**

22            Plaintiffs are numerous indirect purchasers of dynamic random access memory

23   ("DRAM"), who allege that they purchased DRAM at artificially inflated prices as a result of

24   defendants' unlawful conspiracy to fix prices in the DRAM market.  See generally Second

25   _____

26        [1]    The specific defendants at issue are as follows: Micron Technology, Inc.; Micron
     Semiconductor Products, Inc.; Infineon Technologies AG; Infineon Technologies North
27   America Corporation; Mosel Vitelic Corporation; Mosel Vitelic Corporation USA; Nanya
     Technology Corporation; Nanya Technology Corporation USA; Elpida Memory, Inc.; Elpida
28   Memory (USA), Inc.; Hynix Semiconductor, Inc.; Hynix Semiconductor America, Inc.; and NEC
     Electronics America, Inc. (collectively "defendants").

Amended Class Action Complaint ("SAC"). Defendants are either foreign corporations, or U.S. subsidiaries of foreign corporations, who manufacture and sell DRAM in the U.S.

On August 14, 2006, defendants moved for judgment on the pleadings with respect to plaintiffs' original complaint. Defendants sought judgment as a matter of law in connection with (a) plaintiffs' second and fourth claims for relief, which alleged violations of the California Cartwright Act and 22 states' antitrust and unfair competition laws; and (b) plaintiffs' fifth claim for relief, which alleged violations of 22 states' consumer protection and unfair competition laws.

The court issued an order granting defendants' motion in part, and denying it in part, on June 1, 2007. See generally Order Granting in Part and Denying in Part Defendants' Motions for Judgment on the Pleadings ("JOP Order"). In the order, the court came to two overarching conclusions. First, the court held that, under the standing test enunciated in Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519 (1983)("AGC"), plaintiffs lacked antitrust standing to assert their claims under both the California Cartwright Act and 13 state antitrust statutes, for all claims based on purchases of products in which DRAM is a component. The court further granted defendants' motion for lack of standing with respect to 3 more state antitrust statutes, regardless whether those claims were based on purchases of non-component DRAM, or products in which DRAM is a component. Second, the court held that plaintiffs' claims under various states' consumer protection statutes failed, on grounds that the claims were untimely, had procedural deficiencies, or else failed to state a valid claim for relief. See generally JOP Order. The court granted leave to amend, but only as to three specific state laws – South Dakota, New York, and Rhode Island. See JOP Order at 62-63.

On June 28, 2007, plaintiffs filed a first amended complaint with respect to the limited issues upon which the court had granted leave to amend in its order. One day later, however, plaintiffs filed a motion requesting leave to file a second amended complaint, in order to add new allegations to the complaint that might overcome several of the court's

2

prior concerns as stated in the JOP Order. Defendants opposed the motion on grounds of futility. The court ultimately granted plaintiffs' request on August 17, 2007, in view of the liberal standards applicable to motions for leave to amend. See generally Order Granting Motion for Leave to File Second Amended Complaint. That same day, plaintiffs filed their second amended complaint.

Defendants now move, once again, to dismiss portions of that complaint. Specifically, they move to dismiss the second, fourth, fifth, and sixth claims for relief, as alleged in the second amended complaint. While many of defendants' arguments in support of their motion overlap with previous arguments made in connection with the earlier-filed motions for judgment on the pleadings, other arguments are new.

**DISCUSSION**

A.    Legal Standard

In evaluating a motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. See, e.g., Burgert v. Lokelani Bernice Pauahi Bishop Trust, 200 F.3d 661, 663 (9th Cir. 2000)(citations omitted). In order to survive a dismissal motion, however, a plaintiff must allege facts that are enough to raise his/her right to relief "above the speculative level." See Bell Atlantic Corp. v. Twombly, --- U.S. ---, 127 S. Ct. 1955, 1964-65 (2007). While the complaint "does not need detailed factual allegations," it is nonetheless "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. In short, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," not just conceivable. Twombly, 127 S. Ct. at 1974.

B.    Defendants' Motion to Dismiss

Defendants' motion presents six distinct issues for resolution: whether plaintiffs have satisfied antitrust standing under the AGC test; whether plaintiffs have standing to assert claims under the consumer protection statutes of Nebraska, New York, and North

3

Carolina; whether plaintiffs' amended claims pursuant to the consumer protection statutes of New York and Rhode Island have been properly stated; whether plaintiffs' unjust enrichment claim fails as a matter of law; whether claims previously dismissed without leave to amend other than antitrust standing should once more be dismissed here; and whether named plaintiff Robert Cademy should be dismissed. The court addresses each issue in turn.

C.    Antitrust Standing

As did their original motion for judgment on the pleadings, defendants' motion to dismiss challenges plaintiffs' second and fourth claims for relief. Plaintiffs' second claim for relief once again alleges a violation of California's Cartwright Act, while plaintiffs' fourth claim for relief alleges a violation of 22 states' antitrust and unfair competition laws. See SAC, ¶¶ 269-76, 287-311; Cal. Bus. & Prof. Code § 16720. Defendants urge the court to dismiss the whole of plaintiffs' second claim for relief, and certain claims brought under the antitrust laws of 15 states in connection with plaintiffs' fourth claim for relief.[2] Defendants' challenge to both claims is based on the argument that, despite revised allegations in their second amended complaint, plaintiffs still cannot satisfy the AGC standing factors. Thus, antitrust standing remains lacking.

