1   THE HONORABLE CHARLES B. RENFREW (Ret.)
    633 Battery Street
2   San Francisco, CA 94111
    Telephone:  (415) 397-3933
3   Facsimile:  (415) 397-7188

4   SPECIAL MASTER

5

6

7

8
                    **UNITED STATES DISTRICT COURT**
9                   **NORTHERN DISTRICT OF CALIFORNIA**
                         **OAKLAND DIVISION**
10

11  In re DYNAMIC RANDOM ACCESS          Master File No. M-02-1486-PJH
    MEMORY (DRAM) ANTITRUST
    LITIGATION                           MDL No. 1486
12  ─────────────────────────────
                                         Case No. C 06-4333 PJH
13  This document relates to:            Case No. C 06-6436 PJH

14  **ALL INDIRECT PURCHASER**           **REPORT AND**
    **ACTIONS**                          **RECOMMENDATIONS OF**
                                         **SPECIAL MASTER**
15  and
                                         PART I: SETTLEMENT CLASS
16  *State of California et al. v. Infineon*   CERTIFICATIONS AND PLANS OF
    *Technologies AG, et al.*            ALLOCATION AND DISTRIBUTION
17                                       OF THE SETTLEMENT PROCEEDS
                                         TO THE SETTLEMENT CLASSES
18  and
                                         Judge:  Honorable Phyllis J. Hamilton
19  *State of New York v. Micron Technology,*
    *Inc., et al.*
20

21

22

23

24

25

26

27        Report and Recommendations of Special Master Part I re Settlement Class Certification,
28                         Settlement Fund Allocation and Distribution

# **TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................1

II.     THE REFERENCE TO THE SPECIAL MASTER ........................................2

        A.      The Orders of Reference From the District Court ...........................2
        B.      Form of Report and Recommendations on Issues
                Referred to the Special Master...........................................5

III.    SUMMARY OF THE SPECIAL MASTER'S FINDINGS
        AND RECOMMENDATIONS ...........................................................9

        A.      Certification of the Indirect Purchaser
                Settlement Class (Section VII, below).....................................9
        B.      Subclasses are Not Recommended for the Indirect
                Purchaser Settlement Class (Section VII.D)...............................11
        C.      The Plan of Allocation and Distribution of the Settlement
                Proceeds to Members of the Indirect Purchaser
                Settlement Class (Section IX).............................................13
        D.      Certification of the Government Purchaser
                Settlement Classes (Section VIII).........................................16
        E.      Subclasses are Not Recommended for the Government
                Purchaser Settlement Classes (Section VIII.E)............................19
        F.      The Plans of Allocation and Distribution of the Settlement
                Proceeds to Members of the Government Purchaser
                Settlement Classes (Section XI)...........................................20

IV.     BACKGROUND ....................................................................21

        A.      The Status of the Indirect Purchaser Plaintiff Class
                Actions at the Time of Settlement ......................................21
        B.      The Status of the Attorneys General's Actions at the
                Time of Settlement......................................................25

V.      THE TERMS OF THE SETTLEMENT AGREEMENTS ...................................30

        A.      The Samsung Settlement..................................................30
        B.      The Winbond Settlement .................................................34
        C.      The Multi-Defendant Settlement ........................................35
        D.      The Nanya Settlement...................................................42
        E.      The Mitsubishi Settlement ..............................................44
        F.      The Toshiba Settlement .................................................46
        G.      The Hitachi Settlement .................................................48

i

VI.   THE PROCEEDINGS BEFORE THE SPECIAL MASTER WITH
REGARD TO CERTIFICATION OF THE PROPOSED INDIRECT
PURCHASER SETTLEMENT CLASS ...................................................................49

    A.   The Proposed Indirect Purchaser Settlement Class Defined in the
Settlement Agreements ................................................................................49
    B.   The Preliminary Matter of the Scope of the Plaintiffs' Actions .................51
    C.   Definition of the Indirect Purchaser Settlement Class .................................53
    D.   Resolving Via Compromise the Objection of the Attorneys
General of Illinois, Idaho, Oregon and Washington to the Inclusion of
Their Citizens in the Nationwide Indirect Purchaser Settlement Class ........54

VII.  FINDINGS OF FACT AND CONCLUSIONS OF LAW
REGARDING THE SATISFACTION OF THE RULE 23
REQUIREMENTS BY THE INDIRECT PURCHASER
SETTLEMENT CLASS ....................................................................................58

    A.   Satisfaction of the Requirements of Rule 23(a) of the Federal Rules of
Civil Procedure ...........................................................................................59
    B.   Satisfaction of the Requirements of Rule 23(b)(2) of the Federal
Rules of Civil Procedure .............................................................................67
    C.   Satisfaction of the Requirements of Rule 23(b)(3) of the
Federal Rules of Civil Procedure ................................................................74
    D.   The Question of the Need For Subclasses ...................................................87

VIII. FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING
THE SATISFACTION OF THE RULE 23 REQUIREMENTS BY THE
GOVERNMENT PURCHASER SETTLEMENT CLASSES ...............................90

    A.   Satisfaction of the Requirements to Rule 23(a) ...........................................94
    B.   Satisfaction of the Requirements of Rule 23(b)(2) .......................................97
    C.   Satisfaction of the Requirements of Rule 23(b)(3) .......................................98
    D.   The Inclusion of Class Members from Outside of
California Asserting Cartwright Act Claims in the
Samsung/Winbond Government Purchaser Settlement Class ...................107
    E.   The Inclusion of Both Direct and Indirect Purchaser Claims
Within the Proposed Government Purchaser Settlement Classes..............108

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

IX.   THE PROCEEDINGS BEFORE THE SPECIAL MASTER REGARDING
      THE ALLOCATION AND DISTRIBUTION OF THE SETTLEMENT
      PROCEEDS TO THE INDIRECT PURCHASER SETTLEMENT
      CLASS AND THE NECESSITY OF CREATING SUBCLASSES
      FOR THIS PURPOSE ....................................................................112

      A.   Initial Proceedings Directed to Formulating a Plan of Distribution ..........114
      B.   The Appointment of Reseller Allocation Counsel.....................................116
      C.   The Distribution Data and Expert Opinion Underlying the
           Negotiation of the Plan of Distribution of the Settlement
           Funds to the Proposed Indirect Purchaser Settlement Class.....................119
           1.   The Process of Arriving at a Fair and Reasonable
                Estimate of the Flow of DRAM From the Defendants to
                Resellers and Ultimately End-Buyers Through the
                Distribution Channels ...................................................................120
           2.   The Process of Negotiating Treatment of the Absorption
                of Overcharges by Resellers and the Pass-on of
                Overcharges to End-Buyers in the Plan of Distribution ................127
      D.   Resolving the Question of Whether Certain Class Members'
           Claims Should be Accorded Different Weight in Calculating
           Settlement Refunds to Reflect Differences in the "Strength" of
           Their Litigation Postures..............................................................139
      E.   The Terms of the Negotiated Plan of Allocation and
           Distribution of the Settlement Proceeds to the Proposed
           Indirect Purchaser Settlement Class............................................142

X.    FINDINGS OF FACT AND CONCLUSIONS OF LAW
      REGARDING THE FAIRNESS AND ADEQUACY OF THE
      INDIRECT PURCHASER SETTLEMENT CLASS'S NEGOTIATED
      PLAN OF DISTRIBUTION ........................................................144

XI.   FINDINGS OF FACT AND CONCLUSIONS OF LAW
      RELEVANT TO THE ALLOCATION AND DISTRIBUTION
      OF THE SETTLEMENT PROCEEDS TO THE GOVERNMENT
      PURCHASER SETTLEMENT CLASSES .......................................166

      A.   Survey Evidence and Full Time Employee
           ("FTE") Methodology...................................................................167
      B.   The Fairness and Reasonableness of Treating All
           Government Purchaser Plaintiffs Equally in the
           Plans of Distribution ...................................................................171
      C.   The Fairness and Reasonableness of Treating
           Direct and Indirect Purchases Equally in the Plans of Distribution...........173

D. Issues Relevant to Class State California's Plan of Distribution ................176

1. Description of and Recommendations Concerning the Distribution of Settlement Proceeds Among Different Government Purchaser Plaintiff Groups in California .................................................................................177

2. Description of and Recommendations Concerning Distributions to Political Subdivisions ...........................................179

3. Description of and Recommendation Concerning Distribution to the University of California.................................186

4. Description of and Recommendation Concerning Incentive Awards to Class Representatives University Of California and Lead Plaintiff City of Los Angeles...................187

E. Issues Relevant to Other Class States' Plans of Distribution ....................194

1. Alaska ........................................................................................194
2. Delaware ....................................................................................195
3. New Mexico................................................................................197
4. Ohio............................................................................................199
5. Pennsylvania .............................................................................202

XII. CONCLUSION................................................................................................207

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

# TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                              <u>**Page**</u>

*ABC Internat. Traders, Inc. v. Matsushita Electric Corp.*
   14 Cal. 4th 1247 (1997) ...................................................................................69

*Amchem Products, Inc. v. Windsor*
   521 U.S. 591 (1997).................................................................................*passim*

*Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*
   459 U.S. 519 (1983)..................................................................5, 6, 23, 84

*Bell v. Farmers Ins. Exchange*
   115 Cal. App. 4th 715 (2004) .........................................................................169

*Blackie v. Barrack*
   524 F.2d 891 (9th Cir. 1975) ............................................................................61

*Blue Cross & Blue Shield of New Jersey v. Philip Morris USA, Inc.*
   178 F. Supp. 2d 198 (E.D.N.Y. 2001) ..........................................................169

*Blue Cross  Empire Healthcare, Inc. v. Philip Morris USA, Inc.*
   *rev'd on other grounds sub. nom. Simon II Litig. v. Philip Morris*
   *USA Inc.,* 407 F.3d 125 (2d Cir. 2005)
   393 F.3d 312 (2nd Cir. 2004)........................................................................169

*Bredbenner v. Liberty Travel, Inc.*
   No. 09-905, 2011 U.S. Dist. LEXIS 38663,
   2011 WL 1344745 (D.N.J. Apr. 8, 2011) ......................................................187

*City and County of San Francisco et al. v. Microsoft Corp.*
   No. 04-cv-03705 (D. Md. August 21, 2006)....................................92, 95, 99

*City of County of San Francisco et al. v. Microsoft Corp.*
   No. 04-cv-03705 (D. Md. Feb. 9, 2007) ............................................95, 99

*Clayworth v. Pfizer*
   49 Cal. 4th 758 (2010) ..............................................................................*passim*

*Clothesrigger, Inc v. GTE Corp.*
   191 Cal. App. 3d 605 (1987) ............................................................................76

*Connecticut v. Doehr*
   501 U.S. 1 (1991)............................................................................................169

*Cook v. Niedert*
   142 F.3d 1004 (7th Cir. 1998) ........................................................................189

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

*Dennis v. Kellogg Company*
   687 F.3d 1149 (9th Cir. 2012) ................................................................. 161

*Dennis v. Kellogg Company ("Kellogg II")*
   Slip Op. 10527, D.C. No. 3:09-cv-01786-IEG-WMC
   2012 U.S. App. LEXIS 18576 (9th Cir. Sept. 4, 2012) ................................ 144, 161

*Denny v. Jenkins and Gilchrist*
   230 F.R.D. 317 (S.D.N.Y. 2005) ............................................................. 145

*Dotson v. United States*
   87 F.3d 682 (5th Cir. 1996) ................................................................... 145

*Dunleavy v. Nadler (In re Mego Fin. Corp. Sec. Litig.)*
   213 F.3d 454 (9th Cir. 2000) ................................................................. 145

*E. Tex. Motor Freight Sys. Inc. v. Rodriguez*
   431 U.S. 395 (1977) ............................................................................... 64

*Ehrheart v. Verizon Wireless*
   609 F.3d 590 (3d Cir. 2010) .......................................................... 77, 107, 148

*Ellis v. Costco Wholesale Corp.*
   657 F.3d 970 (9th Cir. 2011) ................................................................... 69

*Fletcher v. Security Pacific National Bank*
   23 Cal. 3d 442 (1979) ............................................................................. 69

*FTC v. Kuykendall*
   371 F.3d 745 (10th Cir. 2004) ................................................................ 72

*Gasperini v. Center for Humanities, Inc.*
   518 U.S. 415 (1996) ............................................................................. 166

*Gerlinger v. Amazon.com Inc.*
   526 F.3d 1253 (9th Cir. 2008) ................................................................ 84

*Guaranty Trust Co. of New York v. York*
   326 U.S. 99 (1945) ............................................................................... 166

*Hammes v. AAMCO Transmissions, Inc.*
   33 F.3d 774 (7th Cir. 1994) .................................................................... 84

*Hammon v. Barry*
   752 F. Supp. 1087, 1095 (D.D.C. 1990) ................................................... 145

*Hanlon v. Chrysler Corp.*
   150 F.3d 1011 (9th Cir. 1998). .......................................................... *passim*

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*
   392 U.S. 481 (1968) ..................................................................... 81, 82, 83

vi

*Illinois Brick v. Illinois*
    431 U.S. 720 (1977) .................................................................*passim.*

*In re Agent Orange Prod. Liability Litig.*
    818 F.2d 145 (2d Cir. 1987) .................................................145, 147

*In re Air Cargo Shipping Services Antitrust Litigation*
    MD-06-1775, 2008 U.S. Dist. LEXIS 107882
    (E.D.N.Y. Sept. 26, 2008), *rec. adopted,*
    2009 U.S. Dist. LEXIS 97365 (E.D.N.Y. Aug. 21, 2009)........................86

*In re Air Cargo Shipping Services Antitrust Litigation*
    MD-06-1775, 2009 U.S. Dist. LEXIS 88404 (E.D.N.Y. Sept. 25, 2009) .................85

*In re Airline Ticket Commission Antitrust Litig.*
    953 F. Supp. 280 (D. Minn. 1997).................................................149

*In re Ampicillin Antitrust Litig.*
    55 F.R.D. 269 (D.C. Cir. 1972) .....................................................96

*In re Antibiotic Antitrust Action*
    333 F. Supp. 278 (S.D.N.Y. 1971).............................................96, 169

*In re Atl. Gulf Cmtys. Corp.*
    369 B.R. 156 (Bankr. D. Del. 2007) ...............................................37

*In re Brand Name Prescription Drugs Antitrust Litig.*
    No. 94 C 897, 1999 U.S. Dist. LEXIS 12936,
    1999 WL 639173 (N.D. Ill. Aug. 17, 1999) ......................................149

*In re Cardizem CD Antitrust Litig.*
    200 F.R.D. 326 (E.D. Mich. 2001) .................................................75

*In re Cathode Ray Tubes Antitrust Litig.*
    738 F. Supp. 2d 1011 (N.D. Cal. 2010) ...........................................84

*In re Cendant Corp. Litig.*
    264 F.3d 201 (3d Cir. 2001)........................................................100

*In re Cendant Corp. Sec. Litig.*
    109 F. Supp. 2d 235 (D.N.J. 2000), *aff'd,* 264 F.3d 201 (3d Cir.)
    *cert. denied,* 535 U.S. 929 (2002)...........................................7, 146

*In re Chlorine & Caustic Soda Antitrust Litig.*
    116 F.R.D. 622 (E.D. Pa. 1987).....................................................63

*In re Cipro Cases I & II*
    121 Cal. App. 4th 402  (2004) ................................................81, 169

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

In re Computron Software, Inc. Sec. Litig.
  6 F. Supp. 2d 313 (D.N.J. 1998) ..................................................144

In re Cont'l Ill. Sec. Litig.
  962 F.2d 566 (7th Cir. 1992) .............................................188, 190

In re Copley Pharmaceutical, Inc.
  161 F.R.D. 456 (D. Wyo. 1995) ...................................................80

In re Corel Corp. Sec. Litig.
  293 F. Supp. 2d 484 (E.D. Pa. 2003) .........................................146

In re Corrugated Container Antitrust Litig.
  556 F. Supp. 1117 (S.D. Tex. 1982)
  aff'd., 687 F.2d 52 (5th Cir. 1982) .....................................149, 173

In re Exxon Valdez
  No. A89-0095 (HRH), 1996 U.S. Dist. LEXIS 8173
  (D. Alaska, June 11, 1996) ........................................................148

In re Flash Memory Litig.
  No. C 07-0086 SBA, 2009 U.S. Dist.
  LEXUS 38941 (N.D. Cal. Mar. 31, 2009) ...............................29, 85

In re Ford Motor Co. E-350 Van Products Liability Litig.
  No. Civ. A. 03-4458, slip. op. 2012 WL 379944 (D.N.J. Feb. 6, 2012) ........................8

In re General Motors Pick Up Truck Fuel Tank
  55 F.3d 768 (3d Cir. 1995) ........................................................148

In re Global Crossing Sec. & ERISA Litig.
  225 F.R.D. 436 (S.D.N.Y. 2004) .......................................147, 153

In re Graphics Processing Unit Antitrust Litig.
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) .......................................85

In re Heritage Bond Litig.
  MDL No. 1475, 2005 U.S. Dist. LEXIS 13555 (C. D. Cal. 2005) ..........................148

In re Holocaust Victims Asset Litig.
  105 F. Supp. 2d 139 (E.D.N.Y. 2000) .......................................144

In re Hydrogen Peroxide Antitrust Litig.
  552 F.3d 305 (3d Cir. 2008).................................................59, 102

In re Initial Pub. Offering Secs. Litig.
  471 F.3d 24 (2d Cir. 2006)...........................................................59

In re Insurance Brokerage Antitrust Litig.
  579 F.3d 241 (3d Cir. 2009)..................................................passim.

viii

*In re Literary Works in Elec. Databases Copyright Litigation*
  654 F.3d 242 (2nd Cir. 2011)..................................................9, 65, 88, 114

*In re Lorazepam*
  205 F.R.D. at 400 ...............................................................................187

*In re Lucent Tech., Inc. Sec. Litig.*
  307 F. Supp. 2d 633 (D.N.J. 2004) ...............................................144, 146

*In re Marsh ERISA Litig.*
  265 F.R.D. 128 (S.D.N.Y. 2010) ...........................................................147

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*
  No. 02-1484, 2007 WL 4526593 (S.D.N.Y. Dec. 20, 2007) ...................153

*In re Mexico Money Transfer Litigation*
  164 F. Supp. 2d 1002 (N.D. Ill. 2000) ..................................................158

*In re Mexico Money Transfer Litig.*
  267 F.3d 743 (7th Cir. 2001) ................................................................168

*In re Microsoft Corp. Antitrust Litig.*
  185 F. Supp. 2d 519 (D. Md. 2002)...............................................158, 159

*In re Microsoft I-V Cases*
  135 Cal. App. 4th 706 (2006) ...............................................................158

*In re Motor Vehicles Canadian Export Antitrust Litig.*
  269 F.R.D. 80 (D. Me. 2010)........................................85, 103, 105

*In re Motor Vehicles Canadian Export Antitrust Litig.*
  235 F.R.D. 127 (D. Me. 2006) ..............................................................100

*In re Motorsports Merchandise Antitrust Litig.*
  160 F. Supp. 2d 1392 (N.D. Ga. 2001) .................................................202

*In re Music Compact Disc Minimum Advertised Price Litigation*
  216 F.R.D. 197 (D. Me. 2003).........................................................*passim.*

*In re NASDAQ Market-Makers Antitrust Litig.*
  169 F.R.D. 493 (S.D.N.Y. 1996) .............................................................75

*In re NCO Fin. Sys., Inc. Debt Collection Litig.*
  2002 U.S. Dist. LEXIS 17602 (E.D. Pa. 2002) ......................................157

*In re Packaged Ice Antitrust Litig.*
  2011 U.S. Dist. LEXIS 150427 ( E.D. Mich. Dec. 13, 2011)...................149

*In re Painewebber Ltd. P'ships. Litig.*
  171 F.R.D. 104 (S.D.N.Y. 1997) ....................................................146, 147

ix

In re Pet Food Prods. Liab. Litig.
629 F.3d 333 (3d Cir. 2010)..............................................88, 114, 150

In re Pet Food Prods. Liab. Litig.
2011 U.S. Dist. LEXIS 38181 (D.N.J. Apr. 5, 2011) ................................89

In re Pharmaceuticals Average Wholesale Price Litig.
588 F.3d 32 (1st Cir. 2009)..............................................................159

In re Prudential Ins. Co. of Am. Sales Practice Litig.
261 F.3d 355 (3d Cir. 2001) ...............................................................86

In re Relafen Antitrust Litig.
231 F.R.D. 52 (D. Mass. 2005)..........................................................118

In re Remeron Direct Purchaser Antitrust Litig.
2005 WL 3008808 (D.N.J. Nov. 9, 2005) ......................................145, 147

In re Remeron End-Payor Antitrust Litig.
2005 WL 2230314 (D.N.J. Sept. 13, 2005) ...........................................144

In re Rubber Chemicals Antitrust Litig.
232 F.R.D. 346 (N.D. Cal. 2005)............................................60, 61, 63

In re Sprint Corp. ERISA Litig.
443 F. Supp. 2d. 1249 (D. Kan. 2006) ..............................................153

In re Stock Exchange Antitrust Litig.
317 F.3d 134 (2nd Cir. 2003)........................................................77, 107

In re Sugar Industry Antitrust Litig.
MDL Dkt. No. 201, 1976 WL 1374 (N.D. Cal. 1976)......................60, 169

In re Telectronics Pacing Sys., Inc.
172 F.R.D. 271 (S.D. Ohio 1997) .......................................................79

In re TFT-LCD (Flat Panel) Antitrust Litig.
586 F. Supp. 2d  1109 (N.D. Cal. 2008) ...............................................85

In re Tobacco Cases II
46 Cal. 4th 298 (2009) .....................................................................85

In re Toys-R-Us Antitrust Litig.
191 F.R.D. 347 (S.D.N.Y. 2000) ................................................158, 159

In re Vitamins Cases
107 Cal. App. 4th 820  (2003) ...............................................158, 164, 183

In re Warfarin Sodium Antitrust Litig.
391 F.3d 516 (3rd Cir. 2004) ......................................................passim

x

*Jones v. Nat'l Distillers*
  56 F. Supp. 2d 355 (S.D.N.Y. 1999)........................................................202

*Las Vegas Sands LLC v. Nehme*
  632 F.3d 525 (9th Cir. 2011) ...............................................................145

*Law v. NCAA*
  108 F. Supp. 2d 1193 (D. Kan. 2000) ....................................................147

*Local No. 93, Int'l Assoc. of Firefighters v. City of Cleveland*
  478 U.S. 501 (1986)............................................................................71

*Lower Lake Erie Iron Ore Antitrust Litig.*
  998 F.2d 1144 (3d Cir. 1993)...............................................................83

*Maley v. Del Global Techs. Corp.*
  186 F. Supp. 2d 358 (S.D.N.Y. 2002)....................................................148

*Mehling v. New York Life Ins. Co.*
  No. 99-5417, 2008 WL 597725 (E.D. Penn. March 4, 2008)......................153

*Minnesota v. United States Steel Corp.*
  44 F.R.D. 559 (D. Minn. 1968).........................................................95, 96

*Mirifashi v. Fleet Mortg. Corp.*
  356 F.3d 781  (7th Cir. 2004) ..............................................................159

*Morgan v. Laborers Pension Trust Fund for Northern District of California*
  81 F.R.D. 669 (N.D. Cal. 1979)............................................................97

*Nachshin v. AOL, LLC*
  663 F.3d 1034 (9th Cir. 2011) ........................................................*passim.*

*Newton v. Merrill Lynch, Pierce, Fenner, & Smith*
   253 F.3d 154 (3d Cir. 2001)...............................................................102

*Oregon Laborers-Employers Health & Welfare Trust Fund v. Phillip Morris, Inc.*
  188 F.R.D. 365 (D. Ore. 1998) ........................................................62, 74

*Oregon v. AU Optronics Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.)*
  MDL No. 1827, No. C 10-4346 SI, 2011 U.S. Dist.
  LEXIS 76562 (N.D. Cal. July 11, 2011)..................................................67

*Ortiz v. Fibreboard Corp.*
  527 U.S. 815 (1999)............................................................................65

*Pac. R.R. v. Ketchum*
  101 U.S. 289 (1879).............................................................................71

*Pacific Gas & Elec. Co. v. County of Stanislaus*
  16 Cal. 4th  1143 (1997) ...............................................................91, 106

xi

*Palmyra Park Hosp. Inc. v. Phoebe Putney Memorial Hosp.*
    604 F.3d 1291 (11th Cir. 2010) .................................................. 83

*People v. Pacific Land Research Co.*
    20 Cal. 3d 10 (1977) .................................................................. 70

*People v. Superior Court (Jayhill Corp.)*
    9 Cal. 3d 283 (1973) .................................................................. 69

*Rodriguez v. West Publ. Corp.*
    2007 U.S. Dist. LEXIS 74767 (C.D. Cal. Sept. 10, 2007)....................................... 156

*Rodriguez v. West Publ. Corp.*
    563 F.3d 948 (9th Cir. 2009) ...........................................................*passim.*

*Sansom Comm. by Cook v. Lynn*
    735 F.2d 1535 (3d Cir. 1984)....................................................... 71

*Sav-on Drug Stores, Inc. v. Superior Ct.*
    34 Cal. 4th 319 ...................................................................... 169

*Schlesinger v. Reservists Comm. to Stop the War*
    418 U.S. 208 (1974)................................................................ 64

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*
    599 U.S. (2010)................................................................61, 101

*Smith v. MCI Telecomm. Corp.*
    No. 87-2110, 1993 WL 142006 (D. Kan. Apr. 28, 1993)....................................... 146

*State of Alabama v. Chevron USA, Inc.*
    No. Civ. 78-51-N, 1980 WL 1808  (M.D. Ala. Jan. 11, 1980) .................................. 97

*State of California v. Levi-Strauss*
    41 Cal. 3d 460 (1986) .......................................................159, 163, 164

*State of Illinois v. Associated Milk Producers*
    351 F. Supp. 436 (N.D. Ill. 1972) ................................................... 97

*State of Illinois v. Harper & Row Publishers, Inc.*
    301 F. Supp. 484 (N.D. Ill. 1969) ................................................... 96

*State of New York et al. v. Reebok International, Inc.*
    903 F. Supp. 532 (S.D.N.Y. 1995), *aff'd* 96 F.3d 44 (2nd Cir. 1996) ..................... 159

*State of New York v. Dairylea*
    1985 WL 1825 (S.D.N.Y. 1985)...................................................... 159

*State of New York v. Keds*
    No. 93 Civ. 6708 (CSH), 1994 WL 97201 (S.D.N.Y. Mar. 21, 1994).................... 159

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

*Staton v. Boeing Co.*
  313 F.3d 447 (9th Cir. 2002) ...................................................................... 88

*Sullivan v. DB Invs., Inc.*
  667 F.3d 273 (3d Cir. Dec. 20, 2011)
  *cert. denied sub nom. Murray v. Sullivan*
  132 S. Ct. 1876 (Apr. 2, 2012) ........................................................*passim.*

*TBK Partners, Ltd. v. Western Union Corp.*
  675 F.2d 456 (2d Cir. 1982) ...................................................................... 86

*Trimont Land Corp. v. Truckee Sanitary Dist.*
  145 Cal. App. 3d 330 (1983) ...................................................................... 91

*United Mine Workers of America v. Gibbs*
  383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966) .............................. 61

*United States of America v. Keyspan Corporation*
  763 F. Supp. 2d 633 (S.D.N.Y. 2011) ........................................................ 67

*United States v. Esquivel*
  88 F.3d 722 (9th Cir. 1996) ............................................................... 94, 190

*United States v. Microsoft*
  143 F.3d 935 (D.C. Cir. 1998) .................................................................... 72

*Valentino v. Carter-Wallace, Inc.*
  97 F.3d 1227 (9th Cir. 1996) ...................................................................... 74

*Wal-Mart Stores v. Dukes*
  ___ U.S. ___, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) ....................*passim*

*Walsh v. Great Atl. & Pac. Tea Co., Inc.*
  726 F.2d 956 (3d Cir. 1983) .................................................................... 146

*Wells v. One2One Learning Foundation*
  39 Cal. 4th 1164 (2006) ............................................................................ 91

*Wershba v. Apple Computers, Inc.*
  91 Cal. App. 4th 224 (2001) ...................................................................... 76

*Yang v. Odom*
  392 F.3d 97 (3d Cir. 2004) ...................................................................... 154

*Zinser v. Accufix Research Inst., Inc.*
  253 F.3d 1180 (9th Cir. 2001) .................................................................... 74

xiii

1

## Statutes

2   11 U.S.C. § 547(b) .................................................................................37

3   11 U.S.C. § 548(a)(1) .............................................................................37

4   15 U.S.C. § 26 .......................................................................................24

5   28 U.S.C. § 1332(d)(11)(B) ...................................................................29

6   28 U.S.C. § 1292(b) ..............................................................................24

7   Bankruptcy Code § 547 .........................................................................37

8   Bankruptcy Code § 548 .........................................................................37

9   Cal. Bus. & Prof. Code § 16720 ............................................................24

10  Cal. Bus. & Prof. Code § 16750(a) ......................................................106

11  Cal. Bus & Prof. Code § 16750(c) .........................................................93

12  Cal. Bus. & Prof. Code § 16750(d) ......................................................169

13  Cal. Bus. & Prof. Code § 17200 ............................................................25

14  Cal. Gov. Code § 4551 .........................................................................109

15  Cal. Gov. Code § 12650 .........................................................................91

16  Cal. Gov. Code § 23000 .........................................................................91

17  Cal. Gov. Code § 34100 .........................................................................91

18  California Code of Civil Procedure § 384 .............................................164

19  Fed. R. Civ. P. 23 ............................................................................*passim*

20  Fed. R. Civ. P. 53(a)(1)(A) ......................................................................3

21

## Constitutional Provisions

22  Cal. Const., Art. IX,  § 14 .......................................................................91

23  Cal. Const., Art. IX, § 9(f) ..........................................................31, 36, 92

24  Cal. Const., Art. XI, § 1 ..........................................................................91

25  Cal. Const., Art. XI, § 2 ..........................................................................91

26  Cal. Const., Art. XI, § 5 ..........................................................................91

xiv

27

28

Cal Const., Art. XI, § 7 ...................................................................91

Cal. Const., Art. XI, § 9 ..................................................................91

**<u>Other Authorities</u>**

2010 U.S. Census Briefs, *Population Change and Distribution 2000 to 2010*
    http://www.census.gov/prod/cen2010/briefs/c2010br-01.pdf. ..................190

4 William B. Rubenstein, et al., *Newberg on Class Actions,* § 11:38 (4th ed. 2008)....188

7A Wright & Miller, *Federal Practice & Procedure,* § 1777 (2d ed. 1986).................75

American Law Institute, *Principles of the Law:*
    *Aggregate Litigation,* § 3.06 at 216. ......................................................106

*Collier on Bankruptcy,* § 541.09A (15th ed. rev. 2004) ...................................37

Diamond, *Reference Guide on Survey Research,*
    *in Reference Manual on Scientific Evidence,* 229 (2nd ed. 2000) ............167, 168, 170

Eisenberg & Miller, *Incentive Awards to Class Action Plaintiffs:*
    *An Empirical Study,* 53 U.C.L.A. L. Rev. 1303 ...............................188, 192

Farmer, *More Lessons from the Laboratories*
    *Cy Pres Distributions In Parens Patriae Actions*
    *Brought By State Attorneys General*
    68 Fordham L. Rev. 361 (1999)..................................................................159

Frank T. Martinez, City Clerk,
    *Your Government at a Glance, Facts about the City of Los Angeles*
    (2006 ed.), available at http://cityclerk.lacity.org/cps/pdf/govtglnc.pdf...................190

Kaye and Freedman, *Reference Guide on Statistics in*
    *Reference Manual on Scientific Evidence,* 83 (2nd ed. 2000) ..................................168

Machiraju, *When Hot Docs Set Your Company on Fire:*
    *Expanding the Role of General Counsel in Managing*
    *Antitrust Risk,* 22 Geo. J. Legal Ethics, 997, 1004 (2009)........................................73

Majoras, *You Too Can Win Antitrust Cases: The Myths and Realities of*
    *Trying An Antitrust Case to a Jury, Antitrust Source,* 1 (June 2009) ........................73

*Manual for Complex Litigation,* Fourth, § 21.23 ............................................4

McLaughlin, *McLaughlin on Class Actions,* §6.28, at 141 (5th ed. 2009)...................105

Miller & Singer, *Nonpecuniary Class Action Settlements*
    60 Law & Contemp. Probs., 106-107 (Autumn 1997) ............................................160

xv

*Pennsylvania Legislator's Municipal Deskbook,*
  *Local Government Entities in Pennsylvania,* (3d ed. 2006),
  http://www.lgc.state.pa.us/deskbook06 ...............................................................206

The State Bar of California Antitrust and Unfair Competition Law Section
  *California State Antitrust Law and Unfair Competition Law*
  § 14.02 [e] (2009 ed.)...............................................................................85

Wikipedia, United States, available at http://en.wikipedia.org/wiki/United_States..........1

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

# I. INTRODUCTION

1.      This Report and Recommendation arises in the context of various class actions and *parens patriae* actions brought on behalf of indirect purchasers of DRAM which have resulted in proposed global settlements totaling $310,720,000 plus injunctive relief.  These settlements resolve the claims of all indirect purchasers of DRAM in the United States[1] during the period January 1, 1998 through December 31, 2002.[2]  During that period, DRAM was the most common form of digital memory used in electronic devices.  Most DRAM was used in computers, the majority in personal desktops and laptops, as well as servers, printers and other computer-peripheral products. The balance was used in other DRAM-containing devices, such as office equipment (faxes etc.), telecommunications equipment and game consoles.  DRAM was sold to direct and indirect purchasers in the form of chips and modules, and as components in computers and DRAM-containing devices.

2.      A substantial amount of computer DRAM was sold directly by the chip manufacturers who are the defendants in this litigation to computer manufacturers ("OEMs") such as Dell, Apple, Hewlett Packard, IBM and Sun Microsystems.  OEMs generally sold to resellers as well as to end-buyers through telephonic and internet sales.  DRAM resales took the form of DRAM chips on modules that were used by the

---

[1]  As discussed below, United States as used in the class definition includes its territories and the District of Columbia.  This is specified in most but not all of the settlement agreements.  Since a single settlement class is being certified for the purpose of effectuating the global settlement of the litigation, the parties agree and the Special Master concludes that the term United States as used in all of the agreements should be construed to include U.S. territories.  Further, it is increasingly common usage for the term "United States" to encompass not only its 50 States and its federal district but also its territories, commonwealths and other possessions, *see, e.g.,* Wikipedia, United States, *available at* http://en.wikipedia.org/wiki/United_States.

[2]  As discussed below, this time period is the longest conspiracy period alleged in any of the various cases being settled.

1

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

purchaser to increase the memory in a computer or peripheral and DRAM modules installed in computers, peripherals and other DRAM-containing devices purchased by other resellers or end-buyers.  DRAM resellers (as well as the end-buyers who purchased from the OEMs) were indirect purchasers of the DRAM chips in the computers and DRAM-containing devices that they bought.  As such, they are putative members of the proposed Indirect Purchaser Settlement Class in this litigation.  Indirect purchasing DRAM resellers range from "big box stores" like Best Buy and electronic manufacturing services companies like Celestica to small individual computer builders.  The proposed Indirect Purchaser Settlement Class also includes the resellers' customers, the ultimate end-buyers of the DRAM, as represented by the named class representatives and their counsel, and in certain states, the Attorneys General acting in their *parens patriae* capacity.  These end-buyers consist of two groups:  (1) individuals, also referred to as natural persons or households, including sole proprietorships; and (2) private corporations and partnerships.  Insofar as the reference orders, discussed below, are concerned, this litigation also includes putative classes in certain states consisting of certain state and/or local government entities in those states, all referred to as Government Purchaser Plaintiffs in the various settlement agreements.

## II.  THE REFERENCE TO THE SPECIAL MASTER

**A.     The Orders of Reference From the District Court**

3.     The subject matter of the reference to the Special Master is contained in multiple orders entered by this Court in the above-referenced action.

4.     The first was entered in late 2007 in connection with the first of the negotiated settlements in this litigation.  On October 10, 2007, all plaintiffs jointly filed a motion for preliminary approval of settlements with defendants Samsung

2

Semiconductor, Inc., Samsung Electronics Company Ltd. and Samsung Electronics
America, Inc., and with Winbond Electronics Corporation and Winbond Electronics
Corporation America, provisional certification of settlement classes, and an order
pursuant to Rule 53 of the Federal Rules of Civil Procedure referring to a Special Master
the issues of the division and distribution of settlement proceeds to members of the
proposed Indirect Purchaser Settlement Class and members of the proposed Government
Purchaser Settlement Class. The Settling Plaintiffs also requested the Court to defer
consideration and dissemination of Class Notices until the work of the Special Master
could be completed. The then non-settling defendants (all of whom have now settled)
opposed the motion. On November 15, 2007, the Court denied the motion for
preliminary approval and provisional class certification without prejudice, and ordered
the settling parties to submit a stipulation referring the two proposed settlements to a
special master as a prerequisite to preliminary approval.

5. On November 30, 2007, the Court signed the Stipulation and Order (Dkt.
No. 1787) submitted by the plaintiffs and settling defendants Samsung and Winbond,
which appointed the undersigned as Special Master in these proceedings pursuant to
Federal Rule of Civil Procedure 53(a)(1)(A), and ordered the issuance of a Report and
Recommendation on the subjects of: (1) "[t]he development of a plan of allocation of
settlement proceeds for the benefit of members of the proposed Private Indirect
Purchaser Settlement Class and the proposed Government Purchaser Settlement Class,
and/or addition of any subclasses or other means of ensuring a fair and equitable
allocation;" and (2) "[t]he development of a proposed form of notice, and methods to
disseminate that notice, in order to adequately apprise settlement class members of the
proposed settlements." At the same time, the Court entered a separate Order (Dkt. No.
1789) broadening the reference to include the preparation of a Report and

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

Recommendation on the subject of whether, under "the guidance provided by the Manual for Complex Litigation, Fourth, § 21.23 . . . ultimate certification of the class is appropriate."

6.     Three years later, following the signing of a settlement agreement with most of the other defendants herein, on November 29, 2010, the Court signed a Stipulation and Order (Dkt. No. 2099) submitted by plaintiffs and settling defendants Infineon Technologies AG and Infineon Technologies North America Corp., Elpida Memory, Inc. and Elpida Memory (USA) Inc., NEC Electronics America, Inc. (presently known as Renesas Electronics America Inc.), Micron Technology, Inc. and Micron Semiconductor Products, Inc., Mosel Vitelic, Inc. and Mosel Vitelic Corp. and Hynix Semiconductor Inc. and Hynix Semiconductor America Inc. to include their settlement agreement within the scope of the Court's previous reference to the Special Master.  This stipulation and order also expanded the reference to include findings and recommendations as to "[t]he appropriate amount of fees and reimbursement of expenses to be awarded to Plaintiffs and the appropriate amount of incentive awards to be awarded to the class representatives pursuant to Section 29 of the settlement agreement between Plaintiffs and the Settling Defendants."

7.     Thereafter, plaintiffs and defendants Nanya Technology Corporation and Nanya Technology Corporation USA, Inc. entered into a settlement agreement, and on March 16, 2011, the Court signed a Stipulation and Order (Dkt. No. 2102) submitted by plaintiffs and settling defendants to include the Nanya settlement within the scope of the Court's November 29, 2010 reference to the Special Master.

8.     Plaintiffs subsequently entered into settlement agreements with three DRAM manufacturers who were not named previously in the litigation, Mitsubishi,

4

Toshiba and Hitachi.  On October 9, 2012, pursuant to the settlement agreement, plaintiffs filed complaints naming these entities as defendants in this litigation.  On November 5, 2012, the Court signed a Stipulation and Order (Dkt. No. 2126) submitted by plaintiffs and settling defendants Mitsubishi, Toshiba and Hitachi including their settlements within the scope of the Court's November 29, 2010 reference to the Special Master.

**B.     Form of Report and Recommendations on Issues Referred to the Special Master**

9.     The reference to the Special Master from this Court covers the following issues:  (1) certification of the proposed settlement classes; (2) the necessity of establishing any subclasses; (3) a fair, reasonable and adequate plan of allocation and distribution of the settlement proceeds to members of the settlement classes; (4) the form of notice, plan for the dissemination of notice and appropriate claim forms and claims procedures; as well as (5) a fair, reasonable and appropriate award of attorneys' fees and reimbursement of expenses.  As evidenced by the time period during which the Orders discussed above were entered, the Special Master was required to make recommendations and findings on each of the listed issues as to a series of settlements negotiated between 2007 and 2012.  Accordingly, although proceedings before the Special Master began in early 2008, it soon became clear that it would be neither an efficient use of judicial resources nor cost-effective for the putative settlement classes for the parties and the Special Master to address these issues piecemeal rather than in the context of the global settlement of the litigation, the protracted mediations and negotiations for which began in 2008 and continued through 2010.  In addition, when the proceedings began before the Special Master in 2008, an appeal was pending from this Court's order dated January 29, 2008 granting in part and denying in part a motion

5

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

to dismiss claims arising from the purchase of DRAM-containing products based on application of *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*") to *inter alia,* the state antitrust laws of 15 states, including California.  Since the settlement classes described in the Samsung and Winbond settlements included purchasers of DRAM-containing products, the parties and the Special Master concluded that it would be appropriate to await the outcome of the appeal since it could have a bearing on certain of the reference issues.[3]

10.     The parties did utilize the initial period of the reference to provide the Special Master with the opportunity to review portions of the District Court record, including the briefing on class certification and the defendants' AGC motion.[4]  In addition, as noted above, at the outset of these proceedings, the then non-settling defendants, who had objected to the preliminary approval of the Samsung and Winbond settlements, continued to press their objection to the certification of a single settlement class before the Special Master.  Accordingly, in February 2008, the parties, including the non-settling defendants submitted letter briefs to the Special Master outlining the universe of potential subclasses that might be appropriate.[5]  Ultimately, it was determined that the parties would attempt to agree on a "road-map" to determine the most logical order for considering the issues referred to the Special Master.  The negotiation of the road-map, however, was soon overtaken by the negotiation of the global resolution of the litigation, which obviated the objection of the non-settling

---

[3] Subsequently, this appeal was stayed as a condition of the global settlements reached in 2010 and will be dismissed upon the finality of the settlements. Accordingly, the parties and the Special Master have proceeded without the guidance of the Ninth Circuit.

[4] A copy of the January 23, 2008 cover letter to the Special Master showing an index to the materials transmitted by Co-Lead Counsel is attached as Exhibit 1 to the Appendix hereto.

[5] Copies of these letter-briefs are attached as Exhibit 2 to the Appendix hereto.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

defendants to the certification of a settlement class.  Ultimately, the road-map was finalized and submitted to the Special Master in October 2010,[6] shortly before this Court entered its order referring to the Special Master the issues of settlement class certification, distribution, notice and attorneys' fees and reimbursement of expenses as to the settlements with the remaining defendants.  The foregoing discussion is set forth herein to eliminate any question that an adverse inference as to the diligence of the parties could be drawn from the passage of time since the initial reference.

11.     Due to the scope of the reference, the Special Master's Report and Recommendations is being issued in three separate parts.  Part I herein covers the issues of the certification of the proposed settlement classes, the necessity of establishing subclasses and a fair, reasonable and adequate plan of allocation and distribution of the settlement proceeds to members of the settlement classes.  Part II of the Report, which will be issued separately, will cover the appropriate forms of notice, the plan for the dissemination of notice and the forms and procedures for the submission and payment of claims, including the formulae for the payment of claims for the purchase of DRAM in DRAM-containing devices.  Finally, Part III of the Report will cover the award of a fair and reasonable attorneys' fee to plaintiffs' and class members' counsel and reimbursement of expenses.

12.     As to the issues covered herein in Part I, the referral orders from this Court require that the Special Master make a recommendation to the Court as to whether the proposed Indirect Purchaser Settlement Class and the Government Purchaser Settlement Classes should be certified pursuant to Fed. R. Civ. P. 23 and whether any subclasses should be established.  Because the question of the establishment of

---

[6] A copy of the road-map letter is attached as Exhibit 3 to the Appendix hereto.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

subclasses in the settlement context is fundamentally and inextricably intertwined with the creation of a fair, reasonable and adequate method of allocating and distributing the settlement funds, the majority of the findings on the subject of subclasses will be made in connection with the Special Master's findings regarding the allocation and distribution of the settlement proceeds to the members of the Indirect Purchaser Settlement Class and the Government Purchaser Settlement Classes.

13.    Accordingly, the Special Master will first discuss and make findings and recommendations on:  (1) the issue of whether the proposed Indirect Purchaser Settlement Classes satisfies the requirements of Fed. R. Civ. P. 23, including the necessity of establishing subclasses in order to satisfy the requirements of the Rule; and (2) on the issue of whether the proposed Government Purchaser Settlement Classes satisfy Rule 23, including whether the inclusion of both class members' direct and indirect purchase claims creates a conflict of interest or requires subclasses.[7]  The Special Master will then discuss and make findings and recommendations as to the fairness, reasonableness and adequacy of the parties' negotiated plans of allocation and distribution, including whether any aspect of the plan for the Indirect Purchaser Settlement Class requires the establishment of subclasses.[8]

---

[7] This Report and Recommendations on the certification of classes for the purpose of settling the claims in this litigation addresses only the issue of whether such classes may be certified under the particular facts and circumstances of this case in which a global release of all potentially viable claims is required.  It does not purport to apply to certification for *litigation* purposes.  *See, e.g., In re Ford Motor Co. E-350 Van Products Liability Litig.*, No. Civ. A. 03-4458, slip. op. 2012 WL 379944, *6 n.2 (D.N.J. Feb. 6, 2012). (Precedent on certification of settlement class is distinguishable in the context of motion for certification of a litigation class.)

[8] This Report and Recommendations addresses a number of allocation and distribution issues raised by various parties that were ultimately resolved through negotiation and compromise, such as weighting or "tiering" the recoveries of members of the Indirect Purchaser Settlement Class to reflect either their position in the chain of distribution or various aspects of the state laws under which their damage claims arose.  The positions of the parties on these issues are not

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

## III.  SUMMARY OF THE SPECIAL MASTER'S
## FINDINGS AND RECOMMENDATIONS

**A.      Certification of the Indirect Purchaser Settlement Class (Section VII, below)**

14.      The following nationwide Indirect Purchaser Settlement Class meets the requirements of Fed. R. Civ. P. 23 and with the consent of all parties to the settlements is recommended by the Special Master for certification for the purpose of effectuating the herein-described settlements:

> The Indirect Purchaser Settlement Class:  All natural persons and non-governmental entities, who, at any time during the period from January 1, 1998 through December 31, 2002, purchased dynamic random access memory ("DRAM") devices and components, including all products containing DRAM, anywhere in the United States indirectly from the defendants, their parents, subsidiaries and affiliates.  Excluded from this definition are defendants and their parents, subsidiaries and affiliates, legal representatives, successors, assigns or co-conspirators; all governmental entities; any judicial officer presiding over the settled litigation and the members of his/her immediate family and judicial staff.

15.      The Indirect Purchaser Settlement Class is so numerous that joinder of all of its members in these proceedings is impracticable.

16.      The members of the Indirect Purchaser Settlement Class is united by a common interest in determining whether the defendants' alleged course of conduct is actionable, and thus, satisfies the commonality requirement of Fed. R. Civ. P. 23(a)(2).

---

discussed for the purpose of adjudicating their merits, but rather so that the record may show that all important considerations relating to the issues of allocation and distribution were fully raised, addressed and considered and were resolved by the crafting of a *pro rata* plan of distribution that is fair, reasonable and adequate under the circumstances of this litigation.  *See, e.g., In re Literary Works in Elec. Databases Copyright Litigation*, 654 F.3d 242, 251-53 (2nd Cir. 2011). (Where the court remanded a plan of distribution for further findings even though there was no determinative evidence that one group of claimants within the settlement class had been treated unfairly because the record provided no basis upon which to determine whether a reduction in value applied to their claims in the allocation process fairly reflected their weaknesses.)

9

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

17.     The injury claimed by the named plaintiffs in *Petro Computer Systems, Inc. v. Micron Technology*, Case No. M-02-1486-PJH, who are the proposed representatives of the Indirect Purchaser Settlement Class, arises from the same conduct alleged to have caused injury to each member of the settlement class, and therefore the claims of the proposed representatives are typical of the claims of the absent class members.

18.     The fact that the proposed class representatives and the class they seek to represent possess claims arising out of the same common nucleus of alleged facts and allege the same species of injury satisfies the adequacy of representation requirement. There are no individual issues affecting only the proposed class representatives that would result in their interests conflicting with the interests of the proposed class in the prosecution of the litigation.  In addition, the proposed Class Counsel, who are Co-Lead Counsel Josef D. Cooper, Daniel E. Gustafson, Daniel J. Mogin and Timothy Battin, along with Liaison Counsel Francis O. Scarpulla and Steering Committee Chair Terry Gross, are skilled practitioners specializing in antitrust litigation, who have demonstrated their adequacy as representatives of the proposed class by, among other things, achieving the global settlement of the litigation on terms favorable to all members of the proposed class.

19.     The injunctive and equitable claims alleged on behalf of the Indirect Purchaser Settlement Class all arise from a course of conduct by the defendants that, if proved, would be generally applicable to all class members.  Therefore, the Indirect Purchaser Settlement Class satisfies the requirements of Fed. R. Civ. P. 23(b)(2) for certification for the purpose of settling and releasing those injunctive and equitable relief claims.

20.     The claims for damages alleged on behalf of the Indirect Purchaser Settlement Class all arise from a common nucleus of operative facts concerning the Settling Defendants' alleged price-fixing of the DRAM chips they manufactured.  The injury allegedly suffered by the proposed class members stems solely from the purchase of defendants' DRAM chips in the form of DRAM modules, either as the modules themselves or installed in a computer or other DRAM-containing device.  The common issues of liability arising from the Settling Defendants' alleged illegal conduct predominate over any individual issues especially given that manageability is not an issue insofar as a settlement class is concerned.  The shared nature of the injury allegedly suffered by all class members provides the Indirect Purchaser Settlement Class with a sufficient cohesion of interest that the settlement and release of all of their claims in a single proceeding is superior to the individual adjudication of their claims. Therefore, the Indirect Purchaser Settlement Class satisfies the requirements of Fed. R. Civ. P. 23(b)(3).

**B.     Subclasses Are Not Recommended for the Indirect Purchaser Settlement Class (Section VII.D)**

21.     Subclasses within a settlement class become necessary when there are conflicts between class members arising from the distribution of the benefits and/or burdens of the settlement.  However, not every difference in situation between groups of class members triggers the need for subclasses, and where the district court can be satisfied that all class members' interests have been fully and fairly represented and treated fairly, formal subclassing, with its attendant delay and expense, is neither necessary nor advisable.

22.     The Indirect Purchaser Settlement Class includes persons and entities that have nationwide federal injunctive claims for disgorgement, nationwide California

11

Unfair Competition Law claims for restitution and California Cartwright Act claims for damages, claims under the antitrust laws of various states (otherwise known as "repealer" claims)[9] as well as, in many states, *parens patriae* claims brought on their behalf by the Attorneys General.[10]  In addition, the Indirect Purchaser Settlement Class contains purchasers of both standalone DRAM modules and DRAM-containing devices, as well as persons and entities who purchased for the purpose of reselling those modules or devices, and end-buyers who purchased for their own use.

  23. The Special Master appointed the law firm of Berman DeValerio as Resellers' Allocation Counsel to advance the separate interests of those with reseller claims within the Indirect Purchaser Settlement Class.  Significant reseller class members also participated through their own counsel throughout the proceedings.  And the Attorneys General represented the interests of end-buyers in many repealer States, albeit almost exclusively regarding natural persons, in conjunction with counsel for the Indirect Purchaser Settlement Class who represented both natural and corporate end-buyers in repealer and non-repealer States.  These counsel negotiated a plan of distribution for the Indirect Purchaser Settlement Class in which all definable interests within the class were fully and fairly represented and were treated fairly.  The plan arrived at by the agreement of all of these parties creates a structure for ensuring that reimbursement to class members reasonably will be tied to the extent of damages

---

[9]  As used herein, the terms "repealer" and "non-repealer" refer to whether or not an individual state has amended or construed its antitrust or consumer protection laws to permit indirect purchasers to recover for price-fixing damages resulting from the pass-on of overcharges in the prices paid for products purchased from an entity other than the price-fixer.  States which permit this type of recovery are said to have repealed the prohibition enunciated in *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), and are commonly referred to as repealer states.  States that do not permit indirect purchaser recovery are known as non-repealer states.

[10] This includes States whose laws designate their Attorneys General as the sole representative for their consumers in whole or in part in bringing antitrust claims.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

incurred.  Therefore, balancing the costs, including the further delay in these already protracted proceedings, against the benefits of the creation of formal subclasses, the Special Master recommends that no subclasses within the Indirect Purchaser Settlement Class should be certified by this Court.

**C.    The Plan of Allocation and Distribution of the Settlement Proceeds to Members of the Indirect Purchaser Settlement Class (Section IX)**

24.    The Special Master recommends that this Court adopt the following plan for the allocation and distribution of the settlement funds to the Indirect Purchaser Settlement Class:

- All non-governmental entity indirect purchasers (resellers and end-buyers) will be entitled to claim a cash distribution from the net settlement fund.[11]  Subject to (i) the provisions for specified minimum and maximum recovery amounts described below; (ii) to establishing the estimated actual single damages for DRAM and DRAM-containing devices; and (iii) establishing the value of DRAM in DRAM-containing products, the claims of all resellers, end-buyer businesses and households will be treated the same for purposes of computing *pro rata* shares of the settlement fund.[12]

- All claimants will be required to submit claim forms under penalty of perjury, stating the quantity and type of DRAM modules and DRAM-containing products purchased during the settlement class period.

- A *pro rata* recovery amount will be calculated for each claimant on the basis of the amount of DRAM modules and DRAM-containing product purchases each made, according to a formula that weights the DRAM content of the various categories of DRAM-containing products and converts all purchases to a common unit of measure.  The "value" of the DRAM in computers and other

---

[11] The net settlement fund, as used here, is the amount for distribution to the class after payment of taxes, escrow fees, attorneys' fees and expenses, the Special Master's fees and costs and any other court approved charges against the settlement proceeds (plus any interest earned thereon).

[12]  The estimate of actual single damages and the estimates of the value of DRAM in DRAM-containing products will be covered in Part II of this Report and Recommendations as part of the discussion of the claim form and claims processing procedures.

13

categories of DRAM-containing products will be determined from available data.[13]

•       All small claimants (resellers and end users) whose *pro rata* recovery amount is less than $10, will have their recovery raised to that amount.

•       The total amount of recoveries to small claimants will be capped at $50 million.  If the total dollar amount of all small claimant recovery, after each claimant is raised to $10, exceeds $50 million, no distribution of individual checks will be made to this group.  Rather, $40 million will be distributed *cy pres* to the benefit of small claimants.

•       In the event that the number of small claims received is such that the total small claimants' recovery (after enhancement to the $10 minimum described above) does not exceed $25 million, the difference between the amount being paid directly to small claimants and $25 million will be distributed as follows: (1) first, the amount of the small claimant checks will be increased *pro rata* above $10, up to a cap of the estimated actual single damages suffered by each claimant as a result of his/her/its claimed purchases, until the available funds up to such $25 million are exhausted; or (2) if this procedure for increasing small claimant checks does not exhaust the available funds up to such $25 million, any remainder will be distributed *cy pres*.

•       In the event that the *pro rata* distribution share of any claimant whose *pro rata* share would be greater than $10 would exceed the estimated actual single damages suffered by him/her/it as a result of their claimed purchases, their recoveries will be limited to their estimated actual single damages.  Any excess would be distributed *cy pres*.

•       Estimated actual single damages for DRAM and DRAM-containing products will be calculated as a percentage overcharge based on data developed during the litigation.

•       No specific *cy pres* distribution plan(s) will be submitted until events dictate that a *cy pres* distribution is necessary.  Similarly, a decision as to the ultimate disposition, e.g. (*cy pres* or additional distribution) of any residue of uncashed checks will not be made as part of the initial plan.

25.     This plan of allocation and distribution is the result of arm's length

negotiations between counsel representing the interests of resellers and end-buyers,

purchasers of DRAM modules as well as all types of DRAM-containing products, as

---

[13]  The specifics of this formula will also be covered in Part II of this Report and Recommendations as part of the discussion of the claim form and claims processing procedures.

14

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

well as purchasers in repealer and non-repealer jurisdictions and in states with *parens patriae* statutes.  With the exception of Resellers' Allocation Counsel and counsel for certain individual class members, each of the counsel participating in the negotiations had all been involved in the prosecution of the claims herein.  Therefore, they were each personally aware of the merits of all of the claims being settled and in a position to determine whether the apportionment of the settlement proceeds in the negotiated plan of distribution is fair and reasonable in light of all of the circumstances of this litigation.

26.     The Special Master personally observed certain aspects of the negotiations and was kept apprised of the parties' progress.  The parties exchanged evidence and vigorously advocated disparate positions.  Among the subsidiary negotiated issues that informed and affected the plan of allocation and distribution were: a fair and reasonable estimate of the channels of DRAM distribution (Section IX.C.1); a fair and reasonable estimate of the absorption of overcharges by DRAM resellers and the pass-on of overcharges to end-buyers (Section IX.C.2); and the question of whether or to what degree differences in claimants' litigation postures and/or strengths, i.e. whether or not claimants purchased/resided in repealer states or states with *parens patriae* statutes, should be reflected in the distribution of the settlement proceeds (Section IX.D).

27.     The basic feature of the plan adopted by the parties here is that to the maximum extent all class members are to be treated equally and the settlement proceeds be divided *pro rata* based upon the quantity of DRAM purchased by each class member.

28.     Guided by the reasoning of applicable precedent in which courts have approved plans such as this that strive to the maximum extent practicable to treat all

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

class members alike, the Special Master finds that the plan negotiated here is fair, reasonable and adequate.

29.     Although the primary provision of the plan of distribution is to distribute the settlement proceeds to the class members in cash, the plan includes provisions for *cy pres* distribution in the event that the claims experience demonstrates that cash distribution to small claimants is not feasible.  However, because the parties' best educated estimate was that the claims rate would suffice for there to be cash distributions to small claimants, they decided to postpone the selection of recipients of the *cy pres* distribution until and unless it was clear that a *cy pres* distribution would be necessary.  The Special Master finds that deferring the process of selecting *cy pres* recipients under these circumstances comports with applicable Ninth Circuit precedent and is in the best interests of members of the settlement class.

**D.     Certification of the Government Purchaser Settlement Classes (Section VIII)**

30.     The following Government Purchaser Settlement Classes meet the requirements of Fed. R. Civ. P. 23 and with the consent of all parties are recommended by the Special Master for certification for the purpose of effectuating the herein-described settlements:

> The Samsung/Winbond Government Purchaser Settlement Class:  All state government entities, all political subdivisions and all public colleges and universities in Class States Alaska, Delaware, Ohio and Pennsylvania, all political subdivisions in New Mexico and all political subdivisions, the University of California and the State Bar of California in Class State California who purchased DRAM or DRAM-containing products directly or indirectly from Samsung and Winbond between January 1, 1998 and December 31, 2002;

> The Multi-Defendant Government Purchaser Settlement Class:  All political subdivisions in Class State New Mexico and all political subdivisions, the University of California and the State Bar of California in Class State California

16

who purchased DRAM or DRAM-containing products directly or indirectly from Infineon, Elpida, NEC, Mosel, Micron, Hynix, Nanya, Mitsubishi, Toshiba and Hitachi between January 1, 1998 and December 31, 2002.

31.     Each of the Government Purchaser Settlement Classes is so numerous that joinder of all of its members in these proceedings is impracticable.

32.     The members of each of the Government Purchaser Settlement Classes are united by a common interest in determining whether the defendants' alleged course of conduct is actionable, and thus, satisfy the commonality requirement of Fed. R. Civ. P. 23(a)(2).

33.     The proposed representatives of the Samsung/Winbond Government Purchaser Settlement Class are Alaska, Delaware, Ohio and Pennsylvania, and for California class members, the City and County of San Francisco, Santa Clara County and the Los Angeles Unified School District, and for New Mexico class members, the Rio Rancho Public Schools.  The proposed representatives of the Multi-Defendant Government Purchaser Settlement Class are for California class members, the City and County of San Francisco, Santa Clara County and the Los Angeles Unified School District, and for New Mexico class members, the Rio Rancho Public Schools.  The injury claimed by these proposed class representatives arises from the same conduct alleged to have caused injury to each member of the settlement classes, and therefore the claims of the proposed representatives are typical of the claims of the absent class members.

34.     The fact that the proposed class representatives and the class they seek to represent possess claims arising out of the same common nucleus of alleged facts and allege the same species of injury satisfies the adequacy of representation requirement. There are no individual issues affecting only the proposed class representatives that

17

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

would result in their interests conflicting with the interests of the proposed class in the prosecution of the litigation. In addition, the proposed Class Counsel, Emilio E. Varanini, a Deputy Attorney General of California, is a skilled practitioner specializing in antitrust litigation, who has demonstrated his adequacy as counsel for the representatives of the proposed classes by, among other things, playing a leading role in achieving the settlement of the litigation on terms favorable to all members of the proposed Government Purchaser Settlement Classes.

35. The claims for damages alleged on behalf of all members of the Government Purchaser Settlement Classes all arise from a common nucleus of operative facts concerning the Settling Defendants' alleged price-fixing of the DRAM chips they manufactured and involves common claims under the Cartwright Act or, in the case of Class State New Mexico, its closely analogous law. The injury allegedly suffered by the proposed class members stems solely from the purchase of Defendants' DRAM chips in the form of DRAM modules, either as the modules themselves or installed in a computer or other DRAM-containing device. The common issues of liability arising from the Settling Defendants' alleged illegal conduct predominate over any individual issues given that manageability is not an issue insofar as the proposed certification of a settlement class is concerned. The shared nature of the injury allegedly suffered by all class members provides the Government Purchaser Settlement Classes with a sufficient cohesion of interest for settlement purposes that the settlement and release of all of their claims in a single proceeding is superior to the individual adjudication of their claims. Therefore, the Government Purchaser Settlement Classes satisfy the requirements of Fed. R. Civ. P 23(b)(3).

///

---

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

**E.      Subclasses Are Not Recommended for the Government Purchaser Settlement Classes (Section VIII.E)**

36.      Unlike the Indirect Purchaser Settlement Class, there are no resellers in either of the Government Purchaser Settlement Classes.  However, also unlike the Indirect Purchaser Settlement Class, the Government Purchaser Settlement Classes are settling both class members' direct and indirect purchaser claims.  Most of the class members' direct purchaser claims arise from assignment-clauses in government purchase contracts, with a small number of others arising from purchases made from Defendant Micron's subsidiary Crucial.  However, the presence of both of these claims within each of the settlement classes does not trigger the type of conflict that would require subclasses.

37.      In the litigation class certification context, this Court found that the presence of both direct and indirect claims had the potential to create serious conflicts; however, these potential conflicts can and should be treated differently in the context of the certification of the Government Purchaser Settlement Classes.  Here, rather than there being some class members who made direct purchases and others who made indirect purchases, the same class members – the same entities – have claims arising from both direct and indirect purchases.  No class member has only direct purchases.  Accordingly, pursuant to *In re Insurance Brokerage Antitrust Litigation,*[14] subclasses do not need to be created here insofar as these proposed settlement classes are concerned.

///

///

---

[14] 579 F.3d 241 (3d Cir. 2009). This case was decided after this Court declined to certify a class of government entities for litigation purposes.

19

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

**F.     The Plans of Allocation and Distribution of the Settlement Proceeds to Members of the Government Purchaser Settlement Classes (Section XI)**

38.     The plans of allocation and distribution for the Government Purchaser Settlement Classes were the product of an agreement between the Attorneys General of Class and Non-Class States.  They were based on the use of survey evidence, expert analysis and legal precedent.  The Special Master recommends that this Court adopt each of the plans for the allocation and distribution of the settlement funds to the Government Purchaser Settlement Classes as being fair, reasonable and adequate.

39.     The first tier of the allocation of the portion of the settlement funds designated for the benefit of the Government Purchaser Plaintiffs in both non-class and Class States is a division of the funds into three (3) "pots:" one for state agencies, one for political subdivisions (e.g., cities, counties, K-12 school districts and other special districts) and one for public colleges and universities.  This division was based upon the results of a 2009 survey of government entities.  The survey involved a statistically-valid random selection of government entities in all three of the above groups (state agencies, local government entities and public colleges/universities) who were asked to supply, according to statistically-valid procedures, a random sample of purchase information about DRAM-containing products for the relevant time period of 1998 to 2002.  From this, the Attorneys General agreed on an estimate of the percentage of total purchases of DRAM-containing products attributable to each of the three above groups, and applied this percentage to create the settlement pots.

40.     Within each pot, funds were allocated to each of the states participating in the settlement in proportion to its entities' total number of full-time employees ("FTE"), or, in the case of public colleges and universities, total enrollment.  The Attorneys General submitted evidence that FTEs and enrollment respectively are

20

appropriate proxies for the use of DRAM and DRAM-containing equipment by government entities and colleges/universities respectively.  The Special Master finds that using FTE and enrollment, as a metric for allocating the settlement proceeds between the states, is fair, reasonable and adequate.

41.    Each Class State has proposed its own plan for the distribution of its share of the settlement proceeds to its members of the Government Purchaser Settlement Classes.  The Special Master recommends that their individual distribution plans, each of which is described in Section XI, below, all be approved by this Court as fair, reasonable and adequate.

## IV.  BACKGROUND

**A.    The Status of the Indirect Purchaser Plaintiff Class Actions at the Time of Settlement**

42.    Class action complaints by private plaintiffs ("Indirect Purchaser Plaintiffs") were first filed in various state courts in 2002.  Beginning in 2005, private indirect purchaser cases were filed in federal court even as some of the state court cases were removed to federal court.  In all, more than 60 class action complaints, making similar allegations against various DRAM manufacturers were filed in both state and federal courts around the country.[15]  Eventually, all federal court indirect purchaser actions were transferred by the Judicial Panel on Multidistrict Litigation and consolidated for pretrial purposes with the *Petro* action.  All indirect-purchaser cases in state courts were stayed by stipulation.  The Indirect Purchaser Plaintiffs in the MDL

---

[15] A list of the actions encompassed by the settlements herein is Exhibit 4 to the Appendix hereto.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

designated the *Petro* complaint as the relevant complaint for purposes of coordinated pretrial proceedings.[16]

43.     General discovery in the private actions was stayed until July 24, 2005, due to the continuing investigation of the United States Department of Justice ("DOJ"). However, during the stay, the Indirect Purchaser Plaintiffs obtained access to the millions of pages of documents that the defendants produced to the DOJ and propounded limited interrogatories.[17]   Pursuant to court order, the parties conducted common liability discovery in a coordinated manner.   In addition to the coordinated discovery, the Indirect Purchaser Plaintiffs also propounded discovery on third parties, directed principally to the issue of the pass-through of the alleged overcharge to indirect purchasers, and reviewed and carefully analyzed the third-party information obtained (which consisted of thousands of pages of documents).

44.     During discovery, Defendants produced over four million documents from both domestic and foreign entities.   These documents, some of which had to be translated into English, were processed, reviewed, categorized and annotated by counsel for the Indirect Purchaser Plaintiffs using a then-groundbreaking internet-based

---

[16] Before consolidation of several complaints and claims into the *Petro* case, Judge Hamilton dismissed on personal jurisdiction grounds the claims made against certain foreign defendants in the following cases filed in state courts and removed to federal court:   North Carolina actions against Hynix Semiconductor Inc., Nanya Technology Corporation and Winbond Electronics Corporation; Tennessee actions against Hynix Semiconductor Inc., Nanya Technology Corporation, Winbond Electronics Corporation and Winbond Electronics Corporation America; and Vermont actions against Hynix Semiconductor Inc., Elpida Memory, Inc., Elpida Memory (USA) Inc., NEC Electronics Corporation, NEC electronics America, Inc., Winbond Electronics Corporation and Winbond Electronics Corporation America.   This set of defendants included foreign parent corporations and their U.S. subsidiaries.

[17] The factual basis for the findings regarding the status of the private litigation is contained in the Declaration of Josef D. Cooper in Support of Motion for Preliminary Approval of Settlement with Samsung and Winbond, filed on October 10, 2007, a copy of which is attached as Exhibit 5 to the Appendix hereto.

22

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

electronic document management system that allowed simultaneous access by counsel working from their own offices all over the United States.  Following the document review, the Indirect Purchaser Plaintiffs participated in the depositions of approximately 100 witnesses from defendants and third-parties.  Counsel for the Indirect Purchaser Plaintiffs also worked extensively with consultants and economic experts in preparation for motions for class certification and trial.

45.     On August 14, 2006, Defendants moved for judgment on the pleadings as to all claims arising from the purchase of DRAM as a component in a computer or other device, asserting that Indirect Purchaser Plaintiffs who purchased DRAM as a component lacked standing under various state antitrust laws because their alleged injuries were too remote and therefore failed to satisfy the antitrust standing requirements set forth in *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*").  (Dkt. No. 1008.)  On October 13, 2006, certain defendants filed five motions for summary judgment.  On June 1, 2007, the Court granted judgment on the pleadings in relevant part for lack of antitrust standing against those claims based on purchases of products in which DRAM is a component, dismissing those claims with prejudice (Dkt. No. 1555; "the AGC Order").

46.     On June 29, 2007, Indirect Purchaser Plaintiffs filed a Motion for Leave to File a Second Amended Complaint to allege facts demonstrating that the markets for DRAM modules and for computers are "inextricably linked, and cannot be considered separately" (Dkt. No. 1593-1594), which the Court granted on August 17, 2007.  (Dkt. No. 1683.)  Defendants filed a motion to dismiss the Second Amended Complaint, again challenging on AGC grounds, Indirect Purchaser Plaintiffs' standing to assert claims for computer purchases under the antitrust laws of sixteen states.  (Dkt. No. 1740.)  On

23

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

January 29, 2008, the Court granted Defendants' motion to dismiss.  (Dkt. No. 1809.)

On March 28, 2008, the Court certified both the AGC Order and the subsequent order on

the motion to dismiss for interlocutory appeal of the *AGC* standing issues.  (Dkt. No.

1849.)  On April 18, 2008, the Court entered an order on the parties' stipulation for a

stay of all proceedings during the time the Ninth Circuit considered Indirect Purchaser

Plaintiffs' 1292(b) Petition.  (Dkt. No. 1853.)  Indirect Purchaser Plaintiffs' Petition for

Permission to Appeal Under 28 U.S.C. § 1292(b) was granted by the Ninth Circuit Court

of Appeals on June 26, 2008.  That appeal was stayed shortly after the parties completed

their briefing of the appeal in the Ninth Circuit pending the finality of the settlements.

47.     After Indirect Purchaser Plaintiffs' class certification motion was

originally filed in July 2007 and then briefed by the parties, the motion was taken off

calendar by the court pending issuance of the AGC Order.  Subsequent to the AGC

Order, the Indirect Purchaser Plaintiffs filed a motion for leave to file an amended

complaint, which this Court granted.  Thereafter, on August 24, 2007, the Indirect

Purchaser Plaintiffs filed a motion for class certification (Dkt. No. 1689) that conformed

to the allegations of their Second Amended Complaint:

A.   For claims for injunctive relief under Section 16 of the Clayton Act (15

U.S.C. § 26), the Indirect Purchaser Plaintiffs sought certification of the following class

pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure:

> All individuals and entities who, during the period from April 1, 1999 through
> December 31, 2002, purchased DRAM in the United States indirectly from the
> defendants or their subsidiaries.  DRAM means:  (1) DRAM modules; and (2)
> DRAM in personal computers, desktops, laptops, notebooks, workstations or
> servers.

B.   For claims for damages under California's Cartwright Act (Cal. Bus. & Prof.

Code § 16720); injunctive and restitutionary relief under Cal. Bus. & Prof. Code

24

§ 17200 ("UCL"); and disgorgement under California law principles of unjust enrichment, the Indirect Purchaser Plaintiffs sought certification of the following class pursuant to Fed. R. Civ. P. (b)(3):

> All individuals and entities who, during the period from April 1, 1999 through December 31, 2002, purchased DRAM in the United States indirectly from the defendants or their subsidiaries as end-buyers or end-buyers. DRAM means: (1) DRAM modules; and (2) DRAM in personal computers, desktops, laptops, notebooks, workstations or servers

48. Defendants filed their opposition to the class certification motion on September 28, 2007. (Dkt. Nos. 1728-1736.) The Court never ruled on Indirect Purchaser Plaintiffs' class certification motion. As discussed above, Defendants filed a new round of motions to dismiss directed to the Indirect Purchaser Plaintiffs' Second Amended Complaint, and on December 5, 2007, the Court vacated the January 16, 2008 hearing on class certification in order to "settle the pleadings before class certification [was] addressed." (Dkt. No. 1794) On January 29, 2008, the Court granted on *AGC* grounds the defendants' subsequent motion to dismiss the state law claims filed by indirect purchasers of DRAM-containing products, which claims arose under the laws of 15 states. Rather than proceed with the remaining claims, including the claims of the indirect purchasers of DRAM modules, the Indirect Purchaser Plaintiffs sought leave to appeal. This process, which included the interlocutory appeal to the Ninth Circuit and the attendant stay of the District Court proceedings, was itself stayed by the pendency of the proposed settlements that are the subject of this Report and Recommendations.

**B.    The Status of the Attorneys General's Actions at the Time of Settlement**

49. The Attorneys General began their investigation into this case in June 2005, serving investigative subpoenas and interrogatories on defendants and third-

parties pursuant to applicable state laws.[18]  Defendants produced the same millions of

pages of documents to the Attorneys General that they had previously produced to the

Indirect Purchaser Plaintiffs and supplemented them with additional documents and

interrogatory responses including narrative statements of conduct from various

Defendants.  Following an extensive independent review of documents, data and

interrogatory answers, the Attorneys General, except New York, filed *State of California

et al. v. Infineon Technologies AG et al.,* Case No. 06-4333 PJH ("*Infineon*") in this

Court.  The State of New York filed a separate action in the Southern District of New

York that was transferred to this Court and captioned *State of New York v. Micron

Technology Inc., et al.*, Case No. 06-4636 PJH.  Both complaints alleged a longer time

period for the conspiracy than had been previously alleged.[19]

50.     Although the Attorneys General were given access to the depositions

conducted by the Direct and Indirect Purchaser Plaintiffs, and conducted an independent

review of those depositions, the Attorneys General further conducted a substantial

number of additional depositions and interviews of employees, current and former, of

the Defendants.  Additionally, the Attorneys General conducted numerous interviews

and depositions of, as well as obtained a voluminous number of documents in

---

[18] The factual basis for the findings regarding the status of the Attorneys General's litigation is
contained in the Declaration of Emilio E. Varanini in Support of Motion for Preliminary
Approval of Settlement with Samsung & Winbond, filed October 10, 2007, a copy of which is
attached as Exhibit 6 to the Appendix hereto.

[19] Neither of these Complaints named Winbond as a defendant.  Instead, a separate complaint,
captioned *State of California et al. v. Winbond Electronics Co.*, Case No. 07-2589 PJH, was
filed against Winbond by all of the Attorneys General except New York that alleged illegal
conduct in Singapore that substantially affected U.S. commerce.  The multistate complaint in
*Infineon* did not name Samsung as a defendant either; a separate complaint, captioned *State of
California et al. v. Samsung Electronics Co., Ltd. et al.*, Case No. 07-1347 PJH, was filed
against Samsung by the multistate group as part of the settlement with Samsung.

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

conjunction with the Indirect Purchaser Plaintiffs, from OEMs and third party retailers and resellers involving the sale of DRAM and DRAM-containing equipment.

51.     Furthermore, Attorneys General worked with the government entities that they represented to gather and analyze purchase information, including conducting a purchasing survey and speaking with purchasing representatives, in order to determine injury and damages throughout the relevant damages period.  This work included not only working with expert economists who analyzed gathered information to determine the fact and extent of harm suffered by the represented government entities but also included answering interrogatories and submitting to depositions across the country. This process took several months to complete.

52.     Indirect Purchaser Plaintiffs provided the Attorneys General with access to their electronic document management system.  The Attorneys General supplemented this system with document management systems of their own and conducted independent document review.  The Attorneys General reviewed and culled through all of the documents, interrogatory responses and depositions in preparation for trial, bearing in mind the evidentiary rulings of this Court in the opt-out plaintiff cases.  As part of this review, the Attorneys General explored additional issues such as the alleged output-signaling aspects of the defendants' conduct and the alleged agency relationship between defendants Nanya Technology Corporation and Nanya Technology Corporation USA, Inc.  Like the Indirect Purchaser Plaintiffs, the Attorneys General worked extensively with experts and consultants in preparing their case for trial.

53.     Also, like the Indirect Purchaser Plaintiffs, the Attorneys General faced motions to dismiss various state law claims.  Most of the state law claims either did not face a challenge or the challenges were denied.  Pursuant to the Court's order of April

27

15, 2008, dismissals of the state law claims of Utah, Tennessee and New Mexico were granted, and the Court struck Louisiana's claims for actual and treble damages, Mississippi's claim for monetary damages and all of Tennessee's antitrust claims for relief apart from its limited request to deny the Defendants the opportunity to do business in the state.  By order dated August 31, 2007, the Court also dismissed several of New York's claims, including the following:  Sherman Act claims on behalf of indirect purchasers and unnamed government entities; Donnelly Act claims on behalf of unnamed government entities and natural persons; Executive Law claims on behalf of unnamed government entities and treble damages claims; and all Cartwright Act claims. The Attorneys General and the Defendants also engaged in extensive motion practice against each other with varying degrees of success.[20]  The bulk of the claims of the Attorneys General remained intact.  Thereafter, the need for the Attorneys General to prepare their case for trial became even more acute when on April 18, 2008 the Court entered an order on the Indirect Purchaser Plaintiffs' stipulation for a stay of their proceedings during the time the Ninth Circuit considered Indirect Purchaser Plaintiffs' 1292(b) Petition.  (Dkt. # 1853.)

54.    Although the majority of claims by the Attorneys General were filed as representative or *parens patriae* claims, certain Attorneys General filed class claims on behalf of (mostly) local government entities.  *In State of California et al. v. Infineon Technologies et al.,*[21] this Court rejected the motion of California and New Mexico to certify a litigation class of their political subdivisions and public agencies that purchased

---

[20] *See, e.g., State of California et al. v. Infineon Technologies et. al,* 531 F. Supp. 2d 1124 (N.D. Cal. 2007).

[21] No. 06-4333 PJH, 2008 U.S. Dist. LEXIS 81251 (N.D. Cal. 2008).

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

DRAM and DRAM-containing products.[22]   Applying the "rigorous analysis" necessary for certification of a litigation class under federal law, this Court found that the expert for these states lacked a "sufficiently plausible methodology" to establish that the states' proposed evidence "concerning antitrust impact – and specifically pass-through – will be sufficiently generalized so as to allow common questions as to impact to predominate."[23]

55.     Following the denial of the motion for certification of a litigation class of governmental entities, the California Attorney General filed an action on behalf of 97 political subdivisions[24] as well as the University of California in the California Superior Court in San Francisco.[25]   The California Attorney General thereafter vigorously litigated that state court case, successfully opposing a number of motions and also serving discovery that the Defendants were ordered to answer.[26]

---

[22] *Id.* at *25.

[23] *Id.* at *39.   The court also noted that there was an intraclass conflict since there were entities that had both indirect purchaser claims and direct purchaser claims by operation of assignment included in the proposed litigation class.   As will be discussed below, the Special Master finds and concludes that the inclusion of both types of claims does not create conflicts that preclude certification of classes for settlement purposes.

[24] The term "political subdivisions" includes K-12 school districts, counties, cities and special districts of whatever kind.

[25] *City of Los Angeles v. Infineon Technologies AG*, No. CGC-08-480561 (San Francisco Super. Ct. complaint filed Oct. 3, 2008).   The Class Action Fairness Act only allows removal of such individual civil actions from state court to federal court when brought on behalf of 100 or more individual entities. *See* 28 U.S.C. § 1332(d)(11)(B) (under CAFA, a "mass action" is removable and  "means any civil action  . . .  in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact").   Accordingly, the Defendants did not attempt to remove this action to federal court.

[26] The California Attorney General also filed a number of amicus briefs, both in the Ninth Circuit and in other similar price-fixing cases, on the issue of standing in support of the Indirect Purchaser Plaintiffs.  *See, e.g.,* Cal. Atty. Gen. Amicus Brief re: Antitrust Standing in Support of Opposition to Motion to Dismiss, *In re Flash Memory Antitrust Litig.,* No. C 07-0086-SBA

29

## V.    THE TERMS OF THE SETTLEMENT AGREEMENTS

56.    The Plaintiffs in the above-described actions have entered into a series of settlement agreements with the named Defendants in this litigation and with certain originally unnamed co-conspirators, who, pursuant to the settlement agreements, are named as Defendants.  These settlements resolve all of the claims that were or could have been brought against these Defendants arising from the facts pleaded in the operative complaints herein in return for specific injunctive relief and monetary payments that aggregate to $310,720,000.  The settlements are:

### A.  The Samsung Settlement

57.    The Samsung Settlement Agreement ("SSA"), executed in January 2007, settles all claims against Samsung Semiconductor, Inc., Samsung Electronics Company Ltd. and Samsung Electronics America, Inc., collectively referred to as "Samsung," including all parents, subsidiaries, affiliates, predecessors and successors made by (1) a nationwide[27] class of Indirect Purchaser Plaintiffs defined as natural persons and non-governmental entities that indirectly purchased DRAM, including all products containing DRAM, between January 1, 1999 and December 31, 2002; (2) individual Government Purchaser Plaintiffs who directly or indirectly purchased DRAM or DRAM-containing products (in two-thirds of the Plaintiff States), various Attorneys General suing *parens patriae* on behalf of natural persons who indirectly purchased

---

(N.D. Cal., filed Apr. 30, 2008); State of California Amicus Brief re: Antitrust Standing in Support of Opposition to Motion to Dismiss, *In re TFT-LCD (Flat Panel) Litig.*, No. M-07-1827 SI (N.D. Cal., filed Apr. 12, 2008); Cal. Atty. Gen. Amicus Brief in Support of Opposition to Motion to Dismiss, *In re DRAM Antitrust Litig.*, M-02-1486 PJH (N.D. Cal., filed July 5, 2007).

[27]  Unlike all subsequent settlement agreements, other than the Winbond agreement, the SSA speaks of "the United States" without defining precisely what it intended to encompass by that term.  However, there is nothing in the SSA that indicates that the reference to the United States was intended to *exclude* its territories.  Accordingly, the SSA is being construed consistent with the other settlement agreements.

30

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

DRAM or DRAM-containing products, and (in four Plaintiff States), corporations who

indirectly purchased DRAM or DRAM-containing products, [28] all between January 1,

1999 and December 31, 2002; and (3) a Government Purchaser Plaintiff Class consisting

of all state government entities, all political subdivisions,[29] and all colleges and

universities in the Class States[30] of Alaska,[31] Delaware, Ohio and Pennsylvania, all

political subdivisions in Class State New Mexico,[32] and all political subdivisions, the

University of California and the State Bar of California in Class State California[33] that

---

[28] SSA ¶¶ 1, 2.  Plaintiff states include the following states and commonwealths: Alaska,
Arizona Arkansas, California, Colorado, Delaware, Florida, Hawaii, Idaho, Illinois, Iowa,
Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi,
Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina,
North Dakota, Northern Mariana Islands, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island,
South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia and
Wisconsin.

[29] The term "political subdivisions" includes K-12 school districts, counties, cities and special
districts of whatever kind.

[30] The term "Class States" as used in this Report and Recommendations refers to those Attorneys
General that are seeking in whole or in part certification of a class of Government Purchaser
Plaintiffs in their States in order to effectuate the settlements, including the release.  By state
statutes, all other Attorneys General, referred to by the term "Non-Class States," do not need
certification of a class of Government Purchaser Plaintiffs in order to effectuate the settlements,
including the release.

[31] For Class State Alaska, only the following political subdivisions are part of this proposed
class: the City of Anchorage, the City of Fairbanks and the City of Juneau.  There are no
colleges or universities in Class State Alaska in the proposed class.

[32] The State of New Mexico is representing state government entities in a non-class capacity for
purposes of settlement.

[33] The State of California is representing state government entities in a non-class capacity for
purposes of settlement with the exception of the University of California and the State Bar of
California. The University of California and the State Bar of California are autonomous entities
under the California Constitution, *see, e.g.,* CAL. CONST. ART. IX, § 9(f).

---

31

directly or indirectly purchased DRAM or DRAM-containing products between January 1, 1999 and December 31, 2002.[34]

58. The terms of the SSA require Samsung to pay into escrow a settlement fund which is divided into an Indirect Purchaser Settlement Fund of $80,000,000 for all non-government indirect purchasers and the Government Settlement Fund of $10,000,000 to pay the claims of the Government Purchaser Plaintiffs, including the limited classes described above.[35] Apart from the settlement funds, Samsung agreed to make an additional payment up to a maximum of $2,500,000 for the costs of notice and claims administration.[36] In addition, Samsung agreed to the entry of a final judgment containing injunctive relief in the form of an order enjoining Samsung Semiconductor, Inc. ("SSI") and Samsung Electronics Company Ltd. ("SEC") from engaging in any horizontal conduct that constitutes a *per se* violation of Section 1 of the Sherman Act with respect to the sale of any DRAM product for delivery in the United States and the systematic reciprocal exchange of DRAM pricing information as alleged in *United States v. Samsung Electronics Co. Ltd. et al.,* Case No. CR05-0643 (PJH) (N.D. Cal.) for a period of three years from the date of the execution of the agreement and requiring SSI to establish and maintain a program or programs to ensure compliance with applicable antitrust competition laws for a period of three years, and requiring Samsung to give the

///

///

///

---

[34] A copy of the SSA is attached as Exhibit 7 to the Appendix hereto.

[35] SSA ¶ 7.

[36] SSA ¶ 11.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

Settling Plaintiffs[37] its full, continuing and complete cooperation in the prosecution of any actions against other DRAM producers.[38]

59.     The SSA becomes final with an order and final judgment that includes, in addition to the injunctive relief described above, the following provisions:  (1) approval of the settlement as fair, reasonable and adequate within the meaning of Federal Rule of Civil Procedure 23; (2) certification of the non-governmental settlement class, described above and the class of governmental entity purchasers located in those states for which the Attorneys General made class allegations, as described above; (3) dismissal of the action against Samsung with prejudice and without cost to Samsung, except as provided in the SSA; (4) reservation of exclusive jurisdiction over the settlement, including administration of the settlement distribution, to the United States District Court for the Northern District of California; (5) approval of an additional award of $1,000,000 (on top of the $10 million in settlement funds) in attorneys' fees to the plaintiff states; and (6) approval of an additional award of up to $19,500,000 in attorneys' fees (on top of the $80 million in settlement funds) to private counsel for the indirect purchaser plaintiffs.[39]

60.     Upon finality, the SSA releases Samsung from any claims, demands, actions or suits, known or unknown, brought in any capacity arising out of or relating in any way to the sale or pricing of DRAM products up to December 31, 2002 based on the

---

[37] The term Settling Plaintiffs refers to the Indirect Purchaser Plaintiffs and the Attorneys General.

[38] SSA ¶¶ 13, 19.  An attorneys' fee amount of $19.5 million for private counsel was agreed upon and memorialized in a Letter from Gary L. Halling, Counsel for Samsung Semiconductor, Inc. and Samsung Electronics Company Ltd. to Josef D. Cooper, David Boies, III, Daniel J. Mogin and Daniel E. Gustafson, Counsel for the Indirect Purchaser Plaintiffs, dated April 30, 2007, a copy of which is attached as Exhibit 8 to the Appendix hereto.

[39] SSA ¶¶ 13, 19.  The final amount of attorneys' fees to be paid to private indirect purchaser plaintiffs was negotiated separately.  *See* n.33, *supra*.  Samsung's payments for these attorneys' fees have been paid into a separate escrow fund.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

conduct alleged and causes of action asserted or that could have been asserted in this or any similar action.[40]  The released claims include, but are not limited to, claims arising under any federal or state antitrust, unjust enrichment, unfair competition, trade practice statutory or common law and consumer protection law.[41]  The release does not apply to claims by any plaintiff or class member not set forth in the SSA, such as claims arising solely out of product liability or warranty claims in the ordinary course of business.

**B.  The Winbond Settlement**

61.  The Winbond Settlement Agreement (WSA), executed in March 2007, settles all claims against Winbond Electronics Corporation and Winbond Electronics Corporation America, its subsidiary (collectively, "Winbond") made by the plaintiffs and classes described above with regard to the Samsung settlement.[42]

62.  The terms of the WSA required Winbond to pay $2,000,000 into an escrow to create a settlement fund,[43] and obligated Winbond to be enjoined and restrained by entry of a final judgment from engaging in any horizontal conduct that constitutes a *per se* violation of Section 1 of the Sherman Act with respect to the sale of

---

[40] SSA ¶ 16.

[41] SSA ¶ 16.

[42]  A copy of the WSA is attached as Exhibit 9 to the Appendix hereto.  Plaintiff State New York, which never filed suit against Winbond, is not a party to the WSA.  Like the SSA, the WSA does not specifically include U.S. territories within the definition of the United States, but will be similarly construed.

[43] Unlike the SSA, which provided for two separate settlement funds, one of $80 million for the private party plaintiffs and one of $10 million for the government purchaser plaintiffs, the WSA does not specify how this settlement fund is to be allocated between the private and the government purchaser plaintiffs.  However, as will be discussed below in paragraph 69 in connection with the Multi-Defendant settlement, the parties to all subsequent settlement agreements in this litigation determined that the relative sizes of the Samsung settlement payments, which were the product of separate arm's length negotiations, represented a fair and reasonable allocation of the settlement proceeds between the private party purchasers and the government purchasers and the parties to these proceedings before the Special Master agree that this division should also apply to the Winbond settlement proceeds.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

any DRAM product for delivery in the United States for three years from the date final judgment is entered; to establish and maintain a program or programs for the purpose of assuring compliance with applicable U.S. antitrust and competition laws by their officers and employees; and to give the Settling Plaintiffs full, continuing and complete cooperation.[44]

63.     The scope of the releases provided to Winbond upon finality of the WSA is identical to the releases afforded Samsung in the SSA and described above.

64.     The WSA does not address attorneys' fees.

## C.     The Multi-Defendant Settlement

65.     The Multi-Defendant Settlement Agreement ("MDSA"), executed in June 2010, settles all claims against Defendants Infineon Technologies AG and Infineon Technologies North America Corp. ("Infineon"), Elpida Memory, Inc. and Elpida Memory (USA) Inc. ("Elpida"), NEC Electronics America, Inc. (presently known as Renesas Electronics America Inc.) ("NEC"), Micron Technology, Inc. and Micron Semiconductor Products, Inc. ("Micron"), Mosel Vitelic Inc. and Mosel Vitelic Corp. ("Mosel") and Hynix Semiconductor Inc. and Hynix Semiconductor America Inc. ("Hynix") (collectively, "the MDSA Defendants") made by (1) a nationwide[45] Indirect Purchaser Settlement Class of natural persons and non-governmental entities that indirectly purchased DRAM, including any DRAM-containing device, between January 1, 1998 and December 31, 2002; (2) (a) Government Purchaser Plaintiffs who directly or indirectly purchased DRAM or DRAM-containing products, (b) (in two-thirds of the Plaintiff States) Attorneys General suing *parens patriae* on behalf of natural persons

---

[44] WSA ¶ III.C.

[45] The MDSA was the first settlement agreement to explicitly include U.S. territories within the scope of the settlement class.  All subsequent settlement agreements also refer to U.S. territories in addition to "the United States."

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

who indirectly purchased DRAM or DRAM-containing products and (c) (in four Plaintiff States), on behalf of corporations who indirectly purchased DRAM or DRAM-containing products - all between January 1, 1998 and December 31, 2002;[46] and (3)  a Government Purchaser Plaintiff Class consisting of all of political subdivisions in Class State New Mexico[47] and all political subdivisions, the University of California and the State Bar of California in Class State California[48] that between January 1, 1998 and December 31, 2002, directly or indirectly purchased DRAM or DRAM-containing products.[49]

66.   The MDSA obligates the Settling Defendants to pay into escrow $173,176,800 to establish a settlement fund.  Each Defendant's share of the settlement fund is as follows:

Infineon:      $29,113,776

---

[46] MDSA at 2.  The Attorneys General referred to in the MDSA represent the states or commonwealths acting in their sovereign or proprietary capacity, and the persons and entities therein which they represent acting in their representative or *parens patriae* or other capacity, or acting pursuant to Federal Rule of Procedure 23 as alleged in the Third Amended Complaint filed in *State of California et al. v. Infineon Technologies et al.*, C 06-4333 (PJH) of the following states or commonwealths:  Arizona, Arkansas, California, Colorado, Florida, Hawaii, Idaho, Illinois, Iowa, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, ,Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, Virginia, Washington, West Virginia and Wisconsin.  MDSA ¶ 3.  This is a slightly smaller number of states than were parties to the SSA and WSA.  As will be discussed below, this change is reflected in the definitions of the Government Purchaser Settlement Classes.

[47] See footnote 32 above.

[48] The State of California is representing state government entities in a non-class capacity for purposes of settlement with the exception of the University of California and the State Bar of California. The University of California and the State Bar of California are autonomous entities under the California Constitution, *see, e.g.,* CAL. CONST. ART. IX, § 9(f).

[49] A copy of the MDSA is attached as Exhibit 10 to the Appendix hereto.

36

Elpida:          $  4,259,948[50]

NEC:             $20,277,350

---

[50] As set forth in its March 19, 2012, Chapter 15 bankruptcy petition in the United States Bankruptcy Court in Delaware (Ca. No. 12-10947), defendant Elpida Memory Inc. ("Elpida") experienced significant losses in 2007 (¥23.5 billion) and 2008 (¥178.9 billion) that led it to restructure and borrow significant sums in 2009 under government supervision (approximately ¥110 billion).  Since then, Elpida has continued to struggle due to the depressed global economy.  Uncertain about its ability to make upcoming debt payments, Elpida filed for bankruptcy in Tokyo on February 27, 2012.  Elpida's U.S. bankruptcy petition did not include Elpida's subsidiary, Elpida Memory (USA), Inc. ("Elpida USA"), which is named independently as a defendant in this litigation.

Plaintiffs have advised the Special Master that they have done sufficient research into the situation to ascertain that the settlement funds deposited into escrow by Elpida USA are not part of the bankruptcy estate.  See, e.g., *In re Atl. Gulf Cmtys. Corp.*, 369 B.R. 156, 165 (Bankr. D. Del. 2007); 5-541 Collier on Bankruptcy § 541.09A (15th ed. rev. 2004) ("In general, most courts have held that assets in escrow are not property of the estate, even though the debtor may have certain rights under an escrow agreement and, therefore, in the assets escrowed.").  Neither do they believe that the Elpida settlement funds could be considered either a preference or a fraudulent transfer.  The settlement payment was made on November 28, 2010, more than a year before the bankruptcy filing, so it is outside of the term for a preference under § 547 of the Bankruptcy Code.  11 U.S.C. § 547(b).  § 548 of the Bankruptcy Code allows a trustee to go back two years and void certain transfers of the debtor's property as "fraudulent."  However, that requires either a showing of actual intent to defraud creditors, or that the debtor received "less than a reasonably equivalent value" in return for the transfer.  11 U.S.C. § 548(a)(1).  Neither showing could be made here.

In addition, Elpida has advised the Bankruptcy Court of its desire not to have the bankruptcy proceedings interfere with the finalization of this settlement by filing a declaration, dated April 13, 2012, of Kota Takemura, an executive of Elpida, the debtor-in-possession in the Japanese proceeding.  In that declaration, Mr. Takemura lists the settled matters by name and number and requests that they be exempted from any stays entered in the bankruptcy proceedings, stating that upon "final approval" of the settlement "Elpida and Elpida USA will get the benefit of a final release" and that "[s]taying the Antitrust Matter would jeopardize the settlement and would be detrimental to Elpida's reorganization and creditors."  (Copies of certain of the bankruptcy filings including Mr. Takemura's declaration are attached as Exhibit 11 to the Appendix hereto.)

---

37

| Mosel: | $ 2,778,900 |
| Micron: | $66,774,984 |
| Hynix: | $49,971,842 |

The MDSA allows these payments to be made in installments, with each of the defendants, other than Mosel, making three equal payments, the first within 20 days of the execution of the agreement and the other two payments on the first and second anniversaries of the first payment.  The second and third installment payments accrue interest at the rate of the three-month LIBOR plus 3.0% from the date of the first payment.  As of the date of this Report and Recommendations, all Settling Defendants have made all principal settlement payments in full, with the exception of Mosel.

67.     The MDSA required that Mosel's payments be made in three installments, beginning with a payment of 35% of the amount owed in January 2012, 35% in February 2012 and 30% in March 2012, with quarterly interest-only payments prior to those dates, as well as making two payments of $30,000 in addition to its proportionate share of the total shown above.[51]  However, shortly before the first payment was due, counsel for Mosel informed Co-Lead Counsel for the Indirect Purchaser Settlement Class and the Plaintiff States that while it was committed to meeting its obligations under the MDSA, including making all payments due, it could not meet the payment schedule outlined above while it was currently engaged in restructuring efforts in conjunction with its lender banks and the Taiwanese government. Following negotiations with Plaintiffs' Counsel, which included a due diligence verification of Mosel's financial situation, the parties agreed to a modification of the MDSA as to the schedule for principal payments by Mosel.  These due diligence

---

[51]MDSA ¶ 21(b).

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

materials have been made available to the Special Master; however due to their sensitive and confidential nature, they are not being attached as exhibits.  On June 25, 2012, Mosel executed a Judgment Note in exchange for a delay of one year (plus the possibility of a further delay of one additional year) in the payment of settlement funds by Mosel that is acceptable to all parties.[52]

68.    The Judgment Note provides that Mosel will continue to pay interest and make a modest additional payment of $10,000.  Should Mosel not meet its obligations (or continue to request delays), Settling Plaintiffs may in their sole discretion find Mosel to be default, allowing them to:  (A) enter a confession of judgment by Mosel in state and federal court that can be enforced elsewhere in the United States or Taiwan; (B) obtain an additional $50,000 from Mosel to cover the costs of collection on the judgment; (C) seek in the alternative an arbitral award on an expedited basis that can be enforced in the United States or Taiwan; and (D) seek an injunction barring Mosel from doing business in the United States or in individual states such as California.  Settling Plaintiffs may also receive an additional $50,000 from Mosel should it or a significant portion of its assets be purchased by another company.  The Special Master finds that the Judgment Note provides a reasonable guarantee that Mosel will meet its obligations, and that this modification of the MSDA does not adversely affect the reasonableness of the settlement with Mosel or of the distribution plans proposed herein.

69.    The MDSA provides that 8/9ths of the settlement fund will be used for the benefit of the non-governmental indirect purchasers and 1/9th of the settlement fund will benefit the Government Purchaser Plaintiffs, including the Government Purchaser Plaintiffs' Class of certain governmental entities in Class States California and New

---

[52] Copies of the Judgment Note and accompanying Attorneys' Declaration from counsel for Mosel are attached as Exhibit 12 to the Appendix hereto.

39

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

Mexico.[53]  This division is based on the ratio of the $80 million settlement payment made by Samsung to settle the individual and *parens patriae* claims of the Indirect Purchaser Settlement Class and the $10 million payment made by Samsung to settle the claims of the Government Purchaser Plaintiffs including the Government Purchaser Classes to the total of Samsung's settlement payments.  The amounts of the Samsung payments were negotiated separately and at different times between Samsung and the Indirect Purchaser Plaintiffs' Co-Lead Counsel and between Samsung and the Attorneys General.  Each of these settlements was the product of independent arms' length negotiations in which each plaintiff group presented market data regarding its share of sales, made arguments regarding the strength of its claims and was generally acting with the intention and incentive of maximizing its own recovery.  Accordingly, all parties to the MDSA (and all subsequent settlement agreements) have agreed that the relative relationship between the two settlement amounts represents a fair and reasonable allocation of the settlement proceeds between the Indirect Purchaser and Government Purchaser groups.

70.     Funds paid into escrow may be used to pay the costs of notice and claims administration based on the ratio that the MDSA settlement fund bears to the totality of the MDSA, Samsung and Winbond settlement funds, with no obligation by plaintiffs to refund this amount in the event that the MDSA does not become final.

71.     The MDSA also provides injunctive relief in the form of a final judgment enjoining the MDSA defendants from engaging in any horizontal conduct that

---

[53] MDSA ¶ 21 provides that "[t]he Settlement Fund shall be held by the Escrow Agent (and may be divided pursuant to the instructions in the Escrow Agreement), pursuant to the agreement of the parties that 8/9ths of the Settlement Fund shall be for the benefit of the Indirect Purchaser Plaintiffs and 1/9th of the Settlement Fund shall be for the benefit of the Government Purchaser Plaintiffs, which amounts shall include any allocated attorneys' fees."

40

constitutes a *per se* violation of Section 1 of the Sherman Act with respect to the sale of any DRAM product for delivery in the United States for a period of three years from the date of the execution of the MDSA and requiring them to establish and/or maintain a compliance program or programs for the MDSA defendants' officers and employees with responsibility for pricing and sales of DRAM in and to the United States regarding the legal standards imposed by federal and state antitrust laws for a period of three years from the execution of the agreement, and to give the Settling Plaintiffs full, continuing and complete cooperation. [54]

72.     The MDSA becomes final with an order and final judgment that includes, in addition to the injunctive relief described above, the following provisions:  (1) approval of the settlement as fair, reasonable and adequate within the meaning of Fed. R. Civ. P. 23; (2) certification of the non-governmental settlement class, described above and the class of governmental entity purchasers located in those states for which the government plaintiffs made class allegations; (3) dismissal of the action against the MDSA defendants with prejudice and without cost to them, except as provided in the MDSA; (4) an award of attorneys fees out of the settlement fund; and (5) reservation of exclusive jurisdiction over the settlement, including administration of the settlement distribution, to the United States District Court for the Northern District of California.[55]

73.     The MDSA departs from the Samsung and Winbond settlement agreements in the temporal scope of the Indirect Purchaser and Government Purchaser Settlement Classes by having the class periods commence on January 1, 1998, rather than on January 1, 1999.  This is a result of a difference between the class damage

---

[54] MDSA ¶¶ 14, 20.

[55] MDSA ¶ 14.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

periods alleged in the earlier-filed private actions and the damage period alleged in the proprietary and *parens patriae* actions of the Attorneys General. [56]

74.   The MDSA releases the MDSA Defendants from any claims, demands, suits, or other actions, known or unknown, brought in any capacity arising out of or relating in any way to the pricing, production, development or sale of DRAM products or products containing DRAM up to December 31, 2002, including claims based on the conduct alleged and causes of action asserted or that could have been asserted by the settling plaintiffs in this or any similar action.[57]   The released claims include, but are not limited to, claims arising under any federal or state antitrust, unjust enrichment, unfair competition, trade practice statutory or common law and consumer protection law.[58] The release does not apply to claims not set forth in the MDSA, such as claims arising solely out of product liability or warranty claims in the ordinary course of business.[59]

**D.  The Nanya Settlement**

75.   The Nanya Settlement Agreement (NSA), executed in January 2011, settles all claims against Nanya Technology Corporation and Nanya Technology Corporation USA, Inc., including all parents, subsidiaries, affiliates, predecessors, successors and assigns, and each and all of the present and former principals, partners, officers, directors, supervisors, employees, representatives, insurers, attorneys, heirs, executors, administrators and assigns of each of the foregoing, including Inotera Memories, Inc. (collectively, "Nanya") made by the plaintiffs and classes described above with regard to the Multi-Defendant Settlement.

---

[56] MDSA ¶ 2.

[57] MDSA ¶ 17.

[58] MDSA ¶ 17.

[59] MDSA ¶ 19.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

76.     The terms of the NSA require Nanya Technology Corporation to pay $3,823,200 in U.S. funds into the Settlement Fund Escrow Account, which it was permitted to pay in three equal installments, with the first payment due within 20 days from the notice of the execution of the Agreement.[60]  Nanya elected to pay its entire settlement obligation in full at the time of its initial payment.[61]  Like the MDSA, the NSA provides that 8/9ths of the Nanya settlement fund will be used for the benefit the non-government indirect purchasers and 1/9th will be for the benefit of the Government Purchaser Plaintiffs, including the same Government Purchaser Plaintiff Class as in the MDSA.[62]  Consistent with the scope of the Multi-Defendant settlement, the class periods in the NSA commence on January 1, 1998.

77.     Funds paid into escrow may be used to pay the costs of notice and claims administration based on the ratio that the NSA settlement fund bears to the totality of the NSA, MDSA, Samsung and Winbond settlement funds, with no obligation by plaintiffs to refund this amount in the event that the NSA does not become final.[63]

78.     The NSA also provides injunctive relief in the form of a final judgment enjoining Nanya Technology Corporation and Nanya Technology Corporation USA, Inc. for three years from the execution of the NSA from engaging in any price fixing, market allocation or bid rigging which constitutes horizontal conduct that is a *per se* violation of Section 1 of the Sherman Act with respect to the sale of any DRAM product

---

[60] NSA ¶ 21. A copy of the Nanya Settlement Agreement is attached as Exhibit 13 to the Appendix hereto.

[61] The NSA also provided for second and third payments on the anniversaries of the first payment, and that beginning on the date of the first payment, the unpaid installments would accrue interest at the rate of the three-month LIBOR plus 3.0%.  These provisions were obviated by Nanya's paying in full.

[62] *Id.*

[63] NSA ¶ 13.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

for delivery in the United States, including as to Nanya Technology Corporation USA, Inc., enjoining it from discussing with other DRAM manufacturers (other than affiliated entities) the prices of DRAM to be sold to original equipment manufacturers ("OEM") of computers and servers or exchanging information on sales of DRAM to OEM customers for the purpose of monitoring and enforcing adherence to agreed-upon prices; and requiring Nanya Technology Corporation and Nanya Technology Corporation USA, Inc. to establish and/or maintain a program or programs for three years after final approval of the NSA to provide relevant antitrust compliance education regarding the legal standards imposed by federal and state antitrust laws to their officers and employees with responsibility for pricing and sales of DRAM in and to the United States; and to give the Settling Plaintiffs cooperation.[64]

79.   The NSA becomes final upon the finality of an order and final judgment that mirrors the terms of the final judgment provided for in the MDSA.

80.   The scope of the NSA release mirrors the releases in the other settlement agreements and releases Nanya from any claims or other actions arising out of or relating to any act or omission concerning the sale or pricing of DRAM up to December 31, 2002, based on the alleged conduct and causes of action asserted or that could have been asserted in the litigation and does not apply to claims by any of the settling plaintiffs and classes not set forth in the NSA, such as claims arising solely out of product liability or warranty claims in the ordinary course of business.[65]

**E.  The Mitsubishi Settlement**

81.   The Mitsubishi Settlement Agreement (MSA), executed in December 2011, settles all claims against Mitsubishi Electric Corporation and Mitsubishi Electric

---

[64] NSA ¶ 14.

[65] NSA ¶¶ 17, 19.

44

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

and Electronics USA, Inc., including all parents, subsidiaries, affiliates, predecessors, successors and assigns, and each and all of the present and former principals, partners, officers, directors, supervisors, employees, representatives, insurers, attorneys, heirs, executors, administrators and assigns of each (collectively, "Mitsubishi") made by the same plaintiffs and classes as defined above in the MDSA.

82.    The MSA requires that the Indirect Purchaser Plaintiffs and the Attorneys General file actions against Mitsubishi in the United States District Court for the Northern District of California, and that all counsel jointly request a stay of the newly-filed actions pending completion of these proceedings before the Special Master and consideration of class certification, the fairness of the settlement and related matters by this Court.[66]

83.    The MSA requires Mitsubishi to pay into escrow $5,500,000, plus an additional $100,000 for Mitsubishi's share of the costs of the Special Master, notice and claims administration, within thirty days from the date that Mitsubishi receives final escrow instructions.[67]  As with the settlement payments in the MDSA and NSA, the Mitsubishi Settlement Fund is divided 8/9ths for the benefit of all non-governmental indirect purchasers and 1/9th for the benefit of the Government Purchaser Plaintiffs including the Government Purchaser Plaintiff Class consisting of certain governmental entities in Class States California and New Mexico.[68]

84.    The MSA also provides injunctive relief in the form of a final judgment enjoining Mitsubishi from engaging in any horizontal conduct that constitutes a *per se*

---

[66] MSA ¶ 10.  A copy of the Mitsubishi Settlement Agreement is attached as Exhibit 14 to the Appendix hereto

[67] MSA ¶ 21.

[68] MSA ¶ 21.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

violation of Section 1 of the Sherman Act with respect to the sale of any DRAM product for delivery in the United States for a period of three years from the date of the execution of the MSA, and requiring Mitsubishi, if it does not already have one in place, to establish and maintain a program or programs to ensure compliance with applicable antitrust competition laws for the same three-year period.  Mitsubishi is also required to give the Settling Plaintiffs its full, continuing and complete cooperation.

85.    The MSA becomes final upon the finality of an order and final judgment that mirrors the terms of the final judgment provided for in the MDSA and NSA.[69]

86.    The MSA releases are consistent in scope with the releases in the other settlement agreements.[70]

## F.  The Toshiba Settlement

87.    The Toshiba Settlement Agreement (TSA) executed in September 2012 settles all claims against Toshiba Corporation and Toshiba America Electronic Components, Inc. including all parents, subsidiaries, affiliates, predecessors, successors and assigns, and each and all of the present and former principals, partners, officers, directors, supervisors, employees, representatives, insurers, attorneys, heirs, executors, administrators and assigns of each of the foregoing (collectively, "Toshiba") made by the same plaintiffs and classes as defined above in the MDSA.

88.    The TSA provides that the Indirect Purchaser Plaintiffs and the Attorneys General will file actions against Toshiba in the United States District Court for the Northern District of California, and jointly request a stay pending completion of

---

[69] MSA ¶ 14.

[70] MSA ¶¶ 17-19.

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

proceedings before the Special Master and consideration of class certification, the fairness of the settlement and related matters by this Court.[71]

89.      The TSA requires Toshiba to pay $7,250,000, plus an additional deposit of $200,000 for Toshiba's share of the costs of the Special Master, notice and claims administration, within thirty days after Toshiba receives final escrow instructions, which will be divided 8/9ths to the benefit of the non-governmental purchasers and 1/9th to the benefit of the Government Purchaser Plaintiffs including the Government Purchaser Plaintiff Class consisting of certain governmental entities in Class States California and New Mexico.[72]

90.      The TSA also provides for injunctive relief in the form of an order and final judgment enjoining Toshiba from engaging in any price fixing, market allocation and bid rigging with respect to the sale of any DRAM product for delivery in the United States, which constitutes horizontal conduct that is a *per se* violations of Section 1 of the Sherman Act, for a period of three years from the date of the execution of the TSA, and requiring Toshiba to certify that Toshiba Corporation has an antitrust compliance program and that Toshiba does not manufacture or sell DRAM.  In the event that Toshiba begins again to manufacture and sell DRAM within three (3) years of the execution of the TSA, Toshiba will begin to certify compliance with the injunctive provisions of the TSA.[73]

91.      The TSA becomes final upon the finality of an order and final judgment that mirrors the terms of the final judgment provided for in the MDSA.[74]

---

[71] TSA ¶ 10.  A copy of the Toshiba Settlement Agreement is attached as Exhibit 15 to the Appendix hereto.

[72] TSA ¶ 21.

[73] TSA ¶ 14.

[74] TSA ¶ 14.

92.     The TSA releases are consistent in scope with the releases in the other settlement agreements.[75]

**G. The Hitachi Settlement**

93.     The Hitachi Settlement Agreement (HSA) executed in July 2012, settles all claims against Hitachi Ltd., including all parents, subsidiaries, affiliates, predecessors, successors and assigns, and each and all of the present and former principals, partners, officers, directors, supervisors, employees, representatives, insurers, attorneys, heirs, executors, administrators and assigns of each (collectively, "Hitachi") made by the same plaintiffs and classes as defined above in the MDSA.

94.     The HSA also provides that the Indirect Purchaser Plaintiffs and the Attorneys General will file actions against Hitachi in the United States District Court for the Northern District of California, and jointly request a stay pending completion of proceedings before the Special Master and consideration of class certification, the fairness of the settlement and related matters by this Court.[76]

95.     The HSA requires Hitachi to pay $5,500,000, plus an additional $100,000 for its share of the costs of the Special Master, notice and claims administration, within thirty days after Hitachi receives final escrow instructions, which inures 8/9ths to the benefit the non-governmental indirect purchasers and 1/9th to the benefit of the Government Purchaser Plaintiffs including the Government Purchaser Plaintiff Class consisting of certain governmental entities in Class States California and New Mexico.[77]

---

[75] TSA ¶¶ 17-19.

[76] HSA ¶¶ 10, 26.  A copy of the Hitachi Settlement Agreement is attached as Exhibit 16 to the Appendix hereto.

[77] HSA ¶ 21.

48

96.     The HSA provides for injunctive relief in the form of an order and final judgment enjoining Hitachi from engaging in any price fixing, market allocation and bid rigging, with respect to the manufacture and sale of DRAM for delivery in the United States, which constitutes horizontal conduct that is a *per se* violations of Section 1 of the Sherman Act for a period of three years from the date of the execution of the HSA, and requiring Hitachi to certify that it has an antitrust compliance program and that Hitachi does not manufacture DRAM.  In the event that Hitachi begins again to manufacture and sell DRAM within three years of the execution of the HSA, Hitachi will begin to certify compliance with the injunctive provisions of the HSA .[78]

97.     The HSA becomes final upon the finality of an order and final judgment that mirrors the terms of the final judgment provided for in the MDSA.[79]

98.     The HSA releases are consistent in scope with the releases in the other settlement agreements.[80]

## VI.    THE PROCEEDINGS BEFORE THE SPECIAL MASTER WITH REGARD TO CERTIFICATION OF THE PROPOSED INDIRECT PURCHASER SETTLEMENT CLASS

**A.     The Proposed Indirect Purchaser Settlement Class Defined in the Settlement Agreements**

99.     The operative complaint at the time of the Samsung and Winbond settlements was plaintiffs' original complaint filed in the *Petro* action on June 17, 2005. That pleading made two claims for relief on behalf of all indirect DRAM purchasers in the United States between April 1, 1999 and December 31, 2002.  One was a federal law

---

[78] HSA ¶ 14.

[79] HSA ¶ 14.

[80] HSA ¶¶ 17-19.

claim, brought under the Clayton Act, for injunctive and equitable relief for violations of Section 1 of the Sherman Act, and the other was a claim for damages arising from violations of California's antitrust statute, the Cartwright Act and California's Unfair Competition Law ("UCL").  In addition, the original *Petro* complaint, along with other complaints that became part of the MDL proceedings, made a variety of damage claims under various state antitrust, consumer protection statutes and common law unjust enrichment.  By the time of the MDSA in 2010, the plaintiffs' operative pleading was their Third Amended Class Action Complaint, filed February 27, 2008.  That pleading alleged the same nationwide and statewide claims as the original complaint, but limited the class allegations to indirect DRAM purchasers who purchased "for end use in Computers."[81]

100.   The settlement agreements, however, are all consistent in scope, and contemplate the certification of a nationwide settlement class for the purpose of settling and releasing all claims arising out of the common core of operative facts that was alleged in both plaintiffs' original and Third Amended Complaints held by any indirect DRAM purchaser (who does not request exclusion) regardless of the purpose or use for which the DRAM purchase was made.

101.   The proposed Settlement Class representatives are the named plaintiffs in the *Petro* action, which include both resellers and end-buyers.[82]  Proposed Class Counsel

---

[81] Third Amended Complaint at ¶ 48.  Copies of plaintiffs' original Complaint and Third Amended Complaint are attached as Exhibits 17 and 18 to the Appendix hereto.

[82] These parties are:  Petro Computer Systems, Inc., a California corporation (reseller); Gary Petersen, a California resident (sole proprietor reseller); Pamela Uglem, a Minnesota resident (end-buyer); Dale Dickman, a Texas resident, (end-buyer); Michael Juetten and Robert Cademy, California residents (end-buyers); Heather Delaney and Ben Stewart, New York residents (end-buyers); Johnson & Jennings, Inc., a California corporation (end-buyer) and G.C.A. Strategies, Inc., a California business entity (end-buyer).

50

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

are Plaintiffs' Co-Lead Counsel in the MDL, Josef D. Cooper, Daniel E. Gustafson, Daniel J. Mogin and Timothy Battin, along with Plaintiffs' Liaison Counsel, Francis O. Scarpulla and the Chair of Plaintiffs' Steering Committee, Terry Gross.

**B.    The Preliminary Matter of the Scope of the Plaintiffs' Actions**

102.    The settlement agreements were entered into over a period of five (5) years, beginning with the Samsung agreement in 2007, and ending with the Toshiba and Hitachi agreements in 2012.  During those years, various complaints were filed by the Indirect Purchaser Plaintiffs, the earliest of which alleged that Defendants' conspiracy began raising DRAM prices in 1999, and then by the Attorneys General, which alleged that the Defendants' conspiracy began raising DRAM prices in 1998.  As noted above, this difference is reflected in the temporal scope of the settlement classes defined in the various agreements.  The earlier negotiated SSA and WSA cover indirect purchasers during the period January 1, 1999 through December 31, 2002, and the MDSA, NSA, MSA, TSA and HSA cover DRAM purchasers during the period January 1, 1998 through December 31, 2002.

103.    There is a second difference between the SSA and WSA and the subsequent settlement agreements in that the SSA and WSA settles claims for purchases within "the United States" without defining whether that term includes United States territories, whereas the subsequent settlement agreements all specifically include claims arising from purchases made in US territories.  There is no evidence that the use of the term "United States" in the Samsung and Winbond agreements was intended to exclude purchasers in the territories.

104.    To reflect the distinction between the temporal and geographic ranges of these two groups of settlements in the administration of the global settlement of this

51

litigation (i.e., in the releases, claims and distribution of funds), it would be necessary to certify two nationwide Indirect Purchaser Settlement Classes, one against all defendants other than Samsung and Winbond for purchases in the United States and its territories during the period January 1, 1998 through December 31, 2002, and one against Samsung and Winbond for purchases made in the states (and District of Columbia) of the United States during the period January 1, 1999 through December 31, 2002.  It would then be necessary to incur the expense and risk the potential confusion of having two parallel claims processes, one to distribute the Samsung and Winbond settlement funds and the other to distribute the settlement funds from all of the other defendants, with the vast majority of DRAM purchasers (all of those located in the 50 states and District of Columbia who purchased during the years 1999 through 2002) being members of both settlement classes and entitled to submit a claim form for payment from each fund.

105.    No party to any of the proceedings before the Special Master has suggested that it would be appropriate to so burden the settlement distribution process. The Special Master has been advised of the temporal and geographic differences between the proposed classes in the Samsung and Winbond settlement agreements and those in the agreements with the other ten (10) Defendants.  The Indirect Purchasers' Co-Lead Counsel has recommended for efficiency and clarity that a single settlement class of purchasers in the United States including its territories be certified against all Defendants for the entire 1998 through 2002 time period specified in the majority of the settlement agreements; the Attorneys General agree.

106.    The Special Master finds and recommends to the Court that the added complexity and expense involved in creating a class structure, class notices, plans of distribution and recovery formulae to preserve what may well have been an unintended

52

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

geographic difference in the Samsung and Winbond settlements,[83] or even the temporal difference therein, would not be justified by any benefit that might be derived from doing so.  In each of the settlement agreements, the settlement terms along with the class action device are designed to settle the individual and *parens patriae* state claims of all natural persons and business entities who indirectly purchased DRAM under the protection of the antitrust laws of the United States during the entire period in which the defendants' alleged conspiracy is believed to have raised or stabilized prices for DRAM in products and modules.  The fact that the parties were imprecise in defining the geographic scope of this protection or even that the parties' perception of the time period affected by the Defendants' alleged conspiracy may have changed while the settlements were being negotiated and finalized is not a matter that considerations of fairness or adequacy require to be reflected in either the plan of distribution or the settlement class structure.[84]

## C.    Definition of the Indirect Purchaser Settlement Class

107.    Accordingly, as will be discussed more fully below, the Special Master finds and recommends that the following nationwide Indirect Purchaser Settlement Class should be certified for the purpose of effectuating all of the above-described settlements:

> The Indirect Purchaser Settlement Class:  All natural persons and non-governmental entities, who, at any time during the period from January 1, 1998 through December 31, 2002, purchased dynamic random access memory ("DRAM") devices and components, including all products containing DRAM, anywhere in the United States indirectly from the defendants, their parents, subsidiaries and affiliates.  Excluded from this definition are defendants and their parents, subsidiaries and affiliates, legal representatives, successors, assigns or

---

[83] See footnote 16, above.

[84] The same situation exists with the Government Purchaser Plaintiff Settlement Classes, and the same result of having a single geographic and temporal scope against all defendants is similarly appropriate.

53

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

co-conspirators; all governmental entities; any judicial officer presiding over the settled litigation and the members of his/her immediate family and judicial staff.

The Special Master recommends the certification of this nationwide class to effectuate the above-described settlements and to release the claims that were pending in this litigation as of the time of settlement.  This class, and the claims released as described below, reflects a reasonable compromise of the parties involved in these proceedings as part of their agreed-upon settlement and based upon the particular factors present in this case.

**D.     Resolving Via Compromise the Objection of the Attorneys General of Illinois, Idaho, Oregon and Washington to the Inclusion of Their Citizens in the Nationwide Indirect Purchaser Settlement Class**

108.     The Attorneys General of Illinois, Idaho, Oregon and Washington objected to the inclusion of their citizens in the definition of the nationwide Indirect Purchaser Settlement Class submitted to the Special Master in Co-Lead Counsel's letter-brief of March 11, 2011.[85]  Because that objection must be addressed to determine whether a nationwide class can be certified for settlement purposes as called for under the various settlement agreements, the following discussion of the resulting compromise is required.

109.     On March 24, 2011, the Illinois Attorney General on behalf of herself as well as the Attorneys General of Idaho, Oregon and Washington, sent a letter-brief to the

---

[85] A copy of Co-Lead Counsel's March 11, 2011 letter-brief is attached as Exhibit 19 to the Appendix hereto.  That submission discussed each of the requirements for the certification of settlement classes in Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3).  It relied on the existence in this litigation of federal and California law claims asserted on behalf of DRAM purchasers in the United States as support for the certification of a nationwide settlement class for both injunctive and monetary relief.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

Special Master objecting to the "certification of a nationwide class of private indirect purchasers . . . to the extent that class does not exclude the indirect purchasers in [those] states."[86]  These states have antitrust statutes that expressly limit either indirect purchaser recovery or indirect purchaser class actions to cases brought by the Attorneys General ("AG-only States").  The letter-brief argued that because their state antitrust laws "do not recognize the right of any private individual to represent the claims of their indirect purchasers" the citizens of Illinois, Idaho, Oregon and Washington should be excluded from the nationwide settlement class.[87]

110.    On April 1, 2011, the Indirect Purchaser Plaintiffs responded.[88]  The Indirect Purchaser Plaintiffs argued that the participation of the citizens of Illinois, Idaho, Oregon and Washington in the nationwide settlement class was simply a matter of contract that did not in fact implicate any of the conflicts between the state statutes and the class action device upon which the objection was grounded.  The Indirect Purchaser Plaintiffs cited language in each of the settlement agreements by which these Attorneys General had voluntarily agreed that their natural person citizens would be included in the nationwide settlement class and compensated for both their individual and *parens patriae* claims from the 8/9th of each settlement fund allocated to pay the claims of all non-governmental indirect purchasers.

///

---

[86] A copy of this letter-brief is attached as Exhibit 20 to the Appendix hereto.

[87] It should be noted that the California Attorney General's letter-brief of March 25 (Exhibit 25) did not take a position one way or the other on the issues raised in the letter-brief of the Illinois Attorney General regarding the AG-only States, noting only that such raised conflict of law issues.

[88] A copy of this letter-brief is attached as Exhibit 21 to the Appendix hereto.

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

111.    Also on April 1, 2011, counsel for each of the Settling Defendants submitted a letter-brief in opposition that focused on the same contractual provisions.[89] The Defendants also asserted that the AG-only States offer to release the claims of their natural person citizens "as long as fairly compensated under the allocation plan" (Exhibit 22 at ¶ 1) was contrary to the language in the settlement agreements which releases those claims upon finality of the settlements, conditioned on this Court's adoption of an allocation and distribution plan that is fair and reasonable to the nationwide settlement class as a whole.

112.    A hearing was held before the Special Master on April 7, 2011, at which the AG-only States' objection to the inclusion of their natural person citizens was discussed.  The AG-only States agreed to withdraw their objection provided that language would be recommended by the Special Master to this Court for inclusion in any preliminary and final approval orders that would confirm that the agreement of the AG-only States to the participation of their natural person citizens in the Indirect Purchaser Settlement Class was the product of a negotiated compromise based on the particular facts of this case and that this compromise would not have precedential value in any other litigation.

113.    Thereafter, the Illinois Attorney General proposed language for inclusion in the Court's orders, and all parties agreed to the language set out below.  On April 22, 2011, the Illinois Attorney General submitted this language to the Special Master.[90]  She also forwarded it to the Resellers' Allocation Counsel that had been appointed by the Special Master on April 20, 2011.[91]

---

[89] A copy of this letter-brief is attached as Exhibit 22 to the Appendix hereto.

[90] A copy of this letter is attached as Exhibit 23 to the Appendix hereto.

[91] See Section IX.B., *infra*.

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

114.   The Special Master, having received no objection from any party to the language forwarded on April 22, 2011 by the Illinois Attorney General, hereby finds it to be an appropriate resolution of the objection raised to the certification of the nationwide Indirect Purchaser Settlement Class by the AG-only States, and recommends that the following language be included in the orders of the Court:

In the initial paragraphs of the Preliminary Approval Order and Final Approval Order:

> This litigation presented a series of difficult factual, legal and procedural issues, many of which remained undecided at the time of the settlements. This settlement resolves the litigation to give certainty to the parties and nothing in this Order, other than the findings and conclusions of the Court as expressly set forth in this Order, resolves those issues.

In the release section of the Final Order (and the notices as appropriate):

> Private claims against the Settling Defendants are released by two Settling Plaintiff groups: the class of Indirect Purchasers as certified above and the Attorneys General through their *parens patriae* claims as identified above. The releases are as follow:

> > The Settling Defendants Releasees [as defined above] shall be completely released, acquitted, and forever discharged from any and all claims, demands, actions, suits, causes of action, whether class, individual, or otherwise in nature (whether or not any Settling Plaintiff has objected to the settlement or makes a claim upon or participates in the Settlement Fund), whether directly, representatively, derivatively or in any other capacity that Releasors [as defined above], or each of them, ever had, now has, or hereafter can, shall, or may have on account of, related to, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected injuries, damages, and the consequences thereof in any way arising out of or relating in any way to any act or omission of the Settling Defendants Releasees (or any of them) concerning the pricing, production, development, or sale of DRAM products or products containing DRAM up to December 31, 2002, based on the conduct alleged and causes of action asserted or that could have been asserted, in complaints filed in the Actions by the Settling Plaintiffs, or in any similar action filed in any federal or state court, including, without limitation, any claims arising under any federal or state antitrust,

57

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

unjust enrichment, unfair competition, trade practice statutory or common law, and consumer protection law (to the extent that a consumer protection claim would be based on allegations of an antitrust or unfair competition violation) (the "Released Claims"). Releasors shall not, after the date of this Agreement, seek to establish liability against any Settling Defendants Releasee based, in whole or in part, upon any of the Released Claims, or conduct at issue in the Released Claims.  The Settling Parties contemplate and agree that this Agreement may be pleaded as a bar to a lawsuit, and an injunction may be obtained, preventing any action from being initiated or maintained in any case sought to be prosecuted on behalf of indirect DRAM purchasers with respect to the claims released in this paragraph.  This release, discharge, and covenant not to sue does not include claims by any of the Settling Plaintiffs other than the claims set forth therein and does not include other claims, such as those solely arising out of product liability or warranty claims in the ordinary course of business.

Because both Settling Plaintiff groups are giving complete releases of the Released Claims, this Court need not determine and has not determined which of the two Settling Plaintiff groups is releasing or may release any of the Released Claims.

## VII.   FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE SATISFACTION OF THE RULE 23 REQUIREMENTS BY THE INDIRECT PURCHASER SETTLEMENT CLASS

115.    As noted above, the proposed nationwide Indirect Purchaser Settlement Class is settling claims for injunctive and equitable relief brought under the federal Clayton Act, claims for damages brought under the California Cartwright Act and UCL, and claims for damages brought under various state antitrust and consumer protection statutes and common law.  In addition, certain Attorneys General have brought *parens patriae* actions against the defendants that are being released as part of the consideration for the settlement payments directed to the benefit of the Indirect Purchaser Settlement Class.

116.    The certification issue presented to the Special Master pursuant to the referral order of this Court requires an evaluation under the particular facts and

58

circumstances of this case of whether the proposed settlement class meets the requirements of Fed. R. Civ. P. Rule 23(a), and of Rule 23 (b)(2) and Rule 23 (b)(3).  It is important to note at the outset of this inquiry that there is a key difference in the Rule 23 evaluation depending upon whether a class is being certified for the purpose of litigating claims, or as here, for the sole purpose of an agreed-upon settlement of all claims.  Judge Anthony Scirica of the Third Circuit Court of Appeals succinctly described this difference in his recent concurring opinion to the *en banc* majority decision in *Sullivan v. DB Invs., Inc*. ("*Sullivan*"), 667 F.3d 273, 334-35 (3d Cir. 2011), *cert. denied sub nom. Murray v. Sullivan*, 132 S. Ct. 1876, 182 L.Ed. 2d 646  (2012):

> Because of the pivotal role and ensuing consequences of the class certification decision, trial courts must conduct a "rigorous analysis" of Rule 23's prerequisites.  *Wal-Mart Stores, Inc. v. Dukes*,___U.S.___, 131 S. Ct. 2541, 2551-52, 180 L. Ed. 2d 374 (2011); *In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 315-21 (3d Cir. 2008); *In re Initial Pub. Offering Secs. Litig*., 471 F.3d 24, 31-42 (2d Cir. 2006).  The same analytical rigor is required for litigation and settlement certification, but some inquiries essential to litigation class certification are no longer problematic in the settlement context. A key question in a litigation class action is manageability—how the case will or can be tried, and whether there are questions of fact or law that are capable of common proof. But the settlement class presents no management problems because the case will not be tried. Conversely, other inquiries assume heightened importance and heightened scrutiny because of the danger of conflicts of interest, collusion, and unfair allocation.  *See Amchem,* 521 U.S. at 620 ('[O]ther specifications of the Rule [23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context.')." (Footnote omitted.)

**A.    Satisfaction of the Requirements of Rule 23(a) of the Federal Rules of Civil Procedure.**

117.    Fed. R. Civ. P. Rule 23(a) establishes four requirements for class certification:  numerosity, commonality, typicality and adequacy of representation.  As the United States Supreme Court observed in *Wal-Mart Stores v. Dukes ("Wal-Mart")*, ___U.S. ___, 131 S. Ct. 2541, 2550, 180 L. Ed. 2d 374 (2011), "[t]he Rule's four

59

requirements--numerosity, commonality, typicality and adequate representation—'effectively "limit the class claims to those fairly encompassed by the named plaintiff's claims."' (Citations omitted.)" The Special Master finds that each of these requirements is present for the proposed Indirect Purchaser Settlement Class.

118.     Numerosity:  The requirement of numerosity is met when the putative class members are so numerous that joinder of all class members as parties is impracticable.  It goes without saying that joinder of all persons who purchased computers, other DRAM-containing devices and DRAM modules over a five-year period as parties to this litigation would be impracticable, if not impossible.  Where, as here, this finding can be based on common sense assumptions, it is not necessary for the record to contain the precise number of putative class members.  *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) ("*Rubber Chemicals*"); *In re Sugar Industry Antitrust Litig.* ("*Sugar Industry*"), MDL Dkt. No. 201, 1976 WL 1374, at *12 (N.D. Cal. 1976).  In support of their motion for preliminary approval of the Samsung and Winbond Settlements, Settling Plaintiffs filed declarations that estimated the number of indirect purchasers of DRAM in the United States during the proposed class period as being in the tens of millions.[92]

119.     Commonality:  The commonality requirement is satisfied when "there are questions of law or fact common to the class."  Rule 23(a)(2).  Almost forty years ago, the Ninth Circuit described the commonality inquiry to be an assessment of whether "the class is united by a common interest in determining whether a defendant's course of

---

[92] Declaration of Josef D. Cooper in Support of Preliminary Approval of Class Action Settlements with Samsung and Winbond Defendants, filed October 10, 2007 (Dkt.No. 1747-9) at ¶ 12 and Declaration of Blake L. Harrop in Support of Preliminary Approval of Class Action Settlements with Samsung and Winbond Defendants, filed October 10, 2007 (Dkt.No. 1747-10) at ¶ 9.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

conduct is in its broad outlines actionable." *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975). The Supreme Court last year described this concept in similar terms as a requirement that the class's claims "must depend upon a common contention" which must be "of such a nature that it is capable of classwide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the [class members'] claims in one stroke." *Wal-Mart*, 131 S.Ct. at 2551. Because the overwhelmingly common questions in this litigation involves the truth or falsity of the existence, scope and effect of the Defendants' alleged price-fixing conspiracy, "[c]ourts consistently have held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *Rubber Chemicals*, *supra*, 232 F.R.D. at 351 (quoting *Sugar Industry*, 1976 WL 1374, at *13) (internal quotations omitted). The appropriateness of the trial court's focus on whether each class member's claim is grounded in the same alleged antitrust violation as the named plaintiff's was confirmed by Judge Scirica's concurrence in *Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011). There, he noted that:

> "[c]ommonality for a settlement class should be satisfied under the standard for supplemental jurisdiction first set forth in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966), allowing joinder of claims deriving from a common nucleus of operative fact. *See also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, __ U.S. __, 130 S. Ct. 1431, 1443, 176 L. Ed. 2d 311 (2010), (Scalia, J., plurality opinion) ('A class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits.')."

*Id.* at 335 (Scirica, C.J., concurring).

120.   There are numerous questions of law and fact that are common to all members of the Indirect Purchaser Settlement Class, most of which are the same questions that this Court previously found were common to the class of direct purchasers

61

of DRAM:  "The existence, scope, and efficacy of the conspiracy to fix or stabilize prices of DRAM . . . are common questions that all plaintiffs must address."  *In re Dynamic Random Access Memory Antitrust Litig.,* (" *In re DRAM Direct Litig.*"), No. M 02-1486 PJH, 2006 U.S. Dist. LEXIS 39841, at *24 (N.D. Cal. June 5, 2006).  Other common issues include:  (1) the appropriate measure of damages suffered by the class members; (2) whether Defendants' conduct violates the antitrust, unfair competition and consumer protection laws of the states alleged in various complaints; and (3) whether the class is entitled to injunctive relief and the appropriate nature of class-wide equitable relief.

121.    Typicality:  The requirement of typicality is present when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  "Typicality determines whether a sufficient relationship exists between the injury to the named Plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct."  *Oregon Laborers-Employers Health & Welfare Trust Fund v. Phillip Morris, Inc.*, 188 F.R.D. 365, 373-74 (D. Ore. 1998) (internal quotations and citations omitted). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1988).

122.    The Supreme Court noted in *Wal-Mart*, 131 S.Ct. 2551, n.5:

[t]he commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

62

Courts have generally found the typicality requirement to be satisfied by the "elements [of] a [price-fixing] conspiracy, its effectuation and resulting damages." *In re Chlorine & Caustic Soda Antitrust Litig.,* 116 F.R.D. 622, 626 (E.D. Pa. 1987); *see also Rubber Chemicals*, 232 F.R.D. at 351. Similarly, this Court held in certifying the class of direct DRAM purchasers: "In cases involving an alleged price fixing conspiracy, the representative plaintiff is usually considered typical even though the plaintiff followed different purchasing procedures, purchased in different quantities or at different prices or purchased a different mix of products than did the members of the class.* * * [T]here is substantial legal authority holding in favor of a finding of typicality in price fixing conspiracy cases, even where differences exist between plaintiffs and absent class members with respect to pricing, products and/or methods of purchasing products." *In re DRAM Direct Litig., supra*, 2006 U.S. Dist. LEXIS 39841 at *24.

123.     To prevail on their claims at trial, Plaintiffs and members of the proposed Indirect Purchaser Settlement Class alike would need to establish the existence, scope and efficacy or impact of the alleged conspiracy. Thus, the typicality requirement of Rule 23(a)(3) is satisfied.

124.     Adequacy of Representation:  The fourth requirement of Rule 23(a) mandates that the representative plaintiff(s) fairly and adequately represent the class. As the *Wal-Mart* Court recognized the commonality and typicality "requirements . . . also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest." *Wal-Mart*, 131 S.Ct. at 2551 n.5. The Ninth Circuit in *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) defined the adequacy inquiry similarly as a combination of elements of commonality and typicality, with a particular focus on the

63

potential for conflicts of interest between the proposed class and those who seek to represent it: "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S. Ct. 1891, 52 L. Ed. 2d 453 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216, 94 S. Ct. 2925, 41 L. Ed. 2d 706 (1974)); see also *Amchem Prods. v. Windsor*, 521 U.S. 591, 625-26 (1997).  An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process for absent members of the class.  *Hanlon v. Chrysler Corp.* ("*Hanlon*"), 150 F.3d 1011, 1020 (9th Cir. 1998).

125.    The Plaintiffs and all members of the proposed Indirect Purchaser Settlement Class share the same interest in establishing Defendants' liability and recovering damages for the same nature of injury—overcharges in the prices of the DRAM that they purchased in computers, other DRAM-containing devices and DRAM modules.  *See*, *e.g., Petro* Complaint at ¶¶ 137, 270, 276, 280 and 310.  In the present context, this cohesion of interest also translates into sharing the same interest in achieving the global settlement of this litigation on terms that are highly favorable (as well as fair, reasonable and adequate) to the proposed class as a whole.

126.    The Indirect Purchaser Plaintiffs' Co-Lead Counsel, Liaison Counsel and the Chair of the Steering Committee (collectively "Counsel") are nationally-recognized attorneys who have successfully prosecuted numerous antitrust class actions.  They are personally known to the Special Master, who has observed their competence and skill both in these proceedings and in other antitrust litigation.  These Counsel are capable of, and committed to, vigorously prosecuting the Indirect Purchaser Settlement Class's

---

64

claims, a fact demonstrated by the magnitude of the proposed Settlements. The proposed Indirect Purchaser Settlement Class has also benefited from the advocacy of the Attorneys General in the prosecution of the various state *parens patriae* actions.

127.    The Indirect Purchaser Plaintiffs' Counsel also demonstrated the adequacy of their representation of the entire proposed Indirect Purchaser Settlement Class by alerting the Special Master to the fact that, during the litigation, their earlier focus had been on quantifying damages for the end-buyers of DRAM and DRAM-containing products.[93]   The Indirect Purchaser Settlement Class proposed herein however contains both resellers and end-buyers and accordingly, Counsel recognized that it would be necessary to craft a plan for distributing the net settlement proceeds to settlement class members in both groups. (Findings and recommendations regarding this plan of distribution are made in Section IX, below.)

128.    To provide the most vigorous representation practicable to both resellers and end buyers in the negotiation of the plan of distribution, and to avoid any appearance of a conflict of interest, separate representation of the resellers in the Indirect Purchaser Settlement Class was obtained in the form of Allocation Counsel appointed by the Special Master. *See, e.g., Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*, 654 F.3d 242, 249 (2d Cir. 2011) (in which the Second Circuit noted that case law has long provided that even a "fundamental" conflict within a proposed class can be cured by providing each interest group with "separate representation," citing, *inter alia, Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)).[94]   (For a full

---

[93]They informed the Special Master that, in their amended motion for certification of a litigation class, they had proposed to limit that class to end-buyers and offered expert testimony that this group had paid 100% or more of the total overcharges suffered by indirect purchasers of DRAM.

[94] As noted above, certain states also raised an issue with respect to whether the Indirect Purchaser Plaintiffs have standing to represent indirect purchaser consumers in those states.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

description of the process by which Allocation Counsel was selected and appointed, please refer to Section IX.B., below.)

129.    As detailed below in Section IX, Allocation Counsel, together with Counsel for putative reseller class member Celestica, prepared and submitted the work of expert economists that advanced opinions regarding the degree to which indirect purchaser resellers absorbed overcharges in DRAM and DRAM-containing devices and disputed and criticized the opinions advanced in the expert declaration that Co-Lead Counsel had previously filed with the District Court, as well as those contained in contemporaneous expert reports submitted on behalf of end-buyers by Co-Lead Counsel and the Attorneys General.

130.    As a result of this procedure, the Special Master finds that there was independent and vigorous representation of both indirect purchaser resellers and end-buyers in the process by which the proposed plan of distribution was determined, and this representation eliminated any potential for a conflict of interest between the end-buyer named plaintiffs and the reseller members of the proposed settlement class.  It fully satisfied the *Amchem* requirement[95] of "heightened scrutiny" to avoid the "danger of conflicts of interest, collusion, and unfair allocation" noted by Judge Scirica in *Sullivan* as the chief function of a court evaluating the certification of a settlement class. *See Sullivan*, 667 F.3d at 335.

///

---

However, the Special Master finds that issue need not be resolved because the settlement resolves all claims brought by all parties and it is not necessary to make findings concerning which attorneys represent which consumers.

[95] *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620 (1997).

66

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

**B.      Satisfaction of the Requirements of Rule 23(b)(2) of the Federal Rules of Civil Procedure.**

131.     In addition to satisfying Rule 23(a), certification of a class for purposes of obtaining injunctive and equitable relief requires a finding that "the party opposing the class has acted on grounds that apply generally to the class."  Rule 23(b)(2).  The use of the word "generally" in the rule eliminates any need to examine whether each and every putative class member can show that it comes within the sphere of the defendants' threat of future harm. [96]  As the Advisory Notes to the 1966 Amendment of Subdivision (b)(2) state, "[a]ction or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class."  The work of all of the expert economists submitted to the Special Master supports the conclusion that the Settling Defendants' alleged anticompetitive conduct in fixing and stabilizing the prices of DRAM sold to computer and other device OEMs, if allowed to continue, would threaten future harm generally to purchasers down the chain of distribution.

132.     The Indirect Purchaser Plaintiffs are settling all injunctive claims that the class members possess against Settling Defendants under the federal antitrust laws, including the entire range of relief that can obtained as part of such claims.  *See United States of America v. Keyspan Corporation*, *supra,* 763 F. Supp. 2d 633 (S.D.N.Y. 2011); *Oregon v. AU Optronics Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.),* MDL No. 1827, No. C 10-4346 SI, 2011 U.S. Dist. LEXIS 76562 (N.D. Cal. July 11, 2011).

---

[96]  In litigation, "to establish the need for injunctive relief, plaintiffs must generally demonstrate three uncomplicated prerequisites: 'a threat of loss'; that the injury in question 'is of the type the antitrust laws were intended to prevent'; and 'a significant threat of injury from a violation of the antitrust laws.' [*In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395 (3d Cir. 2000)] at 399 (citations & quotations omitted; alterations added)."  *Sullivan,* 667 F.3d at 317.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

Under the particular facts and circumstances of this case, the injunctive claims are sufficiently viable such that the certification of a nationwide class under Rule 23(b)(2) in order to execute a global release is appropriate.

133.    As will be noted below in the discussion of Rule 23(b)(3), the relative merits of the claims asserted and to be settled by the proposed settlement classes plays no role in the settlement class certification evaluation.  Accordingly, the Special Master makes no determination as to whether any Plaintiff or class member would ultimately prevail on any request for specified equitable relief in litigating the injunctive claims, only that such claims have been made in this litigation and may be settled on a class-wide basis no matter the range of relief requested for such claims.  For this reason, it is not necessary for the Special Master to determine whether in a litigation context the Supreme Court's holding in *Wal-Mart Stores, Inc. v. Dukes, supra*, 131 S. Ct. at 2552-57, would require any injunctive claims that may involve such relief to meet the certification criteria of Rule 23(b)(3) in lieu of Rule 23(b)(2).[97]

134.    It is sufficient here that certification of a settlement class under Rule 23(b)(2) is sought only because such a class has made an argument that their injunctive claims under federal law could include an ancillary order for relief requiring disgorgement or restitution.  That argument does not, in contrast to the Title VII back pay claims at issue in *Wal-Mart*, involve individual monetary claims as such; but rather constitutes nothing more than a claim that the Defendants' conduct entitles class members to a range of injunctive relief that could include ancillary restitution or disgorgement in order to satisfy the objective of restoring competition to a market.  *Cf.*

---

[97]  It should also be noted that *Wal-Mart* was a litigation class and therefore a central focus of the Supreme Court was the question of class-wide evidence to establish a Title VII violation for litigation purposes, issues that are absent for the settlement class here.

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 987 (9th Cir. 2011) (remanding the issue of certification of a (b)(2) class as the certification of such a class may still be appropriate where the relief sought focuses on the defendant's conduct, not on the individual characteristics or injuries of a plaintiff, such as in the case of punitive damages). The Special Master finds that he may, for settlement purposes, approve the certification of an injunctive class under Rule 23(b)(2) that includes the entire potential range of equitable relief that the Indirect Purchaser Settlement Class could have pursued under federal law had it continued to litigate this matter even if the certification of a similar injunctive class for litigation purposes may be questionable after *Wal-Mart*.

135.   In addition, the Indirect Purchaser Settlement Class is also settling injunctive claims under the California Unfair Competition Law and California Unfair Business Practices Act where those claims include the full range of equitable relief possible, including but not limited to restitution. The California Supreme Court has traditionally treated restitution as being ancillary to injunctive relief and thus as a component of the injunctive relief that a plaintiff could obtain under these state laws. *See e.g., ABC Internat. Traders, Inc. v. Matsushita Electric Corp.,* 14 Cal. 4th 1247, 1270 (1997) ("[S]ection 17535 . . . 'authorizes a trial court to order restitution . . . in order to deter future violations of the unfair trade practice statute and to foreclose retention by the violator of its ill-gotten gains.' [Citation omitted.]"); *Fletcher v. Security Pacific National Bank,* 23 Cal.3d 442, 452-53 (1979) ("[A] court of equity may exercise its full range of powers 'in order to accomplish complete justice between the parties, restoring if necessary the status quo ante as nearly as may be achieved.' (*People v. Superior Court (Jayhill Corp.),* 9 Cal. 3d 283, 286 (1973). As we stated recently, 'Even in the absence of the specific authorization contained in section 17535, a trial court has the inherent power to order restitution as a form of ancillary relief.' (*People v.*

*Pacific Land Research Co.* 20 Cal.3d 10, 19, fn. 9 (1977).") Though, as explained below, there are strong arguments in the litigation context both for and against application of California law on a nationwide basis, those claims are sufficiently viable at this point in time in the settlement context of this case that certification of a nationwide class is appropriate in order to execute the global release of these claims required by the settlement agreements.

136.   On March 9, 2011, the California Attorney General submitted a letter-brief on behalf of Settling Plaintiffs requesting a finding and recommendation that the injunctive relief secured by the settlements is "not moot" and is "appropriate and valuable."[98]   The Settling Plaintiffs stated that they were briefing this issue because they anticipated that an objection to the certification of the settlement classes might be made along the line of the one made in the *Sullivan* litigation.[99]   There, in the words of the *en banc* majority, "objectors asserted that the market for rough gem diamonds had become competitive during the course of the instant litigation, rendering an injunction to enforce compliance with antitrust laws superfluous, and divesting the Indirect Purchasers of antitrust standing to seek relief." *Sullivan*, 667 F.3d at 291.  As will be discussed further in Part III of the Special Master's Report and Recommendation on the award of fair and reasonable attorneys' fees and reimbursement of expenses, the Special Master finds that the injunctive relief obtained in the settlements here is not moot and is indeed both appropriate and valuable.

137.   However, following the reasoning of the *Sullivan en banc* majority, the Special Master also finds that such a determination is not necessary to the satisfaction of

---

[98] A copy of this letter-brief is attached as Exhibit 24 to the Appendix hereto.

[99] *Sullivan v. DB Invs., Inc.*, 613 F.3d 134, 156-58 (3rd Cir. 2010), *pet'n for reh'g en banc granted and opn. vacated*, 619 F.3d 287 (3rd Cir. 2010).

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

the requirements of Rule 23(b)(2). In the context of settlement class certification, the fact that the defendants have voluntarily agreed to take or refrain from taking certain actions that are class-wide in applicability itself establishes sufficient commonality to certify an injunctive settlement class. As the *Sullivan en banc* majority observed, "it is well established that 'parties to a suit have the right to agree to anything they please in reference to the subject matter of their litigation, and the court, when applied to, will ordinarily give effect to their agreement, if it comes within the general scope of the case made by the pleadings.' *Sansom Comm. by Cook v. Lynn*, 735 F.2d 1535, 1548 (3d Cir. 1984) (quoting *Pac. R.R. v. Ketchum*, 101 U.S. 289, 297, 25 L. Ed. 932 (1879) (quotations & alterations omitted))." *Sullivan,* 667 F.3d at 317. Similarly, there is no need to inquire into whether the particular injunctive relief obtained in settlement could have been awarded had the case gone to trial. "As the Supreme Court has recognized, a district court may 'provide broader relief in an action that is resolved before trial than the court could have awarded after a trial.'" *In re "Agent Orange" Prod. Liability Litig*., 818 F.2d 179, 185 (2d Cir. 1987) (quoting *Local No. 93, Int'l Assoc. of Firefighters v. City of Cleveland*, 478 U.S. 501, 525, 106 S. Ct. 3063, 92 L. Ed. 2d 405 (1986) (alterations omitted).

138.     In this case, the injunctive relief takes three forms: a ban on per se illegal activity, the institution of antitrust compliance programs that meet the specifications of the Settling Plaintiffs,[100] and a duty of cooperation with the Settling Plaintiffs. The Attorneys General submitted to the Special Master substantial evidence of the potential

---

[100] For those Settling Defendants (Hitachi, Toshiba and Mitsubishi) who had already exited the DRAM industry before the suits were filed by Indirect Purchaser Plaintiffs and Attorneys General, they need only institute a compliance program with specific requirements if (a) they do not already have a compliance program as a general matter, and (b) they do not re-enter the DRAM industry. This variance, reflecting their long-time exit from the industry, does not affect the appropriateness and value of the injunctive relief secured by Settling Plaintiffs.

for future injury absent the bans, including the limited nature of the federal plea agreements, the existence of alleged price-fixing of other products in ongoing cases against some but not all of the Settling Defendants, and the existence of changing market conditions that make the recurrence of the conspiracy plausible absent the bans on illegal *per se* conduct that they obtained.[101]   The ban itself on *per se* conduct is clear and understandable on its face, and its violation could enable the Settling Plaintiffs to ask for the imposition of severe penalties in a contempt proceeding in lieu of going through the burden and expense of filing a lawsuit.[102]   Although the ban is of short duration, lasting only three years from the date of execution of the settlement agreements, the Attorneys General point out that such a short duration is justified for two reasons: (1) the lapse of 10 years from the last date of the DRAM price-fixing conspiracy; and (2) the likely shift in technologies away from DRAM to other kinds of chips in 2014 and 2015.[103]

139.   The second aspect of the injunctive relief is the compliance training requirements imposed on all Settling Defendants.   For those Settling Defendants who are still involved in manufacturing DRAM (and thus still participate in the DRAM market), they are required to have in place or set up a compliance training program that will be vetted by the Settling Plaintiffs, with the Attorneys General taking the laboring oar.   Such industry-wide compliance training for all Settling Defendants ensures better

---

[101] *See* Mar. 9, 2011, Letter to Special Master (Exhibit 24); *see also* Dr. Kenneth Flamm, Expert Report Concerning Factors Affecting a Price-Fixing Conspiracy, *State of California et al. v. Infineon Technologies et al.* (No. 06-4333 PJH) (Mar. 5, 2010).

[102] *See United States v. Microsoft*, 143 F.3d 935, 940 (D.C. Cir. 1998); *accord*, *FTC v. Kuykendall*, 371 F.3d 745, 763 (10th Cir. 2004).

[103] *See* Mar. 9, 2011, Letter to Special Master (Exhibit 24) (citing articles as to the developments of alternatives to DRAM such as memristors and phase-change memory).

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

knowledge of, and compliance with legal requirements for ensuring a competitive market for DRAM.[104]

140.    The cooperation requirements, though they differ slightly in the various settlement agreements, all have a common core in that they are designed to facilitate the introduction of evidence at trial, including providing access to employees for deposition and trial, assisting in locating former employees and providing witnesses who can testify to the amount of sales and testify regarding the authenticity and genuineness of documents, as well as establish their admissibility as business records.  While the critical nature of this relief arguably declined as the litigation progressed toward global settlement, it is not without import today.  Should a Settling Defendant terminate its Settlement Agreement, these provisions will become a very important part of the Settling Plaintiffs' trial preparation against that defendant and facilitate the seamless introduction and use of documents and data and the presentation of fact witnesses.[105]  In addition, reason dictates that the Settling Defendants' awareness that these cooperation provisions are in place acts as a deterrent to their withdrawing from the Settlement Agreements.

///

---

[104] *See, e.g.,* Machiraju, *When Hot Docs Set Your Company on Fire: Expanding the Role of General Counsel in Managing Antitrust Risk*, 22 Geo. J. Legal Ethics, 997, 1004-05, 1007 (2009).  Although those compliance training requirements as such do not apply to Hitachi, Toshiba and Mitsubishi unless they reenter the DRAM market, all three are still required to certify that they do have antitrust compliance training programs in place in their corporate headquarters.  Even such a limited certification plays its part in helping disseminate knowledge of competitive norms and preventing a repeat of the DRAM price-fixing conspiracy in other industries.

[105]  *See* Mar. 9, 2011, Letter to Special Master (Exhibit 24); *see also* Majoras, *You Too Can Win Antitrust Cases: The Myths and Realities of Trying An Antitrust Case to a Jury*, Antitrust Source, 1-2, 8-9 (June 2009).

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

141.    The nature of the injunctive relief obtained in the Settlement Agreements and the nature of the claims for other equitable relief is common to all members of the Indirect Purchaser Settlement Class and addresses and arises from behavior by the Settling Defendants that applies generally to the class.  Accordingly, the Special Master finds and recommends that the requirements of Rule 23(b)(2) are met for the certification of the proposed Indirect Purchaser Settlement Class for the purpose of settling their claims for injunctive relief and other ancillary equitable relief.

## C.    Satisfaction of the Requirements of Rule 23(b)(3) of the Federal Rules of Civil Procedure.

142.    In addition to the proposed class satisfying Rule 23(a), a class seeking damages must also satisfy the requirements Rule 23(b)(3).  This requires a determination that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

143.    In evaluating the certification of a settlement class, "[j]udicial economy and fairness are the focus of the predominance and superiority requirements."  *Oregon Laborers-Employers,* 188 F.R.D. at 375. "'Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy.' *Valentino*, 97 F.3d at 1234."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (citing *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996)).  Unlike class certification for litigation purposes, however, the judicial economy at issue for a settlement class is obtained through the effectuation of the settlement itself, rather than through a trial of the class's claims.  This difference caused the Ninth Circuit to observe that for a settlement class, "certification pursuant to Rule 23(b)(3) . . . is appropriate 'whenever the actual interests of the parties can be

74

served best by settling their differences in a single action.'" *Hanlon, supra*, 150 F.3d at 1022 (quoting 7A Wright & Miller, *Federal Practice & Procedure* § 1777 (2d ed. 1986)).

144.    As will be discussed below, the Special Master finds that the common questions of fact and law noted above predominate over any individual questions affecting members of the Indirect Purchaser Settlement Class, and the requirements of Rule 23(b)(3) are satisfied.  The Special Master is guided in this finding by this Court's conclusion that the alleged conduct of the Settling Defendants raised liability questions that are common to the settlement class of direct purchasers.[106]  There is no reason to distinguish that decision from applicability to the proposed Indirect Purchaser Settlement Classes given the ubiquitous and nationwide nature of the alleged price-fixing conspiracy.[107]

145.    To satisfy Rule 23(b)(3), common questions need only predominate; they do not need to be dispositive of the litigation as a whole.  *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 339 (E.D. Mich. 2001).  Thus, the predominance standard is met "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless."  *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996).

146.    It has long been accepted that the predominance test is "readily met" in horizontal price-fixing antitrust cases such as the instant case.  *Amchem,* 521 U.S. at 625; *see also, In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3rd Cir. 2004).

---

[106] *In re DRAM Antitrust Litig.*, 2006 WL 1530166 at *7.

[107] *Cf. Sullivan* at 301 (noting that both of the proposed classes of direct and indirect purchasers were harmed by the international price-fixing activities of the settling defendants).

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

147.     In this litigation, there is a single unifying (and for purposes of settlement under the particular facts and circumstances of this case, viable) damage claim asserted on behalf of all members of the proposed Indirect Purchaser Settlement Class under the California Cartwright Act that provides predominating issues of both fact and law for the proposed Indirect Purchaser Settlement Class.  California state courts have certified nationwide classes for settlement purposes in unfair competition actions where the allegedly illegal conduct has a nexus to California.  *See, e.g., Wershba v. Apple Computers, Inc.*, 91 Cal. App. 4th 224, 241-42 (2001) (class action settlement based on California's unfair competition and consumer legal remedies laws could include out-of-state class members where nexus of conduct was in California), and *Clothesrigger, Inc v. GTE Corp.*, 191 Cal. App. 3d 605, 612-16 (1987) (class action settlement could involve nationwide class under California's laws). The Special Master has reviewed a letter-brief submitted by the California Attorney General regarding the extraterritorial application of the Cartwright Act, in which the California Attorney General set out an extensive and detailed factual nexus between the alleged DRAM price-fixing conspiracy and California. [108]  It appears to the Special Master that all members of the Indirect Purchaser Settlement Class have alleged a sufficiently viable claim and therefore have established a sufficient possibility of recovering damages under California law such that the interests of the parties can be served best by receiving value for the settling and global release of those claims in a single action via the certification of a nationwide settlement class encompassing those claims.  *See Hanlon, supra*, 150 F.3d at 1022.  The Special Master notes that the question of whether California antitrust and antitrust-

---

[108] See also, the cases cited and discussion in the California Attorney General's submission to the Special Master dated March 25, 2011, a copy of which is attached as Exhibit 25 to the Appendix hereto.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

related unfair competition claims can be extended in extraterritorial fashion nationwide, no matter the factual nexus, is being vigorously litigated before the Ninth Circuit.[109] However, in the absence of final appellate precedent adverse to the claims being settled, and potentially even in the face of such precedent, the claims retain value for purposes of their settlement and release.[110]

148.    In addition to the shared Cartwright Act claims, the Indirect Purchaser Settlement Class's federal common law claims for disgorgement of the fruits of the Settling Defendants' antitrust violations provides an independent basis for certification of the settlement class under Rule 23(b)(3).  Although the Special Master has concluded that these claims under federal and California law may be certified pursuant to Rule 23(b)(2), it is also appropriate under the most narrow construction of *Wal-Mart* to certify the disgorgement claims under Rule 23(b)(3), which provides class members with the opportunity to exclude themselves.  Common questions indisputably predominate with regard to these claims that focus solely on the alleged behavior of the Settling Defendants and the benefits that they reaped from that behavior.

149.    The nationwide Indirect Purchaser Settlement Class's Cartwright Act damage claims and their federal common law and California law disgorgement claims

---

[109] *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 1827, 2010 WL 2609434 (N.D. Cal. June 28, 2010), Order Granting Plaintiffs' Motion to Certify for Interlocutory Appeal, *supra* (N.D. Cal. Mar. 4, 2011).  The appeal, captioned *AT&T Mobility LLC v. AU Optronics Corporation*, No. 11-16188, was set for oral argument on November 9, 2012.

[110] Both the Second and Third Circuits have found class settlements permissible even where subsequent legal developments conclusively invalidated the underlying claims.  *See, e.g., Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010) (retroactive statutory amendment to eliminate private right of action did not operate to preclude final approval of class settlement by the court because the parties' negotiated agreement remained an enforceable contract); *In re Stock Exchange Antitrust Litig.*, 317 F.3d 134, 150-51 (2d Cir. 2003) (court had jurisdiction to entertain motion for settlement of antitrust claims even though affirmative antitrust immunity defense had merit).

are sufficient to establish that common questions predominate and therefore it is proper to certify the proposed settlement class pursuant to Rule 23(b)(3).  However, the Special Master finds that it is appropriate to also address the issue of the settlement class certification of putative class members' claims for damages under various other state antitrust and consumer protection laws, if for no other reason than these findings provide much of the basis for the Special Master's recommendation of a classwide *pro rata* plan of distribution.  *See, infra*.

150.   Without regard to the Cartwright Act, or federal common law or California law disgorgement claims, and considering only the other state law damage claims, the Special Master finds that the common nucleus of operative facts underlying each of these claims provides a core of common factual questions which predominate over any individual questions of state law recovery, and which are independently sufficient to support certification of the Indirect Purchaser Settlement Class under Rule 23(b)(3) for purposes of settlement, especially here, where the AG-only states and other states with *parens* authority have executed settlement agreements contingent on the certification of a class that includes their citizens.

151.   The Rule 23(b)(3) predominance inquiry in the context of the certification of a nationwide indirect purchaser settlement class involving various state antitrust and consumer protection law claims was recently the subject of an extensive *en banc* decision by the Third Circuit in *Sullivan v. DB Investments, Inc.,* 667 F.3d 273 (3d Cir. 2011), *cert denied sub nom. Murray v. Sullivan*, 132 S.Ct. 1876, 182 L.Ed. 2d 646 (2012).  This litigation, like *Sullivan*, joins in a single settlement class, indirect purchasers whose claims are subject to "variations in the rights and remedies available to injured class members under the various laws of the fifty states."  *Id*. at 301 (internal

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

quotation marks omitted). This does not, however, defeat a finding of predominating common issues. "This is so because a finding of commonality does not require that all class members share identical claims, and predominance is not considered deficient merely because claims were subject to the [varying] laws of fifty states." *Id*. (internal quotation marks and citations omitted).

152.    The predominance inquiry focuses on whether the claims to be aggregated for release by a class action settlement arise from a common nucleus of operative facts pre-existing the settlement and whether the class members seek redress for economic injury of the same nature. By its use of the disjunctive "or" in the phrase "common questions of law or fact," Rule 23(b)(3) presupposes that class members may possess differing claims subject to the vicissitudes of individual legal requirements so long as these claims raise common questions of fact that singly or collectively predominate over questions affecting only individuals. "[I]diosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate . . . ." *Hanlon*, *supra,* 150 F.3d at 1022-23. In *Hanlon*, the predominating common question was Chrysler's use of a defective door latch on a variety of minivans sold nationwide. Its common solution was the replacement of all class members' door latches with safe ones. This common problem, calling for a common solution, predominated over variations in the laws governing the requirements of the individual's claims. *Id.*[111] What matters is whether the proposed settlement encompasses claims

---

[111] The most significant problem presented by certification of a nationwide class based on disparate state-law claims is grouping them for trial according to their elements of proof, a problem that is absent in the settlement context. But, even with litigating claims arising under states' tort laws, courts have found that "state law does not need to be universal in order to justify nationwide class certification." *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 292 (S.D. Ohio 1997). In *Telectronics*, the court addressed variations in state laws invoked for redress by looking for substantial similarity in the "important/meaningful/ significant/pivotal" issues raised by the respective claims to designate trial subclasses. The same technique was

79

arising from a common core of operative facts and extinguishes the claims of absent

class members only in return for fair and reasonable compensation.  In rejecting an

appeal from the certification of a settlement class, the Ninth Circuit held that the

requisite commonality of issues was present because there was

> a common core of salient facts coupled with disparate legal remedies within the
> class.  Although members of the proposed class in this instance may possess
> different avenues of redress, their claims stem from the same source:  the
> allegedly defective designed rear liftgate latch installed in minivans
> manufactured by Chrysler between 1984 and 1995.

*Id*. at 1019-1020.  The *Hanlon* court found that the issues arising from the adjudication

of this "common nucleus of facts" coupled with the common nature of the injury alleged

(claims based on personal injury and wrongful death having been excluded from the

class action) predominated over any variations in state consumer protection laws.  *Id*. at

1023.

153.    As the *Sullivan* court found, "[p]redominance under Rule 23(b)(3) cannot

be reduced to a mechanical, single-issue test; rather, [a]s long as a sufficient

constellation of common issues binds class members together, variations in the sources

and application of applicable laws will not foreclose class certification."  *Sullivan,* 667

F.3d at 301 (internal quotation marks and citations omitted).  The *Sullivan* court

concluded that "[t]hus, it is not surprising that we can find no support in our Court's

jurisprudence for the proposition that commonality and predominance are defeated

merely because available rights and remedies differ under the several laws that form the

basis for the class claims."  *Id*.  Further, in the context of a settlement class certification,

the *Sullivan* court concluded that trial courts "simply need not inquire whether the

varying state treatments of indirect purchaser damage claims at issue would present the

applied to organize common issues arising in all cases for class-wide trial in *In re Copley
Pharmaceutical, Inc*., 161 F.R.D. 456, 465-67 (D. Wyo. 1995).

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

type of 'insuperable obstacles' or 'intractable management problems' pertinent to certification of a litigation class." *Sullivan* at 303-304 (citation omitted).  This is because "[t]he proposed settlement here obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws, and 'the difference is key.' *Warfarin*, 391 F.3d at 529." *Id*. at 304.  Therefore, *Sullivan* concludes, "state law variations are largely 'irrelevant to certification of a settlement class.' *Warfarin*, 391 F.3d at 529." *Id*.[112]

154.     The central issue in *Sullivan* was whether a single settlement class could be certified that contained persons with claims arising under the laws of "non-repealer" states that follow the Supreme Court's holding in *Illinois Brick v. Illinois*, 431 U.S. 720 (1977) ("*Illinois Brick*"), along with persons whose claims arose under the laws of "repealer" states that do not follow *Illinois Brick*.  *Illinois Brick* concerned proof of injury in federal antitrust cases.  Specifically, the Supreme Court applied the prohibition on the "defensive" use of pass-on in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), to likewise prohibit the "offensive" use of pass-on evidence to establish antitrust liability.  After *Illinois Brick*, a downstream customer was not permitted to establish that the defendant had injured him using proof that he had

---

[112] This eliminates the need for courts considering settlement class certifications to grapple with such issues as whether or how the fact of damage, or "antitrust impact," could be proved on a classwide basis in order to find that common issues predominate.  Proof of injury has no practical application if the defendant has offered compensation to all class members and the case is not going to be tried.  It therefore falls within the ambit of the manageability concerns that *Amchem* teaches need not hamper a certification for settlement purposes.  The Special Master therefore merely notes in discussing the certification of a nationwide class of indirect purchasers that the plaintiffs here contend that, as to the settlement class's Cartwright Act claims, *Clayworth v. Pfizer*, 49 Cal. 4th 758 (2010) settled any doubt that indirect purchasers of an allegedly price-fixed good or service may assert the inference or presumption of injury arising from evidence of the price-fixing that was recognized in *In re New Motor Vehicle Canadian Export Antitrust Litig.*, 235 F.R.D. 127, 135 (2006); *In re Cipro Cases I & II*, 121 Cal. App. 4th 402, 412-14 (2004); and *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341, 1350-51 (1987).

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

paid an illegal overcharge that was passed-on to him by an intermediary purchaser of the defendants' product, just as *Hanover Shoe* prevented a defendant from defending an antitrust claim with evidence that the plaintiff had passed on the alleged overcharge to its downstream customers.  The Supreme Court found that to permit antitrust recovery through proof of pass-on damages would require it to overrule *Hanover Shoe,* whose rationale "that the attempt to trace the complex economic adjustments to a change in the cost of a particular factor of production would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings applies with no less force to the assertion of pass-on theories by plaintiffs than it does to the assertion by defendants."  *Illinois Brick,* 431 U.S. at 729.

155.    *Illinois Brick* had the effect of eliminating federal antitrust recovery for most indirect purchasers of price-fixed goods and services.  Thereafter, various state courts and legislatures considered whether to apply *Illinois Brick* to their own state laws.  Approximately half of the states in the country either enacted statutes conferring on indirect purchasers the right to recover for damages passed on to them, or have issued court decisions that permit such recovery under state antitrust laws and/or consumer protection statutes.  Such states are commonly referred to as *Illinois Brick* "repealer" states.  In the other states, the legislatures have not acted and their courts have held that state policy requiring their antitrust laws to be construed in keeping with federal precedent compels them to follow *Illinois Brick*.  These states are commonly known as "non-repealer" states.[113]

---

[113] There is also a third category of states that have enacted "repealer" statutes that either permits only the Attorney General to sue on behalf of indirect purchasers, or limits class actions on behalf of indirect purchasers to those where the Attorney General is the proposed class representative.  These are the "AG-only states" referred to in Section III.B., above.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

156.    The *Sullivan* holding is grounded in the fact that the impediment to

indirect purchaser recovery in *Illinois Brick* is fundamentally a rule of proof.  The

*Illinois Brick* court articulated its holding as "declin[ing] to construe § 4 to permit

offensive use of a pass-on theory against an alleged violator that could not use the same

theory as a defense in an action by direct purchasers."  *Id*. at 735.  Thus, *Illinois Brick*

created a fact-specific bar to certain claims of antitrust injury.[114]  Nonetheless, as the

*Sullivan* court observed, the *Illinois Brick* prohibition on establishing injury with proof

of pass-on damages is "often confusingly" referred to as the failure of "a statutory

standing requirement."  *Sullivan*, 667 F.3d at 307.[115]  However, as the *Sullivan* Court

held, the many cases adjudicating *Illinois Brick's* application to individual fact patterns

demonstrate that the potential lack of *Illinois Brick* "standing" does not prevent an

indirect purchaser from "establish[ing] a justiciable case or controversy" in a federal

court.  *Sullivan* at 307.[116]

---

[114] The *Illinois Brick* Court provided two examples of situations that fall outside of its scope: where the indirect purchaser had "a preexisting cost-plus contract" and "where the direct purchaser is owned or controlled by its customer," and left open the door for courts to permit recovery in "[a]nother situation in which market forces have been superseded" so that traditional notions of "pass-on" are not required to demonstrate injury to the indirect purchaser.  *Id*. at 736 and n.16.

[115] "Because we find *Hanover Shoe* dispositive here, we do not address the standing issue, except to note, as did the Court of Appeals below, 536 F. 2d at 1166, that the question of which persons have been injured by an illegal overcharge for purposes of § 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4."  *Id*. at 728 n.7.

[116] Since 1977, there have been numerous examples of cases adjudicating the application of *Illinois Brick* to the claims of various individuals and putative classes.  See, e.g., *Palmyra Park Hosp. Inc. v. Phoebe Putney Memorial Hosp*., 604 F.3d 1291, 1303-07 (11th Cir. 2010) (holding that the plaintiff, a competitor of the defendant, had standing to assert a Section 2 claim even though the plaintiff never dealt directly with the defendant); *In re Lower Lake Erie Iron Ore Antitrust Litig*., 998 F.2d 1144, 1167-68 & n.21 (3d Cir. 1993) (holding that *Illinois Brick* does not "announc[e] a strict prohibition against recovery by indirect purchasers" and proceeding with a fact-based inquiry into its applicability in that case).

---

83

157.    Thus, the *Sullivan* Court found that since *Illinois Brick* "affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court," (citing *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008)), it is "simply another element of proof for an antitrust claim," and hence, may be waived by a settling defendant. *Sullivan* at 307, quoting *Hammes v. AAMCO Transmissions, Inc.,* 33 F.3d 774, 778 (7th Cir. 1994) ("[D]espite the suggestive terminology, 'antitrust standing' is not a jurisdictional requirement and is therefore waivable."). Accordingly, the Special Master finds that the presence of purchasers with claims arising under both repealer and non-repealer state antitrust and consumer protection statutes presents no impediment to a finding that common questions predominate and the Indirect Purchaser Settlement Class satisfies the requirements of Rule 23(b)(3).

158.    The question of whether a settlement class can include persons whose claims might be defeated by a failure of proof other than under the *Illinois Brick* prohibition was also considered by the Special Master. The proposed Indirect Purchaser Settlement Class contains purchasers of DRAM as a component in a computer or other DRAM-containing device.[117] As stated above, the Indirect Purchaser Plaintiffs' claims for DRAM purchased as an installed component of another product were dismissed by this Court for lack of antitrust standing in the above-referenced AGC Order. The Samsung and Winbond settlements were signed before the AGC Order was entered, and the Multi-Defendant and subsequent settlements were signed while an interlocutory appeal from the AGC Order has been pending.[118] However, case law has long

---

[117] This is also true of the Government Purchaser Settlement Classes.

[118] It should also be noted that at the time the AGC Order was entered, this Court was deciding a question of first impression and did not have the benefit of the California Supreme Court's decision in *Clayworth v. Pfizer*, 49 Cal. 4th 758, or the thinking of other federal district courts which have subsequently declined to similarly apply *Associated General Contractors* to the Cartwright Act and various other state indirect purchaser laws. S*ee, e.g., In re Cathode Ray*

84

recognized the ability to settle claims that had been previously dismissed on the merits,

whether or not they were the subject of an active appeal.  For example, in a very similar

situation, the district court in *In re New Motor Vehicles Canadian Export Antitrust*

*Litigation*, 269 F.R.D. 80, 88 (D. Me. 2010), certified a settlement class of indirect

purchasers whose Sherman Act claims had been previously dismissed for lack of

antitrust injury under *Illinois Brick*, holding that "whether these plaintiffs and the class

they represent have any right to recover" by appealing the dismissal of their Sherman

Act claims constituted a question common to the class that supported certification for

settlement purposes.  *See also, e.g., In re Insurance Brokerage Antitrust Litig.,* 579 F.3d

241, 249-50, 285 (3d Cir. 2009) (affirming certification of a settlement class based on

Sherman Act, RICO and other claims, despite the dismissal of identical or nearly

identical claims brought against non-settling defendants); *In re Air Cargo Shipping*

*Services Antitrust Litigation*, MD-06-1775, 2009 U.S. Dist. LEXIS 88404 (E.D.N.Y.

Sept. 25, 2009), (certifying a settlement class and approving the settlement of claims that

---

*Tubes Antitrust Litig.*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010); *In re Flash Memory Litig.,* No. C 07-0086 SBA, 2009 U.S. Dist. LEXIS 38941 (N.D. Cal. Mar. 31, 2009); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008); *In re Graphics Processing Unit Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007).  In addition, the AGC Order was not applied to the *parens patriae* claims of the Attorneys General, which are being settled in conjunction with the class action claims, and *Associated General Contractors* cannot in the views of many of those Attorneys General as expressed to the Special Master, be extended to the *parens patriae* claims of a number of them in this litigation.  *See, e.g., In re Tobacco Cases II*, 46 Cal. 4th 298, 305, 314 (2009) (actions of California Attorney General under Unfair Competition Law not subject to standing requirements); THE STATE BAR OF CALIFORNIA ANTITRUST AND UNFAIR COMPETITION LAW SECTION, CALIFORNIA STATE ANTITRUST LAW AND UNFAIR COMPETITION LAW, § 14.02 [E], 514-15 (2009 ed.) (doubtful that *AGC* standing requirement applies to *parens patriae* antitrust claim of California Attorney General given federal precedent on issue).

For the reasons discussed above, *Sullivan* teaches that courts need not wade through the comparative merits of these decisions when certifying a settlement class whose claims, regardless of comparative strengths or weaknesses, all arise from a common core of conduct and seek redress for the same type of economic harm.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

it had previously dismissed as preempted by the Airline Deregulation Act).[119]  Applying

the reasoning of the *Sullivan* majority, as well as the guidance of the precedent cited

above, the Special Master concludes that the existence of the AGC Order presents no

impediment to the ability of the Indirect Purchaser Settlement Class to satisfy the

predominance requirement of Rule 23(b)(3).

159.    The Special Master also finds that the settlement of the claims of the

proposed class as a single action is superior to the maintenance of a myriad of individual

actions.  The superiority inquiry traditionally requires a consideration of four factors:

the individual interest of members of the class in maintaining their own actions; the

extent and nature of any litigation commenced by or against the class; the desirability of

concentrating claims in a particular forum; and the difficulties likely to be encountered

in the management of the class action.[120]  The fourth factor – manageability – is of no

concern in the settlement context for the proposal is that there be no trial.[121]  There is no

evidence that members of the Indirect Purchaser Settlement Class have any interest in

conducting individual actions, beyond those few parties who are already pursuing

individual actions.

160.    As to the desirability of concentrating the claims to be settled in this

forum, courts have consistently recognized the important public policy goals that are

furthered by permitting global class action settlements.  *See, e.g., In re Prudential Ins.

Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366 (3d Cir. 2001) (quoting *TBK*

---

[119] *In re Air Cargo Shipping Services Antitrust Litigation*, MD-06-1775, 2008 U.S. Dist. LEXIS 107882, *124, 206 (E.D.N.Y. Sept. 26, 2008), *rec. adopted*, 2009 U.S. Dist. LEXIS 97365 (E.D.N.Y. Aug. 21, 2009).

[120] *See* Fed. R. Civ. P. 23(b)(3); *cf. In re DRAM Antitrust Litig.*, 2006 WL 1530166, at *10-11 (in litigation context).

[121] *Amchem*, 521 U.S. at 620.

86

*Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982) (holding that a class action settlement release could bar the relitigation of all claims arising out of the "same nucleus of operative facts" even if those claims were not actually litigated in the class action because that rule "serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that 'prevent relitigation of settled questions at the core of a class action.'")); *Sullivan*, 667 F.3d at 310-311 ("[w]e need not take judicial notice of the fact that plaintiffs with non-viable claims do nonetheless commence legal action," and "that release of all claims serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that prevent relitigation of settled questions at the core of a class action.") (internal quotation marks and citation omitted).  This is especially important where, as here, we have settlements that, taken together, encompass all of the Defendants involved in this alleged price-fixing conspiracy and all of the diverse Plaintiffs who brought independent and valid indirect purchaser claims against those Defendants, including both class claims and Attorneys General's *parens* claims.

**D.    The Question of the Need For Subclasses**

161.    Finally, the Special Master also considered the question of whether it is necessary to create subclasses within the Indirect Purchaser Settlement Class in order to meet the requirements of Rule 23(b)(3).

162.    In a settlement class certification, the need for subclasses is triggered by conflicts within the class relating to the burdens of the settlement and/or the distribution of the settlement proceeds.  This is true because the sole purpose of certifying a settlement class is to effectuate the terms of the settlement.  *See, e.g.,* the Second Circuit's description of when conflicting interests require subclasses in *Literary Works*

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

*in Elec. Databases Copyright Litig. v. Thomson Corp.*, 654 F.3d 242, 250 (2d Cir. 2011):

> The two subgroups in *Amchem* had competing interests in the distribution of a settlement whose terms reflected "essential allocation decisions designed to confine compensation and to limit defendants' liability." *Id.* at 627.  Some of those allocation decisions - for example, to cap the annual number of opt-outs, and not to adjust for inflation - disadvantaged exposure-only plaintiffs.  Although the named parties all "alleged a range of complaints," none exclusively advanced the particular interests of either subgroup; "each served generally as representative for the whole, not for a separate constituency." *Id.*

As the above description demonstrates, the question of settlement subclasses is tied to the question of whether fundamental differences exist within the class as to essential allocation (or scope of release) decisions that result in the settlement benefitting some class members to the disadvantage of others.  This is not to say that such an allocation (or release) may not be appropriate, only that the particular interests of the subgroups must be fairly and fully represented in the decision-making process.  *Id*. at 253.

163.    It is also not the law that every different situation between groups of class members triggers the need for subclasses, even where such differences are reflected in allocation decisions.  *See, e.g., Staton v. Boeing Co.*, 313 F.3d 447 (9th Cir. 2002) (affirming the district court's decision not to certify subclasses, but remanding for further consideration of the fairness of a tiered distribution plan).  As the Third Circuit noted in *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 343 (3d Cir. 2010), a case where it found subclasses were most likely necessary to ensure adequate representation of all potential settlement claimants' interests, there must be a "careful balancing of the costs and benefits . . . when deciding to certify a subclass."[122]  This caution against the

---

[122]  Interestingly, no settlement subclasses were ever certified in the *Pet Food* litigation.  The district court interpreted its mandate from the circuit as an instruction "'to determine whether the $250,000 allocated to Purchase Claims was fair, reasonable and adequate.'  (Third Cir. Op. at 55-56.)" rather than an instruction to certify subclasses.  It therefore requested briefing from all

over-use of subclasses was echoed recently in *Sullivan*, where the Third Circuit found that subclasses are not required because "the plan of allocation 'was carefully devised to ensure a fair distribution of the settlement fund,' and in that case, as here, the plan 'merely created a structure for ensuring that reimbursement [was] tied to the extent of damages incurred.' Id. at 272." *Sullivan*, 667 F.3d at 327 (quoting *In re Insurance Brokerage Antitrust Litig., supra*, 579 F.3d at 272).

164.    As will be discussed in Section X, below, in crafting the plan of distribution for the Indirect Purchaser Settlement Class, the Special Master finds that both the procedures employed, specifically the appointment of Allocation Counsel to advance the separate interest of the resellers within the settlement class and the direct participation of significant reseller class members, as well as the terms of the negotiated plan of distribution for the Indirect Purchaser Settlement Class resulted in the particular interests of all definable subgroups within the class being fully and fairly represented. Further, the Special Master finds that the ultimate plan arrived at by the agreement of the parties creates a structure for ensuring that reimbursement to class members reasonably will be tied to the extent of damages incurred.  Therefore, balancing the costs, including the further delay in these already protracted proceedings, against the benefits of the creation of formal subclasses, the Special Master concludes that no subclasses should be recommended for certification to this Court.

///

---

parties on the fairness of the settlement allocation to claimants with Purchase Claims.  *In re Pet Food Prods. Liab. Litig.*, MDL No. 1850, Civ. Action No. 07-2867 (NLH), 2011 U.S. Dist. LEXIS 38181, *50 (D.N.J. Apr. 5, 2011). The plaintiffs and defendants settled with the objectors who had taken the appeal and the district court determined that the record made by the plaintiffs and defendants was sufficient to ensure that the interests of the Purchaser Claims claimants was adequately represented.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

1

**VIII.  FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE SATISFACTION OF THE RULE 23 REQUIREMENTS BY THE GOVERNMENT PURCHASER SETTLEMENT CLASSES**

2

3       165.    Two Government Purchaser Settlement Classes have been proposed for

4   certification.  The need for two classes results from the fact that the Government

5   Purchaser Plaintiffs who are parties to the earlier Samsung and Winbond settlement are

6   different from the Government Purchaser Plaintiffs who are parties to the other later

7   negotiated settlements.  Following the Samsung and Winbond settlements, certain states

8   dismissed their claims with prejudice against the remaining defendants and ceased their

9   participation in the litigation other than for purposes of effectuating the Samsung and

10  Winbond settlements.

11      166.    On March 9, 2011, the Class States of Alaska, California, Delaware, New

12  Mexico, Ohio and Pennsylvania[123] submitted a letter-brief to the Special Master in

13  which they requested that the Special Master recommend to this Court the certification

14  of two classes of Government Purchaser Plaintiffs.[124]  Following the April 7, 2011

15  hearing before the Special Master on the subject of class certification, the Special Master

16  requested that the Attorneys General of the Class States confirm in writing the precise

17  definitions of the government entities in each of the proposed Government Purchaser

18  Settlement Classes.  Class State California agreed to undertake that task.  Accordingly,

19  on April 14, 2011, the California Attorney General on behalf of all Class States formally

20  _____

[123] The term "Class States" was coined during the proceedings before the Special Master to

21  identify those states who are seeking to utilize the class action device to represent certain Government Purchaser Plaintiffs within their borders, and to distinguish them from the Non-

22  Class States who represent their Government Purchaser Plaintiffs in a proprietary capacity. There are many other government purchasers covered by the settlements who will share in the

23  proceeds of the settlements as a result of the direct representation of those entities by their respective state Attorneys General without resorting to the class action device.  The distribution

24  of the settlement funds to those entities is beyond the purview of the reference to the Special Master.

25  [124] A copy of this letter-brief is attached as Exhibit 26 to the Appendix hereto.

26                                              90

27          Report and Recommendations of Special Master Part I re Settlement Class Certification,
                            Settlement Fund Allocation and Distribution

28

requested the Special Master to recommend the certification of two classes of

Government Purchaser Plaintiffs.  The Government Purchaser Plaintiffs, the Indirect

Purchaser Plaintiffs, the Attorneys General and the Settling Defendants also agree to the

certification of these classes.  For the purpose of effectuating the above-described

settlements, the following classes of Government Purchaser Plaintiffs are recommended:

> The Samsung/Winbond Government Purchaser Settlement Class:  All
> state government entities, all political subdivisions,[125] and all public
> colleges and universities in Class States Alaska,[126] Delaware, Ohio and
> Pennsylvania, all political subdivisions in New Mexico,[127] and all
> political subdivisions, the University of California and the State Bar of

---

[125] The Special Master finds by way of clarification that the term "political subdivisions" encompasses all non-state and non-federal government entities of whatever kind in a given state except for colleges and universities.  *See, e.g.,* CAL. CONST.  ART.  IX, § 14 (school districts); *id.* ART. XI, § 1 (counties); *id.* § 2, 5 (cities); *id.* §7 (counties and cities); *id.* § 9 (municipal corporations or utilities); *Wells v. One2One Learning Foundation*, 39 Cal. 4th 1164, 1195, 1201 (2006) (discussing K-12 school districts as being political subdivisions); *Pacific Gas & Elec. Co. v. County of Stanislaus*, 16 Cal. 4th  1143, 1151 (1997) (discussing counties specifically and political subdivisions generally under the Cartwright Act); *Trimont Land Corp. v. Truckee Sanitary Dist.*, 145 Cal. App. 3d 330, 342-43, 347 (1983) (discussing the two types of special districts, municipal corporations and public corporations, within municipal corporations being able to act outside of the territorial limits of the municipality establishing them); Cal. Gov. Code, §§  12650 (example of political subdivisions including cities, counties, K-12 school districts and special districts), 23000 (counties), 34100 (cities include chartered cities and general law cities). Colleges and universities are carved out as a sub-group within these proposed settlement classes from state or local government entities only because they are handled differently in the allocation process devised by Class and Non-Class States.  Otherwise, by way of illustrative example only, the term "political subdivisions" would include local K-12 school districts, counties, cities and special districts of whatever kind.

[126] For Class State Alaska, only the following political subdivisions are part of this proposed class: the City of Anchorage, the City of Fairbanks and the City of Juneau.  Colleges and universities in the State of Alaska are not part of the proposed settlement class.

[127] The State of New Mexico is representing state government entities in a non-class capacity for purposes of settlement.  Class State California recently confirmed that colleges and universities in Class State New Mexico are state government entities and so are also being represented in a non-class capacity for purposes of the settlement.  *See, e.g.,* Letter-Brief to the Special Master submitted on March 21, 2012, a copy of which is attached as Exhibit 27 to the Appendix hereto.

---

California in Class State California[128] who purchased DRAM or DRAM-containing products directly or indirectly from Samsung and Winbond between January 1, 1998 and December 31, 2002;

<u>The Multi-Defendant Government Purchaser Settlement Class</u>:  All political subdivisions in Class State New Mexico[129]  and all political subdivisions, the University of California and the State Bar of California in Class State California[130] who purchased DRAM or DRAM-containing products directly or indirectly from Infineon, Elpida, NEC, Mosel, Micron, Hynix, Nanya, Mitsubishi, Toshiba and Hitachi between January 1, 1998 and December 31, 2002.[131]

167.    The proposed representatives of the Samsung/Winbond Government Purchaser Settlement Class are Alaska, Delaware, Ohio and Pennsylvania, and for California class members, the City and County of San Francisco, Santa Clara County and the Los Angeles Unified School District, and for New Mexico class members, the Rio Rancho Public Schools.  The proposed class attorney is Emilio E. Varanini, a Deputy Attorney General of California.  The proposed representatives of the Multi-Defendant Government Purchaser Settlement Class are for California class members, the City and County of San Francisco, Santa Clara County and the Los Angeles Unified School District, and for New Mexico class members, the Rio Rancho Public Schools.

---

[128] The State of California is representing state government entities in a non-class capacity for purposes of settlement with the exception of the University of California and the State Bar of California. The University of California and the State Bar of California are autonomous entities from the rest of the State itself under the California Constitution, *see, e.g.,* CAL. CONST. ART. IX, § 9(f).

[129]  See footnote 127, above.

[130] See footnote 128, above.

[131] Similar classes have been approved in the past.  *See* Conditional Order Certifying Settlement Class and Approving Settlement at ¶3, *City and County of San Francisco et al. v. Microsoft Corp.*, No. 04-cv-03705 (D. Md. August 21, 2006); *id.* Final Order Certifying Settlement Class and Approving Settlement at ¶3, *City of County of San Francisco et al. v. Microsoft Corp.*, No. 04-cv-03705 (D. Md. Feb. 9, 2007).  These orders were attached to a letter-brief submitted to the Special Master on March 9, 2011 (see Exhibit 26 to Appendix).

92

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

The proposed class attorney is again Emilio E. Varanini, a Deputy Attorney General of California.

168.     As discussed below, the Special Master is recommending the certification of both of these settlement classes under Rule 23, the Cartwright Act, and, insofar as the State of New Mexico is concerned, under its own state law.  Although aware of this Court's concern about the inclusion of direct purchaser claims within these proposed classes, as will be discussed below, the Special Master concludes that the inclusion of these claims within these proposed classes does not create a conflict of interest.

169.     The difference in the scope of these two recommended classes reflects the ruling of the Court that out-of-state government entities could not sue under the Cartwright Act that was entered *after* the Indirect Purchaser Plaintiffs, Government Purchaser Plaintiffs and Attorneys General entered into the Samsung and Winbond settlements.  As discussed below, the Special Master finds that the ability of Class States Alaska, Delaware, Ohio and Pennsylvania to appeal that ruling constitutes a sufficient basis on which they may be included in the proposed class as to the Samsung and Winbond settlements.[132]  Finally, as is also discussed below, the Special Master finds and concludes that a settlement class may be certified as to Class States California and New Mexico for purposes of effectuating all of the settlements even though this Court rejected the certification of litigation classes in both States.[133]

---

[132] After the Court's ruling that out-of-state government entities could not sue under the Cartwright Act, Class States Alaska, Delaware and Ohio dropped out of the case and Class State Pennsylvania amended the allegations in the Third Amended Complaint in *State of California et al. v. Infineon Technologies et al.*, C 06-4333 PJH.  Therefore, there is no reason why a nationwide class of Government Purchasers should include Alaska, Delaware, Ohio and Pennsylvania as to all other Settling Defendants, even for settlement purposes.

[133] Subsequent to the denial of California and New Mexico's motion to certify classes of government entities for litigation purposes, the California Attorney General, using the authority granted to her by California Business & Professions Code Section 16750(c), brought individual

93

170.     In recommending the certification of the Government Purchaser Settlement Classes to this Court and finding that the requirements of Rule 23 are met by the Government Purchaser Settlement Classes, the Special Master incorporates by this reference the findings of fact as to the antitrust allegations made generally in the settled litigation and the conclusions of law set out above with regard to the Indirect Purchaser Settlement Class.  Accordingly, the following findings and conclusions will focus solely on factual or legal issues particular to the Government Purchaser Settlement Classes.

## A.     Satisfaction of the Requirements to Rule 23(a)

171.     For the reasons discussed above with regard to the Indirect Purchaser Settlement Class, the Special Master finds that the proposed Government Purchaser Settlement Classes each satisfy the requirements of numerosity, commonality, typicality and adequacy of representation set out by Rule 23(a).

172.     <u>Numerosity</u>.  The number of Government Purchasers in the smaller Multi-Defendant Settlement Class is approximately 4,000+ in California and approximately 800 in New Mexico.[134]  These numbers are sufficient to establish that

---

claims on behalf of 97 local government entities, as well as the University of California.  *See* First Amended Complaint, *City of Los Angeles et al. v. Infineon Technologies et al.* (Cal. Super. Ct. San Francisco Feb. 4, 2009) (No. GCC-08-480561).  These claims are also being released. As discussed below, the Special Master finds the decision of the State of California to seek certification of a settlement class including these entities is superior to proceeding with the allocation and distribution of settlement proceeds on the basis of these individual claims.

[134] The record contains 2002 Census data on government entities in California and New Mexico, as to which judicial notice should be taken pursuant to Fed. R. Evid. 201(b) and case law.  *See e.g., United States v. Esquivel*, 88 F.3d 722, 726-27 (9th Cir. 1996).  This census data was attached as Exh. 7 to a letter-brief submitted to the Special Master on March 9, 2011.  A copy of this letter-brief is attached as Exhibit 26 to the Appendix hereto.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

individual joinder would be impracticable.[135]  Logic dictates that the number of

Government Purchaser Plaintiffs in the larger Samsung/Winbond Settlement Class is

also sufficient to meet the numerosity requirement.  The Special Master therefore finds

the numerosity requirement to be met here.

173.   Commonality and Typicality.  For the same reasons discussed above with

regard to the Indirect Purchaser Settlement Class, the Special Master finds that the

Government Purchaser Settlement Classes satisfy the requirements that common

questions exist and the claims of the proposed class representatives are typical of the

claims of class members.

174.   Adequacy of Representation.  Satisfaction of the adequacy of

representation test requires that the proposed class representatives will fairly and

adequately protect the interests of the class.  The proposed representatives of the

Government Purchaser Classes, like all members of the proposed classes, are either

states or political subdivisions of their respective states that purchased DRAM both

directly and indirectly during the entire class period.  As such, they are incentivized by

their own self-interest to maximize the recovery of every other class member.  All of the

claims for the class representatives arise out of the same underlying alleged DRAM

price-fixing conspiracy and have the same remedial theory, namely that they, like all

---

[135] *Cf. Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 565-66 (D. Minn. 1968)
(numerosity requirement satisfied where state represented class of approximately 700 entities).
In the *Microsoft* case, the district court found the number of government entities in California
alone sufficient to certify a class of indirect purchaser government entities.  *See* Conditional
Order Certifying Settlement Class and Approving Settlement at ¶ 3, *City and County of San
Francisco et al. v. Microsoft Corp.*, No. 04-cv-03705 (D. Md. August 21, 2006); *id.* Final Order
Certifying Settlement Class and Approving Settlement at ¶ 3, *City of County of San Francisco et
al. v. Microsoft Corp.*, No. 04-cv-03705 (D. Md. Feb. 9, 2007).

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

class members, paid overcharges on DRAM-containing equipment as the result of that alleged conspiracy.[136]  The class representatives and class members alike, all being Government Purchaser Plaintiffs, must correspond to fairly narrow legal requirements in purchasing DRAM-containing equipment, particularly because of the high cost of such purchases: large purchases must be made by competitive bid or by master contracts whereas purchases for smaller amounts may be made more flexibly but still in a manner designed to maximize the value obtained for the money spent.[137]

175.   The second aspect of adequacy of representation concerns whether the Class States' counsel is qualified, experienced and generally able to conduct

---

[136] *See, e.g.,* Complaint at 20-22, *State of California et al. v. Samsung Electronics Co. et al.* (N.D. Cal. Mar. 7, 2007) (No. C 07-1347 PJH); Third Amended Complaint at 31-33, *State of California et al. v. Infineon Technologies et al.,* (N.D. Cal. Oct. 2, 2007) (No. C 06-4333 PJH).

[137] *See* Exh. 7 to the March 9, 2011 letter-brief submitted to Special Master (a copy of which is Exhibit 26 to the Appendix hereto), which consists of declarations of individuals responsible among class representatives from California and New Mexico for purchases as well as individuals in both California and New Mexico familiar with purchasing practices of local and state government entities**.**  Insofar as the other Class States may be concerned, their class representatives are the States themselves.  Unless the injuries of the States themselves differ in material respects from those of other government entities, the States are considered to be typical and adequate representatives of a government entity class.  *See, e.g., In re Ampicillin Antitrust Litig.*, 55 F.R.D. 269, 274 (D.C. Cir. 1972) ("States may certainly represent their lesser government entities."); *State of Illinois v. Harper & Row Publishers, Inc.*, 301 F. Supp. 484, 495 (N.D. Ill. 1969) (named representatives (state and local governments) that shared identical positions with class members (public libraries, school districts and boards of education)  on crucial issues in antitrust case adequately protected class members' interests); *Minnesota v. United States Steel Corp.,* 44 F.R.D. at 567-68 (states adequately represented their classes of government entities in price-fixing class action).  Indeed, Class State California recently submitted declarations from the Attorneys General of Class States Alaska, Delaware and Pennsylvania that clarified that their States not only were class representatives but also that they purchased in a unitary fashion similar to their local government entities such that there is evidence in the record supporting the Special Master's finding here that the Class States are typical and adequate representatives.  *See* Letter-Brief, dated Mar. 21, 2012, attached as Exh. 27 to the Appendix.

---

96

litigation.[138]  Generally, courts accept the qualifications, competence and effectiveness

of a state attorney general to represent the state, its government entities, political

subdivisions, or even its residents.[139]  Moreover, based on a review of the record and

first-hand observations during these proceedings, the Special Master finds the Deputy

Attorney General of California proposing to act as attorney for the class representatives

here to be well qualified to handle this settlement on behalf of the putative classes.  The

Special Master is aware of his reputation as counsel in similar antitrust matters and has

observed first hand his participation in these proceedings, both of which amply

demonstrate that he has the type of experience and ability in antitrust government

actions necessary to adequately serve as class counsel.

## B.    Satisfaction of the Requirements of Rule 23(b)(2)

176.    For the reasons discussed above with regard to the Indirect Purchaser

Settlement Class, the Special Master finds that the proposed Government Purchaser

Settlement Classes each satisfy the requirements of Rule 23(b)(2) that their injunctive

and monetary equitable claims under federal and California common law arise from

alleged illegal conduct by the Settling Defendants that was generally directed to the

---

[138] *E.g., Morgan v. Laborers Pension Trust Fund for Northern District of California*, 81 F.R.D. 669, 679 (N.D. Cal. 1979).

[139] *See, e.g., State of Alabama v. Chevron USA, Inc.*, No. Civ. 78-51-N, 1980 WL 1808, *2 (M.D. Ala. Jan. 11, 1980) (state attorney general was proper representative to protect interests of class of public entities in price-fixing action); *State of Illinois v. Associated Milk Producers*, 351 F. Supp. 436, 440 (N.D. Ill. 1972) ("[T]he State through its Attorney General is the proper and best representative of the political subdivisions organized under the authority of the State."); *see also, e.g., In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 333 F. Supp. 278, 280-81 (S.D.N.Y. 1971) (state attorneys general provided class of retail consumers "experienced counsel possessing sufficient resources and professional assistance to meet the obligations inevitably placed on a representative party under Rule 23.").

97

class as a whole.  As discussed above, the Settling Defendants' alleged price-fixing of DRAM is generally applicable to all class members, and likewise the threat that it will be resumed in the future in the absence of injunctive relief constitutes threatened harm to all members of the Government Purchaser Settlement Classes.

## C.    Satisfaction of the Requirements of Rule 23(b)(3)

177.    In a settlement context, the Rule 23(b)(3) requirement that common questions of law or fact predominate over any questions affecting only individual members of a proposed class tests whether proposed classes are sufficiently cohesive to warrant the release of their claims by representation.  Superiority involves the inquiry into whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

178.    The Special Master is guided in considering the predominance inquiry for the Government Purchaser Settlement Classes by the three guideposts articulated in the *Sullivan en banc* decision.[140]  These govern the predominance inquiry in any antitrust context and can be summarized as follows:  (1) whether the conduct of the Settling Defendants, and the resulting injury, are common to all class members; (2) variations in state law do not necessarily defeat predominance; and (3) concerns regarding state law differences largely dissipate when the court is considering the certification of a settlement class.[141]

---

[140]  The *Sullivan* decision looked to prior class action authority and "distill[ed] . . . three guideposts that direct the predominance inquiry: first, that commonality is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members; second, that variations in state law do not necessarily defeat predominance; and third, that concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class."  *Sullivan*, *supra*, 667 F.3d at 297.

[141]  *Id.*

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

179.    The Special Master is also guided by this Court's finding that the conduct of the Settling Defendants raises liability questions that are common to a proposed settlement class.[142]  Although the proposed settlement class that this Court was addressing was composed of direct purchasers, there is no reason to distinguish that class from these Government Purchaser Settlement Classes (composed of both direct and indirect purchaser claims) given the ubiquitous and nationwide nature of the alleged price-fixing conspiracy.[143]  Finally, at least one federal district court has found predominance to be met in certifying a settlement class under the Cartwright Act consisting of indirect purchaser government entities who paid overcharges on products containing software made by a defendant who committed illegal acts of monopoly maintenance.[144]  This case is closely analogous to that monopoly case which also involved the certification of settlement classes of governmental entity purchasers who alleged that they paid overcharges resulting from anticompetitive activity.

180.    All members of the proposed Government Purchaser Settlement Classes alleged that they suffered the same species of injury – they paid too much for DRAM – as a result of the conduct of the Settling Defendants. [145]  In *Sullivan*, the *en banc* court

---

[142] *In re DRAM Antitrust Litig.*, 2006 WL 1530166 at *7.

[143] *Cf. Sullivan* at 301 (noting that both of the proposed classes of direct and indirect purchasers were harmed by the international price-fixing activities of the settling defendants).

[144] Conditional Order Certifying Settlement Class and Approving Settlement at ¶ 3, *City and County of San Francisco et al. v. Microsoft Corp.*, No. 04-cv-03705 (D. Md. August 21, 2006); *id.* Final Order Certifying Settlement Class and Approving Settlement at ¶ 3, *City of County of San Francisco et al. v. Microsoft Corp.*, No. 04-cv-03705 (D. Md. Feb. 9, 2007).

[145] *Compare, e.g.,* Complaint at 20-22, *State of California et al. v. Samsung Electronics Co. et al.,* (N.D. Cal. Mar. 7, 2007) (No. C 07-1347 PJH) (alleging all class members paid overcharges on DRAM-containing products due to the DRAM price-fixing conspiracy) and Third Amended Complaint at 31-33, *State of California et al. v. Infineon Technologies et al.,* (N.D. Cal. Oct. 2, 2007) (No. C 06-4333 PJH) (alleging all class members paid overcharges on DRAM-containing products due to the DRAM price-fixing conspiracy) *with In re Insurance Brokerage Antitrust*

99

---

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

observed that such allegations raise predominantly common questions sufficient to support class certification since the answers to such common injury questions would drive the resolution of litigation.[146]  The *Sullivan* court noted that it could be true that a proposed settlement class might not be able to satisfy the manageability prong of the predominance inquiry because it could not establish that there is a common method of proof to determine whether or not putative members can demonstrate fact of injury; however, this concern relates *only* to classes being certified for trial.  Further, the import of the California Supreme Court's ruling in *Clayworth* is that fact of injury or impact must be presumed under the Cartwright Act and each member of the proposed Samsung/Winbond Government Purchaser Settlement Class is settling Cartwright Act price-fixing claims. [147]  With regard to all of the settlements, New Mexico is proceeding under its own laws as to the certification of the proposed class.  However, it is not the case that individual issues exist under those laws as to New Mexico's government entities that would overwhelm the manifest commonalities that otherwise tie the class together.[148]  New Mexico has submitted to the Special Master a declaration in this

---

*Litig.*, 579 F.3d at 268-69 (actions of settling defendants that reduced competition and resulted in an increase in premiums paid by all plaintiffs sufficient to show commonality on impact for predominance purposes and certification of proposed settlement classes).

[146] *See Sullivan*, 667 F.3d at 299-301.

[147] *Clayworth*, 49 Cal. 4th at 787.  *Cf., e.g., In re Warfarin, supra*, 391 F.3d  at 528 & n.11 (certifying a class of consumer deception claims under the law of all fifty states while recognizing that the entire class also shared a single, common deception claim under the law of Delaware, where the allegedly deceptive communications had originated).

[148] *See In re Motor Vehicles Canadian Export Antitrust Litig., supra,* 235 F.R.D. 127, 135-36 (noting that, under New Mexico's law, class certification of indirect purchasers is appropriate because liability and impact could be proved under same theory as that applicable to consumers in several other States); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 244 n.25 (3d Cir. 2001) (variations in state law do not preclude certification of a settlement class unless the conflicts are "severe.").

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

matter that it is the belief of its Attorney General that the courts in New Mexico would reach a holding substantially similar to *Clayworth* if faced with the same questions as those addressed by the California Supreme Court in *Clayworth*.

181.    The Special Master has reviewed the ruling of this Court that rejected the motion filed by California and New Mexico for certification of *a litigation class.* This Court denied certification principally because it was skeptical that any methodology could demonstrate with generalized proof that "the County of Los Angeles, comprised of over 9.5 million persons, and which purchased a large volume of computer servers pursuant to a statewide contract, for example, experienced impact just as a small municipality or agency located in San Francisco, comprised of a few hundred persons, and which purchased a small number of printers from a re-seller in San Francisco's 'Computer Store' did."[149]   This Court believed that "each divergent factor-customer size, type, procurement channel, product, distribution step-is a factor that increases the likelihood that proof of pass-through can only be shown with resort to individualized proof."[150]   However, nothing in this ruling prevents the two proposed Government Purchaser Settlement Classes from being certified for *settlement* purposes.   This Court's concerns related to litigation issues, that is the likelihood that at trial, individualized proof would overwhelm common proof on the disputed elements of impact and pass-on of damages.[151]   Here, neither a prediction of the common evidence needed to establish

---

[149]*State of California et al. v. Infineon Technologies et al.*, No. 06-4333 PJH, 2008 WL 4155665, *11 (N.D. Cal. Sept. 5, 2008).

[150] *Id.*

[151] The Special Master notes that at the time of this Court's class certification denial, it did not have the benefit of *Clayworth*, *supra*, 49 Cal. 4th 758, which was decided by the California Supreme Court *after* the certification denial and which held that pass-on (or the lack of it) is not a defense under the Cartwright Act.   Nor did it have the benefit of the United States Supreme Court's ruling in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* __ U.S. __, 130 S.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

the defendants' liability to class members nor any other aspect of trial manageability is a concern for the point of these proposed settlements is to eliminate a trial.[152]  As the *Sullivan en banc* court pointed out, when considering certifying a settlement class a district court does not need to "'envision the form that a trial would take,' *Newton* [*v. Merrill Lynch, Pierce, Fenner, & Smith*], 253 F.3d [154], 167 [(3d Cir. 2001)] or consider 'the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove' the disputed element at trial, [*In re*] *Hydrogen Peroxide* [*Antitrust Litig.*], 552 F.3d [305,] 312 [(3d Cir. 2008)]."[153]

182.    In addition, nowhere did this Court suggest that class members suffered *no* impact at all from the Settling Defendants' alleged price-fixing conduct.[154]  Nor has any participant in the proceedings before the Special Master made such a suggestion. Indeed, as discussed below, in the course of the proceedings regarding the plan of distribution of the settlement proceeds, Plaintiffs submitted evidence that indicates that all indirect purchasers suffered some injury.[155]

---

Ct. 1431, 1443, 176 L. Ed. 2d 311 (2010), that substantive state law rules, such as *Clayworth*, must be applied to class certification motions.

[152] *Amchem*, 521 U.S. at 620; *accord, e.g., Sullivan*, 667 F.3d at 303.

[153] *Sullivan* at 306.

[154] *Infineon*, 2008 WL 4155665 at *11 (suggesting only that different sized government entities may have experienced impact differently from the pass-on of overcharges on different products with different distribution channels such that impact was an individualized inquiry).

[155]The Reply Report of Dr. Flamm, which Class State California submitted in support of its motion to certify a litigation class, and which the Special Master reviewed as part of the preparation of this Report and Recommendations, supports the point that all Government Purchaser Plaintiffs in California and New Mexico have suffered some damages with volume being the substantial distinguishing factor.  *See, e.g.,* Exh. 2 at 51, Letter to Special Master (April 18, 2008).

102

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

183.    In addition, it has long been recognized that a court may decline to certify a class for litigation purposes only to later certify the same or a similar class for the limited purpose of settling the litigation.  *See e.g., In re Insurance Brokerage Antitrust Litig.*, 579 F.3d 241 (3rd Cir. 2009) (the court rejected the argument of an objector that a settlement class could not be certified unless a litigation class could have been certified); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 269 F.R.D. 80 (D. Me. 2010) (where the district court certified a settlement class despite the fact that the circuit court had vacated its prior certification of the identical litigation classes).  Further, as the Class States pointed out in their March 9 letter-brief, the proposed settlement classes have a common interest in the outcome of an appeal of the denial of litigation class certification that predominates over any individual certification issues for purposes of Rule 23(b)(3).[156]

184.    Finally, the Special Master notes that the discussion regarding the variations in state law addressed above with regard to the Indirect Purchaser Settlement Class does not apply to the Government Purchaser Settlement Classes.  The proposed Samsung/Winbond Settlement Class consists of Government Purchaser Plaintiffs in the Class States of Alaska, California, Delaware, New Mexico, Ohio and Pennsylvania asserting claims arising under California's Cartwright Act and, in the case of New Mexico, under its own antitrust laws.  The Multi-Defendant Settlement Class consists of Government Purchaser Plaintiffs in California under its antitrust law and in New Mexico based on New Mexico's antitrust law.  No one has asserted that there is any significant

---

[156] See Exhibit 26 at 17-19.  The Class States also made the additional argument in support of certification that to the extent differentiated impact exists within the classes and is cognizable at the settlement stage, the proposed full-time employee allocation methodology for the settlement funds addresses that issue such that common issues continue to predominate over individual issues.  *Id.*

103

difference between California's Cartwright Act and New Mexico's antitrust law, and the Special Master finds no significant variations between California's Cartwright Act and New Mexico's antitrust law that would affect the Multi-Defendant Settlement Class's satisfaction of the predominance requirement of Rule 23(b)(3).

185. The Special Master also finds that the proposed Government Purchaser Settlement Classes satisfy the superiority requirement of Rule 23(b)(3).[157] In short, superiority requires a class action to be superior to other methods for the carrying out of the settlement.[158] As discussed with respect to the certification of the proposed Indirect Purchaser Settlement Class, superiority in a settlement context traditionally requires a balancing of the individual interest of putative class members in conducting any extant or future individual litigation against the desirability of concentrating claims in a particular forum.[159]

186. As predominating common questions of liability unite the proposed settlement classes here, they also render the resolution of all claims in this forum superior to a myriad of individual actions.[160] An important use of class certification in the settlement context, as the *Sullivan en banc* court points out, is to effectuate a global

---

[157] This Court's ruling that rejected the litigation class certification motion filed by California and New Mexico was grounded, in part, on a finding that a class action was not superior to individual actions. However, that determination was based upon the difficulties likely to be encountered in the management of the class action as preventing a finding of superiority. This Court acknowledged that the first three factors for assessing superiority, which are the only factors relevant to a settlement class, supported class certification. *See Infineon*, 2008 WL 4155665 at *12.

[158] *See* Fed. R. Civ. Pro. 23(b)(3); *cf. In re DRAM Antitrust Litig.*, 2006 WL 1530166 at *6-7 (in litigation context).

[159] *Amchem*, 521 U.S. at 620.

[160] *Cf. In re DRAM Antitrust Litig.*, 2006 WL 1530166 at *10-11 (existence of common questions that unite class also militates in favor of a finding of superiority).

104

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

release of all claims that are based on a common nucleus of fact,[161] including claims that were dismissed but nonetheless could be appealed.[162]   One of the grounds given by this Court for refusing to certify government purchaser classes for litigation purposes was that a class action was not superior to individual actions.   However, even in doing so, the Court acknowledged that most of the factors utilized by courts for assessing superiority supported class certification.[163]   The finding that the superiority requirement was absent was grounded solely in this Court's manageability concerns.[164]   As discussed above, manageability is not an issue in settlement class certification.

187.    Although the membership of the Government Purchaser Settlement Classes is far smaller than that of the Indirect Purchaser Settlement Class, there is still a significant danger that in the absence of class treatment the vast majority of the proposed class members' claims would go unprosecuted and uncompensated.   The Special Master finds that class certification in the settlement context of the Government Purchaser Settlement Classes is superior to attempts to settle and release a mass of individual claims.[165]   Indeed, class certification allows for the more expeditious and efficient settlement of claims[166] as the court can address concerns regarding "the adequacy of

---

[161] *Sullivan,* 667 F.3d at 310-11; *see McLaughlin,* MCLAUGHLIN ON CLASS ACTIONS § 6.28, at 141 (5th ed. 2009) ("a settlement is ordinarily impractical unless it covers all claims, actual and potential, state and federal, arising out of the transaction or conduct at issue").

[162] *See, e.g., In re Motor Vehicles Canadian Export Antitrust Litig.*, 269 F.R.D. at 88.

[163] *See Infineon*, 2008 WL 4155665 at *12.

[164] *Id.* at *13.

[165] *Sullivan*, 667 F.3d at 310-11.

[166] *See, e.g.,* Advisory Committee Notes to Rule 23(b)(3) (1966 Amendments) (Class certification should "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness. . . .").

105

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

representation and the fair treatment of class members relative to each other and to the potential value of their claims."[167]   Both of these points appertain particularly to states like Class State California where Government Purchasers, which number approximately 4,000, can all bring individual claims – either by themselves on their own behalf or by the Attorney General on their behalf – in addition to class claims.[168]   It is thus telling that the Settling Defendants insisted on a global release of all claims by Government Purchaser Plaintiffs, including their class claims, as part of the overall settlement of this litigation, and also that no participant in these proceedings has objected to that global release or otherwise filed a response to the arguments of the Class States supporting a finding of superiority.[169]

188.    No one participating in these proceedings has objected to the certification of the proposed Government Purchaser Settlement Classes or otherwise filed a response to the letter-briefs of the Class States supporting a recommendation for certification. Accordingly, the Special Master finds that these proposed classes satisfy the requirements of Rule 23(b)(3).

---

[167] American Law Institute, PRINCIPLES OF THE LAW: AGGREGATE LITIGATION § 3.06 at 216.

[168] *See* Cal. Bus. & Prof. Code §16750(a), (b), (c); *Pacific Gas & Elec. Co. v. County of Stanislaus*, 16 Cal. 4th 1143, 1155-56 (1997).

[169] Absent the use of class certification to effectuate the settlement, Class State California, in particular, would be left in the position where it could compromise and settle the individual actions brought on behalf of 97 political subdivisions in state court and on behalf of 3 political subdivisions in federal court but not the appellate rights of its other political subdivisions which were left unrepresented by the denial of its motion for class certification.  *See, e.g.,* Third Amended Complaint at 31-33, *State of California et al. v. Infineon Technologies et al.,* (N.D. Cal. Oct. 2, 2007) (No. C 06-4333 PJH) (federal court); First Amended Complaint, *City of Los Angeles et al. v. Infineon Technologies et al.*  (Cal. Super. Ct. San Francisco February 4, 2009) (No. CGC-08-480561) (state court).  While the strength of those appellate rights could be debated−though, as noted above, the California Attorney General has asserted that those rights became stronger with the subsequent decision of the California Supreme Court in *Clayworth* on pass-on−such an inquiry into the merits is, as discussed above, unnecessary and inappropriate for class certification.

---

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

**D.** **The Inclusion of Class Members from Outside of California Asserting Cartwright Act Claims in the Samsung/Winbond Government Purchaser Settlement Class**

189.     The Special Master is aware that this Court has ruled that out-of-state Government Purchaser Plaintiffs have no cause of action under the Cartwright Act[170] although those entities are releasing Cartwright Act claims as members of the Samsung/Winbond Settlement Class.  This does not, however, alter the conclusion that the Samsung/Winbond Settlement Class should be certified.  First, it should be noted that the court entered its ruling *after* the parties entered into the Samsung and Winbond settlements, which explicitly contemplate the certification of a class of out-of-state Government Purchaser Plaintiffs under the Cartwright Act.  Both the Second and Third Circuits have found class settlements permissible even where subsequent legal developments conclusively invalidated the underlying claims.  *See, e.g., Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010) (retroactive statutory amendment to eliminate private right of action did not operate to preclude final approval of class settlement by the court because the parties' negotiated agreement remained an enforceable contract); *In re Stock Exchange Antitrust Litig.*, 317 F.3d 134, 150-51 (2d Cir. 2003) (court had jurisdiction to entertain motion for settlement of antitrust claims even though affirmative antitrust immunity defense had merit).

190.     Second, as the Class States argue in support of certification, they maintain valid appellate rights from the ruling dismissing the Cartwright Act claims.[171]  Moreover, as discussed above with regard this Court's AGC Order, this ruling also goes to the merits of the underlying actions, and as such is irrelevant to the class certification

---

[170] *State of California et al. v. Infineon Technologies et al.*, 531 F. Supp. 2d 1124, 1135-37 (N.D. Cal. 2007).

[171] Letter-Brief to Special Master at 21-22 (Mar. 9, 2011), Exh. 25 to Appendix.

inquiry.  If the ability to obtain class certification in the settlement context should turn on the strength or weakness of underlying claims, litigating the validity of those claims would be "an endless process" with the deleterious side-effect of "seriously preventing the parties from getting to, and engaging in, settlement negotiations."[172]  Also, as recognized by the *Sullivan en banc* majority, excluding from the proposed settlement class certain putative members based on a finding that their appellate rights are weak would prevent Samsung and Winbond from receiving the assurance that they bargained for to have the settlement extinguish "every claim from every potential plaintiff."[173]

**E.      The Inclusion of Both Direct and Indirect Purchaser Claims Within the Proposed Government Purchaser Settlement Classes**

191.     Unlike the Indirect Purchaser Settlement Class, the Government Purchaser Settlement Classes are settling both class members' direct and indirect purchaser claims.  The issue presented by this is whether it creates a conflict of interest within the proposed classes that either preclude certification or require the establishment of subclasses.  For the most part, the Class States are settling indirect purchaser claims arising from purchases of DRAM-containing products from Original Equipment Manufacturers (OEMs) such as Dell as well as from retailer resellers such as Best Buy.  However, the Government Purchaser Plaintiffs in the Class States also have claims arising from two types of direct purchases: first, there are purchases of DRAM modules (used to upgrade computer memory) from Defendant Micron's subsidiary, Crucial (miniscule in amount relative to the rest of the claims); and second, there are purchases that are legally "direct" pursuant to assignment-clauses in government purchase contracts.

---

[172] *Sullivan*, 667 F.3d at 311.

[173] *Id.* at 311-12.

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

192.     Assignment-clause claims arise from the assignment of claims to government entities from businesses that sold them DRAM-containing products, pursuant to which the government entity assignee steps into the shoes of a direct purchaser assignor.  For example, such a clause in a contract with an OEM such as Dell would give the government purchaser all of Dell's federal antitrust recovery rights. Included in the proposed settlement classes are Government Purchasers, such as the City of Los Angeles, which have *both* direct and indirect claims.  There are no Government Purchaser Plaintiffs that have only direct claims.

193.     Insofar as the proposed Multi-Defendant Settlements Class is concerned, the only Class State with assignment-clause claims is California.  California is also the only Class State with direct purchaser claims for freestanding DRAM from Crucial. However, insofar as the Samsung/Winbond Settlement Class is concerned, Class States Ohio (assignment clause claims) and Pennsylvania (assignment clause claims) in addition to California have direct purchaser claims.[174]

194.     In the litigation class context, this Court found that the presence of both direct and indirect claims in the proposed litigation class had the potential to create conflicts that were an additional reason for denying California's motion for class certification in the *Infineon* case.[175]

---

[174] California is the only Class State for which assignment-clauses were imputed into all government contracts by operation of law.  Cal. Gov. Code §§ 4551 *et. seq.*  Every other Class State with assignment-clause claims involves circumstances in which assignment clauses were added to contracts between their government entities and the businesses from which they were purchasing DRAM-containing equipment such as PCs.

[175] *State of California et al. v. Infineon Technologies et al.*, No. C 06-4333 PJH, 2008 U.S. Dist. LEXIS 81251, *40-41 (N.D. Cal. 2008).

109

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

195.    In proceedings before the Special Master, the Class States addressed this issue.  They argued that unlike mixing direct and indirect "purchasers" in the same class, here the *same class members – the same entities –* simply have claims arising from both direct and indirect purchases.  Accordingly, relying on Third Circuit authority handed down after this Court's ruling here, the Class States argue that there is no conflict of interest *between* class members, citing *In re Insurance Brokerage Antitrust Litigation*[176] for its holding that a class member's having different kinds of claims does not present conflict of interest.[177]  Therefore, there is no impediment to certification or need for subclassing.  No party to these proceedings has opposed the conclusion that a single class can be certified to settle both the Class State's direct and indirect purchaser claims.

196.    *In re Insurance Brokerage Antitrust Litigation* addressed whether the district court abused its discretion in approving the certification of a single settlement class with claims against two different groups of settling defendants – insurance brokers and insurers – for alleged illegal bid-rigging and steering activities in the property and casualty insurance industries.[178]  The plaintiffs settled with a specific group of insurer settling defendants.[179]  In certifying a single class of purchasers of insurance policies from insurance brokers and insurers for settlement purposes, the district court addressed and rejected an objection that it should have certified subclasses just because the allocation plan awarded a different sum to different types of claims (more specifically, the allocation plan distinguished between whether a plaintiff only purchased an

---

[176] 579 F.3d 241 (3d Cir. 2009). This case was decided after this Court declined to certify a class of government entities for litigation purposes.

[177] Letter-Brief to Special Master (Jan. 14, 2011), attached as Exhibit 28 to the Appendix hereto.

[178] 579 F.3d at 248-49.

[179] *Id.* at 250-53.

insurance policy versus whether the plaintiff also purchased supplemental insurance). That objection was renewed on appeal.[180]

197.    In response to this objection, the State Attorneys General stressed what the Third Circuit found to be the key point:  *"there can be no need for subclasses where the difference involved different claims by many of the same persons."*[181] The Special Master finds the Third Circuit's reasoning to be persuasive:

> Many of the Settlement Class Members are *both* [insurance] and [supplemental insurance] policyholders and will be entitled to recover damages for overpayment of premiums for both types of insurance.  This illustrates that the Plan of Allocation did not create de facto subclasses among the class members but merely created a structure for ensuring that reimbursement is tied to the extent of damages incurred on certain policies of insurance.  This method for distributing the fund, in which individuals and entities may have claims that span several of the allocation groups, did not produce a divergence of interests among the class members.  Rather, regardless of the type of insurance at issue and the time period during which it was purchased, all of the class members shared a unified interest in establishing the [Insurance] Settling Defendants' liability for engaging in anticompetitive conduct which increased the cost of premiums for all policyholders.[182]

198.    The Government Purchaser Settlement Class members from California, Ohio and Pennsylvania each have direct and indirect purchaser claims.  They each have the exact same interest vis-à-vis the Settling Defendants in this case, namely establishing the liability of the Settling Defendants for anti-competitive conduct and obtaining damages.  The presence of direct purchaser claims merely allows this group of Government Purchaser Plaintiffs the opportunity for certain of their purchases to establish liability for damages under federal law as well as under state law.

---

[180] *Id.* at 270.

[181] *Id.* (*italics added*).

[182] *Id.* at 272-73.

111

199.    Allowing claimholders with a common interest that have each alleged multiple claims to compromise and settle those claims as a single unit in a single class furthers the important judicial goals of securing global peace and facilitating class-wide settlements.[183]  While under certain circumstances subclassing may be necessary and beneficial, it is not a panacea, and courts have cautioned against the "Balkanization" of settlement classes, with its potential to add additional cost and invite delay to the proceedings.[184]  Here, it is difficult to imagine how subclassing would add any benefit given the same claimholders would constitute the membership of both subclasses.

200.    Based on *In re Insurance Brokerage Antitrust Litigation,* a case, as noted above. that was decided after this Court handed down its *Infineon* decision, the Special Master finds that no conflict of interest is created by the inclusion of direct and indirect purchaser claims within the Government Purchaser Settlement Classes.  Accordingly, the Special Master finds that the subclassing of direct and indirect purchaser claims within the Government Purchaser Settlement Classes is neither necessary nor beneficial.

## IX.    THE PROCEEDINGS BEFORE THE SPECIAL MASTER REGARDING THE ALLOCATION AND DISTRIBUTION OF THE SETTLEMENT PROCEEDS TO THE INDIRECT PURCHASER SETTLEMENT CLASS AND THE NECESSITY OF CREATING SUBCLASSES FOR THIS PURPOSE

201.    The referral requires, *inter alia*, that the Special Master recommend to this Court a plan of allocation and distribution of the settlement funds to members of the proposed Indirect Purchaser Settlement Class.  In addition, as noted above, the referral

---

[183] *See Sullivan*, 667 F.3d at 310-12 (discussing important policy interests in allowing for certification of nationwide settlement classes in antitrust actions notwithstanding variations in state law so long as the class has a common interest).

[184] *See id.* at 326.

112

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

includes the question of whether the proposed nationwide settlement class should be divided into subclasses.

202.   As noted above, the Indirect Purchaser Settlement Class includes persons and entities that have, in addition to federal injunctive claims, federal common law and California common law disgorgement claims and Cartwright Act claims, claims under repealer state antitrust laws and, in many states, *parens patriae* claims brought on their behalf by the Attorneys General.  It also includes persons and entities that, while possessing injunctive and disgorgement claims and Cartwright Act claims, also purchased in non-repealer states and therefore have arguably weaker individual state law damage claims than indirect purchasers in repealer states.[185]  In addition, the Indirect Purchaser Settlement Class contains purchasers of both stand-alone DRAM modules and DRAM- containing devices, as well as persons and entities who purchased for the purpose of reselling those modules or devices and end-buyers who purchased for their own use.[186]  The Special Master considered at length whether it was necessary or advisable to attempt to create subclasses within the Indirect Purchaser Settlement Class to recognize any or all of these differences under the particular circumstances of this case in this settlement context.

203.   As noted above, the sole purpose of certifying a settlement class is the effectuation of the terms and conditions of the settlement, and the most critical issue, at

---

[185]  It should be noted that, as a practical matter, even if citizens of one state may have antitrust claims under the laws of other states in which they made purchases, the settlement class is not so easily divisible.  Rather, the same class member can have claims in both repealer and non-repealer states.

[186] Again, the class members cannot be physically divided along any or all of these lines.  It is not difficult to imagine that a single individual or business entity, from a small sole-proprietorship computer products business to Best Buy, routinely made purchases of DRAM and DRAM-containing devices for its own use in addition to those it purchased for resale.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

least from the class' perspective, is arriving at and implementing the fair and adequate distribution of the settlement proceeds to its members. Accordingly, in the settlement class context, subclasses tend to be employed to recognize distinctions between class members that are reflected in the distribution of the settlement benefits. *See, e.g., In re Pet Food Prods. Liab. Litig., supra,* 629 F.3d 333; *Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*, *supra,* 654 F.3d 242. In the settlement class context, subclassing is essentially a tool of distribution management. Because here, the question of the need for subclasses was fundamentally a function of the method of allocating and distributing the settlement funds, the Special Master elected to consider subclasses within the context of the determination of a fair, adequate and reasonable plan of distribution for the Indirect Purchaser Settlement Class.

**A.      Initial Proceedings Directed to Formulating a Plan of Distribution**

204.      Beginning in January 2008, the Special Master held a series of hearings to discuss the relevant issues in allocating and distributing the Samsung and Winbond settlement proceeds, and to discuss the potential need for the creation of subclasses. However, the Special Master and the parties were aware that whatever was accomplished vis-à-vis the Samsung and Winbond settlements would likely have to be repeated since settlement negotiations were underway with the bulk of the defendants, who were not yet before the Special Master. In addition, as discussed above, during this period, this Court's AGC Order was on appeal, the outcome of which had the potential to affect the formulation of the distribution plan. This all changed when the Multi-Defendant and Nanya settlements were reached in 2010. At that time, the litigation was resolved against all remaining named defendants, and pursuant to this settlement, the

114

appeal of the AGC Order would be dismissed upon final approval.  Accordingly, work on the plan of distribution began in earnest in the fall of 2010.[187]

205.    At a hearing on September 17, 2010, the Special Master directed this now larger group of parties[188] to confer and arrive at a description of issues that were reasonably anticipated to have a significant affect on the allocation and distribution of the settlement proceeds.  These issues were submitted to the Special Master in a joint "road-map" letter from the parties on October 13, 2010.[189]  The parties divided the issues into "phases" for consideration by the Special Master.  The first phase involved establishing the market facts relevant to a reasonable allocation of the funds to pay the anticipated claims of all indirect purchasers in the nationwide class, focusing on the products, distribution channels, final uses, and the distribution ("pass-on") of the alleged overcharges between intermediate and end-buyer groups, as well as their various characteristics and their relative percentages of DRAM commerce.  The second phase involved resolution of issues relevant to the crafting of a fair and reasonable plan of distribution, including:  (1) whether monetary distributions could feasibly be made to household claimants; (2) whether a *cy pres* distribution should be used for some claimants; and (3) whether it was necessary or desirable for the plan to reflect differences in the "strength" or procedural positions underlying individual claims (due to the *Illinois Brick* repealer-nonrepealer state dichotomy or for any other reason), and if

---

[187]  Subsequently, settlements were reached with Toshiba, Mitsubishi and Hitachi, three DRAM manufacturers with small market shares who had entered into agreements with plaintiffs to toll the statute of limitations as to any claims against them.  However, for all practical purposes, the litigation phase of the case ended with the Multi-Defendant and Nanya settlements.

[188]  The relevant parties in arriving at a plan of distribution for the Indirect Purchaser Settlement Class are the private Plaintiffs, including reseller Counsel, the Attorneys General who are asserting *parens patriae* claims on behalf of natural persons, and to a lesser extent, the Settling Defendants.

[189]  A copy of this letter is Exhibit 3 to the Appendix hereto.

---

115

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

so, whether this required the certification of subclasses and the creation of separate subclass funds.  The Special Master agreed to adopt the parties' suggested phasing of the issues.

206.    The Special Master requested the parties wherever possible to resolve disputes and areas where the data was conflicting or ambiguous through negotiation and compromise to arrive at a plan of allocation.  The parties were also instructed to be mindful in their negotiations of principles of fairness, adequacy and reasonableness under the circumstances of the case, as well as, *inter alia*, market data, the practicalities of distribution and the relative injuries incurred by resellers and end-buyers.  The Special Master remained available to resolve disputed factual issues, especially in light of the fact that it was anticipated that much of the presentations of market facts, as well as methodologies and conclusions regarding the pass-on of the alleged overcharge down the chain of DRAM distribution would most likely be in the form of expert opinion and reports.

## B.  The Appointment of Reseller Allocation Counsel

207.    Also at the outset of the process, the parties recognized that whereas the private plaintiffs' litigation strategy had been to focus on the claims of end-buyers, the settlement classes included indirect purchaser resellers in various positions along the DRAM chain of distribution.  To facilitate the fullest possible participation by resellers in the preparation of a distribution plan, on November 1, 2010, the Special Master sent a letter to the general counsels of approximately 25 companies identified as being among the largest indirect purchaser resellers of DRAM, and invited those companies to participate in the allocation process.[190]  These included reseller-retailers Best Buy, Wal-

---

[190] A copy of a sample letter is Exhibit 29 in the Appendix hereto.

116

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

Mart, CompUSA, Office Depot, Staples, Fry's Electronics, as well as reseller-wholesalers, specialty distributors and product manufacturers like CDW, Celestica, Flextronics and Nvidia. Several responses were received, and initially it appeared that there might be voluntary participation from resellers across a broad spectrum of the chain of distribution. Ultimately, however, only Celestica, a large electronics manufacturing services ("EMS") company, elected to participate in the process through its own counsel, James Southwick of Susman Godfrey, L.L.P. Celestica made a number of written submissions and participated in reaching the proposed agreed-upon plan of distribution described below.

208.    At a hearing before the Special Master on April 7, 2011, Indirect Purchaser Plaintiffs Co-Lead Counsel requested the appointment of separate counsel to represent the interests of resellers in the allocation and distribution process, a request to which no Defendants' counsel or Attorney General objected.

209.    Indirect Purchaser Plaintiffs' Co-Lead Counsel subsequently recommended, without objection from any party, that the law firm of Berman DeValerio be appointed to serve as Allocation Counsel for the resellers in the proposed Indirect Purchaser Settlement Class. The Special Master was personally familiar with Joseph J. Tabacco, Jr. and Christopher T. Heffelfinger of the Berman DeValerio law firm, knew them to be highly competent and experienced attorneys, and was aware that this firm had extensive antitrust experience. On April 19, 2011, the Special Master was advised that Berman DeValerio was willing to serve in this capacity and that it was in fact counsel for Granite Communications, Inc., a reseller of products containing DRAM and a putative member of the proposed Indirect Purchaser Settlement Class. The Special Master was also informed by Plaintiffs' Co-Lead Counsel that Berman DeValerio had

served as counsel for indirect purchaser resellers in other indirect purchaser antitrust cases, including as court-appointed allocation counsel.

210.    Accordingly, on April 20, 2011, the Special Master issued a Memorandum and Order appointing the law firm of Berman DeValerio as "Allocation Counsel" for the resellers in the Indirect Purchaser Settlement Class for the purpose of "representing the interests of Resellers in connection with the allocation and distribution of the settlement proceeds in these actions."[191]

211.    The Special Master directed Berman DeValerio to confer immediately with other counsel and obtain all materials necessary to familiarize themselves with these proceedings and perform their duties and to report by May 6, 2011, regarding the status of their review and providing an estimate of the time required to actively participate in these proceedings.  The Special Master further requested Berman DeValerio to confer with Celestica's counsel regarding Celestica's request for creation of an EMS Reseller subclass.  On May 6, 2011, Berman DeValerio submitted to the Special Master a letter stating that they had obtained materials sufficient to familiarize themselves with the case and that they had preliminarily communicated with counsel for Celestica, in addition to which they included a proposed two-stage expert reporting schedule from Dr. Gary L. French of Nathan Associates, Inc, the expert they proposed to retain for this undertaking.[192]

---

[191] *See, e.g., In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 62, 67-68 (D. Mass. 2005) (approving similar structural protections implemented by lead counsel, including designation of certain counsel to represent groups of class members within a nationwide settlement class).

[192] A copy of this letter is attached as Exhibit 30 to the Appendix hereto.  In this letter, Resellers Allocation Counsel set forth a proposal that within 30-40 days, Dr. French would evaluate the analysis of reports previously prepared for litigation by Drs. Kenneth Flamm and Michael J. Harris, experts retained by the Attorneys General and the Indirect Purchaser Plaintiffs, respectively, regarding the pass-through of DRAM overcharges to end-buyers of products

118

**C.   The Distribution Data and Expert Opinion Underlying the Negotiation of the Plan of Distribution of the Settlement Funds to the Proposed Indirect Purchaser Settlement Class**

212.   During the course of these proceedings, expert reports prepared at the direction of the Indirect Purchaser Plaintiffs' Co-Lead Counsel for use in certifying litigation classes and other motion practice, as well as reports prepared specifically for submission to the Special Master, including those from the Attorneys General, Celestica and resellers' Allocation Counsel, were used and relied upon by the parties in support of their respective positions on a fair and reasonable distribution of the settlement funds. This section of the Report and Recommendations discusses pertinent aspects of these expert submissions to highlight some of the more prominent issues that occasioned significant discussions and arm's length negotiations among the parties, including, *inter alia*:  (a) identifying the chains of distribution and the relative levels of commerce of DRAM and DRAM-containing products within each of these chains; (b) the statistical/econometric modeling, and assumptions underlying those models, used by the parties' experts to determine relative rates of pass-through and absorption of the asserted overcharge; and (c) developing an appropriate claims administration procedure.

213.   The parties devoted significant time to exploring and critiquing these issues and the expert reports that were offered by the Attorneys General, the Indirect Purchaser Plaintiffs' Co-Lead Counsel, resellers' Allocation Counsel and counsel for Celestica in support of their respective positions.  These exchanges enabled the parties to assess critically the relative strengths and merits of their respective positions concerning

_____

containing DRAM.  It was further contemplated that to the extent Dr. French determined that he disagreed with the analyses in these reports, he would proceed to prepare a report setting forth his own methodology and estimate of the rate of overcharge absorption by resellers and pass-through to end-buyers.  Berman DeValerio timely submitted Dr. French's initial evaluation of the reports of Drs. Flamm and Harris report on June 10, 2011, which was then followed by submission of his Report on July 25, 2011.

119

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

the distribution and to begin a process of narrowing the range of disputed issues such as rates of absorption and pass-through of the overcharge. Ultimately, this process was an essential link in the sequence of negotiations that culminated in the proposed terms of the plan of distribution described below.

214. The process by which the parties ultimately reached an agreement on a proposed plan of distribution of the settlement proceeds was an adversarial process involving the Indirect Purchaser Plaintiffs' Co-Lead Counsel, the Attorneys General, acting as *parens patriae*, counsel for Celestica, resellers' Allocation Counsel, and to a more limited extent, counsel for Settling Defendants. The process was rigorous and the result of persuasive advocacy. The outcome was a recommended plan of distribution that is well-grounded in market facts, fairly accounts for the conflicting evidence of the relative injury suffered by resellers and end-buyers, and recognizes the practicalities of distributing funds to a large nationwide settlement class.

> **1. The Process of Arriving at a Fair and Reasonable Estimate of the Flow of DRAM From the Defendants to Resellers and Ultimately End-Buyers Through the Distribution Channels**

215. The process began by establishing reliable estimates of the flow and amount of commerce in DRAM. This was necessary to understand the various amounts of DRAM and DRAM-containing products that passed from the Settling Defendants' direct customers, such as the major OEMs like Dell and Apple, to and through the reseller members of the class, as well as the amounts of DRAM that passed from the OEMs to end-buyers without a resale. This matter was initially discussed at a hearing before the Special Master on November 19, 2010, and in written submissions from the Indirect Purchaser Plaintiffs and the Attorneys General prior to the hearing.

216.   Also at the November 19, 2010, hearing, counsel for Indirect Purchaser Plaintiffs, the Attorneys General from California and Illinois, Mr. Southwick, Celestica's counsel, and counsel for another reseller, Ingram Micro Inc.,[193] discussed with the Special Master issues relating to the allocation of settlement proceeds, and other topics including those pertaining to various claims processing issues, and the consumer distribution that occurred in the Compact Disc Multi-District Litigation (*In re: Compact Disc Minimum Advertised Price Antitrust Litigation*, 216 F.R.D. 493 (S.D.N.Y. 1996)).

<u>Indirect Purchaser Plaintiffs' Submittal of Report of Dr. Roger Bohn, November 10, 2010</u>

217.   In advance of the hearing on November 19, 2010, the Indirect Purchaser Plaintiffs submitted to the Special Master a report of their industry expert, Dr. Roger Bohn, dated November 10, 2010 (the "Bohn 2010 Report").[194]  In his report, Dr. Bohn described the predominant channels and types of indirect purchasers of DRAM during the time period 1982 through 2002.  Bohn 2010 Report, at ¶ 4. Dr. Bohn stated that it is his understanding that his report "is intended to assist in the allocation of settlement funds." *Id*.  To that end, Dr. Bohn attempted to quantify the flow of DRAM through market channels from the manufacturers through to the end-buyers and to describe certain characteristics of DRAM indirect purchasers.  *Id*.  After noting that DRAM is most often purchased not as a standalone module, but rather as a critical component of other electronic products, predominantly computers, Dr. Bohn divided his discussion

---

[193] Jeffrey Howard of Crowell & Moring, represented Ingram Micro, Inc., a distributor and also a reseller at that meeting.  Subsequently, Ingram decided to withdraw from participation in the proceedings before the Special Master.  Celestica and its counsel, Mr. Southwick, remained involved in the proceedings.

[194] A copy of the Bohn 2010 Report is attached as Exhibit 31 to the Appendix hereto.  Dr. Bohn had previously submitted two reports in connection with both class certification (July 10, 2007) and in connection with a motion for leave to file a second amended class action complaint (June 29, 2007). In addition, Dr. Bohn had previously given a deposition in the case (August 9, 2007).

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

into three parts:  an overview of DRAM and its most common uses; a tracing of the distribution channels that DRAM takes from defendant manufacturers to end-buyers; and an analysis of where and how much DRAM is used by end-buyers.  *See id.*

218.   For purposes relevant here, Dr. Bohn concluded, *inter alia*, the following: (1) that defendants sold 90 to 91% of total worldwide DRAM during the class period (*Id*. at ¶ 19); (2) that approximately 81% of all DRAM was used in computers of different types, including desktop and laptop PCs, workstations and mainframes (*Id.* at ¶ 20), and 19% was used in non-computer DRAM-containing devices (*Id*. at ¶ 21); (3) 63% of total DRAM was used in computers sold by Original Equipment Manufacturers ("OEMs") (*Id*. at ¶ 21); (4) 25% of DRAM for end-use was purchased by individual consumers, 64% by businesses and 11% by governmental entities (*Id*.  at ¶¶ 21, 22, 95 and 96); (5) that OEMs sold 28% of total DRAM directly to end-buyers and that the remaining 72% of DRAM was sold by indirect purchasing resellers and resold in both computer and non-computer devices (*Id*. at ¶ 6); (6) that at least 40 million members of the proposed settlement class were natural persons who purchased computers (*Id*. at ¶ 106); (7) about 16 million class members were private businesses (*Id*. at ¶¶ 23, 106); and (8) there were roughly 20 million class members who purchased small amounts of DRAM in non-computer devices (*Id*. at ¶ 106).

219.   Dr. Bohn opined in his report that most resellers of DRAM, computers and DRAM-containing devices appear to be settlement class members since they did not purchase from the DRAM chip manufacturers, but rather from OEMs, DRAM module makers, graphic card makers and computer distributors.  *Id*. at ¶ 97.  Beyond stating that resellers would tend to adjust their selling prices to reflect the cost of DRAM (*id*.), Dr. Bohn offered no opinion on the rate of absorption, or pass-through, of cost increases by

122

resellers in this report. Dr. Bohn further concluded that given the wide variance in price per megabyte of DRAM over the class period, dollars of DRAM sales, not megabytes, was the appropriate unit of measure to which the above percentages should be applied. (*Id.* at ¶13.)

<u>Attorneys General Allocation Letter and Report of Steven M. Schroeder, November 12, 2010</u>

220. The Attorneys General submitted a position statement proposing an allocation among indirect purchaser end-buyer businesses, indirect purchaser end-buyer natural persons and indirect purchaser resellers to the Special Master by letter dated November 12, 2010, from the Illinois Attorney General (the "Attorney General Allocation Letter").[195] That letter included Appendix 1 consisting of a flow chart showing the distribution chains to end-buyer businesses and consumers, and Appendix 2 consisting of the Expert Report of Steven M. Schroeder.

221. In their letter, the Attorneys General proposed that the allocation determination be made based on models of the markets through which the DRAM-containing products reached members of each of these three basic groups. The model summarized in Appendix 1 to the AG Allocation Letter divides the purchases of DRAM-containing products into two categories: (a) computers and computer-related products and (b) non-computer products.

222. The Expert Report of Steve Schroeder concluded that both computers and computer-related products accounted for about 83% of indirect DRAM purchases; and that computer products were sold through two different distribution channels, a "retail" channel where such products were sold through one or more indirect purchaser resellers,

---

[195] A copy of the Attorney General Allocation Letter and Expert Report of Mr. Schroeder is attached as Exhibit 32 to the Appendix hereto.

and an original equipment manufacturer ("OEM") channel where such products were sold directly by OEMs (direct purchasers such as Apple and Dell) to end-buyers through phone and/or internet ordering. Based on the limited data available and using the year 2000 as a baseline, Mr. Schroeder estimated that 58% of computer purchases should be allocated to the retail channel and 42% should be allocated to the OEM channel.[196] Both channels, and their relative market share percentages, are depicted in Appendix 1 to the Attorney General Allocation Letter. Mr. Schroeder also estimated that 62% of end-buyer computer product indirect purchasers are businesses and 38% are individuals and households.

223. As to non-computer DRAM-containing devices, Mr. Schroeder estimated that the remaining 17% of DRAM was purchased in a wide variety of product categories, most of which accounted for less than 1% and none for more than 5.5% of total DRAM purchases. Mr. Schroeder divided the non-computer purchases between businesses and households based on the products' most common uses (see Appendix 3) to arrive at the estimate that 58% of non-computer products were purchased by businesses and 42% were purchased by individuals and households.

224. Unlike Dr. Bohn, Mr. Schroeder computed his estimates of DRAM commerce using megabytes rather than dollars.

225. On November 19, 2010, the Special Master held a hearing to discuss the reports and to outline a schedule for further proceedings regarding the appropriate market structure to use for allocation and distribution purposes. In an effort to resolve

---

[196] The Attorney General Allocation Letter did not attempt to estimate an overcharge absorption rate for the indirect purchaser resellers in the retail distribution channel. The flowchart that is Appendix 1 to the letter simply indicated that "Reseller Share TBD" for both "Computer and Computer-related Purchases" and "Non-computer Purchases."

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

the differences in the expert reports, on November 30, 2010, at the Special Master's request, Dr. Bohn and Mr. Schroeder discussed the matter in a telephonic conference. While there was little progress with respect to using dollars versus megabytes as the appropriate unit of measurement, the experts did agree that their 10% discrepancies relating to the sales of computer product DRAM (Dr. Bohn estimated that split at 28% of DRAM being sold to individuals and 72% to businesses, while Mr. Schroeder estimated the split at 38% to individuals and 62% to businesses) were likely attributable to the following:  5% due to different data sets, 4% due to the use of dollar/megabyte units and 1% in the adjustments Dr. Bohn made at paragraph 91 of his report.

Supplemental Report of Dr. Bohn, February 18, 2011

226.    Under the direction of the Special Master, counsel for the parties engaged in discussions regarding the data and conclusions in the Bohn and Schroeder reports, including the informal exchange of the experts' underlying data and information about their methods.  For example, on January 5, 2011, Dr. Bohn was given access to the PC-Q database and other data relied on by the Attorneys General and Mr. Schroeder.[197] Celestica provided information about the role of indirect purchasing EMS in the distribution channel in the form of a February 25, 2011 Declaration of economist Russell W. Mangum.[198]

227.    As a result of these discussions and exchanges of information and views, on February 18, 2011, the Indirect Purchaser Plaintiffs submitted to the Special Master a supplemental report from Dr. Bohn, the purpose of which was to update his November

---

[197] Indirect Purchaser Plaintiffs' Co-Lead Counsel put all data relied on by their pass-through expert, Dr. Harris, on an FTP site for access by all counsel.

[198] A copy of the declaration is attached as Exhibit 33 to the Appendix hereto.

2010 quantitative estimates of the flow of DRAM through the distribution channels. "Bohn 2011 Supp. Report" at 1.

228.     Principally, Dr. Bohn revised upward his earlier estimate of the DRAM ultimately purchased by individuals to 31%, and lowered his estimate of the DRAM purchased by end-buyer businesses to 69%. *Id.* at 2.  Dr. Bohn considered the DRAM flowing through the retail and OEM channels, estimating that 68.34% of the DRAM sold to end-buyers of all types came through the retail (reseller) channel and 31.56% was sold via telephone and internet by OEMs to end-buyers. *Id.* at 2-3.

229.     Dr. Bohn's supplemental report describes the distribution channels for DRAM and DRAM-containing devices. *Id*. at 4-17.  Dr. Bohn describes how the manufacturing of DRAM was done by the defendants, and that large computer OEMs such as Dell, Hewlett-Packard, Compaq (which merged with HP in 2001), IBM, Apple and Gateway, that design, assemble (or contract for the assembly of) and market computer products, were the biggest direct purchasers of DRAM.  *Id*. at 5.  Dr. Bohn divided the distribution channels for computer products into three basic levels:  (1) the OEMs who brand and market the products; (2) retailers who sell to end-buyers; and (3) distributors in between who buy from OEMs and sell to retailers.  *Id*. at 7-8.  He notes, however, that there are frequently additional levels of complexity in the distribution channels.  In Exhibit 1, Dr. Bohn describes as an example, a chain of distribution involving the electronics manufacturing services ("EMS") sector whereby, in some instances, DRAM is distributed directly to module makers and distributors who, in turn, distribute down to the EMS sector. The EMS sector then assembles computer products and other DRAM-containing devices and distributes them to OEMs.  As another example, Dr. Bohn describes an alternative distribution chain involving the EMS sector

126

whereby the DRAM defendants distribute DRAM directly to OEMs who, in turn, distribute that DRAM to the EMS sector.  Using that DRAM, the EMS sector assembles the computers and other devices and distributes them back to the OEMs, who then send them through either the retail channel or sell them to end-buyers via telephone and internet sales.  *Id.* at 21.

230.     Ultimately, after consideration of Dr. Bohn's Supplemental Report, the Attorneys General, Indirect Purchaser Plaintiffs' Co-Lead Counsel and counsel for Celestica were able to reach consensus on a fair and reasonable estimate of DRAM sales to individuals and private businesses to be used in the allocation and distribution process.[199]  The parties concluded that Dr. Bohn's revised quantitative estimates of DRAM sales to private businesses and individuals and households represented a fair and reasonable estimate of the DRAM flowing to each group during the relevant period.

231.     Accordingly, for purposes of crafting a plan of distribution, all parties agreed to use as fair and reasonable estimates of DRAM sales to private, non-governmental end-buyer entities and natural persons, the figures of 31% of DRAM flowing to individuals and households and 69% going to businesses.

**2.       The Process of Negotiating Treatment of the Absorption of Overcharges by Resellers and the Pass-on of Overcharges to End-Buyers in the Plan of Distribution**

232.     At the direction of the Special Master, the parties then began a similar adversarial process to arrive at a fair and reasonable estimate of the degree to which the alleged overcharges were passed-on by the resellers in the settlement class to the end-buyers and consumers in the class.  The process began by examination of reports

---

[199] This structure was later also accepted by the Reseller's Allocation Counsel.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

prepared by Dr. Michael Harris, who had been engaged by the Indirect Purchaser

Plaintiffs, and Dr. Kenneth Flamm, who had been engaged by the Attorneys General.

Subsequently, Celestica submitted to the Special Master an expert report from Russell

W. Mangum regarding the overcharge absorption in the EMS sector, and resellers'

Allocation Counsel submitted a separate report from Dr. Gary L. French regarding the

overcharge absorption rate by resellers generally.  Significant, and at times contentious,

informal discovery and information exchange occurred between counsel and their

experts, and a series of hearings were held seeking the guidance of the Special Master.

Following the submission of the data discussed in this section, the parties agreed to a

negotiated "common pot" modified *pro rata* distribution plan that, while accounting for

their differing positions on the absorption-pass-on of the alleged overcharges, did not

require the Special Master to make findings of fact with regard to the relative merits of

the experts' opinions or supporting data, or to arrive at a recommendation of a specific

percentage of overcharge suffered by resellers or end-buyers.  The Special Master

believes that this negotiated resolution serves the interests of all members of the Indirect

Purchaser Settlement Class at least as well, if not better, than a process by which the

distribution plan would incorporate a pass-on determination made by the Special Master.

<u>The July 10, 2007 Declaration of Michael J. Harris, PhD.</u>

233.    In his declaration dated July 10, 2007, Dr. Harris opined that based on

empirical studies the pass-through rates by resellers to end-buyers exceeded 100% of the

alleged overcharge.[200]  In providing this estimate of pass-through in the DRAM industry,

Dr. Harris developed two empirical models—one for "Base DRAM" and one for

"Aftermarket DRAM."  Harris Decl., Ex. 3.  In the first stage, the "Base DRAM Pass-

---

[200] A copy of Dr. Harris's declaration is attached as Exhibit 34 to the Appendix hereto.

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

Through Model," Dr. Harris used a hedonic regression model to explain computer prices in terms of the various components (*e.g.*, hard-drive, processor etc.) including Base DRAM installed in the computer.  The coefficients on each component obtained from the hedonic model were then interpreted as the incremental price with respect to an additional unit (or presence) of the associate component.  *Id*. at Ex. 3, p. 6.  In the second stage of his model, Dr. Harris then examined the relationship between the implicit price of DRAM obtained from the first stage and the spot price of DRAM.  *Id.* at Ex. 3, p. 11.

234.    Dr. Harris's "Aftermarket DRAM Pass-Through Model" is an analysis of prices and pass-through confined to the DRAM module as a separate standalone item of purchase.  Dr. Harris used databases from "two major Aftermarket DRAM resellers, CDW and Crucial," to estimate Aftermarket DRAM prices as a function of DRAM spot market prices, density and time period.  Harris Decl., Ex. 3.  Using the estimated coefficients for DRAM spot prices, Dr. Harris concluded that pass-through rates for Aftermarket DRAM are between 115% and 123% due to the industry mark-up of modules.  Harris Decl., Ex. 3 at 19.  Dr. Harris suggests that Aftermarket pass-through rates for Point-of-Sale ("POS") DRAM are equally valid because otherwise "prices would necessarily diverge, which would prompt consumers to shift purchases to the lower cost source."  Harris Decl., Ex. 3, at 19.

The December 15, 2010 Report of Kenneth Flamm, PhD

235.    In December 2010, the Attorneys General, counsel for the Indirect Purchaser Plaintiffs and counsel for Celestica and Ingram participated in a conference call on the allocation issue.  The purpose of this conference, as related to the Special Master in a letter dated January 14, 2011 from the Attorneys General, was "to walk the

129

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

resellers through the expert approaches and their conclusions about pass through."[201] This conference was part of a series of ongoing discussions on the topic of resolving the reseller pass-through issue, all of which were preliminary at that point in time.

236.     The Attorney General's January 14, 2011 letter to the Special Master also transmitted an expert report from Dr. Kenneth Flamm, dated December 15, 2010, concerning the pass-through of DRAM overcharges in computer product prices (the "Flamm Report").[202]  Dr. Flamm analyzed what economic theory teaches with respect to the division of economic damages from the alleged DRAM price-fixing conspiracy between resellers of DRAM-containing products, and the final end-buyers of those products and what data obtained in discovery from three different types of retailers showed about that pass-through.  Dr. Flamm concluded, *inter alia*, that economic theory, testimony and retail pricing policies all support the conclusion that resellers passed through 100% or more of their costs (including the illegal price increases) for DRAM-containing products, as increased prices charged to their customers.  Further, he concluded that a distributor or retail pricing policy of adding a percentage markup to cost would push the total pass-through rate to the ultimate end-buyers above 100%. Flamm Report, at 3.

237.     In his report, Dr. Flamm described economic theories and empirical studies from the reseller and retail sector supporting his view that reseller pass-through to end-buyers was likely to be at or above 100%.  *Id*. at 4.  Dr. Flamm explained that it is reasonable to assume that pass-through will always be positive because a pass-through rate of zero requires either that demand for a product be perfectly elastic—a scenario in

---

[201] A copy of Mr. Harrop's letter is attached as Exhibit 35 to the Appendix hereto.

[202] A copy of Dr. Flamm's report is attached as Exhibit 36 to the Appendix hereto.

which minute changes in price will cause extreme fluctuations in quantity demanded—or perfectly inelastic—a similarly unlikely scenario in which even dramatically large price increases will not prompt sellers to increase output. *See id*. at 5-6. Dr. Flamm then described a phenomenon known as "overshifting" which he contends makes it possible in a market such as the one in which equipment containing DRAM is sold for pass-through to exceed 100%. *Id*. at 6-8.

238.    To support his conclusion of 100% (or greater) pass-through, Dr. Flamm relied on an empirical analysis of DRAM pass-through, using data produced by Best Buy, CDW and Office Depot to build monthly datasets which include units sold, average price and average cost (by month) for each individual product. *See id*. at 16-17. The data encompasses various categories of products containing DRAM, including desktop computers, notebooks, servers, memory modules, printers and graphics cards. For each reseller and each product category, Dr. Flamm performed a regression analysis.

### The April 17, 2011 and May 9, 2011 Reports of Russell W. Mangum, PhD.

239.    On April 7, 2011, Celestica submitted to the Special Master the Expert Report of Russell W. Mangum that estimated the extent to which increases in DRAM costs were absorbed or passed-through by EMS companies.[203] Dr. Mangum concluded that in general, EMS companies have limited ability to pass-on costs increases in component parts such as DRAM. Mangum Report at ¶ 20. Specifically because unanticipated component costs do not alter the contracts with OEMs, EMS companies generally cannot pass-on price increases. *Id*. at ¶¶ 23, 24. Relying on data from Celestica (*Id*. at ¶¶ 34, 35) and using a regression analysis (¶¶ 32, 33), Dr. Mangum

---

[203] A copy of Dr. Mangum's report is attached as Exhibit 37 to the Appendix hereto.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

concluded that Celestica passed-on only approximately 29% of the DRAM overcharges
it incurred. *Id*. at ¶ 39, Table 3.

240.    Over the following weeks, counsel for Celestica, Indirect Purchaser
Plaintiffs' Co-Lead Counsel and the Attorneys General discussed and evaluated Dr.
Mangum's conclusions and data sources.  On April 25, 2011, Settling Plaintiffs' counsel
requested that Celestica provide specific data for further analysis of Dr. Mangum's
conclusions regarding pass-on.  On May 9, 2011, Celestica submitted the Supplemental
Expert Report in which Dr. Mangum offered a revised pass-through rate for Celestica
and other EMS companies to 35.5% (from 29% in his prior report).  *Id*. at ¶¶ 5, 6).
Counsel continued to engage in discussions and correspondence regarding the source
data for Dr. Mangum's conclusions, particularly the availability of Celestica's Bills of
Materials ("BoMs") that are generated during assembly of a product under contract with
an OEM.

241.    On May 20, 2011, counsel for Plaintiffs submitted a letter-brief to the
Special Master detailing the discussions with Celestica, reporting that the parties were
unable to resolve the matter relating to Celestica's data and BoMs, and setting forth their
position that, because Dr. Mangum's conclusions deviated significantly from Dr.
Harris's and Dr. Flamm's estimated pass-on rates, it was advisable for the Indirect
Purchaser Plaintiffs' Co-Lead Counsel and the Attorneys General to have an
understanding of the data used by Dr. Mangum and the structure of his pass-through
model before they could engage in any significant negotiations regarding a pass-on
estimate for the plan of distribution.[204]  On May 24, Plaintiffs' counsel sent a
supplemental letter to the Special Master citing testimony from Ian James Rock, a

---

[204] A copy of that letter-brief and the other correspondence discussed in this paragraph are
attached as Exhibit 38 to the Appendix hereto.

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

Celestica Account General Manager, who had testified in a related DRAM action. Plaintiffs asserted that Mr. Rock's testimony was evidence that Celestica had recovered the totality of the component costs on the relevant BoMs from Sun Microsystems. Celestica disagreed with Plaintiffs' counsel's interpretation of Mr. Rock's testimony. On May 27, counsel for Celestica responded that it should not be required to produce BoMs because recovery of the BoMs from archives would be labor intensive, require considerable time, and would not result in a complete record, and further, that the actual DRAM cost data used by Dr. Mangum was superior to that shown on the BoMs and was available and already produced to all parties. On June 10, 2011, Co-Lead Counsel submitted a letter from Dr. Harris, and the Attorneys General submitted a report from Mr. Schroeder, to further explain the need for the Celestica BoMs. The same day, Celestica submitted the Declaration of Robert Wicik that stated the reasons for resisting further production of BoMs.

242. By this time, Berman DeValerio had been appointed as Reseller Allocation Counsel to represent all resellers in the settlement class, and had retained Dr. Gary L. French to review the work done by Dr. Harris and Dr. Flamm, and to prepare a report on the rate at which he estimated resellers absorbed or passed-through the alleged DRAM overcharge during the relevant period.

The June 10, 2011 Report of Gary L. French, PhD.

243. Dr. French's June 10, 2011 report[205] consisted primarily of observations on the expert reports of Dr. Flamm (November 21, 2007, March 19, 2008 and December 15, 2010), Dr. Bohn (July 10, 2007 and February 18, 2011) and Dr. Harris's Declaration, as well as a declaration/report from Margaret E. Guerin-Calvert (September 27, 2007).

_____

[205] A copy of this report is attached as Exhibit 39 to the Appendix hereto.

Dr. French opined that the conclusions reached by Drs. Harris and Flamm regarding the pass-through of 100% (or more) of the alleged overcharge by resellers were unwarranted. French Report I, at 3. Dr. French concluded that some of those overcharges would have been absorbed by wholesalers, retailers and other resellers in the distribution chain, and proposed doing an empirical analysis of his own to arrive at a reasonable quantification of absorption. *Id.* at 2.

244.    Dr. French disagreed with the underlying premises adopted by Drs. Flamm and Harris that the relative elasticity of the supply and demand curves between upstream and downstream buyers are more likely than not to support a pass-through rate of 100% pass-through (or more). *Id.* at 8-9.[206] Dr. French offered his view that "[i]n the markets for personal computers and memory upgrades the quantity demanded is sensitive to the price," citing to deposition testimony of Dr. Bohn that demand for personal computers is "rather elastic." *Id.* at 12 n. 20. While Dr. French agreed that there are some theoretical and empirical models that are consistent with more than 100% pass-through, he pointed to empirical literature cited by Dr. Flamm showing pass-through rates of less than 100%. Dr. French also cited a study using a reduced form econometric model to estimate pass-through in retail supermarkets that found that pass-

---

[206] Dr. French used the example of tax incidence, a form of additional cost like an illegal overcharge, and its impact on market equilibrium to illustrate the relative elasticity of the intermediaries' supply and demand curves. Dr. French offered that regardless on whom the tax is levied, the impact on the equilibrium price and quantity is not immediately clear, because "those on whom taxes are levied do not always pay the taxes." *Id.* at 8. Where, for example, suppliers are targeted for the tax, if demand for the taxed product is inelastic—meaning that buyers are not sensitive to price changes, perhaps because of a lack of substitutes—then the suppliers of the taxed product will be able to "pass on" much of the cost of the tax in the form of higher prices to consumers without incurring substantial declines in quantity demanded. On the other hand, if demand for the product is very elastic over the relevant price range—meaning that buyers are sensitive to price changes—then sellers may be forced to absorb most (or even all) of the tax, because raising prices would result in massive losses in sales. *Id.*

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

through "varies substantially across products and across categories," but was on average above 60% for most categories.

245.    Dr. French also pointed to a number of other factors he believed supported a lower than 100% pass-through rate for DRAM overcharges, such as, *inter alia*, frequent price fluctuations in DRAM, and the fact that DRAM costs are only a small portion of the total cost of a computer or other device. *Id*. at 12.  Dr. French also disputed Dr. Flamm's assumption—underlying his view of 100% pass-on—that, in the long-run, there is a perfectly competitive market for computer products in which resellers are charging prices that yield the lowest profit margin possible while still enabling them to remain in business, noting that Dr. Flamm never defines what constitutes the "long run" and ignores damages that may have been caused in the short run. *Id*. at 13.

246.    Dr. French also challenged the empirical work done by Drs. Harris and Flamm.  Dr. French concluded that Dr. Harris's model is theoretically flawed, inappropriately treats data observations, and results in economically nonsensical results and a poor model fit. *Id*. at 18.  Fundamentally, Dr. French challenged Dr. Harris's Base DRAM analytic as incomplete and overly restrictive because his dataset—derived from The Computer Shopper Leading Brand Index—focused solely on home or business desktop computers, but excluded all other product groups, such as notebooks, laptops, workstations, and servers.  Dr. French leveled a similar criticism at Dr. Harris's selection of DRAM modules used in his Aftermarket pass-through analysis. *Id*. at 17.

247.    Dr. French then challenged the hedonic model—(estimating implicit prices or values)—used by Dr. Harris, principally on the ground that the use of such a model is not appropriate in pass-through analysis. *Id*. at 18.  Dr. French asserted that Dr.

135

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

Harris made a fundamental error by taking a coefficient of 1.06 for DRAM price to be the functional equivalent of a pass-through rate of 106%. This error, according to Dr. French, actually results in a pass-through rate of 300% when applied to average spot and implicit prices for DRAM used by Dr. Harris. *Id.* at 18 n. 45.

248.   Dr. French also challenged Dr. Flamm's empirical analysis of DRAM pass-through on, *inter alia*, the following grounds: (a) Dr. Flamm eliminated price observations for the first two months of each product's history by inclusion of a two-month price lag which is significant because the bulk of transactions occur in the first few months after a product's introduction; (b) the measures of cost used by Dr. Flamm did not relate specifically to the cost of DRAM itself, but rather to the total costs of the products (as such, it's unclear whether resellers treat increases—or decreases—in DRAM component costs identically to fluctuations in the cost of components representing a larger share of the total product cost); (c) the cost patterns observed in both the Best Buy data and the CDW data may have more to do with differences in accounting methods used by Best Buy and CDW and, accordingly, it may not be appropriate to assume that changes in the average cost variable—used by Dr. Flamm—truly represent changes in the reseller's marginal cost of sales; and (d) Dr. Flamm did not account for omitted variable bias in his model. As to omitted variable bias, Dr. French asserted that Dr. Flamm had it wrong by attributing the correlation between declining costs and declining prices to a causal relationship. Dr. French contended that the main reason for the declines in both price and cost is likely due to the decline in demand of a particular computer model. *Id.* at 21. Dr. French acknowledged that Dr. Flamm did include a trend variable to control for obsolescence, but asserted that the variable Dr. Flamm used was insufficient because it only produced a single coefficient to measure the rate of obsolescence for all products within a product category. *Id.* Dr.

136

French prepared a table to show that Dr. Flamm's pass-through rates dropped between 48% and 43% when a product "dummy" variable is added and the regression model generates a specific coefficient to measure the rate of obsolescence for each product. *Id.* at 22.

249.    Finally, Dr. French proposed to use a reduced form econometric model to quantify the proportion of DRAM overcharges that were absorbed by indirect purchaser resellers and passed-through to indirect purchaser end-buyers. *Id.* at 24-25.[207] Dr. French offered to submit his second report within 45-60 days. *Id.* at 25.

The July 12, 2011 Supplemental Report of Russell W. Mangum, PhD.

250.    On June 17, 2011, the Special Master held a hearing wherein questions relating to Dr. Mangum's pass-through model, as well as the open issue of production of Celestica's BoMs were discussed. On June 21, 2011, a joint letter from Co-Lead Counsel and Celestica was submitted to the Special Master regarding the production of a dataset containing revision-controlled, costed BoMs for DRAM-containing devices purchased by Celestica's largest customers. On June 21, 2011, counsel and their respective experts held a teleconference relating to the competing models and conclusions concerning pass-through of increased DRAM costs through reseller channels.

251.    On July 20, 2011, Celestica submitted the Second Supplemental Expert Report of Russell W. Mangum, in which Dr. Mangum, following Celestica's submission of new estimates of EMS purchases—based upon new DRAM transactions data— concluded that Celestica passed through approximately 38% of the alleged DRAM

---

[207] Dr. French describes a reduced form econometric price model as an equation expressing the price of a product as a function of supply factors, demand factors and various product characteristics. *Id.* at 23-24 n.54.

137

overcharges and absorbed 62%. *Id*. at ¶12. Dr. Mangum also concluded that the ratio of weighted average DRAM cost to the weighted average prices for DRAM-containing devices price for products used in the analysis is approximately 14.8% ($76.20/$516.50). *Id*. at ¶13.[208]

<u>The July 25, 2011 Second Report of Gary L. French, PhD.</u>

252. On July 25, 2011, Resellers' Allocation Counsel submitted to the Special Master the Second Expert Report Regarding The Pass Through of DRAM Price Increases to Downstream Indirect Purchasers by Dr. French.[209] Dr. French quantified the proportion of DRAM price increases that are passed through to end-buyers by resorting to two econometric models, one modifying Dr. Flamm's model (the "Modified Flamm Model") and the other, Dr. French's reduced form model (the "French Model"). Excluding standalone DRAM memory modules,[210] the French Model yielded pass-through rates to end-buyer purchasers for various computer product categories for which data was available that ranges from 26.8% to 47.4%, with a weighted average of pass-through rate across all categories by revenue of 36.724%, or 52.544% when weighted by DRAM cost. *Id*., Ex. 4. Using the Modified Flamm Model, Dr. French estimated a weighted average pass-through rate across all categories by revenue of 61.452%, or 68.804% when weighted by DRAM cost. *Id*., Ex. 2.

253. On July 28, 2011, all counsel and experts participated in a meeting wherein the expert reports were discussed. On August 8, 2011, Celestica produced

---

[208] A copy of Dr. Mangum's second supplemental report is attached as Exhibit 40 to the Appendix hereto.

[209] A copy of Dr. French's second report is attached as Exhibit 41 to the Appendix hereto.

[210] Dr. French concluded that the situation with modules varied substantially from that of computer products, and the pass-through rate for memory modules is 110.4%.

BoMs' files used to assign the quantity of DRAM per DRAM-containing device in conformance with the terms agreed upon by the parties as submitted to the Special Master on June 21, 2011.

254.    Thereafter, all counsel participated in a series of negotiations that ultimately resulted in their arriving at a fair and reasonable method of recognizing the pass-on of DRAM overcharges to end-buyers as well as the absorption of a portion of those overcharges by resellers in a plan of distribution of the settlement proceeds to resellers and end-buyers.

**D.    Resolving the Question of Whether Certain Class Members' Claims Should be Accorded Different Weight in Calculating Settlement Refunds to Reflect Differences in the "Strength" of Their Litigation Postures**

255.    The Special Master was presented with the question of whether fairness demanded a plan of distribution that recognized differences between the strength of claims based on whether individual state antitrust laws are hospitable or hostile to indirect purchasers.  In other words, whether these differences in state law were such that citizens of states that had enacted "*Illinois Brick* repealer" legislation (and, in some instances also, *parens patriae* statutes) should be paid more than citizens of "non-repealer" states.

256.    On November 12, 2010, the Illinois Attorney General submitted a letter to the Special Master in which, among other things, the Illinois Attorney General asserted that "the significant difference in the value of claims held by end-buyers in States whose laws allow for recoveries for indirect purchasers mandates that those end-buyers receive a significantly larger per capita recovery than those in states without such laws."  At that time, it was decided to postpone the issue.

139

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

257.     Consideration of the issue began on March 11, 2011, when the Attorneys General of Illinois and Florida submitted a letter-brief to the Special Master reflecting the views of several Attorneys General containing a proposal "for allocating the end-buyer natural person portion of the DRAM indirect purchaser settlement funds to account for the availability of indirect purchaser damages among the states."[211]   The proposal advocated dividing individual end-buyer natural persons into two groups, those from "strong law indirect purchaser states" and those from "weak law indirect purchaser states."   The proposal also advocated that the claims of natural persons residing in states with *parens patriae* statutes should have their claims "value[d] more highly" than those who reside in states without *parens patriae* statutes, presumably by putting them in the "strong law" category.   No specific allocation or weighting of the claims between the two proposed groups was proposed in this letter-brief.   The Special Master further discusses this proposal, which well might have merit in an appropriate case under different facts, in order to illustrate the practical difficulties that were raised by it in this case as a prelude to the compromise reached and endorsed by all parties in this case in the allocation plan.[212]

258.     In a letter-brief response, dated March 23, 2011,[213] Indirect Purchaser Plaintiffs Co-Lead Counsel raised a number of "significant questions" about this proposal.   These questions, *inter alia*, included:

---

[211] A copy of this letter-brief is attached as Exhibit 42 to the Appendix hereto.   The California Attorney General did not join this letter-brief.

[212] *See Sullivan, supra*, 667 F.3d at 326-28 (citing and discussing cases in noting that the decision when to tier in an allocation plan was one subjected to the discretion of the district court in assessing the circumstances of the case – an exercise of which would only be reviewed on appeal for abuse – and that circumstances which could militate against tiering include the imprecision in valuing differentials in state law for tiering purposes in a given case and whether the underlying injury of all of the claimants in various states is the same or different).

[213] A copy of this letter-brief is attached as Exhibit 43 to the Appendix hereto.

140

(a) balancing of the scope of representation of the Indirect Purchaser Plaintiffs vis-à-vis the *parens patriae* claims of the Attorneys General;

(b) whether the *parens patriae,* antitrust and consumer protection claims that this Court had dismissed with prejudice on the grounds that the states lack the authority to assert them should be accorded the same weight as the active *parens* claims of other states;

(c) whether the proposal covered claims filed by and on behalf of both natural persons and businesses; and

(d) whether other differences should be considered in addition to the existence or absence of *Illinois Brick* repealers.

259.    At the hearing on April 7, 2011, the Special Master expressed concerns about this proposal.  He questioned  whether any weighted distribution plan would unduly complicate and prolong the settlement approval process and invite appeals in this litigation that is already more than nine years old.  He stated his concern that any weighted distribution plan may ultimately turn on subjective views as to the relative merits and relative importance of aspects of the totality of a class member's released claims, and spawn an ancillary round of litigation among class member objectors about who should get how much and on what basis.  The Special Master requested the parties to meet and confer to attempt to arrive at a simple, straight-forward and fair plan for distributing the proceeds of the settlements to the non-government indirect purchasers.

260.    Following that request, all parties, after much debate and compromise, fashioned and agreed upon a plan of allocation and distribution that does not distinguish between claimants based upon their residency in repealer states, or on any other basis that attempts to qualify or quantify the relative strengths or weaknesses of their litigation postures.  That plan could not have been achieved without the cooperation of all

141

participants, including the Attorneys General (even though many of them do not require court approval for distribution plans involving their own *parens patriae* claims)[214] and the resellers, who worked hard to fashion a distribution plan that would be fair to all claimants. The agreement, and the Special Master's findings below that it presents a fair and reasonable plan of distribution, effectively eliminated the need for the Special Master to consider subclassing to effectuate a distribution based upon an evaluation or perception of differences in class members' state law claims.

261.     As noted above, not every difference in position between settlement class members requires the creation of a formal subclass. Rather, what is required is that each material difference of position be adequately advocated and resolved by negotiation or adjudication and that the fairness and adequacy of the result be considered by this Court. The Special Master finds that this occurred here and the parties reached a reasonable compromise.

**E.     The Terms of the Negotiated Plan of Allocation and Distribution of the Settlement Proceeds to the Proposed Indirect Purchaser Settlement Class**

262.     The negotiated plan of allocation and distribution for the Indirect Purchaser Settlement Class provides for an essentially *pro rata* distribution to all class members (based on the amount of DRAM purchased) from a single fund with certain adjustments to reflect the pass-on of the alleged overcharge to end-buyers. The plan does not propose to attempt to create categories of claims weighted on the basis of their relative merit. The plan does not require the creation of subclasses. The principal terms of the negotiated "Indirect Purchaser Plan of Distribution" is summarized as follows:

---

[214] *See, e.g., State of Washington et al. v. Chimei Innolux Corp.*, 659 F.3d 842 (9th Cir. 2011) (*comparing* and contrasting Washington *and* California *parens* statutes for purposes of CAFA analysis, including pointing out that California's *parens* statute requires court approval of distribution plans while Washington's *parens* statute does not).

•    All non-governmental entity indirect purchasers (resellers and end-buyers) will be entitled to claim a cash distribution from the net settlement fund.[215]  Subject to (i) the provisions for specified minimum and maximum recovery amounts described below; (ii) establishing the estimated actual single damages for DRAM and DRAM-containing devices; and (iii) establishing the value of DRAM in DRAM-containing products, the claims of all resellers, end-buyer businesses and households will be treated the same for purposes of computing *pro rata* shares of the settlement fund.

•    All claimants will be required to submit claim forms under penalty of perjury, stating the quantity and type of DRAM modules and DRAM-containing products purchased during the settlement class period.

•    A *pro rata* recovery amount will be calculated for each claimant on the basis of the amount of DRAM modules and DRAM-containing product purchases each made, according to a formula that weights the DRAM content of the various categories of DRAM-containing products and converts all purchases to a common unit of measure.  The "value" of the DRAM in computers and other categories of DRAM-containing products will be determined from available data.[216]

•    All small claimants (resellers and end users), defined as those claimants whose *pro rata* recovery amount is less than $10, will have their recovery raised to that amount.

•    The total amount of recoveries to small claimants will be capped at $50 million.  If the total dollar amount of all small claimant recovery, after each claimant is raised to $10, exceeds $50 million, no distribution of individual checks will be made to this group.  Rather, $40 million will be distributed *cy pres* to the benefit of small claimants.

•    In the event that the number of small claims received is such that the total small claimants' recovery (after enhancement to the $10 minimum described above) does not exceed $25 Million, the difference between the amount being paid directly to small claimants and $25 Million will be distributed as follows:  (1) first, the amount of the small claimants' checks will be increased *pro rata* above $10, up to a cap of the estimated actual single damages suffered by each claimant as a result of his/her/its claimed purchases, until the available funds up to such $25 million are exhausted; or (2) if this procedure for increasing small

---

[215] The net settlement fund, as used here, is the amount for distribution to the class after payment of taxes, escrow fees, attorneys' fees and costs, the Special Master's fees and costs and any other court approved charges against the settlement proceeds (plus any interest earned thereon).

[216] The specifics of this formula will be covered in Part II of this Report and Recommendations as part of the discussion of the claim form and claims processing procedures.

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

claimants' checks does not exhaust the available funds up to such $25 million, any remainder will be distributed *cy pres*.

• In the event that the *pro rata* distribution share of any claimant whose *pro rata* share would be greater than $10 would exceed the estimated actual single damages suffered by him/her/it as a result of their claimed purchases, their recoveries will be limited to their estimated actual single damages. Any excess would be distributed *cy pres*.

• Estimated actual single damages for DRAM and DRAM-containing products will be calculated as a percentage overcharge based on data developed during the litigation.[217]

• No specific *cy pres* distribution plan(s) will be submitted until events dictate that a *cy pres* distribution is necessary. Similarly, a decision as to the ultimate disposition, (e.g., *cy pres* or additional distribution) of the residue of uncashed checks will not be made until the size of any residue is quantified.[218]

## X. FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE FAIRNESS AND ADEQUACY OF THE INDIRECT PURCHASER SETTLEMENT CLASS'S NEGOTIATED PLAN OF DISTRIBUTION

263. Approval of plans of allocation and distribution of a settlement fund in a class action is governed by the same standards applicable to approval of the settlement as a whole – namely, allocation and distribution plans must be fair, adequate and reasonable. *In re Lucent Tech., Inc. Sec. Litig.*, 307 F.Supp.2d 633, 649 (D.N.J. 2004) (quoting *In re Computron Software, Inc. Sec. Litig.*, 6 F.Supp.2d 313, 321 (D.N.J. 1998)); *see also In re Remeron End-Payor Antitrust Litig.*, No. 02-2007 FSH, 2005 WL

---

[217] The calculation of estimated single damages for DRAM modules and DRAM-containing products will also be covered in Part II of this Report and Recommendations

[218] As discussed in Section X, subsequent to arriving at the terms of the negotiated plan of distribution, the parties briefed the issue of whether the Ninth Circuit's recent decision in *Dennis v. Kellogg Co.*, No. 11-5706, 2012 WL 2870128 (9th Cir. July 15, 2012), vacated and reissued as *Dennis v. Kellogg Co.*, Slip Op. 10527, D.C. No. 3:09-cv-01786-IEG-WMC, 2012 U.S. App. LEXIS 18576, (9th Cir. Sept. 4, 2012) required alteration of this aspect of the plan. After consideration of the issue, the Special Master concluded that it continues to be appropriate in the circumstances of this case to defer the identification of *cy pres* recipients until the necessity and extent of any *cy pres* distribution is established.

144

2230314, at *25 (D.N.J. Sept. 13, 2005). The district court's approval of an allocation plan for a settlement in a class action is reviewed for an abuse of discretion. *Dunleavy v. Nadler (In re Mego Fin. Corp. Sec. Litig.)*, 213 F.3d 454 (9th Cir. 2000). *See also Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011). ("[D]istrict courts enjoy broad supervisory powers over the administration of class action settlements to allocate the proceeds among the claiming class members equitably.") *In re Remeron Direct Purchaser Antitrust Litig.*, No. 03-0085 FSH, 2005 WL 3008808, at *11 (D.N.J. Nov. 9, 2005) (quoting *Hammon v. Barry,* 752 F. Supp. 1087, 1095 (D.D.C. 1990) (internal quotation marks and citations omitted)).

264.    A district court's approval of a proposed class action settlement, including a proposed settlement distribution, will be reviewed and reversed only for abuse of discretion. *Rodriguez v. W. Publ'g Corp., supra,* 563 F.3d at 963. A court abuses its discretion when it fails to apply the correct legal standard or bases its decision on unreasonable findings of fact. *Las Vegas Sands LLC v. Nehme*, 632 F.3d 525, 542 (9th Cir. 2011).

265.    Special Masters are frequently used to assist settling parties and the courts in arriving at fair, adequate and reasonable plans of allocation and distribution. *See e.g.*, *Dotson v. United States*, 87 F.3d 682, 684 (5th Cir. 1996) (acknowledging that special master developed plan of distribution for settlement that was ultimately approved by the court); *In re Agent Orange Litig.*, 818 F.2d 145, 157-8 (2d Cir. 1987) (recognizing that lower court adopted special master's plan of distribution with modifications); *Denny v. Jenkins and Gilchrist,* 230 F.R.D. 317, 321 n. 21 (S.D.N.Y. 2005) (tax shelter advice settlement provided that a court-appointed master would recommend a plan of distribution for the court's approval, taking into account the

145

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

various factors relating to the extent of each class members' injuries); *In re Holocaust Victims Asset Litig.*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000) (special master appointed to develop a proposed plan for allocating and distributing settlement funds); *Smith v. MCI Telecomm. Corp.*, No. 87-2110, 1993 WL 142006, (D. Kan. Apr. 28, 1993) (special master assisted parties in developing allocation plan of settlement funds).

266.     By any objective measure, "a Plan of Allocation need not be, and cannot be, perfect." *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 272 (D.N.J. 2000), *aff'd*, 264 F.3d 201 (3d Cir.), *cert. denied*, 535 U.S. 929 (2002).   Neither need a plan of distribution be optimal from the perspective of each and every potential claimant.   In many cases, if not in most cases, perfection to everyone's satisfaction is unattainable.   *In re Warfarin Sodium Antitrust Litigation*, 212 F.R.D. 231, 258 (E.D. Del. 2002), *aff'd*, 391 F.3d 516, 534 (3d Cir. 2004).   In designing a plan of distribution for a settlement such as this involving a large number of different products and millions of class members, a delicate balance must be achieved between precision and administrative feasibility.   *See In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104,135 (S.D.N.Y. 1977) ("Efficiency, ease of administration and conservation of public and private resources are highly relevant in the reasonableness of a settlement.").   The key standards for allocation and distribution of settlements are broad notions of fairness, reasonableness and adequacy.   "A district court's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.' *Walsh v. Great Atl. & Pac. Tea Co., Inc.*, 726 F.2d 956, 964 (3d Cir. 1983)." *Sullivan, supra,* 677 F.3d at 326.   "A plan that reimburses class members based on the type and extent of their injuries is generally reasonable." *In re Lucent Tech., Inc. Sec. Litig,* 307 F. Supp. 2d at 649; *see also In re Corel Corp. Sec.*

146

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

*Litig.*, 293 F. Supp. 2d 484, 493 (E.D. Pa. 2003) and *Remeron,* 2005 WL 3008808, at *11.

267.    There is rarely only one way of distributing settlement funds that qualifies as fair, reasonable and adequate under any given set of circumstances. Accordingly, the selection of a distribution method or plan does not require that all other possible means of distributing the settlement funds be rejected as inadequate or unreasonable, only that the method that is selected by the parties and the court be fundamentally fair and practicable.

268.    The crafting of a plan of distribution by negotiation and agreement of counsel familiar with the litigation is the preferred method of arriving at a fair, reasonable and adequate allocation and distribution of the settlement proceeds.  As noted by the district court in *In re Marsh ERISA Litig.,* 265 F.R.D. 128, 145-46 (S.D.N.Y. 2010):

> A district court has broad supervisory powers with respect to allocating a class action settlement and wide latitude in determining what to consider in approving a settlement allocation.  *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179, 181 (2d Cir. 1987).  'When formulated by competent and experienced class counsel, an allocation plan need have only a 'reasonable, rational basis.'  *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 462 (S.D.N.Y. 2004).  In determining whether a plan of allocation is fair, courts give substantial weight to the opinions of experienced counsel.  *See In re Painewebber Ltd. P'ships. Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997).

In *Law v. NCAA,* 108 F. Supp. 2d 1193, 1196 (D. Kan. 2000), the district court found that the case law indicates that "[t]he adequacy of an allocation plan ordinarily 'turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information.'  (Citation omitted)"  Other cases relying on the competence of the counsel proposing the plan of

147

distribution as grounds for a finding of fairness and adequacy include: *In re Heritage Bond Litig.,* MDL No. 1475, 2005 U.S. Dist. LEXIS 13555, at *38-39 (C. D. Cal. 2005) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel.");  *Maley v.[ Del Global Techs. Corp].,* 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002)…. "The fact that the plan of allocation is recommended by experienced and competent counsel further cuts in favor of approving the Settlement."  "The proposed Plan of Allocation, which was devised by experienced plaintiffs' counsel who are familiar with the relative strengths and weaknesses of the potential claims of Class members, satisfies the same standards of fairness, reasonableness, and adequacy that apply to the overall settlement"); *In re Exxon Valdez,* No. A89-0095 (HRH), 1996 U.S. Dist. LEXIS 8173, at *5 (D. Alaska, June 11, 1996) ("In light of the experience and views of counsel and the zeal with which they represent their clients, the court is satisfied that the Plan of Allocation is in the best interests of plaintiffs.").

269.    The Special Master's role in the recommendation of a plan of allocation and distribution is not unlike the court's principal role, which "is to protect the unnamed members of the class."  *Ehrheart v. Verizon Wireless,* 609 F.3d 590, 593 (3d Cir. 2010). Accordingly, as the court in *Sullivan* advised, judges and special masters alike must:

> [R]emain cognizant that our "'intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties.'" *Rodriguez,* 563 F.3d at 965 (quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir. 1998)); *see also GM Truck,* 55 F.3d at 805 (same).

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Sullivan,* 667 F.3d at 325-26.  Based upon first hand observation, the Special Master finds that the proposed plan of distribution to the Indirect Purchaser Settlement Class is in no way the product of collusion, fraud, or overreaching by any party or counsel.

270.    The basic feature of the plan is that to the maximum extent all class members are treated equally, and the settlement proceeds divided *pro rata* based upon the quantity of DRAM purchased by each class member.  Many courts have approved as fair, reasonable and equitable plans such as this that strive to the maximum extent practicable to treat all class members alike.  For example, in *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 1999 U.S. Dist. LEXIS 12936, 1999 WL 639173 (N.D. Ill. Aug. 17, 1999), the court approved a *pro rata* distribution in a case involving class member pharmacies of all sizes, ranging from small, independent pharmacies to large chain pharmacies, including CVS, Walgreens and Walmart.  *See also, e.g., In re Packaged Ice Antitrust Litig.*, 2011 U.S. Dist. LEXIS 150427, (E.D. Mich. Dec. 13, 2011); *In re Airline Ticket Commission Antitrust Litig.*, 953 F. Supp. 280, 284-85 (D. Minn. 1997) (proposed *pro rata* distribution plan was "cost-effective, simple and fundamentally fair"); *In re Corrugated Container Antitrust Litig.*, 556 F. Supp. 1117, 1129 (S.D. Tex. 1982) (approval of class action settlement that provided for *pro rata* distribution based upon valid claims of allowable purchases), *aff'd*, 687 F.2d 52 (5th Cir.1982).

271.    In arriving at this "single pot" plan of distribution, the parties elected not to make any distinctions in the distribution formula to account for actual or perceived differences in the merits or "strength" of the various settled claims, either on the basis of the *Illinois Brick* repealer/non-repealer state dichotomy, the DRAM module vs. DRAM as component distinction adopted in this Court's AGC Order, or any other differences in

<hr>

149

situation that could potentially affect a class members' claim in a merits determination. Recommending that the negotiated plan be adopted by this Court, the Special Master concurs with the *Sullivan en banc* decision under the particular circumstances of this case that there should be no requirement that a distribution formula reflect a merits determination in order to be fair and reasonable.

272.     In *Sullivan*, class member objectors claimed that "differences in state law mandate[d] a differential allocation in the percentage of recovery within the Indirect Purchaser Consumer Settlement Fund, which should 'account for the[ ] varying strengths and weaknesses' of consumer claims as informed by the applicable state law treatments of indirect purchaser causes of action." *Sullivan,* 667 F.3d at 326. Therefore, they asserted that the district court's failure to "utilize subclasses in accounting for the varied rights to recovery caused by *Illinois Brick* disparities in state laws" was an abuse of discretion. *Id.* The *en banc* court disagreed. First, the court cautioned against viewing every distinction between class members as an example of the "divergent and antagonistic interests" that require subclassing. Second, the court noted that it is the presence of significant variations in the compensation being afforded to certain groups within a settlement class that tend to require closer scrutiny and possible subclasses, comparing its decisions in *Insurance Brokerage* (no subclasses required) and *Pet Food* (remanded for further evaluation of the plan of distribution and possible subclasses). *Id.* at 327. Turning to the *pro rata* distribution plan before it, the Third Circuit observed:

> "Like the progressive settlement contemplated in *Insurance Brokerage*, the settlement at issue here provides for a *pro rata* distribution to all class members, and does not distinguish based upon any variables, such as the applicable state law of claimants' states of residence or location of purchase. * * * [T]he [District] Court observed that there were no intra-class conflicts since all putative members experienced injury caused by De Beers, all sought recovery for overpayment caused by allegedly

150

anticompetitive behavior, and all shared common interests in establishing damages and injunctive relief."

*Id.* at 327-28.  The same can be said of the Indirect Purchaser Settlement Class here.

273.    Finally, the Third Circuit cautioned that crafting a fair and reasonable plan of distribution based upon assigning strengths and weaknesses to the merits of various class members' claims carries with it its own pitfalls and difficulties:

> [A]s the district court in *Warfarin* observed, '[i]t is purely speculative that claimants from indirect purchaser states could anticipate a greater recovery than claimants from other states.'  *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 260 (D. Del. 2002); *see also Cendant*, 264 F.3d at 250 (given the 'speculative' nature of such an inquiry, differences in the liability standards between § 11 and § 10(b) securities claims did not warrant differential plan of allocation).  And only by engaging in the type of fact-intensive merits and choice-of-law analyses that we have rejected could a district court attempt to assay the 'varying strengths and weaknesses' of asserted state claims.

*Id.* at 327.  Therefore, the Third Circuit concluded that "[i]t may be entirely reasonable to apply the same damages calculation to claimants from all states" and found "no support in our case law for differentiating within a [settlement] class based on the strength or weakness of the theories of recovery.  Accordingly, we decline to require such an analysis."  *Id.* at 327-28.

274.    The Special Master observed first hand the vigorous exploration and persuasive advocacy by counsel representing the interests of each of the variously affected constituencies within the proposed Indirect Purchaser Settlement Class.  There was a full exploration, including the development of an adequate record, of each of the major issues bearing on the fairness and adequacy of any plan of distribution that might be created for the Settlement Class—namely the channels of DRAM commerce, the passing on of the alleged overcharges down the chain of distribution from resellers to end-buyers—as well as the more purely merits based issues of *Illinois Brick* repealer

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

state law vs. non-repealer state law, the potential for nationwide reach of the California
Cartwright Act and of federal monetary equitable claims, the existence of *parens patriae*
claims for certain consumers, the effect of this Court's AGC Order which
"strengthened" the claims of all DRAM module purchasers (more likely resellers) vis-à-
vis the class claims of purchasers of computers and other DRAM-containing devices
(more likely end-buyers) in this case, and the effect of subsequent decisions in other
cases, as well as the disagreement about the inapplicability of that AGC Order to the
*parens patriae* claims of the Attorneys General.[219]

275.    As with any good negotiated resolution, each of these conceptual
positions is reflected in the plan ultimately agreed upon, but none solely determines its
outcome.  The plan begins with all processed claims (i.e., timely, verified, if required,
etc.) being subjected to a *pro rata* formula weighted only for the DRAM "content" or
"value" of the claimant's particular purchases.[220]  Thereafter, a second formula adjusts
all claimants' *pro rata* "payments" by raising all of the claims that under the initial
formula generated a payment of less than $10.00 up to $10.00.  All parties agree based
upon past experience that the vast majority of the claims in this category will have been
submitted by natural person end-buyers.  If the total of these adjusted claims is $50
million or less, as is the educated expectation of all parties and the Special Master, then
there will be a direct distribution to these claimants.

---

[219] *See* footnote 120, *supra*.

[220] A DRAM module, for example, has a DRAM content value of 100% while a gaming
console's DRAM content value is substantially less.  The precise value assigned to the DRAM
content of various DRAM-containing devices will be covered in Part II of this Report and
Recommendations.

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

276.     The negotiated plan of distribution also contains provisions for the eventuality that small claims when raised to the $10 "floor" payment will exceed the specified $50 million of the settlement fund.  In that event, the plan provides that those claimants whose "payments" under the original formula were less than $10 will not receive a cash distribution.  Rather, they will be compensated in two ways.  First, like all members of the settlement classes, they will receive the benefit of the injunctive relief provided for in the various settlement agreements.  Second, a fund of $40 million will be created from the settlement proceeds to be distributed *cy pres* as determined by the Court for the benefit of small claimants.

277.     The concept of setting a *de minimis* payment amount below which checks will not be issued has long been accepted as a feature of class action distributions.  *See, e.g.*, *Mehling v. New York Life Ins. Co.*, No. 99-5417, 2008 WL 597725, at *7 (E.D. Penn. March 4, 2008) (approving a $50 minimum payment); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02-1484, 2007 WL 4526593, at *12 (S.D.N.Y. Dec. 20, 2007) ($50 minimum payment reasonably required to efficiently administer the settlement fund); *In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1268 (D. Kan. 2006) ($25 *de minimis* threshold amount ruled fair); *In re Global Crossing Securities and ERISA Litig.*, 225 F.R.D. 436, 463 (S.D.N.Y. 2004) ($10 *de minimis* threshold found reasonable).  It is based in part on the idea that at some point the benefit to the class as a whole does not justify the cost of processing small claims, issuing refund checks and following up on uncashed checks, which themselves have little value to the recipients.  As the court explained in *In re Global Crossing Sec. and ERISA Litig.*:

> Claimants who are entitled to receive only small settlement amounts can impose additional costs on the settlement fund, because such persons are less likely to cash their checks than are those claimants who receive larger amounts.  The claims administrator therefore must incur additional expenses in contacting claimants who have not cashed their checks and

153

urging them to do so.  If the checks remain uncashed, the money must be reallocated…which create additional costs for the settlement fund.

225 F.R.D. at 463.  *See also In re Music Compact Disc Minimum Advertised Price Litigation*, 216 F.R.D. 197, 208-10, 214 (D. Me. 2003) (no requirement for a cash payment where amount paid would be small and costly to administer).

278.    The Third Circuit in the *Sullivan* decision recently joined the numerous district courts in confirming the reasonableness of the $10 *de minimis* threshold for payments.  In addition to confirming the reasonableness of not sending refund checks for less than $10 on the basis of particular factual circumstances ("minimum recovery requirement is a common procedure that addresses 'the undeniable fact that claims-processing costs money, which comes out of the settlement fund' (citation omitted)"), the *Sullivan* court rejected the objectors' arguments that these class members will receive no benefit in return for their releases on two additional grounds.  *Sullivan,* 667 F.3d at 328.  First, the Third Circuit noted that the objectors' position "fails to acknowledge the injunctive relief offered by the settlement, however, which is intended to benefit all class members regardless of individual monetary recovery," and second, it "ignore[s] a key rationale underlying the class action mechanism."  *Id.* at 329.  "In addition to providing individual class members with payments, '[t]he policy at the very core of the class action mechanism'" is to provide sufficient incentive to prosecute an action "by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor," *Yang*, 392 F.3d at 106 (quoting *Amchem*, 521 U.S. at 617)."  *Id*.  The *Sullivan* court found that the members of the settlement class derived a benefit as citizens from incentivizing the representative parties and their counsel to enforce the antitrust laws.

154

279.     Here, the plan of distribution provides a mechanism for paying small claimants and employs a procedure for eliminating *de minimis* refunds only in the event that there are more than 5 million small claimants (and the total of the minimum $10 payments would therefore exceed $50 million), an event which would require a robust claims experience above the norm experienced in most similar class actions. Accordingly, the Special Master finds that the provision for not making cash payments below $10 is fair and reasonable.  In addition, unlike the *de minimis* claimants in *Sullivan*, the small claimants here will receive the benefit of a *cy pres* distribution in the amount of $40 million in addition to the injunctive relief and "civic" benefits discussed by the Third Circuit.

280.     There are two additional provisions of the proposed plan of distribution that potentially trigger *cy pres* distributions in addition to the *de minimis* claims threshold discussed above.  The first involves the situation in which so few claims are received that a *pro rata* distribution to small and/or large claimants would exceed those claimants' estimated actual single damages and the second is the disposition of the residue of uncashed checks following an initial distribution.  For a smaller-than-expected claims experience in the small claimant group to trigger a *cy pres* distribution, the number of small claims raised to the minimum $10 payments must total less than $25 million.  In that event, the small claimant checks will be increased *pro rata* until the distribution to this group either totals $25 million or has resulted in each small claimant receiving a check for his/her/its estimated single damages, an amount that under the plan serves as a refund cap for all claimants.  In the event that, even after each small claimant is raised to the maximum refund amount, the total refunds to small claimants does not reach $25 million, the difference between the total refunds and $25 million will be distributed *cy pres* for the benefit of small claimants, who it is anticipated will be largely

155

natural person households.[221] For a smaller-than-expected claims experience with larger claimants (those whose initial unadjusted *pro rata* refund is greater than $10) to result in a *cy pres* distribution, all individual *pro rata* refunds to this group must be greater than the amount of estimated single damages for each claimant. In that situation, refund checks would be limited to the amount of estimated single damages. Any excess funds would be distributed *cy pres* for the benefit of all class members, and the Settling Plaintiffs would propose a *cy pres* plan to the Court, seeking its approval for the distribution of any such excess funds. *See, e.g., In re Music Compact Disc Minimum Advertised Price Litigation*, 216 F.R.D. 197, 208-210, 214 (D. Me. 2003) (approving a similar, joint plan of Attorneys General and private plaintiffs in which such a *cy pres* distribution was proposed and approved for the excess funds).

281.    Caps on a maximum *pro rata* distribution are a commonly employed aspect of class action distributions. *See, e.g., Rodriguez v. West Publ. Corp.*, 2007 U.S. Dist. LEXIS 74767, at *40 (C.D. Cal. Sept. 10, 2007), *affirmed in part and reversed on other grounds by Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ("The Court rejects the argument of certain Objectors that the possibility of a cap on individual recovery resulting in a *cy pres* award should defeat approval of the Settlement. Those provisions do not render the Settlement inadequate. The Maximum Payment was a heavily negotiated term of the Settlement. Because the Net Settlement Fund is to be distributed *pro rata* among the Class Members who make a valid claim, the Maximum Payment prevents a small group from receiving a multi-million dollar windfall. . . . The Maximum Payment does not create any benefit for Defendants, as they will not receive

---

[221] The purpose of this provision of the agreement by which at least $25 million in value will be directed to the compensation of small claims is to recognize the value of the end-buyers' overcharge pass-on arguments and the natural person class members' *parens patriae* claims.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

any money back if the Maximum Payment and *cy pres* award are implicated. In that event, this Court will determine the recipient of any *cy pres* award of the undistributed funds."); *In re NCO Fin. Sys.,* 2002 U.S. Dist. LEXIS 17602 at *24 (E.D. Pa. 2002) (approving a settlement distribution plan that provided that "[t]o the extent that claiming class members' checks are returned or remain uncashed for a period of 120 days after mailing, or each claiming class member receives the maximum share of $75.00 and there still remains a portion of the net settlement fund undistributed, NCO shall transmit to Lead/Liaison Counsel a check representing the remaining portion of the net settlement fund for a *cy pres* distribution"); *In re Music Compact Disc Minimum Advertised Price Litigation*, *supra,* 216 F.R.D. 197, 208-10 (district court approved a fixed distribution that capped recovery at $25 per consumer).

282.    Like the maximum payment in *Rodriguez,* the maximum payment cap here was the result of negotiations between plaintiffs' Co-Lead Counsel, the Attorneys General, resellers' Allocation Counsel and counsel for class member Celestica.  The capping of large claimant refunds at 100% of single damages and the distribution of any overage *cy pres* for the benefit of all claimants, large and small, was an additional means of reflecting in the settlement distribution plan the pass-on and *parens patriae* claims of individual natural person households, who are more likely to fall within the small claimant group.

283.    As noted above, the proposed plan of distribution here is grounded in the educated prediction that all or virtually all of the settlement proceeds will be paid out *pro rata* to class members based upon the extent of damages suffered, which all counsel recognize as the preferred option in damage claim class action settlements.[222]  Despite

---

[222] *See, e.g., Sullivan*, 667 F.3d at 325-28.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

the preference for cash refunds to class members, however, a viable alternative does exist in which the settlement funds are distributed, in whole or in part, *cy pres* or through fluid recovery, to charitable and/or public institutions which are found by the court to convey an indirect benefit on members (frequently consumers) of the settlement class. *See, e.g., In re Toys-R-Us Antitrust Litig.*, 191 F.R.D. 347, 353-54 (S.D.N.Y. 2000); *In re Mexico Money Transfer Litigation*, 164 F.Supp.2d 1002, 1010-11 (N.D. Ill. 2000), *aff'd*, 264 F.3d 743 (7th Cir. 2001); *In re Microsoft I-V Cases*, 135 Cal. App. 4th 706, 716 (2006); *In re Vitamins Cases*, 107 Cal. App. 4th 820, 826, 830-32 (2003).  While the *cy pres* approach has been most often used to distribute the residue of a settlement fund that results when less than all refund checks are cashed, federal courts have employed this approach under federal common law to distribute either a significant part of a settlement fund, or the entirety of a settlement fund, where it has found that a cash distribution to individual class members is not economically feasible.  *See, e.g., In re Microsoft Corp. Antitrust Litig.*, 185 F. Supp. 2d 519, 523 & n.2 (D. Md. 2002) (addressing distribution of entirety of settlement fund in context of proposed nationwide class settlement); *In re Mexico Money Transfer Litig.*, 164 F.Supp.2d at 1010-11, 1018-19, 1030-31 (addressing proposed split distribution plan in context of proposed nationwide settlement under which Settling Defendants would provide transferable discount coupons on future transfers of monies to Mexico and would fund a *cy pres* contribution to charitable or public interest organizations serving Mexican or Mexican-American causes).  In a number of multistate cases involving the nationwide settlement of primarily federal antitrust claims, state attorneys general received the approval of the federal courts for a *cy pres* distribution of the whole or a substantial part of a settlement fund, again based on concerns that distribution of settlement proceeds to individuals was not feasible.  *See, e.g., In re Music Compact Disc Minimum Advertised Price Litigation*,

158

216 F.R.D. at 208-10, 214; *In re Toys-R-Us Litig.*, 191 F.R.D. at 353-55; *State of New York et al. v. Reebok International, Inc.* 903 F. Supp. 532, 537 (S.D.N.Y. 1995), *aff'd* 96 F.3d 44 (2nd Cir. 1996); *State of New York v. Keds*, No. 93 Civ. 6708 (CSH), 1994 WL 97201, at *3 (S.D.N.Y. Mar. 21, 1994).

284.     As these cases illustrate, distributions of *cy pres* relief using all or part of a settlement fund serves multiple goals:  it allows small claimants, usually consumers, to receive some relief when their individual claims would simply be too small to ensure a feasible distribution; it operates to punish and deter defendants who have engaged in illegal acts by preventing them from keeping ill-gotten gains under the guise that direct distribution back to individuals is not feasible; and it avoids problems with other forms of indirect relief.  *See, e.g., In re Pharmaceuticals Average Wholesale Price Litig.*, 588 F.3d 32, 35-36 (1st Cir. 2009); *Mirifashi v. Fleet Mortg. Corp.* 356 F.3d 781, 784 (7th Cir. 2004); *see also State of California v. Levi-Strauss*, 41 Cal.3d 460, 474-78 (1986) (noting that direct distribution can be a problem because not only do silent class members receive no compensation at all but others can receive a windfall and that a failure to allow for *cy pres* would "cripple" the compensatory function of the private class action).  In determining the feasibility of direct distribution, the courts can consider factors such as whether there is too large of a potential class of claimants to make any individual distribution feasible, or whether assuming a large claims rate, the fund or a portion of the fund would be so small that administrative costs would be disproportionate to the benefits of an individual cash distribution.[223]

---

[223] *See, e.g., In re Microsoft Corp. Antitrust Litig.*, 185 F. Supp. 2d at 523 & n.2 (D. Md. 2002); *Toys-R-Us*, 191 F.R.D. at 353-55; *Reebok*, 903 F. Supp. at 536-37; *Keds*, 1994 WL 97201, at *3; *State of New York v. Dairylea*, 1985 WL 1825, at *1-2 (S.D.N.Y. 1985); Farmer, *More Lessons from the Laboratories, Cy Pres Distributions In Parens Patriae Actions Brought By State Attorneys General*, 68 FORDHAM L. REV. 361, 399-402, 405 (1999); Miller &

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

285.     Recently in *Nachshin v. AOL*, 663 F.3d 1034 (9th Cir. 2011), the Ninth Circuit addressed the question of what kind of safeguards are necessary to ensure the fairness and adequacy of a distribution plan that proposes to distribute some or (as in that case) all of the settlement proceeds *cy pres* for the indirect benefit of a settlement class.[224]  First, the Ninth Circuit held that any proposed direct beneficiaries of a *cy pres* distribution must be "tethered to the nature of the lawsuit and the interests of the silent class members," finding that the lack of any such tethering, even though the recipients might be providing important public service and pursuing "virtuous goals," raised at a minimum the appearance of impropriety, if not the actual opportunity for the distribution to reflect "the whims and self interests of the parties, their counsel, or the court."  *Id.* at 1039.  The Ninth Circuit observed that any *cy pres* award must (1) address the underlying objectives of the statutes involved; (2) target the interests of the plaintiff class; (3) provide reasonable certainty that members of the settling class will benefit; and (4) account for the broad geographic distribution of the class.  *Id.* at 1040.[225]

---

Singer, *Nonpecuniary Class Action Settlements*, 60 LAW & CONTEMP. PROBS. 106-107 & n. 42-45 (AUTUMN 1997).

[224] *Nachshin* involved a class action lawsuit brought on behalf of 66 million subscribers of AOL alleging that AOL wrongfully inserted footers containing promotional messages in violation of various federal and California statutes into the e-mail sent by its subscribers.  *Id.* at 1036.  In exchange for certification of a nationwide class and the release of all claims, AOL agreed to injunctive relief in the form of a notice and opt-out process.  *Id.* at 1036-37.  As all of the parties agreed that the maximum amount of damages which the plaintiffs would receive at trial would be $2 million (on an unjust enrichment theory) and as a *pro rata* distribution of those damages would amount to $0.03 per plaintiff, the parties agreed to a suggestion of the district court judge that AOL make a series of charitable donations.  *Id.*  Because the parties claimed they could not identify any charitable organization that would benefit the class or would be specifically germane to the issues in the case, they agreed with the suggestion of the district court that donations be made to local charitable organizations in Los Angeles.  *Id.*

[225] Based on these criteria, the Ninth Circuit reasoned that the charities selected had nothing to do with the gravamen of plaintiffs' claims, which were that 66 million nationwide subscribers of defendant AOL's services were the victims of an allegedly unlawful advertising campaign that exploited their outgoing e-mail messages.  *Id.* at 1040-41.  The Ninth Circuit also reasoned that,

286.     Because the proposed plan of distribution here provides for a *cy pres* distribution only as a contingent occurrence, the parties have not attempted to employ the guidance of *Nachshin* and identify organizations to receive the settlement proceeds. In fact, the agreed-upon plan specifically provides that such identification be deferred until it is clear that one of the events triggering the need for *cy pres* relief has occurred. Subsequent to the parties agreeing on the distribution plan, they and the Special Master specifically addressed this aspect of the distribution following the issuance by the Ninth Circuit of its opinion in *Dennis v. Kellogg Company*, 687 F.3d 1149 (9th Cir. 2012) ("*Kellogg*"), vacated and reissued as *Dennis v. Kellogg Company*, Slip Op. 10527, D.C. No. 3:09-cv-01786-IEG-WMC, 2012 U.S. App. LEXIS 18576 (9th Cir. Sept. 4, 2012) ("*Kellogg II*").

287.     The original *Kellogg* decision, issued on June 7, 2012, raised the question of whether it had become a requirement in this Circuit to select even contingent *cy pres* recipients before final approval of a settlement. The plaintiffs in *Kellogg* filed a petition for rehearing and for rehearing *en banc*, on the basis, *inter alia*, that the Ninth Circuit's language that appeared to suggest a blanket requirement that even contingent *cy pres* recipients be designated prior to final approval conflicted with *Rodriguez* and other Ninth Circuit precedent. On September 4, 2012, the *Kellogg* panel issued an Order vacating its prior opinion and replacing it with a revised opinion that specifically distinguished the situation in the *Kellogg* case from the holding in *Rodriguez,* that where

---

as two-thirds of the *cy pres* donations were going to local charities located in Los Angeles that had little to do with the Internet, it was not clear how anyone in the nationwide class, even those located in Los Angeles, would benefit from the *cy pres* distribution plan. *Id.* The Ninth Circuit rejected the argument of the parties that adequate charities could not be identified, noting that "[t]he parties should not have trouble selecting beneficiaries from any number of non-profit organizations that work to protect Internet users from fraud, predation, and other forms of online misfeasance." *Id.* at 1041.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

a *cy pres* distribution is contingent on the outcome of the claims process for a cash distribution, issues regarding the identification of recipients "will not be ripe until it is determined that available cash remains in th[e] fund after the claims process has concluded." *Kellogg II,* 2012 U.S. App. LEXIS 18576, at *11-12.  Thus, the reissued opinion in *Kellogg* confirmed the validity of *Rodriguez.*

288.    Plaintiffs' counsel argued to the Special Master that the provision of the plan of distribution here to defer selection of *cy pres* recipients until it was established through the claims process that a *cy pres* distribution was necessary complied with *Rodriguez* and *Kellogg II* and served the best interests of the putative settlement class. Identification of specific *cy pres* recipients at this time, they argued, would mean the expenditure of significant time and money—all of which would be potentially, or indeed likely, wasted.  Counsel for the State of California informed the Special Master that they had consulted a nationally recognized expert in *cy pres* distributions, who was of the opinion that, since it is impossible to know the extent of funds available for *cy pres* distribution until claims are received, any identification process that would take place at this time was likely to be so imprecise that it would have to be redone when and if the need for a *cy pres* distribution were established.  No other party to the proceedings expressed an opposing view to the Special Master.  Accordingly, the Special Master finds that it is fair, reasonable and adequate to defer the selection of *cy pres* recipients until the claims experience triggers the need for a *cy pres* distribution under the provisions of the plan of distribution, or this Court determines that *cy pres* is the appropriate disposition of any residual remaining from uncashed checks.

289.    Given that the nationwide class of Indirect Purchaser Plaintiffs includes viable claims under California's Cartwright Act and its Unfair Competition Law, the

162

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

Special Master also considered California law in assessing the fairness and adequacy of the *cy pres* provisions of the plan of distribution. During the course of these proceedings, on November 12, 2010, the California Attorney General submitted to the Special Master a letter-brief describing the availability of *cy pres* remedies under California law, which is even more receptive than the Ninth Circuit and other federal courts to the use of *cy pres* as a viable remedy in large class actions where individual cash distributions would result in small payments.[226] In *State of California v. Levi Strauss*, 41 Cal.3d 460, 479 (1986), the California Supreme Court found that, in evaluating the benefits of attempting the re-distribution to claimants of even a considerable residue of settlement proceeds, courts should consider "the amount of compensation provided to class members, the proportion of class members sharing in the recovery, the size and effect of the spillover to nonclass members, and the costs of administration." The Court then made the following observations regarding disposal of the residue:

> The disposition of the residue on remand is a matter within the discretion of the trial court. However, it should be noted that under the criteria set forth here, Amici's suggestion that the residue should be used to establish a consumer trust fund has considerable merit. It is estimated that up to one-half of the original group of claimants may have moved since 1981. Claimants who have moved may be difficult to locate. Hence, further attempts to distribute the entire fund to individual claimants would result in an even lower rate of participation than did the original plan. Amici's consumer trust fund plan-or a plan employing earmarked escheat [where the funds are given to a government organization to be used on projects that benefit class members who have not received a distribution] in place of the consumer trust fund-would provide some indirect compensation for silent class members, while ensuring that the residue of the recovery is used on projects designed to effectuate the aims of the Cartwright Act.[227]

---

[226] A copy of this letter-brief is attached as Exhibit 44 to the Appendix hereto.

[227] *Id*. at 479-80. The Court rejected limiting the possibilities for distributing the residue to those then set out in the *parens* statute, namely individual distribution or general escheat. *See id*. at 478 & nn. 14, 15.

163

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

290.     The view of the *Levi Strauss* court as to the desirability of *cy pres* was later explicitly codified as California Code of Civil Procedure Section 384, which also embraces nationwide classes that are certified under California law.[228]  Although Section 384 expressly addresses only *cy pres* distribution of a residue, the state appellate court in *In re Vitamin Case,* 107 Cal. App. 4th 820 (2003), found that the principles and policies discussed in *Levi Strauss* and underlying Section 384 also justify a *cy pres* distribution of 100% of a settlement's proceeds under proper circumstances.  The *Vitamins* Court emphasized that 100% *cy pres* distribution of the settlement proceeds in that case was appropriate, observing in a footnote that a direct distribution to a limited number of claimants would actually result in only a small fraction of the class obtaining any conceivable benefit from the settlement:

> The vitamins that settling Defendants manufactured and sold were used not only in vitamin supplements, but also in beef, pork, chicken, some types of fish and dairy products as well as cereals, margarine, flour, bread, baby food, juice, hair products, weight-loss products and pet food.  One could imagine that nearly every consumer in California during the applicable 10-year period is a class member.  In fact, in the motion for preliminary approval of the class settlement, the number of potential claimants was estimated to be *30,000,000*.  Thus, the size of the class is extremely large. Given the size of the class compared to the size of the award -- roughly, $38 million -- the amount of individual recovery would surely be quite small.
>
> FN2 Appellants contend that we should not compare the number of class members to the size of the award, but should instead consider the *likely* number of claimants.  Although appellants do not state expressly the number of claimants they anticipate, we can estimate that number from their contention that the average class member would receive approximately $300.  Even if the full $38 million were available for distribution to the class members -- which it certainly would not be because the costs of administration and distribution would also come from that sum -- less than one-half of a percent of the Consumer Class

---

[228] Also following *Levi-Strauss*, the California *parens* statute was amended to provide that "[i]n exercising its discretion, the court may employ *cy pres* or fluid recovery mechanisms as a way of providing value to persons injured as a result of a violation of this chapter."  *See* Historical and Statutory Notes to § 16760(e)(1), Stats.2001, c. 74 (A.B.260).

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

members (assuming a class of 30 million) can receive an award of $300; more than 99 percent of the class members would not receive any award.  In other words, appellants' plan is premised on the *hope* that only the smallest fraction of class members will file claims.  We know of no authority that would support a plan premised on such a hope.[229]

291.   Although California courts have not set out express criteria to be met for *cy pres* distributions as the Ninth Circuit did in *Nachshin v. AOL*, the California Attorney General's November 12, 2010 letter-brief suggested to the Special Master some best practices for *cy pres* relief derived from considerable first hand experience with *cy pres* settlements.  These practices include the following:

- Nexus with the interests of the class and/or purpose of the litigation;

- Accountability of recipients to the court;

- An overall *cy pres* plan that identifies goals, standards and process;

- Incorporation of the plan into the fairness proceedings to the extent feasible;

- Written proposals documenting the competence of recipients, the work to be done, the timetable involved, and benefit to the class;

- Safeguards against favoritism or self-interest in recipient selection, including self-interest of Settling Defendants; and

- Monitoring of recipients to insure use of funds in accordance with the court order.[230]

---

[229]107 Cal. App. 4th at 830 & n.2.  It should be noted, however, that while there is no authority *compelling* a direct distribution based on the assumption that only a small fraction of a consumer class will submit claims, courts have approved plans of distribution predicted on educated estimates of a claims result.  Indeed, the Third Circuit *en banc* panel in *Sullivan,* 667 F.3d at 327 & n.60, affirmed final approval of such a plan.  In addition, as discussed above, a claims rate target of not more than 5 million small claimants made by the negotiating parties here forms the basis of their agreement to allocate $50 million for a direct distribution to small claimants.  These cases reflect a trial court's wide latitude to fashion a plan of distribution according to the specific case situation before it.

[230] See Exhibit 44.

165

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

292.    The Special Master concludes that federal and state law allows, based on specific factual circumstances, direct cash distribution plans, mixed distribution plans with a direct distribution component and a *cy pres* component (as proposed here), and even 100% *cy pres* distribution plans. Further, the Special Master finds no conflict between state and federal law that is relevant to the agreed-up plan of distribution for the proposed Indirect Purchaser Settlement Class.[231]

## XI.   FINDINGS OF FACT AND CONCLUSIONS OF LAW RELEVANT TO THE ALLOCATION AND DISTRIBUTION OF THE SETTLEMENT PROCEEDS TO THE GOVERNMENT PURCHASER SETTLEMENT CLASSES

293.    As with the proposed plan of distribution for the Indirect Purchaser Settlement Class, the plans of allocation and distribution for the Government Purchaser Settlement Classes were the product of the agreement of the relevant counsel, in this instance the Attorneys General of Class and Non-Class States, as well as the use of a survey, expert analysis and prior precedent. Pursuant to this process, the Attorneys General submitted to the Special Master a plan for allocation of the proceeds among the Class States as well as intrastate distribution plans for allocation of the proceeds within each of those Class States.[232]   No party to these proceedings has objected to the allocation plan or the intrastate distribution plans.   The Special Master will first address

---

[231] The Special Master acknowledges that it is the position of California that, as to the settlement of claims based on the Cartwright Act, if there were such a conflict, state law would trump federal law under *Erie* principles.  *See* Letter-Brief submitted to the Special Master on January 20, 2012 (a copy of which is attached as Exhibit 45 to the Appendix hereto), citing and discussing, among other cases, *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 109-10 (1945) and *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 429 (1996).  However, given the finding of no conflict between state and federal law on the applicable standards for reviewing the *cy pres* component of a settlement distribution plan, there is no need to address this issue.

[232]  Copies of these submittals are attached as Exhibits 46 through 48 to the Appendix hereto.

166

issues of general applicability to the Class States' proposed allocation plan and then address issues relevant to individual intrastate distribution plans.  Ultimately, the Special Master finds this well thought out allocation plan, and the various well-thought out intrastate distribution plans, to be rational and to be the product of reasonable compromises.

## A.    Survey Evidence and Full Time Employee ("FTE") Methodology

294.    All of the settlements in this case reserved one-ninth of the settlement funds to be distributed for the benefit of Government Purchaser Plaintiffs in Non-Class and Class States.  The Attorneys General agreed that those funds would first be divided into three pots: one for state agencies, one for political subdivisions (e.g., cities, counties, K-12 school districts and other special districts) and one for public colleges and universities.  This division into three pots was based on 2009 results of a survey of government entities in this case.

295.    The survey involved a statistically-valid random selection of government entities in all three of the above groups (state agencies, local government entities and public colleges/universities) who were asked to supply, according to statistically-valid procedures, a random sample of purchase information about DRAM-containing products for the relevant time period of 1998 to 2002.[233]  From the survey's results, an estimate

---

[233] *See* Exhs. 4 & 5 to a February 22, 2011 Letter-Brief (a copy of which is attached as Exhibit 49 to the Appendix hereto).  The survey covered 488 government entities in which 272 entities ultimately provided data for purchases during the relevant time period of 1998 to 2002.  *Id.  See also* Supp. Decl. of Blake L. Harrop at ¶ 4 (the declaration was enclosed in the February 22, 2011 Letter-Brief; Exhibit 49.)  Other entities responding to the survey - but stating that they had no purchase data - were still properly treated as having responded to the survey for purposes of assessing the survey validity.  *See* Diamond, REFERENCE GUIDE ON SURVEY RESEARCH, IN REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 229, 245 (2nd ed. 2000) (defining failure to respond as a "nonresponse").

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

was made as to the percentage of total purchases of DRAM-containing products attributable to each of the three above groups.[234]  These estimates did not vary substantially within a 95% confidence interval.[235]  In turn, those percentages were used to divide the settlement funds among the three groups.  Then, within each of those groups, the funds were allocated to each State representing government entities in proportion to its entities' total number of full-time employees, or, in the case of public colleges and universities, total enrollment.[236]  The resulting purchase estimates were then used to calculate the percentage of the settlements to be allocated to each State regardless of its status as a Class State or a Non-Class State.

296.    Generally, courts have referred to surveys as support for the reasonableness of proposed settlement consideration.[237]  Because as "a method of data collection, surveys have several crucial potential advantages over less systematic approaches,"[238] surveys provide more than a "rough correlation" on which to base an

---

[234] The survey yielded a ratio of state institutions of higher education purchases to state agency purchases of 1.15 to 1.  The survey further yielded a ratio of political subdivision purchases to purchases by state agencies of 1.88 to 1.  Supplemental Decl. of Blake L. Harrop at ¶¶5-6, Letter-Brief to Special Master (Feb. 22, 2011).

[235] Suppl. Decl. of Blake L. Harrop at ¶ 4, Letter-Brief to Special Master (Feb. 22, 2011).  The confidence level assesses the probability that the true figure being determined falls within the range of error found in the survey.  Kaye and Freedman, REFERENCE GUIDE ON STATISTICS IN REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 83, 121-123 (2nd ed. 2000).  Thus, a 95% confidence level – the "most common in social science" for determining the significance of statistical results – means that there is no more than a 5% chance that the result of the survey – including the found range of error - is a fluke.  *Id.* at 124-25 & n.142 (citing cases).

[236] *See* Appendix, Letter-Brief to Special Master (Apr. 18, 2008); Exh. 6, Letter-Brief to Special Master (Feb. 22, 2011).

[237] *See In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001) (survey of behavior of likely recipients of settlement coupons supported conclusion that said coupons were valuable).

[238] REFERENCE GUIDE ON SURVEY RESEARCH, *supra*, at 231.

allocation plan for purposes of settlement.[239]  More broadly, the results of a survey may

support an antitrust settlement because antitrust damages may be proved through the use

of a survey,[240] and it is well accepted that a survey may be used for other purposes such

as class certification.[241]  Finally, the use of a survey in the settlement context does not

raise due process concerns.[242]

///

///

---

[239] Indeed, in a related context, the California Court of Appeal approved the use of statistical sampling as a device to aid in the distribution of damages to individual class members after trial. *In re Cipro Cases I & II*, 121 Cal. App. 4th 402, 417-18 (2004) (citing *Bell v. Farmers Ins. Exchange*, 115 Cal. App. 4th 715 (2004)).

[240] *E.g.*, Cal. Bus. & Prof. Code § 16750(d); *see also, e.g., In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322, 353 (E.D. Pa. 1976) (court approved the use of a statistical survey based on the sugar companies' sales records to determine the amount of the overcharge passed on to the consumers who made up the proposed class);  *In re Antibiotic Antitrust Action*, 333 F. Supp. 278, 289 (S.D.N.Y. 1971) (statistical extrapolations, including sampling of sales records, can be used to prove classwide damages); *see generally, Bell v. Farmers Ins. Exchange*, 115 Cal. App. 4th 715, 754 (2004) (noting the general use of surveys in antitrust among other types of actions to prove damages).

[241] *See Sav-on Drug Stores, Inc. v. Superior Ct.*, 34 Cal. 4th 319, 333 & n. 6 (2004) (citing *Bell*, 115 Cal. App. 4th 715); *see also, e.g., Blue Cross & Blue Shield of New Jersey v. Philip Morris USA, Inc.*, 178 F. Supp. 2d 198, 252 (E.D.N.Y. 2001) (surveys and sampling techniques found admissible in a large number of actions to prove causation where they were conducted according to scientific standards); *id.* at 252-253 (use of such aggregate techniques especially helpful to prove claims such as consumer fraud where individual claims are of low value), *rev'd on other grounds sub. nom. Empire Healthcare, Inc. v. Philip Morris USA, Inc.*, 393 F.3d 312 (2nd Cir. 2004).

[242] *See, e.g., Blue Cross*, 178 F. Supp. 2d at 252-53 (generally does not violate the due process clause to use inferential statistical evidence).  *Bell*, the only California case on statistical extrapolations in a damages context, notes that a due process claim in this context rests on the deprivation of property that belongs to a party, e.g., a claim by the defendant that it had to pay excess damages due to an improper statistical extrapolation.  115 Cal. App. 4th at 751 (citing and discussing *Connecticut v. Doehr*, 501 U.S. 1, 11 (1991)).  Because the survey is being used in the context of a settlement to craft the allocation plan, there is no issue of Settling Defendants paying "excess damages" and hence no potential due process violation.

---

297.    The survey's procedures and results here followed generally accepted survey principles and yielded statistically-significant results.[243]  The survey involved random sampling with a respectable 56% of the state agencies, political subdivisions and public colleges/universities surveyed providing actual data and its results were confirmed to a statistically-significant 95% confidence level.[244]  Its use in the allocation plan thus correlates with economic facts and was otherwise reasonable and proper.

298.    The Full-Time Employee ("FTE") method to allocate settlement funds among the various government entities represented in each of the distribution "pots," other than the universities/colleges pot, was based on the concept that those entities paid overcharges for computers, and was used previously in the distribution of the settlement proceeds in the *Microsoft* case.[245]  The district court in *Microsoft* approved the use of that method based on the reasonable notion—supported by expert testimony—that the

---

[243] *Compare, e.g.,* Exhs. 4 & 5, Letter to Special Master (Feb. 22, 2011), *with* REFERENCE GUIDE ON SCIENTIFIC RESEARCH, *supra,* at 233-234.

[244] Suppl. Decl. of Blake L. Harrop, at ¶ 4, Letter to Special Master (Feb. 22, 2011); *cf. Bell,* 115 Cal. App. 4th at 750, 753-54 (finding use of a survey to calculate damages for unpaid time and half activity to be appropriate where survey employed random sampling, where response rate was over 90% and where the margin of error was + or - 10% to a 95% degree of confidence but striking down use of survey to calculate damages for unpaid double overtime under due process clause where distribution was highly skewed and where the margin of error was + or – 30%); REFERENCE GUIDE ON SURVEY RESEARCH, *supra,* at 245 (even if the sample is drawn at random for purposes of the survey if the response rate is below 75%, courts should scrutinize the survey more carefully and if the response rate drops below 50%, the survey should be regarded "with significant caution as a basis for precise quantitative statements about the population from which the sample was drawn"); REFERENCE GUIDE ON STATISTICS, *supra,* at 83, 123-25, 129 n.157 (survey results are considered to be statistically significant to a 95% degree of confidence if the results do not fall below a preset significance level of 0.05); *id.* at 128-129 & n.155 (that results do not fall below a preset significance level does not answer the question of how large is the standard range of error or the "confidence interval"); *id.* at 118-19 (the larger is the standard range of error, the more likely it is that the estimate does not reflect the truth).

[245] Exh. E to Exh. 1, to a Letter-Brief Submitted to the Special Master on April 18, 2008 (a copy of which is attached as Exhibit 50 to the Appendix hereto.

---

170

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

more employees a government entity had, the more likely it was to use computers.[246]

The Attorneys General used student enrollment rather than the number of employees for

the universities/colleges pot enrollment data based upon the conclusion of Dr. Flamm

that the number of students appeared to line up better with computer usage for colleges

and universities than did the number of full-time employees.[247]

**B.      The Fairness and Reasonableness of Treating All Government Purchaser
         Plaintiffs Equally in the Plans of Distribution**

299.    In rejecting certification of a Government Purchaser Plaintiff *litigation

class,* this Court expressed skepticism that any methodology could demonstrate with

generalized proof that:

> the County of Los Angeles, comprised of over 9.5 million persons, and
> which purchased a large volume of computer servers pursuant to a
> statewide contract, for example, experienced impact just as a small
> municipality or agency located in San Francisco, comprised of a few
> hundred persons, and which purchased a small number of printers from a
> re-seller in San Francisco's 'Computer Store' did.[248]

This Court did not suggest *how* the overcharges absorbed by large government entities

may have differed from the absorption rates of smaller government entities, but rather

noted only that it was not satisfied that the Class States' expert could supply a

methodology that would apply classwide for calculating the pass-on of overcharges.[249]

300.    For settlement class distribution purposes, however, there is ample

evidence in the record, consisting of an analysis of data performed by Dr. Flamm in

---

[246] *Id.*

[247] Exh. 7 of Letter to Special Master (Jan. 20, 2012) (Suppl. Rpt. of Dr. Kenneth Flamm).

[248] *State of California et al. v. Infineon Technologies et al.*, No. C 06-4333 PJH, 2008 WL 4155665, at *11 (N.D. Cal. Sep. 5, 2008).

[249] *Id.*

preparation of his reply report in support of the certification motion that indicates that the only difference between large and small government entities were the volume of the purchases made of DRAM-containing equipment.  Large government entities were not, according to this analysis, any more successful than smaller government entities in avoiding overcharges through the use of long-term contracts or other means.[250]  The FTE methodology roughly correlates with these facts:  it will give larger refunds to larger entities with more full-time employees reflecting their larger volume of purchases of DRAM-containing equipment and hence, their greater injury from the overcharge attached to each of those purchases.  As noted above in the discussion of the proposed plan of distribution for the Indirect Purchaser Settlement Class, the courts have favored *pro rata* plans of allocation that reflect a correlation to the injuries suffered by class members because they are generally considered to be fair and reasonable.[251]

301.   Moreover, it is reasonable to craft allocation plans that do not discriminate between different types of purchasers where those purchasers have all executed broad releases of their claims and where any attempt to craft a more discriminating allocation plan would be costly, complex, burdensome and not necessarily more fair.[252]  Here, large and small government entities alike have executed

---

[250] *See, e.g.,* Exh. 2 at 29-30, Letter-Brief to Special Master (April 18, 2008) (no evidence that large entities such as Los Angeles Unified could avoid pass-on of overcharges through long-term contracts; data shows otherwise); *id.* at 36-37 (analysis of WSCA data – WSCA being a multistate contracting vehicle used by entities in many of the Class States such as California – shows very little variation); *see also id.* at 41, 44-45.  Though this Reply Report was not considered or discussed in the Court's opinion discussed above in the text, it is relied on here only in this very limited context for the direct support it provides for the proposed allocation plan given that a court has broad powers in ensuring an equitable distribution of settlement proceeds.  *See Sullivan*, 667 F.3d at 328.

[251] *See Sullivan*, 667 F.3d at 317.

[252] *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 539-40 (3d Cir. 2004) (consumers who paid fixed co-pays for medication could share equally in settlement with other consumers who

172

---

broad releases of their claims through their Attorneys General—a fact that the Class States were entitled to take account of in agreeing to this carefully negotiated plan. Given this Court's concerns that a classwide methodology of tracing overcharges with any precision is problematic, the Special Master finds that attempting such an assessment of the contracting strategies and distribution channels used by *each* Government Purchaser in the proposed classes would be a complex, burdensome and costly fact-based inquiry that would require the extensive review of documents and data from each of those plaintiffs and from businesses up and down the distribution chain. This is exactly the kind of protracted fact-based inquiry that the *Sullivan en banc* court found to be unnecessary in rejecting an objector's argument that the merits of class members' underlying claims must be factored into a settlement distribution plan.[253]

## C.   The Fairness and Reasonableness of Treating Direct and Indirect Purchases Equally in the Plans of Distribution

302.   The proposed plan of distribution does not differentiate between claims for purchases made "directly" from the defendants and purchases made "indirectly" from them.  Claims for direct purchases are of two types: (1) some Government Purchasers made a small number of purchases of DRAM modules directly from

---

suffered damages as the fixed co-pay consumers executed a broad release of a medley of claims); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1329 (5th Cir. 1981) (court affirmed decision of trial court not to weigh value of claims from pre-1973 against claims post-1972 for three reasons: (1) release encompassed both sets of claims; (2) distribution formula for allocating value to both sets of claims would be "costly, complex, and burdensome;" and (3) pre-1973 claims would be effectively discounted because they contained more undocumented claims and undocumented claims would receive less under the proposed allocation plan).

[253] *See Sullivan*, 667 F.3d at 316-17 (discussing the argument that the validity and merits of individual claims should have a bearing on the allocation plan).  The Class States also argued that the *Clayworth* decision by the California Supreme Court superseded this earlier decision of the Court.  *See* Letter-Brief to Special Master at 14-15 (Feb. 22, 2011).  The Special Master finds that this issue need not be addressed given the recommendation above.

173

defendant Micron's Crucial division (the "Crucial claims");[254] and (2) as discussed above, some Government Purchasers purchased DRAM-containing products from OEMs and other direct purchasers using contracts that contained assignment clauses.[255]

303.    The Class States submitted evidence in these proceedings[256] that the Crucial purchases, and hence the overcharges suffered on those purchases, were miniscule in volume vis-à-vis the purchases constituting the other claims being settled and released.  As reflected in the case law cited above, while it is appropriate for reimbursement from a settlement fund to be tied generally to the injury suffered, strict precision is not required.[257]  The proposed allocation plan accomplishes this goal in a broad sense through its use of the survey and the FTE (or student population) methodology.  The fact that some members of the proposed Government Purchaser Settlement Classes may have made some purchases from Crucial in addition to OEMs and resellers while most other putative class members purchased only from OEMs and resellers does not trump the fact that all class members suffered a common injury.  All have a common interest in that they sought monetary compensation for overcharges caused by allegedly anti-competitive behavior, and all sought injunctive relief.[258]  That common interest can justify an allocation plan that treats all purchases by Government Purchaser Settlement Class members the same.  The Special Master finds that the

---

[254] *See, e.g.*, Complaint at 25-26, *State of California et al. v. Samsung Electronics Corp. et al.*, Complaint, Case No. C 07-1347 (N.D. Cal.), filed March 7, 2007.

[255] *See, e.g.*, Complaint at 24-25, *State of California et al. v. Samsung Electronics Corp. et al.*, Complaint, Case No. C 07-1347 (N.D. Cal.), filed March 7, 2007.

[256] *See* Supp. Decl. of Emilio E. Varanini IV, Letter to Special Master (Feb. 22, 2011).

[257] *See, e.g., Sullivan*, 667 F.3d at 316.

[258] *Cf. id.* (same as to proposed settlement class of indirect purchasers).

174

proposed plan of distribution is fair and reasonable without having to adjust for the small volume of direct Crucial purchases.[259]

304.     Regarding the need to make adjustments for the assignment-clause claims, the Class States assert that determining an independent value for the assignment-clause claims, which, except for Class State California operated only by contract, would be difficult as a statistical matter and would raise the need to weigh a number of variables both among the Class States and between the Class States and the Non-Class States when the total amounts available for settlement are small to begin with.  They submitted evidence that, to account for this variable, a new statistically-valid survey would need be taken of Government Purchaser Plaintiffs in Class States and Non-Class States (as some of them had assignment-clause contracts) to determine the total amount of purchases that were made directly from OEMs such as Dell.[260]  Even assuming that doing such a survey were worth the cost, the Class States further point out that to make an adjustment for that variable would be tantamount to making an adjustment for the validity and merits of an individual claim, raising the specter of needing to make further adjustments for the validity and merits of other individual claims.  They, in effect, caution that this would undo their carefully negotiated allocation plan, which already compensates, through the use of the FTE proxy, for their largest variable: volume of purchases.

305.     Finally, the Special Master finds merit in the Class States' argument that, if they were to adjust for the variable of direct and indirect purchases and possibly for

---

[259] *Cf. id.* at 316-17 (holding same in determining whether proposed allocation plan had to account for variables including the viability and merits of individual claims).

[260] *See* Supp. Decl. of Emilio E. Varanini IV, Letter-Brief to Special Master (Feb. 22, 2011).

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

other variables relating to the merits of individual claims, this would unwind the division

of the total settlement proceeds directed to Government Purchaser Plaintiffs that they

have carefully negotiated with the Non-Class States.  The Special Master finds no

compelling reason to depart from the teaching of the *Sullivan en banc* court on not

litigating the merits of claims in a settlement context, and finds that in crafting their

distribution plan, the Class States need not engage in the fact-intensive inquiry necessary

to weight the formula for computing refunds on the respective class members' individual

claims for direct and indirect purchases.  The distribution plan bears a reasonable

relationship to the injury that those class members suffered, and that is sufficient for the

Special Master to recommend it to this Court.[261]

**D.   Issues Relevant to Class State California's Plan of Distribution**

306.   As described below, Class State California's distribution plan of those

settlement funds allocated to its political subdivisions is a complex mixed direct

distribution/*cy pres* plan.  In contrast, its distribution plan of those settlement funds

allocated to its universities/colleges is a direct distribution plan which gives its

university and college systems a *pro rata* share of those funds based on enrollment.[262]  It

also proposes bonuses be awarded to its class representatives in federal court: the

City/County of San Francisco, the County of Santa Clara and Los Angeles Unified; the

University of California; and its lead plaintiff in the state court case, the City of Los

Angeles.  Insofar as Class State California's mixed distribution plan has a *cy pres*

component, Class State California has stated that it will follow the guidelines discussed

---

[261] *Sullivan*, 667 F.3d at 327-28.

[262] California is representing its state agencies in a non-class capacity.  The Special Master
therefore does not need to issue a recommendation as to its proposed distribution plan for those
settlement funds allocated to its state agencies with one exception discussed above.

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

above with regard to the *cy pres* component of the distribution plan for the Indirect

Purchaser Settlement Class.

1.      **Description of and Recommendations Concerning the Distribution of
        Settlement Proceeds Among Different Government Purchaser
        Plaintiff Groups in California**

307.    The total available for Class State California Government Purchaser

Plaintiffs from all of the settlements is approximately $4,543,447.  Class State California

proposes to subtract approximately $481,525 for incentive awards to be paid to the class

representatives (in addition to their distributions), leaving approximately $4,061,922.

Pursuant to the survey methodology that was previously discussed in this Report and

Recommendation in approving the Class States' allocation plan, this amount of

approximately $4,061,922 shall be divided as follows:  approximately $1,007,356 (or

24.80%) to state agencies, approximately $1,816,917 (or 46.70%) to political

subdivisions and approximately $1,157,647 (or 28.50%) to colleges and universities.

Because this proposed distribution of funds among these three groups mirrors the

proposed distribution of funds by the Class and Non-Class States among these three

groups with the exception of the proposed bonuses, the Special Master finds it to be fair

and reasonable for the same reasons that the Class States' allocation plan was found to

be fair and reasonable.

308.    Class State California is representing all of its state agencies only in a

non-class capacity for purposes of settlement except for the State Bar of California.

Class State California has proposed to distribute approximately two-thirds of those

settlement proceeds for state agencies (or approximately $666,768) directly back to state

agencies on a *pro rata* basis with a minimum cut-off of 7,548 FTEs corresponding to the

Department of Developmental Services.  All other state agencies below that cut-off,

177

including the State Bar of California, would be able to apply for a technology-related grant from the approximately one-third of settlement proceeds for state agencies (or approximately $340,589) reserved for them.  While the Special Master only has jurisdiction to determine if the State Bar of California is being treated fairly as part of this proposed distribution plan for state agencies, the Special Master finds that such a split distribution plan treats the State Bar of California in a fair and reasonable manner.  Such a split distribution plan is generally fair and reasonable, fitting within the discretion accorded to the California Attorney General as the representative of the Government Purchaser Plaintiffs, for the same reasons as the split distribution plan proposed for political subdivisions; those reasons are discussed in more detail below in this Report and Recommendations.

309.    Class State California is representing all of its colleges and universities in a non-class-capacity, except that it is representing the University of California in a class capacity for purposes of settlement.  This then requires a determination that the University of California is being treated fairly in the proposed division of settlement funds allocated to public colleges/universities.  Finally, Class State California is representing its political subdivisions in a class capacity for purposes of settlements, and a similar determination must be made as to the proposed intrastate distribution plan for the settlement funds allocated to those political subdivisions.  The Special Master finds, as set out below, that these distribution plans are fair and reasonable and fit within the discretion accorded to the California Attorney General as the representative of those Government Purchaser Plaintiffs.

///

///

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

### 2.   Description of and Recommendations Concerning Distributions to Political Subdivisions

310.   Class State California has chosen to subdivide the funds assigned to its political subdivisions into two pots, a direct distribution fund and a *cy pres* pool.  The first pot would amount to approximately two-thirds of the total and would be directly distributed to political subdivisions in *pro rata* fashion according to the number of their FTEs.  A minimum "floor" was placed on the size of the political subdivision that would be eligible for a direct distribution, based on FTEs and the expected amount that they would receive in a *pro rata* distribution plan, for the following reasons: (1) A minimum "floor" allows for meaningful amounts to be distributed in *pro rata* fashion to those political subdivisions who were most injured by the actions of the Settling Defendants; (2) Political subdivisions who do not receive a direct payment will still be able to benefit indirectly both from applying for the *cy pres* pool (for which they will have priority); and (3) Political subdivisions who do not receive a direct payment will also still benefit from the injunctive relief  that is intended to benefit all class members regardless of the size of the monetary recovery.  Furthermore, political subdivisions that were found by Class State California in the course of its case not to have documentation as to their purchases of DRAM-containing equipment were excluded from being eligible for direct distributions on the theory that proving their injuries would have been more difficult as it would have required extrapolations to be made.

311.   The second pot would amount to approximately one-third of the total and would be distributed *cy pres* to political subdivisions for technology-related projects, with those political subdivisions not receiving a direct distribution receiving priority in any grant applications to obtain money from that fund.[263]  Class State California asserts

---

[263] Assuming that the issues of this distribution are not controlled by substantive California Cartwright Act law, the Ninth Circuit's decision in *Kellogg* (discussed above) is distinguishable.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

that applications for technology-related grants will address the objectives of the settlement.  Class State California also asserts that it will ensure that the grants made are geographically diverse and that safeguards are put into place to avoid any conflicts of interest.  The Special Master concurs in this assessment.

312.    Class State California chose this two-third, one-third split between the direct distribution pot and the *cy pres* pot for the following reasons:  Class State California believes that the largest entities with viable individual, documented claims in state court as of the time of settlement deserve meaningful, direct compensation for their injuries.  Class State California also believes the following groups lack such an entitlement to direct compensation for their injuries: the smaller political subdivisions with substantially lesser injuries that would receive nothing more than *de minimis* awards in any *pro rata* distribution of the fund, political subdivisions with undocumented claims and political subdivisions with no claims other those which exist solely through an appeal of the Court's adverse decision on class certification. However, in the view of Class State California, those latter groups of political subdivisions do deserve *some* benefit, albeit indirect, for having compromised and released their claims via the proposed settlement classes.  And, to give a small group of large political subdivisions with individual, documented, claims in state court the *entire* settlement fund in a *pro rata* distribution would be to give them a windfall versus other political subdivisions with individual claims in state court but with lesser injuries, let

Although the amount that will go into this "*cy pres*" pot is certain at this time, the Special Master concludes that the fact that the class members for whose benefit this distribution will be made is confined to California political entities, who also make up the universe of potential *cy pres* recipients, sufficiently distinguishes this situation from the facts in *Kellogg* so that it is not necessary for the State of California to identify the individual *cy pres* recipients in order for the court to assess the fairness, adequacy and reasonableness of either the proposed settlements or California's plan of distribution.

180

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

alone political subdivisions compromising and releasing their class claims. In the opinion of Class State California, the proposed two-thirds, one-third split best reconciles these competing imperatives.

313. Accordingly, based on all of these principles, the first pot amounts to approximately $1,277,223, consisting of approximately two-thirds of the total or, to be precise, 67.33%. With a minimum cut-off of 8,063 FTEs, the Fresno Unified School District will receive the smallest distribution of approximately $25,324.49, and the political subdivision with the largest number of FTEs—Los Angeles County with 99,476 FTEs—will receive approximately $312,436.96. The political subdivisions that will receive direct distributions include counties, cities and school districts. The second pot, for which all political subdivisions in Class State California are eligible to apply for grants with those not receiving direct distributions having priority, amounts to approximately $619,694.13 or 32.67% of the entire pot.

314. Insofar as its mixed distribution plan for political subdivisions is concerned, Class State California argues that such a plan is permitted under both federal and state precedent, reflects the mix of individual and class claims asserted in this case, is the only feasible plan given the amount of funds vis-à-vis the number of political subdivisions in California, and in fact has a rough correlation with economic facts. Insofar as this mixed distribution plan has a *cy pres* component, Class State California has stated that it will follow the guidelines discussed above. [264]

315. As an alternative to a pure direct *pro rata* distribution plan, mixed distribution plans involving both a direct distribution component and an indirect *cy pres* component can be appropriate under state and federal law if the use of such plans offers

---

[264] *See* Letter-Brief to Special Master (January 20, 2012), attached as Exh. 45 to Appendix.

181

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

the best means of ensuring that as wide a spectrum of the class as possible benefits from the settlement.  Accordingly, the Special Master finds that Class State California put a lot of thought and consideration into devising a comprehensive mixed distribution plan that will benefit either directly or indirectly as great a spectrum of its class of political subdivisions as possible at a time when the budgets of its political subdivisions have been cut due to dire economic circumstances.  This proposed distribution plan fits well within the discretion accorded to the California Attorney General in the representation of Government Purchaser Plaintiffs.  An Attorney General such as the California Attorney General is in the best position to know how allocation in his or her State would work based on conditions appertaining to their Government Purchaser Plaintiffs.  Accordingly, an Attorney General in California can exercise his or her discretion in choosing from a broad range of allocation options based on her knowledge of local conditions.  In exercising her discretion, the California Attorney General can, for example, reasonably find that a direct distribution of approximately less than $25,324 to a political subdivision would not be a meaningful benefit given the total amount of settlement funds available to political subdivisions, the sheer number of political subdivisions, and local procurement conditions.  For reasons discussed below, the Special Master finds that the mixed distribution plan proposed by Class State California is not only fair and reasonable, but also appears to be preferable to a pure direct distribution plan or a pure *cy pres* plan.

316.    On the one hand, as Class State California explains, in comparing the size of the settlement funds available to the political subdivisions against the size of this settlement class of approximately 4,000+ entities, most of those entities would receive *de minimis* awards in any purely *pro rata* distribution even without factoring in administrative costs.  Even if there were no reason to expect that the claims rate for such

182

a relatively small class receiving extensive notice and having a need for money in an era of budget deficits would be larger than the estimated 7% common in large consumer class actions,[265] most of those entities would still receive *de minimis* awards in any *pro rata* distribution of the fund.[266]  It is fair and reasonable for Class State California to wish to avoid such minimally beneficial awards as part of a distribution plan.[267]

317.    And, if a minimum cut-off based on FTEs or some other criteria were to be imposed for the filing of claims so that those remaining political subdivisions eligible to make claims could receive a meaningful benefit, then most political subdivisions— even many with individual, documented claims in state court—would be left with their only compensation being their injunctive claims.  While such an option may be permitted under federal law,[268] it is more questionable as an option under California law given that law's explicit endorsement of *cy pres* as an alternative to leaving large segments of the classwide population with no monetary benefit, direct or indirect, at all.[269]  Accordingly, Class State California is entitled to craft a mixed distribution plan when such plans have not only received approval from federal courts but also meet the tenets of state law by providing for some *cy pres* relief.

318.    On the other hand, a 100% *cy pres* distribution plan would mean that large political subdivisions with individual claims in state court,[270] and with

---

[265] *Compare, e.g., Sullivan*, 667 F.3d at 329 n.60.

[266] *See* Letter-Brief to Special Master (January 20, 2012), Exhibit 45.

[267] *See, e.g., Sullivan* at 329.

[268] *See Sullivan* at 329 & n.60.

[269] *See, e.g., In re Vitamins Antitrust Litig.*, 107 Cal. App. 4th at 830 & n.2.

[270] This would include the individual claims of three class representatives in federal court.

183

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

documentation of their injuries, would be treated the same as political subdivisions with individual claims in state court but far smaller injuries, political subdivisions with only appellate rights for the denial of their class claims in federal court, and even political subdivisions with undocumented claims.  It is equally reasonable for Class State California to wish to avoid a plan that has no compensatory mechanism at all when direct distribution remains feasible even in part for those political subdivisions that suffered the most and can prove it.[271]

319.    The mixed distribution plan submitted by Class State California balances out all of these concerns in ingenious and effective ways within the discretion of its Attorney General.  It rewards the largest political subdivisions in California—large being a relative term as the cut-off is around 8,000 FTEs—with individual, documented claims in state court by ensuring that they receive a meaningful *pro rata* direct distribution based on their FTEs.  As noted above, the FTE method to allocate settlement funds among government entities, based on an underlying suit that illegal acts under the antitrust laws led to those entities paying overcharges for computers, was used previously in the *Microsoft* case.[272]  The district court in that case approved the use of that method based on the reasonable notion—supported by expert testimony—that the more employees a government entity had, the more likely it was to use computers.[273]

---

[271] *See Sullivan*, 667 F.3d at 328 (direct distribution plans that are based on the type and extent of injuries are reasonable); *id.* at 329 n.60 (a direct distribution plan is appropriate and reasonable even if no more than seven percent of a large consumer class can be expected to file claims even with the most extensive notice campaign).

[272] Exh. E to Exh. 1, Letter-Brief to Special Master (April 18, 2008), attached as Exh. 50 to Appendix.

[273] *Id.*

184

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

320.    Given that FTEs are a suitable proxy for injury, this means those individual political subdivisions with the greatest injuries—as measured by volume of purchases—and with the most viable claims are receiving meaningful direct awards. Although there is a minimum cut-off for the direct distribution of funds, such a cut-off is fair and reasonable as part of a plan of distribution that is tied, if by proxy, to the extent of the injuries suffered by the class members.[274]

321.    At the same time, it rewards all other class members with an indirect monetary benefit via the award of *cy pres* grants for geographically diverse, technology-related projects for which these class members would have priority from a sizeable (approximately one-third) part of the original pot of settlement funds available for political subdivisions.  The award of these *cy pres* grants not only ensures that all class members would receive some monetary benefit, direct or indirect, from the settlement in addition to injunctive relief but also ensures that the largest political subdivisions do not receive a windfall in terms of a pro rata distribution of the entire settlement fund only to them.  And, insofar as these *cy pres* grants are concerned, Class State California has committed to ensure that the safeguards that it has set out as part of its best practices and that are required as part of the Ninth Circuit's *Nachsin* opinion will be followed, including the insertion of those safeguards into any court order on its distribution plan.[275]

322.    This proposed distribution plan avoids the result of only one portion of a settlement class receiving any monetary benefit at all from a settlement.  By avoiding that result, this distribution plan fits the objectives of state and federal law.  And, as

---

[274] *See Sullivan,* 667 F.3d at 328-29.

[275] *See* Letter-Brief to Special Master (January 20, 2012), Exh. 45 to Appendix.

185

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

noted, such mixed distribution plans have been approved by federal courts.  Indeed, the class representatives in the federal action and the City of Los Angeles, a lead plaintiff in the state court, have all informed the California Attorney General that they agree with the proposed distribution plan for Class State California's political subdivisions.[276]  Thus, the Special Master recommends its approval.

### 3. Description of and Recommendation Concerning Distribution to the University of California

323.   Class State California has chosen a *pro rata* distribution using enrollment as a proxy for injury for the funds allocated to its colleges and universities, including class member University of California, and entities represented by the Attorney General in a proprietary capacity such as the Cal State University system, and various city and community colleges.  Based on this formula, the University of California system would receive the largest distribution of approximately $228,355 or approximately 25% of the total.

324.   *Pro rata* plans of the type proposed here have been approved in federal class proceedings as tying reimbursement to the extent of damage involved.[277]  Although this proposed *pro rata* plan is tied to enrollment, enrollment is, as previously explained in discussing the Class States' proposed allocation plan, an acceptable proxy for the amount of purchases of DRAM-containing equipment made by colleges/universities, and hence for the overcharges they suffered.  The only class member in this category, the University of California also has the largest potential of recovery and has informed the California Attorney General that it approves the proposed distribution plan.[278]  The

---

[276] *See id.*

[277] *Sullivan*, 667 F.3d at 325-28.

[278] *See* Letter-Brief to Special Master (January 20, 2012), Exh. 45 to Appendix.

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

Special Master finds the proposed distribution plan of those funds allocated to universities and colleges treats the University of California fairly and reasonably. Consequently, its approval is recommended.

4.     **Description of and Recommendation Concerning Incentive Awards to Class Representatives University of California and Lead Plaintiff City of Los Angeles**

325.     For its class representatives in federal court, the City/County of San Francisco, the County of Santa Clara and Los Angeles Unified, as well as the University of California, Class State California proposes to distribute incentive awards of $58,060 (approximately 0.02% of the total settlement proceeds not including the Samsung payments for attorneys' fees) be awarded to each of them in recognition of their leading role in discovery proceedings in federal court – a leading role that Class State California credits as having played its part in helping secure these settlements.[279]   For its lead plaintiff in state court, the City of Los Angeles, Class State California requests that an incentive of $261,270 (approximately 0.09% of the settlement proceeds less the Samsung contribution to fees) be awarded in recognition of a number of factors: (a) the discovery efforts that it had to undergo in *federal* court, which, as the second largest city

---

[279] The question of awarding bonuses to class representatives is most frequently considered as part of the court's consideration of fee and cost awards to class counsel.  *See, e.g., Sullivan,* 667 F.3d at 333, n. 65 ("Incentive awards are not uncommon in class action litigation and particularly where . . . a common fund has been created for the benefit of the entire class." *Lorazepam*, 205 F.R.D. at 400 (internal quotations omitted)). "The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation," and to "reward the public service of contributing to the enforcement of mandatory laws." *Bredbenner v. Liberty Travel, Inc.,* No. 09-905, 2011 U.S. Dist. LEXIS 38663, 2011 WL 1344745, at *22 (D.N.J. Apr. 8, 2011).  It is being discussed here because Class State California proposes to make such awards as part of its plan of distribution from its allocated portion of the settlement funds.  In each instance, however, the underlying basis for the payments remains the same.

187

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

in the United States, were much more extensive than any other Government Purchaser Plaintiff; (b) the meaningful and substantial assistance it provided to the California Attorney General in the state court case; and (c) the independent role that it played in the state court case which required it to review and approve filings and to keep itself apprised of case developments. Although these incentive awards were calculated on the basis of the total settlement recovery, the funds so calculated are to be taken *only* from Class State California's share of those settlement funds allocated to all of its Government Purchaser Plaintiffs.

326.    Incentive awards or bonuses are fairly typical in class actions.[280] They are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as private attorneys general.[281]  They are often sought after a settlement or verdict has been achieved.[282]  And, as the Seventh Circuit has held, "Since without a named plaintiff there can be no class action, such compensation as may be necessary to induce him to participate in the suit could be thought the equivalent of the lawyers' nonlegal but essential case-specific expenses, such as long-distance phone calls, which are reimbursable."[283]

327.    The Special Master agrees that incentive awards are appropriate in this case and notes that the reasonableness of the proposed subjects and magnitude of those

---

[280] *See* 4 William B. Rubenstein, et al., NEWBERG ON CLASS ACTIONS § 11:38 (4th ed. 2008); Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 U.C.L.A. L. REV. 1303 (2006).

[281] *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

[282] *Id.* at 959.

[283] *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992).

188

awards, under federal law, must take into consideration the fact that Class State California is allowed wide discretion in the aggregation of individual claims in such a fashion for allocation purposes as to be worth its time and labor.[284]

328.    The three class representatives of the settlement class—the City/County of San Francisco, Los Angeles Unified and the County of Santa Clara—were the original class representatives of the proposed class in federal court in the *Infineon* case. As set out by Class State California, all of these Government Purchaser Plaintiffs had to devote substantial time, effort and expense to assist the California Attorney General in helping her affirmatively prove its case on injury and damages, and in responding to class discovery and injury/damages discovery from the Settling Defendants. Their willingness in a time of budget austerity to fulfill these tasks, as well as their success in doing so, meaningfully contributed to the ability of the California Attorney General to achieve what is the second largest nationwide indirect purchaser settlement. As typical recipients of incentive awards, and as appropriate representatives of a large class of political subdivisions, it is reasonable to confer incentive awards on them.[285]

329.    Neither the University of California nor the City of Los Angeles is a "class representative" as such. However, it is also reasonable and fair to confer incentive awards on them as well. As set out by the discussion of the Class States' allocation plan and Class State California's distribution plan, universities and colleges together constitute a distinct sub-group. As Class State California explained, the

---

[284] *See Sullivan*, 667 F.3d at 329.

[285] *See, e.g., Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (approving, in the context of a recovery of more than $14 million, an incentive payment of $20,000 to one named plaintiff who "spent hundreds of hours with his attorneys and provided them with 'an abundance of information'").

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

University of California played a leading role on behalf of this sub-group in helping it affirmatively prove its case on injury and damages, and in responding to class discovery and injury/damages discovery from the Settling Defendants.  Because an individual claim was brought on its behalf in state court, it was in effect a named plaintiff, like a class representative, and not an absent member of a proposed class.[286]  Moreover, as its own branch of government under the California Constitution, the University of California has autonomy as to its participation in price-fixing cases brought by the California Attorney General: it is thus in the interests of all concerned that its participation in these cases as a sort of private attorney general on behalf of colleges and universities injured by such conduct be encouraged.[287]

330.    Second, the City of Los Angeles is in a unique position.  As the second largest city in the United States[288] with 41 agencies including three "proprietary" agencies that are largely autonomous,[289] it became the focus of efforts by the Settling Defendants in federal court on class discovery and injury/damages discovery to discredit Class State California's case.  According to Class State California, had the City of Los Angeles (which was then only an absent class member) refused to cooperate with the California Attorney General on such discovery, or otherwise been shown to lack

---

[286] *Cf. In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 571.

[287] *See Rodriguez*, 563 F.3d at 959.

[288] *See, e.g.,* 2010 U.S. Census Briefs, Population Change and Distribution 2000 to 2010, *available at* http://www.census.gov/prod/cen2010/briefs/c2010br-01.pdf.  The Special Master takes judicial notice of this fact pursuant to Fed. R. Evid. 201(b) and case law.  *United States v. Esquivel*, 88 F.3d 722, 726-27 (9th Cir. 1996).

[289] *See, e.g.,* Frank T. Martinez, City Clerk, YOUR GOVERNMENT AT A GLANCE, FACTS ABOUT THE CITY OF LOS ANGELES (2006 ed.), *available at* http://cityclerk.lacity.org/cps/pdf/govtglnc.pdf;  Letter-Brief to Special Master (January 20, 2012), Exh. 45 to Appendix.  Again, the Special Master takes judicial notice of this fact pursuant to Fed. R. Evid. 201(b) and case law.  *Esquivel*, 88 F.3d at 726-27.

190

credibility as to issues relating to injury and damages, the case of Class State California, and possibly that of other Class States and Non-Class States, would have been weakened.  In that role, as set out by Class State California, even more time, effort and expense was involved concerning the City of Los Angeles than was involved concerning the class representatives.

331.    When Class State California filed its case in state court, it expected the City of Los Angeles to serve as a lead plaintiff whose documented injuries and damages would serve as a typical and adequate example for the aggregate group of entities on whose behalf she brought individual claims in state court.  This meant that the City of Los Angeles would serve, at the very least, as a type of named class representative. However, the City of Los Angeles assumed an even more independent role than such a named plaintiff in deciding to have co-equal representation by its own City Attorney's Office and by the California Attorney General on its claims in state court.  This decision arose from the depth of its commitment to acting as a private attorney general in price-fixing actions, a commitment that dates back to the *Microsoft* case.  This meant that the City of Los Angeles had duties that went beyond even a typical, named class representative: while it offered meaningful and substantial assistance to the California Attorney General in the pursuit of her case in state court, in this role, it also independently had to monitor, review and respond to case developments in that court. Accordingly, it is fair to confer an incentive award on the City of Los Angeles that recognizes all of these facts and encourages its continued participation as a private attorney general in price-fixing cases.[290]

---

[290] *See Rodriguez*, 563 F.3d at 958-59.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

332.    As to the magnitude of the proposed incentive awards, Class State California calculated the proposed incentive awards based on a 2006 UCLA law review article that surveyed the grant of incentive awards in class actions.[291]  According to the survey, incentive awards "constituted, on average, 0.16 percent of the class recovery, with a median of 0.02 percent."[292]  The survey further found that the awards had the most positive correlation with 1) reimbursing class representatives for nonpecuniary litigation costs and 2) achieving proportionality between awards and other outcomes in the case such as attorney's fees.[293]  Finally, the survey concluded that there was little support for the proposition that such awards were being abused.[294]  To the contrary, it demonstrated that awards of this magnitude could be important to encourage participation of entities as class representatives, especially those with fiduciary obligations.[295]

333.    For the class representatives and the University of California, Class State California chose an incentive payment of approximately 0.02% of the total settlement proceeds, not counting the Samsung payment for attorneys' fees and expenses.  Class State California reasoned that it did not achieve an isolated settlement for itself or even for a single class of its political subdivision.  Instead, through its efforts as well as the efforts of others, it achieved a combined settlement for Government Purchaser Plaintiffs in a multitude of Class and Non-Class States and for Indirect Purchaser Plaintiffs in all

---

[291] Eisenberg & Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, *supra*, 53 U.C.L.A. L. REV. 1303.

[292] *Id.*

[293] *Id.* at 1303, 1308-09.

[294] *Id.*

[295] *Id.* at 1310.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

50 States.  And, in achieving that combined settlement, it in turn relied on the efforts of the class representatives and the University of California.

334.    Given that 0.02% is a median for class awards, it is reasonable for Class State California to use that approximate percentage to calculate incentive awards for its class representatives and the University of California.  Class State California submitted a filing to the Special Master in which it proposed to multiply that percentage by the aggregate settlement amount for all Government Purchaser Plaintiffs in this case, and there has been no objection or response from any other party in this proceeding.[296]  The Special Master therefore recommends that the incentive awards set out in Class State California's proposed distribution plan for its class representatives and the University of California be approved by this Court.

335.    For the City of Los Angeles, Class State California chose a larger incentive award of approximately 0.09% of the amount used for the calculation of the incentive awards discussed above.  Class State California strongly argues that this amount is reasonable because of the extraordinary burdens placed on the City of Los Angeles even in federal court when it was still ostensibly an absent class member as well as in state court when it was the lead plaintiff and where it had an independent role in the review and management of litigation.  As the second largest city in the nation with 41 agencies, including 3 autonomous agencies, its ability to show evidence of injury and damages was a bellwether for the success or failure of the Government Purchaser Plaintiffs' case as a whole.  And, that the presence of Class State California's state court case, which included the City of Los Angeles, specifically contributed to the ability of Class and Non-Class States alike to achieve these settlements is evidenced by the

---

[296] Letter-Brief to Special Master (January 20, 2012), Exh. 45 to Appendix.

Settling Defendants' specific statements that they agreed to these settlements on the condition that these settlements would include Class State California's state court case.[297]   Under these specific circumstances, it was reasonable and fair for Class State California to propose a higher incentive for the City of Los Angeles—a number, it should be noted, which is still lower than the average for such incentive awards. Accordingly, the Special Master recommends that the incentive award set out in Class State California's proposed distribution plan for the City of Los Angeles be approved by this Court.

**E.    Issues Relevant to Other Class States' Plans of Distribution**

**1.    Alaska**

336.    Class State Alaska is a member of the Samsung/Winbond Government Purchaser Settlement Class only.  The settlement funds available from the Samsung and Winbond settlements for Class State Alaska are approximately $23,097 for the state and $7,929 for local government entities, using the same methodology as described above for allocating each Class State's appropriate share of settlement funds.  Class State Alaska is in a different position from the other Class States because the only entities covered by the settlements are the State itself and three political subdivisions with colleges and universities not being part of the settlement class.[298]  It accordingly proposes to combine its settlement funds and then allocate these settlement funds among all of these entities in *pro rata* fashion according to their FTEs.[299]

---

[297] *Id.*

[298] Letter-Brief to Special Master (January 24, 2012) (Alaska), a copy of which is attached as Exhibit 51 to the Appendix hereto.

[299] *Id.*

194

337.     *Pro rata* plans of the type proposed here have been approved in federal class proceedings as tying reimbursement to the extent of damage involved.[300]  As previous discussed, FTEs are a suitable proxy for injury where state agencies or political subdivisions are concerned.  Class State Alaska allocates a single sum of money to the State itself pursuant to this plan.[301]  Since it purchases in unitary fashion,[302] this is appropriate.  Accordingly, the Special Master finds the distribution plan proposed by Class State Alaska to be fair and reasonable and recommends its adoption by this Court.

### 2.     Delaware

338.     Class State Delaware is a member of the Samsung/Winbond Government Purchaser Settlement Class only.  The settlement funds available from the Samsung and Winbond settlements for Class State Delaware are approximately $35,575.  Pursuant to the survey methodology discussed above in the recommendation for approval of the Class States' allocation plan, this amount is derived as follows: approximately $8,882 (24%) for the state agencies' pot; approximately $16,013 (48%) for the political subdivisions' pot; and approximately $10,138 (28%) for the colleges and universities' pot.

339.     Regarding Class State Delaware's political subdivisions, Class State Delaware proposes to distribute the funds allocated to political subdivisions in *pro rata* fashion according to the number of their FTEs with a minimum floor of 200 FTEs for a political subdivision to receive a check from these funds.  With that floor, the settlement

---

[300] *Sullivan*, 667 F.3d at 326-28.

[301] *See* Letter-Brief to Special Master (March 21, 2012), attached as Exhibit 27 to the Appendix.

[302] *See id.*

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

funds will reach Delaware's 25 largest political subdivisions, representing over 90% of the FTE's for all of Delaware's political subdivisions, including all 3 of its counties.[303]

340.    Regarding its colleges and universities, Class State Delaware proposes to distribute the funds allocated to those colleges and universities in *pro rata* fashion based on enrollment.[304]

341.    *Pro rata* plans of the type proposed here have been approved in federal class proceedings as tying reimbursement to the extent of damage involved.[305]   Although the proposed *pro rata* plan for colleges and universities is tied to enrollment in lieu of FTEs, enrollment is, as previously explained in discussing the Class States' proposed allocation plan, an acceptable proxy for the amount of purchases of DRAM-containing equipment made by colleges/universities, and hence for the overcharges they suffered. As discussed above, Class State Delaware's proposed floor of 200 FTEs for those settlement proceeds it is distributing to its FTEs is within the range of a fair and reasonable distribution cut-off.  Class State Delaware allocates a single sum of money to the State itself pursuant to this plan.[306]   Since it purchases in unitary fashion,[307] this is appropriate.  Just as with Class State California, Class State Delaware's proposed distribution plan is fair and reasonable and is recommended for approval by this Court.

///

///

---

[303] Letter to Special Master (February 10, 2012) (Delaware), a copy of which is attached as Exhibit 48 to the Appendix hereto.

[304] *Id.*

[305] *Id.*

[306] *See* Letter-Brief to Special Master (March 21, 2012), attached as Exhibit 48 to the Appendix.

[307] *See id.*

196

### 3.     New Mexico

342.    The total settlements funds available for Class State New Mexico from all of the settlements are approximately $212,361. Pursuant to the survey methodology discussed above in the recommendation for approval of the Class States' allocation plan, this amount is derived as follows:  approximately $51,171 (24%) for state agencies; approximately $102,343 (48%) for political subdivisions; and approximately $58,847 (28%) for colleges and universities.

343.    Insofar as Class State New Mexico's state agencies are concerned, New Mexico has proposed to escheat the settlement funds allocated to those agencies back to its State Treasury.[308]  However, New Mexico's state agencies are not part of the class and therefore their settlement recovery is beyond the purview of this Court's referral. Insofar as Class State New Mexico's political subdivisions and colleges/universities are concerned, New Mexico has proposed a 100% *cy pres* distribution plan.[309]

344.    This full *cy pres* distribution based on the following factors:  1) the funds are insufficient to amount for a meaningful direct distribution to these groups; and 2) all class members can meaningfully benefit not only from applying for *cy pres* grants but also from the injunctive relief secured in this case.  Class State New Mexico further observes that many of its smaller entities lack documentation of their purchases of DRAM-containing equipment.[310]  As these same reasons were found adequate to support

---

[308] Letter-Brief to Special Master (February 23, 2012) (New Mexico), a copy of which is attached as Exhibit 52 to the Appendix hereto.

[309] Class State California has recently clarified that Class State New Mexico's colleges and universities' participation in this *cy pres* pool is also beyond the purview of this Court's referral as these are state entities and thus not part of the putative settlement classes that were referred to the Special Master.  *See* Letter-Brief to Special Master (March 21, 2012), attached as Exhibit 27 to the Appendix.

[310] Letter-Brief to Special Master (Feb. 23, 2012), Exh. 52 to Appendix.

Class State California's creation of a *cy pres* fund in its proposed mixed distribution plan (where Class State California received a much larger share of the settlement funds), they also support the conclusion Class State New Mexico's proposed distribution plan for its political subdivisions and colleges/universities is fair and reasonable.

345.   Although Class State New Mexico alone has proceeded in including its government entities in the proposed settlement classes, as well as proffering this distribution plan, pursuant its own law, there is no reason to believe that New Mexico statutes or case law would deviate from federal law or California's Cartwright Act in any substantial respect regarding either the standards for upholding a full *cy pres* plan or the procedural protections required for such a plan.[311]   As explained above in discussing Class State California's distribution plan, federal law and California's Cartwright Act both support the use of full *cy pres* distribution plans in appropriate circumstances. Class State New Mexico cites federal law in support of its 100% *cy pres* distribution plan.[312]   And Class State New Mexico expressly declares its belief that neither Tenth Circuit case law nor New Mexico law would deviate from the Ninth Circuit's *Nachsin* case in terms of the procedural protections required for cy pres distribution plans.[313] Indeed, Class State New Mexico declared that its proposed *cy pres* distribution plan would follow the principles set down by the Ninth Circuit's *Nachsin* case and by the

---

[311] It was noted previously that no one had called attention to any significant differences between New Mexican antitrust law and California antitrust law insofar as class certification was concerned.  The New Mexico Attorney General had executed a declaration in this matter at one point stating his belief that the courts in New Mexico would follow those in California on the subject of pass-on.  There is no reason to believe that a different result would obtain here as to *cy pres* distribution plans.  Similarly, as to the applicability of *Kellogg* to the New Mexico distribution, the same considerations discussed in footnote 263 above apply.

[312] Letter-Brief to Special Master (Feb. 23, 2012), Exh. 52 to Appendix.

[313] *Id.*

198

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

California Attorney General.[314]  Consequently, the Special Master finds Class State New Mexico's proposed distribution plan as to its political subdivisions and its colleges and universities be fair and reasonable and recommends its adoption by this Court.[315]

### 4.   Ohio

346.    Class State Ohio is a member of the Samsung/Winbond Government Purchaser Settlement Class only.  The settlement funds available from the Samsung and Winbond settlements for Class State Ohio are approximately $367,025.  Ohio proposes to subtract 10% or approximately $36,702 to be paid into a fund pursuant to Ohioan law for the expenses of its Antitrust Section.[316]  That leaves approximately $330,322 for distribution.

347.    Pursuant to the survey methodology discussed above in the recommendation for approval of the Class States' allocation plan, this amount is derived as follows:  approximately $81,919 (24%) for state agencies; approximately $154,260 (48%) for political subdivisions; and approximately $94,141 (28%) for colleges and universities. groups.

---

[314] *Id.*

[315] Insofar as Class State New Mexico's state agencies are concerned, New Mexico has proposed to escheat the settlement funds allocated to those agencies back to its State Treasury.  New Mexico points out not only that it is obligated to do so under its own law (which, rather than the Cartwright Act, is applicable here) but also that such a distribution makes sense by way of analogy to the *pro rata* distribution of settlement funds to consumers.  Consumers who receive such funds are free to spend them for whatever purpose they wish; by parity of reasoning, it makes sense for state agencies receiving funds to spend those funds as they wish, including in reimbursement of their own state treasury for the extra funds it gave them in the first instance to spend on overcharges for DRAM-containing equipment.  However, there is no need to approve the proposed distribution plan as to New Mexico's state agencies because those agencies are not part of the class.

[316] Letter-Brief to Special Master (February 10, 2012) (Ohio), a copy of which is attached as Exhibit 47 to the Appendix hereto.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

348.     Insofar as Class State Ohio's state agencies, political subdivisions, and colleges and universities are concerned, it has proposed a single *cy pres* distribution plan that already involves a selection of geographically diverse not-for-profits across that State.[317]  These entities work with universities, schools and local governments and service a broad cross-section of Ohioans.[318]  And, every proposed grant involves the purchase of DRAM-containing equipment, or similar types of electronic equipment, in order to help the organization in question accomplish its goals.[319]

349.     Class State Ohio's proposed single *cy pres* distribution plan involves a selection of geographically diverse not-for-profits that work with universities, schools and local governments in servicing a broad cross-section of Ohioans, and that would use the proposed grants to purchase of DRAM-containing equipment, or similar types of electronic equipment, in order to help those organizations accomplish their goals.[320]  Thus, Class State Ohio's *cy pres* distribution plan already complies with the principles set out by the Ninth Circuit's *Nachsin* decision and by the California Attorney General.

350.     The question of whether Class State Ohio's proposal for a single *cy pres* distribution of its settlement funds is fair and reasonable is distinct from whether the plan itself complies with the *Nachsin* principles.  Here, the Special Master concludes that the relatively small amount available for distribution makes a *cy pres* alternative reasonable. As Class State Ohio points out, neither its political subdivisions nor its colleges and universities are receiving a sufficient amount of settlement funds to enable

---

[317] *Id.*  The Special Master notes that Ohio has already selected and identified its *cy pres* recipients.  *Id.*

[318] *Id.*

[319] *Id.*

[320] *Id.*

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

a meaningful distribution of those funds in a *pro rata* fashion.[321]  Moreover, all class

members can meaningfully benefit not only from the proposed *cy pres* grants but also

from the injunctive relief secured in this case.[322]  Just as these factors justify the *cy pres*

aspects of the distribution plans proposed by Class States California and New Mexico,

they also justify the distribution plans proposed by Class State Ohio.

351.    Regarding Class State Ohio's state agencies, Class State Ohio simply

asserts its authority under Ohio state law to dispose of the funds allocated to those

agencies as it sees fit.[323]  As with its political subdivisions and colleges and universities,

the amounts available to state agencies are certainly too small to ensure a meaningful

cash distribution of funds.  It is certainly a fair and reasonable policy choice for Class

State Ohio to prefer *cy pres* distribution to an escheat of those funds to its State

Treasury.[324]

352.    This leaves the question of whether Class State Ohio's proposal to give

10% of its settlement funds as a contribution to the expenses of its Antitrust Section is

fair and reasonable.  Generally speaking, this proposal is no different than the incentive

awards which Class State California has included in its plan of distribution.  Certainly,

Class State Ohio's Antitrust Section has expended time and effort in recovering these

funds, as well as injunctive relief, for its government entities and others in the settlement

classes.  Further, diverting these funds to the Antitrust Section will benefit the Ohio

class as a whole by giving the Antitrust Section modest assistance to pursue future

---

[321] *Id.* at 3-4.

[322] *Id.*

[323] *Id.* at 3.

[324] *Cf. Nachshin*, 663 F.3d at 1041 (noting that escheat to the State is a perfectly acceptable disposition where *cy pres* is not an available option).

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

antitrust violators.[325] Consequently, the Special Master finds Class State Ohio's

distribution plan to be fair and reasonable and recommends its approval.

### 5. Pennsylvania

353.    Class State Pennsylvania is a member of the Samsung/Winbond

Government Purchaser Settlement Class only.  The settlement funds available from the

Samsung and Winbond settlements for Class State Pennsylvania are approximately

$456,131.  Pursuant to the survey methodology discussed above in the recommendation

for approval of the Class States' allocation plan, this amount is derived as follows:

approximately $109,911 (24%) for state agencies; approximately $219,822 (48%) for

political subdivisions; and approximately $126,397 (28%) for colleges and

universities.[326]

354.    Class State Pennsylvania need not further explain what it is doing with

the funds that it has allocated to the State itself given that the State itself purchases in

unitary fashion rather than under the auspices of individual state agencies.[327]  Insofar as

Class State Pennsylvania's colleges and universities are concerned, it has proposed to

distribute the funds allocated to them in *pro rata* fashion using enrollment[328]—similar to

Class State California.

---

[325] *Cf. In re Motorsports Merchandise Antitrust Litig.*, 160 F. Supp. 2d 1392, 1394 (N.D. Ga. 2001), quoting *Jones v. Nat'l Distillers*, 56 F. Supp. 2d 355, 358 (S.D.N.Y. 1999) ("Where settlement funds remain after distribution to class members, courts have approved charitable donations to organizations geared toward 'combating harms similar to those that injured the class members. Such a donation may serve the cy pres principle of indirectly benefitting all class members.'").

[326] Letter-Brief to Special Master (February 13, 2012) (Pennsylvania), a copy of which is attached as Exhibit 46 to the Appendix hereto.

[327] See Letter-Brief to Special Master (Mar. 21, 2012), Exh. 27 to Appendix.

[328] Letter to Special Master (Feb. 13, 2012), Exh. 46 to Appendix.

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution

355.     Insofar as Class State Pennsylvania's political subdivisions are concerned, it has proposed to distribute the funds allocated to them using a mixed distribution plan similar to Class State California, except that its plan is skewed more towards a direct distribution than is the one proposed by Class State California.  Like Class State California, Class State Pennsylvania chose to base its *pro rata* allocation to its political subdivisions according to the number of their FTEs.  Like Class State California, a minimum "floor" size is proposed for those political subdivision that would be eligible for a direct distribution, based on FTEs and the expected amount that they would receive in a *pro rata* distribution plan, for the following reasons: (1) A minimum "floor" allows for meaningful amounts to be distributed in *pro rata* fashion to those political subdivisions who were most injured by the actions of the Settling Defendants; (2) Political subdivisions who do not receive a direct payment will still be able to benefit indirectly both from applying for the *cy pres* pool (for which they will have priority); and (3) Political subdivisions who do not receive a direct payment will also still benefit from the injunctive relief  that is intended to benefit all class members regardless of the size of the monetary recovery.[329]

356.     Like Class State California, Class State Pennsylvania took the left-over money for the political subdivisions below the direct distribution floor and created a *cy pres* pot.  That *cy pres* pot gives those political subdivisions not receiving a direct distribution of settlement funds an opportunity to benefit indirectly from the settlement beyond the injunctive relief that was obtained in this action.[330]

---

[329] *See id.* (adopting California's discussion regarding its proposed distribution plan and regarding the law applicable to distribution plans).

[330] *See id.* (adopting California's discussion regarding its proposed distribution plan and regarding the law applicable to distribution plans).  Similarly, as to the applicability of *Kellogg* to the New Mexico distribution, the same considerations discussed in footnote 263 above apply.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

357.    Class State Pennsylvania set its floor for direct distribution at $100, and will make a cash distribution to any political subdivision whose *pro rata* share based on FTEs, is $100 or larger.  The remaining funds – amounting to approximately $31,197 – constitute the residue *cy pres* pot.[331]

358.    As far as Class State Pennsylvania's proposal to distribute settlement proceeds allocated to its colleges and universities in a *pro rata* fashion based on enrollment, such *pro rata* plans, as discussed above, have been approved in federal class proceedings as a fair and reasonable means of tying reimbursement to the extent of the damages suffered.[332]  Although this particular plan is tied to enrollment rather than evidence of purchases, as previously discussed above, enrollment is an acceptable proxy for the amount of purchases of DRAM-containing equipment made by colleges/universities, and hence for the overcharges they suffered.  Just as with Class State California, the Special Master finds this aspect of Class State Pennsylvania's proposed distribution plan to be fair and reasonable and recommends its approval by this Court.

359.    In a fashion similar to Class State California, Class State Pennsylvania has proposed a mixed distribution plan for those settlement proceeds allocated to its political subdivisions.  For the same reasons as set out above with respect to Class State California's mixed direct distribution plan, the Special Master finds Class State Pennsylvania's mixed distribution plan to be fair and reasonable. [333]  Insofar as this

---

[331] *Id.*

[332] *Sullivan*, 667 F.3d at 326-28.

[333] Given that Class State Pennsylvania has more funds available for its political subdivisions than does Class State New Mexico or Class State Ohio, it was certainly fair and reasonable to Pennsylvanian political subdivisions for Class State Pennsylvania to follow the example of Class

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

proposed distribution plan from the Pennsylvania Attorney General is different than the one proposed by the California Attorney General, an Attorney General is in the best position to know how allocation in his or her State would work based on conditions pertaining to their Government Purchaser Plaintiffs.  Accordingly, an Attorney General in California or Pennsylvania can exercise his or her discretion in choosing from a broad range of allocation options based on his or her knowledge of local conditions, and that choice may differ from state to state without either plan falling below the standard of fair, reasonable and adequate.

360.    As to the  $100 minimum distribution floor, the Special Master finds it to fall into a range that is fair and reasonable.[334]  As noted above, the use of "cut-offs" to eliminate *de minimis* claims ensure the distribution of *meaningful* benefits.[335]

361.    Reviewing Class State Pennsylvania's list of government entities that would receive a direct distribution,[336] shows that while Class State Pennsylvania has numerous political subdivisions, it has very few with any appreciable number of FTEs. For example, the largest political subdivision in Pennsylvania is Philadelphia with only 29,795 FTEs; the next largest political subdivision, Southeastern Pennsylvania Transportation Authority, has only 8,553 FTEs whereas Pittsburgh, the fourth largest

---

State California rather than Class States New Mexico or Ohio, both of which proposed 100% *cy pres* distribution plans.

[334] *See In re Music Compact Disc Minimum Advertised Price Litigation*, 216 F.R.D. at 214; *see also Sullivan*, 667 F.3d at 326 ("principal obligation" is to ensure that the "fund distribution is fair and reasonable as to all participants in the fund").

[335] *See, e.g., Sullivan* at 326-29 & n.60.

[336] Commonwealth of Pennsylvania Distribution Plan, Letter-Brief to Special Master (Feb. 13, 2012), Exh. 46 to Appendix.

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

political subdivision by FTE count, has only 4,065 FTEs.[337]  Similarly, Class State Pennsylvania has a far higher percentage of political subdivisions with lower FTEs than California.  Only 31 political subdivisions out of a total of approximately 5,149[338] have 1,000 or more FTEs.[339]  Given the correlation between a government entity's FTEs and procurement of DRAM-containing equipment it would appear correct, as Class State Pennsylvania maintains, that a disbursement check even as relatively small as $100 to some Pennsylvania political subdivisions might still constitute a meaningful benefit.  Were Class State Pennsylvania to use a cut-off similar to that approved above for Class State California, almost no Pennsylvania political subdivisions would receive any direct distribution of funds.  Clearly, fair and reasonable means two different cut-offs when applied to these two states.

362.    As far as abiding by Ninth Circuit precedent and principles of good practice in cy pres distributions, the Special Master concludes that Class State Pennsylvania is expected to follow the *cy pres* principles set out in the Ninth Circuit decision of *Nachsin* as well as by the California Attorney General by adopting the arguments made by Class State California in support of its proposed plan.[340]  There is no

---

[337] *Id*. at 85.

[338] *See, e.g., id.* at 1-86; PENNSYLVANIA LEGISLATOR'S MUNICIPAL DESKBOOK, LOCAL GOVERNMENT ENTITIES IN PENNSYLVANIA, 1 & n.1 (3d ed. 2006), *available at* http://www.lgc.state.pa.us/deskbook06/Basics01_Local_Government_Entities.pdf.

[339] *Id.*

[340] *See id.* at 2 (Feb. 13, 2012) (adopting California's discussion regarding its proposed distribution plan and regarding the law applicable to distribution plans).

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

reason to believe that Class State Pennsylvania would later deviate from these principles when it comes time for it to make its *cy pres* grants.[341]

363.    Accordingly, the Special Master finds Class State Pennsylvania's distribution plan to be fair and reasonable and recommends its approval by this Court.

## XII.    CONCLUSION

For all of the above-stated reasons, the Special Master finds that the Indirect Purchaser Settlement Class and each of the Government Purchaser Settlement Classes satisfy the requirements of Fed. R. Civ. P. 23 (a), (b)(2) and (c)(3), and recommends that these classes should be certified for the purpose of effectuating the settlement agreements executed to resolve this litigation.  The Special Master further finds that the allocation of the settlement funds between the Indirect Purchaser Settlement Class and the Government Purchaser Plaintiffs (including the Government Purchaser Settlement Classes) provided in each of the settlement agreements is fair, reasonable and adequate, and that each of the proposed plans for distributing the allocated settlement funds to the members of the relevant settlement classes is also fair, reasonable and adequate, and recommends that that preliminary approval of the settlements be granted by this Court.

Respectfully submitted,


Dated:  _____January 7, 2013_____          ____/s/ Charles B. Renfrew_____
                                                                Hon. Charles B. Renfrew (Ret.)
                                                                Special Master

---

[341] Class Counsel in this case is from Class State California and is well-aware of these principles, and can be expected to work closely with the attorneys for Class State Pennsylvania to ensure compliance with the best practices in *cy pres* distributions.

207

Report and Recommendations of Special Master Part I re Settlement Class Certification, Settlement Fund Allocation and Distribution

Report and Recommendations of Special Master Part I re Settlement Class Certification,
Settlement Fund Allocation and Distribution