THE HONORABLE CHARLES B. RENFREW (Ret.)
633 Battery Street
San Francisco, CA 94111
Telephone:  (415) 397-3933
Facsimile:  (415) 397-7188

SPECIAL MASTER

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| In re DYNAMIC RANDOM ACCESS MEMORY (DRAM) ANTITRUST LITIGATION | Master File No. M-02-1486-PJH |
| | MDL No. 1486 |
| | Case No. C 06-4333 PJH |
| | Case No. C 06-6436 PJH |
| This document relates to: | |
| **ALL INDIRECT PURCHASER ACTIONS** | **REPORT AND RECOMMENDATIONS OF SPECIAL MASTER** |
| and | PART III: ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS FOR PLAINTIFFS |
| *State of California et. al. v. Infineon Technologies AG, et al.* | Judge:   Honorable Phyllis J. Hamilton |
| and | |
| *State of New York v. Micron Technology, Inc., et al.* | |

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION .................................................................................. 1

II.     THE RECORD SUPPORTING THE SPECIAL
        MASTER'S FINDINGS ........................................................................ 2

III.    SUMMARY OF THE SPECIAL MASTER'S FINDINGS
        AND CONCLUSIONS ......................................................................... 5

IV.     FINDINGS OF FACT AND CONCLUSIONS OF LAW
        REGARDING THE APPROPRIATE AMOUNT OF ATTORNEYS'
        FEES TO BE AWARDED TO COUNSEL .......................................... 13

        A.      The Settlement Fund Achieved for the Proposed Settlement
                Classes Constitutes A Fair, Reasonable and Adequate
                Resolution of the Litigation That Entitles
                Counsel to a Reasonable Attorneys' Fee ...................................... 13

        B.      The Ninth Circuit's Standards and Procedures for Determining
                Attorneys' Fee Awards in Common Fund Cases ........................... 15

        C.      Computation of the 25% Benchmark Fee ...................................... 19

        D.      The Lodestar Cross Check Supports an Award of
                At Least the Benchmark Fee ......................................................... 21

        E.      The Results Achieved by Counsel in Light of the Circumstances,
                Risk and Complexity of the Litigation and the Skill and Quality of Their
                Work Supports An Award of At Least the 25% Benchmark Fee ................. 31

                1.      The Results Achieved by Counsel .................................... 31

                2.      Counsel's Efforts in the Litigation .................................. 33

                3.      The Substantial Risks Facing Counsel in this Complex Litigation ... 42

                        a. The *Assoc, Gen. Contractors* Issue .............................. 42

                        b. Risk of Failure to Certify Litigation Classes ............................. 46

                        c. Other Aspects of Risk and Complexity in the Litigation ............. 48

                        d. The Quality of Counsel's Work Reflects
                           Their Skill and Experience ........................................... 51

V.     FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE
        REIMBURSEMENT OF LITIGATION COSTS AND EXPENSES ....................... 52

VI.    FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE
        PAYMENT OF INCENTIVE AWARDS TO THE CLASS
        REPRESENTATIVES ................................................................................. 56

VII.   CONCLUSION .......................................................................................... 58

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## Cases

*Alpine Pharmacy, Inc. v. Charles Pfizer & Co., Inc.*,
   481 F.2d 1045 (2d Cir.)................................................................ 14

*Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
   459 U.S.519 (1983).............................................................*passim*

*Bebchick v. Washington Metro. Area Transit Comm'n*,
   805 F.2d 396 (D.D.C. 1986).......................................................... 45

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)............................................................... 13, 20

*Brailsford v. Jackson Hewitt, Inc. et al.*, C06-00700 CW,
   2007 U.S. Dist. LEXIS 35509 (May 3, 2007 N.D. Cal.) ......................... 19

*California v. Infineon*,
   2008 WL 4155665 (N.D. Cal. Sept. 5, 2008)..................................... 48

*California v. Infineon Technologies AG*,
   531 F. Supp. 2d 1124 (N.D. Cal. 2007) .......................................... 44

*Central R.R. & Banking Co. v. Pettus*,
   113 U.S. 116 (1885)................................................................... 13

*Chapman v. Pac. Tel. & Tel. Co.*,
   456 F. Supp. 77 (C.D. Cal. 1978) .................................................. 54

*Chun-Hoon v. McKee Foods Corp.*,
   716 F. Supp. 2d 848 (N.D. Cal. 2010) ............................................ 25

*Computer Statistics, Inc. v. Blair*,
   418 F.Supp. 1339 (C.D. Tx. 1976) ................................................. 54

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984).................................................................. 14

*Craft v. County of San Bernardino*,
   624 F.Supp 1113 (C.D. Cal 2008) .................................................. 51

*Craigslist, Inc. v. Mesiab, et al.*,
   2010 WL 5300883, at * 7 (N.D. Cal. Nov. 15, 2010) ........................... 30

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive
Awards for Plaintiffs

*Craigslist, Inc. v. Naturemarket, Inc.*,
  694 F. Supp.2d 1039 (N.D. Cal. 2010)................................................................30

*Fischel v. Equitable Life Assur. Soc'y*,
  307 F.3d 997 (9th Cir. 2002)...............................................................23, 25

*Florida v. Dunne*,
  915 F.2d 542 (9th Cir. 1990) ................................................................15

*Gong-Chun v. Aetna Inc.*,
  2012 WL 2872788 (E.D. Cal. July 12, 2012) ...........................................25

*Harris v. Marhoefer*,
  24 F.3d 16 (9th Cir. 1994).....................................................................52

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ...............................................................................45

*In re Activision Sec. Litig.*,
  723 F. Supp. 1373 (N.D. Cal. 1989)........................................................19

*In re "Agent Orange" Prod. Liabl. Litig.*,
  818 F.2d 115 (2d Cir. 1987) ...................................................................25

*In re Apple iPhone 4 Prods. Liability Litig.*,
  2012 WL 3283432 (N.D. Cal. Aug. 10, 2012)..........................................56

*In re Automotive Refinishing Paint Antitrust Litig.*,
  2008 U.S. Dist. LEXIS 569 (E.D. Pa. Jan. 3, 2008) ................................19

*In re Bluetooth Headset Prods. Liability Litig.*,
  654 F.3d 935 (9th Cir. 2011) ...........................................................17, 32

*In re Brooktree Sec. Litig.*,
  915 F. Supp. 193 (S.D. Cal. 1996) .........................................................52

*In re Cement & Concrete Antitrust Litig.*,
  1981 WL 2039 (D. Ariz. Feb. 5, 1981) ...................................................49

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
  216 F.R.D. 197 (D. Me. 2003)..........................................................13, 14

*In re Crazy Eddie Sec. Litig.*,
  824 F. Supp. 320 (E.D.N.Y. 1993).........................................................24

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive
Awards for Plaintiffs

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    M-02-1486, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) (Hamilton, J.) .... 16, 26, 57

*In re Heritage Bond Litig.*,
    2005 WL 1594389 (C.D. Cal. June 10, 2005) ............................................... 19, 33, 51

*In re Linerboard Antitrust Litig.*,
    296 F.Supp.2d 568 (E.D. Pa. 2003) ........................................................................ 49

*In re Media Vision Tech. Sec. Litig.*,
    913 F. Supp. 1362 (N.D. Cal. 1995) ...................................................................... 52

*In re Medical X-Ray Film Antitrust Litig.*,
    1998 WL 661515 (E.D.N.Y. Aug. 7, 1998) .......................................................... 24

*In re Netflix Privacy Litigation*
    2013 U.S. Dist LEXI 37286 (N.D. Cal March 18, 2013)...................................... 17

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2007).................................................................. 52

*In re Pacific Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ............................................................................ 19, 42

*In re Portal Software, Inc. Sec. Litig.*,
    2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) ...................................................... 24

*In re Quantum Health Res., Inc.*,
    962 F. Supp. 1254 (C.D. Cal. 1997) ...................................................................... 52

*In re Relafen Antitrust Litig.*,
    231 F.R.D. 52 (D. Mass. 2005)............................................................................... 19

*In re Shopping Carts Antitrust Litig.*,
    1983 WL 1950 (S.D.N.Y. Nov. 18, 1983) ............................................................ 49

*In re Sodium Gluconate Antitrust Litig.*,
    No. C-97-4142 (N.D. Cal. 1999) (Wilken, J.) ...................................................... 16

*In re Sorbates Direct Purchaser Antitrust Litig.*,
    No. 98-4886 (N.D. Cal. Nov. 20, 2000) (Legge, J.)............................................. 16

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    MDL No. 1819 (N.D. Cal. Oct. 14, 2011) ...................................................... 19, 24

*In re Superior Beverage/Class Container Consolidated Pretrial*,
     133 F.R.D. 119 (N.D. Ill. 1990) ...................................................... 42

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
     2013 U.S. Dist. LEXIS 51271 (N.D. Cal. Mar. 29, 2013) .......... 14, 19, 24, 26, 33, 56

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
     2011 WL 7575003 (Dec. 27, 2011) ................................................ 57

*In re Toys "R" Us Antitrust Litig.*,
     191 F.R.D. 347 (E.D.N.Y. 2000) ................................................... 13

*In re Vitamins Antitrust Litig.*,
     2001 U.S. Dist. LEXIS 25067 (D.D.C. July 13, 2001) ................. 19

*In re Washington Public Power Supply System Sec. Litig.*,
     19 F.3d 1291 (9th Cir. 1994) ........................................... 13, 17, 25

*Internal Imp. Fund Trustees v. Greenough*,
     105 U.S. 527 (1881) ...................................................................... 13

*Laffey v. Northwest Airlines, Inc.*,
     572 F. Supp. 354 (D.D.C. 1983) .................................................. 30

*Laffey v. Northwest Airlines, Inc.*,
     746 F.2d 4 (D.C. Cir.1984) .......................................................... 30

*Meijer v. Abbott Laboratories*,
     C-07-05985 (N.D. Cal. Aug. 11, 2011) (Wilken, J.) .................... 16

*Mills v. Elec. Auto-Lite Co.*,
     396 U.S. 375 (1970) ...................................................................... 13

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
     473 U.S. 614 (1985) ...................................................................... 15

*Paul, Johnson, Alston & Hunt v. Graulty*,
     886 F.2d 268 (9th Cir.1989) ................................................... 16, 17

*Perma Life Mufflers, Inc. v. International Parts Corp.*,
     392 U.S. 134 (1968) ...................................................................... 14

*Pillsbury Co. v. Conboy*,
     459 U.S. 248 (1983) ...................................................................... 14

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive
Awards for Plaintiffs

*Radcliffe v. Experian Info. Solutions,*
 715 F.3d 1157 (9th Cir. 2013) ...................................................................57

*Reiter v. Sonotone Corp.,*
 442 U.S. 330 (1979) ...................................................................................14

*Rodriguez v. Disner,*
 688 F.3d 645 (9th Cir. 2012) .....................................................................15

*Save Our Cumberland Mountains, Inc. v. Hodel,*
 857 F.2d 1516 (D.C. Cir. 1988) .................................................................30

*SEC v. Kirkland,*
 WL 3981434 (M.D. Fla. 2008)...................................................................54

*Six (6) Mexican Workers v. Arizona Citrus Growers,*
 904 F.2d 1301 (9th Cir. 1990) ..............................................................17, 20

*Spicer v. Chicago Bd. Options Exch., Inc.,*
 844 F. Supp 1226 (N.D. Ill. 1993)..............................................................52

*Staton v. Boeing Co.,*
 327 F.3d 938 (9th Cir. 2003).................................................................15, 21

*State of Hawaii v. Standard Oil Co.,*
 405 U.S. 251 (1972) ...................................................................................14

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.,*
 2005 WL 1213926 (E.D. Pa. May 19, 2005) ..............................................49

*Sullivan v. DB Investments, Inc.,*
 667 F.3d 273 (3d Cir. N.J. 2011)................................................................32

*Sun Microsystems v. Hynix Semiconductor, Inc., et al.,*
 No. C06-1665 PJH (N.D. Cal. May 7, 2009) ..............................................36

*Theme Productions, Inc. v. North American Marketing,*
 731 F.Supp.2d 937 (N.d. Cal 2010) ...........................................................23

*United States v. Samsung Electronics Co., Ltd., et al.,*
 No. CR05-0643 PJH (N.D. Cal. November 30, 2005) .................................36

*Van Vranken v. ARCO,*
 901 F. Supp. 294 (N.D. Cal. 1995).............................................................16

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive
Awards for Plaintiffs

*Vincent v. Hughes Air West, Inc.*,
    557 F.2d 759 (9th Cir. 1977) .................................................................52

*Vizcaino v. Microsoft*,
    142 F. Supp. 2d 1299 (W.D. Wash. 2001) ........................................ 51

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ....................................................*passim*

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (4th Cir. 2005) .................................................................49

*Williams v. Rohm & Haas Pension Plan*,
    658 F.3d 629 (7th Cir. 2001) ...............................................................31

*Zografos v. Qwest Communs. Co., LLC*,
    2013 U.S. Dist LEXIS 995573 (D. Or. July 11, 2013) ...........................20


**<u>Statutes</u>**

15 U.S.C. §26 ..............................................................................14, 46

28 U.S.C. §1332 (d)(2) .........................................................................34

28 U.S.C. § 1292(b) ..............................................................................43


Federal Rule of Civil Procedure 23(b)(2) ............................................46

Federal Rule of Civil Procedure 23(b)(3) ............................................46


California Business and Professions Code
    § 16720 ...........................................................................................46
    § 17200 ...........................................................................................46

Florida Statutes

    § 501.2105 .......................................................................................14
    § 501.2075 .......................................................................................14
    § 542.23 ...........................................................................................14

# I.    INTRODUCTION

1.    This is the third and final part of the Report and Recommendations that arises in the context of the proposed settlement of various class, *parens patriae*, and governmental purchaser actions brought on behalf of indirect purchasers of DRAM in the United States between January 1, 1998 and December 31, 2002.[1]   The proposed global settlements ("Settlements") consist of cash payments totaling $310,720,000 ("Settlement Fund")[2] plus injunctive relief.  Upon finality of the Settlements, the Settlement Fund, net of expenses including attorneys' fees, will be distributed to members of the proposed Indirect Purchaser Settlement Class, and two proposed Governmental Purchaser Settlement Classes, as well as Government Purchasers being represented in a non-class capacity by the Attorneys General. Certain issues relevant to the District Court's approval of the Settlements have been referred to the undersigned as Special Master.[3]  This Report and Recommendations, Part III, contains the Special Master's findings of fact, conclusions of law and recommendations concerning the award of fair and reasonable compensation to the counsel whose efforts created the Settlement Fund and other benefits from these Settlements.  It also contains findings, conclusions and recommendations on the appropriateness of making incentive awards to the private plaintiffs who brought the settled actions.

