JOSEF D. COOPER (53015)
TRACY R. KIRKHAM (69912)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA 94103
Telephone: (415) 788-3030
Facsimile: (415) 882-7040
E-mail: jdc@coopkirk.com
Co-Lead Counsel for Indirect-Purchaser Plaintiffs

KAMALA D. HARRIS
Attorney General of the State of California
KATHLEEN FOOTE (65819)
Senior Assistant Attorney General
EMILIO E. VARANINI (163952)
455 Golden Gate Avenue, Ste. 11000
San Francisco, CA 94102
Telephone: (415) 703-5908
Facsimile: (415) 703-5480
E-mail: Emilio.Varanini@doj.ca.gov
Attorneys for the State of California On Behalf of All Attorneys General

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| In re DYNAMIC RANDOM ACCESS MEMORY (DRAM) ANTITRUST LITIGATION | Case No. M-02-1486-PJH<br>MDL No. 1486 |
| This Document Relates to: | **NOTICE OF MOTION AND MOTION TO GRANT INDIRECT PURCHASER PLAINTIFFS' AND ATTORNEYS GENERAL'S JOINT APPLICATION FOR ATTORNEYS' FEES AND APPLICATIONS FOR COSTS AND INCENTIVE AWARDS** |
| **ALL INDIRECT PURCHASER ACTIONS** | |
| and | |
| *State of California et al. v. Infineon Technologies AG, et al.* | **DATE:** June 25, 2014<br>**TIME:** 9:00 a.m.<br>**COURT:** Hon. Phyllis J. Hamilton |
| *State of New York v. Micron Technology, Inc., et al.* | |
| *State of California et al. v. Samsung Electronics Co., Ltd., et al.* | Case No. C 06-4333 PJH |
| *State of California et al. v. Winbond Electronics Co.* | Case No. C 06-6436 PJH |
| *Petro Computer Systems, Inc. v. Hitachi, Ltd.* | Case No. C 07-1347 PJH |
| *Petro Computer Systems, Inc. v. Mitsubishi Electric Corporation, et. al.* | Case No. C 07-2589 PJH |
| (Additional Captions on Next Page) | Case No. C 12-5213 PJH<br>Case No. C 12-5214 PJH |

1

2  *Petro Computer Systems, Inc. v. Toshiba*   )   Case No. C 12-5215 PJH
   *Corporation, et. al.*                      )   Case No. C 12-5230 PJH
3                                              )   Case No. C 12-5229 PJH
   *State of California et*                     )   Case No. C 12-5231 PJH
   *al., v. Toshiba Corporation et al.,*        )
4                                              )
   *State of California et*                     )
5  *al., v. Mitsubishi Electric Corporation, et. al.*   )
                                               )
6  *State of California et al., v. Hitachi, Ltd.*   )
   _____     )
7                                              )

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT on June 25, 2014, at 9:00 a.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Phyllis J. Hamilton, United States District Judge for the Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, the Indirect Purchaser Plaintiffs and Attorneys General will and hereby do move for an order granting the Indirect Purchaser Plaintiffs' and Attorneys General's Joint Application for Attorneys' Fees; Indirect Purchaser Plaintiffs' Application for Costs and Incentive Awards; and Attorneys General's Application for Costs.

These Applications are based upon this Notice; the attached Indirect Purchaser Plaintiffs' and Attorneys General's Joint Application for Attorneys' Fees; Indirect Purchaser Plaintiffs' Application for Costs and Incentive Awards; and Attorneys General's Application for Costs, dated August 6, 2013, and all supporting documents (Docket Nos. 2181 – 2185, previously filed in Master File No. M-02-1486-PJH), the Report and Recommendations of Special Master, Part III: Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs (Docket No. 2155), and all other documents filed in these actions.

Dated: March 11, 2014                                   Respectfully submitted,


                                         /s/Tracy R. Kirkham
                                         Tracy R. Kirkham

On behalf of Indirect Purchaser Plaintiffs'
Co-Lead Counsel


                                         /s/Emilio E. Varanini
                                         Emilio E. Varanini

On behalf of All Attorneys General

| | |
|---|---|
| 1 | JOSEF D. COOPER (53015)<br>TRACY R. KIRKHAM (69912) |
| 2 | COOPER & KIRKHAM, P.C. |
| 3 | 357 Tehama Street, Second Floor<br>San Francisco, CA 94103<br>Telephone: (415) 788-3030 |
| 4 | Facsimile: (415) 882-7040<br>E-mail:  jdc@coopkirk.com |
| 5 |                  trk@coopkirk.com |
| 6 | Co-Lead Counsel for Indirect Purchaser Plaintiffs |
| 7 | KAMALA D. HARRIS<br>Attorney General of the State of California |
| 8 | KATHLEEN FOOTE (65819)<br>Senior Assistant Attorney General |
| 9 | EMILIO E. VARANINI (163952)<br>Deputy Attorney General |
| 10 | 455 Golden Gate Avenue, Ste. 11000<br>San Francisco, CA 94102 |
| 11 | Telephone: (415) 703-5908<br>Facsimile: (415) 703-5480 |
| 12 | E-mail:  emilio.varanini@doj.ca.gov |
| 13 | Attorneys for the State of California On Behalf of All Attorneys General and All<br>Governmental Purchaser Class Plaintiffs |
| 14 | |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | | |
|---|---|---|
| 17 | In re DYNAMIC RANDOM ACCESS MEMORY (DRAM) ANTITRUST LITIGATION | Master File No. M-02-1486-PJH<br>MDL No. 1486 |
| 18 | | |
| 19 | | Case No. C 06-4333 PJH<br>Case No. C 06-6436 PJH |
| 20 | This document relates to: | |
| 21 | **ALL INDIRECT PURCHASER ACTIONS** | INDIRECT PURCHASER PLAINTIFFS' AND ATTORNEYS GENERAL'S JOINT APPLICATION FOR ATTORNEYS' FEES; |
| 22 | and | INDIRECT PURCHASER PLAINTIFFS' APPLICATION FOR COSTS AND |
| 23 | *State of California et. al. v. Infineon Technologies AG, et al.* | INCENTIVE AWARDS; AND ATTORNEYS GENERAL'S |
| 24 | | APPLICATION FOR COSTS |
| 25 | and | Judge:  Hon. Phyllis J. Hamilton |
| 26 | *State of New York v. Micron Technology, Inc., et al.* | **Special Master:  Hon. Charles B. Renfrew** |
| 27 | | |
| 28 | | |

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL
APPLICATIONS FOR COSTS

### **TABLE OF CONTENTS**

SUMMARY OF APPLICATIONS ........................................................ 1

APPLICATION ................................................................................... 1

I.    INTRODUCTION ...................................................................... 1

II.   THE EXTRAORDINARY SETTLEMENTS ACHIEVED BY IPP
      COUNSEL AND THE AGS........................................................ 3

III.  THE WORK DONE BY IPP COUNSEL AND THE AGS TO
      ACHIEVE THE SETTLEMENTS ................................................ 5

   A.   THE IPP ACTIONS .................................................................. 5

      1.   Discovery ......................................................................... 6

      2.   Motion for Judgment on the Pleadings and Motion to Dismiss............... 9

      3.   Class Certification........................................................... 10

   B.   THE ATTORNEYS GENERAL ACTIONS .................................... 11

   C.   MEDIATION, SETTLEMENT DISCUSSIONS AND SETTLEMENTS ..................... 14

      1.   Mediations and Settlement Discussions................................... 14

      2.   The Samsung Settlement...................................................... 16

      3.   The Winbond Settlement ..................................................... 17

      4.   The Multi-Defendant Settlement .......................................... 17

      5.   The Nanya Settlement ......................................................... 18

      6.   The Mitsubishi, Toshiba, and Hitachi Settlements ..................... 18

   D.   POST-SETTLEMENT PROCEEDINGS BEFORE THE SPECIAL MASTER ............ 19

IV.   ARGUMENT ............................................................................ 22

   A.  THE PERCENTAGE OF THE SETTLEMENT FUND REQUESTED IN THIS
       CASE IS FAIR AND APPROPRIATE. ........................................ 24

      1.   The Ninth Circuit Recognizes the Common Fund Doctrine................. 24

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS
FOR COSTS

B. THE NINTH CIRCUIT SUPPORTS A PERCENTAGE-OF-THE-RECOVERY METHOD IN AWARDING ATTORNEYS' FEES. ................................................................. 25

C.   THE NINTH CIRCUIT'S BENCHMARK ATTORNEYS' FEES AWARD IS 25%. ................... 26

D.   RELEVANT FACTORS ................................................................................. 28

   1.   The Result Achieved for the Class ................................................... 28

   2.   Counsel's Effort ........................................................................... 29

   3.   Counsel's Skill and Experience ....................................................... 32

   4.   Complexity of the Issues ............................................................... 33

   5.   Risk of Non-Payment ................................................................... 34

   6.   A Lodestar Analysis Confirms That the Requested Fee is Reasonable. ................ 36

F. REIMBURSEMENT OF LITIGATION COSTS AND EXPENSES IS FAIR AND REASONABLE ........................................................................................ 38

G. PAYMENT OF INCENTIVE AWARDS TO THE CLASS REPRESENTATIVES IS APPROPRIATE. ...................................................................................... 39

V.   CONCLUSION ................................................................................................. 40

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS FOR COSTS

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alpine Pharmacy, Inc. v. Charles Pfizer & Co., Inc.*,
481 F.2d 1045 (2d Cir.)……………………………………………………………23

*Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)………………………………………………………………3

*Bebchick v. Washington Metro. Area Transit Comm'n*,
805 F.2d 396 (D.D.C. 1986)……………………………………………………35

*Blum v. Stenson*,
465 U.S. 886 (1984)……………………………………………………………… 25

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980)………………………………………………………………22

*Brailsford v. Jackson Hewitt, Inc. et al.*, C06-00700 CW,
2007 U.S. Dist. LEXIS 35509 (May 3, 2007 N.D. Cal.)……………………………27

*Burden v. SelectQuote Ins. Serv*.,
2013 U.S. Dist. LEXIS 41522 (N.D. Cal. Mar. 18, 2013)……………………….....4

*California v. ARC America Corp.*,
490 U.S. 93 (1989)………………………………………………………………1

*California v. Infineon*,
2008 WL 4155665 (N.D. Cal. Sept. 5, 2008)………………………………….....13

*California v. Infineon Technologies AG*,
531 F. Supp. 2d 1124 (N.D. Cal. 2007)……………………………………………13

*Central R.R. & Banking Co. v. Pettus*,
113 U.S. 116 (1885)………………………………………………………………23

*Chun-Hoon v. McKee Foods Corp.*,
716 F. Supp. 2d 848 (N.D. Cal. 2010)……………………………………………38

*Clayworth v. Pfizer*,
49 Cal. 4th 758 (Cal. 2010)……………………………………………………...20

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984)………………………………………………………………23

*County of Suffolk v. Long Island Lighting Co.*,
907 F.2d 1295 (2d Cir. 1990)……………………………………………………4

*Craigslist, Inc. v. Mesiab, et al.*,
    2010 WL 5300883, at * 7 (N.D. Cal. Nov. 15, 2010) (James, MJ)......................37

*Craigslist, Inc. v. Naturemarket, Inc.*,
    694 F. Supp.2d 1039 (N.D. Cal. 2010)...............................................................37

*Fischel v. Equitable Life Assur. Soc'y*,
    307 F.3d 997 (9th Cir. 2002)...........................................................................25

*Gong-Chun v. Aetna Inc.*,
    2012 WL 2872788 (E.D. Cal. July 12, 2012).................................................38

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998)........................................................................25

*Harris v. Marhoefer*,
    24 F.3d 16 (9th Cir. 1994)..............................................................................38

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)........................................................................................28

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)...................................................................................1, 13

*In re Activision Sec. Litig.*,
    723 F. Supp. 1373 (N.D. Cal. 1989)...............................................................27

*In re Apollo Group Secs. Litig.*,
    2012 U.S. Dist. LEXIS 55622 (D. Ariz. Apr. 20, 2012)..................................37

*In re Apple iPhone 4 Prods. Liability Litig.*,
    2012 WL 3283432 (N.D. Cal. Aug. 10, 2012).................................................39

*In re Automotive Refinishing Paint Antitrust Litig.*,
    2008 U.S. Dist. LEXIS 569 (E.D. Pa. Jan. 3, 2008)........................................27

*In re Bluetooth Headset Prods. Liability Litig.*,
    654 F.3d 935 (9th Cir. 2011).........................................................................37

*In re Brooktree Sec. Litig.*,
    915 F. Supp. 193 (S.D. Cal. 1996).................................................................38

*In re Cement & Concrete Antitrust Litig.*,
    1981 WL 2039 (D. Ariz. Feb. 5, 1981)..........................................................33

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    216 F.R.D. 197 (D. Me. 2003).......................................................................24

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS
FOR COSTS

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.,*
    109 F.3d 602 (9th Cir. 1997)……………………………………………………26

*In re Crazy Eddie Sec. Litig.,*
    824 F. Supp. 320 (E.D.N.Y. 1993)……………………………………………29

