1  JOSEF D. COOPER (53015)
   TRACY R. KIRKHAM (69912)
2  COOPER & KIRKHAM, P.C.
   357 Tehama Street, Second Floor
3  San Francisco, CA  94103
   Telephone: (415) 788-3030
4  Facsimile:  (415) 882-7040
   E-mail:  jdc@coopkirk.com
5  Co-Lead Counsel for Indirect-Purchaser Plaintiffs

6  KAMALA D. HARRIS
   Attorney General of the State of California
7  KATHLEEN FOOTE (65819)
   Senior Assistant Attorney General
8  EMILIO E. VARANINI (163952)
   455 Golden Gate Avenue, Ste. 11000
9  San Francisco, CA 94102
   Telephone: (415) 703-5908
10 Facsimile:  (415) 703-5480
   E-mail:  Emilio.Varanini@doj.ca.gov
11 Attorneys for the State of California On Behalf of All Attorneys General

12

13                    **UNITED STATES DISTRICT COURT**

14                    **NORTHERN DISTRICT OF CALIFORNIA**

                           **OAKLAND DIVISION**
15

16 | In re DYNAMIC RANDOM ACCESS | ) | Case No. M-02-1486-PJH |
   | MEMORY (DRAM) ANTITRUST | ) | MDL No. 1486 |
   | LITIGATION | ) | |

17 _____  )  **INDIRECT PURCHASER PLAINTIFFS**
                                )  **AND ATTORNEYS GENERAL'S JOINT**
18 This Document Relates to:    )  **MOTION FOR FINAL APPROVAL OF**
                                )  **PLANS OF DISTRIBUTION; RESPONSES**
   ALL INDIRECT PURCHASER ACTIONS )  **TO OBJECTIONS TO PROPOSED**
19                               )  **DISTRIBUTION AND FOR FINAL**
   and                          )  **ADOPTION OF RELEVANT FINDINGS**
20                              )  **IN SPECIAL MASTER'S REPORT AND**
   *State of California et al. v. Infineon* )  **RECOMMENDATIONS, PARTS I & II**
21 *Technologies AG, et al.*     )
                                )
   *State of New York v. Micron Technology Inc., et* )  Hearing Date:  June 25, 2014
22 *al.*                         )  Time: 9:00
                                )  Courtroom: 3
23                              )  The Honorable Phyllis J. Hamilton
                                )  The Honorable Charles B. Renfrew (ret.)
24                              )      Special Master
                                )
25                              )
                                )  Case No. C 06-4333 PJH
26                              )
                                )  Case No. C 06-6436 PJH
27 _____  )

28

_____

| | |
|---|---|
| *State of California et al. v. Samsung Electronics Co., Ltd., et al.* | Case No. C 07-1347 PJH |
| *State of California et al. v. Winbond Electronics Co.* | Case No. C 07-2589 PJH |
| *Petro Computer Systems, Inc. v. Hitachi, Ltd.* | Case No. C 12-5213 PJH |
| *Petro Computer Systems, Inc. v. Mitsubishi Electric Corporation, et. al.* | Case No. C 12-5214 PJH |
| *Petro Computer Systems, Inc. v. Toshiba Corporation, et. al.* | Case No. C 12-5215 PJH |
| *State of California et al., v. Toshiba Corporation et al.,* | Case No. C 12-5230 PJH |
| *State of California et al., v. Mitsubishi Electric Corporation, et. al.* | Case No. C 12-5229 PJH |
| *State of California et al., v. Hitachi, Ltd.* | Case No. C 12-5231 PJH |

## **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................1

II.    THE STANDARDS FOR FINAL APPROVAL OF A PLAN OF DISTRIBUTION........3

III.   THE PROPOSED *PRO RATA* DISTRIBUTION IS A FAIR, REASONABLE
       AND ADEQUATE MENS OF PROVIDING SETTLEMENT BENEFIT
       TO THE INDIRECT PURCHASER SETTLEMENT CLASS ..........................................8

IV.    THE PROPOSED *CY PRES* ASPECTS OF THE DISTRIBUTION ARE
       FAIR, REASONABLE AND ADEQUATE MEANS OF PROVIDING
       SETTLEMENT BENEFIT TO THE INDIRECT PURCHASER
       SETTLEMENT CLASS ........................................................................................12

       A.  The $50 Million Cap Contingency *Cy Pres* Distribution .............................12
       B.  The Residual Contingency *Cy Pres* Distribution........................................16

V.     IT IS NOT NECESSARY TO DETERMINE THE IDENTITY OF
       THE CONTINGENT *CY PRES* RECIPIENTS IN ORDER TO GRANT FINAL
       APPROVAL TO THE PLAN OF DISTRIBUTION OR THE SETTLEMENTS ............18

VI.    CONCLUSION........................................................................................................23

i

JOINT MOTION FOR FINAL APPROVAL OF PLANS OF DISTRIBUTION AND ADOPTION OF SPECIAL
MASTER'S FINDINGS – CASE NO. M-02-1486-PJH

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Case Authority:</u>

3

4

*Abood v. Detroit Bd. Of Ed.*
431 U.S. 209 (1977)..................................................................................................23

5

6

*Arthur v. Microsoft Corp.*
267 Neb. 586; 676 N.W.2d 29 (Neb. 2004)...........................................................10

7

*Ciardi v. F. Hoffmann-La Roche, Ltd.*
436 Mass. 53; 762 N.E.2d 303 (Mass. 2002)........................................................10

8

9

*Davenport v. Washington Ed. Assn.*
551 U.S. 177 (2007)..................................................................................................23

10

11

*Dennis v. Kellogg Co.*
697 F.3d 858 (2012)..........................................................................................18, 19

12

13

*Dunleavy v. Nadler (In re Mego Fin. Corp. Sec. Litig.)*
213 F.3d 454 (9th Cir. 2000) .....................................................................................3

14

15

*Hammon v. Barry*
752 F. Supp. 1087 (D.D.C. 1990) ...........................................................................3

16

*Illinois Brick Co. v. Illinois*
431 U.S. 720 (1977)...........................................................................................8, 9, 10

17

18

*In re Agent Orange Prod. Liab. Litig.*
818 F.2d 179 (2d Cir. 1987)......................................................................................4

19

20

*In re Airline Ticket Commission Antitrust Litig.*
953 F. Supp. 280 (D. Minn. 1997).........................................................................11

21

22

*In re Baby Prods. Antitrust Litig.*
708 F.3d 468 (5th Cir. 2011) ............................................................................16, 22

23

*In re Bankamerica Cop. Se. Litig.*
210 F.R.D. 694 (E.D. Mo. 2002) .............................................................................9

24

25

*In re Brand Name Prescription Drugs Antitrust Litig.*
No. 94 C 897, 1999 U.S. Dist. LEXIS 12936, 1999 WL 639173 (N.D. Ill. Aug. 17, 1999).........11

26

27

28

ii

JOINT MOTION FOR FINAL APPROVAL OF PLANS OF DISTRIBUTION AND ADOPTION OF SPECIAL
MASTER'S FINDINGS – CASE NO. M-02-1486-PJH

*In re Cendant Corp. Sec. Litig.*
109 F. Supp. 2d 235 (D.N.J. 2000), *aff'd,* 264 F.3d 201 (3d Cir.),
*cert. denied,* 535 U.S. 929 (2002) ...............................................................3

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*
216 F.R.D. 197 (D. Me. 2003) ............................................................11, 17

*In re Computron Software, Inc. Sec. Litig.*
6 F.Supp.2d 313 (D.N.J. 1998) ..........................................................3

*In re Corrugated Container Antitrust Litig.*
556 F. Supp. 1117 (S.D. Tex. 1982), *aff'd,* 687 F.3d 52 (5th Cir. 1982) ......................11

*In re Exxon Valdez*
No. A89-0095 (HRH), 1996 U.S. Dist. LEXIS 8173 (D. Alaska, June 11, 1996) ...................5

*In re Global Crossing Sec. & ERISA Litig.*
225 F.R.D. 436 (S.D.N.Y. 2004) ........................................................4

*In re Heritage Bond Litig.*
NDL No 1475, 2005 U.S. Dist. LEXIS 13555 (C.D. Cal. 2005)...................................4, 9

*In re Lucent Tech, Inc. Sec. Litig.*
307 F. Supp. 2d 633 (D.N.J. 2004) .....................................................3

*In re Marsh ERISA Litig.*
265 F.R.D. 128 (S.D.N.Y. 2010) ........................................................4

*In re Mexico Money Transfer Litigation*
164 F. Supp. 2d 1002 (N.D. Ill. 2000)
*aff'd,* 264 F.3d 743 (7th Cir. 2001) .....................................................18