As outlined by the court in its JOP Order, antitrust standing generally refers to the requirement that an antitrust plaintiff demonstrate "injury in his business or property" by

---

[2]    The 15 states are: Arizona, California, Iowa, Kansas, Maine, Michigan, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, South Dakota, West Virginia, and Wisconsin. See SAC, ¶¶ 287-311. Defendants here include 2 additional states – Iowa and West Virginia – that were not challenged in defendants' prior motion for judgment on the pleadings, and they no longer challenge plaintiffs' claim under Minnesota's antitrust statute, in view of the Minnesota Supreme Court's recent holding that the AGC factors are *not* applicable to Minnesota law. See Lorix v. Crompton Corp., 736 N.W.2d 619, 632 (Minn. 2007)("The AGC factors, as we have explained, do not provide the benchmark for standing under Minnesota antitrust law.")). With respect to Iowa and West Virginia, Iowa's Supreme Court recently announced that the AGC factors apply to Iowa's antitrust law, and West Virginia's antitrust law contains a relevant harmonization provision. See Southard v. VISA USA, Inc., 734 N.W.2d 192, 198-99 (Iowa 2007)("We think the district court properly applied [the AGC] factors in deciding the plaintiffs had no standing under Iowa's competition law"); W. Va. Code § 47-18-16 ("This article shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes").

"reason of anything forbidden in the antitrust laws," and the prudential pre-requisites associated with this requirement. See, e.g., 15 U.S.C. § 15(a); Atl. Richfield Co. v. USA Petroleum, 495 U.S. 328, 334 (1990). A determination of antitrust standing centers on the relationship between a given plaintiff's alleged harm, and the alleged wrongdoing by defendants. See, e.g., AGC, 459 U.S. at 535. In AGC, the Supreme Court identified a number of factors for determining whether a plaintiff who has alleged an injury under the antitrust laws has standing. As noted on prior occasions by this court, those factors include: (1) the nature of the plaintiffs' injury; (2) the directness of the injury; (3) the speculative nature of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. See Am. Ad. Mgmt. v. GTE, 190 F.3d 1051, 1054-55 (9th Cir. 1999); see also Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 987 (9th Cir. 2000). This time around, plaintiffs do not seek to revisit the issue of whether AGC factors should be applied in the first instance. Rather, the only issue is whether the AGC factors support a finding of antitrust standing, in view of plaintiffs' new allegations.

Before addressing this issue, however, a few points are in order. First, and as defendants have acknowledged, the instant motion targets only those claims by plaintiffs who purchased DRAM as a component of computers (defined in the SAC as "desktops, laptops (or notebooks), servers and workstations"), and not those claims by plaintiffs who purchased free-standing DRAM modules. Second, with respect to plaintiffs' preliminary argument that the court need not even reach defendants' standing arguments, in view of the court's order granting plaintiffs' motion for leave to file a second amended complaint, the court rejects this argument. Contrary to plaintiffs' view that this prior order already concluded that plaintiffs' revised allegations satisfy the AGC factors, that order did not address the merits of plaintiffs' new allegations. Instead the court looked at plaintiffs' proposed new allegations in view of the Ninth Circuit's liberal standards regarding leave to amend, and concluded only that the allegations were, at a minimum, not clearly futile. See Order Granting Leave to File SAC at 4-6. Typically, the court waits until a motion to

dismiss has been filed to pass upon the viability of substantive allegations, in part because this enables the parties to further develop their arguments. The court made this clear at the hearing on the motion for leave to file a second amended complaint, when it specifically referenced the possibility of a motion to dismiss in the future.

Turning, then, to the arguments before the court, defendants challenge plaintiffs' revised allegations based on four of the AGC factors: the nature of plaintiffs' injury (i.e, antitrust injury), the directness of the injury, the speculative nature of the harm, and the complexity in apportioning damages. In its JOP Order, the court found that all four of these factors weighed against a finding of standing. See JOP Order at 13-18. Plaintiffs' second amended complaint includes new allegations aimed at overcoming these objections. Defendants assert, however, that these factors continue to weigh against a finding of standing, as none of the new allegations actually cure the deficiencies noted previously by the court.

The most critical AGC factor before the court is that of antitrust injury. As noted by the court in the JOP order, a plaintiff may only pursue an antitrust action if it can show antitrust injury – i.e., "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." See Am. Ad. Mgmt, 190 F.3d at 1055; JOP Order at 13. The Ninth Circuit has identified four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent. Id. In the JOP Order, the court found that plaintiffs had satisfactorily alleged the first three of these requirements. See JOP Order at 13. However, it found that plaintiffs had not adequately alleged that plaintiffs' injury is "of the type the antitrust laws were intended to prevent," because the law requires that plaintiffs be participants in the relevant market[3] alleged, and plaintiffs had failed to allege that they were either consumers

_____

[3] To the extent that the court's discussion in the JOP Order addressed plaintiffs' participation in the "relevant market" for DRAM, the court's discussion was focused solely on the principle that antitrust injury analysis is concerned with "protecting the economic freedom

1  or participants in the market for DRAM.  See id. at 14-15.  Rather, they had alleged only

2  that they were consumers in secondary markets (e.g., computer markets) incidental to the

3  market for DRAM itself.  Id.

4        Plaintiffs' revised allegations now seek to overcome these concerns by stating,

5  among other things: that 90% of the DRAM sold during the class period was used for

6  computers; that DRAM "has no free-standing use" and "must be inserted into a device such

7  as a computer to serve any function"; that the DRAM and computer markets are "intimately

8  connected," and can be considered "different stages of a single market supply chain"; that

9  increases in the price of DRAM "lead to quick, corresponding price increases at the OEM

10  and retail levels for [c]omputers..."; and that the demand for DRAM was ultimately

11  determined by computer end-buyers, making the DRAM and computer markets

12  "inextricably linked" and impossible to "consider[] separately."  See, e.g., SAC ¶¶ 55, 76,

13  98-99, 139-40.

14        Defendants assert that these allegations still fail to satisfy the requirement that

15  plaintiffs be participants in the relevant market for DRAM.  This is because, they argue, the

16  Ninth Circuit has specifically held that the market participation requirement under AGC

17  requires plaintiffs to allege that the products at issue are reasonably interchangeable, or

18  have cross-elastic demand.  See Bhan v. NME Hosps. Inc., 772 F.2d 1467, 1470 (9th Cir.