2.    The Special Master recognizes that fixing the award of attorneys' fees, the reimbursement of attorneys' costs and expenses and the decision to make incentive awards

---

[1]  The settling parties and the claims asserted in the litigation are discussed in the Report and Recommendations of Special Master Part I re: Settlement Class Certification, Settlement Fund Allocation and Distribution, filed January 8, 2013 (Dkt. No. 2132) ("Report, Part I") at ¶¶ 1-2, 42, 56-98.

[2] This number represents all cash payments the Defendants are obligated to make pursuant to the terms of their various settlement agreements and includes funds earmarked for attorneys' fees, and notice and claims administration, and as consideration for delay in payment.

[3]   A history of the various orders defining the subject matter of the referral appears in Report, Part I at ¶¶ 3-8.

to plaintiffs are matters particularly within the sole discretion of this Court. Nothing in this Report, including the Special Master's ultimate finding that under all of the circumstances of the litigation, the requested Ninth Circuit benchmark fee of 25% of the Settlement Fund would be fair and reasonable compensation for Counsel is intended to invade that discretion in any way. The Special Master's role is not to usurp the discretion of this Court. Rather, this Report is intended to provide the Court with an evaluation of the relevant authority and factual findings based on a review of the submissions of Counsel and the Special Master's personal observations of the complexity of the issues, the risks attendant to this case proceeding to trial, and the experience, skill and integrity of the attorneys, which I have personally observed, who have provided leadership in prosecuting the Settled Actions. It is hoped that these findings and conclusions will be helpful in the exercise of this Court's discretion.

## II.  THE RECORD SUPPORTING THE SPECIAL MASTER'S FINDINGS

3.   On August 7, 2013, the Indirect-Purchaser Plaintiffs' Counsel ("IPP Counsel") and the Attorneys General ("AGs") (together referred to as "Counsel") submitted to the Special Master a joint petition[4], requesting that this Court award Counsel the Ninth Circuit benchmark fee of 25% of the Settlement Fund, or $77,680,000, and to hold that the fee award should accrue its proportionate share of the interest earned by the Settlement Fund.[5]

---

[4] "Indirect Purchaser Plaintiffs' and Attorneys General's Joint Application for Attorneys' Fees; Indirect Purchaser Plaintiffs' Application for Costs and Incentive Awards; and Attorneys General's Application for Costs," dated August 6, 2013 (hereinafter, "Application"); a copy of the petition is attached as Exhibit 65 in the Appendix hereto. For clarity, all exhibits to the entire Report and Recommendations are being numbered sequentially beginning with those in the Appendix to Part I.

[5] During the course of the proceedings before the Special Master leading up to this Part III of the Report and Recommendations, the leadership of the Attorneys General and IPP Counsel were requested to negotiate the broad procedures for petitioning for awards of attorneys' fees and the reimbursement of expenses. These negotiations resulted in an agreement under which they determined that they would submit a joint petition requesting an aggregate fee award of 25% of the common fund, which would then be divided 80.8% to IPP Counsel and 19.2% to the AGs. They

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

1   4.  Also on August 7, 2013, IPP Counsel submitted to the Special Master a

2 separate application for the reimbursement of expenses incurred by IPP Counsel in the

3 amount of $6,338,232, which included, *inter alia*, expert fees and legal fees of the

4 economists and counsel who participated in the proceedings before the Special Master

5 concerning the plan of allocation and distribution of the Settlement Fund to the proposed

6 Indirect Purchaser Settlement Class.  It also included a request that incentive awards of

7 $5,000 be made to each of the 10 class representatives in the lead *Petro* complaint, who

8 provided key support to the litigation, and that each of the other approximately 140

9 plaintiffs in the settled cases be given incentive awards of $500.[6]

10   5.  At the same time, the Attorneys General submitted a separate application for

11 reimbursement of their expenses incurred in prosecuting these cases, in the amount of

12 $5,483,468.63, which included expert and economist fees and fees for contractual services

13 from paralegals and attorneys who are not in the offices of the Attorneys General and are

14 not part of the Attorneys General's lodestar.[7]

---

also agreed that IPP Counsel and the AGs would submit individual requests for the reimbursement of expenses, that compensation for counsel for Celestica and Resellers' Allocation Counsel would be requested as expense item, that the totality of expenses requested would not exceed an agreed upon cap and that IPP Counsel would submit a request for incentive awards to the named plaintiffs.  A copy of this agreement is attached as Exhibit 66 to the Appendix hereto.

Other than this negotiation, the Special Master has not requested or attempted to suggest any division of the aggregate fee award among Counsel.  First, the Special Master believes that, especially in light of the fact that the aggregate fee request is less than Counsel's aggregate lodestar, no allocation to individual firms or Attorneys General can be fairly made without knowing the totality of the amount of the fee available for division.  Second, while reported lodestars certainly play a role in a fee division, intimate knowledge of the individual firms' relative contributions to Counsel's efforts as a whole – the kind of knowledge that is uniquely in the province of the attorneys who assumed leadership roles – is indispensable to a fair and reasonable division of a fee award.  The Special Master fully endorses the concept embodied in this Court's decision to assign to Co-Lead Counsel for the DRAM direct purchaser plaintiffs the responsibility to allocate their aggregate award among the direct purchaser plaintiffs' counsel and recommends that this procedure be adopted for IPP Counsel and the Attorneys General.  See, "Order Awarding Plaintiffs' Counsel Attorneys' Fees and Reimbursement of Expenses," filed August 16, 2007, Dkt. No. 1682.

[6]  This application is part of Exhibit 65 in the Appendix hereto.

[7]  This application is also part of Exhibit 65 in the Appendix hereto.

---

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

6.      The Special Master has reviewed the above-described requests for attorneys'
fees, expenses and incentive awards.  The Special Master has also received and reviewed the
following supporting documentation submitted concurrently with the fee and expense
requests:  (1) the Declaration of Terry Gross in Support of the Joint Application for Award
of Attorneys' Fees and Indirect Purchase Plaintiffs' Application for Reimbursement of
Expenses and Incentive Awards ("Gross Decl.") [8]; (2) each of the declarations contained in
the Compendium of IPP Counsel Declarations in Support of Motion for Attorneys' Fees and
Incentive awards[9]; (3) the Declaration of Chair of Multistate Group, and Liaison Counsel,
for Attorneys General in Support of the Joint Motion for Attorneys' Fees ("Varanini
Decl.")[10] and (4) each of the declarations contained in the Compendium of the Attorneys
General Declarations in Support of the Joint Motion for Attorneys' Fees and the Attorneys
General's Motion for Costs.[11]

7.      The Special Master has further considered and reviewed the history of the
indirect purchaser litigation and the novel and complex issues it presented both before the
District Court and the Ninth Circuit Court of Appeals, as well as in the proceedings before
the Special Master, descriptions of which are set forth in the Report Parts I and II.  The
Special Master has also considered his personal observations of the skill and competence
with which both private counsel for the Indirect Purchaser Plaintiffs and the Attorneys
General who all appeared before him handled the numerous difficult issues in this litigation.

///

///

---

[8]  A copy of the Gross Decl. is attached as Exhibit 67 in the Appendix hereto.

[9]  A copy of the IPP Counsel Compendium is attached as Exhibit 68 in the Appendix hereto.

[10]  A copy of the Varanini Decl. is attached as Exhibit 69 in the Appendix hereto.

[11]  A copy of the AGs Compendium is attached as Exhibit 70 in the Appendix hereto.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

### III.   SUMMARY OF THE SPECIAL MASTER'S FINDINGS AND CONCLUSIONS

8.      The Settlement Fund and the injunctive relief provided by the Settlements constitutes fair and reasonable compensation for the claims raised by the Settled Cases and to be released by the proposed Indirect Purchaser Settlement Class and the Governmental Purchaser Settlement Classes, and generates a "common fund" from which Counsel, whose efforts created these benefits, is entitled to be awarded fair and reasonable compensation for their services.[12]

9.      Ninth Circuit case authority provides that the goal of every fee award in a common fund class action is to fairly compensate counsel for their efforts while protecting the interests of the class.  In order to arrive at a fee award that is fair and reasonable under all of the circumstances of the litigation, the district court may employ either a percentage of the fund approach or a lodestar approach.   In the last 25 years, the vast majority of district courts in the Ninth Circuit have utilized the percentage of the fund approach in cases where the principal settlement consideration is monetary, including this Court's fee award to counsel for the direct purchaser plaintiffs in this litigation.  The Special Master finds that the percentage of the fund is the proper methodology to employ in arriving at a fair and reasonable fee award for counsel for the indirect purchaser plaintiffs.

10.      Accordingly, the starting point for determining a fair and reasonable attorneys' fee is a computation of 25% of the value of the settlements achieved, an amount of fees that, although subject to adjustment either upward or downward under the individual circumstances of the case, is presumptively reasonable as a general matter.  Here, the settlement value consists of $310,720,000 in cash payments, plus the benefit of various measures directed to the restoration of competition and the deterrence of future violations of

---

[12]  This finding also includes the claims of those Government Purchasers being represented by and released in a non-class capacity by the Attorneys General.

the antitrust laws in the sale of DRAM.  Counsel have requested a fee of $77,680,000, which is 25% of $310,720,000, which is the total of all monetary deposits made by Defendants into the Settlement Fund, including monies earmarked for the payment of attorneys' fees, the payment of notice and claims administration costs and additional consideration paid for a delay in payment.  The Special Master finds that this is the appropriate number to use for the cash benefit of the settlement to the proposed Settlement Classes and non-class Governmental Purchasers.  Accordingly, the Special Master finds that the Ninth Circuit benchmark fee for Counsel is $77,680,000.

11.    In computing this benchmark fee, no dollar value is being assigned to the non-monetary relief obtained in this case.  However, as discussed below, the benefit of the non-monetary relief is a consideration in deciding whether the benchmark fee is fair and reasonable.  As the Special Master previously found in the Report, Part I, the injunctive provisions of the settlement agreements conveyed a substantial and tangible benefit on the proposed Settlement Classes.  Accordingly, the availability of this non-monetary relief supports the award of the requested benchmark fee to Counsel.

12.    The determination of whether the benchmark 25% fee is fair and reasonable in any particular case requires an inquiry into the particular circumstances of the case, including the hours invested by counsel in the litigation.  This inquiry is commonly referred to as "the lodestar cross-check."  An attorneys' or law firm's lodestar is computed by multiplying the number of hours invested in the litigation by the relevant hourly rate(s).  The cross-check is performed by comparing the aggregate lodestar for all counsel against the 25% benchmark.  The difference between the lodestar and the benchmark fee amount is commonly referred to as a "multiplier."  Ninth Circuit authority permits the awarding of percentage fees that represent a range of "multipliers" on the lodestar amount.  Most commonly, such multipliers are at least 2.0.

13.     Performing the lodestar "cross-check" on a percentage of the fund fee is not the same as arriving at a fee award utilizing the lodestar methodology, and the cross-check does not require the same degree of precision in the computation of the lodestar calculation that would ordinarily accompany a lodestar fee award.  Rather, to perform the cross-check, a court need only determine that the lodestar hours are generally in the range that would be reasonable in litigation of similar duration and complexity, and that the hourly rates are consistent with rates charged by counsel of similar seniority, skill and experience in the relevant market.

14.     For this reason, the Special Master did not perform an item by item or line by line review of Counsel's underlying time records.  Rather, the Special Master reviewed the declarations of the individual firms regarding the services they performed, the hours they spent on the litigation and the hourly rates utilized in their lodestars.  In order to judge the reasonableness of Counsel's aggregate lodestar, the Special Master reviewed the manner in which IPP Counsel and the AGs recorded their time and calculated the hours in the aggregate lodestar.  The Special Master then reviewed the work performed by Counsel, as described in the various declarations filed in support of the fee request as well as in the declarations submitted previously which formed the basis of the litigation history set out in the Report, Part I.  The Special Master's review of Counsel's efforts included the Special Master's personal observations of the work done by the counsel who have appeared before him in the multi-year course of this referral.  The Special Master focused on the work necessary to conduct discovery and prepare the litigation for trial, and the work done with regard to the major legal issues such as antitrust standing and class certification.

15.     The Special Master further reviewed the hourly rates, both historical and current, reported by IPP Counsel as their normal and customary hourly rates, and considered the AGs' use of rates from the Laffey Index, which includes an adjustment for the San

Francisco market.   The Special Master focused on the normal and customary hourly rates

for IPP Co-Lead Counsel and the other firms forming the IPP leadership group since the

personal efforts of these firms account for more than 2/3 of the hours in private counsel's

aggregate lodestar.  Not only have these rates been found to be reasonable by numerous

other district courts, but the Special Master was personally acquainted with the expertise and

experience of many of these counsel prior to this litigation and had the opportunity to

observe their skill in handling complex, difficult issues during the referral proceedings.

Similarly, use of the Laffey index as a rate structure for the AGs has been approved by other

district courts.   Since the authorities agree that the hourly rates used in a lodestar

calculation should be reasonable as judged by the prevailing market rates in the geographic

location of the forum court, the Special Master finds that the modest upward adjustment

made by the AGs is reasonable.  Finally, the Special Master relied on his observations of the

skill and competence of the AGs' leadership group during the proceedings before him in

finding that the rates used by the AGs to generate their portion of Counsel's aggregate

lodestar are reasonable.

16.     Accordingly, the Special Master finds that the number of reported hours that

make up Counsel's aggregate lodestar is reasonable as a general matter in light of the

history, difficulty and complexity of the litigation to serve as the hours-expended

component of an appropriate lodestar cross-check on the 25% benchmark fee requested by

Counsel.   The Special Master also finds that hourly rates that make up both Counsel's

aggregate historical and current rate lodestars are reasonable in light of the expertise and

experience of Counsel to serve as the hourly rate component of an appropriate lodestar

cross-check on the 25% benchmark fee requested by Counsel.

17.     Applying both the historical rate and current rate lodestars as a cross-check

on the benchmark fee results in the benchmark fee representing less than 100% of the

lodestar amount. As noted above, in most cases, a percentage of the fund fee provides counsel with a payment that is greater than the lodestar to compensate for the following: the risk of non-payment; the fact that counsel's payment is delayed, sometimes by many years, after the services were rendered; the fact that counsel in a class action generally carries the costs of prosecution for the duration of the litigation; and the recognition of the quality of counsel's efforts in securing a recovery where the litigation is risky. When the lodestar used in the cross-check is greater than the 25% benchmark fee, i.e., there is a "negative multiplier," that is usually a sign that an upward adjustment of the percentage should be made. Here, Counsel have waived any upward adjustment to the benchmark. Accordingly, the Special Master finds that the lodestar cross-check supports the reasonableness of awarding the benchmark fee in this litigation.

18. In addition to the lodestar cross-check, Ninth Circuit authority provides that other factors should be considered in assessing the reasonableness of the 25% benchmark fee (and determining whether it should be adjusted either upward or downward) including the result achieved for the class, counsel's skill and experience in antitrust cases, the complexity of the issues presented by the litigation, and the risk of non-payment undertaken and overcome by counsel. The Special Master finds that each of these considerations supports the reasonableness of Counsel's request for the benchmark fee, and would have supported the reasonableness of making an upward adjustment and awarding a fee greater than 25% of the Settlement Fund had such a fee been requested. Counsel have requested that the total compensation to be awarded by this Court include the interest that the 25% fee amount has earned during the time the Settlement Fund has been invested. The Special Master finds that this is consistent with controlling authority and is more than reasonable under the circumstances of this litigation, particularly the fact that Counsel's requested fee is less than their total reported lodestar.