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
    M-02-1486, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) (Hamilton, J.)……...26, 40

*In re Heritage Bond Litig.,*
    2005 WL 1594389 (C.D. Cal. June 10, 2005)…………………………...27, 28, 29, 36

*In re King Resources Co. Sec. Litig.,*
    420 F. Supp. 610 (D. Colo. 1976)……………………………………………28

*In re Linerboard Antitrust Litig.,*
    296 F.Supp.2d 568 (E.D. Pa. 2003)…………………………………………...33

*In re Media Vision Tech. Sec. Litig.,*
    913 F. Supp. 1362 (N.D. Cal. 1995)…………………………………………38

*In re Medical X-Ray Film Antitrust Litig.,*
    1998 WL 661515 (E.D.N.Y. Aug. 7, 1998)……………………………………29

*In re Omnivision Techs., Inc.,*
    559 F. Supp. 2d 1036 (N.D. Cal. 2007)…………………………………………38

*In re Pacific Enters. Sec. Litig.,*
    47 F.3d 373 (9th Cir. 1995)……………………………………………………27, 34

*In re Portal Software, Inc. Sec. Litig.,*
    2007 WL 4171201 (N.D. Cal. Nov. 26, 2007)…………………………………38

*In re Quantum Health Res., Inc.,*
    962 F. Supp. 1254 (C.D. Cal. 1997)……………………………………………38

*In re Relafen Antitrust Litig.,*
    231 F.R.D. 52 (D. Mass. 2005)……………………………………………...27

*In re San Juan Dupont Plaza Hotel Fire Litig.,*
    1989 WL 996278 (D. PR Sept. 14, 1989)………………………………………17

*In re Shopping Carts Antitrust Litig.,*
    1983 WL 1950 (S.D.N.Y. Nov. 18, 1983)………………………………………33

*In re Sodium Gluconate Antitrust Litig.,*
    No. C-97-4142 (N.D. Cal. 1999) (Wilken, J.)……………………………………26

*In re Sorbates Direct Purchaser Antitrust Litig.,*
   No. 98-4886 (N.D. Cal. Nov. 20, 2000) (Legge, J.)…………………………………25

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
   MDL No. 1819 (N.D. Cal. Oct. 14, 2011)………………………………….....27, 29

*In re Superior Beverage/Class Container Consolidated Pretrial,*
   133 F.R.D. 119 (N.D. Ill. 1990)……………………………………………....34

*In re Teletronics Pacing Sys., Inc.,*
   137 F. Supp. 2d 1029 (S.D. Ohio 2001)……………………………………....36

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
   2013 U.S. Dist. LEXIS 51271 (N.D. Cal. Mar. 29, 2013)………………………passim

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
   2011 WL 7575003 (Dec. 27, 2011)…………………………………………....40

*In re Toys "R" Us Antitrust Litig.,*
   191 F.R.D. 347 (E.D.N.Y. 2000)…………………………………………24

*In re Vitamins Antitrust Litig.,*
   2001 U.S. Dist. LEXIS 25067 (D.D.C. July 13, 2001)………………………27

*In re Washington Public Power Supply System Sec. Litig.,*
   19 F.3d 1291 (9th Cir. 1994)……………………………………………...23, 25, 35

*Internal Imp. Fund Trustees v. Greenough,*
   105 U.S. 527 (1881)…………………………………………………23

*Laffey v. Northwest Airlines, Inc.,*
   572 F. Supp. 354 (D.D.C. 1983)…………………………………………...37

*Laffey v. Northwest Airlines, Inc.,*
   746 F.2d 4 (D.C. Cir.1984)…………………………………………...37

*Meijer v. Abbott Laboratories,*
   C-07-05985 (N.D. Cal. Aug. 11, 2011) (Wilken, J.)…………………………………25

*Mills v. Elec. Auto-Lite Co.,*
   396 U.S. 375 (1970)…………………………………………………22

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
   473 U.S. 614 (1985)…………………………………………………23

*Morris v. Lifescan, Inc.,*
   54 Fed. App'x 663 (9th Cir. 2003)……………………………………………...25

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS
FOR COSTS

*Paul, Johnson, Alston & Hunt v. Graulty,*
    886 F.2d 268 (9th Cir.1989)……………………………………………..24, 37

*Perma Life Mufflers, Inc. v. International Parts Corp.,*
    392 U.S. 134 (1968)……………………………………………………23

*Pillsbury Co. v. Conboy,*
    459 U.S. 248 (1983)……………………………………………………23

*Radcliffe v. Experian Info. Solutions,*
    715 F.3d 1157 (9th Cir. 2013)……………………………………….…40

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979)……………………………………………………23

*Save Our Cumberland Mountains, Inc. v. Hodel,*
    857 F.2d 1516 (D.C. Cir. 1988)………………………………………37

*Spicer v. Chicago Bd. Options Exch., Inc.,*
    844 F. Supp 1226 (N.D. Ill. 1993)……………………………………38

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.,*
    2005 WL 1213926 (E.D. Pa. May 19, 2005)…………………………33

*State of Hawaii v. Standard Oil Co.,*
    405 U.S. 251 (1972)……………………………………………………23

*Sullivan v. DB Investments, Inc.,*
    667 F.3d 273 (3d Cir. N.J. 2011)…………………………………....4, 28

*Trans World Airlines, Inc. v. Hughes,*
    312 F. Supp. 478 (S.D.N.Y 1970)……………………………………33

*Van Vranken v. ARCO,*
    901 F. Supp. 294 (N.D. Cal. 1995)…………………………………26

*Vincent v. Hughes Air West, Inc.,*
    557 F.2d 759 (9th Cir. 1977)…………………………………………38

*Vizcaino v. Microsoft,*
    142 F. Supp. 2d 1299 (W.D. Wash. 2001)………………………...32

*Vizcaino v. Microsoft Corp.,*
    290 F.3d 1043 (9th Cir. 2002)………………………………………25, 26

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
    396 F.3d 96 (4th Cir. 2005)…………………………………………33

*Wininger v. SI Management L.P.*,
 301 F.3d 1115 (9th Cir. 2002)……………………………………………...25

### **STATUTES**

15 U.S.C. §26……………………………………………………………….10

28 U.S.C. §1332 (d)(2)…………………………………………………...…6

Federal Rule of Civil Procedure 23(b)(2)……………...………………….10

California Business and Professions Code
 § 16720……………………………………………………………10
 § 17200……………………………………………………………10

Florida Statutes

 § 501.2105………………………………………………………24
 § 501.2075………………………………………………………24
 § 542.23………………………………………………………24

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS
FOR COSTS

## SUMMARY OF APPLICATIONS

The Indirect-Purchaser Plaintiffs' counsel ("IPP Counsel") and the Attorneys General ("AGs") (together, "Counsel") hereby request the Special Master to recommend that the District Court award Counsel 25% of the total common fund obtained in this litigation as attorneys' fees, which is the Ninth Circuit's suggested benchmark.[1]  The Defendants are paying a total of $310,720,000 in settlement for the benefit of the members of the settlement classes and the non-class governmental entities (the "Settlement Fund").[2]  Accordingly, the requested fees total $77,680,000.[3]  Counsel also request the Special Master to recommend that the fee award accrue its proportionate share of the interest earned by the Settlement Fund.

IPP Counsel separately apply for the reimbursement of expenses incurred by IPP Counsel in prosecuting these cases, in the amount of $6,338,232.

In addition, IPP Counsel separately request the Special Master to recommend incentive awards of $5,000 for each of the 10 class representatives in the lead *Petro* complaint, who provided key support to the litigation, and incentive awards of $500 for each

---

[1]  As used herein, "this litigation" or "the litigation" refers collectively to all of the state and federal actions encompassed within the settlement agreements before this Court and to all of the claims that will be dismissed upon final approval.

[2]  This number represents all cash payments the Defendants are obligated to make pursuant to the terms of their various settlement agreements and includes funds earmarked for attorneys' fees, and notice and claims administration.  The Special Master has previously recognized that this is the proper valuation of the monetary settlement of this litigation.  *See* Report and Recommendations of Special Master, Part I: Settlement Class Certification and Plans of Allocation and Distribution of the Settlement Proceeds to the Settlement Classes, filed January 8, 2013 (Dkt. 2132) ("R&R Part I") at ¶¶ 1, 56.  The Settlement Fund of $310,720,000 is comprised of all payments by defendants in settlement of the case, and in addition the Fund is accruing interest.

[3]  The $113 million "ice-breaker" settlement with Samsung included separate attorneys' fees payments to the IPPs and the AGs in the amounts of $19.5 million and $1 million, respectively.  The settlements with the other Defendants did not include any separate and additional contributions for attorneys' fees.  Gross Dec. ¶ 24. Thus, IPP Counsel and the AGs seek a "blended" fee award of 25% of the total $310,720,000 Settlement Fund, or $77,680,000 ($20,500,000 in fees separately contributed by Samsung and $57,180,000 from the remaining settlement funds).

of the approximately 140 plaintiffs in the other IPP cases that were coordinated or consolidated with this litigation.

The AGs separately apply for reimbursement of expenses incurred by them in prosecuting these cases, in the amount of $5,483,468.63, which includes expert and economist fees and fees for external legal and paralegal services.

This fee petition and additional post-settlement applications are submitted to the Honorable Charles Renfrew as Special Master pursuant to the Orders appointing him and defining the scope of his reference (Dkt. Nos. 1789, 2099, 2102 and 2126). The joint application for attorneys' fees and IPP Counsel's separate application for reimbursement of costs and expenses and incentive awards for the representative plaintiffs are supported by the Declaration of Terry Gross ("Gross Dec.") and the Compendium of IPP Counsel Declarations attached thereto. The joint application for fees and the AGs' separate application for reimbursement of costs and expenses are supported by the Declaration of Emilio E. Varanini ("Varanini Dec.") and the Compendium of AG Declarations attached thereto.

## APPLICATION

## I.   INTRODUCTION

The private IPP Counsel, and the AGs of numerous states, respectfully submit this memorandum to support their request for $77,680,000 in attorneys' fees (25% of the Settlement Fund of $310,720,000).  IPP Counsel also request $6,338,232 in reimbursement of expenses and incentive awards to the named plaintiffs, and the AGs request $5,483,468.63 in reimbursement of expenses.  IPP Counsel have dedicated their time and energy for eleven years -- since August 2002 -- to prosecuting and settling this case.  The AGs have been investigating, subsequently litigating and settling this case, for eight years.

Originally commenced in state courts before the 2005 enactment of the Class Action Fairness Act ("CAFA"), this litigation is one of the first multi-district indirect-purchaser antitrust cases pursued in federal court after the enactment of CAFA.  It was commenced 25 years after *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), removed indirect-purchaser, antitrust cases from federal courts.  The Supreme Court subsequently found that state *Illinois Brick* repealer statutes were not preempted.  *California v. ARC America Corp.,* 490 U.S. 93 (1989).  The practical effect of these decisions was that between *Illinois Brick* and the inception of this case, state-law indirect-purchaser actions were infrequently litigated in federal courts and even more infrequently included in MDL proceedings.  Notwithstanding the novel and complex issues resulting from these circumstances, IPP Counsel and the AGs were able achieve settlements totaling more than $310 million, one of the largest all-cash recoveries in the history of indirect-purchaser antitrust litigation.[4]  Both IPP Counsel and the AGs have vigorously prosecuted this action, including voluminous document discovery and document review, depositions in the United States, Asia and Europe, motion practice, appeals, protracted settlement negotiations, and detailed proceedings before the Court-

---

[4]   In addition, the settlement agreements generally provide for injunctive relief, and require Defendants to engage in compliance programs for several years.  Furthermore, some Defendants were and are required to provide valuable cooperation to the IPPs and the AGs.

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS FOR COSTS

appointed Special Master.  IPP Counsel have pursued this case for eleven years without a guarantee that any fees would ever be paid or that their out-of-pocket costs would be recovered.   IPP Counsel have devoted 152,485 attorney and paralegal hours to the prosecution of this case, and have incurred over $6.3 million in expenses, none of which has been reimbursed.  Thus, for as long as 11 years they have borne considerable risk, litigating on a wholly contingent basis while incurring significant outflows for attorneys, staff, experts, litigation expenses, interest/carrying costs and overhead. In addition, IPP Counsel will continue to devote significant time to administration of the settlement, ensuring proper payments are made to class members, and defending the settlement against potential, but almost inevitable, appeals by the professional-objector bar, which could take years.  This future time is not included in this petition, and will further increase the already negative multiplier on Counsel's lodestar represented by the requested percentage of the fund.

Likewise, the AGs have collectively devoted approximately 77,400 attorney and paralegal hours to this litigation.  The AGs have collectively incurred over $5.4 million of unreimbursed expenses in pursuing this litigation.  As with IPP Counsel, the AGs worked without any guarantees regarding reimbursement of their cost outlays or receipt of attorneys' fees.  The AGs will continue to devote significant time to the administration of the settlement and in defense of potential appeals, and likewise this future time is not included in this petition.