*In re Microsoft I-V Cases*
135 Cal.App.4th 706 (2006) ..........................................................18

*In re NCO Fin. Sys.*
2002 U.S. Dist. LEXIS 17602 (E.D. Pa. 2002) ..............................................17

*In re Oracle Se. Litig.*
1994 U.S. Dist. LEXIS 21593 (N.D. Cal 1994) ..............................................9

*In re Packaged Ice Antitrust Litig.*
2011 U.S. Dist. LEXIS 15-0427, (E.D. Mich. Dec. 13, 2011) ...................................11

*In re Paine Webber Ltd. Partnerships Litig.*
171 F.R.D. 104 (S.D.N.Y. 1977) ......................................................3, 4

iii

*In re Relafen Antitrust Litig.*
231 F.R.D. 52 (D. Mass. 2005)............................................................................9, 10

*In re Remron Direct Purchaser Antitrust Litig.*
No. 03-0085 FSH, 2005 WL 3008808 (D.N.J. Nov. 9, 2005).........................................3

*In re Remron End-Payor Antitrust Litig.*
No. 02-2007 FSH, 2005 WL 2230314 (D.N.J. Sept. 13, 2005).....................................3

*In re Toys-R-Us Antitrust Litig.*
191 F.R.D. 347 (S.D.N.Y. 2000)..............................................................................18

*In re Vitamins Cases*
107 Cal.App.4th 820 (2003)...................................................................................18

*In re Warfarin Sodium Antitrust Litigation*
212 F.R.D. 231 (E.D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004)..........................3

*Knox v. Service Employees Intern. Union, Local 1000*
132 S. Ct. 2277 (2012)..........................................................................................23

*Kowalski v. Tesmer*
543 U.S. 125 (2004)..............................................................................................23

*Klier v. Elf Atochem North America, Inc.*
658 F.3d 468 (5th Cir. 2011)..................................................................................16

*Law v. NCAA*
108 F. Supp. 2d 1193 (D. Kan. 2000)........................................................................4

*Maley v. [Del Global Techs. Corp.]*
186 F. Supp. 2d 358 (S.D.N.Y. 2002)........................................................................4

*Nachshin v. AOL, LLC*
663 F.3d 1034 (9th Cir. 2011).......................................................................3, 15, 16

*Rodriguez v. West Publ. Corp.*
2007 U.S. Dist. LEXIS 74767 (C.D. Cal. Sept. 10, 2007)
*aff'd in part and rev on other grounds by Rodriguez v. West Publ'g Corp.*
563 F.3d 948 (9th Cir. 2009)......................................................................17, 20, 23

*State of California v. Infineon Techs. AG*
531 F. Supp. 2d 1124 (N.D. Cal. 2007)....................................................................10

JOINT MOTION FOR FINAL APPROVAL OF PLANS OF DISTRIBUTION AND ADOPTION OF SPECIAL
MASTER'S FINDINGS – CASE NO. M-02-1486-PJH

*Sullivan v. DB Invs., Inc.*
667 F.3d 273 (3d Cir. 2011), (*en banc), cert denied sub nom.*
*Murray v. Sullivan* 132 S. Ct. 1876 (Apr. 2, 2012)............................................................4, 10, 14, 16

*Walsh v. Great Atl. & Fac. Tea Co., Inc.*
726 F.2d 956 (3d Cir. 1983)................................................................................................................4

*Warth v. Seldin*
422 U.S. 490 (1997)............................................................................................................................23

*Woodley v. Maynard*
430 U.S. 705 (1977)................................................................................................................19, 22

**Statutory Authority:**

Federal Rule of Civil Procedure, Rule 53(f)..............................................................................2, 5

Massachusetts Consumer Protection Statute, §9 ........................................................................10

JOINT MOTION FOR FINAL APPROVAL OF PLANS OF DISTRIBUTION AND ADOPTION OF SPECIAL
MASTER'S FINDINGS – CASE NO. M-02-1486-PJH

## I.   INTRODUCTION

On January 17, 2014, this Court granted the joint motion of the Indirect Purchaser Plaintiffs and the Attorneys General to conditionally adopt the findings of fact, conclusions of law and recommendations of the Special Master regarding the plans of distribution of the settlement proceeds and the protocols for processing claims to the settlement funds.  "Order Granting Preliminary Approval of Joint Settlements, Conditionally Certifying Settlement Classes, Adopting Special Master's Report and Recommendations, Parts I & II, Disseminating Notice To the Settlement Classes, and Scheduling Fairness Hearing," filed January 17, 2014, Dkt. No. 2174 ("Preliminary Approval Order").  The Preliminary Approval Order also scheduled a hearing for 9:00 AM on June 25, 2014, at which time the Court would entertain any objections raised by class members to, *inter alia*, the plans of distribution and the claims processing protocols.

The Indirect Purchaser Plaintiffs and the Attorneys General hereby move this Court for an order finally adopting the relevant findings of the Special Master and directing that the recommended plans of distribution and claims processing protocols be implemented upon the finality of the settlements.  This motion is based on the facts and legal analysis and conclusions set forth in the relevant sections of the "Report And Recommendations Of Special Master, Part I: Settlement Class Certifications And Plans Of Allocation And Distribution Of The Settlement Proceeds To The Settlement Classes," filed January 8, 2013, Dkt. No. 2132, (hereinafter cited as "Report, Part I, at ___"), the Appendix thereto, Dkt. Nos. 2133 - 2144, the "Report And Recommendations Of Special Master, Part II: Notice Programs, Claims Procedures and Processing," filed June 24, 2013, Dkt. No. 2146, (hereinafter cited as "Report, Part II, at ___"), and the Appendix thereto, Dkt. No. 2147, this memorandum, "Indirect Purchaser Plaintiffs' and Attorneys General's Joint Motion for Final Approval and Responses to Objections to Final Approval of Settlements, Certification of Settlement Classes and for Final Adoption of the Special Master's Report and Recommendations, Part I," filed June 4, 2014, Dkt. No. 2214, (hereinafter cited as **"**Memorandum re Settlement Approval at ___"), the motion for preliminary approval of

the plans of distribution, Dkt. No. 2265, and all of the records in this litigation.

This memorandum will address the objections that are directed to aspects of the proposed plan of distribution for the Indirect Purchaser Settlement Class.  Six objections were filed to the proposed plan on behalf of a total of thirteen members of the Indirect Purchaser Settlement Class. No objection was lodged to the claims processing protocols for the Indirect Purchaser Settlement Class[1] or to the plans of distribution recommended by the Special Master for the Government Purchaser Settlement Classes.  Therefore, the Court's conditional adoption of the Report and Recommendation, Parts I and II, as to the plans of distribution to the Government Classes and the claims protocols for the Indirect Purchaser Settlement Class should be deemed finally adopted.  *See* Fed. R. Civ. P. 53(f).

All of the objections to the Indirect Purchaser Settlement Class's plan of distribution raise issues that were previously addressed by the parties before the Special Master and were thoroughly covered by the Special Master's findings of fact and conclusions of law.  None of the objections presents a new matter for consideration by the Court.  Although there are six objections, there are only two aspects of the distribution plan at issue.  All of the objections argue that the plan of distribution is unfair because: (1) it will pay claims on a *pro rata* basis without regard to the state in which a claimant resides; and/or (2) it contains contingency *cy pres* provisions.

As noted in the Memorandum re Settlement Approval, fixing a plan for distributing the settlement proceeds to class members is distinct from the decision to grant final approval to a settlement and dismiss the claims against the defendants.  The principle issue for settlement approval—a comparison of the settlement consideration against the risks of proceeding to trial—is replaced in fixing a plan of distribution, with the goal of achieving a disbursement methodology that fairly balances the interests and concerns of class members within a framework that is

---

[1]   Claims processing protocols refers to the form of the claim forms, the nature of the information solicited thereby, as well as the methodology for converting the DRAM content of various DRAM-containing devices into a standard unit in order to effectuate the *pro rata* distribution.

understandable, transparent, practical and cost-effective.