19  1985)(in analyzing whether requirement that plaintiff be "a participant in the same market

20  as the alleged malefactors" is satisfied, "the focus is upon the reasonable interchangeability

21  of use or the cross-elasticity of demand between the services provided" by both).  Yet the

22  SAC alleges neither.

23        Plaintiffs, by contrast, do not dispute that an injured party must be a "market

24  participant" in order to suffer antitrust injury, but assert that defendants improperly confuse

25  

26  of participants in the relevant market," see AGC, 459 U.S. at 538.  Accordingly, the term
"relevant market" as used previously by the court is distinct from the term of art employed

27  elsewhere in antitrust law – e.g., for purposes of defining the "relevant market" for products and
services, particularly in section 2 cases.  The latter is discussed more fully herein.

28

the "relevant market" analysis used in section 2 monopoly cases, with the "market participation" requirement actually contemplated by the Ninth Circuit's interpretation of AGC. The concepts of "reasonable interchangeability" and "cross-elasticity" are limited to the former, and have no application to a decision whether plaintiffs have sufficiently alleged the latter for purposes of satisfying antitrust injury in a classic section 1 case (a fact that is further illustrated, say plaintiffs, by defendants' reliance on cases that generally describe the market definition requirements applicable to section 2 cases, see Opp. Br. at 9:20-22). Rather, all that is required to satisfy the market participation test is that plaintiffs allege a sufficiently close relationship to the target market, such that they can be deemed to participate in it, regardless whether they are consumers or competitors in the allegedly restrained market. See Opp. Br. at 12:1-13:6. Plaintiffs further assert that their revised allegations do so, by virtue of alleging either a single computer market with multiple links in the chain, and/or the existence of sufficiently "intertwined" or "inextricably linked" DRAM and computer markets.

As neither party disputes that some form of market participation is required in order for a plaintiff to satisfy the antitrust injury factor, the parties' dispute therefore boils down to one key issue: namely, a determination of the proper standard to be applied in assessing whether an antitrust plaintiff has adequately alleged market participation, for purposes of satisfying antitrust injury requirements under AGC. If defendants are correct, allegations of reasonable interchangeability and/or cross-elasticity are required to establish market participation. If plaintiffs are correct, allegations that two related markets are "inextricably" intertwined – such as those made here – will suffice.

The case law, as always, provides the starting point. With respect to antitrust injury, the Ninth Circuit has repeatedly stated that the requirement that a plaintiff's alleged injury be related to anticompetitive conduct requires, "as a corollary, that the injured party be a participant in the *same* market as the alleged malefactors." See, e.g., Am. Ad. Mgmt., 190 F.3d at 1057 (emphasis added); Exhibitors' Serv., Inc. v. Am. MultiCinema, Inc., 788 F.2d

8

574, 579 (9th Cir. 1986); <u>Bhan</u>, 772 F.2d at 1470.  Parties whose injuries, "though flowing

from that which makes the defendant's conduct unlawful, are experienced in another

market do not suffer antitrust injury."  <u>Am. Ad. Mgmt</u>, 190 F.3d at 1057.  It is based on this

principle that the court earlier found that plaintiffs had failed to allege that their injuries as

end users of undefined electronic products were sufficiently tied to the DRAM market that

was allegedly restrained by defendants' unlawful conduct.

The Ninth Circuit has not had many occasions, however, to further define the

boundaries of the "same market."  Defendants rely on the Ninth Circuit's decision in <u>Bhan</u>

that, "[i]n analyzing whether [a plaintiff] and [alleged antitrust violators] participate in the

same market, the focus is upon the reasonable interchangeability of use or the cross-

elasticity of demand between the [goods or services] provided by [both]."  <u>Bhan</u>, 772 F.2d

at 1470-71.  Defendants' reliance on <u>Bhan</u> is appropriate, since the case discusses the

contours of antitrust standing within the parameters of the market participation requirement.

Nonetheless, the court's enthusiasm for adopting <u>Bhan</u>'s 'reasonably interchangeable'

and/or 'cross-elastic' requirements is tempered.  This is because, while <u>Bhan</u> continues to

be good law, the court can find no subsequent Ninth Circuit authority that affirmatively

endorses a general rule applying <u>Bhan</u>'s reasonably interchangeable and cross-elastic

requirements to the market participant inquiry in section 1 cases.  The Ninth Circuit's oft-

cited <u>American Ad. Mgmt</u>. case, for example, contains a lengthy discussion of the market

participant requirement, and while it cites <u>Bhan</u>, the opinion omits entirely any discussion of

reasonable interchangeability or cross-elasticity of demand.  <u>See, e.g., Am. Ad Mgmt.</u>, 190

F.3d at 1057-58.  The court finds such omission significant.

Moreover, applying reasonable interchangeability of use or cross-elasticity of

demand factors to the market participation requirement here is not naturally implicit.  As

plaintiffs correctly note, these concepts have traditionally been paramount in section 2

cases, where definition of the 'relevant market' is key.  <u>See, e.g, Todd v. Exxon Corp</u>., 275

F.3d 191 (2d Cir. 2001); <u>Big Bear Lodging Ass'n v. Snow Summit, Inc.</u>, 182 F.3d 1096 (9th

9

Cir. 1999)(applying interchanchangeability discussion in context of anticompetitive effects

and market definition, not standing); In re Super Premium Ice Cream Distrib. Antitrust Litig.,

691 F. Supp. 1262, 1268 (N.D. Cal. 1988)(analyzing cross-elasticity of demand for

purposes of satisfying relevant market analysis in section 2 monopolization claim);

Integraph Corp. v. Intel Corp., 195 F.3d 1346, 1355 (Fed. Cir. 1999)(discussing relevant

market for section 2 purposes). In the section 2 context, the definition of the relevant

market is critical to the success of a claim on the merits, as a successful section 2 claim is

dependent upon proof of the relevant product market and geographic market. See, e.g.,

Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993); United States v. Grinnell

Corp., 384 U.S. 563 (1966). This is simply not an issue in a section 1 price-fixing case

such as the one at bar. Indeed, the court finds it not altogether improbable that the Ninth

Circuit's omission of any discussion about reasonable interchangeability of use or cross-

elasticity of demand factors in its American Ad. Mgmt. opinion stems from the very fact that

the plaintiffs in American Ad. Mgmt. raised claims limited to section 1 of the Sherman Act,

while the Bhan plaintiffs stated section 2 claims in addition to section 1 claims. See Am.