19.     The Special Master is familiar with the lead counsel for both the Indirect Purchaser Plaintiffs and the Attorneys General as being experienced antitrust attorneys.  In addition, the skill and experience of Counsel is demonstrated by the fact that they achieved one of the largest indirect purchaser case settlement funds despite significant obstacles to recovery.  Antitrust litigation virtually always presents complex violation issues, but that complexity is compounded exponentially in cases, like this litigation, where the claims of indirect purchasers arise under the laws of multiple jurisdictions, with variations in the standards of proof required to prevail.  In addition, the complexity of the issues to be tried put Counsel at great risk of not succeeding in obtaining the certification of litigation classes or subclasses.  Finally, both the risky nature of the undertaking and Counsel's skill and expertise are clearly demonstrated by the fact that this recovery of over $300 million for the proposed settlement classes was achieved in the face of an earlier ruling that eliminated the vast majority of the private plaintiffs' claims from the litigation pending an appeal.

20.     The Special Master finds that consideration of the circumstances of the litigation, particularly the relevant factors set out by the Ninth Circuit, fully supports the requested benchmark award of 25% of the Settlement Fund, or $77,680,000, in attorneys' fees to Counsel in this litigation.

21.     The Special Master also evaluated IPP Counsel's request for reimbursement of litigation expenses in the amount of $6,338,232 and the AGs' request for reimbursement of litigation expenses in the amount of $5,483,468.63.  The Special Master reviewed the sixty-three (63) declarations of IPP Counsel and the thirty-two (32) declarations from the AGs as to the reasonableness and necessity of the expenses incurred by each of the private firms and state offices.  The Special Master explored in some detail, although not on a line-by-line basis, the categories into which the claimed expenses fall and finds them to be within the range of magnitude that are usual and expected in litigation of this scope,

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

complexity and duration, and of the type that are generally incurred for the benefit of plaintiffs in antitrust litigation.

22.     For example, the major expense item for each of the private firms was the total of their contributions into IPP Counsel's common expense fund.  This fund was administered by Liaison Counsel Francis Scarpulla and was used to pay plaintiffs' economic experts and third-party vendors, principally those associated with discovery such as the firm providing document processing and electronic data storage for the millions of pages of reviewed documents, as well as court reporter and deposition transcript costs for more than 100 depositions.

23.     Nearly 20% of IPP Counsel's requested expenses are attributable to the billings of the counsel and experts who advanced the interests of the reseller members of the proposed Indirect Purchaser Settlement Class and assisted Counsel and the Special Master in arriving at a fair and reasonable plan for distributing the Settlement Fund.  The Special Master personally observed and is aware of the contribution of these counsel and experts and finds that their bills are a reasonable and necessary expense incurred for the benefit of the proposed Settlement Class.

24.     The Special Master finds that, as with IPP Counsel, a significant portion of the expenses incurred by the AGs were expert witness fees and expenses connected with document processing and deposition discovery, including repeated contributions made by each of the AGs into a fund to cover such fees and expenses.  Approximately 39% of the AGs' aggregate expenses are attributable to the hiring through a contract with the California Attorney General of a specialized and experienced group of paralegals and attorneys, not included in the AGs' lodestar, who assisted the AGs in their document handling and review and trial preparation, e.g., by setting up databases and review protocols for millions of pages of documents as well as engaging in the review of those documents, and who also assisted

the AGs by obtaining information from California and New Mexican governmental entities and personnel regarding DRAM purchases and purchasing patterns by those entities that were used in the motion of class certification, in the AG's formulation of their allocation and distribution plan for Class and Non-Class States, and in the crafting of California's plan of distribution of its share of the Settlement Fund. The Special Master has reviewed the supporting documentation in the form of the bills submitted by this vendor and the authorities holding that similar costs of contract paralegal and attorney services are reimbursable and finds that the billings submitted for reimbursement by the AGs fall with in the range of magnitude that are usual and expected in litigation of this scope, complexity and duration, and that the services reflected in those billings are of the nature of services generally incurred for the benefit of plaintiffs in antitrust cases.

25. Accordingly, on this basis, the Special Master finds that the expenses incurred by IPP Counsel and the AGs were reasonable and necessary in the circumstances of this litigation.

26. Finally, IPP Counsel have requested incentive awards of $5,000 to each class representative on the *Petro* complaint and $500 for each of the approximately 140 named plaintiffs in the other state and federal IPP cases that were coordinated with this litigation. The Special Master has reviewed the portion of the Gross Declaration setting out the contribution to the litigation made by the *Petro* class representatives and finds that they have conferred a benefit on the proposed Indirect Purchaser Settlement Class for which the law of this Circuit provides that a reasonable incentive award is appropriate. The Special Master further finds that the amount of $5,000 is within the range of incentive awards in other cases of similar size and complexity. In addition to compensating plaintiffs for time and effort expended in the prosecution of the case that created the common fund, another recognized purpose of incentive awards is to provide an inducement for plaintiffs to come forward and

file meritorious class actions. This purpose is particularly important in the area of antitrust litigation where private enforcement has long been recognized to play an important role in promoting a competitive market place for goods and services. The Special Master finds that the plaintiffs who were not selected as *Petro* class representatives nonetheless fulfilled this second purpose and that the modest $500 incentive awards requested for these plaintiffs are fair and reasonable.

IV. **FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE APPROPRIATE AMOUNT OF ATTORNEYS' FEES TO BE AWARDED TO COUNSEL**

A. **The Settlement Fund Achieved for the Proposed Settlement Classes Constitutes A Fair, Reasonable and Adequate Resolution of the Litigation That Entitles Counsel to a Reasonable Attorneys' Fee**

27. The United States Supreme Court "has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 393 (1970); *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 123 (1885). The purpose of this doctrine is that "those who benefit from the creation of the fund should share the wealth with the lawyers whose skill and effort helped create it." *In re Washington Public Power Supply System Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994). This "common fund doctrine" is firmly rooted in American case law. *See, e.g., Internal Imp. Fund Trustees v. Greenough,* 105 U.S. 527, 532-33 (1881); *Central R.R.*, 113 U.S. at 123.

28. The common fund doctrine applies both to private counsel and state Attorneys General. *See In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 214 (D. Me. 2003); *In re Toys "R" Us Antitrust Litig.,* 191 F.R.D. 347, 357 (E.D.N.Y. 2000) (approving $5.4 million in fees plus costs to the States and class plaintiffs'

1  counsel pursuant to final approval of settlement agreement); *In re Compact Disc Antitrust*

2  *Litig.*, 216 F.R.D. at 214-15; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist.

3  LEXIS 51271, at *103 (N.D. Cal. Mar. 29, 2013) (awarding $11,054,191.01 in common

4  fund fees and $1,206,479.48 in expenses to States). Here, many of the States asserted

5  *parens patriae* actions on behalf of their citizens which were settled as part of the global

6  settlement of the Indirect Purchaser Plaintiff claims. In addition, the Clayton Act

7  specifically provides that the AGs, as well as private counsel, can recover their reasonable

8  attorney fees and disbursements if they succeed on their injunctive claims, *see* 15 U.S.C. §

9  26, demonstrating that Congress has made the determination that States may recover

10 attorney fees and disbursements, whether the case is tried to judgment or settles prior to

11 judgment.[13]

12      29.      Private antitrust litigation such as the settled cases here are a necessary and

13 desirable tool to assure the effective enforcement of the antitrust laws. *See, e.g., Pillsbury*

14 *Co. v. Conboy*, 459 U.S. 248, 262-63 (1983); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 331

15 (1979); *State of Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972); *Perma Life Mufflers,*

16 *Inc. v. International Parts Corp.*, 392 U.S. 134, 139 (1968) (overruled on other grounds by

17 *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)). Appropriate fee

18 awards promote the filing of meritorious antitrust actions, as the United States Supreme

19 Court has repeatedly recognized: "In the absence of adequate attorneys' fee awards, many

20 antitrust actions would not be commenced." *Alpine Pharmacy, Inc. v. Charles Pfizer & Co.,*

21

22

23 ─────────────────
[13] The AGs also brought their claims pursuant to their own state laws, which also provide for the
24 awarding of reasonable attorneys' fees. *See, e.g.*, Fla. Stat. § 542.23 ("In any action under this
    section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a
25 reasonable attorney's fee, to the plaintiff."); Fla. Stat. § 501.2105 (the court may award costs and
    fees); Fla. Stat. § 501.2075 ("If civil penalties are assessed in any litigation, the enforcing authority
26 is entitled to reasonable attorney's fees and costs.") Finally, the settling parties here contemplated
    an award of fees to the AGs. *See, e.g.,* Samsung Settlement Agreement ¶ 20 (Dkt. No. 1747-3).

27

28 Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
    Incentive Awards for Plaintiffs

*Inc.*, 481 F.2d 1045, 1050 (2d Cir.), *cert. denied*, 414 U.S. 1092 (1973); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 653-54 (1985).

30.     The settlements here have created a common fund intended for benefit of parties—the members of the proposed Indirect Purchaser Settlement Class and the class and non-class governmental entities represented by the AGs—injured by the activities alleged in the settled complaints.  As will be discussed in more detail below, the Special Master finds that the settlements, if given final approval, will confer substantial benefits on these private and governmental entity indirect purchasers of DRAM.  Accordingly, the Special Master finds that Counsel representing the injured plaintiffs—both private lawyers and the AGs— are entitled to an award of attorneys' fees and the reimbursement of their out-of-pocket expenses.

## B.     The Ninth Circuit's Standards and Procedures for Determining Attorneys' Fee Awards in Common Fund Cases

31.     Courts in the Ninth Circuit are fortunate to have the benefit of clearly articulated common sense standards and procedures for setting attorneys' fees in common fund cases.   To begin, there is the overarching concept of fairness to both the beneficiaries of the fund and the counsel whose efforts created it.  "The guiding principle is that attorneys' fees 'be reasonable under the circumstances.' *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990)." *Rodriguez v. Disner,* 688 F.3d 645, 653 (9th Cir. Cal. 2012).  Although the District Court has a special duty to protect the interests of the class (*Staton v. Boeing Co.*, 327 F.3d 938, 970 (9th Cir 2003)), that duty is consistent with awarding an appropriate share of a common fund as compensation to counsel.   *See id.* at 974.

32.     In the years following the 1966 amendment to Rule 23, when common fund cases began to proliferate, two methods for determining fee awards developed.  One approach, based on the fact that class action common fund cases were almost universally

---

15

undertaken as a contingency, was to award counsel a percentage of the recovery at the usual "market rate" for contingency representations.  The other approach, know as the "lodestar" method, involved developing a fee award by multiplying the hours reasonably expended by counsel times a reasonable hourly rate, mimicking the usual method of setting fees in hourly representations, but then adjusting the lodestar calculation by a "multiplier" to account, among other reasons, for the contingent nature of the representation with its attendant delay in payment and its risk of no payment at all.

33.    When faced almost 25 years ago with making a choice between the two methods, the Ninth Circuit wisely endorsed both and left the choice to the discretion of the trial court (although it applied the percentage of the fund approach in that original case). *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d. 268, 272 (9th Cir. 1989) ("*Graulty*").  In the years since *Graulty*, this Court and the other courts in this Circuit have almost universally employed the percentage of the fund approach, coupled with a lodestar cross-check.  *See, e.g., In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, M-02-1486, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) (Dkt. No 1648) (Hamilton, J.) (25% of common fund awarded); *Meijer v. Abbott Laboratories*, C-07-05985 (N.D. Cal. Aug. 11, 2011) (Wilken, J.) (33⅓% of the common fund awarded); *In re Sorbates Direct Purchaser Antitrust Litig.*, No. 98-4886 (N.D. Cal. Nov. 20, 2000) (Legge, J.) (25% of the fund awarded); *Van Vranken v. ARCO*, 901 F. Supp. 294 (N.D. Cal. 1995) (25% awarded*); In re Sodium Gluconate Antitrust Litig.*, No. C-97-4142 (N.D. Cal. 1999) (Wilken, J.) (30% awarded).  This method has the advantage of preserving the judicial economies of the percentage of the fund approach while ensuring that counsel do not receive a windfall fee totally out of proportion to the effort they expend in producing the common fund.   In the Special Master's personal experience, this is the best approach.[14]

---

[14]   As it developed, the lodestar approach has the tendency to mire trial courts in the minutiae of counsels' daily activities, and in the inevitable second guessing of virtually every decision from pre-

34.     *Graulty* established 25% of the common fund as the appropriate "bench mark" percentage award in this Circuit.  In doing so, the Ninth Circuit stated that in general fee awards ordinarily should "range from 20[%] to 30[%] of the fund created."  *Id* at 272. The Ninth Circuit recently described the process in *Jones v. GN Netcom, Inc. (In re Bluetooth Headset Prods. Liab. Litig.)*, 654 F.3d 935, 942 (9th Cir. 2011):

> Because the benefit to the class is easily quantified in common-fund settlements, we have allowed courts to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar. Applying this calculation method, courts typically calculate 25% of the fund as the "benchmark" for a reasonable fee award, providing adequate explanation in the record of any "special circumstances" justifying a departure. *Six (6) Mexican Workers v. Ariz. Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir. 1990); accord *Powers*, 229 F.3d at 1256-57; *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).

35.     Thus, the starting point for awarding a common fund fee in this Circuit is the calculation of 25% of the common fund.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002).  However, the determination of whether to award the 25% benchmark or to upwardly or downwardly adjust it can be made only after consideration of the lodestar cross-check, the quality of counsel's representation and the result obtained for the class in light of the circumstances, risk and complexity of the case, financial considerations such as the delay in payment, the risk of non-payment and the burden of financing the litigation. Finally, the fee should be roughly in keeping with the range of fees awarded in similar cases.  *See, e.g., Id.* at 1048-50; *see also, In re Netflix Privacy Litigation,* 2013 U.S. Dist. LEXIS 37286, *29 (N.D. Cal. March 18, 2013) ("The Ninth Circuit has set forth a non-

---

trial strategy (was filing this motion or that document request "reasonably necessary?") to the staffing of counsels' activities (could that brief have been competently drafted by a lawyer with less seniority and hence a lower hourly rate?).  *See e.g., In re Washington Public Power Supply System Securities Litigation*, 779 F. Supp 1063 (D.Ariz. 1990).  In response to this trend, the Third Circuit convened a Task Force to study the question of common fund fee award.  In 1985, that Task Force issued a report endorsing the percentage of the fund approach.  *Court Awarded Attorney Fees, Third Circuit Task Force*, 108 F.R.D. 237, 250 (1985).