The risk in this case was particularly acute because the damage claims were indirect, based not on federal antitrust law, but on the laws of thirty-three states and the District of Columbia.  Further, Defendants contended that there was no method of common proof of impact and damages to either the IPP or governmental purchaser classes.  They successfully argued that California and New Mexico could not certify a class of government entities for litigation purposes.  Defendants also successfully moved to dismiss virtually all of the IPP class's antitrust claims arising from the purchase of DRAM as a component in a computer or other electronic device.  This Court found that those plaintiffs who purchased DRAM as a

component lacked standing under various state antitrust laws because injury from the purchase of the price-fixed product as one of many components of another product was too remote to satisfy the "antitrust standing" requirements set forth in *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), a decision eliminating approximately 80% of the commerce in DRAM from the IPPs' case and severely damaging the IPP's position.

In spite of the odds against them, IPP Counsel and the AGs reached cash settlements with all Defendants totaling $310,720,000.  Counsel now seek an award of $77,680,000. This amount is fair and reasonable because it comports with Ninth Circuit precedent and is fully supported by the lodestar cross-check, as it represents less than 100% of Counsel's recorded lodestar amount.  All factors relevant to determining the propriety of a fee award -- including the result achieved for the class, Counsel's effort in prosecuting and settling this case, Counsel's skill and experience in complex antitrust cases, the complexity of the issues presented and the risk of non-payment -- support the reasonableness of this award.

IPP Counsel and the AGs also separately seek reimbursement of their litigation costs and expenses in the amount of $6,338,232 and $5,483,468.63, respectively.  All of the expenses incurred by IPP Counsel and the AGs were reasonable and necessary in the prosecution of this case.  *See* Gross Dec. ¶ 48; Varanini Dec. ¶¶26-27.

In addition, each of the *Petro* class representatives has dedicated significant time and effort in pursuing this case.  Thus, IPP Counsel request that the Court approve incentive awards of $5,000 to each of the ten class representatives in the lead *Petro* case, and $500 to each of the approximately 140 plaintiffs in the other IPP cases that have been settled as part of the settlement in this case.

## II.   THE EXTRAORDINARY SETTLEMENTS ACHIEVED BY IPP COUNSEL AND THE AGS

The $310,720,000 Settlement Fund is one of the highest settlements ever achieved in an indirect-purchaser antitrust case.  The settlement is all cash, and there will be no reversion

or refund to any Defendant.  *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271, at *63  (N.D. Cal. Mar. 29, 2013) (citing large amount of cash settlement and fact that no amount will revert to defendants as significant factors in approving 28.5% fee award); *Burden v. SelectQuote Ins. Serv*., 2013 U.S. Dist. LEXIS 41522, at *9 n.2 (N.D. Cal. Mar. 18, 2013) ("[t]he Court lauds the parties' agreement to include a non-reversionary clause which enhances the benefit to the Settlement Class").  The amount recovered for the classes is approximately 12% of the single damages sustained by the class.[5]  *See, e.g. Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 324 (3d Cir. N.J. 2011) (approving $272.5 million indirect-purchaser settlement, representing 10.93% of the single damages); *County of Suffolk v. Long Island Lighting Co*., 907 F.2d 1295, 1324 & n.17 (2d Cir. 1990) (approving $390 million settlement, representing 11.47% of the single damages).

The following chart summarizes the dates when the agreements were reached, and the principal amounts of the monetary relief obtained.

| Defendant | Date | Amounts |
|-----------|------|---------|
| Samsung | Jan-07 | $113,000,000 |
| Winbond | Mar-07 | $2,000,000 |
| Multi-Defendant | Jun-10 | 173,176,800[6] |
| Nanya | Jan-11 | 3,823,200 |
| Mitsubishi | Dec-11 | 5,600,000 |
| Toshiba | Dec-11 | 7,450,000 |
| Hitachi | Jul-12 | 5,600,000 |

---

[5]  Although Defendants argued that the conspiracy was largely ineffective at raising prices, Direct Purchaser Plaintiffs' expert, Dr. Paul C. Liu, estimated that the total overcharges due to defendants' conspiracy was at least $2.6 billion.  Rebuttal Expert Report of Paul C. Liu, Nov. 22, 2006, at 3 (Dkt. No. 1182). Thus, the $310 million recovery represents approximately 12% of single damages.

[6]  The amounts that certain of these Defendants ultimately agreed to pay were increased by $70,000 in return for plaintiffs' agreement to delay receipt of the funds, for a total principal amount of $310,720,000.

Gross Dec. ¶¶ 31, 34.

There is also significant non-monetary relief. The first major defendant to settle, Samsung, agreed to provide cooperation to both the IPPs and the AGs in litigation against the other Defendants, and to provide trial witnesses if needed. This assistance was valuable in maximizing the monetary recovery against the other Defendants. In addition, each Defendant agreed: (1) to establish an antitrust compliance program; (2) to an injunction against anticompetitive conduct with respect to DRAM for a period of three years; and (3) to provide complete cooperation to plaintiffs in prosecuting any antitrust cases against any co-conspirator. R&R No. 1 ¶¶ 56-98, at pp. 30-49.

## III. THE WORK DONE BY IPP COUNSEL AND THE AGS TO ACHIEVE THE SETTLEMENTS

### A. The IPP Actions

IPPs first filed class action complaints in California state courts in August 2002. All the cases filed in California state courts were coordinated by the Judicial Council in a Special Coordinated Proceeding in the complex litigation department in the San Francisco Superior Court, and two of the leadership firms in this case were appointed Co-Liaison Counsel. Co-Liaison Counsel in that proceeding began discovery and entered into a discovery plan with defendants that included the production of grand jury documents, and the commencement of written discovery and depositions. Co-Liaison Counsel filed a consolidated amended complaint on behalf of a nationwide class of non-governmental indirect DRAM purchasers. Motion practice and discovery continued in the California coordinated proceeding through 2004 and into 2005. Gross Dec. ¶ 2.

Beginning in late 2004, private indirect-purchaser cases were filed in federal and state courts other than California; and a number of these later-filed state-court cases were removed to federal court, predominantly due to CAFA. In all, more than 60 class-action complaints making similar allegations against various DRAM manufacturers were filed in state and federal courts across the country. On June 17, 2005, counsel in the California coordinated proceeding, in order to facilitate the global litigation and resolution of the claims of the

nationwide class of purchasers alleged in that proceeding, filed a complaint in this court captioned *Petro Computer Systems, Inc. v. Micron Technology, Inc*, C 05-0247 ("*Petro*"), that alleged original jurisdiction in federal court pursuant to the CAFA-enacted 28 U.S.C. §1332 (d)(2) (class action diversity), and ultimately requested that the San Francisco Superior Court stay the California state court actions. Eventually, the Judicial Panel on Multidistrict Litigation transferred all federal-court, indirect-purchaser actions to the United States District Court for the Northern District of California, and consolidated the cases for pretrial purposes with *Petro*. All indirect-purchaser cases that remained in state courts were thereafter coordinated. The IPPs in the MDL designated *Petro* as the relevant complaint for purposes of coordinated pretrial proceedings. R&R No. 1 ¶ 42 at 20-21; Gross Dec. ¶ 3.

In the almost eleven years between the filing of the first complaints, the final settlement with Toshiba in October 2012, and the Special Master's recent Reports and Recommendations regarding the settlements, IPP Counsel have devoted extraordinary effort and resources on behalf of the IPP class members.

### 1. Discovery

Because of the continuing investigation of the United States Department of Justice ("DOJ"), general discovery in the private actions was stayed until July 24, 2005. During that stay, however, the IPPs conducted a thorough investigation of the DRAM market, consulted with experts, obtained access to and reviewed the millions of pages of documents that the Defendants produced to the DOJ, propounded interrogatories and also began preparing for class certification. R&R No. 1 ¶ 43 at 22.[7]

After the Court lifted the stay, the IPPs, along with the Direct Purchaser Plaintiffs and the AGs, engaged in coordinated common liability discovery. The IPPs also propounded

---

[7] After IPP Counsel had been litigating against Defendants in state court for two years, in September 2004, the DOJ announced that it was indicting Infineon and that Infineon was pleading guilty to a price-fixing conspiracy involving six OEMs, and over the next year announced indictments and pleas with other Defendants. Thereafter, throughout this litigation, Defendants argued that the DOJ indictments and pleas established only a very limited conspiracy and that the conspiracy involved only these six OEMs and only for a short time period. Thus, the IPPs' investigation focused on demonstrating that the Defendants' conspiracy was much broader than that reflected in the DOJ indictments and was for a longer period. Gross Dec. ¶ 5.

third-party discovery, directed principally to marshaling evidence necessary to prove the pass-through of overcharges to indirect purchasers.  IPP Counsel and their experts and consultants reviewed and carefully analyzed the third-party information obtained, which consisted of hundreds of thousands of pages of documents and extensive data.  *Id.*

During discovery, Defendants produced over four million documents from both domestic and foreign entities.  There were numerous issues regarding the completeness of each Defendant's productions, the technical form of the electronic documents, and whether document searching occurred within the files of particularly important company witnesses, or "custodians" -- all of which required extensive negotiations with Defendants.  Documents were also produced in foreign languages, which required translation into English.  IPP Counsel processed, reviewed, categorized, and annotated these documents, using a then-groundbreaking internet-based electronic document management system that allowed simultaneous access by counsel working from their separate offices all over the United States thereby enhancing efficiency while holding down costs.[8]  Review of these documents was a massive project, and accounts for a substantial number of the hours devoted by the IPPs.  R&R No. 1 ¶ 44 at 22-23; Gross Dec. ¶ 7.

IPP Counsel later shared access to this database and their work product with the AGs, after the states filed cases in July 2006.  Counsel obtained worldwide transactional sales data of DRAM manufactured by Defendants in the global market, and, in consultation with IPP experts, sought and received manufacturing cost data and detailed transactional sales data of DRAM, both as components in computers and as stand-alone DRAM modules.  IPP Counsel engaged in continuous consultations with their experts in order to ensure that the sales and

---

[8]  Notably, while the Direct Purchaser Plaintiffs conducted their document review by printing copies of documents and reviewing them separately by hand for each defendant, IPP Counsel created and utilized new web-based technology and optical character searches by subject matter to make the review process much more efficient.  Gross Dec. ¶ 8.

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS FOR COSTS

transactional data obtained was sufficient to enable the experts to do appropriate damages calculations.  R&R No. 1 ¶ 44 at 22-23; Gross Dec. ¶ 9.

The IPPs and AGs also served subpoenas on more than 30 third parties, primarily on large computer OEMs that purchased DRAM and sellers of products containing DRAM, such as Dell, Gateway, Apple, Hewlett-Packard, IBM, Circuit City, CompUSA, Ingram Micro and CDW.  This discovery was critical because the IPPs needed to demonstrate that pass through of the direct overcharge could be established on a class-wide basis.  Each of these subpoenas had to be individually negotiated, with the assistance of the IPPs' expert economists.  Gross Dec. ¶ 10.

Because Defendants contended that there was no method of common proof of impact and damages, and that the indirect-purchaser distribution channels were so complicated that it was virtually impossible to establish that any overcharge was passed through to the ultimate consumers, the IPPs had to devote substantial resources in investigating and obtaining discovery on these issues.  This involved comprehensive investigations into various sources of industry data on sales, transactions and pricing of DRAM and products containing DRAM, aided by experts, in order to facilitate the experts' regression analyses.  It also required an intricate analysis of the market structure and its numerous distribution channels, in order to develop methods of common proof of impact and damages.  *Id.* ¶ 11.

Following the document review and investigations, IPP Counsel, in coordination with direct purchaser counsel, deposed over 100 witnesses from Defendants and third parties, on issues relating to liability and to class certification, *e.g.*, channels of distribution, manufacturing, pricing, and sales processes, identities of witnesses, and various issues critical to the IPPs' class certification experts.  IPP Counsel also attended the expert depositions in the Direct-Purchaser actions, conducted depositions of defendants' expert witness for class certification, and defended the depositions of their own experts, Drs. Michael Harris and Roger Bohn.  Each of these depositions required intensive preparation. Following difficult and lengthy negotiations, the fact depositions took place in various locations throughout the United States, Asia and Europe.  IPP Counsel likewise shared these

deposition transcripts with the AGs.   Additionally, IPP Counsel worked closely with consultants and economic experts to ensure that the discovery obtained would be focused on information needed to prepare for class certification and trial.   R&R No. 1 ¶ 44 at 22-23; Gross Dec. ¶ 14.

### 2.   Motion for Judgment on the Pleadings and Motion to Dismiss

On August 14, 2006, Defendants moved for judgment on the pleadings as to all antitrust claims arising from the purchase of DRAM as a component in a computer or other device, asserting that such plaintiffs lacked standing under various state antitrust laws because their injuries were too remote to the price-fixing of DRAM itself, and therefore failed to satisfy the "antitrust standing" requirements set forth in *AGC.*  (Dkt. No. 1008).  On October 13, 2006, certain Defendants filed five motions for summary judgment.  On June 1, 2007, the Court granted judgment on the pleadings in relevant part for lack of antitrust standing for those claims based on purchases of products in which DRAM was a component, dismissing those claims with prejudice (Dkt. No. 1555; "the *AGC* Order").  R&R No. 1 ¶ 45 at 23; Gross Dec. ¶ 15.