## II.      THE STANDARDS FOR FINAL APPROVAL OF A PLAN OF DISTRIBUTION

As covered in the Report, Part I, at ¶ 263, approval of plans of allocation and distribution of a settlement fund in a class action is governed by the same standards applicable to approval of the settlement as a whole—namely, allocation and distribution plans must be fair, adequate and reasonable.  *In re Lucent Tech., Inc. Sec. Litig.*, 307 F.Supp.2d 633, 649 (D.N.J. 2004) (quoting *In re Computron Software, Inc. Sec. Litig.,* 6 F.Supp.2d 313, 321 (D.N.J. 1998)); *see also In re Remron End-Payor Antitrust Litig.,* No. 02-2007 FSH, 2005 WL 2230314, at *25 (D.N.J. Sept. 13, 2005).   However, district courts enjoy broad supervisory powers over the administration of class action settlements to allocate the proceeds among the claiming class members equitably.  *Dunleavy v. Nadler (In re Mego Fin. Corp. Sec. Litig.)*, 213 F.3d 454 (9th Cir. 2000); *see also Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011).); *In re Remron Direct Purchaser Antitrust Litig.*, No. 03-0085 FSH, 2005 WL 3008808, at *11 (D.N.J. Nov. 9, 2005) (quoting *Hammon v. Barry,* 752 F. Supp. 1087, 1095 (D.D.C. 1990).

Moreover, by any objective measure, "a Plan of Allocation need not be, and cannot be, perfect."  *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 272 (D.N.J. 2000), *aff'd*, 264 F.3d 201 (3d Cir.), *cert. denied*, 535 U.S. 929 (2002).  Neither need, nor can, a plan of distribution be optimal from the perspective of each and every individual potential claimant.  In many cases, if not in most cases, perfection to everyone's satisfaction is unattainable.  *In re Warfarin Sodium Antitrust Litigation*, 212 F.R.D. 231, 258 (E.D. Del. 2002), *aff'd*, 391 F.3d 516, 534 (3d Cir. 2004).  As the Special Master concluded, "In designing a plan of distribution for a settlement such as this involving a large number of different products and millions of class members, a delicate balance must be achieved between precision and administrative feasibility."  Report, Part I, at ¶ 266, citing *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104,135 (S.D.N.Y. 1977) ("Efficiency, ease of administration and conservation of public and private resources are highly relevant in the reasonableness of a settlement.").

In light of these standards, "[a] district court's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.' *Walsh v. Great Atl. & Pac. Tea Co., Inc*., 726 F.2d 956, 964 (3d Cir. 1983)." *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 326 (3d Cir. 2011) (*en banc), cert. denied sub nom. Murray v. Sullivan,* 132 S. Ct. 1876 (Apr. 2, 2012) (hereinafter, "*Sullivan*").

This Court can give great weight to the fact that this plan of distribution was arrived at by negotiation and agreement of counsel familiar with the litigation under the supervision of the Special Master.  Many courts have held that the experience of the counsel who formulated the distribution plan was a significant factor in determining that the plan of distribution represents a fair, reasonable and adequate allocation and distribution of the settlement proceeds.  As noted by the district court in *In re Marsh ERISA Litig.,* 265 F.R.D. 128, 145-46 (S.D.N.Y. 2010):

> A district court has broad supervisory powers with respect to allocating a class action settlement and wide latitude in determining what to consider in approving a settlement allocation.  *In re Agent Orange Prod. Liab. Litig*., 818 F.2d 179, 181 (2d Cir. 1987).  "When formulated by competent and experienced class counsel, an allocation plan need have only a 'reasonable, rational basis.'"  *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 462 (S.D.N.Y. 2004).  In determining whether a plan of allocation is fair, courts give substantial weight to the opinions of experienced counsel.  *See In re PaineWebber Ltd. P'ships. Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997).

In *Law v. NCAA,* 108 F. Supp. 2d 1193, 1196 (D. Kan. 2000), the district court found that the case law indicates that "[t]he adequacy of an allocation plan ordinarily 'turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information.'  (Citation omitted)."  Other cases relying on the competence of the counsel proposing the plan of distribution as grounds for a finding of fairness and adequacy include: *In re Heritage Bond Litig.,* MDL No. 1475, 2005 U.S. Dist. LEXIS 13555, at *38-39 (C. D. Cal. 2005) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel.");  *Maley v. Del Global Techs. Corp.,* 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002) ("The proposed Plan of Allocation, which was devised by experienced plaintiffs' counsel who are familiar with the relative strengths and

4

weaknesses of the potential claims of Class members, satisfies the same standards of fairness, reasonableness, and adequacy that apply to the overall settlement"); *In re Exxon Valdez*, No. A89-0095 (HRH), 1996 U.S. Dist. LEXIS 8173, at *5 (D. Alaska, June 11, 1996) ("In light of the experience and views of counsel and the zeal with which they represent their clients, the court is satisfied that the Plan of Allocation is in the best interests of plaintiffs.").

In particular, the proposed plan of distribution before this Court was negotiated under the auspices of the Special Master between Indirect Purchaser Plaintiffs' Co-Lead Counsel and Leadership Group, the Attorneys' General's Co-Lead Counsel, Resellers' Allocation Counsel and Counsel for Indirect Purchaser Settlement Class member, Celestica. The involvement of these counsel is an important factor here, as the Special Master found. Report, Part I, at ¶ 213. The major groups of alleged victims in this case were resellers, large-purchasing end users and household consumers. Though household consumers were by far the largest numerical group, on an individual basis, they each purchased far fewer computers, other DRAM-containing products, or DRAM module upgrades during the class period than did resellers or large business end users.

One of the principal issues in the negotiations was the amount of the overcharge that the reseller class members had passed-on to the end-user class members.[2] Report, Part I at ¶ 232. The litigation class proposed for certification by Indirect Purchaser Plaintiffs' Co-Lead Counsel and Leadership Group had been limited to end-users, and during the course of the litigation, these counsel had advanced the position that 100% of the overcharges allegedly imposed by defendants were passed on to end-users by resellers and others down the chain of distribution. *Id.* at ¶ 236. Although there would have been nothing wrong with the Special Master appointing one of those counsel to represent the resellers' interests to look at the pass-on issue from the perspective of resellers, the parties felt that it was preferable to find counsel for the resellers who had not previously been involved with the litigation.

---

[2]   No objection has been interposed to the treatment of resellers and end-users vis-à-vis one another in the proposed Plan of Distribution. Thus, this aspect of the distribution plan as recommended by the Special Master should be deemed adopted. *See* Fed. R. Civ. P. 53(f).

Accordingly, the Special Master first solicited representation for resellers directly from their ranks.  The only reseller willing to invest its counsel's efforts was Celestica, a specialty reseller that bought DRAM chips and modules and assembled computer products for sale to large OEMs.  *Id.* at ¶ 207.   Because it was felt that the general reseller group needed broader representation than could be offered by Celestica's counsel, the Special Master appointed Berman DeValerio as Resellers' Allocation Counsel.  *Id.* at ¶ 209.   For the purposes of negotiating the pass-on issue, the interests of all end-users, whether large purchasers and small, corporate or corporeal, were aligned and were represented by Indirect Purchaser Plaintiffs' Leadership Group and the Attorneys' General.

Under the auspices of the Special Master, and armed with extensive economic data and expert analysis regarding market structure and the pricing decisions affecting the passing on of damages down the chain of distribution, these groups of alleged victims hammered out a single pot *pro rata* distribution plan.  Report, Part I, at ¶¶ 270-271.  This plan recognized that quantifying pass-on damages was difficult and subject to endless second-guessing, and that claimants who purchased large quantities of DRAM should receive more than claimants who purchased small amounts.[3] . This aligned the interests of all large quantity purchasers, whether they be resellers like Best Buy or end-users like Bank of America.  In addition to crafting a plan that was consistent with the economic data, the representatives of these different groups had to balance non-economic concerns, including that: (a) household consumers in the aggregate have the single largest number of claims and could swamp the entire distribution should they file in unprecedentedly large numbers; (b) however, conversely, this is the group least likely to actually file for a refund, so a significant swath of the Indirect Purchaser Class could potentially receive no direct compensation should only a small number of household consumer claims be filed; and (c) due to the small

---

[3]  *See,* "Declaration of Josef D. Cooper in Support of Indirect Purchaser Plaintiffs' and Attorneys General's Join Motion for Final Approval of Plans of Distribution and for Final Adoption of Relevant Findings in Special Master's Report & Recommendations, Parts I & II," dated June 6, 2014 (hereinafter referred to as "Cooper Decl. at ¶__") at ¶ 4, and the "Declaration of Emilio E. Varanini in Support of Indirect Purchaser Plaintiffs and Attorneys General's Joint Motion for Final Approval of Plans of Distribution and for Final Adoption of Relevant Findings in Special Master's Report & Recommendations, Parts I & II," dated June 6, 2014 (hereinafter referred to as "Varanini Decl. at ¶__") at ¶ 4.  These Declarations are being filed concurrently with this memorandum.