Ad. Mgmt., 190 F.3d at 1053; cf. Bhan, 772 F.2d at 1469. Regardless, however, a review

of Bhan in context, and a recognition of the standard employed in section 2 cases, counsel

the court to apply great caution before adopting any rule that would apply the factors urged

by defendants, to the market participation requirement espoused by the Ninth Circuit.

This is not to say that plaintiffs necessarily have a more persuasive argument. In

support of their contention that allegations of "inextricably linked" markets are sufficient to

allege market participation, they rely on case law that has recognized antitrust standing

where a plaintiff's injuries are "inextricably intertwined" with the injuries of market

participants, as well as case law further noting that a plaintiff need not be a competitor or

consumer in a given market to qualify as market participants. See, e.g., Blue Shield v.

McCready, 457 U.S. 465 (1982)("although McCready was not a competitor of the

conspirators, the injury she suffered was inextricably intertwined with the injury the

conspirators sought to inflict on" the restrained market); Ostrofe v. H.S. Crocker Co., 740

F.2d 739, 745-46 (9th Cir. 1984)(although not a consumer or competitor in the allegedly

restrained market, plaintiff "was an essential participant in the scheme to eliminate

competition in the marketing of labels by fixing prices and allocating customers"); Am. Ad.

Mgmt., 190 F.3d at 1058 ("it is not the status as a consumer or competitor that confers

antitrust standing, but the relationship between the defendant's alleged unlawful conduct

and the resulting harm to the plaintiff"). While plaintiffs have correctly recited the law,

however, the court is not convinced that the present factual scenario fits within the confines

of the cases cited by plaintiffs.

A review of both cases illustrates this point. In McCready, plaintiff was a health plan

subscriber who sued her health plan provider for antitrust violations. Her health plan

refused to reimburse subscribers for psychotherapy treatment conducted by psychologists,

but reimbursed subscribers for the same treatment if conducted by medical psychiatrists.

Plaintiff alleged that her provider had conspired to boycott clinical psychologists, and had

failed to reimburse her in furtherance of this alleged conspiracy. In considering plaintiff's

antitrust standing, the court held that plaintiff's injury was inextricably intertwined with the

injury the conspirators sought to inflict on psychologists and the psychotherapy market,

since plaintiff's injury – the concerted refusal to reimburse her claims – was the "necessary

step," and "means" by which, the conspiracy was enacted. See 457 U.S. at 483-84. The

court also held that plaintiff was a "direct victim" of defendants' concerted refusal to deal,

and as a consumer of psychotherapy services (even if not a consumer of health plans),

was also "within that area of the economy ... endangered by [that] breakdown of

competitive conditions" resulting from defendants' selective refusal to reimburse." Id. at

481, 483-84.

In Ostrofe, plaintiff was an employee who was discharged by the employer

defendant when plaintiff refused to cooperate with his employer to price-fix the market for

paper lithograph labels. In discussing antitrust standing, the Ninth Circuit analogized the

case to <u>McReady</u>, and noted that Ostrofe's injury was similarly "direct," such that antitrust injury was satisfied.   The Ninth Circuit reasoned that, where a plaintiff is the direct means through which anticompetitive conduct is undertaken, that plaintiff's injuries are sufficiently intertwined with the anticompetitive conduct to satisfy antitrust injury requirements.  This is so, even though the plaintiff in <u>Ostrofe</u> was neither a consumer nor competitor nor directly involved in the restrained market.  <u>See</u> 740 F.2d at 745.

Both <u>McReady</u> and <u>Ostrofe</u>, therefore, stand for the proposition that antitrust injury can be satisfied when a plaintiff is the direct victim of a conspiracy, or the actual means by which the defendants' allegedly anticompetitive conduct is carried out.  In such cases, there is an inextricable linking of a plaintiff's injury with the anticompetitive conduct in question, and standing will not be thwarted by the fact that the plaintiff was not participating directly in the market that was restrained (either as consumer or competitor).

Here, by contrast, plaintiffs do not allege either that they are direct victims of defendants' alleged conspiracy, or that they were the necessary means by which defendants' conspiracy was effectuated.  On balance, therefore, the court finds that neither <u>McReady</u> nor <u>Ostrofe</u> provide support for treating plaintiffs' revised allegations as sufficient to satisfy antitrust injury under the law of these cases, despite the fact that the revised allegations state that the DRAM and computer markets are "inextricably" linked.