---

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

exhaustive list of factors which may be relevant to the district court's determination of the percentage ultimately awarded: (1) the results achieved; (2) the risk of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases.").

36.     The objective of this process is the arrival at a " reasonable percentage" of the fund after consideration of "all the circumstances of the case." *Vizcaino*, 290 F.3d at 1948.   Accordingly, the lodestar cross check does not supplant the percentage calculation as the basis of the award.  Neither does it require the sort of detailed task by task or lawyer by lawyer evaluation of the reasonableness of each of the hours recorded and the hourly rates applied that became common in lodestar based fee awards, and that motivated the Third Circuit Task Force to recommend the percentage over the lodestar approach.  Rather, as the *Vizcaino* Court noted, in applying the lodestar cross-check, "the primary basis of the fee award remains the percentage," and reference to the lodestar is simply to "provide a useful perspective on the reasonableness of a given percentage award."  *Id*. at 1050.

37.     In the joint fee application submitted to the Special Master, Counsel have requested a fee of 25% of the total cash benefit secured for the members of the private and governmental purchaser classes and those governmental purchasers represented in a non-class capacity.[15]  Counsel have made this request aware that the requested fee of $77,680,000 represents less than the total of the lodestars reported by the various private firms and Attorneys General whose cases are covered by the proposed global settlements.[16] It is also noteworthy that this request is being made even though one practical effect will be

---

[15]  See the Joint Petition submitted to the Special Master on August 7, 2013, a copy of which appears in the Appendix hereto as Exhibit 65.

[16]  See, Gross Decl. at  ¶47, submitted to the Special Master on August 7, 2013, and Declaration of Emilio Varanini at ¶22, submitted to the Special Master on August 7, 2013.  Copies of the Gross Declaration and the Varanini Declaration appear in the Appendix hereto as Exhibits 67 and 68 respectively.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

that the disparity between Counsel's lodestar and the benchmark fee will continue to

increase since Counsel are undertaking and will continue to undertake substantial tasks in

connection with obtaining preliminary and final approval of these settlements without any

additional compensation.   Nonetheless, the Special Master will take Counsel's requested

fee to establish the potential fee under consideration, even though the Special Master notes

that, ordinarily, when application of the lodestar cross check produces a "negative

multiplier" as in this case, it would be appropriate to consider whether under all of the

circumstances of the litigation a fee greater than the 25% benchmark should be awarded.[17]

## C.   Computation of the 25% Benchmark Fee

38.   Counsel have computed the dollar value of the 25% benchmark fee in this

case by applying that percentage to the total of all cash payments being made by defendants

into the settlement fund, including cash earmarked for notice and claims processing and

---

[17]   Numerous courts in this Circuit and elsewhere have awarded fees exceeding 25%, including fee awards of one-third of the common fund generated by the work of plaintiffs' counsel, under circumstances similar to this case.  *See, e.g., In re Pacific Enters. Sec. Litig.*, 47 F.3d at 379 (fee award of one-third of common fund justified due to complexity of issues and risks involved); *Vizcaino,* 290 F.3d at 1047-52 (affirming award of 28% of $96 million common fund because of exceptional result and extreme risks of the litigation); *In re Heritage Bond Litig.*, 2005 WL 1594389, at *8 (C.D. Cal. June 10, 2005) (one-third was justified based on the result obtained, Class Counsel's effort, experience and skill, and the great risk assumed); *see, e.g., In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1378 (N.D. Cal. 1989) (benchmark is closer to 30%).  *In re Automotive Refinishing Paint Antitrust Litig.*, 2008 U.S. Dist. LEXIS 569, at *23 (E.D. Pa. Jan. 3, 2008) (one-third, where class counsel spent almost six years and more than 48,000 hours prosecuting the case); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 77-82 (D. Mass. 2005) (one-third of common fund was justified due to, *inter alia*, skill and efficiency of counsel, complexity and four-year duration of the litigation, and class counsel's expenditure of tens of thousands of hours on the case); *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067, at *58 (D.D.C. July 13, 2001) (determining that one-third was reasonable and granting fee award of approximately 34% of the total estimated settlement amount in antitrust price fixing litigation); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271 (N.D. Cal. Mar. 29, 2013) (28.5% of the common fund awarded as attorneys' fees); *In re Static Random Access Memory (SRAM) Antitrust Litig.,* MDL No. 1819 (N.D. Cal. Oct. 14, 2011) (33-1/3% of common fund awarded as attorneys' fees); *Brailsford v. Jackson Hewitt, Inc. et al*., C06-00700 CW, 2007 U.S. Dist. LEXIS 35509, at *14 (N.D. Cal. May 3, 2007) (awarding 30% of the common fund).

---

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

1   attorneys' fees, as well as payments resulting from the renegotiation of certain defendants'

2   payment schedules.  The Special Master finds that this is proper, resulting in a benchmark

3   fee in this litigation of $77,680,000.  Courts have long recognized that it is appropriate to

4   base a percentage fee on the gross monetary benefits available to pay class members' claims

5   and expenses, including any "additional benefits conferred on the class by the Settling

6   Defendants' separate payment of attorneys' fees and expenses, and the expenses of

7   administration."  *Zografos v. Qwest Communs. Co., LLC*, 2013 U.S. Dist. LEXIS 99573, *6-

8   7 (D. Or. July 11, 2013) (citing, *inter alia, Boeing Co. v. Van Gemert*, 444 U.S. 472, 479

9   (1980)); *see also Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311

10  (9th Cir. 1990).[18]

11          39.     Even if the separate funds contributed by Defendant Samsung and earmarked

12  as attorneys' fees were considered a separate fee payment, the Special Master finds that the

13  requested total fee of $77,680,000 is fair and reasonable for all of the reasons set forth

14  herein. The Samsung contribution to attorneys' fees is approximately 18.1% of the cash

15  consideration in the Samsung Settlement.  If this Samsung contribution of 18.1% to fees

16  were considered a separate fee of less than the 25% benchmark, then the requested fees from

17

---

18  [18]  As described in the Report, Part I, the litigation was settled in a series of settlements negotiated
19  over a five plus year period. Report, Part I, at ¶¶ 4-8.  The first settlement negotiated was with
    Samsung and included a separate breakdown of an amount for attorneys' fee payments to the IPP
20  Counsel and the AGs in the amounts of $19.5 million and $1 million, respectively, which have been
    held in separate escrow accounts from the balance of the Samsung payments.  *Id* at ¶ 59.  However,
21  none of the subsequent settlements with the other Defendants included any separate breakdown of
    contributions earmarked for attorneys' fees.  *Id* at ¶¶ 61-98.  The Petition filed by IPP Counsel and
22  the AGs seeks a fee award of 25% of the total $310,720,000 Settlement Fund, without regard to the
    location of the escrowed funds from which it would be paid.  The Special Master agrees that it is
23  appropriate to compute the Ninth Circuit benchmark fee, which is the starting point for making all
    fee awards in this Circuit, as 25% of the total cash settlement consideration regardless of whether
24  certain amounts of that consideration are earmarked for certain purposes since all such purposes are
    for the benefit of the proposed settlement classes.  Moreover, the Special Master finds that treating
25  the $20,500,000 separately contributed by Samsung for the purpose of paying a portion of counsels'
    fees and expenses the same as all other funds contributed by the defendants is a fair and reasonable
26  method of reconciling the difference between the provisions of the Samsung settlement agreement
    and the other five agreements that make up the global settlement of the litigation.

27

---

28

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

the other settlements necessary to arrive at a total award of $77,680,000 (the blended 25%

benchmark) represent 28.9% of the cash benefits of those settlements, the Special Master

finds that the same considerations that support the reasonableness of a blended fee of 25%

of the total settlement proceeds equally support the reasonableness of a fee of slightly less

than 29% of the settlements entered into after Samsung.

40.     The Special Master notes that Counsel's computation of the benchmark fee

does not ascribe any value to the injunctive relief obtained by Counsel in this litigation,

although the Special Master previously found that such equitable relief conferred a valuable

benefit on the settlement classes.[19]   However, this does not mean that the value of the

injunctive relief obtained should play no part in setting an appropriate fee award.  The Ninth

Circuit has directed trial courts to "consider the value of the injunctive relief obtained as a

'relevant circumstance' in determining what percentage of the common fund class counsel

should receive as attorneys' fees, rather than as part of the fund itself."  *Staton,* 327 F.3d at

974 (citing *Vizcaino*, 290 F.3d at 1049).

### D.    The Lodestar Cross Check Supports an Award of At Least the Benchmark Fee

41.     While the lodestar cross check provides the trial court with valuable data

relevant to the determination of a fair and reasonable fee award, the Ninth Circuit has

cautioned that under the percentage of the fund method, the focus is not on the attorneys'

billing records, but on whether the percentage awarded and the resulting fee are reasonable

under the circumstances of the case.  *See Vizcaino,* 290 F.3d at 1048.  The amount of the

lodestar by itself is not determinative of the size of a reasonable fee, and the purpose of the

cross-check is not to ferret out any particular incidence of duplication, wasted effort or

excessive billing:  "Calculation of the lodestar, which measures the lawyers' investment of

---

[19]   Report, Part I at ¶ 136.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

1   time in the litigation, provides a check on the reasonableness of the percentage award.

2   Where such investment is minimal, as in the case of an early settlement, the lodestar

3   calculation *may* convince a court that a lower percentage is reasonable." *Id.* at 1050

4   (emphasis added).  As the *Vizcaino* Court's use of "may" rather than "should" or "must" in

5   the preceding quote indicates, the purpose of the lodestar calculation is to give the trial court

6   a general sense of the investment that counsel have made in the litigation, which is but one

7   factor relevant to determining what percentage of the common fund represents a fair fee.

8          42.     Here, each of the sixty-three (63) private firms representing a plaintiff in the

9   settled state and federal cases here submitted a declaration to the Special Master computing

10  that firm's individual lodestar as of December 31, 2012.[20]  Each declarant affirmed that the

11  hours set forth in his or her declaration were actually and reasonably incurred in the

12  prosecution of this litigation and recorded contemporaneously with the performance of the

13  legal services.  Similarly, each declarant affirmed that the hourly rates used in the firm's

14  lodestar computation were the firm's usual and customary rates, either at the present time or

15  at the time the services were preformed, and that no time spent on the preparation of their

16  request for a fee award or its documentation was included in their lodestar calculations.  Mr.

17  Terry Gross, Chair of the Indirect Purchaser Plaintiffs' Executive Committee, then

18  aggregated the reported 152,485 of attorney and paralegal hours for and calculated an

19  aggregate lodestar of approximately $64 million at historical rates with no prime rate

20  enhancement for the amount of time spent in litigation and in settlement and $79 million at

21  current rates.[21]

22

23  [20]   A copy of each of these declarations appears in the Appendix hereto as Exhibit 69.

24  [21]   The Special Master notes that a review of the individual firm declarations reveals that there may
    be some very limited confusion in a couple of the declarations as to the hourly rates reported on an
25  individual firm basis, and therefore neither of Mr. Gross' lodestar calculations (which he does
    qualify as "approximate") is purely current or purely historical.  However, this is irrelevant to the
26  validity of the lodestar cross check since in this Circuit, when using the lodestar approach it is
    appropriate to compensate attorneys in common fund cases for delay in payment, "either (1) by

27

28  Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
    Incentive Awards for Plaintiffs

43.     Similarly, each of the Attorneys General submitted a declaration to the Special Master setting forth the time expended by their offices prior to December 31, 2013, offered for inclusion in the AGs' portion of the lodestar.[22]   As with the private counsel, the AGs affirmed that the time included in the lodestar was recorded contemporaneously.  In addition, the time included in the lodestar incurred by the AGs prior to August 2010 was submitted on a regular basis to a fees committee formed by the AGs and for which the Attorney General of the State of Hawaii tracked the time.[23]   That time was scrutinized for compliance with the protocol of the National Association of Attorneys General, which was developed based on the case law.  *Id.*

44.     The AGs calculated their portion of Counsel's joint lodestar using a uniform set of hourly rates pursuant to the methodology approved in *Theme Productions, Inc. v. North American Marketing*, 731 F.Supp.2d 937 (N.D. Cal. 2010) and commonly used by AGs with the approval of the courts to calculate the fees to which they are entitled.[24]   The AGs calculated their attorneys' fees by multiplying the hours spent by each attorney and paralegal who work on the litigation by an hourly rate taken from the Laffey index for attorneys and paralegals of similar years of experience and adding a 9% cost of living adjustment for the market differential between Washington D. C. where the Laffey index is calculated and Northern California, the relevant market for this litigation.[25] Using this methodology, Mr. Emilio Varanini, Chair of the Multistate Group of, and Liaison Counsel

---

applying the attorneys' current rates to all hours billed during the course of the litigation; or (2) by using the attorneys' historical rates and adding a prime rate enhancement." *Fischel v. Equitable Life Assur. Soc'y of the United States*, 307 F.3d 997, 1010 (9th Cir. 2002) (internal quotation marks and citation omitted).

[22]   A copy of each of these declarations appears in the Appendix hereto as Exhibit 70.

[23]   Varanini Declaration at ¶ 18-20.

[24]   Application at 37-38.

[25]   *Id.* at ¶ 21.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

for, the Attorneys General, aggregated the approximately 77,400 hours reported by the individual state offices, which using the adjusted Laffey index rates described above generates a lodestar of $31,390,687.

45.     Rounding the AG lodestar and adding it to the private firms' lodestar results in total lodestars for all Counsel of approximately $95 million at private counsel's historical rates and $110 million at private counsel's current hourly rates.  These lodestars are computed on approximately 229,400 hours of attorney and paralegal time devoted over an eleven-year period to securing a recovery for private indirect purchasers, consumers and government entities.  Numerous courts have awarded attorneys' fees of more than 25% of a common fund under similar circumstances.  Most recently, Judge Illston of this District awarded attorneys fees of 28.6% of the common fund in an antitrust class action of similar scope in which plaintiffs' counsel invested approximately 313,000 hours.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271, *62-68 (N.D. Cal. Mar. 29, 2013); *see also, e.g., In re Static Random Access Memory (SRAM) Antitrust Litig.,* MDL No. 1819 (N.D. Cal. Oct. 14, 2011) (33-1/3% of common fund awarded as attorneys' fees after more than four years and 76,000 hours of work on the case);  *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 325 (E.D.N.Y. 1993) (one-third fee award justified in part due to the expenditure of 30,000 hours by 11 firms); *In re Medical X-Ray Film Antitrust Litig.*, No. CV–93–5904, 1998 WL 661515, at *23 (E.D.N.Y. Aug. 7, 1998) (one-third of the common fund awarded after 17 law firms spent about 30,000 hours litigating the case).

46.     The requested benchmark fee of $77,680,000 represents approximately 81.8% of Counsel's lodestar at historical rates and 70.6 % of Counsel's lodestar at current hourly rates, or "negative" multipliers of approximately .82 and .71 respectively.  This calculation alone is virtually sufficient to satisfy the cross-check requirement.  *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *16 (N.D. Cal. Nov.