On June 29, 2007, the IPPs moved for leave to file a further amended complaint, to allege facts that demonstrated that the markets for DRAM modules and for computers are "inextricably linked, and cannot be considered separately," which the Court granted on August 17, 2007 (Dkt. Nos. 1593-1594, 1683).  On August 17, 2007, the IPPs filed their Second Amended Complaint (Dkt. No. 1684).  R&R No. 1 ¶ 46 at 23-24; Gross Dec. ¶ 16.

On October 1, 2007, Defendants filed a motion to dismiss the Second Amended Complaint, again challenging it on *AGC* grounds, and challenging the IPPs' standing to assert claims for computer purchases under the antitrust laws of sixteen states.  (Dkt. No. 1740.)  On October 31, 2007, IPP Counsel filed an opposition to the motion to dismiss.  (Dkt. No. 1762).  On January 29, 2008, the Court granted Defendants' motion to dismiss.  (Dkt. No. 1809; the "MTD Order").  R&R No. 1 ¶ 46 at 23-24; Gross Dec. ¶ 17.

On March 28, 2008, the Court certified both the *AGC* Order and the MTD Order for interlocutory appeal of the *AGC* standing issues.  (Dkt. No. 1849).  On April 18, 2008, the

Court entered an order on the parties' stipulation for a stay of all proceedings during the time the Ninth Circuit considered IPPs' 1292(b) Petition.  (Dkt. No. 1853).  The Ninth Circuit Court of Appeals granted IPPs' Petition for Permission to Appeal Under 28 U.S.C. § 1292(b) on June 26, 2008.  On February 17, 2009, the IPPs filed their opening brief, and on September 9, 2009, the IPPs filed their reply brief. R&R No. 1 ¶ 46 at 23-24; Gross Dec. ¶ 19.

As discussed below, in December 2009, the IPPs and the AGs reached a settlement with all remaining Defendants, and on February 11, 2010, pending the finality of the settlements, the IPPs moved to stay the appeal, pending final approval of the settlements.

### 3.  Class Certification

The IPPs' class certification motion was scheduled to be filed in August 2006, but that date was postponed until after the issuance of the *AGC* Order.  Subsequent to the *AGC* Order, on July 10, 2007, the IPPs filed a motion for class certification (Dkt. No. 1689).  As discussed above, after the Court granted the IPPs' motion for leave to file an amended complaint, on August 17, 2007, the IPPs filed their Second Amended Complaint.  On August 24, 2007, the IPPs filed Amendments re: Motion for Class Certification to conform the class certification motion to the recently filed Second Amended Complaint (Dkt. No. 1689).  The motion sought a federal injunctive-relief class under Section 16 of the Clayton Act (15 U.S.C. §26), pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, for:

> All individuals and entities who, during the period from April 1, 1999 through December 31, 2002, purchased DRAM in the United States indirectly from the defendants or their subsidiaries.  DRAM means: (1) DRAM modules and (2) DRAM in personal computers, desktops, laptops, notebooks, workstations or servers.

The IPPs also sought class certification for damage claims under California's Cartwright Act (Cal. Bus. & Prof. Code § 16720); injunctive and restitutionary relief under Cal. Bus. & Prof. Code § 17200 ("UCL"); and disgorgement under California law principles of unjust enrichment, pursuant to Fed. Civ. P. Rule 23(b)(3), for:

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS FOR COSTS

> All individuals and entities who, during the period from April 1, 1999 through December 31, 2002, purchased DRAM in the United States indirectly from the defendants or their subsidiaries as end-users or end-buyers.   DRAM means: (1) DRAM modules and (2) DRAM in personal computers, desktops, laptops, notebooks, workstations or servers.

Defendants filed their opposition to the class certification motion on September 28, 2007. (Dkt. Nos. 1728-1736.)   On November 27, 2007, Defendants sought the Court's permission to file a supplemental opposition to Plaintiffs' motion.   (Dkt No. 1780).R&R No. 1 ¶¶ 47-48 at 24-25; Gross Dec. ¶¶ 20-22.

After Defendants filed their motion to dismiss the IPPs' Second Amended Complaint (as discussed above), on December 5, 2007, the Court vacated the January 16, 2008 hearing on class certification in order to "settle the pleadings before class certification [was] addressed."  (Dkt. No. 1794).  This class certification process was then stayed pending the appeal to the Ninth Circuit, and then was stayed by the pendency of the settlement agreements. R&R No. 1 ¶ 48 at 25; Gross Dec. ¶ 23.

## B.   The Attorneys General Actions

The AGs began their investigation into this case in June 2005, serving investigative subpoenas and interrogatories on Defendants and third parties pursuant to applicable laws in various states.   Defendants produced the same millions of pages of documents to the AGs that they had previously produced to the IPPs and supplemented them with additional documents and interrogatory responses including narrative statements of liability from various Defendants.   Following a thorough independent review of documents, data, and interrogatory answers, the AGs, other than New York, filed Case No. 06-4333 PJH in this Court.  The State of New York filed a separate action in the Southern District of New York that was transferred to this Court in Case No. 06-4636 PJH.   Both complaints alleged a longer time period for the conspiracy than had been previously alleged.  R&R No. 1 ¶ 49 at 25-26.

The AGs were given access to the depositions taken by the Direct and Indirect Purchaser Plaintiffs, and conducted an independent review of those depositions.   After this

review, the AGs conducted a substantial number of additional depositions and interviews of current and former employees of the Defendants. The AGs obtained supplemental interrogatory statements from many of the Defendants. Additionally, the AGs conducted numerous interviews and took depositions of, as well as obtained a voluminous number of documents, in conjunction with the IPPs, from OEMs and third-party retailers and resellers involved in the sale of DRAM and DRAM-containing equipment. R&R No. 1 ¶ 50 at 26-27; Varanini Dec. ¶ 11.

The AGs worked with the government entities they represented to gather and analyze purchase information, conduct a purchasing survey, and speak with state employees, in order to determine the extent of the injury and damages the states suffered throughout the relevant damages period. This work included not only working with expert economists who analyzed the gathered information and data to determine the fact and extent of harm suffered by the represented government entities but also included answering interrogatories and submitting to depositions across the country. Varanini Dec. ¶ 14. Additionally, the AGs undertook a survey of state purchasers to further support their damages calculation. Varanini Dec. ¶ 16. This process took many months to complete. R&R No. 1 ¶ 51 at 27.

The IPPs provided the AGs with access to their electronic document management system without charge. The AGs supplemented this system with document management systems of their own and conducted independent document review. The AGs reviewed all of the documents, interrogatory responses, and deposition testimony in preparation for trial, and selected essential documents and testimony, bearing in mind the evidentiary rulings of the District Court in the opt-out plaintiff cases. As part of this review, the AGs explored additional theories of liability such as the output-signaling aspects of the Defendants' conduct and the agency relationship between Defendants Nanya Taiwan and Nanya U.S.A. Varanini Dec. ¶ 14. Like the IPPs, the AGs worked closely with experts and consultants in preparing their case for trial. R&R No. 1 ¶ 52 at 27.

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS
FOR COSTS

Also, like the IPPs, the AGs faced motions to dismiss various state law claims.  Most of the state law claims either did not face a challenge or survived the Defendants' challenges. Only the challenges to the state law claims of Utah, Tennessee, and New Mexico were granted.  The AGs and the Defendants also engaged in substantial motion practice against each other with varying degrees of success.  *See, e.g., California v. Infineon Technologies AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007) (holding that only the California Attorney General can bring *parens patriae* claims under the Cartwright Act and only on behalf of California residents, finding some state price-fixing claims were barred by *Illinois Brick*, finding some state price-fixing claims were barred for failure to allege intrastate activity, applying discovery rule to some state law claims, and finding that some states' *parens patriae* claims were deficient); Am. Notice of Pl. State of Florida's Mot. To Strike, *State of California et. al. v. Infineon Technologies*, No. 06-4333 PJH (N.D. Cal., filed July 15, 2008) (Dkt. No. 425), Order Granting Motion to Strike (Dkt. No. 456). The bulk of the claims of the AGs remained intact.  The need for the AGs to prepare their case for trial became even more acute when, on April 18, 2008, the Court entered an order on the IPPs' stipulation for a stay of the IPP proceedings during the time the Ninth Circuit considered IPPs' 1292(b) Petition.  (Dkt. No. 1853).  The stay did not affect the AG case, which was proceeding on course for trial.  R&R No. 1 ¶ 53 at 27-28.

Although the majority of claims by the AGs were filed as *parens patriae* or representative claims on behalf of government entities, natural persons, and in a few instances businesses, several AGs filed class claims on behalf of certain local government entities.  *State of California et. al. v. Infineon Technologies*, No. 06-4333 PJH (N.D. Cal. 2008).  Ultimately, the Court rejected the motion of California and New Mexico to certify a litigation class of political subdivisions that purchased DRAM and DRAM-containing products in those states, although the Court did leave open the possibility of certifying subclasses.  *California v. Infineon*, Case No. 06-4333 PJH, 2008 WL 4155665 (N.D. Cal. Sept. 5, 2008).  R&R No. 1 ¶ 54 at 28-29.

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS FOR COSTS

Following the Court's denial of the California Attorney General's motion for certification of a litigation class of governmental entities, the California Attorney General filed an action in the California Superior Court in San Francisco on behalf of 97 political subdivisions as well as the University of California. *Los Angeles v. Infineon Technologies AG*, No. CFC-08-480561 (San Francisco Supr. Ct. Oct. 3, 2008).[9]  Varanini Dec. ¶ 12.  The California Attorney General thereafter litigated that state court case, successfully opposing a number of motions and also serving additional discovery that the Defendants were compelled to answer.  R&R No. 1 ¶ 55 at 29.

### C.    Mediation, Settlement Discussions and Settlements

#### 1.    Mediations and Settlement Discussions

The IPPs and AGs began settlement discussions with various Defendants in early 2006.  In June 2006, the IPPs and AGs reached a settlement in principle with Samsung.  The IPPs and AGs reached a settlement with Winbond shortly thereafter.[10]  Written settlement agreements were executed with Samsung and Winbond in early 2007.  Samsung then provided substantial cooperation to the IPPs and the AGs.  R&R No. 1 ¶¶ 57-63 at 30-35; Gross Dec. ¶¶ 24-27; Varanini Dec. ¶ 10.

On November 30, 2006, the parties commenced a mediation with all other remaining Defendants, with Judge Daniel J. Weinstein as the mediator.  The initial phase of this mediation took place over many months, but ultimately was unsuccessful.  Shortly after the Court was informed that the settlement discussions were unsuccessful, on June 1, 2007, the Court issued its *AGC* Order.  (Dkt. No. 155).  This ruling, dismissing all IPP antitrust claims based on purchases of products containing DRAM, had the effect of potentially removing approximately 80% of the commerce in DRAM from the IPPs' case, and severely damaged

---

[9]  The term "political subdivisions" includes K-12 school districts, counties, cities, and special districts of whatever kind.

[10]  The New York AG's office did not join in this settlement.

the IPP's position in further settlement discussions.  Despite this adverse ruling, the IPPs and AGs refused to accept any settlements based on a reduced class comprised solely of purchasers of stand-alone DRAM modules.  Instead, as noted above, the IPPs attempted to overcome the *AGC* issue by amending their complaint to allege facts showing the interconnected nature of the DRAM chip market and the market for computers into which the vast majority of those chips are placed.  When, on January 9, 2008, the Court granted Defendants' motions to dismiss the Second Amended Class Complaint, again based on *AGC,* and the Court made it clear that as a matter of law, no component product market could satisfy AGC standing requirements, the IPPs obtained permission from both this Court and the Ninth Circuit to raise this issue by interlocutory appeal.  IPP Counsel filed their opening brief in the appeal, and then all parties moved to stay the IPP district court litigation pending resolution of the Ninth Circuit appeal. The AGs' case however, continued to be litigated. Gross Dec. ¶ 28.

The settlement value of the litigation was also adversely affected by the worldwide financial crisis in 2008, which had a dramatic impact on the Defendants' ability and willingness to pay any substantial settlement amounts (some Defendants filed for bankruptcy, were reorganized, or were acquired while in distress).  Mediation discussions with Judge Weinstein continued after the Ninth Circuit appeal was filed and after the 2008 market decline, but the IPPs and AGs refused to agree to what they viewed as inadequate settlement proposals.  Gross Dec. ¶¶ 29-30; Varanini Dec. ¶ 9, 15.

Ultimately, in December 2009, the IPPs and AGs reached a settlement in principle with the remaining named Defendants.  Written settlement agreements were executed in December 2010, and January 2011.  Starting shortly after the settlement was agreed to in principle, all parties began discussions with the Special Master concerning the resolution of the entire case.  R&R No. 1 ¶ 4 at 2-3, ¶¶ 65-74 at 35-42; Gross Dec. ¶ 31; Varanini Dec. ¶ 9, 15.