JOINT MOTION FOR FINAL APPROVAL OF PLANS OF DISTRIBUTION OF SETTLEMENT PROCEEDS AND ADOPTION OF SPECIAL MASTER'S FINDINGS – CASE NO. M-02-1486-PJH

number of modules and DRAM-containing products purchased by individual household consumers, a pure *pro rata* distribution might result in many of these individuals receiving checks so small that it would not be worth their time either to file claims in the first instance, or to cash the checks that they would receive.  Cooper Decl. at ¶ 8; Varanini Decl. at ¶ 8.  To resolve those issues, counsel agreed, based on the economic data, to establish maximum and minimum dollar amounts of the settlement funds that would be dedicated for the benefit of small claimants, generally consumer households, either through a direct cash payments and/or through a *cy pres* distribution.  Cooper Decl. at ¶ 9; Varanini Dec. at ¶ 9.  In addition, counsel agreed that if the raw *pro rata* share of any claimant was less than $10.00, that claimant's share would be raised to $10.00.  *See* Report, Part I, at ¶ 276.  Counsel for all of the various constituencies agreed that this plan was fair and reasonable.[4]  *Ibid.*  As the Special Master correctly found, "the selection of a distribution method or plan does not require that all other possible means of distributing the settlement funds be rejected as inadequate or unreasonable, only that the method that is selected by the parties and the court be fundamentally fair and practicable."  Report, Part I, at ¶ 267.

---

[4]   Objectors Norman Palmer and Estate of Fern Cook have interposed a general objection to the plan of distribution, couched as an objection to "the settlement," based on an erroneous reading of the Special Master's description of these negotiations.  First, Palmer and Cook assert that "[l]arge corporations within the reseller subgroup were . . . represented by their own counsel during the settlement negotiations."  "Objections to Proposed Settlement and Notice of Intent to Appear," filed May 5, 2014 (Dkt. No. 2201) at 3, (hereinafter cited as "Palmer Objection at ___").  This statement is wrong on two counts.  First, all of the settlements were negotiated by Indirect Purchaser Plaintiffs' Leadership Group and the Attorneys' General's Co-Lead Counsel.  Neither Resellers' Allocation Counsel nor counsel for Celestica played any role in those negotiations.  Second, as to the plan of distribution negotiations, all resellers from large corporations to individual mom and pop proprietorships were represented by the Allocation Counsel appointed by the Special Master.  Only Celestica participated through its own counsel.  Then, Palmer and Cook claim that "attorneys general from various states provided separate representation for many Class Members."  *Ibid.*  This statement is vaguely correct and rather innocuous until Palmer and Cook couple it with their ultimate assertion that "individual purchasers did not have separate counsel representing their interest" and therefore the "settlement is presumptively unfair."  *Ibid.*  As described above, at all times, the interests of *all* "individual purchasers," by which plaintiffs assume that Palmer and Cook mean household consumers, were fully represented and vigorously advanced by counsel for the Indirect Purchaser Plaintiffs and the Attorneys General.

### III.  THE PROPOSED *PRO RATA* DISTRIBUTION IS A FAIR, REASONABLE AND ADEQUATE MEANS OF PROVIDING SETTLEMENT BENEFIT TO THE INDIRECT PURCHASER SETTLEMENT CLASS

Two of the objectors to the certification of the Indirect Purchaser Settlement Class advance the exact same *Illinois Brick* argument again in opposition to the plan of distribution—that the Settlement Class contains persons and entities who will be compensated under the plan for their purchases of DRAM and DRAM-containing products despite the fact that, according to objectors, they have no colorable claims because they reside in states whose courts construe their antitrust laws in accordance with the United States Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ("*Illinois Brick*").[5]

Neither of these objections presents even a reasonably compelling argument for the fairness of a weighted or tiered settlement distribution, let alone demonstrates that a failure to weight class members' settlement recoveries renders the recommended plan fundamentally unfair and inadequate.  As discussed in detail in the Memorandum re Settlement Approval, this objection is predicated on a misunderstanding of the claims at issue here and a misreading of *Illinois Brick*.  For, example, objector Marlow repeatedly makes the bald assertion that the recommended plan will pay people "whose states do not even permit them to file suit" without suggesting an alternative.  Marlow Objection at 10.[6]   That assertion is not correct.  Every member of the Indirect Purchaser Settlement Class is settling multiple colorable claims, including identical claims for ancillary monetary relief under the Sherman Act and damages under the Cartwright Act.  *See,* Memorandum re Settlement Approval at 5-16.

///

---

[5]  See, "Objection to Class Certification, Plan of Allocation and Attorney's Fees," dated May 5, 2014, Dkt. No. 2199, at 6-7 (hereafter cited as "Cochran Objection at ___");  "Notice Of Objection, Intention To Appear And Request To Be Heard," dated May 5, 2014, Dkt. No. 2204, at 2, 10-11 (hereinafter cited as "Marlow Objection at ___").

[6]  It is not clear from Marlow's objection whether he is advocating that this alleged inequity could be cured by an unequal distribution of the settlement proceeds that favors residents of *Illinois Brick* repealer states over those of non-repealer states, or whether he believes that the only fair distribution would give nothing at all to non-repealer state residents.

Objector Cochran makes the same *Illinois Brick* based objection to the plan, but, unlike Marlow, urges an alternative distribution that she contends would be fair.  After citing a number of cases in which there were weighted distributions, Cochran concludes that this Court should adopt an "allocation of the Settlement Fund in this case . . . [that] follow[s] a grid similar to the one set forth in *[In re] Relafen [Antitrust Litig.*, 231 F.R.D. 52,65 (D. Mass. 2005)], which tracked the differences among the various state's antitrust and consumer protection laws."  Cochran Objection at 6-7.  However, none of the weighting protocols in the cases on which she relies accomplish her stated purpose of having a system that pays more to *Illinois Brick* repealer state residents.  Three of the four cases cited by Cochran—*In re Heritage Bond Litig.*, 2005 U.S. Dist. LEXIS 13555 (C.D. Cal. 2005), *In re Bankamerica Corp. Sec. Litig.*, 210 F.R.D. 694 (E.D. Mo. 2002) and *In re Oracle Sec. Litig.*, 1994 U.S. Dist. LEXIS 21593 (N.D. Cal. 1994)— are not even antitrust cases.  They are securities cases that appear to have implemented weighted distribution plans tied to evidence that securities purchasers during certain time periods suffered greater injury than others.  Whatever the basis in those cases was for determining that some claims were "stronger" than others, it was not residence in an *Illinois Brick* repealer or non-repealer state.

The case chiefly relied upon by Cochran is *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 65 (D. Mass. 2005).  While *Relafen* is an antitrust case in which a weighted refund plan was adopted for a settlement class, it is not authority for dividing the Indirect Purchaser Settlement Class here into the repealer vs. non-repealer resident groups for which Cochran appears to be arguing.  First, *Relafen* did not arise in a comparable situation to this litigation, where all class members have a unitary claim under a single law, i.e., under the California Cartwright Act or under the Sherman Act for ancillary restitutionary relief flowing from an injunction.  Moreover, it appears that the basis for the tiered recovery adopted by the District Court in *Relafen* pertains far more to the underlying facts concerning pharmaceutical purchases than simply to the *Illinois Brick* repealer issue.  For example, the weighting given to the claims of residents of repealer states in *Relafen*, range from a high of 90% for residents of Hawaii alone, to a low of 9.2% for residents of Alabama, Kansas,

9

Mississippi, New Hampshire, Oregon and Utah.  This weighting would be patently unfair here, when the residents of Hawaii, Mississippi, Oregon, Utah, and (for the Samsung/Winbond settlements) New Hampshire are represented in this case not only by Class Counsel but also *parens patriae* by the Attorneys General of those States.  In contrast, in *Relafen*, residents of Massachusetts, Nebraska, and West Virginia, all of whom have been considered non-repealer states at various times,[7] had their claims weighted at 82.5%.  The critical factor in the *Relafen* weighting scheme, and the reason that Hawaii claimants were paid at a higher rate than any others, was each state's pharmaceutical consumer protection statutes, not its antitrust laws.  Accordingly, there is nothing about the *Relafen* weighting scheme that recommends its adoption here.