The question nonetheless remains whether plaintiffs' allegations of "inextricably linked" markets otherwise sufficiently allege that plaintiffs are participating in the "same market" as the allegedly restrained DRAM market, as the market participation requirement would be understood by the Supreme Court or the Ninth Circuit in section 1 cases.  In other words, and in view of the fact that plaintiffs never allege that they are buyers in the "same market" as the defendants, the issue is simply whether plaintiffs' revised allegations can be treated as *tantamount* to allegations of the same market.[4]

---

[4]     The SAC does allege, in passing, that plaintiffs "participate in the market for the sale of DRAM."  <u>See</u> SAC, ¶ 132.  However, as plaintiffs' subsequent allegations make clear, plaintiffs' participation in the market "for the sale of DRAM" is alleged via plaintiffs' participation

As demonstrated above, the case law ultimately provides no ready answer to this, since it neither convincingly requires allegations of reasonable interchangeability and cross-elasticity of demand in order to allege participation in the "same market," and furthermore appears to limit findings of antitrust injury in cases alleging "inextricably linked" injuries, to situations in which the victims are either direct victims of the conspiracy, or the actual means by which a given conspiracy is effectuated.  Moreover, while plaintiffs are correct that the fact that they are neither consumers nor competitors in the market for DRAM poses no bar to a finding of antitrust injury,[5] plaintiffs have not cited any controlling legal authority, nor could the court locate any, that found the market participation requirement satisfied for plaintiffs who are neither consumers nor competitors in the restrained market, *and* who do not have a direct relationship with, or are the direct victims of, the alleged conspiracy.

In sum, therefore, while both parties present earnest and thoughtful arguments on the issue, the court finds that neither side provides a convincing answer to what types of allegations satisfy the "same market" requirement, or as to whether plaintiffs' revised allegations should be treated the same as would be allegations stating that plaintiffs are participating in the "same market" as defendants.  On balance, however, the court concludes that plaintiffs' revised allegations are *not* sufficient to satisfy the market participation requirements recognized by the Supreme Court and Ninth Circuit.

This conclusion is most consistent, in the court's view, with the existing legal precedent, which time and again has reiterated the "same market" language in discussing

---

in an "inextricably linked and intertwined" computer market.  See id. at ¶¶ 133, 137, 139. Accordingly, the former cannot plausibly be considered as an allegation that plaintiffs participate in the same market for DRAM.

[5]     The court's prior JOP Order contained the observation that "antitrust standing is generally granted only where the plaintiff is a participant in the relevant market – e.g., a consumer or competitor in the relevant market alleged." See JOP Order at 14. For purposes of clarification, the court notes here that in making this observation, it was not the court's intention to imply that *only* consumers or competitors can qualify as market participants. As plaintiffs note, such is not the case. See Am. Ad. Mgmt., 190 F.3d at 1058. Rather, the court's statement set forth the principle that consumers or competitors are qualifying *examples* of market participants.

the market participation requirement.  See, e.g., Am. Ad. Mgmt., 190 F.3d at 1057;

Exhibitors' Serv., Inc.,788 F.2d at 579; Bhan, 772 F.2d at 1470.  Moreover, the court finds

that a contrary conclusion runs the risk of opening the floodgates to potential litigation.  In

today's current business climate, and with increasingly globalized markets, nearly all

markets that service one another can be said to be "related" to such a degree that the

impact of one upon another could allegedly be "proven" with the use of econometrics.  If

such is the standard for market participation, it is difficult to imagine a scenario in which any

two markets would not serve as the platform for a lawsuit similar to the instant one in the

event of anticompetitive conduct, regardless whether the ultimately injured plaintiffs

themselves have tenuous ties with the alleged malefactors and even the allegedly

restrained market itself.

On the other hand, the court readily acknowledges that, if ever there were a situation

in which two related markets should be declared tantamount to the same market, this is

likely it.  Plaintiffs' revised allegations, after all, state that 90% of the DRAM sold during the

class period was used for computers, that DRAM "has no free-standing use," that increases

in the price of DRAM "lead to quick, corresponding price increases at the OEM and retail

levels for [c]omputers...," and that the demand for DRAM was ultimately determined by

computer end-buyers, among other things.  See, e.g., SAC ¶¶ 55, 76, 98-99.  These

allegations could very well satisfy a market participation test that is extended to reach not

only those plaintiffs who are participating in the "same market" as defendants, but those

who are participating in sufficiently "interlinked" markets, too.  Such a decision, however, if

it is to be made, must be made upon more convincing authority than that presented here.

Accordingly, the court finds that plaintiffs' revised allegations continue to weigh against a

finding that antitrust injury has been sufficiently stated.

With respect to the remaining AGC factors raised by the parties here – i.e., the

directness of the injury, the speculative nature of the harm, and the complexity in

apportioning damages – the court is inclined to find that plaintiffs' revised allegations do

14

sufficiently address the court's prior concerns, and that these factors now tilt in plaintiffs'
favor at the pleading stage. Notwithstanding, given the added weight that the court gives
the importance of the antitrust injury factor in this case, and in order to avoid any
inconsistency in finding that plaintiffs have alleged a sufficiently "direct" injury that in the
court's view does not qualify as an antitrust injury, the court declines to pass conclusively
on the merits of the remaining AGC factors. See, e.g., Am. Ad. Mgmt., 190 F.3d at 1055
(while "[n]o single factor is decisive," court "give[s] great weight to the nature of the
plaintiff's alleged injury"). Rather, the court concludes that, on balance, plaintiffs' revised
allegations have failed to adequately allege antitrust standing for plaintiffs' claims based on
purchases of DRAM as a component in computers. See also Ostrofe, 740 F.2d at 739 (it is
"virtually impossible to announce a black-letter rule that will dictate a result in every case.
Instead, previously decided cases identify factors that circumscribe and guide the exercise
of judgment in deciding whether the law affords a remedy in specific circumstances").
Accordingly, defendants' motion to dismiss such claims for lack of antitrust standing is
hereby GRANTED.

In so ruling, the court acknowledges the potentially devastating effect of this ruling
on plaintiffs' case in chief, as well as the fact that the ruling itself is not without controversy
or uncertainty, given the state of the law on the issues raised herein with respect to
antitrust injury. Indeed, the court does not expect to be the last word on this issue.
Nonetheless, after due consideration of the parties' arguments, the court is convinced that
the present ruling is most faithful to existing precedent.