26, 2007) (finding that a negative multiplier suggests that "the requested percentage[-]based fee is fair and reasonable"); *see also, e.g., Gong-Chun v. Aetna Inc.*, No. 1:09–cv–01995–SKO, 2012 WL 2872788, at *23 (E.D. Cal. July 12, 2012) (performing lodestar cross-check resulting in negative multiplier of .79 and therefore finding the fee award reasonable), and *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 853–54 (N.D. Cal. 2010) (performing lodestar cross-check resulting in negative multiplier of .59 and therefore finding the fee award reasonable).

47.    Indeed, it is constructive to compare this negative multiplier that Counsel have voluntarily agreed to with the law of this Circuit that in common fund cases, a fair and reasonable fee should include a positive multiplier on Counsel's lodestar.  "It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases." *Washington Public*, 19 F.3d at 1299; see also *Vizcaino*, 290 F.3d at 1051. This provides the "necessary incentive" for attorneys to bring actions to protect individual rights and to enforce public policies.  *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987).  In common fund cases, there is no concern about financially burdening a defendant to compensate for the risk of nonpayment, because the attorney's fee award is deducted from the plaintiffs' fund. *Washington Public*, 19 F.3d at 1300. In such cases, the plaintiffs "should share the wealth with the lawyers whose skill and effort helped create it." *Id*.  Indeed, where a court selects the lodestar approach, the Ninth Circuit has held it to be an "abuse of discretion to fail to apply a risk multiplier . . . when (1) attorneys take a case with the expectation that they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk [i.e., it is the same rate charged to hourly clients], and (3) there is evidence that the case was risky." *Fischel v. Equitable Life*

*Assur. Soc'y*, 307 F.3d 997, 1008 (9th Cir. 2002).[26]  Each of the declarations from the private firms states that this litigation was undertaken without guarantee of compensation and at the expense of other contingency and hourly business.[27]

48.     Generally, percentage of the fund awards exceed the amount of the lodestar used in the cross check by a mutiplier greater than 2.0.  See e.g., *Vizcaino v. Microsoft*, 290 F.3d at 1050-51 (upholding a 28% fee award that constituted a 3.65 multiple of lodestar); *id.*, at 1052-54 (noting district court cases in the Ninth Circuit approving multipliers as high as 6.2, and citing only 7 of 34 decisions with approved multipliers below 2.0).

49.     This Court's award of the 25% benchmark fee (the amount requested) to counsel for the direct purchaser plaintiffs in this litigation, which the Special Master has considered in arriving at his findings and conclusions, represents a multiplier of 2.3 on their aggregate reported lodestar.  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, M-02-1486, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) (Dkt. No 1648).

50.     The plaintiffs in the *LCD Litigation*[28] submitted two expert declarations in support of their fee request that, *inter alia*, contain a review of multipliers awarded in common fund cases.[29]  One review was conducted by Brian Fitzpatrick, Esq., a Professor of Law at Vanderbilt University and author of an article entitled, *An Empirical Study of*

---

[26]   Although not a lodestar method award, Judge Illston recently reconsidered and increased to 25% an award she had made of 20% of a common fund because the lower award did not provide a risk multiplier on the lodestar calculation.  *Lemus v. H&R Block Enterprises, LLC,* 2012 U.S. Dist. LEXIS 128514 (N.D. Cal. Sept. 10, 2012).

[27]   See, e.g., the Declaration of Josef D. Cooper in Support of Petition for Attorneys' Fees ("Cooper Decl."), at ¶ 8.  This Declaration is included in Exhibit 69 in the Appendix hereto.

[28]   *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827, (N.D. Cal.).

[29]   These are the Declaration of Brian T. Fitzpatrick, dated September 6, 2012, which is part of Docket No. 6662-3 filed in *the LCD Litigation* on September 7, 2012, a copy of which appears as Exhibit 71 to the appendix hereto, and the Declaration of Richard M. Pearl, dated September 7, 2012 and filed the same day also as part of Docket No. 6662-3, which is Exhibit 72 to the Appendix hereto.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

*Class Action Settlements and Their Fee Awards*, published in December 2010 in the Journal of Empirical Legal Studies (7 J. Empirical L. Stud. 811) for which he examined every class action settlement approved by the federal courts during 2006 and 2007. Fitzpatrick Declaration at ¶ 3.  Mr. Fitzpatrick reported that of the 192 fee awards studied where "a lodestar cross-check and the lodestar multiplier was ascertainable, the mean and median multipliers were 1.62 and 1.30." *Id*. at ¶ 25.

51.    The other review of multipliers in common fund cases submitted to Judge Illston was done by Richard M. Pearl, Esq., an attorney specializing in court-awarded attorneys' fees and a member of the California State Bar's Attorneys Fees Task Force and author of California Attorney Fee Awards, 2d Ed. (Calif. Cont. Ed. Of Bar 1994), and its supplements, and California Attorney Fee Awards, 3d Ed. (Cal. CEB 2010) and its supplements, which treatise has been cited by the California appellate courts on more than 35 occasions.  Pearl Declaration at ¶¶ 1 and 3.  Mr. Pearl's declaration cites to numerous common fund cases in which the fee awards represented multipliers of greater than 4 times counsels' reported lodestars; the highest being a multiplier of 19.6.  *Id*. at ¶ 25.

52.    The purpose of this discussion is that the negative multiplier generated here by the lodestar cross-check supports the requested award of the benchmark fee.  Some courts in applying the lodestar cross-check make an across the board reduction of the claimed lodestar to account for an assumed element of "unreasonable" waste and duplication.  They then examine the reasonableness of the "multiplier" that is generated when the adjusted lodestar is compared to the percentage fee.  For the benchmark fee here to generate the same 2.3 multiplier that this Court's benchmark award gave to the counsel who brought actions for direct DRAM purchasers, arguably a far less risky endeavor than indirect purchaser litigation, almost 70% of Counsels' total lodestar at current rates would have to be disallowed.  There is no danger that an award of the requested 25% fee would be

a windfall out of proportion to the effort Counsel expended in producing the common fund. Counsel have requested that the total compensation to be awarded by this Court include the interest that the 25% fee amount has earned during the time the Settlement Fund has been invested.  This Court awarded Direct Purchasers' counsel the proportionate interest earned as part of their settlement funds by their fee award.  (Dkt. No 1648).  The Special Master finds that doing the same for Counsel is fair and reasonable under the circumstances of this litigation, particularly in light of the fact that, unlike the Direct Purchasers' counsel, the fee requested by Counsel is less than their total reported lodestar.

53.    The Special Master carefully reviewed the declarations of the individual private counsel and Attorneys General whose time makes up the lodestar in this case.[30]   The Special Master reviewed these declarations and found that in general their descriptions of the tasks upon which Counsel expended time comports with the Special Master's understanding of the scope of the work done on behalf of the proposed Indirect Purchaser Settlement and Governmental Purchaser Settlement Classes and the Governmental Purchasers represented in a non-class capacity.[31]   In this regard, the Special Master notes

---

[30]   While not all are not completely free of areas that might bear more inquiry if the lodestar method were employed, employing any particular lodestar as a cross-check does not require a determination that every hour in the computation was in fact reasonably expended for the benefit of the class.  The cross-check requirement is satisfied if the lodestar when compared to the percentage fee award generates a multiplier that is within a range that the court finds is fair and reasonable in light of the particular circumstances of the case and multipliers awarded in similar matters.  Similarly, the common expedient of applying a percentage reduction to the claimed lodestar for what some courts believe is an inevitable degree of duplication and waste does not mean that each of the individual firm lodestars that make up the aggregate lodestar should be subject to the same reduction, or necessarily any reduction at all. It may be that some of the individual lodestars reflect services of very little value to the class while others reflect the services of counsel who held the laboring oars and exercised rigorous "billing judgment" when recording their time. This is a determination that does not become relevant until there is an allocation of the fee award among individual firms, a determination, which as the Special Master noted above, is best made by leadership counsel who are the most familiar with the work done in the litigation.

[31]   Some of these efforts will be discussed below and others are detailed in the Report, Part I, at ¶¶ 42-55, 108-114 and 204-260.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

that the efforts of the firms making up Indirect Purchaser Plaintiffs' Leadership Group[32]

account for over 70% of private counsels' total lodestar.  Similarly, approximately 60% of

the Attorneys General's total lodestar is attributable to the efforts of California, Florida,

Illinois and Oregon, the states serving as co-lead counsel for the Attorneys General.  The

Special Master has personal knowledge of the skill and integrity of these attorneys from

observing their actions in these proceedings.

54.     In addition, based upon personal experience, the Special Master finds that the

total number of attorney and paralegal hours invested in this litigation, as reported in the

declarations of Counsel, fall within the expected range of time reasonably required to

prosecute litigation of the magnitude, complexity and duration of the settled cases.

55.     As to the reasonableness of the hourly rates used in the lodestar, the Special

Master computed an average (but not weighted) blended historical hourly rate of $420 and a

current rate of $518 for the portion of the lodestar attributable to IPP Counsel.  The Special

Master also reviewed the individual hourly rates and experience of the IPP Counsel

leadership group and compared them to the hourly rates approved by courts and charged by

San Francisco litigators as listed in the Pearl Declaration at ¶¶ 11-14.  The Special Master

also notes that, in reviewing the report and recommendation regarding fees submitted to the

*LCD* court by the Special Master in that case, he accepted Mr. Pearl's specific evaluation

and confirmation of the reasonableness of the hourly rates charged by Cooper & Kirkham,

P.C., Gustafson Gluek, PLLC, and Straus & Boies, LLP, three of the four Co-Lead Counsel

in this case, and of Zelle Hoffman Voelbel & Mason LLP, Liaison Counsel here.  As noted

above the individual lodestars of these firms, along with the lodestars of the firms of Co-

Lead Counsel Daniel Mogin and Executive Committee Chair Terry Gross, account for over

---

[32]   Indirect Purchaser Plaintiffs' four Co-Lead Counsel, Liaison Counsel and the Chair of Plaintiffs'
Executive Committee.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

70% of private counsel's combined lodestar.  Accordingly, the Special Master finds that the hourly rates reflected in IPP Counsel's portion of the joint lodestar fall within the range of reasonable hourly rates that would be expected to be charged in the San Francisco market by antitrust counsel with the same skills and expertise as the IPP leadership group for litigation of this magnitude and complexity.

56.     The Attorneys General used the *Laffey* Matrix hourly rates.  The *Laffey* Matrix is a "widely recognized compilation of attorney and paralegal rate data."  *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F.  Supp. 2d 1039, 1067 (N.D. Cal. 2010), citing *Laffey v. Northwest Airlines, Inc.,* 572 F. Supp. 354 (D.D.C.1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C.Cir.1984); *accord, Craigslist, Inc. v. Mesiab, et al.*, 2010 WL 5300883, at * 7 (N.D. Cal. Nov. 15, 2010) (James, MJ).  The *Laffey* Matrix is regularly updated by the Civil Division of the United States Attorney's Office for the District of Columbia, and is often used to evaluate work "performed by a mix of senior, junior and mid-level attorneys, as well as paralegals." *Naturemarket*, 694 F. Supp. 2d at 1067; *see* http://www.justice.gov/usao/dc/ divisions/Laffey_Matrix_2003-2013.pdf, visited June 27, 2013.  The *Laffey* Matrix is particularly suited to determining prevailing local market rates for government or nonprofit attorneys who do not bill at market rates, because a "proxy for the market must be found in order to set a reasonable hourly rate."  *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1519 (D.C. Cir. 1988), *citing Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 16 n.74 (D.C. Cir.1984), *overruled on other grounds* by *Hodel*. Accordingly, the Special Master finds that the hourly rates reflected in Attorneys General's portion of the joint lodestar fall within the range of reasonable hourly rates in the San Francisco market for government antitrust counsel with the same skills and expertise as the Attorneys General's leadership group for litigation of this magnitude and complexity.

///

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

57. The Special Master finds that under the law of this Circuit, application of the lodestar cross-check to the benchmark fee here would ordinarily raise the question of whether the requirement to compensate Counsel for risk and other contingency factors, along with consideration of the specific circumstances of the litigation, support an upward adjustment to the benchmark fee. Since Counsel have voluntarily limited their fee request to $77,680,000, the Special Master finds that application of the lodestar cross-check fully supports this fee award, which is 25% of the common fund in this litigation.

**E.    The Results Achieved by Counsel in Light of the Circumstances, Risk and Complexity of the Litigation and the Skill and Quality of Their Work Supports An Award of At Least the 25% Benchmark Fee**

**1. The Results Achieved by Counsel**

58. The $310,720,000 Settlement Fund ranks among the highest settlements achieved in an indirect-purchaser antitrust case. The settlement is all cash, and there will be no reversion or refund to any Defendant. In general in a contingency representation, the larger the monetary result achieved for the client, the larger the remuneration counsel can expect to receive. However, from time to time, in common fund cases, it has been asserted by objectors that where the class recovery is hundreds of millions of dollars, the attorneys' fees should be capped at a smaller percentage than would apply in cases where the recovery is smaller. *See, e.g., Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629 (7th Cir. 2011); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718-19 (7th Cir. 2001); Vizcaino, 290 F.3d at 1047. This proposition has been rejected by the Ninth Circuit. Where, as here, the benchmark fee represents less than Counsel's total reported lodestar, the wisdom of the Ninth Circuit's more flexible approach is clear.

59. The avowed purpose of the so-called "mega-fund" or "increase-decrease rule" (*Vizcaino*, 290 F.3d at 1047) is to prevent a fee that represents an unreasonable windfall for class counsel. However, a reasonable fee under all of the circumstances of the

particular litigation is the goal in all common fund cases regardless of the size of the class's recovery.  In other words, a windfall fee that is out of all proportion to the "hours spent on the case" and not justified by some other consideration is no more acceptable in a $3 million case than in $300 million dollar litigation.  Accordingly, the law of this circuit calls for trial courts in *all* common fund cases to determine whether the benchmark 25% fee should be adjusted after consideration of the circumstances of the individual case, including the lodestar cross-check.  *In re Bluetooth Headset Prods. Liab. Litig*, 654 F.3d at 942.  Or in the words of the *Vizcaino* Court, "[s]election of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." *Vizcaino*, 290 F.3d at 1048.  Under this procedure, and in light of the facts established here, there can be no possibility of a windfall fee award.

60.     Here, the cash settlement fund is approximately 12% of the overcharge imposed by the Defendants, as computed by the direct purchaser class's damages expert.[33] This result is comparable to settlements in other price-fixing cases where the court awarded 25% or more of the settlement fund as attorneys' fees.  *See, e.g.*, *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 324, 330–33 (3d Cir. 2011), *cert denied*, 132 S. Ct. 1876 (U.S. 2012), *reh'g denied*, 132 S. Ct. 2451 (affirming a settlement fund that represented 10.93% of the estimated overcharge, and affirming attorneys' fees in the amount of 25%).