Thereafter, the IPPs and AGs pursued three other DRAM manufacturers: Toshiba, Mitsubishi and Hitachi. These three manufacturers had not been named as defendants, but had entered into tolling agreements with the IPPs and AGs. The IPPs and AGs ultimately executed settlement agreements with these three DRAM manufacturers between December 2011 and October 2012. Gross Dec. ¶ 34; R&R No. 1 ¶¶ 81-98 at 44-49.

The details of each of these settlement agreements is described below.

### 2.        The Samsung Settlement

The IPPs began settlement discussions with Samsung in early 2006, and reached an agreement in principle in June 2006. The AGs entered into the settlement discussions with Samsung later in 2006. The written settlement agreement between the IPPs, the AGs and Samsung was executed in February 2007. The terms of the Samsung settlement required Samsung to pay a total of $113,000,000, comprised of the following: $80,000,000 to the Settlement Fund designated for the IPPs; $10,000,000 into the Settlement Fund designated for the Governmental Plaintiffs; $2,500,000 for the costs of notice and claims administration; $1,000,000 in attorneys' fees to the Attorneys General; and $19,500,000 in attorneys' fees to IPP Class Counsel.[11]  R&R No. 1 ¶¶ 57-58 at 30-33; Gross Dec. ¶ 24.

In addition, Samsung agreed to the entry of a final judgment containing an order (1) enjoining Samsung Semiconductor, Inc. ("SSI") and Samsung Electronics Company Ltd. ("SEC") from engaging in anti-competitive conduct with respect to the sale of any DRAM product for delivery in the United States, or the systematic reciprocal exchange of DRAM pricing information as alleged in *United States v. Samsung Electronics Corp. Ltd. et al.*, Case No. CR05-0643 (PJH) (N.D. CA.), for a period of three years from the date of execution of the agreement; (2) requiring Samsung to establish and maintain a program or programs to ensure compliance with the applicable antitrust competition laws for a period of three years;

---

[11]  The settlement with Samsung concerning fees and notice costs was reached during a mediation before Judge Charles Legge (ret.).

and (3) requiring Samsung to give the IPPs and AGs its full, continuing, and complete cooperation in the prosecution of any actions against other DRAM producers.  R&R No. 1 ¶ 58 at 32-33.

After the execution of the Samsung Settlement Agreement, Samsung provided documents, testimony and assistance that was invaluable in prosecuting these cases.  Gross Dec. ¶ 26.

### 3.    The Winbond Settlement

The Winbond settlement agreement was executed in March 2007.[12]  This settlement required Winbond to pay $2,000,000 into the Settlement Fund.  Like Samsung, Winbond is further enjoined from anticompetitive activity, must establish and maintain an antitrust compliance program, and provide full, continuing, and complete cooperation with the continued prosecution of the action.  The Winbond settlement agreement does not contain any separate payment of attorneys' fees or notice costs.  R&R No. 1 ¶¶ 61-64 at 34-35.

### 4.    The Multi-Defendant Settlement

The Multi-Defendant Settlement Agreement ("MDSA") settles all claims against Defendants Infineon Technologies AG and Infineon Technologies North America Corp. (together, "Infineon"), Elpida Memory, Inc. and Elpida Memory (USA) Inc. (together, "Elpida"), NEC Electronics America, Inc. (presently known as Renesas Electronics America Inc.) ("NEC"), Micron Technology, Inc. and Micron Semiconductor Products, Inc. (together, "Micron"), Mosel Vitelic Inc. and Mosel Vitelic Corp. (together, "Mosel"), and Hynix Semiconductor Inc. and Hynix Semiconductor America Inc. (together, "Hynix").  It was achieved in spite of a restrictive judgment-sharing agreement that sought to protect defendants from the full effects of joint and several liability, a significant obstacle.  *See, e.g.*, *In re San Juan Dupont Plaza Hotel Fire Litig.*, 1989 WL 996278 (D. PR Sept. 14, 1989)**.**

---

[12]  New York did not join the Winbond Settlement.

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS FOR COSTS

The MDSA obligates these Defendants to pay into the Settlement Fund $173,176,800, divided as follows:

|  | |
|---|---|
| Infineon: | $29,113,776 |
| Elpida: | $4,259,948 |
| NEC: | $20,277,350 |
| Mosel: | $2,778,900 |
| Micron: | $66,774,984 |
| Hynix: | $49,971,842 |

The MDSA provides that 8/9ths of the MDSA payments to the Settlement Fund will be used for the benefit of the IPPs and 1/9th of the MDSA payments to the Settlement Fund will be used to benefit the governmental entities represented by the AGs, based on the ratio agreed to in the Samsung Settlement. The MDSA also provides for injunctive relief similar to the Samsung and Winbond settlements, antitrust training and compliance programs, and full, continuing, and complete cooperation. R&R No. 1 ¶¶ 65-74 at 35-42; Gross Dec. ¶ 32.

### 5.      The Nanya Settlement

The Nanya settlement agreement requires Nanya Technology Corporation to pay $3,823,200 into the Settlement Fund. Like the MDSA, the Nanya settlement agreement provides that 8/9ths of the Nanya payments to the Settlement fund will be used for the benefit of the IPPs and that 1/9th will be for the benefit of the governmental entities represented by the AGs. The Nanya settlement agreement also provides injunctive relief, compliance programs and complete cooperation. R&R No. 1 ¶¶ 75-80 at 42-44.

### 6.      The Mitsubishi, Toshiba, and Hitachi Settlements

The IPPs and the AGs reached settlement agreements with Mitsubishi, Toshiba, and Hitachi prior to filing suit against these three entities. IPPs and the AGs had entered into tolling agreements with Mitsubishi, Toshiba, and Hitachi, but agreed to file actions against these entities only as part of the settlement agreements negotiated with these entities. The Mitsubishi settlement agreement requires Mitsubishi to pay into the Settlement Fund

$5,500,000 plus an additional $100,000 for Mitsubishi's share of the costs of the Special Master, notice, and claims administration.   The Toshiba settlement agreement requires Toshiba to pay into the Settlement Fund $7,250,000, plus an additional $200,000 for Toshiba's share of the costs of the Special Master, notice, and claims administration.  The Hitachi settlement agreement requires Hitachi to pay into the Settlement Fund $5,500,000, plus an additional $100,000 for Hitachi's share of the costs of the Special Master, notice, and claims administration.   The Mitsubishi, Toshiba, and Hitachi settlement agreements all provide that 8/9ths of payments to the Settlement Fund will be for the benefit of the IPPs, and 1/9th will be for the benefit of the governmental entities represented by the AGs.  R&R No. 1 ¶¶ 81-98 at 43-48.

The Mitsubishi, Toshiba, and Hitachi settlement agreements also provide for injunctive relief and antitrust training and compliance tailored to their particular situations. R&R No. 1 ¶¶ 83, 89 & 95 at 44-49.

**D.     Post-Settlement Proceedings Before the Special Master**

After the settlements were reached with Samsung and Winbond, the Court entered two orders (Dkt. Nos. 1787 and 1789) on November 30, 2007, which appointed Judge Charles Renfrew as Special Master, to issue a Report and Recommendation as to whether the settlement classes defined in the agreements should be certified, with or without subclasses, and, if so, to develop fair and reasonable plans of allocation and distribution for the settlement classes, as well as determine reasonable forms of notice and methods for disseminating the notice.  R&R No. 1 ¶ 5 at 3-4.

Pursuant to this reference, the IPPs, AGs, Samsung and Winbond had numerous meetings with the Special Master to discuss these issues.  Shortly thereafter, the IPPs filed an appeal in the Ninth Circuit challenging the Court's *AGC* Order and MTD Order. Additionally, mediation and settlement discussions continued between the plaintiffs and the remaining Defendants.  Because the results of the ongoing settlement discussions and the pending appeal would have a significant bearing on the issues referred to the Special Master,

and because an important case concerning indirect-purchaser claims under California law was pending before the California Supreme Court, *Clayworth v. Pfizer*, 49 Cal. 4th 758 (Cal. 2010), the Special Master and the parties concluded it would be appropriate to await the outcome of the appeal and the settlement discussions before continuing with the settlement approval process. R&R No. 1 ¶ 9 at 5-6; Gross Dec. ¶ 38.

In December 2009, after the IPPs and the AGs reached an agreement in principle with the remaining Defendants, the Special Master began discussions with all parties concerning a schedule and process for the Special Master to make a report and recommendation on all issues referred to him. On November 29, 2010, after the IPPs and AGs signed written settlement agreements with all of the remaining Defendants, except Nanya, the Court entered another order that referred the new MDSA to the Special Master and included it within the previous reference, and also expanded the reference to include findings and recommendations as to attorneys' fees, reimbursement of expenses and incentive awards. Finally, after the later settlement agreements with Nanya, Mitsubishi, Toshiba and Hitachi were signed, the Court entered Orders including these settlements within the scope of the Court's November 29, 2010 reference to the Special Master. R&R No. 1 ¶¶ 6-8, 10 at 4-7; Gross Dec. ¶ 39.

The IPPs, AGs and Defendants agreed with the Special Master upon a detailed briefing schedule, dividing the briefing and argument into five phases. The first phase involved establishing the basic market facts relevant to a reasonable allocation of the funds to pay the anticipated claims of all indirect purchasers in the nationwide class, focusing on the products, distribution channels, final uses and the pass-on of the alleged overcharges between indirect-purchaser-resellers and end-user/consumer groups, as well as their various characteristics and their relative percentages of DRAM commerce. The second phase involved identifying and resolving issues relevant to crafting a fair and reasonable plan of distribution to all class members, including such issues as whether monetary distributions could be made to household claimants, whether a *cy pres* distribution could be used for some

claimants, and whether the plan should reflect differences in the "strength" or procedural positions underlying individual claims, due to differences in state law, and if so, whether subclasses were necessary.  The third phase involved proposals concerning the settlement of the class claims asserted by the AGs on behalf of certain Governmental Purchaser Plaintiffs, as those proprietary claims required court review and approval.  The fourth phase dealt with notice and claims administration.  The fifth phase dealt with attorneys' fees and out-of-pocket litigation expenses.  During this phase, IPP Counsel and the AGs with the assistance of the Special Master resolved a dispute concerning the allocation of attorneys' fees between IPP Counsel and the AGs, with a resolution that 80.8% of the fees would be allocated to IPP Counsel and 19.2% allocated to the AGs.  R&R No. 1 ¶¶ 203-205 at 113-16; Gross Dec. ¶ 40.  As part of that process, IPP Counsel and the AGs agreed to submit this Joint Motion for Attorneys' Fees.  Gross Dec. ¶ 40.

During this process, the parties and the Special Master determined that it was appropriate that there be the fullest participation possible in the allocation proceedings by indirect-purchaser resellers.  Accordingly, the Special Master sent communications to major indirect-purchaser resellers informing them of the pendency of the proceedings before the Special Master, and inviting them to send representatives.  A number of these resellers attended a few hearings before the Special Master, but only one of them, Celestica Inc., an electronics manufacturing services company ("EMS"), a type of reseller that manufactures computers for OEMs, participated with its counsel throughout the entire allocation process before the Special Master.  R&R No. 1 ¶ 23 at 12-13, ¶¶ 207-210 at 116-118; Gross Dec. ¶ 41.[13]  Additionally, the Special Master determined that there should be separate counsel representing indirect-purchaser resellers other than EMS resellers, and on April 20, 2011, the Special Master issued a Memorandum and Order appointing the law firm of Berman

---

[13]   Celestica was represented by Susman Godfrey, LLP.  Celestica's counsel attended all the hearings and submitted several expert reports regarding pass through and the DRAM chain of distribution on behalf of resellers.  See Declaration of James T. Southwick (submitted concurrently) ¶¶9-11.

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS FOR COSTS

Devalerio as Reseller Allocation Counsel to work in conjunction with Celestica's counsel in the allocation process. R&R No. 1 ¶ 23 at 12-13, ¶ 211 at 118.

Throughout these proceedings before the Special Master, the parties prepared and submitted expert reports concerning relevant market facts, focusing on the products, distribution channels, and final uses of DRAM by the resellers and end-user/consumer sub-groups. The issues were vigorously contested among the various groups, including differences between the expert reports from the IPPs' expert, the AGs' expert and the resellers' expert, on DRAM market structure and distribution channels, and on how these would affect the calculation of any distributions to class members and allocations among various groups of indirect purchasers. Many of these disputed issues were resolved only through intense advocacy and with the guidance of the Special Master. Ultimately, the parties, with the guidance of the Special Master, and after extensive briefing, reconciled the various positions. The Special Master also assisted in developing a settlement allocation plan for the class claims by governmental entities. The parties and experts also briefed and argued numerous issues, including: whether any subclassing was needed, or whether individual needs could be adequately met through the distribution calculation methods; whether a 50-state settlement class should be certified; and whether there should be tiering of claims as part of the allocation process. Differing positions on overcharge retention and pass-through from reseller intermediaries to indirect-purchaser end-users necessitated the submission to the Special Master of competing expert reports on that issue alone. R&R No. 1 ¶¶ 212-261 at 119-42; Gross Dec. ¶ 43.