The first appellate court to consider the question of whether the *Illinois Brick* repealer vs. non-repealer state dichotomy requires a weighted or tiered recovery plan as a matter of law or fundamental fairness was the Third Circuit sitting *en banc* in *Sullivan*, *supra*, which was handed down after *Relafen*.  That Court concluded that neither law nor fundamental fairness mandates a weighted recovery based on perceived strength of state law claims.  *Sullivan, supra,* 667 F.3d 273, 327-328.  No federal court has disagreed before or since.  First, the *Sullivan* Court observed that "only by engaging in the type of fact-intensive merits and choice-of-law analyses that we have rejected could a district court attempt to assay the 'varying strengths and weaknesses' of asserted state claims." *Id*. at 328.  The Third Circuit also noted that in *Sullivan*, like here, "each putative

---

[7]   These States provide a good example of another reason why a weighted distribution can be problematical. It is not always easy to classify a state as repealer or non-repealer, and such classification may over time be fluid.  For example, before settling here, the defendants raised the argument that Illinois Brick barred claims under West Virginia's antitrust laws.  *State of California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1154 (N.D. Cal. 2007)  This Court found that West Virginia was a repealer state by virtue of an Attorney General promulgated rule.  *Id.*, at 1154. While Massachusetts antitrust law is construed to apply *Illinois Brick* to damage claims, in *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 436 Mass. 53, 762 N.E.2d 303, 309, 321 (Mass. 2002), the Massachusetts state court allowed individuals who were indirect purchasers of vitamin products to sue for anticompetitive conduct under § 9 of the Massachusetts consumer protection statute.  The same is true of Nebraska.  *Arthur v. Microsoft Corp.*, 267 Neb. 586, 676 N.W.2d 29, 37-38 (Neb. 2004). All of these states and their residents are in this litigation, and consumers there are represented both by Class Counsel and their Attorneys General acting in *parens patriae*.  The difficulty of classifying states by the applicability of *Illinois Brick* as a bar to indirect purchaser damages was another factor that weighed in favor of adopting a *pro rata*, single pot plan of distribution here.

JOINT MOTION FOR FINAL APPROVAL OF PLANS OF DISTRIBUTION OF SETTLEMENT PROCEEDS AND ADOPTION OF SPECIAL MASTER'S FINDINGS – CASE NO. M-02-1486-PJH

class member suffered the same alleged injury as a result of [defendants'] anticompetitive conduct, irrespective of the vagaries of applicable state laws. Recognizing this, the plan of allocation here 'adjust[s] diamond purchases to a common measure,' allowing an 'apples to apples' comparison 'of the relative amount of damages suffered by various claimants within the classes and subclasses and permits distribution pro rata based on the relative amounts of damages suffered.'" *Ibid*.

Many courts have approved distribution plans, such as the one recommended here, that strive to the maximum extent practicable to treat all class members alike.  For example, in *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 1999 U.S. Dist. LEXIS 12936 (N.D. Ill. Aug. 17, 1999), the court approved a *pro rata* distribution in a case involving class member pharmacies of all sizes, ranging from small, independent pharmacies to large chain pharmacies, including CVS, Walgreens and Walmart.  *See also, e.g., In re Packaged Ice Antitrust Litig.*, 2011 U.S. Dist. LEXIS 150427, (E.D. Mich. Dec. 13, 2011); *In re Airline Ticket Commission Antitrust Litig.*, 953 F. Supp. 280, 284-85 (D. Minn. 1997) (proposed *pro rata* distribution plan was "cost-effective, simple and fundamentally fair"); *In re Corrugated Container Antitrust Litig.*, 556 F. Supp. 1117, 1129 (S.D. Tex. 1982) (approval of class action settlement that provided for *pro rata* distribution based upon valid claims of allowable purchases), *aff'd*, 687 F.2d 52 (5th Cir.1982).

As the record of the proceedings before the Special Master demonstrates, the issue of whether to adopt a tiered plan of distribution was thoroughly considered before it was rejected. Report, Part I at ¶¶ 108 -113, 202 – 205, 255 – 261, 274, and Exhibits 19 – 23, 42 in the Appendix thereto.  The basic feature of the recommended plan here is that all class members are essentially treated equally, and the settlement proceeds divided *pro rata* based upon the quantity of DRAM purchased by each class member.[8]  This plan was arrived at through compromise and after a full consideration of "whether any weighted distribution plan would unduly complicate and prolong the

---

[8]   Small claimants may receive more than their strict *pro rata* share of the settlement pot because of the minimum refund amount of $10 and the ability to raise their claims up to single damages depending on claims experience.  For example, in *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 211, 213 (D. Me. 2003), the district court approved a settlement that paid all consumer claimants approximately $14.00.

settlement approval process and invite appeals in this litigation that is already more than nine years old," and exploration of the "concern that any weighted distribution plan may ultimately turn on subjective views as to the relative merits and relative importance of aspects of the totality of a class member's released claims, and spawn an ancillary round of litigation among class member objectors about who should get how much and on what basis."  Report, Part I at ¶ 259.  No objector has impugned the record or the findings of the Special Master as being insufficiently thorough, or the objective as being an inappropriate one for allocation plans.

The *pro rata* aspects of the plan of distribution for the Indirect Purchaser Settlement Class thus represent a fair, reasonable and adequate method of distributing the settlement proceeds, and the Special Master's findings of fact and conclusions of law recommending the plan should be finally adopted by this Court.

## IV.   THE PROPOSED *CY PRES* ASPECTS OF THE DISTRIBUTION ARE FAIR, REASONABLE AND ADEQUATE MEANS OF PROVIDING SETTLEMENT BENEFIT TO SMALL CLAIMANTS IN THE INDIRECT PURCHASER SETTLEMENT CLASS

There are two contingencies in the negotiated plan of distribution that, if they should occur, would trigger the need for this Court to approve a *cy pres* distribution of a portion of the settlement proceeds.  Since neither of these contingencies has yet occurred and, in the considered opinion of both counsel and the Special Master, neither may ever occur, this Court is not now being asked to approve any particular *cy pres* remedy.  All that the Court is being asked to approve at this point is the contingent framework under which a *cy pres* distribution might conceivably be necessary.

Several objectors complain that the mere existence of the *cy pres* contingency renders the plan of distribution unfair.  One objector also asserts that the contingent *cy pres* recipients must be designated before the plan of distribution can be approved.

### A.  The $50 Million Cap Contingency *Cy Pres* Distribution

One contingency that would trigger the need to formulate a *cy pres* distribution is if there are

12

more than five million claims received from "small claimants."  A small claimant is defined in the plan as any class member whose claim in an initial *pro rata* computation would yield a recovery of less than $10.00.  Contrary to the assertions of objectors, this cap was not selected as part of a nefarious secret plan to divert the Indirect Purchaser Settlement Class's money into the hands of third parties.  As the Special Master noted, a *cy pres* distribution will only occur if there is a number of consumer claims that no one realistically expects to reach.  Report, Part I, at ¶ 279.  Although the claims period is not scheduled to close until August 1, 2014, based on the number of claims received as of June 2, 2014, the chances of this *cy pres* provision being triggered is so remote, the objections to it are for all practical purposes moot.  Cooper Decl. at ¶ 13; Varanini Decl. at ¶ 13.

If any number of such claims under five million is received, the plan calls for each of these claimants to be paid a minimum $10.00 recovery.  In other words, if a claimant's "raw," *pro rata* recovery would be $4.72, that claimant's share of the fund will be raised to $10.00.  This raise was negotiated in recognition of the belief, based on counsels' prior experience, that having a set minimum recovery would encourage the filing of household consumer claims.  Encouraging the filing of such claims was important because these class members are numerically the largest set of victims and in the aggregate, paid a significant portion of the allegedly illegal overcharge.   Cooper Decl. ¶ 8; Varanini Decl. ¶ 8.  Based on the economic data, the parties negotiating the plan of distribution agreed to a $50 million cap on the portion of the settlement proceeds that would be used to compensate small claimants, and determined that if there were so many small claimants that raising each to $10.00 would exceed the allotted $50 million, an alternative *cy pres* distribution of $40 million would be made to those claims.  This was based on a belief that a *cy pres* distribution crafted properly would convey a benefit on small claimants equal to or greater than sending them checks that, depending upon the actual number of claims received, could be far less than $10.00 and might not even cover the cost to prepare and disburse them.  In exchange for setting the small claims recovery at $10, in the unlikely event that the *cy pres* provision would be triggered, it was

13

1  agreed that all claimants with recoveries larger than $10.00 would get the benefit of an additional

2  $10 million (the difference between the $40 million *cy pres* and the $50 million that potentially

3  could have gone to small claimants) that would remain in the pot and be paid out *pro rata* to larger

4  claimants.   Cooper Decl. ¶ 12; Varanini Decl. ¶ 12.