D.     Standing Under Various Consumer Protection Statutes

Defendants argue that plaintiffs' fifth claim for relief must also be dismissed for lack
of standing, with respect to those claims brought pursuant to the consumer protection
statutes of Nebraska, New York, and North Carolina. See SAC, ¶¶ 325, 327-28.
According to defendants, these states apply the same AGC factor analysis used to
determine antitrust standing, in determining standing under their consumer protection laws.

For the same reasons as defendants stated with respect to the numerous state antitrust laws above, therefore, dismissal of plaintiffs' consumer protection claims is also warranted.

Defendants are correct in observing that case law from both Nebraska and New York indicate that standing for claims under their state consumer protection statutes, where the claims are based on antitrust violations, should be assessed with reference to AGC factors. See, e.g., Kanne v. Visa U.S.A. Inc., 723 N.W.2d 293, 301 (Neb. 2006)("the standing requirements for an antitrust claim under the Consumer Protection Act should be the same as for an antitrust claim under the Junkin Act.")(Nebraska); State ex rel. Spitzer v. Daicel Chem. Indus., Ltd., 840 N.Y.S.2d 8 (N.Y.A.D. 1st Dept. 2007)(standing under Gen. Bus. Law § 349 lacking since indirect purchasers' claims were too remote)(new York). However, while defendants cite to Crouch v. Crompton, 2004 WL 2414027 at *3 (N.C. Super. Ct. 2004), to argue that the same proposition is true for North Carolina, the court does not find defendants' citation to be on point for any such proposition.[6]

Based on this, and furthermore in light of plaintiffs' apparent non-opposition to defendants' arguments in this regard, the court concludes that plaintiffs' standing under the consumer protection statutes of Nebraska and New York is to be determined with reference to the AGC factors discussed in connection with plaintiffs' antitrust claims. As such, and consistent with the foregoing discussion surrounding application of the AGC factors, the court finds that plaintiffs have failed to adequately allege standing with respect to their claims under the Nebraska and New York consumer protections statutes. The court declines to hold, however, that the same is true for plaintiffs' claims pursuant to North Carolina's consumer protection statute, as the court is unpersuaded by defendants' argument that plaintiffs' standing under this statute should be determined with reference to the AGC factors in the first instance.

---

[6] Specifically, the court finds that the pin cite defendants rely on in Crouch does not support their argument, and the court has declined to comb through the remaining pages of the Crouch opinion searching for the pin cite that might provide defendants with the authority they seek.

In sum, then, defendants' motion to dismiss plaintiffs' claims under the consumer protection statutes of Nebraska and New York for lack of standing, is GRANTED. The motion is DENIED, however, with respect to plaintiffs' claims under North Carolina's consumer protection statute.

E.     Claims Under Consumer Protection Statutes of New York and Rhode Island

Defendants also challenge plaintiffs' claims under the consumer protection laws of New York and Rhode Island on substantive grounds, arguing that both causes of action fail to state a claim pursuant to which relief may be granted. The court dismissed both these state law claims in its JOP Order, finding that plaintiffs had failed to allege the requisite conduct required by each statute. See JOP Order at 52, 55-56. Plaintiffs were granted leave to amend, however, in order to cure the deficiencies noted by the court. Defendants now assert that plaintiffs have failed to cure those deficiencies via amendment, thereby requiring dismissal of these two claims once again.

1.     New York

Plaintiffs assert a consumer protection claim under New York's General Business Law § 349. See SAC, ¶ 327. In order to state a claim under section 349, plaintiffs must allege "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." See New York Jets LLC v. Cablevision Sys. Corp., 2005 WL 2649330, *11 (S.D. N.Y. 2005). To satisfy the consumer-oriented prong, plaintiffs need only allege consumer-oriented conduct that implicates the public interest in New York. See, e.g., Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y. 2d 20, 25 (N.Y. 1995). Previously, the court held that plaintiffs had failed to allege the requisite "consumer-oriented" conduct. See JOP Order at 52.

Defendants now contend that plaintiffs' second amended complaint continues to suffer from the same failure. Despite revised allegations that now expressly state that "New York consumers were targets of the conspiracy," defendants argue that plaintiffs

17

nowhere allege that defendants made any unlawful statements to the indirect purchaser plaintiffs specifically. According to defendants, the law requires plaintiffs to allege that any misleading statements were specifically directed at consumers.

The court is not persuaded. Plaintiffs' revised complaint contains the following allegations: that defendants engaged in trade or commerce in New York; that defendants secretly agreed to raise prices by direct agreements on bids to customers located in New York and through artificial supply restraints on the entire DRAM market; that New York consumers were targets of the conspiracy; and that due to defendants' unlawful conduct in New York, plaintiffs – including New York residents – paid artificially high prices for DRAM. See SAC, ¶ 327. On the whole, the court finds these allegations sufficient, at the pleading stage, to allege consumer-oriented conduct. As noted above, plaintiffs need only allege – and ultimately show – that defendants' acts or practices have a broader impact on consumers at large. See Oswego, 85 N.Y.2d at 25. The Oswego court further distinguished acts with a qualifying "broader impact" from those involving, for example, "private contract disputes, unique to the parties." See id. Similarly, since the instant dispute here deals with defendants' acts in relation to an entire class of citizens and consumers, as opposed to a private contract dispute, it follows that plaintiffs' allegations satisfy the broader impact requirement needed to establish consumer-oriented conduct.

Indeed, this distinction is the same reason that defendants' reliance on case law is misguided. Defendants have cited, for example, to In re Rezulin Products Liability Litig., 392 F. Supp. 2d 597, 614 (S.D. N.Y. 2005) for support that consumer-oriented conduct requires conduct individually targeted at plaintiffs. In In re Rezulin, the court considered whether plaintiffs, certain health benefit plans, could state a claim under section 349 against a defendant manufacturer of a particular diabetes drug. In focusing on whether plaintiffs had satisfied the consumer-oriented prong, the court noted that plaintiffs were complaining of conduct that took place between "one sophisticated business entity" and another, did not implicate diabetic consumers at large, and so did not satisfy the statute's

consumer-oriented conduct requirement.  See id.  The court then went on to hold that, even under the formulation of whether there was a broader impact on consumers at large, the prong would not be satisfied because the record did not establish that there was any actual broad impact on consumers themselves.  Id.