61.     The Indirect Purchaser and Government Purchaser Plaintiffs also benefit from significant non-monetary relief.  The first settling defendant, Samsung, agreed to provide cooperation to both the IPPs and the AGs in litigation against the other Defendants, and to provide trial witnesses if needed.  This assistance was valuable in maximizing the

---

[33] Although Defendants argued that the conspiracy was largely ineffective at raising prices, Direct Purchaser Plaintiffs' expert, Dr. Paul C. Liu, estimated that the total overcharges due to defendants' conspiracy was at least $2.6 billion.  Rebuttal Expert Report of Paul C. Liu, Nov. 22, 2006, at 3 (Dkt. No. 1182).  Thus, the $310 million recovery represents approximately 12% of single damages.

monetary recovery against the other Defendants. In addition, each Defendant agreed: (1) to establish an antitrust compliance program; (2) to an injunction against anticompetitive conduct with respect to DRAM for a period of three years; and (3) to provide complete cooperation to plaintiffs in prosecuting any antitrust cases against any co-conspirator.[34]

## 2. Counsel's Efforts in the Litigation

62. Although subsumed in the lodestar cross-check, courts also refer to the efforts of counsel as an independent factor to be considered in determining the appropriate percentage of a common fund to award as attorneys' fees. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271, at *66; *In re Heritage Bond Litig.*, 2005 WL 1594389, at * 9. As noted above, the recovery here was obtained as a result of over 200,000 hours of work by Counsel. The procedural history of the litigation set out in the Part I of this Report and Recommendations at ¶¶ 42-55, provides a description of most of this effort and will not be repeated here.

63. However, two aspects of Counsel's efforts, which are particularly illustrative of the efficiency and skill with which they conducted the litigation, will be briefly discussed as examples of the high quality of the representation afforded members of the proposed settlement classes.

64. To begin, the Special Master notes that both IPP Counsel and the Attorneys General created organizational structures and adopted litigation strategies that facilitated the efficient resolution of a wide range of claims, brought under differing state laws, with different standards of proof, and which ultimately generated settlements benefiting purchasers of DRAM and DRAM containing products nationwide.

65. Private counsel first filed class action complaints on behalf of a nationwide class of non-governmental indirect DRAM purchasers in California state courts in August

---

[34] Report, Part I, ¶¶ 56-98.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

2002.  These cases were coordinated by the Judicial Council in the complex litigation department in the San Francisco Superior Court.  Cooper & Kirkham and Gross & Belsky were appointed Co-Liaison Counsel and given the duties and responsibilities of lead counsel.[35]   Shortly thereafter, plaintiffs entered into a discovery plan with defendants that included the production of grand jury documents, and the commencement of written discovery and depositions.  Motion practice and discovery continued in the California coordinated proceeding through 2004 and into 2005.[36]

66.   Beginning in late 2004, private indirect-purchaser cases were filed in federal and state courts other than California; and a number of these later-filed state-court cases were removed to federal court.  In all, more than 60 class-action complaints making similar allegations against various DRAM manufacturers, most on behalf of statewide classes, were filed in state and federal courts across the country.  In order to facilitate the global litigation and resolution of the claims of all indirect purchasers nationwide, counsel in the California proceeding, filed a complaint in this Court captioned *Petro Computer Systems, Inc. v. Micron Technology, Inc*, C 05-0247 ("*Petro*"), on June 17, 2005.  The *Petro* complaint alleged original jurisdiction in federal court pursuant to the CAFA-enacted 28 U.S.C. §1332 (d)(2) (class action diversity), and asserted federal equitable claims and damage claims under the California antitrust laws on behalf of a nationwide class, as well as statewide claims under various antitrust and consumer protection laws.  The Judicial Panel on Multidistrict Litigation transferred all federal-court actions to the United States District Court for the Northern District of California, and consolidated the cases for pretrial purposes with *Petro* in the MDL proceeding that had previously been established for the direct purchaser actions.  All indirect-purchaser cases that remained in state courts were thereafter

---

[35] Cooper Decl., ¶ 3.

[36] Gross Decl., ¶ 2.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

coordinated with the MDL. *Petro* was then designated as the relevant indirect purchaser complaint for purposes of coordinated pretrial proceedings.[37]

67.     In August 2005, pursuant to this Court's order (Dkt. No. 526), plaintiffs created a leadership group made up of the four Co-Lead Counsel, Liaison Counsel and Chair of Plaintiffs' Executive Committee listed above, which included the leadership firms from the California state court litigation, thus ensuring continuity with the earlier proceedings in that forum. As noted above, attorneys and paralegals in the firms comprising this leadership group performed the vast majority of the work that resulted in the settlement of the indirect purchaser litigation.

68.     The Attorneys General began their investigation into this case in June 2005, serving subpoenas and interrogatories on Defendants and third parties.  Defendants produced the same millions of pages of documents to the AGs that they had previously produced in the California proceedings and supplemented them with additional documents and interrogatory responses including narrative statements of liability from various Defendants.  Following a thorough independent review of documents, data, and interrogatory answers, the AGs, other than New York, filed a single action, Case No. 06-4333 PJH, in this Court.  The State of New York filed a separate action in the Southern District of New York that was transferred to this Court in Case No. 06-4636 PJH.

69.     The Attorneys General also adopted a leadership structure that promoted the efficient prosecution of the claims brought on behalf of governmental purchasers and *parens patriae* for their citizens.  This structure involved the designation of a representative of the California Attorney General as Chair of the multistate group of AGs, the formation of Executive and Multistate Committees and the designation of the states of California,

---

[37] Report, Part I, ¶ 42; Gross Decl., ¶ 3.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

1    Florida, Illinois and Oregon as Co-Lead Counsel.[38]  The AGs also organized themselves

2    into working committee for discovery, drafting pleadings and other court filings and

3    working with expert witnesses, as well as a Fees Committee that tracked and scrutinized the

4    hours reported by the various offices.  *Id.*

5        70.    Both the organization of counsel and the cooperation between the IPP

6    Counsel and AG leadership groups are exemplified in the efficient conduct of discovery in

7    this matter.

8        71.    Although the first cases were filed in 2002, due to the continuing

9    investigation of the United States Department of Justice ("DOJ"), general discovery in the

10   private actions was stayed until July 24, 2005.  During that stay, however, the IPP Counsel

11   conducted a thorough investigation of the DRAM market, consulted with experts, obtained

12   access to and reviewed the millions of pages of documents that the Defendants produced to

13   the DOJ, propounded interrogatories and also began preparing for class certification.[39]

14

15       72.    After IPP Counsel had been litigating against Defendants in state court for

16   two years, the DOJ announced in September 2004 that Infineon was pleading guilty to a

17   price-fixing conspiracy involving six computer manufactures ("OEMs"), which plea

18   agreement was followed over the next year by indictments and pleas with additional DRAM

19   manufacturers.  While helpful, the pleas' utility in the private cases was limited, since they

20   established only a conspiracy to fix DRAM prices to particular OEMs and for a short time

21   period.  *See, e.g., United States v. Samsung Electronics Co., Ltd., et al.*, Plea Agreement, at

22   ¶ 4(c), (d), No. CR05-0643 PJH (N.D. Cal.  Nov. 30, 2005).  This Court later ruled that the

23   plea agreement of a specific Defendant had only limited evidentiary value against other

24   Defendants.  *See* Transcript of Hearing at 113-117, *Sun Microsystems v. Hynix*

25   ─────────────────
     [38] Varanini Decl., ¶¶ 5-8.

26   [39] Report, Part I, ¶ 43.

27   ─────────────────

28                                    36
     Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
                    Incentive Awards for Plaintiffs

*Semiconductor, Inc. et al.,* C 06-1665 PJH (N.D. Cal. May 7, 2009).   Thus, the DOJ proceedings notwithstanding, IPP Counsel, and later the AGs, were required to conduct substantial discovery focused on demonstrating that the Defendants' conspiracy was much broader than that contained in the DOJ indictments and occurred during a much longer period.[40]

73.   In addition, Defendants contended that certification of litigation classes would be improper because there was no method of common proof of impact and damages, and that the indirect-purchaser distribution channels were so complicated that it was virtually impossible to establish that any overcharge was passed through to the ultimate consumers.  Accordingly, preparation for the filing of class certification motions required IPP Counsel to conduct comprehensive investigations into various sources of industry data on sales, transactions, and pricing of DRAM, and products containing DRAM, aided by experts, and to work with and facilitate their economic experts' regression analyses.  It also required an intricate analysis of the market structure and its numerous distribution channels, in order to develop methods of common proof of impact and damages.[41]

74.   Counsel here, along with the Direct Purchaser Plaintiffs, engaged in multi-year coordinated conspiracy and violation discovery, during which numerous witnesses were deposed on issues relating to liability and overcharge.  IPP Counsel attended the expert depositions in the Direct-Purchaser actions.  In addition, they conducted substantial discovery into the issues of the degree to which the direct purchasers had passed the DRAM overcharges on to the ultimate consumers and other indirect purchasers, as well as the degree to which the Defendants were aware that their price increases were being passed-on

---

[40] Gross Decl., ¶ 5.

[41] *Id.* at ¶ 11.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

and included the indirect purchaser market within the target of their price-fixing conspiracy, complex and time-consuming issues that were absent from the Direct Purchaser Litigation.

75.     IPP Counsel propounded third-party discovery, directed principally to marshaling evidence necessary to prove the pass-through of overcharges to indirect purchasers. Subpoenas were served on more than 30 third parties, primarily on large computer OEMs that purchased DRAM and sellers of products containing DRAM, such as Dell, Gateway, Apple, Hewlett-Packard, IBM, Circuit City, CompUSA, Ingram Micro and CDW.  This discovery was critical because the as indirect purchasers, the *Petro* plaintiffs needed to demonstrate that pass through of the direct overcharge could be established on a class-wide basis.  Each of these subpoenas had to be individually negotiated, with the assistance of expert economists.[42]  IPP Counsel and their experts and consultants reviewed and carefully analyzed this third-party information, which consisted of hundreds of thousands of pages of documents and extensive data.[43]

76.     During discovery, Defendants and third-parties produced over four million documents from both domestic and foreign entities.  Counsel also obtained worldwide transactional sales data of DRAM manufactured by Defendants in the global market, and, in consultation with their experts, sought and received manufacturing cost data and detailed transactional sales data of DRAM, both as components in computers and as stand-alone DRAM modules.  Over 100 depositions were taken of fact witnesses, as well as Defendants' expert witness for class certification, and IPP Counsel defended the depositions of their own experts, Drs. Michael Harris and Roger Bohn.  Additionally, IPP Counsel worked closely

---

[42] Gross Decl., ¶ 10.

[43] *Id.*

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

with consultants and economic experts to ensure that the discovery obtained would be focused on information needed to prepare for class certification and trial.[44]

77.     In order to process the millions of pages of document discovery, IPP Counsel undertook the design and implementation of a new structure and technology for document review that, to the knowledge and the Special Master, had never been used before.[45]  In 2002, when document discovery commenced in this litigation, advances in computer software and hardware, especially in web-based access to documents on a central server and the enhancements in optical character reading, were opening the door to new and vastly more efficient possibilities for litigation document review, and IPP Counsel took full advantage of this opportunity to create an efficient and flexible system for reviewing, organizing and accessing the evidence in this litigation.  *Id.*

78.     Working with an outside consultant, IPP Counsel selected software and a document hosting vendor that could normalize and standardize the formats and load files of the electronic documents that had been produced in the California JCCP Proceeding and were being produced in the MDL litigation, optically "scan" and convert the millions of pages of electronic documents to searchable text files, provide a platform for the retrieval of individual documents through Boolean logic (Lexis style) word searches, and then allow for the annotation and organization of the individual documents by multiple subjects and issues. *Id.*

79.     The availability and use of this technology permitted the reinvention of the entire document review process.  The IPP counsel selected to review documents were organized into teams of five to eight attorneys, who were responsible for identifying the best documentary evidence relevant to their particular subject matter in the universe of

---

[44] Report, Part I, ¶ 44; Gross Decl., ¶ 14.

[45]  Cooper Decl., ¶ 15.

documents produced in discovery, and organizing and annotating those documents for future use as deposition, pretrial motion and trial exhibits. To maximize the collaborative spirit, as well as quality control, no team leader supervised attorneys from his or her office.

80.      Each team produced a narrative memorandum of the evidence relevant to its issue or subject matter, with citations to individual highly probative documents.  These memoranda were updated periodically and were compiled into a general case overview or briefing book that was used by attorneys taking depositions and writing briefs.  As a subject matter team finished its work, the attorneys receiving the highest evaluations from their team leaders were reorganized into the deposition preparation teams.  *Id*.

81.      IPP Counsel provided the AGs with access to their electronic document management system, including their annotations and other work product.  The AGs supplemented this system by creating document management systems of their own and conducting independent document review.  The AGs were also given access to the depositions taken by the Direct and Indirect Purchaser Plaintiffs and conducted an independent review of those depositions. The AGs reviewed all of the documents, interrogatory responses, and deposition testimony taken in the private actions, and selected essential documents and testimony. As part of this review, the AGs explored additional theories of liability such as the output-signaling aspects of the Defendants' conduct and the agency relationship between Defendants Nanya Taiwan and Nanya U.S.A.[46]  Like the IPP Counsel, the AGs worked closely with their experts and consultants in preparing their case for trial.[47]

82.      After this review, the AGs conducted a substantial number of additional depositions and interviews of current and former employees of the Defendants, creating a

---

[46] Varanini Decl., ¶ 14.

[47] Report, Part I, ¶ 52.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

supplemental database of depositions, linked to their document database, for ease of reference. The AGs obtained supplemental interrogatory statements from many of the Defendants. Additionally, the AGs conducted numerous interviews, took depositions of, and obtained a voluminous number of documents from OEMs and third-party retailers and resellers involved in the sale of DRAM and DRAM-containing equipment.[48]

83.    The AGs worked with the government entities they represented to gather and analyze purchase information, conduct a purchasing survey, and speak with state employees, in order to determine the extent of the injury and damages the states suffered throughout the relevant damages period.  This work included not only working with expert economists who analyzed the gathered information and data to determine the fact and extent of harm suffered by the represented government entities but also included answering interrogatories and submitting to depositions across the country.[49]  Additionally, the AGs undertook a survey of state purchasers to further support their damages calculation.[50]  This process took many months to complete.[51]

84.    In addition to preparing Counsel for trial, without the threat of which settlement would have been unlikely, much of the discovery conducted into distribution channels, pass-through, market structure, as well as the work of Counsel's experts proved useful in setting the context in which the plan of distribution and allocation of the settlement proceeds was developed during the proceedings before the Special Master.[52]

///

---

[48] Report, Part I, ¶ 50; Varanini Decl., ¶ 11.

[49] Varanini Decl., ¶ 14.

[50] *Id.* at ¶ 16.

[51] Report, Part I, ¶ 51.

[52] Report, Part I, ¶¶ 204-260.