## IV. ARGUMENT

IPP Counsel, who litigated on behalf of the Class, produced a benefit for the Class members, and therefore are entitled to compensation. The Supreme Court "has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Mills v. Elec. Auto-*

*Lite Co.*, 396 U.S. 375, 393 (1970); *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 123 (1885). The purpose of this doctrine is that "those who benefit from the creation of the fund should share the wealth with the lawyers whose skill and effort helped create it."  *In re Washington Public Power Supply System Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994). This "common fund doctrine" is firmly rooted in American case law.  *See, e.g., Internal Imp. Fund Trustees v. Greenough,* 105 U.S. 527 (1881); *Central R.R.*, 113 U.S. at 123.

The Supreme Court has repeatedly recognized the importance of private antitrust litigation as a necessary and desirable tool to assure the effective enforcement of the antitrust laws. *See, e.g., Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 331 (1979); *State of Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972); *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139 (1968) (overruled on other grounds by *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)). Substantial fee awards in successful cases, such as this one, encourage meritorious class actions, and thereby promote private enforcement of, and compliance with, the antitrust laws.  "In the absence of adequate attorneys' fee awards, many antitrust actions would not be commenced." *Alpine Pharmacy, Inc. v. Charles Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir.), *cert. denied*, 414 U.S. 1092 (1973); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 653-54 (1985).

The AGs, as parties to and contributors towards completion of each of the seven Settlement Agreements in these actions, are also entitled, by the express terms of those agreements, to apply to this Court for an award of their attorneys' fees and expenses from the Settlement Fund. *See, e.g.,* Samsung Settlement Agreement ¶ 20 (Dkt. No. 1747-3).  While most of the AGs pursued *parens patriae* claims, the principles underlying the common fund theory also apply to the AGs' request for fees and costs from the combined settlement fund. The Clayton Act specifically provides that the AGs can recover their reasonable attorney fees and disbursements if they succeed on their injunctive claims, s*ee* 15 U.S.C. § 26, demonstrating that Congress has made the determination that even though States use public

servants paid by state-raised tax monies to pursue these claims, they may recover attorney fees and disbursements, whether the case is tried to judgment or settles prior to judgment. *See In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 214 (D. Me. 2003); *In re Toys "R" Us Antitrust Litig.,* 191 F.R.D. 347, 357 (E.D.N.Y. 2000) (approving $5.4 million in fees plus costs to the States and class plaintiffs' counsel pursuant to final approval of settlement agreement); *In re Compact Disc Antitrust Litig.*, 216 F.R.D. at 214-15; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271, at *103 (N.D. Cal. Mar. 29, 2013) (approving $11,054,191.01 in fees and $1,206,479.48 in expenses to the States).[14]

The settlements here establish a common fund intended for the recovery of injured parties – the Class members and the entities represented by the AGs that purchased DRAM indirectly.  From that combined fund, all counsel representing the injured plaintiffs, including both IPP Counsel and the AGs, are similarly entitled to seek awards of fees and costs.

**A. The Percentage of the Settlement Fund Requested In This Case is Fair and Appropriate.**

**1.  The Ninth Circuit Recognizes the Common Fund Doctrine.**

The Ninth Circuit applies the common fund doctrine when: "(1) the class of beneficiaries is sufficiently identifiable, (2) the benefits can be accurately traced, and (3) the fee can be shifted with some exactitude to those benefiting."  *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir. 1989).  These criteria are met where "each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum [settlement] recovered on his behalf."  *Id.* (quoting *Van Gemert*, 444 U.S. at 479).

---

[14]  The AGs also brought their claims pursuant to their own state laws, which also provide for the awarding of reasonable attorneys' fees. *See, e.g.*, Fla. Stat. § 542.23 ("In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to the plaintiff."); Fla. Stat. § 501.2105 (the court may award costs and fees); Fla. Stat. § 501.2075 ("If civil penalties are assessed in any litigation, the enforcing authority is entitled to reasonable attorney's fees and costs.").

In this case, IPP Counsel and the AGs secured a fund of over $310 million for the benefit of the class members, and those represented by the AGs. Because the class members' claims are "undisputed and mathematically ascertainable," attorneys' fees awarded out of this fund are appropriate and consistent with Ninth Circuit law.

### B. The Ninth Circuit Supports a Percentage-of-the-Recovery Method in Awarding Attorneys' Fees.

The amount of the award of reasonable attorneys' fees and expenses is within the sound discretion of the district court. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998); *Washington Public Power*, 19 F.3d at 1296. In the Ninth Circuit, the district court has discretion in a common fund case to choose either the "percentage-of-the-fund" or the "lodestar" method in calculating fees. *Fischel v. Equitable Life Assur. Soc'y*, 307 F.3d 997, 1006 (9th Cir. 2002); *Wininger v. SI Management L.P.*, 301 F.3d 1115, 1123-24 & n.9 (9th Cir. 2002); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *Washington Public Power*, 19 F.3d at 1296.

Awarding a percentage of the common fund is considered reasonable, and is used by the Ninth Circuit. *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) (noting that under the common fund doctrine, "a reasonable fee is based on a percentage of the fund bestowed on the class"); *see also, e.g., Morris v. Lifescan, Inc.*, 54 Fed. App'x 663, 664 (9th Cir. 2003) (finding the district court did not abuse its discretion in awarding 33% of the settlement fund in attorneys' fees); *Vizcaino*, 290 F.3d at 1050 (stating that that "the primary basis of the fee award remains the percentage method" and finding that the district court did not abuse its discretion in awarding attorneys' fees in the amount of 28% of the common fund); *Graulty*, 886 F.2d at 272 (noting that the percentage-of-recovery method would be more appropriate than the lodestar method).

Virtually all of the major recent antitrust cases in the Northern District of California have applied the percentage of the fund approach. *See, e.g., Meijer v. Abbott Laboratories*, C-07-05985 (N.D. Cal. Aug. 11, 2011) (Wilken, J.) (33⅓%); *In re Sorbates Direct Purchaser*

25

*Antitrust Litig.*, No. 98-4886 (N.D. Cal. Nov. 20, 2000) (Legge, J.) (25%); *Van Vranken v. ARCO*, 901 F. Supp. 294 (N.D. Cal. 1995) (25%); *In re Sodium Gluconate Antitrust Litig.*, No. C-97-4142 (N.D. Cal. 1999) (Wilken, J.) (30%).  Indeed, this Court has already approved a 25% award to counsel for the direct purchaser plaintiffs in their related litigation.  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, M-02-1486, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) (Hamilton, J.).

**C.  The Ninth Circuit's Benchmark Attorneys' Fees Award is 25%.**

The Ninth Circuit has set its benchmark for attorneys' fees at 25% of the monetary value of the recovery obtained in a class action.  *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997) ("*Petroleum Products*"); *Gaulty*, 886 F.2d at 272; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271, *--- (N.D. Cal. Mar. 29, 2013), quoting *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).  The Ninth Circuit has stated that "[i]t is reasonable for the district court to compare the lodestar fee, or sum of lodestar fees, to the 25% benchmark, as one measure of the reasonableness of the attorneys' hours and rates."  *Petroleum Products,* 109 F.3d at 607; *see also Vizcaino*, 290 F.3d at 1050 (calculating the lodestar in an effort measure the attorneys' investment of time into the case "provides a check on the reasonableness of the percentage award").  The 25% benchmark rate is thus "a starting point for analysis," and "[s]election of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case."  *Vizcaino*, 290 F.3d at 1048.

As detailed below, a total fee award of 25% of the entire Settlement Fund is reasonable given the amount of work performed by IPP Counsel and the AGs, the significant risk taken by counsel, the successful result obtained for the class members and those represented by the AGs, and is amply supported by the lodestar cross-check.

Here, Samsung's separate fee payments reflect a lower attorneys' fees percentage due to the discount that it received as the first party to settle.  While the Samsung settlement

standing alone provides for a fee percentage of less than 25%, the blended fees remain only 25% of the total common fund established by the settlements achieved and is thus equal to the Ninth Circuit's benchmark.   Even if the other settlements were to be considered separately, the requested fees of approximately 29% would still be reasonable given the work performed and risk undertaken by IPP Counsel and the AGs.   Numerous courts in this Circuit and elsewhere have awarded fees exceeding 25%, including fee awards of one-third of the common fund generated by the work of plaintiffs' counsel.  *See, e.g., In re Pacific Enters. Sec. Litig.*, 47 F.3d at 379 (fee award of one-third of common fund justified due to complexity of issues and risks involved); *Vizcaino,* 290 F.3d at 1047-52 (affirming award of 28% of $96 million common fund because of exceptional result and extreme risks of the litigation); *In re Heritage Bond Litig.*, 2005 WL 1594389, at *8 (C.D. Cal. June 10, 2005) (one-third was justified based on the result obtained, Class Counsel's effort, experience and skill, and the great risk assumed); *see, e.g., In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1378 (N.D. Cal. 1989) (benchmark is closer to 30%).  *In re Automotive Refinishing Paint Antitrust Litig.*, 2008 U.S. Dist. LEXIS 569, at *23 (E.D. Pa. Jan. 3, 2008) (one-third, where class counsel spent almost six years and more than 48,000 hours prosecuting the case); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 77-82 (D. Mass. 2005) (one-third of common fund was justified due to, *inter alia*, skill and efficiency of counsel, complexity and four-year duration of the litigation, and class counsel's expenditure of tens of thousands of hours on the case); *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067, at *58 (D.D.C. July 13, 2001) (determining that one-third was reasonable and granting fee award of approximately 34% of the total estimated settlement amount in antitrust price fixing litigation); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271 (N.D. Cal. Mar. 29, 2013) (28.5% of the common fund awarded as attorneys' fees); *In re Static Random Access Memory (SRAM) Antitrust Litig.,* MDL No. 1819 (N.D. Cal. Oct. 14, 2011) (33-1/3% of common fund awarded as attorneys' fees); *Brailsford v. Jackson Hewitt, Inc. et al.*, C06-

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS FOR COSTS

00700 CW, 2007 U.S. Dist. LEXIS 35509, at *14 (May 3, 2007 N.D. Cal.) (awarding 30% of the common fund).

### D. Relevant Factors

Courts consider a variety of factors when awarding attorneys' fees based on a percentage of the recovery. These factors may include: the result attorneys obtained for the class; class counsel's effort; class counsel's experience and skill; the complexity of the issues; risks of non-payment; the reaction of the class; and lodestar comparison. *See, e.g., Vizcaino*, 290 F.3d at 1048-50; *In re Hertigate Bond Litig.*, 2005 WL 1594389, at *8 (C.D. Cal. June 10, 2005). These factors support IPP Counsel's and the AGs' request for 25% of the total Settlement Fund as attorneys' fees.

### 1. The Result Achieved for the Class

A major factor in consideration of a fee award is the result achieved for the client. *See Vizcaino*, 290 F.3d at 1048; *In re Heritage Bond Litig.*, 2005 WL 1594389, at *8 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)); *see also In re King Resources Co. Sec. Litig.*, 420 F. Supp. 610, 630 (D. Colo. 1976) (stating that "the amount of the recovery, and end result achieved are of primary importance for these are the true benefit to the client")).

IPP Counsel and the AGs' recovery of over $310 million is an outstanding result. The defendant claims there was no harm, but the direct purchasers' damages expert calculated damages of at least $2.6 billion. *See* Rebuttal Expert Report of Paul C. Liu, Nov. 22, 2006, at 3 (Dkt. No. 1182). IPPs' damages experts concurred and also calculated only 20% of relevant sales were of stand-alone DRAM modules, with the remainder being sales of DRAM-containing products. *See* Declaration of Roger Bohn, June 29, 2007, ¶ 28 (Dkt. No. 1597); Supplemental Expert Report of Roger Bohn to Special Master, Feb. 18, 2011, ¶ 46. Thus, a settlement fund of $310 million represents a recovery of approximately 12% of estimated total damages for all DRAM sales. This result is comparable to settlements in other price-fixing cases where the court awarded 25% or more of the settlement fund as attorneys' fees. *See, e.g., Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 324, 330–33 (3d

Cir. 2011), *cert denied*, 132 S. Ct. 1876 (U.S. 2012), *reh'g denied*, 132 S. Ct. 2451 (affirming a settlement fund that represented 10.93% of the estimated overcharge, and affirming attorneys' fees in the amount of 25%).

The result obtained by the IPPs and the AGs was particularly impressive, given that the Court's ruling on antitrust standing, dismissing approximately 80% of the affected commerce from the case.