5

6        Most court approved plans of distribution have some floor for approved claims and do not

7  mail checks to class members whose *pro rata* share is below a specified minimum.  Report, Part I,

8  at ¶¶ 277-278, 281.  Generally, in those cases, the monies that would otherwise go to those small

9  claimants are redistributed to larger claimants.  Thus, in most cases there is no direct benefit going

10  to the small claimants, nor is there any attempt to distribute money in a way that conveys an

11  indirect benefit on this group.   Relying on these authorities, including the Third Circuit's *en banc*

12  decision in *Sullivan, supra*, 667 F.3d at 328, which rejected an attack on a plan which paid nothing

13  to claimants whose *pro rata* shares were below a $10.00 threshold, the Special Master concluded

14  that the provision of the plan of distribution that would eliminate cash payments to small claimants

15  in the event the $50 million cap was exceeded was fair and reasonable:

16        Here, the plan of distribution provides a mechanism for paying small claimants
17        and employs a procedure for eliminating *de minimis* refunds only in the event that
        there are more than 5 million small claimants (and the total of the minimum $10
18        payments would therefore exceed $50 million), an event which would require a
        robust claims experience above the norm experienced in most similar class
19        actions.  Accordingly, the Special Master finds that the provision for not making
        cash payments below $10 is fair and reasonable.  In addition, unlike the *de
20        minimis* claimants in *Sullivan*, the small claimants here will receive the benefit of
        a *cy pres* distribution in the amount of $40 million in addition to the injunctive
21        relief and "civic" benefits discussed by the Third Circuit.

22  Report, Part I, at ¶ 279.  *See also* cases cited at Report, Part I, at ¶¶ 277 – 278.  The fact that

23  something extra in the form of a *cy pres* distribution is being offered in the proposed plan does not

24  make that plan unfair or unreasonable.  In other words, if no direct benefit to small claimants is

25  acceptable, then providing them with an indirect benefit tailored to their interests by the designation

26  of appropriate *cy pres* recipients in compliance with Ninth Circuit authority and the California

27

28

                                    14

Attorney General's Office Guidelines[9] cannot be unacceptable.[10]  Report, Part I, at ¶¶ 290 - 292.

As noted above, in order for this contingency to be triggered, the claims experience in this litigation will have to be "above the norm experienced in most similar class actions."  Report, Part I, at ¶ 279.  Unlikely or not, the Special Master gave significant consideration to the efficacy of *cy pres* distributions in his Report.  Contrary to the objectors' view that *cy pres* distributions benefit only the *cy pres* recipients, the Special Master found, based on case authority and his own experience, that "distributions of *cy pres* relief using all or part of a settlement fund serves multiple goals:  it allows small claimants, usually consumers, to receive some relief when their individual claims would simply be too small to ensure a feasible distribution; it operates to punish and deter defendants who have engaged in illegal acts by preventing them from keeping ill-gotten gains under the guise that direct distribution back to individuals is not feasible; and it avoids problems with other forms of indirect relief."  Report, Part I, at ¶ 284 (citations omitted).

The Ninth Circuit has never suggested that *cy pres* distributions are fundamentally ineffective or disfavored as a matter of law.  Rather, as the Special Master found, the Ninth Circuit has "addressed the question of what kind of safeguards are necessary to ensure the fairness and adequacy of a distribution plan that proposes to distribute some or (as in [*Nachshin*]) all of the settlement proceeds *cy pres* for the indirect benefit of a settlement class."  *Id*. at ¶ 285, 291; *see also*

---

[9]   See, Declaration of Kathleen E. Foote, filed concurrently herewith, at ¶ 5.  Ms. Foote is a Senior Assistant Attorney General of the State of California.

[10]   Objectors Shannon Cashion, W. Christopher McDonough and Kelly Kress assert that "[s]ettlements involving payments to class members of under $10 per claim are not unusual, and have been supported in the past by courts."  "Objection to Class Action Settlement and Attorneys' Fees," filed May 5, 2014, Dkt. No. 2200, at 7 (hereinafter cited as "Cashion Objection at ___").  Although they provide no citations for these assertions, there may well be a case or cases in which the decision was made to issue checks for amounts less than $10.  That does not translate into the recommended plan here being unfair, unreasonable or inadequate.

  Objectors Palmer and Cook complain that the information that small claimants will not receive individual cash payments if more than five million such claims are received was "buried within other documents" and not featured prominently on the dramclaims.com website, and thus the notice was inadequate.  Palmer Objection at 4.  This information was clearly stated in the long form notice available to all class members. It is also discussed on the Frequently Asked Questions page and on the Calculate Claim page.

---

15

*e.g., Nachshin v. AOL, supra,* 663 F.3d 1034.  Further, in addition to the ability to craft a distribution that complies with Ninth Circuit authority, the Special Master found that the fact that the California Cartwright Act is the substantive law underlying at least one claim possessed by each member of the Indirect Purchaser Settlement Class adds additional support for the propriety of a possible *cy pres* remedy here.  *Id*. at ¶ 289.  The Special Master further discussed how California state courts, including the Supreme Court of California, and the California legislature have specifically endorsed *cy pres* distributions.  *Id*. at ¶¶ 289 – 290.  There is simply no basis for rejecting the Special Master's reasoned conclusions in favor of the objectors' unsupported views that *cy pres* distributions are universally unfair, disfavored and ineffectual as vehicles for conveying benefit to absent class members.[11]

## B.   The Residual Contingency *Cy Pres* Distribution

The other contingency that would trigger the need to formulate a *cy pres* distribution occurs if so few claims are received from small claimants that, even raising the recovery of each to the amount of the claimant's full estimated damages, there are not sufficient claims made to pay-out a total of at least $25 million to small claimants.  In that eventuality, the difference between the total of the actual payouts to small claimants and $25 million will be distributed *cy pres* for the benefit of small claimants.  This provision was negotiated to satisfy the interests of household consumers

---

[11]   In their zeal to condemn *cy pres* distributions, the objectors make broad claims for holding by other circuit courts that are not supported by a reading of the cited decisions themselves.  For example, nowhere in the Fifth Circuit's decision in *Klier v. Elf Atochem North America, Inc.*, 658 F.3d 468 (5th Cir. 2011), does the court even suggest, as objectors Hull, Campbell and Superoxygen claim, that "class representatives and class counsel breach their fiduciary duty to the class members when they provide money to third parties instead of the class."  Objection to Proposed Settlement, filed May 5, 2014, Dkt. No. 2198, at 3.  Neither does the Third Circuit's decision in *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013) support the conclusion, advanced by objector Marlow, that as a matter of law, regardless of the circumstances, "[c]y pres distributions are an inferior form of relief."  Marlow Objection at 16.  Rather, it confirms that the standard of economic infeasibility articulated in *Sullivan, supra*, upon which the Special Master relied here, applies to the approval of a *cy pres* distribution; suggests that great weight should be given to the parties agreement (as the Special Master did here); points out that there can be many reasons for a large *cy pres* distribution, including that checks may simply be too small to warrant class members taking the time to file claims, and in all such situations, class counsel should not be penalized for suggesting an alternative method of getting value to those class members.  *In re Baby Prods.*, 708 F.3d at 173, 178.  In sum, *In re Baby Prods.* confirms that if proper procedures are followed, a *cy pres* distribution can be a fair, reasonable, and adequate alternative to a direct distribution to claimants.

and ensure that they will receive at least $25 million in benefits, either in direct monetary distributions or in a combination of direct distributions and indirect *cy pres* benefits.

The only objector to specifically target this provision is Robert M. Balick, who simply asserts that "eligible funds . . . should be redistributed on a pro rata basis to the proper and pre-paid claimants instead of non-effected [sic] third parties."  Objection, filed March 11, 2014, Dkt. No. 2202.  However, courts have found that it can be more fair to the class as a whole to avoid such windfalls by capping individual settlement recoveries based on an estimate of actual injury and using the excess funds to provide an indirect benefit through a properly crafted *cy pres* distribution to claimant and non-claimant class members alike.  *See, e.g.*, *Rodriguez v. West Publ. Corp.*, 2007 U.S. Dist. LEXIS 74767, at *40 (C.D. Cal. Sept. 10, 2007), *affirmed in part and reversed on other grounds by Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ("The Court rejects the argument of certain Objectors that the possibility of a cap on individual recovery resulting in a *cy pres* award should defeat approval of the Settlement. Those provisions do not render the Settlement inadequate. The Maximum Payment was a heavily negotiated term of the Settlement. Because the Net Settlement Fund is to be distributed *pro rata* among the Class Members who make a valid claim, the Maximum Payment prevents a small group from receiving a multi-million dollar windfall. . . . The Maximum Payment does not create any benefit for Defendants, as they will not receive any money back if the Maximum Payment and *cy pres* award are implicated. In that event, this Court will determine the recipient of any *cy pres* award of the undistributed funds."); *In re NCO Fin. Sys.,* 2002 U.S. Dist. LEXIS 17602 at *24 (E.D. Pa. 2002) (approving a settlement distribution plan that provided that "[t]o the extent that claiming class members' checks are returned or remain uncashed for a period of 120 days after mailing, or each claiming class member receives the maximum share of $75.00 and there still remains a portion of the net settlement fund undistributed, NCO shall transmit to Lead/Liaison Counsel a check representing the remaining portion of the net settlement fund for a *cy pres* distribution"); *In re Music Compact Disc Minimum Advertised Price Litigation*, *supra,* 216 F.R.D. 197, 208-10 (district court approved a fixed

17

distribution that capped recovery at $25 per consumer).