Similarly, in St. Patrick's Home for the Aged & Infirm v. Laticrete Int'l, Inc., 696 N.Y.S.2d 117 (N.Y. App. Div. 1st Dept), a New York state court found that plaintiff – a nursing home – could not satisfy the consumer-oriented prong of a section 349 claim, in an action against the manufacturer of defective exterior wall panels.  Plaintiff alleged that defendant manufacturer had made misrepresentations to the installer, who in turn installed defective wall panels on plaintiff's property.  The court held that, since the misrepresentations took place between sophisticated business entities involved in the same industry, this was not the type of consumer-oriented transaction that the statute meant to remedy.  Rather, it was more akin to a private dispute between supplier and plaintiff over a defective product.  See id. at 122.

Both cases, therefore, dealt with private disputes between parties, rather than allegations of general conduct targeted at the general public.  For this reason, under Oswego's reasoning, section 349 would not be implicated.  These cases are substantially different from the case before the court here, which involves large classes of end-user consumers.  Moreover, it is significant that both the above cases were decided on summary judgment, not motions to dismiss.  Accordingly, to the extent that the In re Rezulin court found that no broader impact had been demonstrated, the court's finding was based on a conclusion that it had not been *proven*.  The question as to whether plaintiffs here can prove their allegations is wholly distinct from whether the law allows for such allegations.

In short, and for the above reasons, the court DENIES defendants' motion to dismiss plaintiffs' re-stated claim under New York Gen. Bus. Law § 349, on the grounds stated herein.

1         2.     Rhode Island

2         Plaintiffs have also amended their claim under Rhode Island Gen. Laws. § 6-13.1-1

3 et seq. ("UTPCPA"). <u>See</u> SAC, ¶ 330. Previously, the court dismissed plaintiffs' claim

4 under the UTPCPA, because plaintiffs had failed to allege any conduct falling under the

5 enumerated list of conduct specifically held unlawful by the statute, and furthermore,

6 because plaintiffs had failed to otherwise plead any conduct causing a "likelihood of

7 confusion." <u>See</u> JOP Order at 54-56. Now, plaintiffs' SAC alleges: that defendants

8 engaged in "unfair or deceptive" acts or practices, which "mis[led] or deceive[d] members of

9 the public; and that Rhode Island consumers "were injured by Defendants' actions." <u>See</u>

10 SAC, ¶ 330. Plaintiffs' opposition brief also relies on all the other general allegations of

11 unlawful activity, as further support for plaintiffs' re-stated claim under UTPCPA. <u>See</u> Opp.

12 Br. at 22-23. Defendants contend that this is insufficient to overcome the defects noted by

13 the court in its JOP Order.

14         This time around, plaintiffs' argument prevails. Plaintiffs rely on the Supreme Court

15 of Rhode Island's decision in <u>Ames v. Oceanside Welding and Towing Co., Inc.</u>, 767 A.2d

16 677 (R.I. 2001). In <u>Ames</u>, the court affirmed summary judgment in defendant's favor on a

17 plaintiff's UTPCPA claim. In looking to whether a practice is "unfair" under UTPCPA, the

18 <u>Ames</u> court considered: whether the practice offends public policy "as it has been

19 established by statutes, the common law, or otherwise;" whether it is immoral, unethical,

20 oppressive, or unscrupulous; and whether it causes substantial injury to consumers. <u>See</u>

21 <u>id</u>. at 681.

22         Applying <u>Ames</u> to the allegations here, plaintiffs' second amended complaint

23 sufficiently satisfies the requisite criteria. Plaintiffs' revised allegations set forth practices by

24 defendants that are likely to offend public policy as has been established by statute and/or

25 common law (e.g., statutory prohibitions on price-fixing). Furthermore, in the court's view,

26 the second amended complaint fairly alleges unscrupulous conduct by defendants, at the

27 very least, and that such conduct caused injury to consumers in Rhode Island, as well as

28

1   consumers across the country.

2       Accordingly, the court concludes that plaintiffs have sufficiently cured the defects

3   noted by the court in its JOP Order.  Defendants' motion to dismiss plaintiffs' restated claim

4   under the UTCPCA is therefore DENIED.

5   F.      Unjust Enrichment Claim

6       Plaintiffs' sixth claim for relief alleges violation of "common law principles of unjust

7   enrichment" and seeks disgorgement of the "benefits conferred" to defendants "via

8   overpayments by Plaintiffs and Class members."  See SAC, ¶¶ 338-41.  Defendants argue

9   that this claim must be dismissed, because (a) it is impossible to tell under which state laws

10  plaintiffs seek disgorgement; and (b) assuming that plaintiffs are seeking relief under

11  California's unjust enrichment laws, plaintiffs have failed to establish that defendants

12  "retained" any unlawful benefits.

13      Preliminarily, defendants are correct that it is difficult, from the face of the second

14  amended complaint, to tell what claims plaintiffs are asserting.  Plaintiffs' claim states

15  neither that it is proceeding under specific state laws, nor that it is proceeding as a single

16  claim on behalf of a nationwide class.  Indeed, its opposition brief can be read to imply

17  both.  See Opp. Br. at 23-25.  Although plaintiffs asserted at the hearing that they are

18  proceeding under California's unjust enrichment law, on behalf of a nationwide class, the

19  claim is unclear under principles of Rule 8 pleading requirements as alleged, and plaintiffs

20  are therefore required to amend their unjust enrichment claim, so that defendants may

21  properly be placed on notice as to the extent of the claim they are required to defend.

22  Accordingly, defendants' motion is hereby GRANTED, with leave to amend so that plaintiffs

23  can properly clarify it.