---

41

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

### 3.  The Substantial Risks Facing Counsel in this Complex Litigation

85.      The risk of non-payment in contingent-fee litigation is a significant factor in determining attorneys' fees.  *Vizcaino*, 290 F.3d at 1048-49; *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (finding no abuse of discretion where the district court awarded 33% of the settlement fund in attorneys' fees -- instead of the standard benchmark of 25% -- due to "the complexity of the issues and the risk"); *In re Wash. Pub. Power Supply Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) (examining the role of risk in litigation); *see also In re Superior Beverage/Class Container Consolidated Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990) ("[t]he 'best' case can be lost and the 'worst' case can be won, and juries may find liability but no damages. None of these risks should be underestimated").

86.       Courts have long recognized that there is generally considerable risk in antitrust cases; one reason why in a significant percentage of such cases, a fee higher than the benchmark is awarded.  That is particularly true of antitrust actions commenced on behalf of indirect purchasers, as this litigation illustrates.  Here, the application of the antitrust injury requirements of *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*Assoc. Gen. Contractors*") to the claims asserted in *Petro* and of the issues raised by the certification of litigation classes for both the private parties and the governmental entities are particularly emblematic of the risk and complexity of this litigation and demonstrate that only counsel of the highest competence could have achieved the settlement recovery realized here.

#### a.  The *Assoc, Gen. Contractors* Issue

87.      On June 1, 2007, this Court granted judgment on the pleadings as to all antitrust claims asserted in *Petro* arising from the purchase of DRAM as a component in a computer or other device, and dismissing those claims with prejudice (Dkt. No. 1555; "the

*AGC* Order").[53]   The *AGC* Order held that plaintiffs purchasing a DRAM-containing product lacked standing under various state antitrust laws because their injuries were too remote to the price-fixing of DRAM itself, and therefore, these purchasers failed to satisfy the "antitrust standing" requirements set forth in *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*Assoc. Gen. Contractors*").

88.     On August 17, 2007, this Court granted IPP Counsel leave to file an amended complaint asserting claims on behalf of persons who purchased DRAM as a component in a computer, as opposed to other DRAM containing devices, and alleging facts to demonstrate that the markets for DRAM modules and for computers are "inextricably linked, and cannot be considered separately" (Dkt. No. 1683).  Plaintiffs' Second Amended Complaint (Dkt. No. 1684) was filed the same day.[54]

89.     On October 1, 2007, Defendants filed a motion to dismiss the Second Amended Complaint, again citing *Assoc. Gen. Contractors* and challenging Plaintiffs' standing to assert claims for computer purchases under the antitrust laws of California and fifteen other states (Dkt. No. 1740).  On January 29, 2008, the Court granted Defendants' motion to dismiss (Dkt. No. 1809; the "MTD Order").[55]

90.     Upon plaintiffs' motion, the Court certified both the *AGC* Order and the MTD Order for interlocutory appeal of the *AGC* standing issues March 28, 2008 (Dkt. No. 1849). The Ninth Circuit granted the Petition for Permission to Appeal Under 28 U.S.C. § 1292(b) on June 26, 2008.  Following completion of the appellate briefing in 2009, which included an *amicus curiae* brief filed by the Attorney General of the State of California in support of appellants, Counsel reached a settlement in principle with all of the remaining

---

[53] Report, Part I, ¶ 45; Gross Decl., ¶ 15.

[54] Report, Part I, ¶ 46; Gross Decl., ¶ 16.

[55] Report, Part I, ¶ 46; Gross Decl., ¶ 17.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

Defendants.  Thereafter, the Ninth Circuit granted a stay of the appeal, pending final

approval of the settlements.

91.     The effect of the *AGC* and MTD Orders was to seriously undermine IPP

Counsel's case.   IPP Counsel's damages experts calculated that only 20% of relevant sales

were stand-alone DRAM modules, with the remainder being sales of the computers and

other DRAM-containing products that had been eliminated from the litigation.[56]  Indeed, in

the MTD Order, this Court "acknowledge[d] the potentially devastating effect of this ruling

on plaintiffs' case in chief."  Dkt. No. 1809 at 15.

92.     These rulings reduced the value of the private litigation by 80% and

increased exponentially IPP Counsel's risk of recovering little or nothing on an investment

of tens of thousands of hours of their time and the multi-million dollar financial

commitment that had funded discovery and the work of their expert witnesses.  Nonetheless,

IPP Counsel never faltered in their vigorous representation of the *Petro* plaintiffs and

putative class.  They succeeded in putting the Defendants sufficiently at risk in pressing the

*Assoc. Gen. Contractors* issue for interlocutory appeal that the Defendants elected to settle

the claims of all DRAM containing product purchasers rather than rely on preserving their

victory on appeal.

93.     The Attorneys General also faced motions to dismiss some of their state law

claims; however, unlike IPP Counsel's claims, most of the state law claims either did not

face a challenge or survived. Only the challenges to the state law claims of Utah, Tennessee,

and New Mexico were granted.  This is not to say, however, that the AGs faced no risk or

trimming of their claims.  *See, e.g., California v. Infineon Technologies AG*, 531 F. Supp. 2d

1124 (N.D. Cal. 2007) (holding that only the California Attorney General can bring *parens*

---

[56] *See* Declaration of Roger Bohn, June 29, 2007, ¶ 28 (Dkt. No. 1597), and Supplemental Expert
Report of Roger Bohn to Special Master, Feb. 18, 2011, ¶ 46, which is Exhibit 73 in the Appendix to
this Report.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

*patriae* claims under the Cartwright Act and only on behalf of California residents, finding some state price-fixing claims were barred by *Illinois Brick Co. v. Illinois* 431 U.S. 720 (1977), finding some state price-fixing claims were barred for failure to allege intrastate activity, applying discovery rule to some state law claims, and finding that some states' *parens patriae* claims were deficient); Am. Notice of Pl. State of Florida's Mot. To Strike, *State of California et. al. v. Infineon Technologies*, No. 06-4333 PJH (N.D. Cal., filed July 15, 2008) (Dkt. No. 425), Order Granting Motion to Strike (Dkt. No. 456).

94.     The AGs' good fortune in having significant aspects of their case remain intact played a role in achieving the global settlement of all claims since they continued to prepare their cases for trial even after this Court entered the April 18, 2008 stay of the *Petro* proceedings pending the Ninth Circuit's consideration of the 1292(b) Petition on the *AGC* issues (Dkt. No. 1853).[57]

95.     Under these circumstances, a settlement fund of $310 million, which represents a recovery of approximately 12% of estimated total damages for all DRAM sales, is a truly remarkable achievement which more than justifies awarding Counsel the 25% benchmark fee which they have requested.[58]  *See Vizcaino*, 290 F.3d at 1048; *Bebchick v. Washington Metro. Area Transit Comm'n*, 805 F.2d 396, 408 (D.D.C. 1986) (stating that attorneys' resolve in fighting to overturn adverse Commission determinations supported an upward adjustment of their lodestar).

///

---

[57] Report, Part I, ¶ 53.

[58] The Special Master is mindful in making this statement that the compensation going to the Indirect Purchaser Settlement Class is also consideration for the release of the *parens patriae* claims being asserted on their behalf by certain of the AGs, and that no determination of the applicability of *AGC* was ever made as to those claims.  Nevertheless, the Special Master agrees with the view that the dismissal of the claims arising from the purchase of DRAM containing products was a "devastating" blow to the Settlement Class's chances of securing a significant recovery in this litigation and that Counsel should be both commended and compensated for overcoming this obstacle.

### b.  Risk of Failure to Certify Litigation Classes

96.     The question of whether litigation classes would ever have been certified provides another aspect of substantial risk for members of the proposed Indirect Purchaser Settlement Class, the proposed Governmental Purchaser Settlement Classes and their Counsel.   Achieving the substantial settlement fund here in light of these risks provides additional support for awarding more than the 25% benchmark fee.

97.     Filing of IPP Counsel's class certification motion was set by court order for a date shortly after the issuance of the *AGC* Order.  Accordingly, on July 10, 2007, IPP Counsel filed a motion for class certification (Dkt. No. 1689) at the same time that they moved for leave to amend to address this Court's *AGC* concerns.  Following the filing of the Second Amended Complaint, on August 24, 2007, IPP Counsel filed  "Amendments re: Motion for Class Certification" to conform the class certification motion to their recently filed Second Amended Complaint (Dkt. No. 1689).  The motion sought certification of nationwide classes of private indirect purchasers of DRAM modules and DRAM in personal computers, desktops, laptops, notebooks, workstations, or servers under Fed. Civ. P. Rule 23(b)(2) for the purpose of obtaining injunctive relief class under Section 16 of the Clayton Act (15 U.S.C. §26), and under Fed. Civ. P. Rule 23(b)(3) for the purpose of obtaining damages under California's Cartwright Act (Cal. Bus. & Prof. Code § 16720), restitutionary relief under Cal. Bus. & Prof. Code § 17200 ("UCL"), and disgorgement under California law principles of unjust enrichment.

98.     Defendants filed oppositions to the class certification motion on September 28, 2007 (Dkt. Nos. 1728-1736) and on November 27, 2007 (Dkt No. 1780).[59]

---

[59] Report, Part I, ¶¶ 47-48; Gross Decl., ¶¶ 20-22.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

99.     After Defendants filed their motion to dismiss the IPPs' Second Amended Complaint (as discussed above) on December 5, 2007, the Court vacated the January 16, 2008 hearing on class certification in order to "settle the pleadings before class certification [was] addressed." (Dkt. No. 1794).  The class certification process was then stayed pending the interlocutory appeal to the Ninth Circuit, and then was further stayed by the pendency of the settlement agreements.[60]   Nonetheless, this Court's ruling on the motion filed by the California and New Mexico indicates that the IPP Counsel faced a substantial risk that a nationwide class of private indirect purchasers of DRAM modules and computers to pursue damage claims would not have been certified.

100.     Although the majority of claims by the AGs were filed as *parens patriae* or representative claims on behalf of government entities, natural persons, and in a few instances businesses, several AGs filed class claims on behalf of certain local government entities.  *State of California et al. v. Infineon Technologies*, No. 06-4333 PJH (N.D. Cal. 2008).  On November 21, 2007, the AGs of California and New Mexico filed a motion to certify a litigation class of political subdivisions that purchased DRAM and DRAM-containing products in those states under the antitrust laws of California and New Mexico. (Dkt. No. 274).  This Court denied the motion, finding that the state's economic expert had failed to proffer a "sufficiently plausible methodology" to establish that the states' proposed evidence "concerning antitrust impact—and specifically pass-through—will be sufficiently generalized so as to allow common questions as to impact to predominate." *California v. Infineon*, Case No. 06-4333 PJH, 2008 WL 4155665 at *39 (N.D. Cal. Sept. 5, 2008) (Dkt. No. 448).  This Court's skepticism about proof of impact went beyond the specifics of the state's expert's methodology, and several of the statements in the opinion may have had applicability to the litigation class proposed by IPP Counsel as well.  For example, this

---

[60] Report, Part I, ¶ 48 at 25; Gross Decl., ¶ 23.

---

47

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

Court observed that it was unlikely that any methodology could demonstrate with generalized proof that "the County of Los Angeles, comprised of over 9.5 million persons, and which purchased a large volume of computer servers pursuant to a statewide contract, for example, experienced impact just as a small municipality or agency located in San Francisco, comprised of a few hundred persons, and which purchased a small number of printers from a re-seller in San Francisco's 'Computer Store' did."[61]  This Court believed that "each divergent factor-customer size, type, procurement channel, product, distribution step-is a factor that increases the likelihood that proof of pass-through can only be shown with resort to individualized proof."[62]

101.    Like IPP Counsel, the AGs did not allow this setback to lessen the pressure on the Defendants to either settle or defend their actions at trial.  A month after certification was denied, the California Attorney General filed an action in the California Superior Court in San Francisco on behalf of 97 political subdivisions as well as the University of California.  *Los Angeles v. Infineon Technologies* AG, No. CFC-08-480561 (San Francisco Supr. Ct. Oct. 3, 2008).[63]  The California Attorney General thereafter litigated that state court case, successfully opposing a number of motions and also serving additional discovery that the Defendants were compelled to answer.[64]

### c.  Other Aspects of Risk and Complexity in the Litigation

102.    The 2008-2010 financial crisis materially affected the ability of some Defendants to pay anything and many Defendants were concerned with cash outflows in

---

[61]*Id.* at *11.

[62] *Id.*

[63] The term "political subdivisions" includes K-12 school districts, counties, cities, and special districts of whatever kind.

[64] Varanini Decl., ¶ 12; Report Part I, ¶ 55.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

light of the economic conditions.  Elpida, for example, ultimately filed for bankruptcy, and Infineon was reorganized and subsequently acquired while in distress.  Additionally, Mosel was unable to meet the payment schedule initially set forth in the Multi-Defendant Settlement Agreement due to its restructuring efforts with its lender banks and the Taiwanese government.  The precarious financial situations of these Defendants created an additional risk that even if Counsel had obtained litigated judgments against them, collecting on those judgments would have been difficult or impossible.[65]

103.    This litigation is composed of numerous actions brought under the antitrust laws of multiple states.  It had long been recognized that antitrust class actions are "arguably the most complex action to prosecute" as "[t]he legal and factual issues involved are always numerous and uncertain in outcome." *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. Civ. A 03-4578, 2005 WL 1213926, at *11 (E.D. Pa. May 19, 2005) (quoting *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003)); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 122 (4th Cir. 2005) (finding no abuse of discretion where the district court ordered an "extraordinary" fee in part because "antitrust cases, by their nature, are highly complex"); *In re Shopping Carts Antitrust Litig.*, MDL No. 451, 1983 WL 1950, at *7 (S.D.N.Y. Nov. 18, 1983) (noting that "antitrust price fixing actions are generally complex, expensive and lengthy"); *In re Cement & Concrete Antitrust Litig.*, MDL No. 296, 1981 WL 2039, at *3 (D. Ariz. Feb. 5, 1981) (considering the "complexity and uncertainty of the legal and factual issues presented" in antitrust litigation).

104.    The complexity attendant to conspiracy and violation proof is compounded in indirect purchaser litigation like this where Counsel had to do the discovery and work with econometric models to trace the effect of the overcharge to the ultimate consumer.  Moreover, this proof had to be marshaled with an eye to the substantive requirements of

---

[65] See, e.g., Report, Part I at ¶ 66, fn. 50 and ¶ 67.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

1  antitrust and consumer protection laws in 33 states and the District of Columbia, all of

2  which had to be reconciled with federal procedural law.  In addition, discovery against all

3  but one of the Defendants involved international discovery, a further complicating factor.