### 2. Counsel's Effort

Another factor to consider is the effort expended by counsel. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271, at *66; *In re Heritage Bond Litig.*, 2005 WL 1594389, at * 9. Both IPP Counsel and the AGs have spent a great deal of time and effort in prosecuting and settling this case. Here, IPP Counsel and the AGs' efforts have been lengthy, intense, and of the highest quality. As noted above, this action was first commenced by IPP Counsel in 2002 and IPP Counsel have been working diligently since then to prosecute and subsequently settle this case. Over this eleven-year period, IPP Counsel have devoted over 152,000 hours to the prosecution of this case on behalf of the Plaintiffs and Class. Gross Dec. ¶ 47. The AGs have devoted approximately 77,400 hours to the prosecution of this case on behalf of their consumers and government entities. Varanini Dec. ¶ 22. Multiple courts have awarded attorneys' fees of at least 25% of a common fund under similar circumstances. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271 (28.5% of the common fund awarded as attorneys' fees in case involving a recovery of $1.1 billion); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, MDL No. 1819 (N.D. Cal. Oct. 14, 2011) (33-1/3% of common fund awarded as attorneys' fees after more than four years and 76,000 hours of work on the case); *In re Crazy Eddie Securities Litigation*, 824 F. Supp. 320, 325 (E.D.N.Y. 1993) (one-third fee award justified in part due to the expenditure of 30,000 hours by 11 firms); *In re Medical X-Ray Film Antitrust Litig.*, No. CV–93–5904, 1998 WL 661515, at *23 (E.D.N.Y. Aug. 7, 1998) (one-third of the common fund awarded after 17 law firms spent about 30,000 hours litigating the case). As

demonstrated by these cases, the amount of time spent by IPP Counsel strongly supports a 25% fee award in this case.

      A.    *Case investigation, filings, and pleading motions*.  IPP Counsel commenced this case in 2002 by filing complaints in various state courts.  In 2005, IPP Counsel filed cases in federal courts as well.  In total, more than 60 class action complaints, supported by extensive investigation regarding the DRAM industry, were filed in 27 states and several federal courts around the country. IPP Counsel obtained the transfer and consolidation of all the federal court actions to the District Court for the Northern District of California and coordinated litigation efforts in state courts around the country.  Finally, IPP Counsel worked to designate the *Petro* complaint as the relevant complaint in order to effectively coordinate pretrial proceedings.  *See* Point III.A., *supra*.  The AGs began investigating Defendants' price-fixing conduct in 2005, and filed suit in the District Court for the Northern District of California in 2006.

      From 2006 to 2008, IPP Counsel devoted substantial time to amending its pleadings following the Court's grant of Defendants' motion for judgment on the pleadings.  In June 2007, IPP Counsel filed a Second Amended Complaint supported by additional investigation and factual research and subsequently worked to defend that Complaint against Defendants' motion to dismiss.  Likewise, the AGs defended their complaints and amended complaints against Defendants' Motions to Dismiss.  This pleading and investigation is indicative of the time and effort expended by IPP Counsel and the AGs throughout the duration of this case.

      B.    *Interlocutory Appeal.*  After the Second Amended Complaint was dismissed, IPP Counsel then filed a successful Petition for Permission to Appeal under 28 U.S.C. § 1292(b).  IPP Counsel filed opening and reply briefs in the Ninth Circuit.  Ultimately, once a settlement was reached with the remaining Defendants, this appeal was stayed pending the outcome of the settlements.   Since the stay, IPP Counsel have participated in several telephonic status conferences.  The most recent status conference took place on June 4, 2013, and the next status conference is scheduled for October 8, 2013.

C. *Discovery Efforts.  Written, Document, Deposition, Third-Party, and Expert Discovery.*  As detailed above, IPP Counsel and the AGs engaged in massive and time-consuming discovery. Defendants produced over 4 million pages of documents from domestic and foreign entities, both to the DOJ and directly to IPP Counsel and the AGs, which counsel processed, reviewed, categorized, and annotated.  Some of these documents required foreign language translations.   IPP Counsel helped to develop an innovative internet-based electronic document management system that allowed counsel all over the country to simultaneously access the documents, and shared this electronic database with the AGs when they became involved in the litigation in 2007.  *See* Point III.A.1, *supra*.

IPP Counsel also deposed over 100 witnesses from Defendants and third parties in the United States, Asia and Europe.  IPP Counsel then shared these deposition transcripts with the AGs in order to assist them with the prosecution of their case. The AGs conducted additional depositions as detailed above.  Additionally, IPP Counsel and the AGs propounded discovery on third parties and subsequently reviewed and analyzed thousands of pages of information obtained from those third parties.  *Id.*

The labor-intensive and expensive discovery conducted in this case by IPP Counsel and the AGs strongly supports their fee request here.

D. *Class Certification Proceedings.*  Class certification under the Federal Rules of an indirect-purchaser class asserting claims under multiple state laws was particularly novel and complex.  Indeed, this litigation was cutting–edge, since this was one of the first post-CAFA state law indirect-purchaser antitrust cases in federal court.  IPP Counsel spent a significant amount of time on class-certification related work. IPP Counsel were prepared to file a motion for class certification in August 2006, but that date was later postponed until after the *AGC* Order was issued.  Following the Court's AGC Order in 2007, IPP Counsel filed a motion for class certification making allegations that conformed to allegations in the Second Amended Complaint filed in August 2007.  IPP Counsel filed two expert reports in support of their motion for class certification, defended their experts' depositions, and

deposed Defendants' expert.   IPP Counsel spent considerable time preparing for class certification and briefing the class motion.  *See* Point III.A.3, *supra*.  Moreover, the execution of the settlement agreements was only the beginning of the lengthy and labor-intensive road to final approval, involving proceedings before the Special Master, this Court and most likely, before the Ninth Circuit Court of Appeals as well.  See Point III.D.

The AGs faced class certification issues of their own.  See Point III.B, *supra*.  In total certain AG counsel devoted significant time and resources to their motion for class certification.

E.     *Settlement Negotiations and Approvals*.  IPP Counsel's and the AGs' efforts during the course of these cases led to protracted settlement negotiations with Defendants that resulted in seven separately-negotiated settlement agreements.  All of the settlements occurred only after substantial discovery had been conducted.  Moreover, following the Samsung and Windbond settlements, it because extremely difficult to settle with any other remaining defendant individually because all of the remaining defendants entered into a judgment sharing agreement after these initial settlements.  The first settlement agreement with Samsung was executed in January 2007, and the most recent settlement agreements were executed as recently as July 2012.  IPP Counsel's efforts resulted in seven separate settlement agreements totaling over $310 million for IPPs and Government Purchaser plaintiffs. *See* Point III.C, *supra*.

### 3.  Counsel's Skill and Experience

#### i.    IPP Counsel

IPP Counsel are among some of the top antitrust attorneys and firms in the country with decades of experience litigating indirect-purchaser, antitrust class actions.  *See* Gross Dec. ¶ 45; Compendium of Declarations of IPP Counsel, Exhibits 1.  This factor weighs in favor of awarding a blended rate of 25% of the total settlement fund as attorneys' fees.  *See Vizcaino v. Microsoft*, 142 F. Supp. 2d 1299, 1306 (W.D. Wash. 2001) *aff'd* 290 F.3d 1043 (9th Cir. 2002).

### ii.   Attorneys General

The Attorneys General are the chief law enforcement officers for their states charged with enforcing state and federal antitrust law to protect their economies and citizens.  The attorneys prosecuting this litigation on behalf of their respective states are among the most experienced government antitrust litigators in the country, with decades of experience in prosecuting antitrust and consumer actions on behalf of the states. Varanini Dec. ¶ 2; Compendium of Declarations of AG Counsel.  As with the IPP Counsel, the AGs' experience weighs in favor of awarding 25 % of the settlement fund as attorneys' fees.

### 4.   Complexity of the Issues

The complexity of the issues is an important factor in antitrust litigation.  *Vizcaino*, 142 F. Supp. 2d at 1306 (listing, *inter alia*, "the novel and difficulty of the questions involved" as one of several factors considered in the court's approval of an award of attorneys' fees of 28% of the settlement fund); *Trans World Airlines, Inc. v. Hughes*, 312 F. Supp. 478, 484 (S.D.N.Y 1970). Antitrust class action are "arguably the most complex action to prosecute" as "[t]he legal and factual issues involved are always numerous and uncertain in outcome." *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. Civ.A 03-4578, 2005 WL 1213926, at *11 (E.D. Pa. May 19, 2005) (quoting *In re Linerboard Antitrust Litig.*, 296 F.Supp.2d 568, 577 (E.D. Pa. 2003)); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 122 (4th Cir. 2005) (finding no abuse of discretion where the district court ordered an "extraordinary" fee in part because "antitrust cases, by their nature, are highly complex"); *In re Shopping Carts Antitrust Litig.*, MDL No. 451, 1983 WL 1950, at *7 (S.D.N.Y. Nov. 18, 1983) (noting that "antitrust price fixing actions are generally complex, expensive and lengthy"); *In re Cement & Concrete Antitrust Litig.*, MDL No. 296, 1981 WL 2039, at *3 (D. Ariz. Feb. 5, 1981) (considering "complexity and uncertainty of the legal and factual issues presented" of the antitrust litigation).

Such issues were compounded in this case because Counsel had to trace the effect of the overcharge to the ultimate consumer and at the same time reconcile the substantive

antitrust and consumer protection laws of 33 states and the District of Columbia with federal procedural law.   The laws of foreign jurisdictions and the difficulties of international discovery were among the other novel and complicating obstacles faced by Counsel.

Some of the other significant legal and factual challenges faced by Counsel included proving that Defendants' conspiracy was effective in raising prices, establishing that overcharges passed through the various distribution channels to consumers, determining what portion of a finished, DRAM-containing product's price was attributable to its DRAM component, and proving that the markets for DRAM modules and DRAM-containing products such as computers were linked and could not be separated.   Legal challenges for both the IPP Counsel and certain AGs included demonstrating that Plaintiffs had standing under multiple state antitrust laws and obtaining class certification.

There is no doubt that IPP Counsel and the AGs vigorously prosecuted their case in the face of Defendants' numerous factual and legal challenges.

### 5.   Risk of Non-Payment

The risk of non-payment in litigating a contingent-fee case likewise is a significant factor in determining attorneys' fees.   *Vizcaino*, 290 F.3d at 1048-49; *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (finding no abuse of discretion where the district court awarded 33% of the settlement fund in attorneys' fees -- instead of the standard benchmark of 25% -- due to "the complexity of the issues and the risk"); *In re Wash. Pub. Power Supply Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) (examining the role of risk in litigation); *see also In re Superior Beverage/Class Container Consolidated Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990) ("[t]he 'best' case can be lost and the 'worst' case can be won, and juries may find liability but no damages. None of these risks should be underestimated").

Here, IPP Counsel assumed this risk and have carried it for eleven years as the case has progressed. Likewise, the AGs have carried this risk for eight years.   The primary risks are listed in detail below:

*Risk of Collection*: The financial crisis materially affected the ability of some defendants to pay anything and many defendants were concerned with cash outflows in light of the economic conditions. Elpida, for example, ultimately filed for bankruptcy, and Infineon was reorganized and subsequently acquired while in distress.

*Defendants' Motion to Dismiss*. The Defendants in this case moved for, and obtained, judgment on the pleadings as to all claims because IPPs purportedly lacked sufficient standing as indirect purchasers. IPP Counsel filed a Second Amended Complaint to make further allegations that indirect purchasers did in fact have sufficient standing. When the Court granted Defendants' motion to dismiss the Second Amended Complaint, IPP Counsel successfully obtained permission to file an interlocutory appeal, and filed opening and reply briefs on appeal. IPP Counsel's willingness to continue to advocate for the purported class despite this adverse decision is a significant factor in the Court's determination of an appropriate fee award. *See Vizcaino*, 290 F.3d at 1048; *Bebchick v. Washington Metro. Area Transit Comm'n*, 805 F.2d 396, 408 (D.D.C. 1986) (stating that attorneys had shown considerable resolve in overturning Commission determinations in support of an upward adjustment of the lodestar). Likewise, the AGs faced numerous motions to dismiss their claims. *See* Points II.A.2 & II.B, *supra*.

*Class Certification*. IPP Counsel incurred significant expense and time to prepare for class certification. IPP Counsel worked for years with prestigious economic experts in prosecuting this case. IPP Counsel prepared a motion for class certification which conformed to the allegations in the Second Amended Complaint and included two expert reports. As noted above IPP Counsel also defended two expert depositions, and took one expert deposition as part of the class certification process. Although the matter was stayed and ultimately not determined due to the pending settlements, IPP Counsel utilized significant resources in order to prepare and defend their motion for class certification. Class certification presents a significant risk of non-payment.

*Contingent Fee*.  The Ninth Circuit has recognized that in common fund cases, class counsel takes on significant risks and responsibilities in representing a purported class on a contingent-fee basis.  *See, e.g., Vizcaino*, 290 F.3d at 1049-50 (affirming a fee award of 28% of the settlement fund and listing one of several factors as counsel's representation of the class on a contingent basis over eleven years and hundreds of thousands of dollars of expenses); *see also In re Teletronics Pacing Sys., Inc.*, 137 F. Supp. 2d 1029, 1043 (S.D. Ohio 2001) (recognizing that there is "a certain degree of risk" in contingency fee arrangements).

Here, IPP Counsel has dedicated 152,485 hours over an eleven-year period to this litigation without compensation.  IPP Counsel also incurred over $6.3 million in expenses over that time period, and carried their costs without reimbursement for those years.  Gross Dec. ¶¶ 47-48.  Moreover, once the 2008 financial crisis occurred, the risk of non-payment became acute, and in fact several foreign Defendants filed for bankruptcy protection.