As the Special Master concluded after reviewing the relevant law on *cy pres*, "the proposed plan of distribution here is grounded in the educated prediction that all or virtually all of the settlement proceeds will be paid out *pro rata* to class members based upon the extent of damages suffered, which all counsel recognize as the preferred option in damage claim class action settlements. [footnote omitted.]  Despite the preference for cash refunds to class members, however, a viable alternative does exist in which the settlement funds are distributed, in whole or in part, *cy pres* or through fluid recovery, to charitable and/or public institutions which are found by the court to convey an indirect benefit on members (frequently consumers) of the settlement class. *See, e.g., In re Toys-R-Us Antitrust Litig.*, 191 F.R.D. 347, 353-54 (S.D.N.Y. 2000); *In re Mexico Money Transfer Litigation*, 164 F.Supp.2d 1002, 1010-11 (N.D. Ill. 2000), *aff'd*, 264 F.3d 743 (7th Cir. 2001); *In re Microsoft I-V Cases*, 135 Cal. App. 4th 706, 716 (2006); *In re Vitamins Cases*, 107 Cal. App. 4th 820, 826, 830-32 (2003)."

## V.   IT IS NOT NECESSARY TO DETERMINE THE IDENTITY OF THE CONTINGENT *CY PRES* RECIPIENTS IN ORDER TO GRANT FINAL APPROVAL TO THE PLAN OF DISTRIBUTION OR THE SETTLEMENTS

Finally, two of the objectors raise the question of the proper designation of *cy pres* recipients under Ninth Circuit law even as three others acknowledge it is premature.[12]  The objectors who raise the issue, Palmer and Cook, disagree with the Special Master's conclusion that it would be difficult and wasteful to engage in the process of selecting *cy pres* recipients at this time, and assert that "failing to indicate the *Cy pres* recipient [now] renders a settlement 'unacceptably vague.' *Dennis*, 697 F.3d at 867."  Palmer Objection at 5.  They make two points in support of this objection.

---

[12]   Objectors Cashion, McDonough and Kress simply "request that this Court keep [the 9th Cir.] standards in mind if Class Counsel seeks to establish a *cy pres*," distribution. These objectors also request the right to brief the *cy pres* issue if and when it becomes ripe.  Cashion Objection at 6.

One is that a putative class member has "the right" to be given the identity of *cy pres* recipients before the opt-out date lest he remain in a class action which ultimately designates as a *cy pres* recipient an entity whose "ideological point of view he finds unacceptable." *Ibid*. Relying on *Woodley v. Maynard*, 430 U.S. 705 (1977), a First Amendment case dealing with the right of a New Hampshire couple to be free from criminal prosecution for covering up the motto "Live Free or Die" on their license plate, objectors Palmer and Cook assert that only the designation of the recipients before the opt-out date "preserves the right of absent class members to distance themselves from causes or institutions they would rather not support." *Id*. at 5-6. Objectors Palmer and Cook's second point is simply that the Ninth Circuit required the identification of *cy pres* recipients before settlement approval in *Dennis v. Kellogg Co*., 697 F.3d 858 (2012). Neither of these arguments has merit, let alone outweighs the significant impediments to and reasons for not undertaking the procedures necessary to now designate potential and contingent *cy pres* recipients, who, based on the claims experience, may well never be needed.

The question of whether it was required, necessary or prudent to designate the *cy pres* recipients who would be used in the event that either of the trigger contingencies discussed above should come to pass was considered fully by the Special Master. See, Report, Part I at ¶¶ 286 – 288. First, the Special Master considered whether the case cited by Palmer and Cook, *Dennis v. Kellogg, supra*, 697 F.3d 858, compelled the designation of contingent *cy pres* recipients as part of the settlement approval process. *Id*. at ¶ 286. The Special Master concluded that where, as here, the settlement consideration is cash,[13] and the *cy pres* distribution is contingent upon inchoate events, *Kellogg* does not require the designation of *cy pres* recipients at this stage of the proceedings. This conclusion is grounded in the Ninth Circuit's stated intention in *Kellogg* not to

---

[13]   Obviously, if the settlement consideration itself is the *cy pres* distribution of *product* as was the case in *Kellogg*, it is virtually impossible for the district court to determine the monetary equivalent value of the settlement without knowledge of the terms and conditions of the distribution, including the entity or entities through which the distribution is going to be made. *Dennis v. Kellogg, supra*, 697 F.3d at 863. Here, valuation of the *all-cash* settlement is easy. $310,720,000 United States dollars are worth $310,720,000 United States dollars.

overrule its previous holding in *Rodriguez v. West Publ'g Corp*., 563 F.3d 948 (9th Cir. 2009). Where a *cy pres* distribution is contingent on the outcome of the claims process for a cash distribution, issues regarding the identification of recipients "will not be ripe until it is determined that available cash remains in th[e] fund after the claims process has concluded."  Report, Part I, at ¶ 287.

The Special Master's conclusion that it was not necessary now to designate potential contingent *cy pres* recipients is buttressed by practical considerations that militate against such an exercise at this time.  As the Special Master noted, "Plaintiffs' counsel argued to the Special Master that the provision of the plan of distribution here to defer selection of *cy pres* recipients until it was established through the claims process that a *cy pres* distribution was necessary . . . served the best interests of the putative settlement class.  Identification of specific *cy pres* recipients at this time, they argued, would mean the expenditure of significant time and money—all of which would be potentially, or indeed likely, wasted.  Counsel for the State of California informed the Special Master that they had consulted a nationally recognized expert in *cy pres* distributions, who was of the opinion that, since it is impossible to know the extent of funds available for *cy pres* distribution until claims are received, any identification process that would take place at this time was likely to be so imprecise that it would have to be redone when and if the need for a *cy pres* distribution were established."  *Id*. at ¶ 288.  The Special Master's conclusions are supported by the Declarations of Kathleen E. Foote, a Senior Assistant Attorney General in California and Chief of the Antitrust Law Section, who has developed particular expertise in *cy pres* practices and procedures, and Harry M. Snyder, a lawyer with extensive experience in crafting and implementing *cy pres* distributions, filed concurrently with this memorandum.

Ms. Foote details her experience in *cy pres* distributions, including participation in generating guidelines for the selection of *cy pres* recipients adopted by the California Attorney General.  Foote Declaration at ¶¶ 1 – 6.  Based on this experience, Ms. Foote opines "that it is infeasible to determine that a particular *cy pres* distribution, even a hypothetical or contingent one,

will effectively serve the interests of the settlement class without knowing how much money is available for distribution and when it will become available.  This is because recipient non-profit and governmental organizations alter their priorities and services, and increase or decrease their staffing and other expenditures, from one year to the next in response to changing public needs and availability of funding from multiple sources; hence, a non-profit or governmental organization offering a program well-suited to meeting the nexus requirement this year may no longer do so two or three years hence." *Id.* at ¶ 7.

Based on his even more extensive experience in this area, Mr. Snyder details in his Declaration the procedures for choosing *cy pres* recipients that he believes are necessary to comply with the requirements of case law and fundamental fairness, and concludes that in order to implement these procedures, it is necessary to know both the "approximate amount of *cy pres* funds that will be available when distributed" and the "timeline for its distribution."  Snyder Declaration at ¶ 8.

As discussed above, the possibility that the $40 million *cy pres* distribution will be occasioned by the receipt of more than five million small claims is so remote that for all practical purposes it can be eliminated from the Court's consideration. This leaves the potential *cy pres* distribution under the recommended plan limited to an amount of money, as yet unknown, that would remain of the $25 million designated for the benefit of small claimants after all such claimants have been compensated to the full extent of their injury.  Clearly, it is not possible at this time to estimate with any degree of precision the approximate date on which the *cy pres* distribution would take place.  The claims period does not close until August and claims processing has just begun.  Even if one could estimate the length of time after the claims deadline that will be required for processing and auditing all of the claims received, the possibility that one or more of the objectors appeal the overruling of their objection(s) to the Ninth Circuit creates another impediment to knowing when a distribution will take place.  Accordingly, even leaving aside the expense of undertaking the process of designating *cy pres* recipients who may well never be

21

needed, Mr. Snyder concludes that "setting out a contingent *cy pres* distribution plan that identifies projects and recipients based on assumptions as to the size of the fund that may be available and the timeline for its distribution would violate best practices for *cy pres* grant making and distribution." *Id*. at ¶ 11.