24      The court notes, however, that in the event plaintiffs allege their claim as instructed,

25  the court is of the opinion that plaintiffs have adequately alleged the second requisite

26  element – i.e., that defendants have retained the unlawful benefits in question.  See First

27  Nationwide Sav. v. Perry, 11 Cal. App. 4th 1657, 1662 (1992)("Unjust enrichment is an

28

equitable remedy at common law which involves (1) receipt of a benefit and (2) unjustified retention of that benefit at another's expense."); see also Cal. Emergency Phys. Med. Group v. Pacificare of Cal., 4 Cal. Rptr. 3d 583, 593 (2003). The SAC alleges that "defendants have been unjustly enriched through overpayments by Plaintiffs and Class members;" that the enrichment "flowed from the conduct challenged in [the] Complaint;" and that "defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and Class members." See SAC ¶¶ 339-40. This sufficiently alleges both that defendants received a benefit, and that defendants have retained that benefit.

To the extent that defendants additionally argue that retention cannot be demonstrated, because the overpayments have already been paid to direct purchasers in settlements with those plaintiffs, the court is unpersuaded by this argument. First, defendants have submitted no controlling authority demonstrating that direct purchaser settlements negate indirect purchasers' ability to bring an unjust enrichment claim based on the same conduct. Second, as a blanket matter, this would be in direct contravention of those state laws in which indirect purchaser recovery is permitted.

In sum, and for the reasons above, plaintiffs' unjust enrichment claim is DISMISSED, with leave to amend.

G.    Twelve Claims Previously Dismissed

Defendants take issue with the fact that plaintiffs' second amended complaint re-alleges several of the claims that the court previously dismissed in its JOP Order. Specifically, defendants note that the revised complaint alleges:

- an indirect purchaser claim under Ohio's antitrust statute (SAC ¶ 303);

- a Pennsylvania antitrust common law claim (SAC ¶ 304); and

- antitrust and consumer protection claims under Alabama, Alaska, Idaho, Louisiana, Montana, Oregon, South Carolina, Utah, West Virginia, and Wyoming laws (SAC ¶¶ 288, 314, 320, 322, 324, 329, 331-32, 334-35).

22

As defendants note, each of these claims was dismissed by the court in its prior order, on various grounds separate and apart from antitrust standing. <u>See</u> JOP Order at 20, 25-26, 29-36, 42, 46-47, 54, 59, and 61. Furthermore, the court expressly declined to grant plaintiff leave to amend these claims in its JOP Order. And since plaintiffs' motion for leave to file a second amended complaint only addressed plaintiffs' ability to overcome the court's standing concerns, plaintiffs have never actually sought, nor has the court granted, leave to re-allege the above previously dismissed claims. Moreover, plaintiffs do not contest this, and concede that these claims should be dismissed. <u>See</u> Opp. Br. at 2, fn. 2 ("[p]laintiffs do not contest the dismissal of the claims addressed in Defendants' brief at VI").

Accordingly, the court hereby GRANTS defendants' motion to dismiss on the above grounds.

H.      Named Plaintiff Robert Cadamy

Defendants' motion challenges the addition of Robert Cadamy as a named plaintiff. <u>See</u> SAC, ¶ 27. Notably, Mr. Cadamy is the only individual named plaintiff who is alleged to have purchased DRAM modules, rather than DRAM as a component in computers. <u>See</u> SAC, ¶¶ 18-27. Defendants' primary objection is that plaintiffs added Mr. Cadamy improperly, after the close of discovery. Plaintiffs, for their part, remark that their failure to seek leave to add Mr. Cadamy as a new plaintiff in connection with their motion for leave to file a second amended complaint was inadvertent, and that their offer to make him available for deposition prior to the deadline for defendants' class certification opposition cures any prejudice to defendants.

Defendants are generally correct in stating that the proper means of adding Mr. Cadamy as a named plaintiff would have been via motion for leave to amend, which plaintiffs could have done when they moved for leave to file a second amended complaint back in June 2007. However, the court is persuaded that plaintiffs' failure to do so was inadvertent, and in view Mr. Cadamy's distinct status as an indirect purchaser of DRAM

23

1  modules, plaintiffs will not be precluded on procedural grounds from adding him as named

2  plaintiff now.

3       The critical touchstone here is therefore whether defendants would be unduly

4  prejudiced by the addition of a new plaintiff.  If briefing on class certification were already

5  complete, the court would unquestionably find that the prejudice to defendants was great.

6  However, in view of the court's December 5, 2007 order vacating all class certification

7  dates, as well as plaintiffs' representation at the hearing on this matter that they will make

8  Mr. Cadamy available for deposition prior to the filing of the class certification motion, the

9  court finds that no undue prejudice would result from allowing Mr. Cadamy to proceed as

10 named plaintiff.

11      For these reasons, and subject to the above understanding, the court hereby

12 DENIES defendants' motion to dismiss Mr. Cadamy as named plaintiff.

13                                    **CONCLUSION**

14      For all the foregoing reasons, the court hereby GRANTS defendants' motion to

15 dismiss in part, and DENIES it in part.  Any amended complaint shall be filed no later than

16 **February 27, 2008**.  Amendments are limited to plaintiffs' claim for unjust enrichment, as

17 set forth herein.  Defendants' response thereto shall be due no later than **March 18, 2008**.

18      In view of the court's December 5, 2007 order vacating all class certification dates,

19 the parties are further instructed to meet and confer with one another for the purpose of

20 stipulating to a proposed briefing schedule and hearing date in connection with the motion

21 for class certification.  The parties shall submit a stipulated proposed order on this point no

22 later than February 13, 2008.

23 **IT IS SO ORDERED**.

24 Dated: January 29, 2008

25                                    _____

26                                    PHYLLIS J. HAMILTON
                                      United States District Judge

27

28