4        105.    Many of the issues that would have made litigating these indirect purchaser

5  claims extremely complex carried over into the post-settlement proceedings before the

6  Special Master.   Those proceedings are covered in detail in the Report, Part I, and the

7  complexity attendant thereto should be self-evident.  Suffice it to say here that Counsel

8  expended many hours under the supervision of the Special Master grappling with and

9  ultimately resolving complex issues, including: (1) establishing the basic market facts

10  relevant to a reasonable allocation of the funds to pay the anticipated claims of all indirect

11  purchasers nationwide; (2) focusing on the products, distribution channels, final uses, and

12  the pass-on of the alleged overcharges between indirect-purchaser-resellers and end-

13  user/consumer groups, as well as their various characteristics and their relative percentages

14  of DRAM commerce; and (3) resolving the issue of the nationwide scope of the proposed

15  private entity settlement class and whether subclasses were required for persons and entities

16  in different positions in the chain of distribution or to account for differences in the

17  "strength" or procedural positions of proposed class members resulting from state law

18  and/or the existence of *parens patriae* claims.   After these issues were resolved, a second

19  phase commenced which involved resolving such complex issues as whether monetary

20  distributions could be made to household claimants, whether a *cy pres* distribution could be

21  used for some claimants, the appropriate form of notice and procedures for calculating and

22  evaluating claims, and other issues of claims administration.

23        106.    Throughout these proceedings, Counsel prepared and submitted expert

24  reports concerning relevant market facts, focusing on the products, distribution channels,

25

26

27

28

and final uses of DRAM by the resellers and end-user/consumer sub-groups.[66]  The positions and issues were vigorously contested among the various groups, including differences between the expert reports from the IPP Counsel's expert, the AGs' expert, Celestica's expert, and the resellers' expert on DRAM market structure and distribution channels, and on how these would affect the calculation of any distributions to class members and allocations among various groups of indirect purchasers.

107.   The complexity attendant to resolving the post-settlement class certification, distribution and claims processing issues provides further support for an award to Counsel of the requested 25% benchmark fee.

### d. The Quality of Counsel's Work Reflects Their Skill and Experience

108.   While the best evidence of the quality of Counsel's work is the result they achieved in light of the difficulties and complexities of this litigation, some courts separately call out counsel's skill and experience as an independent factor to be considered in awarding attorneys' fees.  *See, e.g., In re Heritage Bond Litig.*, 2005 WL 1594389, at *12 (finding that an award of one-third of the settlement fund was appropriate due to class counsel's experience representing plaintiffs in class actions); *Craft v. County of San Bernardino*, 624 F. Supp. 1113, 1120 (C.D. Cal. 2008) (considering class counsel's specialization and regard in the area of law at issue in the case in evaluating experience); *Vizcaino v. Microsoft*, 142 F. Supp. 2d 1299, 1306 (W.D. Wash. 2001) *aff'd* 290 F.3d 1043 (9th Cir. 2002) (finding that the court should consider the experience, reputation and ability of the attorneys when considering a fee award).

109.   IPP Counsel here are among some of the top-rated antitrust attorneys and firms in the country, who cumulatively have decades, if not centuries, of experience

---

[66]  Counsel for class member, Celestica, and counsel appointed by the Special Master to advocate for the reseller members of the proposed Indirect Purchaser Settlement Class also participated in these proceedings.  Compensation for these counsel will be discussed separately below.

1  litigating indirect-purchaser and direct-purchaser antitrust class actions.[67]   The Attorneys

2  General are the chief law enforcement officers for their states charged with enforcing state

3  and federal antitrust law to protect their economies and citizens.  The attorneys prosecuting

4  this litigation on behalf of their respective states are among the most experienced

5  government antitrust litigators in the country, also with decades of experience in antitrust

6  and consumer actions on behalf of the states.[68]   The experience, reputation and skill of IPP

7  Counsel and the AGs,' whose skill and expertise I have personally observed, fully support

8  awarding 25% of the settlement fund.

9

10  **V.  FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE
      REIMBURSEMENT OF LITIGATION COSTS AND EXPENSES**

11

12       110.    Costs incurred in litigation are reimbursable when they are necessary to

13  furnish effective litigation.  *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1372

14  (N.D. Cal. 1995).  IPP Counsel and the AGs are entitled to a reimbursement of reasonable

15  out-of-pocket expenses for litigation and settlement.  *Vincent v. Hughes Air West, Inc.*, 557

16  F.2d 759, 769 (9th Cir. 1977); *In re Quantum Health Res., Inc.*, 962 F. Supp. 1254, 1259

17  (C.D. Cal. 1997); *In re Brooktree Sec. Litig.*, 915 F. Supp. 193, 200 (S.D. Cal. 1996).

18       111.    Reimbursable expenses are those "reasonable expenses that would typically

19  be billed to paying clients in non-contingency matters."  *In re Omnivision Techs., Inc.*, 559

20  F. Supp. 2d 1036, 1048 (N.D. Cal. 2007) (citing *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th

21  Cir. 1994)).  This includes, but is not limited to, reimbursement for expert fees, court fees,

22  photocopying, telephone charges, postage charges, travel costs, computerized legal research

23  costs, and technology expenses.  *Media Vision*, 913 F. Supp. at 1367–71; *Spicer v. Chicago*

24

25  [67] Gross Decl., ¶ 45; Compendium of Declarations of IPP Counsel.

26  [68] Varanini Decl., ¶ 2; Compendium of Declarations of AG Counsel.

27

28  Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
    Incentive Awards for Plaintiffs

1   *Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1264 (N.D. Ill. 1993) (technology services).

2   Reimbursable expenses also include expenses that become necessary because of some

3   specialized issue in a case, such as the Special Master proceedings ordered here by the

4   Court.  (Dkt. Nos. 1789, 2099, 2102 and 2126).

5          112.   IPP Counsel are seeking $6,338,232 for reimbursement of expenses,[69] and

6   the AGs are seeking $5,483,468.63 for reimbursement of expenses.[70]  The Special Master

7   has not performed an audit or item-by-item review of the claimed expenses and does not

8   believe that such a review is required.  The Special Master has reviewed the sixty-three (63)

9   declarations of IPP Counsel and thirty-two (32) Attorneys General setting out the categories

10  of the expenses incurred and finds, based upon his experience in antitrust matters, that as a

11  general matter, the claimed expenses fall into the categories and aggregate to amounts that

12  would be generally expected and reasonable in litigation of this magnitude and duration.  On

13  this basis, the Special Master finds that the expenses incurred herein by IPP Counsel and the

14  AGs were reasonable and necessary to the prosecution of the case, and therefore were made

15  for the benefit of the proposed Settlement Classes.

16         113.   For example, the major expense item for each of the private firms was the

17  total of their contributions into IPP Counsel's common expense fund.  This fund was

18  administered by Liaison Counsel Francis Scarpulla and was used to pay plaintiffs' economic

19  experts and third-party vendors, principally those associated with discovery such as the firm

20  providing document processing and electronic data storage for the millions of pages of

21  reviewed documents, as well as court reporter and deposition transcript costs for more than

22  100 depositions.

23

24

25  [69] Gross Decl., ¶¶ 48-51.

26  [70] Varanini Decl., ¶ 23.

27

---

28

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

114.   The Special Master finds that as with IPP Counsel, as significant portion of the expenses incurred by the AGs were expert witness fees and expenses connected with document processing. deposition discovery, and setting up computer databases.[71] Approximately 39% of the AGs' aggregate expenses are attributable to the hiring through a contract with the California Attorney General of a specialized and experienced group of paralegals and attorneys who assisted the AGs in their document handling and review in setting up supplemental document and deposition databases, and in obtaining information from California governmental entities regarding their DRAM purchases and purchasing patterns that were used in the motion of class certification, in the crafting of the AGs' allocation and distribution plan for Government Purchaser Plaintiffs, and in the California Attorney General's  crafting of  her plan of distribution for California's share of the Settlement Fund.[72]  The Special Master has reviewed the supporting documentation in the form of the contract bills submitted by this vendor and the authorities holding that similar costs of contract paralegal and attorney services are reimbursable and finds that the billings submitted for reimbursement by the AGs fall with in the range of magnitude that are usual and expected in litigation of this scope, complexity and duration, and that the services reflected in those billings are of the nature of services generally incurred for the benefit of plaintiffs in antitrust cases.  *See, e.g., SEC v. Kirkland*, 2008 WL 3981434 (M.D. Fla. 2008) (contract paralegal work which included "factual investigation . . . including locating and interviewing witnesses; . . ., and document production," could be compensated as *taxable* costs); *Chapman v. Pac. Tel. & Tel. Co.*, 456 F.Supp. 77 (C.D. Cal. 1978) (paralegal costs recoverable as *taxable* costs under certain precedent); *Computer Statistics, Inc. v. Blair*, 418

---

[71]  Varanini Decl. at ¶¶ 24-25; Declaration of James A. Donahue, III in Support of Joint Motion for Attorneys' Fees and the Attorneys General's Motion for Costs, at ¶¶ 17-20, a copy of which appears as Exhibit 24 in the Compendium of Attorneys General's Declarations.

[72] Varanini Decl., ¶ 25.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

F. Supp. 1339, 1351-52 (C.D. Tx. 1976)  (paralegal fees could be recovered as taxable costs in antitrust case).

115.     Included in the expenses reimbursement requested by IPP Counsel is the amount of $749,086 as compensation to be paid to the law firm of Susman Godfrey, counsel for Celestica, of which $320,298 represents payments made to Nathan & Associates for the services of Dr. Russell Mangum.[73]  IPP Counsel's expense request also includes compensation for Berman De Valerio, the firm appointed by the Special Master as Resellers' Allocation Counsel, in the total amount of $439,986.65, of which $186,926.65 represents fees owed to Nathan & Associates for the services of Dr. Gary French.[74]  These two expenditures represent nearly 20% of IPP Counsel's requested expense reimbursement.

116.     During proceedings before the Special Master, IPP Counsel, the AGs and the Special Master determined that it would be appropriate and beneficial to secure the fullest participation possible of indirect-purchaser resellers in the allocation process.  Accordingly, the Special Master sent communications to major indirect-purchaser resellers inviting them to participate through their representatives.  A number of resellers attended a few hearings before the Special Master, but only, Celestica Inc., an electronics manufacturing services company, a type of reseller that manufactures computers for OEMs, participated by its counsel and its expert economist throughout the entire allocation process.[75]  Since Celestica as a manufacturing services company had interests that did not necessarily align with

---

[73]  In addition to the Gross Decl., this request is supported by the Declaration of James T. Southwick dated July 26, 2013. A copy of which appears as Exhibit 64 in the Compendium of IPP Counsel Declarations.

[74]   In addition to the Gross Decl., this request is supported by the Declaration of Christopher T. Heffelfinger in Support of Petition for Attorneys' Fees and Reimbursement of Expenses Filed on Behalf of Berman DeValerio, dated July 11, 2013, a copy of which appears as Exhibit 65 in the Compendium of IPP Counsel Declarations.

[75]  Celestica's counsel attended all the hearings and submitted several expert reports regarding pass through and the DRAM chain of distribution on behalf of resellers. See Declaration of James T. Southwick, ¶¶ 9-11.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

"garden variety" resellers who both purchased and resold DRAM containing products, the Special Master determined that these resellers should be represented by separate counsel. On April 20, 2011, the Special Master issued a Memorandum and Order appointing the law firm of Berman DeValerio as Reseller Allocation Counsel to work in conjunction with Celestica's counsel in the allocation process.[76]

117.    Since all of the work done by Susman Godfrey, Berman DeValerio and the experts they retained was post-settlement and for the express purpose of assisting the Special Master to arrive at a recommendation of a fair reasonable and adequate plan of distribution of the settlement proceeds to the proposed Indirect Purchaser Settlement Class, the Special Master finds that it is appropriate to treat their compensation as expenses.  The amounts of compensation requested appear quite reasonable in light of the services that the Special Master observed them performing.

## VI.    FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE PAYMENT OF INCENTIVE AWARDS TO THE CLASS REPRESENTATIVES

118.    IPP Counsel requested that each of the ten *Petro* class representatives receive a payment of $5,000, and that the approximately 140 plaintiffs in the other state and federal cases that were coordinated with this action receive a payment of $500, for the time and effort they have dedicated to this case.

119.    Courts often make incentive awards to class representatives for their service to the class, and for the risks they undertake on behalf of the class.  *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. MDL 3:07–md–1827 SI, 2013 U.S. Dist. LEXIS 51271, at **103-04 (N.D. Cal. Mar. 29, 2013) (approving incentive awards of $15,000 for each of the 40 court-appointed indirect-purchaser class representatives and $7,500 for each of the eight additional named plaintiffs); *In re Apple iPhone 4 Prods. Liability Litig.*, No. 5:10–md–

---

[76] Report Part I, ¶ 23, ¶¶ 207-210 and ¶ 211; Gross Decl., ¶ 41.

2188 RMW, 2012 WL 3283432, at *5 (N.D. Cal. Aug. 10, 2012) (awarding incentive fee of $500 to each class representative); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. MDL 3:07–md–1827 SI, 2011 WL 7575003, at *2 (Dec. 27, 2011) (approving incentive awards of $15,000 for each of the 11 direct-purchaser class representatives "in recognition of their work performed for the benefit of the [c]lass and the risks undertaken"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.* (Direct Purchaser Actions),  No. M-02-1486-PJH, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) (Hamilton, J.); *Radcliffe v. Experian Info. Solutions,* 715 F.3d 1157 (9th Cir. 2013) (approving incentive awards as long as they are not conditioned on the class representative's approval of the settlement).

120.    Here, each of the ten *Petro* class representatives provided key support to this litigation by responding to discovery requests, including both written discovery and production of documents, and regularly conferring with counsel.  Moreover, most *Petro* class representatives were also subjected to in-depth depositions by Defendants (one *Petro* class representative, although never deposed because he was added to the complaint after the Court's dismissal on *AGC* grounds, served an important role as a purchaser of stand-alone DRAM and was prepared to be deposed).  The approximately 140 plaintiffs in the other state and federal indirect-purchaser actions that were coordinated with this action, though they were not deposed and were not served with written discovery, provided support to the prosecution of these indirect-purchaser actions and represented the citizens of their respective states.[77]

121.    Accordingly, the Special Master finds that the requested incentive awards of $5,000 to each of the ten *Petro* class representatives and $500 to each of the approximately 140 plaintiffs in the other state and federal cases that were coordinated with this action are fair and reasonable.

---

[77] Gross Decl., ¶¶ 55-56.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

**VII.    CONCLUSION**

122.    Based on the above-stated findings and conclusions, the Special Master finds and concludes that: Counsel's requested fee award of $77,680,000, or 25% of the total Settlement Fund, is fair and reasonable and in keeping with the precedent of the Ninth Circuit.  The Special Master also finds that the IPP Counsel's requested expense reimbursement of $6,338,232 and the Attorneys General's requested expense reimbursement of $5,483,468.63 are reasonable.  Finally, the Special Master finds that the requested incentive awards of $5,000 to each class representative on the *Petro* complaint and $500 for each of the approximately 140 plaintiffs in the other state and federal cases that were coordinated with this litigation are appropriate and in keeping with Ninth Circuit precedent.


Dated: October 30, 2013                    /s/ Charles B. Renfrew
                                                    Hon. Charles B. Renfrew (Ret.)
                                                         Special Master