IPP Counsel committed significant resources to the case and achieved an excellent result for the purported class in the face of the risk of the Court Orders granting Defendants' motion for judgment on the pleadings and motion to dismiss, the class certification process, and a contingent-fee agreement with their clients.

Likewise the AGs also committed significant resources to this case without any assurances of recovery.  The AGs collectively devoted over 77,000 hours to this case over five years and expended over $5.4 million in litigation expenses.  The AGs obtained an excellent result for those they represented.

**6.   A Lodestar Analysis Confirms That the Requested Fee is Reasonable.**

The Ninth Circuit typically cross-checks the reasonableness of the percentage of the recovery award by comparison to the lodestar time multiplier approach. *See, e.g., Vizcaino*, 290 F.3d at 1050 ("[c]alculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award"); *Heritage Bond*, 2005 WL 1594403, at *5.  The Ninth Circuit has held that 25% is the proper

benchmark for attorneys' fees in common fund cases, unless the circumstances of the case and the lodestar cross-check indicate that an upward or downward adjustment is appropriate. *In re Bluetooth Headset Prods. Liability Litig.*, 654 F.3d 935, 942 (9th Cir. 2011); *Vizcaino*, 290 F.3d at 1048; *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir.1989).

In this case, a cross-check confirms that the requested fee of 25% of the total Settlement Fund is quite reasonable and more than equitable to the classes.  IPP Counsel's lodestar incurred in representing the Class, at their historical rates, was approximately $64 million (Gross Dec. ¶ 47), and the attorneys' fees incurred by the AGs for work performed in this case, when calculated using the *Laffey* Matrix hourly rates, is approximately $31 million,[15] (Varanini Dec. ¶ 22), for a combined total lodestar of approximately $95 million. The requested fees of $77,680,000 produced by the percentage-of-the-recovery method is equivalent to lodestar with a negative multiplier of approximately 0.81.  Varanini Dec. ¶ 22; Gross Dec. ¶ 53.[16]  Courts routinely approve multipliers of several times the actual lodestar generated, including in this litigation, where the Court awarded a multiplier of 2.3 in approving Direct Purchaser Counsel's fees in excess of $80 million.  (Dkt. No. 1648); *In re*

---

[15] The *Laffey* Matrix is a "widely recognized compilation of attorney and paralegal rate data." *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp.2d 1039, 1067 (N.D. Cal. 2010), citing *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C.1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C.Cir.1984); *accord, Craigslist, Inc. v. Mesiab, et al.*, 2010 WL 5300883, at * 7 (N.D. Cal. Nov. 15, 2010) (James, MJ).  The *Laffey* matrix is regularly updated by the Civil Division of the United States Attorney's Office for the District of Columbia, and is often used to evaluate work "performed by a mix of senior, junior and mid-level attorneys, as well as paralegals." *Naturemarket*, 694 F. Supp. 2d at 1067; *see* http://www.justice.gov/usao/dc/divisions/Laffey_Matrix_2003-2013.pdf, visited June 27, 2013.  The *Laffey* matrix is particularly suited to determining prevailing local market rates for government or nonprofit attorneys who do not bill at market rates, because a "proxy for the market must be found in order to set a reasonable hourly rate." *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1519 (D.C. Cir. 1988), *citing Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 16 n.74 (D.C. Cir.1984), *overruled on other grounds* by *Hodel*.

[16]  If IPP Counsel's lodestar is calculated using their current rates (at least $79 million) (Gross Dec. ¶ 47), which is appropriate when a case has been prosecuted over a multi-year period to compensate counsel for delay in receiving payment for their work, *see In re Apollo Group Secs. Litig.*, 2012 U.S. Dist. LEXIS 55622, at *3 (D. Ariz. Apr. 20, 2012), the combined IPP and AG lodestar would be approximately $110 million, and the lodestar multiplier -- 0.7 – an even more negative multiplier (Gross Dec. ¶ 54), further supporting the requested 25% fee award.

*TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271 (N.D. Cal. Mar. 29, 2013) (multiplier of 2.4). It is well established that where there is a negative multiplier—a multiplier of less than one, as here—the fee award is reasonable. *See, e.g., Gong-Chun v. Aetna Inc.*, No. 1:09–cv–01995–SKO, 2012 WL 2872788, at *23 (E.D. Cal. July 12, 2012) (performing lodestar cross-check resulting in negative multiplier of .79 and therefore finding the fee award reasonable); *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 853–54 (N.D. Cal. 2010) (performing lodestar cross-check resulting in negative multiplier of .59 and therefore finding the fee award reasonable); *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *16 (N.D. Cal. Nov. 26, 2007) (finding that a negative multiplier suggests that "the requested percentage[-]based fee is fair and reasonable"). The fractional 0.81 multiplier in this case further demonstrates that the requested fee award of 25% of the total Settlement Fund is proper and reasonable.

### F. Reimbursement of Litigation Costs and Expenses is Fair and Reasonable

Costs incurred in litigation are reimbursable when they are necessary to furnish effective litigation. *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1372 (N.D. Cal. 1995). IPP Counsel and the AGs are entitled to a reimbursement of reasonable out-of-pocket expenses for litigation and settlement. *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 769 (9th Cir. 1977); *In re Quantum Health Res., Inc.*, 962 F. Supp. 1254, 1259 (C.D. Cal. 1997); *In re Brooktree Sec. Litig.*, 915 F. Supp. 193, 200 (S.D. Cal. 1996). The settlements negotiated by the IPP Counsel and the AGs are fair and equitable to the class and those represented by the AGs.

Expenses which may be reimbursed are "reasonable expenses that would typically be billed to paying clients in non-contingency matters." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1048 (N.D. Cal. 2007) (citing *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)). This includes, but is not limited to, reimbursement for expert fees, court fees, photocopying, telephone charges, postage charges, travel costs, computerized legal research costs, and technology expenses. *Media Vision*, 913 F. Supp. at 1367–71; *Spicer v. Chicago*

*Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1264 (N.D. Ill. 1993) (technology services). Reimbursable expenses also include expenses that become necessary because of some specialized issue in a case, such as the special master proceedings ordered here by the Court. (Dkt Nos. 1789, 2099, 2102 and 2126).

IPP Counsel are seeking $6,338,232 for reimbursement of out-of-pocket expenses, Gross Dec. ¶¶ 48-51, and the AGs are seeking $5,483,468.63 for reimbursement of out-of-pocket expenses. Varanini Dec. ¶ 23. All the out-of-pocket expenses devoted to this case by IPP Counsel and the AGs were reasonable and necessary to prosecute the case, and the expenditures were made for the direct benefit of the Settlement Class. In particular, here, the Special Master determined that representation of indirect-purchaser resellers in the allocation process was important to ensure that the interests of all market participants were adequately considered, and so the Special Master requested the participation of large resellers and appointed Reseller Allocation Counsel to work in conjunction with them. Accordingly, the fees and costs incurred by both Reseller Allocation Counsel and Celestica in their significant work in the allocation proceedings are properly treated as reimbursable expenses. Gross Dec. ¶¶ 41-42, 48-51.

### G. Payment of Incentive Awards to the Class Representatives is Appropriate.

IPP Counsel requests each of the ten *Petro* class representatives receive a payment of $5,000, and that the approximately 140 plaintiffs in the other state and federal cases that were coordinated with this action receive a payment of $500, for the time, effort, and service they have dedicated to this case. Courts often make incentive awards to class representatives for their service to the class, and for the risks they undertake on behalf of the class. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. MDL 3:07–md–1827 SI, 2013 U.S. Dist. LEXIS 51271, at **103-04 (N.D. Cal. Mar. 29, 2013) (approving incentive awards of $15,000 for each of the 40 court-appointed indirect-purchaser class representatives and $7,500 for each of the eight additional named plaintiffs); *In re Apple iPhone 4 Prods. Liability Litig.*, No. 5:10–md–2188 RMW, 2012 WL 3283432, at *5 (N.D. Cal. Aug. 10,

2012) (awarding incentive fee of $500 to each class representative); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. MDL 3:07–md–1827 SI, 2011 WL 7575003, at *2 (Dec. 27, 2011) (approving incentive awards of $15,000 for each of the 11 direct-purchaser class representatives "in recognition of their work performed for the benefit of the [c]lass and the risks undertaken"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.* (Direct Purchaser Actions), Master File No. M-02-1486-PJH, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) (Hamilton, J.); *Radcliffe v. Experian Info. Solutions,* 715 F.3d 1157 (9th Cir. 2013) (approving incentive awards as long as they are not conditioned on the class representative's approval of the settlement).

Here, each of the ten *Petro* class representatives provided key support to this litigation by responding to discovery requests, including both written discovery and production of documents, and regularly conferring with counsel.   Moreover, most *Petro* class representatives were also subjected to in-depth depositions by Defendants (one *Petro* class representative, although never deposed because he was added to the complaint after the Court's dismissal on AGC grounds, served an important role as a purchaser of stand-alone DRAM and was prepared to be deposed).  The approximately 140 plaintiffs in the other state and federal indirect-purchaser actions that were coordinated with this action, though they were not deposed and were not served with written discovery, provided support to the prosecution of these indirect-purchaser actions and represented the citizens of their respective states.  Gross Dec. ¶¶ 55-56.

## V.     CONCLUSION

For the foregoing reasons, the Court should award IPP Counsel and the AGs $77,680,000 in attorneys' fees, plus proportionate accrued interest, which represents 25% of the total Settlement Fund.   This fee is reasonable and fair in light of the complicated litigation in the case and the applicable Ninth Circuit law.   In addition, the Court should award $6,338,232 in reimbursement of expenses to IPP Counsel and $5,483,468.63 in reimbursement of expenses to the AGs, and an incentive award of $5,000 to each class

1   representative from the *Petro* complaint and $500 for each of the approximately 140

2   plaintiffs in the other state and federal IPP cases that were coordinated with this litigation.

3

4   Dated:  August 6, 2013                              Respectfully submitted,

5                                                     By: _/s/ Josef D. Cooper_

6

7   Daniel E. Gustafson                              Josef D. Cooper (53015)
    Daniel C. Hedlund                                Tracy R. Kirkham (69913)
8   GUSTAFSON GLUEK PLLC                             John J. Bogdanor (215830)
    Canadian Pacific Plaza                           COOPER & KIRKHAM, P.C.
9   120 South Sixth Street, Suite 2600               655 Montgomery Street, 17 Floor
    Minneapolis, MN 55402                            San Francisco, CA 94111
10  Telephone: (612) 333-8844                        Telephone: (415) 788-3030
    Facsimile: (612) 339-6622                        Facsimile:  (415) 882-7040
11  dgustafson@gustafsongluek.com                    jdc@coopkirk.com
    dhedlund@gustafsongluek.com
12
    Timothy Battin                                   Daniel J. Mogin (95624)
13  STRAUS & BOIES, LLP                              THE MOGIN LAW FIRM, P.C.
    4041 University Drive                            110 Juniper Street
14  5th Floor                                        San Diego, California 92101-1502
    Fairfax, VA 22030                                Telephone: (619) 687-6611
15  Telephone: (703) 764-8700                        Facsimile:  (619) 687-6610
    Facsimile: (703) 764-8704                        dmogin@moginlaw.com
16  tbattin@straus-boies.com
                                                     Co-lead Counsel for Indirect Purchaser
17                                                   Plaintiffs

18  Francis O. Scarpulla (41059)                     Terry Gross (103878)
    Craig C. Corbitt (83251)                         Adam C. Belsky (147800)
19  Christopher T. Micheletti (136446)               Monique Alonso (127078)
    Judith Zahid (215418)                            GROSS BELSKY ALONSO LLP
20  Qianwei Fu (242669)                              One Sansome Street, Suite 3670
    ZELLE, HOFMANN, VOELBEL, MASON                   San Francisco, California 94104
21  & GETTE LLP                                      Telephone:    (415) 544-0200
    44 Montgomery Street, Suite 3400                 Facsimile:    (415) 544-0201
22  San Francisco, CA 94104                          terry@gba-law.com
    Telephone:  (415) 693-0700
23  Facsimile:  (415) 693-0770
    ccorbitt@zelle.com
24                                                   Chair, Indirect Purchaser Plaintiffs'
                                                     Executive Committee
25  Liaison Counsel, Indirect Purchaser Plaintiffs

26

27

28

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS
FOR COSTS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAMALA D. HARRIS
Attorney General of the State of California
KATHLEEN FOOTE (65819)
Senior Assistant Attorney General
EMILIO E. VARANINI (163952)
Deputy Attorney General
455 Golden Gate Avenue, Ste. 11000
San Francisco, CA 94102
Telephone: (415) 703-5908
Facsimile: (415) 703-5480
E-mail:  emilio.varanini@doj.ca.gov

Attorneys for the State of California On
Behalf of All Attorneys General and All
Governmental Purchaser Class Plaintiffs

IPPS' AND AGS' JOINT APPLICATION FOR ATTORNEYS' FEES AND INDIVIDUAL APPLICATIONS
FOR COSTS