Palmer and Cook's other argument is that their participation in a class action in which their money might go to support a *cy pres* recipient not of their liking would violate their First Amendment rights.[14]   The case on which they rely, *Woodley v. Maynard, supra,* 430 U.S. 705, is not even tangentially relevant to a class action or Attorney General settlement *cy pres* distribution. The Third Circuit in *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013) (emphasis added) recently rejected a similar due process challenge:

> Young contends that the settlement notice was inadequate because it did not identify the *cy pres* recipients who will receive excess settlement funds. [footnote omitted.]  His primary concern is that unnamed class members will not have the opportunity to object to the selection of the *cy pres* recipients, who are intended to serve as proxies for the class members' interests. While a valid concern, *failure to identify the cy pres recipients is not a due process violation*. Class members know there is a possibility of a *cy pres* award and that the Court will select among recipients proposed by the parties at a later date. This knowledge is adequate to allow any interested class member to keep apprised of the *cy pres* recipient selection process. We are confident the Court will ensure the parties make their proposals publicly available and will allow class members the opportunity to object before it makes a selection.

Palmer and Cook make the additional argument that without identifying *cy pres* recipients in the notice, putative class members cannot opt out if they disagree with the selection of the proposed recipients.   However, the controlling law in this area is the Ninth Circuit's holding in

---

[14]   It should be noted that if the claims received by all small claimants are too few (which as a practical matter is the only contingency in the proposed plan that might in fact be triggered), there will be no First Amendment problem insofar as these objectors are concerned because they will still receive a check, e.g., their own monies will not be distributed *cy pres*.  Even if the extremely unlikely were to occur and too many claims are received such that the other *cy pres* contingency were to be triggered, there still may not be a First Amendment problem insofar as these objectors are concerned if their own claims are large enough that their raw pro rata share of the fund is $10 or more.  In the event that the claims of the objectors are large enough, they will still receive a check such that the monies they would otherwise receive will not be distributed *cy pres*.

JOINT MOTION FOR FINAL APPROVAL OF PLANS OF DISTRIBUTION OF SETTLEMENT PROCEEDS AND
ADOPTION OF SPECIAL MASTER'S FINDINGS – CASE NO. M-02-1486-PJH

*Rodriguez v. West Publ'g Corp.*, *supra,* 563 F.3d at 966, that where the possibility of a *cy pres* distribution is contingent, a challenge to the *cy pres* implementation is not "ripe" for adjudication. Given that the contingencies involved are highly inchoate and uncertain, that challenge by objectors as third parties cannot be saved from lacking ripeness, and thus exceeding the Article III subject matter jurisdiction of the federal court, merely because they claim that the First Amendment is involved. *See, e.g., Kowalski v. Tesmer*, 543 U.S. 125, 131-34 (2004); *Warth v. Seldin*, 422 U.S. 490, 516 (1997).

Moreover, the objectors cite no case in which a *cy pres* remedy was viewed as some sort of compelled financing of speech by absent class members. As long as funds are disbursed in accordance with non-discriminatory and non-political procedural guidelines that ensure a broad dissemination of grants from the *cy pres* fund, a First Amendment challenge should fail as a matter of substance. This is especially true given that, by definition, this Court, Class Counsel and the Attorneys General all act in a fiduciary capacity on behalf of those absent class members in the selection process. Finally, if after the identity of the selected *cy pres* recipient(s) is published on appropriate websites, should a small claimant class member object to a recipient, this Court has the discretion to allow any such objector to opt-out of the Indirect Purchaser Settlement Class. This would certainly prevent any claimed First Amendment rights from being violated.[15]

## VI.  CONCLUSION

The plan of distribution for the Indirect Purchaser Settlement Class was negotiated under the auspices of the Special Master and then reviewed by him for compliance with the applicable legal principles. Following this review, the Special Master issued a comprehensive Report and

---

[15]  *Cf., e.g., Knox v. Service Employees Intern. Union, Local 1000*, 132 S. Ct. 2277, 2291 (2012) (noting that the facts of that case went beyond the facts of previous cases authorizing a union to undertake a general yearly assessment of fees even if some of their fees are to be used for political purposes so as long as union members could opt-out of authorizing that their fees be used for those purposes); *accord Davenport v. Washington Ed. Assn.*, 551 U.S. 177, 181, 185 (2007); *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 238 (1977).

Recommendations dealing with, *inter alia*, the provisions of the plan of distribution and the claims processing protocols developed to implement it.  Report, Part I, at ¶¶ 201 - 292, and Report, Part II, at ¶¶ 32 – 38, 49 - 51.  The objections that were raised to certain specific aspects of plan present no basis for this Court to reject the recommended plan.  Accordingly, Indirect Purchaser Plaintiffs' Co-Lead Counsel and the Attorneys General respectfully request this Court to: (1) grant final approval to the plan of distribution for the Indirect Purchaser Settlement Class, as well as final approval to the plans of distribution for the Government Purchaser Settlement Classes (to which no objection has been interposed); (2) grant final approval to the claims processing protocols for the Indirect Purchaser Settlement Class, (to which no objection has been interposed); and (3) confirm its adoption of the Special Master's findings of fact and conclusions of law as to the plans of distribution and claims processing protocols.

Dated: June 6, 2013                          COOPER & KIRKHAM, P.C.

                                             By: _/s/  Tracy R. Kirkham_____
                                                   Tracy R. Kirkham

                                             Josef D. Cooper (53015)
                                             Tracy R. Kirkham (69913)
                                             COOPER & KIRKHAM, P.C.
                                             357 Tehama Street, Second Floor
                                             San Francisco, CA 94103
                                             Telephone:  (415) 788-3030
                                             Facsimile:   (415) 882-7040
                                             trk@coopkirk.com

                                             Timothy D. Battin
                                             Christopher V. Le
                                             STRAUS & BOIES, LLP
                                             4041 University Drive
                                             Fifth Floor
                                             Fairfax, VA 22030
                                             Telephone: (703) 764-8700
                                             Facsimile: (703) 764-8704
                                             tbattin@straus-boies.com

                                             Daniel J. Mogin (95624)
                                             THE MOGIN LAW FIRM, P.C.
                                             707 Broadway
                                             Suite 1000
                                             San Diego, California 92101
                                             Telephone: (619) 687-6611

24

Facsimile:  (619) 687-6610
dan@moginlaw.com

Daniel E. Gustafson
Daniel C. Hedlund
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com

*Co-Lead Class Counsel for Indirect-Purchaser
Plaintiffs*

Francis O. Scarpulla (41059)
ZELLE, HOFMANN, VOELBEL, MASON &
GETTE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:  (415) 693-0700
Facsimile:  (415) 693-0770
fscarpulla@zelle.com

*Liaison Counsel, Indirect Purchaser Plaintiffs*

Terry Gross (103878)
GROSS BELSKY ALONSO LLP
One Sansome Street, Suite 3670
San Francisco, California 94104
Telephone:     (415) 544-0200
Facsimile:     (415) 544-0201
terry@gba-law.com

*Chair, Indirect Purchaser Plaintiffs' Executive
Committee*

Dated: June 6, 2013

KAMALA D. HARRIS
Attorney General of California

By: */s/  Emilio E. Varanini*
          Emilio E. Varanini

Kathleen Foote
Emilio E. Varanini
Deputy Attorney General
Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-3664

*Attorneys for the State of California as Liaison
Counsel On Behalf of All Attorneys General*

25

JOINT MOTION FOR FINAL APPROVAL OF PLANS OF DISTRIBUTION OF SETTLEMENT PROCEEDS AND
ADOPTION OF SPECIAL MASTER'S FINDINGS – CASE NO. M-02-1486-PJH

1
2
### **ATTESTATION**

3     Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that I have obtained concurrence in the

4 service and filing of this document with electronic signatures from all counsel of the parties listed

5 above.

6

7 Dated:    June 6, 2013                               */s/ Tracy R. Kirkham*
8                                                         Tracy R. Kirkham

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JOINT MOTION FOR FINAL APPROVAL OF PLANS OF DISTRIBUTION OF SETTLEMENT PROCEEDS AND
ADOPTION OF SPECIAL MASTER'S FINDINGS – CASE NO. M-02-1486-PJH